## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STAES OF AMERICA, *ex rel.* | ) | |
| GEOFFREY HOWARD AND | ) | |
| ZELLA HEMPHILL, | ) | |
| | ) | **Case No. 4:11-cv-04022** |
| **Plaintiffs,** | ) | |
| v. | ) | |
| | ) | |
| KBR, INC. AND KELLOGG BROWN & | ) | |
| ROOT SERVICES, INC., | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Now before the Court is KBR, Inc. and Kellogg Brown & Root Services, Inc.'s (collectively referred to as "KBR" or "Defendants")[1] Motion to Dismiss (ECF No. 38) filed pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, KBR's Motion to Dismiss (ECF No. 38) is DENIED.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as the claims asserted in the Complaint present federal questions under the False Claims Act ("FCA") as amended 31 U.S.C. § 3729, et seq.  This court has jurisdiction over KBR pursuant to 31 U.S.C. 3732(a) because KBR can be found in and transacts the business that is the subject matter of this lawsuit in the Central District of Illinois.

## PROCEDURAL HISTORY

On March 22, 2011, the Relators filed a one-count sealed Complaint alleging violations of the FCA, 31 U.S.S. §§ 3729-33, as amended.  (ECF No. 1).  The Complaint was filed under

---

[1] The Complaint refers to KBR, Inc., Kellogg Brown & Root, Inc., Brown & Root Services, Inc., and Kellogg Brown & Root Services, Inc., collectively as "KBR" or "Defendants."  (ECF No. 1 at 6).

seal to allow the Government time to conduct its own investigation to determine whether to join

the action. *Id.* at 3. After filing several Motions for Extension of Time to Consider Election to

Intervene, on October 7, 2014, the Government filed its Notice of Election to Decline to

Intervene. (ECF No. 25). On October 9, 2014, the Complaint, the Government's Notice of

Election to Decline to Intervene, and ECF No. 26 were unsealed. (ECF No. 26). On March 30,

2015, KBR filed its Motion to Dismiss for Failure to State a Claim. (ECF No. 38). On May 14,

2015, the Relators filed their Memorandum in Opposition to the Motion to Dismiss. (ECF No.

42). On May 29, 2015, KBR filed its Reply to the Relators' Opposition to the Motion to

Dismiss. (ECF No. 44). On June 15, 2015, the Relators filed their Sur-Reply in Opposition to

KBR's Motion to Dismiss. (ECF No. 46). On September 15, 2015, oral argument on the Motion

to Dismiss was held. (Minute Entry Dated 9/15/15; ECF No. 49).

## **STANDARD OF REVIEW**

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper if a complaint fails to

state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a motion to

dismiss, a complaint must contain sufficient factual matter which, when accepted as true, states a

claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged. *Id.* (Citing *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff's claim must "give enough

details about the subject matter of the case to present a story that holds together," to be plausible.

*Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010). A court must draw all inferences

in favor of the non-moving party, and must accept as true all factual allegations in the complaint.

*Bontkowski v. First Nat'l Bank of Cicero,* 998 F.2d 459, 461 (7th Cir. 1993); *Ashcroft*, 556 U.S.

at 678. However, the Court need not accept as true the complaint's legal conclusions; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (Citing *Bell Atlantic Corp.,* 550 U.S. at 555). The Court may consider "documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice," in addition to documents that are cited to and attached by plaintiffs. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

Statements in the complaint must be sufficient to provide the defendant with "fair notice" of the claim and its basis. *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 622 (7th Cir. 2012). This means that (1) "the complaint must describe the claim in sufficient detail to give the defendant 'fair notice of what the . . . claim is and the grounds upon which it rests'" and (2) its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a "speculative level." *EEOC v. Concentra Health Services, Inc.,* 496 F.3d 773, 776 (7th Cir. 2007). Because the "FCA is an anti-fraud statute," FCA claims "are subject to the heightened pleading requirements" of Federal Rule of Civil Procedure 9(b). *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005). This rule requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, the "conditions of a person's mind may be alleged generally." *Id*. Therefore, "[t]he complaint must state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the [Government]." *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc*., 772 F.3d 1102, 1106 (7th Cir. 2014).

## **FACTUAL BACKGROUND**

#### A. Parties

The United States of America, the real party in interest in this case, entered into the Logistics Civil Augmentation Program ("LOGCAP") III contract and various task orders thereunder with KBR. (ECF No. 1 at 4). The United States Army Field Support Command, located in Rock Island, Illinois, awarded and issued the LOGCAP III prime contract. *Id.* The United States Army Field Support Command and its successor, the United States Army Sustainment Command, also located in Rock Island, bear or bore responsibility for administering LOGCAP III, defined the United States' needs under LOGCAP III, and issued task orders pursuant to LOGCAP III. *Id.*

Relator Geoffrey Howard ("Relator Howard") is a former employee of Service Employees International, Inc. ("SEII"), which is entirely owned by KBR through two subsidiaries. *Id.* at 4. Relator Howard joined the LOGCAP project on July 19, 2007, as a data and system analyst. *Id.* Relator Howard's first assignment was to work as a Desktop Analyst for KBR's IT Department at the Al-Asad Airbase in Iraq, known as B-1 within KBR. *Id.* Relator Howard then relocated to KBR site B-9, at Habbaniyah Airbase, where he remained until March 2008. *Id.* at 4-5. Relator Howard's job was to work as an IT technician and to help implement KBR's new property management system. *Id.* at 5. Relator Howard was later transferred to a position with KBR's Support Office in Kuwait ("KSO") on March 16, 2008, where he prepared reports on KBR's materials usage. *Id.* During this assignment, the Relators allege Relator Howard discovered hundreds of millions of dollars in idle Government property. *Id.* Due to pressure from KBR, resulting from his complaints about excessive ordering and underutilization of Government property under the LOGCAP III contract, the Relators allege Relator Howard

resigned on August 2, 2009.  *Id.*  Relator Howard currently resides in Langenberg, Germany.  *Id.*

Relator Zella Hemphill ("Relator Hemphill") is an employee of SEII.  *Id.*  Relator Hemphill joined KBR as a LOGCAP III recruiter in its Human Resources Department in 2004. *Id.*  On July 27, 2005, Relator Hemphill was deployed to the LOGCAP III project to work as an Administrative Specialist in Baghdad, Iraq.  *Id.*  Relator Hemphill was subsequently transferred to Tikrit, Iraq, and Kirkuk, Iraq, to manage KBR's Government property.  *Id.*  During this assignment, the Relators allege Relator Hemphill discovered large problems in how KBR was ordering, using, and accounting for Government property.  *Id.*  In May 2008, Relator Hemphill was transferred to KBR's newly-created Distribution Management Center ("DMC") in KBR's KSO and promoted there to Senior Materials Control Specialist one month later.  *Id.*  Relator Hemphill's job at the DMC was to facilitate usage of KBR's excess Government property by matching internal demand for materials with available supplies in KBR storerooms, a process known as cross-leveling.  *Id.*  Relator Hemphill worked closely with Relator Howard to increase KBR's cross-leveling and correspondingly decrease duplicative purchasing.  *Id.*  Relator Hemphill is a resident of Houston, Texas.  *Id.*

Defendant KBR, Inc. is a global engineering and construction company incorporated in Delaware with its corporate headquarters in Houston, Texas.  *Id.* at 6.  Defendant Kellogg Brown & Root Services, Inc. is a Delaware corporation with its principal place of business located in Houston, Texas.  *Id.*  Defendant Kellogg Brown & Root Services, Inc. is a wholly owned subsidiary of KBR, Inc. and assumed responsibilities for the LOGAP III contract.  *Id.*  Prior to 2005, KBR, Inc. was known as Kellogg Brown & Root, Inc., a wholly owned subsidiary of Halliburton Company.  *Id.*  In April 2007, KBR became an independent company.  *Id.* at 7.

**B.  Background**

In 1985, the Government initiated LOGCAP, a United States Army initiative for the use of civilian contractors to provide combat support and combat service support to armed forces in wartime and other contingencies.  *Id.* at 7.  Since its initiation, LOGCAP has grown exponentially as the Government has relied increasingly on private contractors to support the military missions in Iraq and elsewhere.  *Id.*  From 1992 to 2007 the LOGCAP prime contract increased from $2 billion to $23 billion.  *Id.*  The first LOGCAP prime contract, LOGCAP I, was awarded to KBR in 1992; LOGCAP II, to DynCorp in 1997; and LOGCAP III, to KBR in 2001. *Id.* at 8.

The contracting agency for LOGCAP is the United States Army Sustainment Command located in Rock Island, Illinois.  *Id.*  Once the prime LOGCAP contract has been awarded, all work to be performed under the contract is awarded by individual task orders that specify a particular Statement of Work and period of performance.  *Id.*  The services provided under the LOGCAP program include supply operations such as the delivery of food, water, fuel, spare parts, and other operations; field operations, such as dining and laundry facilities, housing, sanitation, waste management, postal services, and morale, welfare, and recreation activities.  *Id.* Other operations under the LOGCAP program include engineering and construction, support to communication networks, transportation and cargo services, and facilities maintenance and repair.  *Id.*

On December 14, 2001, LOGCAP III was awarded to Brown & Root Services, Inc., a subsidiary of Kellogg Brown & Root.  *Id.* at 6, 8.  Brown & Root Services later transferred its responsibilities under the LOGCAP III contract to Defendant Kellogg Brown & Root Services, Inc.  *Id.* at 6.  LOGCAP III was a performance based cost plus award fee contract that provided for KBR to be paid as profit 1% of its costs plus up to an additional 2% for good performance

based on a detailed set of performance criteria.  *Id.* at 8.  The Relators allege KBR's profit under LOGCAP III increased the more its cost increased with no specified cap.  *Id.* at 9.

LOGCAP III initially was designed to last up to 10 years; however KBR's performance under the contract was subject to intense criticism on multiple fronts.  *Id.*  Beginning in 2004, the Special Inspector for Iraq Reconstruction and other audit agencies found multiple deficiencies by KBR across a wide spectrum of responsibilities under LOGCAP III.  *Id.* Various governmental audits, including a United States Government Accountability Office report issued in April 2005, turned up more than $1 billion in questionable costs.  *Id*.  The Army eventually terminated LOGCAP III early and awarded LOGCAP IV in 2007 to three prime contractors, Fluor, DynCorp, and KBR, who compete for task orders under the contract.  *Id.* KBR did not earn a LOGCAP IV task order until February 27, 2010, and it remains the only LOGCAP prime contractor for Iraq.  *Id*.

### C.  Regulatory Oversight of LOGCAP III

The Relators allege that as a United States Army contract, LOGCAP is subject to the Federal Acquisition Regulations ("FAR") and the Defense supplement to the FAR ("DFAR"). *Id.*  The Relators allege that by its express terms, KBR's performance under LOGCAP was required to comply with a wide range of terms, provisions, and representations set out in the industry standards, Army regulations and programs, and KBR documents among other sources. *Id.* at 10.  The Relators allege that by the terms of the contract these various "clauses and provisions have the same force and effect as if the entire full text was included in the solicitation/contract."  *Id.*  LOGCAP III was awarded on the basis of an offer made by KBR 15 days after the attacks of September 11, 2001, and the Relators allege the award expressly stated it was "based upon the representations, resources and quality of performance proposed."  *Id.*

Among other regulatory provisions, the Relators allege LOGCAP III incorporated FAR § 45.5, which at the time specified KBR was responsible and accountable for the Government property[2] in its possession, and required it to establish and maintain a system to "control, protect, and maintain" all such property.   *Id.*   The Relators allege FAR § 45.5 also made KBR "responsible for the proper care, maintenance, and use of Government property in its possession or control from the time of receipt until properly relieved of responsibility, in accordance with sound industrial practice and the terms of the contract."   *Id.* at 10-11.   (citing 48 C.F.R. § 45.509).   In accordance with this responsibility, the Relators allege KBR was required to promulgate and follow written procedures adequate for assuring that Government property would "be used only for those purposes authorized in the contract."   *Id.* at 11.

**D.  KBR's Control Procedure for Government Property**

In accordance with LOGCAP III KBR developed LOGCAP Government Property Control Procedures ("PCP").   *Id.* at 11.   Each revision of the PCP was submitted to the Defense Contract Management Agency ("DCMA") by KBR for approval.   *Id.*   DCMA approved a KBR PCP on July 15, 2008, under 48 C.F.R. § 45.104(b), which allows the Government to revoke its assumption of risk for "loss, theft, damage or destruction" of Government property if the contractor's property management procedures are inadequate.   *Id.*   The PCP covers "all facets of property control, from requisition through disposition of all [G]overnment property in the possession of KBR."   *Id.*   The Relators allege that according to KBR, the PCP "ensure[s] [G]overnment property is protected, controlled, reserved, and maintained in accordance with the FAR and the terms of the contract."   *Id.*

The Relators allege PCP, Tab A, ¶5.1.1 provides KBR must order Government property–

---

[2] Government property refers to property the Government furnishes to KBR and property KBR acquires under LOGCAP III.  (ECF No. 1 at 10).

whether furnished by the Government or acquired by KBR— in "[r]easonable quantities, commensurate with the work to be accomplished." *Id.* The Relators allege the quantities of material that KBR uses or otherwise consumes must likewise be "reasonable when compared to the work/job at hand and Material Requisitions." *Id.* The Relators allege KBR must use Government property only for performing the LOGCAP III contract and may dispose of Government property only by screening the items against current and anticipated needs. *Id.* The Relators allege KBR is required to promptly report excess items and to dispose of such items only after receiving governmental approval. *Id.* at 11-12.

KBR supplements the PCP with Desktop Operating Procedures ("DOP") and Technical Derivatives ("TD") to promulgate property management policies and procedures not otherwise provided for in the PCP. *Id.* at 12. Unlike the PCP, KBR does not submit its DOP's or TD's to the Government. *Id.* The procedures provided by the PCP state KBR requisitions of Government property must be contractually authorized, necessary for performance of the LOGCAP III contract, and only be in the quantities that are needed for the specific performance. *Id.* The Relators allege that when requesting property, KBR employees are required to prepare a Material Requisition request form ("MR") and forward it to KBR's Material Control office. *Id*. The Material Control office is then responsible for attempting to fill the request internally before ordering additional property. *Id*. Filling an MR with materials available in the local warehouse is known as "transfer," and the process of screening MR's for suitable property available elsewhere within KBR is known as "cross-utilization" or "cross-leveling." *Id.* at 13.

The Relators allege cross-leveling is mandatory and necessary to prevent KBR from buying excess amounts of property. *Id.* The Relators allege KBR is required to use the property in its possession that the Government has already paid for, whether locally or theater-wide,

before it purchases more of the same property. *Id.* KBR supplements the PCP's cross-leveling procedures with a DOP for the Distribution of Government Property ("DGP"). *Id.* Under the DOP, the Relators allege KBR's DMC is responsible for screening all procurement requests for possible cross-leveling. *Id.* The Relators allege KBR's policy is that cross-level requests must be filled for all lines of inventory that are above a safety stock level. *Id.* The Relators allege inventory that does not have a safety stock level, such as excess materials, must be "entirely available" for cross-leveling. *Id.* The Relators allege sites are required to fill all valid cross-leveling requests from the DMC. *Id.*

In screening procurement requests "for availability within theater prior to purchase," the Relators allege the DMC must cross-level materials in the following order: (1) from redistributable storerooms, such as those holding excess materials; (2) from underutilized stock; and (3) from stock, provided the item is above the safety stock level. *Id.* at 13-14. The DOP further states cross-leveling "should not only be used when tasked by the DMC. If a site foresees a need for an item(s), it is contractually obligated to attempt to obtain the items through cross-utilization within its project (group of sites)." *Id.* at 14. Thus, the Relators allege through this provision and others, KBR concedes its contract requires cross-leveling before buying or disposing of Government property. *Id.*

The PCP includes procedures for ensuring "proper consumption, maximum utilization, and required maintenance of Government property in accordance with contractual requirements." *Id.* KBR must use Government property for its authorized purpose. *Id.* KBR departments designate Property Custodians to control and protect the Government property that is issued. *Id.* The Custodians' duties include reporting losses and conducting and reconciling physical inventories. *Id.*

Whenever excess property is discovered, the Relators allege KBR is required to turn it in to Material Control, which then reports "all idle property" to the relevant KBR Project Administrator.  *Id.*  "Idle property no longer required to support the contract will be declared excess," and will be stored pending disposition instructions from a DCMA Plant Clearance Officer or Contracting Officer.  *Id.*  The Relators allege KBR must maintain the Government property in its possession, in accordance with the LOGCAP III contract, "sound industrial practices," the equipment's technical manuals, and local maintenance procedures.  *Id.* at 14.

The Relators allege KBR is also required to keep reasonable stock levels in its warehouses, and Government property must be consumed in reasonable relation to contract requirements.  *Id.* at 15.  KBR warehouses must maintain on-hand stocks "in reasonable quantities to support contractual requirements and in accordance with specific project policies or replenishment lead time.  Stock levels will be based on equipment density, population to be supported, recurring demands or the history of a previous project with like property."  *Id.*  In maintaining stock levels, the Relators allege KBR must return to its warehouses any Government property it has taken out of inventory, but not used, such as materials intended for specific projects or specially reserved in Administrative Change Letters, which are DCMA directives authorizing the contractor to perform additional work under the contract.  *Id.*  The Relators allege the return must occur within a reasonable time after KBR completes the relevant work or has made no demand for the property.  *Id.*  The purpose of the requirement is to ensure that materials KBR reserves for a specific purpose are made available for other projects as soon as they are no longer needed, and to prevent KBR from ordering materials it already has available. *Id.*

KBR's policies for managing inventory under the PCP are set forth in its LOGCAP III

Materials Stock Plan DOP.  *Id.*  In accordance with industry standards, KBR classifies the property in its possession as either stock ("STK"), special order items ("SP"), or non-stock ("NS").  *Id.*  STK is material with recurring demand, and is re-ordered based on the number of those demands.  *Id.*  SP items are property with a non-recurring demand and no expectation of future demand, such as items ordered for a specific project.  *Id.*  SP is also the default classification for all items added to a storeroom.  *Id.* at 16.

NS items are those without demand, and is used until depleted and is not reordered.  *Id.*  The primary difference between NS items and SP items is that NS items are redistributable to other KBR sites, while SP items are reserved for the project for which they were requisitioned.  *Id.*  Because there is little difference between unused SP items and NS items, KBR requires "strong justification" for maintaining items as SP when they do not meet demand criteria, even though they were classified SP by default when they entered the warehouse.  *Id.*  Basically, an item must have a known, upcoming need to continue to be classified as SP.  *Id.*

KBR classifies materials on a site-by-site basis, and items are classified based on the number of demands for them.  *Id.*  An item that is requested nine times during a 360-day period may be classified as STK and added to the Authorized Stock List ("ASL"), which is the list of property KBR keeps in stock.  *Id.*  Items remain on the ASL so long as they have at least three demands in a 360-day period.  *Id.*  But, when ASL items have fewer than three demands, but more than zero, they are reclassified as SP and removed from the ASL.  *Id.*

Stock items are reordered as they are consumed, and all STK item lines on the ASL are calculated by KBR on a reorder point and a safety stock level based on historical usage data.  *Id.* at 17.  The reorder point is the minimum level of an item in inventory.  *Id.*  The safety stock level is a safety margin calculated to allow warehouses to continue to operate in the event of supply

disruptions. *Id.* When a line of STK inventory decreases to the reorder point KBR places a requisition order for the item, and the requisition order replenishes the STK line to the maximum allowed to be kept in inventory. *Id.* SP items, KBR's default classification for all items added to a storeroom, have no reorder point or safety stock level, and KBR will only change the classification of an item from SP to STK when it has been requested nine times or more. *Id.* Even then, KBR's ASL Review Board must approve the reclassification by determining that the item has "legitimate ongoing requirements" that justify its presence on the ASL. *Id.*

KBR must conduct physical inventories of the Government property in its possession, and this must be done at least once a year. *Id.* After each inventory, the count on the inventory record is compared to the balance on the corresponding property record, which is a record KBR keeps in Maximo[3] for all Government property in its possession, accounting for the property from requisition to disposition. *Id.* KBR must record any unresolved discrepancies between the inventory count and its property records in an Inventory Adjustment Report[4] ("IAR"). *Id.* at 17-18. KBR then reports the IAR and the overall inventory results to DCMA. *Id.* at 18. KBR must identify the discrepancies it found during the inventory and submit a complete list of Government property in its possession. *Id.* The Relators allege KBR is therefore contractually obligated to report missing Government property, "mystery" Government property, all unaccounted for Government property, and Government property it counted in inventory that was "not in use nor needed by KBR" to the DCMA annually, at minimum. *Id.* The Relators allege KBR's contract also requires it to report excess materials to the Government at the conclusion of every physical inventory. *Id.*

---

[3] See page 15 of this Order for more about Maximo.
[4] IAR's are a record of the adjustments KBR makes to reconcile its property records with its physical inventory, and must be signed by a KBR Materials Manager and Property Manager, who certify that the adjustments are necessary. *Id.* at 18.

The Relators allege KBR has procedures for requesting disposition instructions from the Government for Government property that it identifies as "excess, obsolete, uneconomically repairable, or otherwise unusable." *Id.* The Relators allege the PCP requires KBR to report excess and unusable materials to the Government by submitting an inventory schedule in accordance with FAR § 45.6. *Id.* Once KBR has submitted a disposition request, the Relators allege the Government will issue instructions for getting rid of the property. *Id.* The Relators allege KBR then turns this documentation over to Material Control who then verifies whether the property is serviceable, and whether it can be used elsewhere on LOGCAP III. *Id.* at 18-19. If Material Control concurs after its review that the property is serviceable and excess, it submits a disposition request to KBR's Houston Support Office for transmittal to the Government via the Government's automated screening system, the Plant Clearance Automated Reutilization Screening System ("PCARSS"). *Id.* at 19.

PCARSS is an online system the Government uses to screen and dispose of its excess property. *Id.* Contractors submit schedules of excess inventory through PCARSS and the Government uses it to review the schedules and in deciding whether to accept or reject them. *Id.* KBR submits schedules to the Government through PCARSS on Standard Form 1428, which is also known as an Inventory Disposal Schedule ("IDS"). *Id.* The IDS lists the property KBR wants to relinquish, including the property's location(s), condition code, quantity, and total acquisition cost. *Id.* KBR must also indicate whether the property was furnished by the Government or acquired by KBR. *Id.* KBR must sign and date the IDS. *Id.*

Prior to 2004, Form 1428 included the contractor's certification that the schedule "does not include any items reasonably usable, without loss to the Contractor, on its work" and that the contractor would notify the Government of any change in the property's status prior to its final

disposition. *Id.* In 2004 and afterwards, KBR made its certifications on a form memorandum attached to the Form 1428's. *Id.* The memorandum was titled "Request for Disposition," and states:

> KBR request [sic] disposition instructions for the attached listed property. It has been determined that this equipment is excess serviceable items to the contract and there is no further use for the property in support of the mission requirements. The attached lists of item(s) have been screened for cross level requirements throughout the theater of operation. The items have been screened and verified there are no foreseeable requirements in support of the current mission at this time.

*Id.*

The Relators allege KBR is obligated to transfer or cross-level Government property before it submits the property to the Government for disposition. *Id.* at 20. Prior to disposition, the Relators allege KBR must take four steps: (1) screen the items against KBR's project-wide needs; (2) report excess items to its Houston Support Office for transmittal to the Government via PCARSS; (3) receive Government authority for disposition; and (4) remove the item's identification as Government property. *Id.* If KBR submits Government property to the Government for disposition and subsequently discovers the property is "usable on other work without financial loss," the Relators allege it must immediately notify the Government and request continued use of the property. *Id.*

KBR implements the PCP and DOP's through an automated property management system that is responsible for managing KBR's Government property in all respects. *Id.* The system identifies when KBR needs to procure an item, when it needs to cross-level an item, and when it needs to dispose of an item. *Id.* Since 2007, KBR has used IBM's Maximo software to manage Government property under LOGCAP. *Id.* Maximo is a universal interface for procurements, services, and work orders, allowing KBR to track Government property from its

acquisition to its delivery and usage. *Id.* When Relator Howard was employed by SEII and joined LOGCAP his job was to help KBR implement Maximo. *Id.* at 21. Before Maximo was implemented KBR had no universal system for tracking materials on the ground. *Id.* As a result, each KBR site maintained its own property management system and each KBR unit operated in isolation. *Id.* The Relators allege KBR's fragmented property management systems caused staggering amounts of waste. *Id.*

For example, the Relators allege soon after the release of the ASL Report in December 2008 Relator Howard found that 33% of the stock in KBR's "A-site" storerooms had never been issued, meaning KBR had bought the items and never used them. *Id.* The Relators allege this idle property was worth $20.5 million. *Id.* The Relators allege this mismanagement of governmental property violated the PCP that KBR had in effect at the time because the PCP required KBR to screen all procurement requests for possible cross-leveling. *Id.* With no common system, the Relators allege KBR sites had no way to know if other sites had the item they needed and, if so, whether or not the item was available. *Id.* at 21-22.

In 2007, Maximo was implemented in response to Government auditor's noticing KBR's inadequate property management systems. *Id.* at 22. Even after Maximo was implemented, a DCMA audit found continued use of a legacy system instead of Maximo. *Id.* On March 16, 2008, Relator Howard began a job with KBR's Support Office in Kuwait in which he created an automated inventory reporting system for Maximo. *Id.* In this position Relator Howard programmed several reports, many of which he designed to monitor KBR's compliance with the PCP and DOP. *Id.* The Relators allege Relator Howard began writing the most important of these reports on June 4, 2008, the ASL Report. *Id.* The ASL Report used the data KBR now stored in Maximo to report the amount of stock, special order, and non-stock items in KBR's

warehouses, and whether KBR's utilization of those materials justified their classifications.  *Id.* at 22-23.  In preparing the ASL Report, Relator Howard worked with KBR's DMC in Kuwait. *Id.*  The DMC is responsible for cross-leveling purchase requests against KBR's current inventory to see whether the requests could be filled internally, and it had been largely unable to perform this task because of KBR's automated systems for managing materials.  *Id.* at 23.  The DMC expected the ASL Report to enable it to cross-level materials functionally for the first time. *Id.*

The Relators allege it was during the development of the ASL Report that Relator Howard and DMC staff learned the extent of KBR's wasteful purchases.  *Id.*  The Report showed KBR warehouses held hundreds of thousands of inventory lines that KBR was either underutilizing[5] or not using at all.  *Id.*  As Relator Howard developed the ASL Report in the summer and fall of 2008, he discovered that the value of KBR's underutilized and zero-utilized[6] materials ran into the hundreds of millions of dollars.  *Id.*  The first KBR employees to review this ASL Report were Relator Howard, Relator Hemphill, and Brandon Simmons, who at the time was Relator Hemphill's manager at the DMC    *Id.*  In Relator Hemphill's position as a Senior Materials Control Specialist she was responsible for cross-leveling materials requisition requests since June 2008 and she had seen that KBR warehouse managers were ordering materials that they already had in their warehouses, or that were readily available nearby.  *Id.* The Relators allege these managers were hostile to Relator Hemphill's cross-leveling requests and routinely refused to transfer property to other KBR sites.  *Id.*  The Relators allege the ASL Report confirmed the practices Relator Hemphill was observing.  *Id.*

The Relators allege they reported the ASL Report findings to KBR management, but

---

[5] Underutilization occurs when an item's stock level exceeds its utilization in the past 360 days.  (ECF No. 1 at 23).
[6] Zero utilization occurs when KBR stocks an item that it did not use at all in the previous 360 days.  *Id.*

KBR did not address the problem or tell the Government about it.  *Id.* at 24.  The Relators allege KBR had a strong incentive to keep buying materials under LOGCAP's cost-plus payment model because KBR senior management regarded new purchases as revenue and profit.  *Id.*  The Relators also allege many of KBR's low-level warehouse managers preferred to order new items simply because it was easier than cross-leveling.  *Id.*  The Relators allege the techniques KBR used to purchase excess materials corrupted every step of its property management, from requisition to disposition.  *Id.*  The Relators allege the practices enabled excessive ordering by allowing storerooms to order materials they already had available on hand and they prevented materials from being cross-leveled by other KBR storerooms.  *Id.*

**E.  KBR's Failure to Transfer or Cross-Level Materials**

The Relators allege KBR has knowingly bought hundreds of millions of dollars' worth of excess materials by not filling orders from materials it has available on hand.  *Id.*  For instance, the Relators allege that in a Materials Control Technical Directive dated March 13, 2010, Rich Kaye, KBR's Deputy Program Manager, stated KBR was submitting 35% of its materials requisitions without screening them for sources currently available in KBR:

> The use of Material Control (MATCON) status in Maximo is being bypassed 35% of the time.  When MATCON is bypassed, requisitions move directly from Awaiting Approval (WAPPR) to Approved (APPR) without giving the Distribution Management Center (DMC) the opportunity to screen for asset availability and to cross-level stocks within the Iraq Joint Operations Area (IJOA).  Bypassing MATCON potentially results in purchasing property and material items that are excess elsewhere in the IJOA.

*Id.* at 24-25; (ECF No. 1-9 at 1).  The Directive further noted KBR authorized personnel to bypass cross-leveling and revoked that approval.  (ECF No. 1 at 25).  The Relators allege the ability to bypass cross-leveling had always been a violation of KBR's PCP.  *Id.*  The reason, as Mr. Kaye had himself explained to a KBR employee ten days earlier, is that if a KBR site "has

an item(s) that can fill a MR . . . and you are the only place it can come from . . . and we don't

cross-level it, we're going to create a PO (and expend $$) for items that [we] have on hand . . .

To have something on hand and  to not use it in lieu of purchasing more is a recipe for the

DCAA to find fault with us and collect back what we paid for the item . . . ." *Id.*; *See* (ECF No.

1-10 at 1).

The Relators allege KBR and Mr. Kaye had long known the company was not cross-

leveling before it bought materials.  (ECF No. 1 at 25).  The Relators allege that at every stage of

the inventory process, KBR's processes for managing Government property were designed to

submit orders for materials KBR already possessed.  *Id.* The Relators allege these flawed

processes include: (1) the failure to receive materials into its warehouses properly, in which

improperly-received materials are stored in the warehouses but left unavailable to other users,

who have to fill their order elsewhere (often, the materials are simply forgotten as soon as they

arrive); and (2) for property that is received into a storeroom, improper reservation of the

property for an invalid purpose, such as a work order that does not exist or that no longer needs

the property.  *Id.*   The Relators allege that because reserved property is unavailable for other

projects, the property sits unused in the warehouse while KBR purchases identical items with

every new work order.  *Id.*

The Relators allege KBR's practice for receiving new inventory has caused hundreds of

millions of dollars of waste in addition to needless purchases.  *Id.*   Under the PCP, Government

property must be received in accordance with Government regulations and KBR policies and

procedures.  *Id.* at 25-26.  The PCP further states that upon arrival at a KBR site, all property

must be received, unpacked, counted, and checked for discrepancies, before being "[p]romptly

documented by receiving reports showing count, condition, description, and purchase order

information." *Id.* at 26.  This process must be conducted promptly, and in fact, the site has 24 hours to receive and process the property "and an additional 48 hours to input the receiving documentation into the automated stock record." *Id.*  Any deviations from this schedule must be approved in advance by the site's project management.  *Id.*

To keep track of property that recently arrived at its warehouses, KBR used temporary receiving storerooms, or TRECs.  *Id.*  TRECs are virtual holding areas that only exist in Maximo. *Id.*  When property has been ordered but not yet received and processed, it is listed in Maximo as being in the TREC.  *Id.*  Once the recipient warehouse has accepted and processed the property, it transfers the property from the TREC into its active storeroom in Maximo.  *Id.*  Thus, the purpose of the TREC is to account for property when it is in transit to the warehouse and up until it is entered into the warehouse's automated records.  *Id.*  Each warehouse had its own TREC for these purposes.  *Id.*  Upon arrival, the warehouse had 24 hours to receive the property and 48 hours to input it into its automated stock records pursuant to the PCP.  *Id.*  Once this happened, the property would be transferred in Maximo from the TREC to the warehouse's active storeroom.  *Id.*

The Relators allege KBR did not use its TRECs as a tool for receiving property, and instead it used its TREC's as virtual dumping grounds for property before it physically arrived at KBR's warehouses.  *Id.*  The Relators allege that while KBR entered property into the TREC "to provide advance notification of the in-transit [movement of property] from one site to another," it failed to transfer the property from the TREC to the warehouse's active storeroom after it received and processed the property.  *Id.* at 26-27.  Thus, the Relators argue property that was physically stored in KBR's warehouses was often still listed as "temporary receiving" in Maximo.  *Id.* at 27.  The Relators allege this property often remained in the TREC for years.  *Id.*

The Relators allege because the warehouses left property in its TREC, the property did not appear as part of KBR's active storerooms, and project managers would not therefore see the property in Maximo as they prepared lists of materials for upcoming work orders.  *Id.*  Nor would the DMC find the property in Maximo as it cross-leveled MR's from other warehouses. *Id.*  The Relators allege that for all practical purposes, the property did not exist to the people who needed it.  *Id.*  Thus, the Relators allege KBR's LOGCAP Theater Procurement Supply Management Manager has acknowledged that "[u]tilization of TREC as a storage facility . . . is a misrepresentation of . . .  inventory quantity which relates to funds."  *Id.*; *See* (ECF No. 1-12 at 1).

The Relators allege KBR placed hundreds of millions of dollars' worth of Government property in TRECs, and knowingly left most of that property in the TRECs for far longer than 48 hours.  (ECF No. 1 at 27).  As early as May 20, 2009, KBR issued a Technical Direction Bulletin that stated "Material Control personnel are not using TRECs correctly," and warehouses were issuing property "directly from the TREC" instead of from an active storeroom.  *Id*.; *See* (ECF No. 1-11 at 1).  The Bulletin further ordered materials managers to cease using TREC's for transactions and to "[r]emove any material line that ha[d] been in-transit for over 60 days."  *Id.* The "in-transit" property was not physically in transit, but instead was property that was accumulating in KBR warehouses because it was never removed from the TREC.  (ECF No. 1 at 27).  The Bulletin also stated materials control personnel would have to issue a Report of Discrepancy or Inventory Adjustment Report whenever TRECs were "scrubbed" for stagnant property.  *Id.* at 27-28.  These would in turn be submitted to DCMA.  *Id.* at 28.  .

The Relators allege that notwithstanding the Bulletin, KBR still did nothing to address the problems with the TRECs.  *Id.*  The Relators allege Relator Hemphill notified her superior,

Elias Faris, about the problems with the TREC's in late 2009 and early 2010.  *Id.*  The Relators allege Relator Hemphill told Mr. Faris KBR was keeping incredible amounts of materials in its TRECs in near perpetuity.  *Id.*  To prove her point, on January 14, 2010, Relator Hemphill ran a report showing the current status of KBR's TREC materials, and forwarded it to Mr. Faris.  *Id.*  The report showed KBR had 74,542 inventory lines in its TRECs with a combined value of $356,164,601.58.  *Id.*  Out of this total, 67,381 inventory lines, 83.52%, had been in the TRECs for more than sixty days, and the total value of this stale inventory was $342,381,068.37.  *Id.*  By contrast, KBR only had $9,471,332.03 worth of freight (material in transit to a warehouse) in its TRECs.  *Id.*

The worst of the KBR sites were the D and F, which were located in and around Baghdad, where 97% of the 28,956 TREC inventory was over sixty days old.  *Id.*; *See* (ECF No. 1-13 at 1).  The value of these idle materials was $153,387,292.12, and the overwhelming majority of the items in the D and F sites had never been used.  (ECF No. 1 at 28-29).  The Relators allege KBR concealed its TREC issues from the Government.  *Id.* at 29.  In email exchanges between Conor O'Muirgheasa, KBR Senior Procurement Support Manager, and David Roy, a KBR project manager, on May 28, 2010, that copied Lynellen Sullivan, KBR's Business Planning Manager in Baghdad, Ms. Sullivan weighed in and stated:

> An IAR [Inventory Adjustment Report] is a report of an adjustment . . . and those adjustments are transactions in my humble opinion.  Decide what you will, but know that we risk TREC audits if we begin consciously taking adjustments in TREC storerooms.

*Id.*; *See* (ECF No. 1-14 at 1).  Ms. Sullivan also stated:

> [w]e created [the] LC-IRQ-DF-999 storeroom[7] at [the] D and F [sites] to avoid taking inventory adjustments in a TREC. We can do the same for every site. I really don't want TREC audits [to] occur especially not right now.

---

[7] The Relators allege the LC-IRQ-DF-999 storeroom was a virtual storeroom in Maximo, created for KBR to avoid performing inventory of TREC property in the TREC itself.  (ECF No. 1 at 29).

*Id.*; *See* (ECF No. 1-15 at 2). At this point, Mr. Faris, who was also copied on the emails, stated KBR was developing processes "to get away from TREC which should have never been created in the first place but we are where we are and have to fix it." *Id.* In response, Michael Porter, KBR Business Process Analyst, sought clarification by stating, "[s]o to solidify this. No IARS in the TREC correct?" *Id.*; *See* (ECF No. 1-15 at 1). Mrs. Sullivan replied, "I advise against inventory adjustments in a TREC." *Id.*

The Relators allege KBR did not want to perform inventory adjustments in its TRECs because it did not want the Government to know the amount of property the TRECs contained. (ECF No. 1 at 29). The Relators allege that by moving property from TREC to the LC-IRQ-DF-9999 storeroom before counting inventory KBR could report any discrepancies to the Government without notifying the Government that the materials had been stored in a TREC. *Id.* at 30. The Relators allege that through this sleight of hand, the Government did not learn that KBR's D and F site TRECs had stockpiled over $153 million worth of materials. *Id.* In June 2010, Mr. O'Muirgheasa stated in email that "the entire history of TRECs appears to be that [KBR] Sites let them get out of control and constantly have to be bailed out." *Id.*; *See* (ECF No. 1-16 at 2). According to Mr. O'Muirgheasa, "[i]tems are placed in TRECs and then forgotten about, it seems." *Id.* Mr. O'Muirgheasa stated, "[t]herefore, closely monitoring items in TRECs . . . will help to stop the current situation from getting much worse. So, to use an analogy, first divert the river that is filling the lake, then drain the lake." *Id.*

The Relators allege that despite knowing about the problems with its TRECs in the first half of 2009, KBR delayed cleaning out the TRECs until mid-2010 because it did not want to notify the Government of the problem, as Lynellen Sullivan made perfectly clear in May 2010. (ECF No. 1 at 30). Consequently, the Relators allege KBR ignored the TREC problem until it

received pressure from the DMC to make reforms in 2010.  *Id.*  By then, the Relators allege the problem was too large for KBR to handle.  *Id.*  The Relators allege the TRECs became a major source of the materials KBR sought to offload onto the Government via PCARSS, and at no point has KBR told the Government about the waste its TRECs caused.  *Id.*

The Relators allege KBR orders excess materials by improperly "reserving" items in Maximo.  *Id.* at 31.  KBR's PCP and DOP allow property managers to reserve inventory for specific purposes, and the authority to reserve property typically comes from a Government work order or under an internal work order or in-house project.  *Id.*  Reserved materials cannot be used for other requests, either from the same site or from other sites via cross-leveling.  *Id.*  Prior to the adoption of Maximo 7.1 in 2009, KBR materials managers needed no internal authorization to reserve materials.  *Id.*  However, since 2009, materials managers have been required to receive DMC's approval before being allowed to reserve materials.  *Id.*  The Relators allege KBR materials managers have abused the reservation system in Maximo to increase or maintain their purchasing by listing materials as reserved, despite there being no applicable work directive.  *Id.*

In her position at DMC, the Relators allege Relator Hemphill frequently witnesses KBR managers blocking requests to cross-level items by reclassifying them as reserved, which allows the material to avoid cross-leveling.  *Id.* at 31-32.  The Relators allege the property KBR's managers reserve is often unassociated with any work order and therefore cannot be properly reserved.  *Id.* at 32.  Nonetheless, due to the reservations, the DMC can no longer cross-level the otherwise available materials.  *Id.*  The Relators allege if the DMC fails to find a second internal source for the material, KBR will order the material new and send a bill to the Government.

The Relators allege KBR reserved materials specifically to avoid cross-leveling.  *Id.*  Trina Hays, a KBR Senior Materials Control Specialist, wrote to two KBR employees in June

2009 about a KBR site that was "placing everything on reserve so DMC won't ask for it [to be] CL [cross-leveled] . . . they are ordering material and we have stock available. . . . We should build another warehouse to stock all the unnecessary material."  *Id.*; (ECF No. 1-17 at 4).  This email was sent to KBR's LOGCAP Chief of Staff, Jeff Rock, in May 2010 by Frances Smith, an original recipient of Ms. Hays' email.  (ECF No. 1 at 32).

The Relators allege that in other cases warehouses were knowingly holding materials as reserved after the expiration of the work directive.  *Id.*  In April 2009, KBR issued an Operations Directive titled "Return of Unused ACL Material and Property to Material Control."  *Id.*; *See* (ECF No. 1-18 at 1).  The Directive ordered project managers to implement a process for returning excess reserved materials to general inventory at the completion of construction projects.  *Id.*  Pursuant to the Directive KBR managers were to hold a meeting within 48 hours of a project's completion to account for and return the unused and unissued materials they had reserved under the ACL.  *Id.*  The Relators allege that in practice KBR has not implemented the Directive and does not remove the reserves on property after projects end.  (ECF No. 1 at 32).

For example, the Relators allege that in January 2011, Relator Hemphill sought to cross-level materials from the D and F sites in Baghdad, where operations were being substantially downsized.  *Id.*  However, warehouse managers told Relator Hemphill that they were reserving the material for an ACL containing 4,000+ lines of inventory.  *Id.*  Because the sites were closing down at that time, the Relators allege it is very unlikely that the warehouse managers actually had this many work orders open.  *Id.* at 33.  Nevertheless, soon after Relator Hemphill began to investigate, the D and F sites abruptly deleted 2,800 of the ACL's 4,000 inventory lines.  *Id.*

In addition, the Relators allege KBR reserves Government property for contracts the Government has not yet awarded.  *Id.*  For example, the Relators allege that in January 2011,

Elias Faris and Tracy Townsend directed KBR materials managers to ship about $2.7 million worth of materials to northern Iraq, claiming the materials were for a State Department project to build museums in Kirkuk and Mosul. *Id.* However, at the time the State Department had not awarded KBR this contract or even indicated KBR would receive it. *Id.* The Relators allege FAR and the LOGCAP contract expressly prohibit KBR from using Government property for unauthorized purposes, nevertheless Mr. Faris and Ms. Townsend instructed employees to simply "put the materials on the shelf" in Kirkuk and Mosul "until we get cleared." *Id.* The Relators allege when DCMA discovered this they ordered the shipments to stop, but KBR had already shipped approximately $700,000 worth of materials at that point. *Id.* When this occurred, the Relators allege Mr. Faris and Ms. Townsend decided to achieve KBR's goal of getting rid of incriminating excess stockpiles by reserving the materials in Maximo for the (nonexistent) museums contract. *Id.* The Relators allege the value of the materials KBR reserved was approximately $2 million, and the reservations were a flagrant violation of the DCMA order because KBR had no contract or work order for the materials. *Id.* The Relators allege KBR's improper inventory reservations allowed it to order tens of millions of dollars in excess materials. *Id.* at 34.

The Relators allege that in May 2009, KBR identified $25,814,165.85 worth of materials that were being reserved in Maximo without justification. *Id.*; *See* (ECF No. 1-19). The Relators allege a related example of KBR reserving materials improperly, and a major contributor to its buildup of excess materials, is KBR's acquisition of materials for scheduled maintenance that it does not perform. (ECF No. 1 at 34). Under LOGCAP, the Army pays KBR to conduct scheduled maintenance on Government property and KBR purchases materials in advance of these scheduled maintenance sessions. *Id.* However, KBR's maintenance work orders have

been severely backlogged for years, which has resulted in KBR failing to perform much of the maintenance it was scheduled to perform.  *Id.*  The Relators allege that even as the managers called this backlog "hopeless," KBR continued to order materials as if a maintenance session had never been missed.  *Id.*

For example, the Relators allege a June 2009 email exchange between Tina Hays and Frances Smith states a KBR maintenance employee in Taji, Iraq was ordering maintenance materials to "cover up the fact that he is not doing the maintenance he says he is doing."  *Id.*; *See* (ECF No. 1-21).  The Relators allege such purchases were excess to KBR's requirements and KBR warehouses were filled with materials for maintenance work orders that were overdue or cancelled.  (ECF No. 1 at 34).  The Relators allege these materials were marked as reserved (or classified as STK) in Maximo, making them unavailable for use on other maintenance work orders.  *Id.*  The Relators allege as KBR continued to fail to keep to its maintenance schedules, the materials simply accumulated in its storerooms.  *Id.*  The Relators allege that even when KBR did maintain property as expected much of the maintenance was for materials KBR had bought in excess of project requirements.  *Id.*  As excess, the Relators allege these materials should not have remained in KBR's possession, rendering KBR's subsequent maintenance bills false.  *Id.* at 35.

The Relators allege that even when materials were not reserved or otherwise unavailable, KBR sites prevented cross-leveling by ignoring DMC's cross-leveling requests.  *Id.*  In early 2009, DMC manager Brandon Simmons complained regularly to KBR's senior leadership in Baghdad that sites were refusing to cross-level available materials.  *Id.*  Ultimately, on February 2, 2009, Mark Brennan, KBR's Deputy Program Manager-Support, emailed KBR's project managers, copying KBR's senior leadership, stating sites were "ignoring DMC requests and

allowing the [cross-leveling] action to be cancelled through neglect, rather than through formal denials approved by the SLT [senior leadership team].  We are getting daily reports of denials from your sites now and none of those denials have been sent through SLT [senior leadership team] for approval."  *Id.*; *See* (ECF No. 1-22 at 1).  The Relators allege Relator Hemphill witnessed a short lived uptick in cross-leveling following Mr. Brennan's email, but sites soon reverted back, disregarding the DMC.  (ECF No. 1 at 35).  The Relators allege KBR took no concrete steps to force its sites to cross-level and over a year later, 35% of KBR's requisitions were bypassing the DMC entirely.  *Id.*

In early 2009, the Relators allege Relator Howard created reports in Maximo that identified over $628 million in excess Government property in KBR's warehouses.  *Id.*  For example, in February 2009, KBR found that the A sites in Iraq held $20.5 million in inventory that had never been issued from a storeroom.  *Id.*; *See* (ECF No. 1-23 at 1).  Likewise, in May 2009, KBR found $24 million in underutilized materials at the D and F sites in Iraq, a number that did not include the property at sites that KBR had previously identified as excess.  *Id.* at 35-36; *See* (ECF No. 1-24 at 1).  The Relators allege Relator Howard reported these totals to his supervisor, Charles Weaver; his manager, Lynellen Sullivan; KBR's LOGCAP Theater PSM Manager–Supply, Jim Haught; and Manager of the KBR SMART team, Jim King who audited the Government property internally.  *Id.* at 36.  The Relators allege KBR's senior management did not want to hear about the problem.  *Id.*

For example, the Relators allege in April 2008, Relator Howard produced a report on excess materials in KBR's T-1 site.  *Id.*  Responding to the report, the Relators allege his manager Ms. Sullivan thanked him, but stated, "[t]he reports you are sending is [sic] causing consternation. . . ."  *Id.*; *See* (ECF No. 1-25 at 1).  The Relators allege as Mr. Weaver explained

to Relator Howard in August 2008, KBR's earnings depended on it ordering materials, whether or not it had surplus stock on hand.  (ECF No. 1 at 36).  The Relators allege KBR never tried to control its inventory under LOGCAP because its revenue under the "cost-plus" contract required it to maintain its purchase levels.  *Id.*  The Relators allege the company had no financial incentive to encourage consumption.  *Id.*

The Relators allege KBR's senior leadership monitored its purchases closely and received reports every month showing the value and amount of its requisitions.  *Id.*  Between October 2007 and August 2008 alone, KBR bought $2,269,182,993 worth of materials under the LOGCAP III contract.  *Id.*; *See* (ECF No. 1-26 at 1-5).  The Relators allege when Relator Howard's management refused to discuss his reports, he then showed them to Mr. King.  (ECF No. 1 at 36).  The Relators allege Mr. King reviewed the reports, but concluded there was nothing he could do.  *Id.*  The Relators allege Mr. King simply told Relator Howard that the excess was too large for KBR to handle and it would cause serious trouble with the Government, if the Government were to find out about it.  *Id.* at 36-37.

Concerned that KBR was not changing its procurement practices, the Relators allege Relator Howard made backups of the data reports he produced on the KSO server before leaving Kuwait on scheduled leave.  *Id.* at 37.  The Relators allege when Relator Howard returned, he discovered his supervisor, Charles Weaver, discovered the backups on the KSO server and deleted them.  *Id.*  The Relators allege that when asked why, Mr. Weaver stated that it was "too dangerous" for KBR to keep the information because DCAA could find it during an audit.  *Id.*

The Relators allege that in fear of what might happen if the Government learned the extent of its problems, KBR decided to hide its excess materials from the Government by not reporting data about the percentage of materials it was utilizing.  *Id.*  The Relators allege that in

May 2009, as part of its preparation to turn over its LOGCAP III operations in Afghanistan to Fluor (which had won the LOGCAP IV task order for Afghanistan), KBR's project manager for Central Asia created a report for Floyd Shelton, KBR's LOGCAP III Business Planning Manager, on the number of employees and the amount of property at KBR's seven Afghan sites. *Id.* Among other things, the report contained a file titled "Inventory Adjustment Report" that listed KBR's inventory of materials in Afghanistan. *Id.*

The Report listed the value of inventory in KBR's warehouses, the number of inventory lines, and the number of inventory lines the warehouses had issued. *Id.* at 38; *See* (ECF No. 1-27). From these numbers the Report calculated the utilization percentage of non-stock inventory, the number of inventory lines that had not been consumed, and the total underutilization percentage. *Id.* The Relators allege the Report showed, unambiguously, that KBR had not used 60% of the inventory lines in its Afghan warehouses. (ECF No. 1 at 38). The total value of KBR's inventory in Afghanistan at that time was $116,665,660. *Id.* The Relators allege that were the Report to see the light of day every aspect of KBR's property management could be called into question. *Id.* For example, the Relators allege KBR had classified 71% of its inventory lines as stock, defined as having at least three demands in each stock year, even though 60% of its inventory lines had zero demands in the prior year. *Id.* The Relators allege Mr. Shelton forwarded the Report to David Stallard, KBR's Deputy Program Manager-Operations in Baghdad, and copied Jim Haught, KBR manager responsible for all LOGCAP III requisitions. *Id.* The Relators allege Mr. Haught forwarded Mr. Shelton's email to three KBR employees, including Tracy Townsend and John Vujic, and asked, "Tracy/John: Need you to validate the material numbers with our records. I don't think we should be showing underutilized on anything that can be seen by USG [the United States Government]." *Id.*; *See* (ECF No. 1-28 at

2).  In response, Ms. Townsend forwarded the report to Relator Howard (copying Mr. Vujic) and asked him to validate the material numbers.  *Id.*; *See* (ECF No. 1-28 at 1).

The Relators allege Relator Howard understood the implication of removing the underutilization percentages and asked his manager, Ms. Sullivan, if she was comfortable hiding this information.  *Id.*  The Relators allege that after discussing Mr. Haught's directive at length, Ms. Sullivan emailed Mr. Howard and stated, "We don't own the data . . . we want to [give] Materials and PSM whatever they want . . . so I'm good with it if it is what they want and need . . . ."  *Id.*  However, the Relators allege Relator Howard refused to tamper with the report.  (ECF No. 1 at 39).  So the next day, after seeing no action from Relator Howard, the Relators allege Ms. Townsend forwarded the report to Ms. Sullivan, copying Mr. Haught, and asked her to validate the numbers by "prepar[ing] a report like the one listed in the attachment named 'Inventory Adjustment Report.'"  *Id.*  The Relators allege Mr. Haught noticed a mistake in Ms. Townsend's email and quickly clarified his directive to Ms. Sullivan by stating, "I don't need a report just like the attachment.  The report should show total numbers and dollars, *not usage or underutilization.*"  *Id.*; *See* (ECF No. 1-28 at 6) (Emphasis added).

Ms. Sullivan then turned to the head of the KSO, Mr. Weaver, and Relator Howard (again) to prepare Mr. Haught's report.  *Id.*  The Relators allege Relator Howard told Mr. Weaver he did not want to be associated with the report because it would be tantamount to providing false information to the Government.  (ECF No. 1 at 39).  The Relators allege Mr. Weaver nonetheless directed Relator Howard to prepare the report.  *Id.*  The Relators allege that by removing its troubling utilization numbers from the report, KBR sought to keep the Government in the dark about its excess materials and wasteful ordering.  *Id.* The Relators allege such episodes occur regularly at KBR, whose employees are told to avoid using email when

talking about excess materials and underutilization.  *Id.*  The Relators allege in one instance Mr. Haught told KBR materials employees during a conference call to refer to excess materials as "redistributable" materials because the Government would be less likely to notice the euphemism.  *Id.*

The Relators allege KBR's top LOGCAP management knows about the improper practices responsible for KBR's buildup of excess materials, but has buried the information.  *Id.*  The Relators allege after Relator Howard's supervisors forced his resignation in August 2009 over his complaints about KBR's wasteful practices, he resolved to tell KBR's senior management about the conduct he witnessed.  *Id.* at 39-40.  The Relators allege that on or about February 25, 2010, Relator Howard phoned KBR's Baghdad headquarters and spoke with Chief of Staff Jeff Rock and Deputy Program Manager Rich Kaye.  *Id.* at 40.  The Relators allege Mr. Rock and Mr. Kaye comprised two of the six members of KBR's LOGCAP III Senior Leadership Team.  *Id.*  The Relators allege that during the call, Relator Howard informed Mr. Rock and Mr. Kaye of the $600 million plus excess materials in the Middle East and asked what they were doing to address the problem.  *Id.*  The Relators allege Mr. Rock replied by stating they could not speak to him about it, but if he sent an email they would look into it.  *Id.*

Following up on their conversation, the Relators allege Relator Howard emailed Mr. Rock on that same day and reiterated that KBR had over $600 million worth of excess materials at the time he had departed, and explained the problems with the TRECs and KBR's refusal to cross-level materials that contributed to build up.  *Id.*; *See* (ECF No. 1-29 at 1-2).  The Relators allege Mr. Rock acknowledged the communication, but did not otherwise respond.  *Id.*  Soon thereafter, the Relators allege Relator Howard forwarded Mr. Rock a copy of Mr. Haught's email that recommended KBR hide utilization percentages from the Government.  *Id.*; *See* (ECF No. 1-

129 at 4-9).  The Relators allege that although Mr. Rock did not acknowledge receiving the forwarded email, KBR soon acted to prevent its employees from leaking any more information. *Id.*  On March 11, 2010, Ms. Sullivan emailed KBR's Maximo staff saying, "Do not speak to anyone outside of KBR about any internal business."  *Id.*; *See* (ECF No. 1-30).  The Relators allege a KBR employee forwarded this email to Relator Howard.  *Id.*

The Relators allege that despite its top management having specific information about excess materials, KBR did not act on Mr. Howard's warnings or disclose them to the Government.  (ECF No. 1 at 40).  Instead, the Relators allege KBR continued to conceal excess materials and underutilization from the Government, trusting it could reduce its inventory without the Government becoming aware of its problems.  *Id.* at 41.  The Relators allege that in this effort KBR decided to reduce its stockpiles of excess materials by returning millions of dollars' worth of property to the Government that some of its LOGCAP sites still needed and continued to order.  *Id.*  The Relators allege KBR prepared and submitted PCARSS forms attesting that the property was surplus to its requirements and asked for disposition instructions. *Id.*  However, the Relators allege these submissions were false because the PCARSS materials were not surplus as KBR did not cross-level them for internal demand.  *Id.*  Instead, the Relators allege KBR sites continued to buy materials that they and other KBR sites were returning to the Government as excess.  *Id.*  The Relators allege KBR maintained its purchasing and its revenue through this fraud, even as it drew down its stockpiles of excess materials.  *Id.*

The Relators allege KBR's senior management in Baghdad pressured KBR sites to prepare PCARSS inventory schedules because they urgently wanted to dispose of the bloated inventory in KBR warehouses before the Government understood the scope of the problem.  *Id.* The Relators allege KBR had to expedite the process because they were unwinding their

operations in Iraq and would soon be unable to hide the excess materials   *Id.*   Because of this, the Relators allege KBR senior management directed employees to funnel as much material as possible into PCARSS, without checking that the material was truly no longer needed.   *Id.*

In April 2009, KBR issued an Operations Directive for Non-Demand Supported Stock Removal.   *Id.*; *See* (ECF No. 1-31).   The purpose of the Directive was to eliminate material with less than two demands in the last year.   (ECF No. 1 at 41-42, ECF No. 1-31 at 1).   Managers were to review their storerooms, identify excess materials, and report them to the Plant Clearance Officer for disposition.   (ECF No. 1 at 42, ECF No. 1-31 at 1-4).    However, the managers were not to look in TREC, unserviceable, or inactive storerooms when identifying excess materials. *Id.*   Further, they were not to report any reserved property.   *Id.*   The Directive required them and the DMC to cross-level the excess materials they found against existing requisitions before submitting the materials to the Government through PCARSS.   *Id.*   This was to be completed by August 2009.   *Id.*

The Relators allege KBR sent a signed memorandum to DCMA each time it entered property into PCARSS.   (ECF No. 1 at 42).   The memorandum stated:

> KBR request disposition instructions for the attached listed property.  It has been determined that this equipment is excess serviceable items to the contract and there is no further use for the property in support of the mission requirements.  The attached list of item(s) have been screened for cross level requirements throughout the theater of operation.  The items have been screened and verified there are no foreseeable requirements in support of the mission at this time.

*Id.*; *See* (ECF No. 1-32 at 1).   The Relators allege a KBR property manager, project manager, material control manager, and the DMC signed the memorandum.   (ECF No. 1 at 42).   The Relators allege these memoranda were patently false because KBR did not try to cross-level the materials it entered into PCARSS.   *Id.*

Throughout 2009, the Relators allege Relator Hemphill and the DMC witnessed property being submitted to PCARSS without the DMC having screened it for internal demands.  *Id.*  On June 18, 2009, KBR's Theater Materials Manager, Rochelle Knight acknowledged as much, saying KBR was not cross-leveling PCARSS submissions "with . . . due diligence."  *Id.*; *See* (ECF No. 1-33 at 2).  The Relators allege that in April 2009, Mr. Haught ordered DMC manager Brandon Simmons to sign PCARSS memoranda whether or not the materials had been cross-leveled.  (ECF No. 1 at 42).  Rather than falsify certify materials had been screened for cross-level requirements, the Relators allege Mr. Simmons resigned.  *Id.* at 43.

The Relators allege KBR's response to Mr. Simmons' resignation was to cut the DMC out of the PCARSS process.  *Id.*  On June 24, 2009, Ms. Knight announced via email, "[i]t is no longer a requirement to send [PCARSS requests] to the DMC.  The new step in this process is to reserve the items in STEAM against your PCARSS schedule.  The intent is to not cross level PCARSS items once they are reserved."  *Id.*; *See* (ECF No. 1-33 at 2).  The Relators allege that three hours after this email, the new manager of the DMC, Conor O'Muirgheasa, emailed a PowerPoint presentation to Ms. Knight, Elias Faris, Tracy Townsend, and Mr. Haught.  *Id.*; *See* (ECF No. 1-34 at 1-13).  Mr. O'Muirgheasa later forwarded a copy to Relator Howard, stating that would probably get him in trouble, but he felt it was the right thing to do.  *Id.*

The Relators allege Mr. O'Muirgheasa's email informed the recipients that the PCARSS memoranda contained three false statements.  (ECF No. 1 at 43).  The Relators allege with KBR's proposed process, Mr. O'Muirgheasa said it could not determine an item was excess outside its site, was not cross-leveling items theater-wide, and did not know there were no foreseeable requirements for the item.  *Id.*  The Relators allege Mr. O'Muirgheasa then attached an example of how KBR was already returning non-excess materials to the Government through

PCARSS, under its existing process.  *Id.*  For example, taking the first line of a June 7, 2009, PCARSS schedule (60 tube tires), the Relators allege Mr. O'Muirgheasa found there were two open MR's from other KBR sites for the same item.  *Id.*  Mr. O'Muirgheasa concluded:

> We are proposing to send [property] . . . to the PCARSS process because it is showing as a non-demand supported item in the storeroom of the site submitting the PCARSS schedule; [y]et it is a (correctly-classified) STK item in several other storerooms in theater; [a]nd it is being actively procured. Instead, we should be cross leveling/transferring this item to where it is needed, then sending the remainder (if any) to PCARSS.

*Id.*; *See* (ECF No. 1-34 at 12).

The Relators allege that at the time of Mr. O'Muirgheasa's email, KBR had submitted dozens of PCARSS memoranda identical to the one Mr. O'Muirgheasa identified as false.  *Id.* at 44.  The Relators allege KBR did not retract or amend these PCARSS submissions following Mr. O'Muirgheasa's email, and instead ignored his concerns.  *Id.*  The Relators allege on July 1, 2009, Mr. Haught issued a Technical Directive adopting Ms. Knight's PCARSS revisions.  *Id.*; *See* (ECF No. 1-7 at 1-2).  In the Directive the Relators allege Mr. Haught stated excess materials should have been available for cross-leveling before being selected for PCARSS, and thus that DMC review of every PCARSS submission would be redundant.  *Id.*  However, the Relators allege Mr. O'Muirgheasa's PowerPoint had shown Mr. Haught that KBR's processes were broken and would only get worse with Ms. Knight's changes.  (ECF No. 1 at 44).  The Relators allege KBR disregarded Mr. O'Muirgheasa's warnings because it was unwilling to delay its inventory drawdown, or sacrifice its current purchases, for the sake of eliminating its excess materials properly.  *Id.*

The Relators allege Mr. Haught left LOGCAP in August 2009 and was replaced by Elias Faris, a specialist on the PCARSS process.  *Id.*  Under Mr. Faris, the Relators allege KBR continued to send materials to the Government through PCARSS.  *Id.*  The Relators allege KBR

began packing excess materials into connexes, steel shipping containers, and once packed KBR stored the connexes in anticipation of shipping them to Afghanistan for use on LOGCAP IV.  *Id.* As of the day the Complaint was written, the Relators allege many connexes that have neither gone to Afghanistan nor to the Government are currently sitting idle in Iraq.  *Id.*  The Relators allege in many cases, KBR managers have refused to open these connexes for stored materials that other sites have requested.  *Id.*  Thus, the Relators allege these connexes are another way KBR prevents its existing Government property from being used on the LOGCAP project in favor of making new purchases.  *Id.*

On November 5, 2009, the Relators allege DCMA issued KBR a Letter of Technical Direction to stop submitting serviceable materials through PCARSS.  *Id.*  The Relators allege the DCMA directed KBR to forward such disposition requests to its Theater Government Property Administrator instead.  *Id.*  Following the letter, the Relators allege KBR continued to submit materials to the Government, likely through a different channel operated by the Defense Reutilization and Marketing Office by calling the materials unserviceable "fair wear and tear" property.  *Id.* at 45.  The Relators allege KBR ultimately resumed its submissions through PCARSS.  *Id.*  As of June 24, 2009, KBR submitted over $1.24 million worth of materials, and between January and October 2010, KBR submitted 97,711 items valued at $187 million to PCARSS.  *Id.*; *See* (ECF No. 1-35 at 2-3).  During that same period, the Government accepted and relieved KBR of responsibility for 102,021 items worth $170 million.  *Id.*

The Relators allege Mr. Faris tracked KRB's PCARSS activities in a weekly report. (ECF No. 1 at 45).  For example, on January 17, 2011, the Relators allege Mr. Faris circulated a report showing KBR sites submitted $40,613,416.05 worth of materials that week and that KBR had $873,212.53 in materials awaiting PCARSS disposition and $16,520,230.95 in materials for

which DCMA had provided disposition instructions.  *Id.*; *See* (ECF No. 1-35 at 6-7).  In Mr. Faris' email, he observed that "we have been very successful in the PCARSS for a few years." *Id.*

The Relators allege KBR's PCARSS submissions were false because it did not screen the materials it sought to return against its existing needs.  (ECF No. 1 at 45).  The Relators allege KBR drew down its excess materials using PCARSS, all the while buying (and charging the Government for) the same materials to meet its ongoing requirements.  *Id.*  The Relators allege the Government therefore paid extra during KBR's drawdown just as it had during KBR's buildup, and was left with millions of dollars' worth of surplus materials that KBR should not have bought in the first place.  *Id.*

At the same time KBR was returning materials through PCARSS, the Relators allege it was not reducing its stock levels and reorder points.  *Id.* at 46.  Thus, the Relators allege many of the items KBR returned as excess were immediately replaced in KBR's warehouses.  *Id*.  The Relators allege KBR tried to hide this failure to reduce stock levels from the Government.  *Id.* On September 28, 2010, the Relators allege DCMA officials Joyce Austin and Mary Sheridan spoke with Tracy Townsend, KBR's Theater Deputy Manager PSM-Supply.  *Id.*  During the conversation, the Relators allege Ms. Austin and Ms. Sheridan asked Ms. Townsend if KBR had reduced its authorized stock levels.  *Id.*  At the time, the Relators allege KBR had been winding down its operations in Iraq for over a year, and DCMA expected it to have reduced its requisition objectives to reflect its decreasing need for materials.  *Id.*  The Relators allege Ms. Townsend responded to DCMA's question by lying and told DCMA that KBR had decreased its authorized stock levels by 50% over its prior levels.  *Id.*  In reality, the Relators allege KBR had not reduced its authorized stock levels at all.  *Id.*

Soon after the call, Ms. Austin emailed Ms. Townsend to memorialize the conversation, and she also summarized statements Ms. Townsend made about cross-leveling. *Id.* Specifically, Ms. Austin stated:

> Just to reiterate our conversation today, KBR is currently re-leveling material stock at a 162.5 day level (50% below) its previous 365 day (100%) established levels with base closures. When a material requisition is submitted, the request is screened to see if the item(s) are available within KBR and no longer needed a[t] that located site. If the item is not in stock at any KBR sites, it is only ordered based on need. Also, you stated KBR is re-leveling with material identified as excess as part of your internal screening process, prior to being placed to the PRP listings.

*Id.*; *See* (ECF No. 1-36 at 1).

On or about the next day, the Relators allege DCMA had a conference call with Ms. Townsend and other KBR personnel, including Deputy Project Manager-Support Julia Hearn; Procurement and Materials Theater Managers Stan Lewis and Sal Hernandez; Mr. O'Muirgheasa; and Ms. Austin and Ms. Sheridan. *Id.* at 47. The Relators allege Mr. O'Muirgheasa invited Relator Hemphill to listen in on the call. *Id.* During the call, the Relators allege DCMA asked again if KBR had reduced its authorized stock levels. *Id.* The Relators allege Mr. Hernandez fielded the question and stated KBR had not in fact reduced its authorized stock levels, but had reduced its requisition objectives. *Id.* The Relators allege Mr. Hernandez stated KBR had set requisition objectives at 70% of the authorized stock levels and filled its remaining need of 30% from cross-leveling. *Id.* The Relators allege this was not true, either. *Id.* At that point, the Relators allege DCMA then asked Mr. O'Muirgheasa for his thoughts. *Id.* Unwilling to lie, the Relators allege Mr. O'Muirgheasa stated KBR had not reduced either its authorized stock levels or its requisition objectives. *Id.* Upon hearing this, the Relators allege DCMA demanded to see KBR's authorized stock levels for 2009 and 2010. *Id.* Following the call, the Relators allege Ms. Hearn lambasted Mr. O'Muirgheasa for telling DCMA the truth. *Id.*

The Relators allege that even though Mr. O'Muirgheasa alerted DCMA to Ms. Townsend and Mr. Hernandez's false statements on this occasion, on information and belief KBR has misled DCMA repeatedly about its materials practices, both before and during the Iraw drawdown.  *Id.*  The Relators allege that attesting to this are the efforts by Ms. Hearn and Ms. Townsend, the two most senior KBR officials on the call, to hide information from the Government.  *Id.*  The Relators allege KBR's misstatements have enabled it to continue ordering far beyond its needs, at the expense of taxpayers.  *Id.*

## DISCUSSION

"The FCA imposes liability where any party 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.' 31 U.S.C. § 3729(a)(1)(A). To establish liability under this theory, a relator must prove the existence of: (1) a false or fraudulent claim; (2) which was presented for payment, or caused to be presented for payment, by the defendant; (3) with knowledge the claim was false."  *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 709 (7th Cir. 2015).  According to the FCA, a "claim" is "any request or demand, whether under a contract or otherwise, for money or property . . . that is presented to an officer, employee, or agent of the United States; or is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest . . ." 31 U.S.C. § 3729(b)(2)(A).  In satisfying the knowledge element, a relator must prove the defendant acted with "actual knowledge," "deliberate ignorance of the truth or falsity," or "reckless disregard of the truth or falsity of the information."   31 U.S.C. § 3729(b)(1)(A).  The FCA does not require a relator to prove a defendant's specific intent to defraud.  31 U.S.C. § 3729(a)(1)(B).  Additionally, "a mere breach of contract does not give rise to liability under the [FCA].  [However,] [i]f the breaching party falsely claims to be in

compliance with the contract to obtain payment [from the Government] there may an actionable false claim." *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 824 (7th Cir. 2011).

After review of the voluminous record, it is evident that the premise of the Relators' claim is that during the time they worked for KBR in Iraq and Kuwait they discovered KBR knowingly and routinely violated their cross-leveling requirements, and concealed those violations from the Government. (ECF No. 50 at 3). As a result, the Relators argue KBR sought substantial payments from the Government for costs that were not allowable, and if the Government had known the truth it would not have paid for these excess goods because KBR violated material terms of LOGCAP III. *Id.* The Relators argue they have alleged KBR perpetrated this fraud through four interrelated schemes: (1) KBR's failure to cross-level before purchasing materials; (2) KBR's failure to properly remove materials from TREC status; (3) KBR's act of improperly reserving goods; and (4) KBR's act of returning supplies to the Government as excess while ordering more. *Id.* at 3-7.

Conversely, KBR argues the Relators have not alleged an objective falsehood related to KBR's management of Government property linked to a claim for payment, which are two essential elements of a false claim action. (ECF No. 51 at 1). KBR also argues the Relators have failed to identify with specificity any particular materials that allegedly were unnecessarily purchased or false claims for payment that allegedly resulted. *Id.*

As such, the question currently before the Court is whether the Relators' Complaint alleges KBR violated the FCA with particularity.

## I.     The FCA

### A.  False or Fraudulent Claim

KBR argues the Relators assertion that the submission of a claim for reimbursement of

allegedly "unreasonable" costs is sufficient to constitute a violation of the FCA is an allegation that appears nowhere in the Complaint[8].  (ECF No. 44 at 1).  KBR argues even if the Relators adequately plead KBR submitted claims for unreasonable or unallowable costs for reimbursement from the Government, this allegation alone is insufficient to support FCA liability.  (ECF No. 44 at 3).  KBR argues the Court in *Watkins* interpreted the FAR provision the Relators attempt to rely on here,  FAR 52.216-7,   and held the FAR did not require KBR to certify the reasonableness of its costs when invoicing the Government, and that such a certification is a necessary prerequisite to FCA liability under this theory.  *Id.* at 3-4.  (citing *United States ex rel. Watkins v. KBR, Inc.*, No. 4:10-4010, 2015 WL 2455533, *13-16  (C.D. Ill. May 22, 2015)).

KBR argues that absent an allegation that a claim itself is factually false, a "legally false" claim fails absent a false certification that is material to payment.  *Id.* at 4.  KBR argues that similar to the relator in *Watkins* the Relators here have not adequately pled KBR had an affirmative obligation under LOGCAP III to certify the reasonableness of its costs when submitting them for payment, and absent such a false certification the Relators' fraud theory fails to state a claim.  *Id.* at 5.  KBR argues *Watkins* undercuts the importance of any certifications of reasonableness imagined by the Relators in this case because it holds certifications of reasonableness are immaterial to payment.  *Id.* at 4.  Finally, KBR argues the Relators' assertion that an invoice seeking payment for unallowable and unreasonable costs is false without regard to whether the contractor executed a certification, was squarely rejected in *Watkins* and does not excuse the Relators from the burden of identifying what falsehood was actually presented to the Government.  *Id.*

---

[8] KBR argues the Relators have failed to state a mere deviation from the FAR because they have not demonstrated that any particular costs incurred by KBR were unreasonable.  *Id.* (ECF No. 44 at 2).

Conversely, the Relators argue KBR's act of returning supplies to the Government for disposition and stating on PCARRS forms that such items had been screened "for cross level requirements throughout the theater of operation" was a false representation because KBR routinely failed to follow its establish practices that required it to cross-level before returning equipment to the Government.  (ECF No. 42 at 25).  The Relators argue a knowing request to the Government for the payment of money which is not owed is unquestionably a false claim.  (ECF No. 46 at 5) (citing *United States v. Bornstein*, 423 U.S. 303, 308-09 (1976) and *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008)).  The Relators argue that in such circumstances no accompanying certification is necessary to establish liability under the FCA because the invoice itself is false.  *Id.* at 6.  The Relators argue that by requesting payment for supplies KBR knew were unnecessary, excessive, and unallowable, KBR submitted false claims for payment that KBR knew it was not entitled to receive under the terms of the LOGCAP III contract.  *Id.*

The Relators also argue that because *Watkins* held the relator in that case had not alleged the invoices themselves were false, it did not consider or address the theory that a claim for unallowable costs knowingly submitted is in itself a false claim.  *Id.* at 7.  The Relators argue if the Government knew KBR had sought reimbursement for thousands of duplicative goods that KBR knew were unreasonable purchases and therefore not "allowable" expenses – because KBR had already purchased those goods and they were available for cross-level or transfer – the Government would not have reimbursed KBR for those excessive purchases, therefore KBR's claims for payment were false under the FCA.  *Id.* (ECF No. 46 at 11).

After review, the Court finds the Relators' allegation that KBR violated the FCA by knowingly submitting and presenting to the Government claims for reimbursement of unallowable and unreasonable costs appears on the face of the Complaint.  As such, the Court

finds it appropriate to address in detail KBR's argument that both *Watkins* and *Sanford-Brown*

are dispositive at this stage of litigation, in addition to the other relevant case law that has been

cited and relied upon by both parties.  With respect to *Watkins*, the Court notes *Watkins* consisted

of an entirely different factual situation that led to the court ultimately granting the defendant's

motion to dismiss.  Unlike the relator in *Watkins*, the Relators here have not alleged a false

certification theory of false claims liability.  On the contrary, the Relators theory of liability is

based on KBR's alleged act of seeking millions of dollars' worth of payments from the

Government for costs that were unallowable and unreasonable, and if the Government had

known the truth it would not have paid for these excess goods because KBR violated material

terms of LOGCAP III.

Focusing primarily on the issue of reasonableness, accepting as true all factual allegations

in the Complaint, under LOGCAP III KBR was required to order Government property in

"reasonable" quantities commensurate with the work to be accomplished, and the property was

required to be "reasonable" when compared to the work/job at hand.  (ECF No. 1 at 11).  It is

also clear, as the Relators argue, that in other litigation between the Government and KBR, both

sides agreed "KBR is entitled to be reimbursed only for its reasonable costs under LOGCAP III,"

and "LOGCAP III incorporated, by reference, the cost principles in the FAR and that FAR §

31.201-3 . . . governs the assessment of the reasonableness of KBR's costs."  *See Kellogg Brown*

*& Root Servs., Inc.*, 728 F.3d at 1358.

When looking at the FAR it is apparent that under § 31.201-2 allowable costs are those

that are "reasonable," and § 31.201-3(a) states "[a] cost is reasonable if, in its nature and amount,

it does not exceed that which would be incurred by a prudent person in the conduct of

competitive business."  FAR § 31.201–3(a). The regulation further provides in § 31.201-3(b) that

"[w]hat is reasonable depends upon a variety of considerations and circumstances, including—(1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance; (2) Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations; (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and (4) Any significant deviations from the contractor's established practices.

Based on a plain reading of the aforementioned sections of the FAR it is this Court's view that the issue of reasonableness of costs is a "highly contestable and fact-specific inquiry that makes it inappropriate for resolution on a 12(b)(6) motion to dismiss." *See Watkins*, 2015 WL 2455533 at \*15. While a prudent businessperson may make mistakes and incur costs based on decisions that in retrospect were unwise, there is a distinct difference between such person and an entity whose superiors have knowledge that billing for certain costs "is a recipe for the DCAA to find fault with us and collect back what we paid them" and returns supplies to the Government for disposition while simultaneously signing a memorandum that falsely states such items have "been screened for cross level requirements throughout the theater of operation," both of which appear on the face of the Complaint and the attachments thereto. *See* (ECF No. 1-10 at 1, ECF No. 1 at 42, ECF No. 1-32 at 1). Therefore, KBR's argument that the Relators have not pled KBR deviated from the FAR because they have not demonstrated that any particular costs incurred by KBR were unreasonable must fail. As such, with the facts currently before the Court, there is no way the Court can conclude the Relators have failed to put KBR on notice of its alleged deviation from the FAR and that had the Government known about its billing for unallowable and unreasonable cost it would not have paid for the excess goods.

Furthermore, with respect to the issue of falsity specifically, while the FCA does not expressly define the term "false," the Seventh Circuit has held "[a] statement may be deemed 'false' for purposes of the [FCA] only if the statement represents 'an objective falsehood.'" *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011). The Complaint references a May 6, 2009, email from Mr. Haught, the KBR manager responsible for all LOGCAP III requisitions, that stated, "I don't need a report just like the attachment. The report should show total numbers and dollars, not usage or *underutilization*[,]" and directed Relator Howard to prepare a report that would be tantamount to providing false information to the Government. (ECF No. 1 at 39, ECF No. 1-28 at 6). The Complaint alleges that by removing its troubling utilization numbers from the report, KBR sought to keep the Government in the dark about its excess materials and wasteful ordering, and such episodes occur regularly at KBR, whose employees are told to avoid using email when talking about excess materials and underutilization. (ECF No. 1 at 39). Therefore, accepting as true the aforementioned factual allegations, there is no reason that KBR's representations concerning the reasonableness of the prices listed in the invoices submitted to the Government cannot be deemed objectively false.

Additionally, this case differs from *Watkins* in that the Relators here do not rely on FAR §§ 52.216-7 and 52.216-26 in arguing KBR is required to affirmatively certify its costs are allowable and reasonable when submitting invoices to the Government for payment under LOGCAP III. *See Watkins*, 2015 WL 2455533 at *13. Because that was the claim the relator in *Watkins* made, the court in that case stated, "[s]ince the regulations provide that giving the 'statement of claimed allowable cost' is optional, this [c]ourt cannot conclude that giving such statement was required. Thus, the [c]ourt rejects [r]elator's contention that statements of certification were required by the regulations." *Id.* Instead, the fraudulent claim in this case is

premised upon the allegation that the invoices (i.e. requests or demands for payment) KBR submitted to the Government were themselves false because they contained unallowable and unreasonable costs.

The court in *Watkins* distinguished that case from *United States ex rel. Chilcott v. KBR, Inc.*, No. 09-4018, 2013 WL 5781660, (C.D. Ill. Oct. 25, 2013)) by stating in *Chilcott* "[it] explained that no certifications of compliance *seemed* necessary to plead the FCA claims at issue there and in *dicta*, observed that the [c]ourt would be receptive to a claim that an invoice itself could be the false record or statement that influences the Government's decision to pay." *Id.* at *14. The court in *Watkins* acknowledged that in *Chilcott* it ultimately decided that issue did not need to be resolved because the relator in *Chilcott* "had adequately alleged that the filing of a standard invoice form carried with it an express certification of compliance, and that disposition on a Rule 12(b)(6) motion to dismiss was not the proper stage at which to contest the veracity of a plaintiff's allegations." *Id.* Thus, the court in *Watkins* stated the allegations in *Chilcott* "were sufficient to convey to the [c]ourt that the plaintiff was pleading an affirmative statement/express certification was required by the defendant to obtain payment in that case." *Id.* Similar to *Watkins*, that is not the situation in the instant case because the Relators have not plead an express certification theory of false claims liability.

Nevertheless, the instant case can further be distinguished from *Watkins* because in that case the court did not specifically address whether a reimbursement claim for unallowable costs is a false claim. Instead, *Watkins* focused on the relator's allegation that statements of allowable costs submitted *along with* invoices in order to get the invoices paid were false because KBR knew the costs were not reasonable. In rejecting the relator's claim *Watkins* held "the statements of allowable cost were simply not material to the Government's decision to pay the invoices."

*Watkins*, 2015 WL 2455533 at *14.  Continuing in its analysis, the court rejected the relator's argument that the FCA does not require in its text any certification requirement by highlighting 31 U.S.C. § 3729(a)(1)(B) and noting "[t]he term record or statement should not be interpreted to encompass the term claim, because reading the statute in that manner violates the well-established canon that different words within the same statute should be given different meanings . . . and it ignores the distinct meaning of the term claim found at § 3729(b)(2)(A)." *Id.* at *15.  Ultimately, *Watkins* rejected the relator's argument that the invoices themselves qualify as "statements" described in § 3729(a)(1)(B) and in analyzing § 3729(a)(1)(A) held the relator's *particular* theory of liability *does* require the pleading of a certification.  *Id.* at *15 (emphasis added).

In holding the relator's theory of liability requires the pleading of a certification *Watkins* relied on *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853-54 (7th Cir. 2009), another case in which the relator relied upon a false certification theory of liability, and stated "[t]he teaching of *Lusby* is that if a plaintiff is pleading a legally false claim theory- one in which the claimant is alleged to have knowingly falsely certified that it has complied with a statute or regulation the compliance with which is a condition for Government payment- then one must concurrently plead the defendant was obligated to certify or affirmatively state compliance with an applicable rule or regulation.  *Id.*

Once again, this Court notes an important distinction between the instant case and *Watkins* and *Lusby*, which is that the Relators here do not rely upon a false certification theory of liability, the type of legally false claim mentioned in *Lusby*.  Instead, the Relators claim is one of factual falsity in that KBR's knowing presentation of invoices for payment to the Government that consisted of unallowable and unreasonable costs was directly connected to the

48

Government's payment decision, and that had the Government known about such costs it would

not have paid, therefore certification is not an issue.[9]  *See* (ECF No. 1 at 48, ECF No. 49 at 56-

58).

Moreover, for purposes of clarity, this Court agrees with *Watkins* that the terms "record

or statement" in § 3729(a)(1)(B) should not be interpreted to encompass the term "claim"

because "claim" has been defined by § 3729(b)(2)(A) to mean "any request or demand" for

money or property.[10]  As such, the Court finds the alleged invoices submitted by KBR were

"claims" under § 3729(a)(1)(A), the section of the FCA relied on by the Relators in this case.

*See* (ECF No. 1 at 48 ¶136, ECF No. 50 at 7).  Now, the Court finds it appropriate to distinguish

this case from *Sanford-Brown*, a case in which the relator alleged regulatory violations that had

no demonstrable nexus to a payment decision.

In *Sanford-Brown*, a relator brought claims under § 3729(a)(1)(A) and § 3729(a)(1)(B)

on behalf of the Government against a for-profit higher education enterprise alleging fraudulent

conduct in connection with claims for federal subsidies under the Higher Education Act.

*Sanford-Brown*, 788 F.3d 696 (7th Cir. 2015).  The case was appealed to the Seventh Circuit

after the district court granted summary judgment for the defendants.  *Id.*  Since the Relators in

this case rely on § 3729(a)(1)(A), for brevity purposes, the Court will only analyze *Sanford-

Brown* with respect to that section of the FCA.

---

[9] Courts have traditionally recognized two categories of false claims under the FCA: (1) a factually false claim, one
in which the claimant misrepresents what goods or services it provided to the Government; and (2) a legally false
claim, one based on a false certification theory of liability where the claimant knowingly falsely certifies that it has
complied with a statute or regulation the compliance with which is a condition for Government payment.  *U.S. ex
rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) (citing *U.S. ex rel. Conner v. Salina Reg'l
Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir.2008).
[10] This Court disagrees with the assertion in *Chilcott* that "[a]n invoice requesting [] improper payment is a 'false
record or statement' that influences the government's payment of money."  Chilcott,2013 WL 5781660, at *13.

49

In addressing the § 3729(a)(1)(A) theory of liability the Court stated, "[g]ood-faith entry into the PPA is the *condition of payment* necessary to be eligible for subsidies under the U.S. Department of Education's subsidies program[,]" and thus ruled, "[a]bsent evidence of fraud before entry, nonperformance after entry into an agreement for Government subsidies does not impose liability under the FCA." *Id.* at 710 (emphasis added). In making its ruling the Court noted its earlier decisions in *Yannacopoulos*; *Main*, 426 F.3d 914 (7th Cir. 2005); and *Gross*, 415 F.3d 601, 604 (7th Cir. 2005) (predating *Main* and holding that an FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements requires an initial fraudulent certification of compliance with applicable authorities to be a condition of or prerequisite to Government payment), compel its result because the relator had not alleged, nor proved, the defendant fraudulently secured its initial Title IV eligibility, so no false certification of compliance could be contributable to it. *Id.* at 711. Therefore, the Court held "we join the Eighth Circuit and hold that FCA liability is not triggered by an institution's failure to comply with Title IV Restrictions subsequent to its entry into a PPA, unless the relator proves that the institution's application to establish initial Title IV eligibility was fraudulent." *Id.*

The Court also noted its decision in *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 712 (7th Cir. 2014) in which it "rejected as 'absurd' the relators' argument that compliance with regulations were conditions of payment in the Medicare and Medicaid context," and stated that "[c]onsistent with *Momence's* foreshadowing . . . it would be equally unreasonable for us to hold that an institution's continued compliance with thousands of pages of federal statutes and regulations incorporated by reference into the PPA are conditions of payment for purposes of liability under the FCA." *Id.* at 711. The Court further went on to note that the Seventh Circuit does not adopt the "so-called doctrine of implied false certification . . .

and instead join[s] the Fifth Circuit." *Id.* at 711-12 (citing *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010)).  The Court stated, "[t]he FCA is simply not the proper mechanism for Government to enforce violations of conditions of participation contained in-or incorporated by reference into- a PPA.  Rather, under the FCA, evidence that an entity has violated conditions of participation after good-faith entry into its agreement with the agency is for the agency-not a court- to evaluate and adjudicate. . . . When entered into in good faith, a PPA memorializes conditions of participation (not conditions of payment) in connection with the U.S. Department of Education's subsidies program." *Id.* at 712.

Thus, in determining whether *Sanford-Brown* is dispositive this Court must determine what condition of payment the Relators have alleged and whether they have alleged a demonstrable nexus of fraud to the payment decision.  Before making that determination the Court once again notes that like *Watkins* and *Lusby*, *Sanford-Brown* and *Gross* are both cases in which the relators alleged false certification theories of liability that require a relator to allege an initial fraudulent certification of compliance with applicable authorities to be a condition of or prerequisite to Government payment, and *Absher* was a case in which the relators relied upon an implied certification theory of liability.  As mentioned earlier, the Relators' theory of liability is based on factual falsity, and the condition of payment is KBR's submission of invoices directly to the Government that are supposed to include allowable and reasonable costs, which effects the Government's payment decision.  The Complaint alleges KBR was required to cross-level and transfer materials internally before billing the Government for materials it already had, which it did not do on numerous occasions.

Therefore, "[e]ven in the absence of an express certification of compliance, [KBR's act of knowingly submitting claims to the Government for payment when it violated] a statute or

regulation that contains, on its face, a direct nexus to the [G]overnment's payment decision is . . . actionable under the FCA." *United States v. Rogan*, 459 F. Supp. 2d 692, 717-18 (N.D. Ill. 2006) aff'd, 517 F.3d 449 (7th Cir. 2008). As such, at this stage of ligation, without the benefit of discovery this Court cannot dismiss the Relators' Complaint because the allegations stated therein "relate to actual money that was or might have been doled out by the Government based upon actual and particularly-identified false representations." *U.S. ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 605 (7th Cir. 2005). The Court finds the Relators Complaint has alleged a false or fraudulent claim.

### B.  Presentment to the Government

In addition, the Court finds the Relators' Complaint also alleges presentment to the Government. The Complaint alleges KBR "knowingly submitted or caused to be submitted to the United States Government false or fraudulent claims for payment of services performed under the LOGCAP III contract when those services did not qualify for payment." (ECF No. 1 at 48). Specifically, the Complaint alleges invoices (i.e. false claims) were sent to the Government when new but unnecessary materials were ordered, and KBR bought materials far in excess of its true requirements because it was being paid for every surplus item it bought by the Government. (ECF No. 1 at 31-32, ECF No. 1 at 24). Because of this practice, the Complaint alleges KBR "knowingly bought hundreds of millions of dollars worth of excess materials by not filling orders from materials it has available on hand." (ECF No. 1 at 24). For example, the Complaint alleges KBR was submitting 35% of its materials requisitions without screening them for sources currently available internally. *Id.* The Complaint also highlights the June 2009 PowerPoint presentation and email referenced above in which Mr. O'Muirgheasa demonstrates how one KBR site returned tire tubes to the Government through the PCARSS process, while

another KBR site in the theater simultaneously placed new orders for the same supplies.  (ECF No. 1-34 at 3-12).  The presentation states:

> We are proposing to send [property] . . . to the PCARSS process because it is showing as a non-demand supported item in the storeroom of the site submitting the PCARSS schedule; [y]et it is a (correctly-classified) STK item in several other storerooms in theater; [a]nd it is being actively procured. Instead, we should be cross leveling/transferring this item to where it is needed, then sending the remainder (if any) to PCARSS.

(ECF No. 1-34 at 12, ECF No. 1 at 43).  As such, the Court finds the Complaint sufficiently alleges KBR presented claims to the Government for payment.

### C. Knowledge of the False or Fraudulent Claim

The Complaint also sufficiently alleges KBR had knowledge, within the meaning of the FCA, that the claims it presented for payment to the Government were false.  The Complaint and the exhibits attached thereto demonstrate KBR acted through at least Rick Kaye, Elias Faris, Conor O'Muirgheasa, David Roy, Lynellen Sullivan, Trina Hays, Tracy Townsend, Mark Brennan, Charles Weaver, Jim Haught, and Rochelle Knight when it engaged in the alleged over-ordering scheme and presented invoices that included unallowable and unreasonable costs to the Government for payment.

Specifically, the Complaint includes a May 4, 2009, email from  Mr. Haught that states "I don't think we should be showing underutilized on anything that can be seen by USG [the United States Government]"  (ECF No. 1-28); the June 24, 2009, PowerPoint presentation mentioned above that was sent to Ms. Knight, Mr. Faris, Ms. Townsend, and Mr. Haught (ECF No. 1-34 at 1-13); a March 3, 2010, email written by Mr. Kaye that states, "[t]o have something on hand and to not use it in lieu of purchasing more is a recipe for the DCAA to find fault with us and collect back what we paid for the item . . . "  (ECF No. 1 at 25, ECF No. 1-10); a March 13, 2010, Materials Control Technical Directive in which Mr. Kaye stated KBR was submitting 35% of its

materials requisitions without screening them for sources currently available in KBR (ECF No. 1 at 24-25, ECF No. 1-9); a May 28, 2010, email in which Ms. Sullivan stated "[w]e created [the] LC-IRQ-DF-999 storeroom at [the] D and F [sites] to avoid taking inventory adjustments in a TREC. We can do the same for every site. I really don't want TREC audits [to] occur especially not right now" (ECF No. 1-15 at 2); and Mr. Faris' response that stated KBR was developing processes "to get away from TREC which should have never been created in the first place but we are where we are and have to fix it" (ECF No. 1-15 at 2).

The Complaint alleges the scheme KBR participated in included: (1) a failure to cross-level before purchasing materials (ECF No. 1 at 24-25, 32, 35-36, 38); (2) a failure to properly remove materials from TREC status (ECF No. 1 at 26-28, 30, ECF No. 1-11); (3) the improper reservation of goods (ECF No. 1 at 31-34, ECF No. 1-18); and (4) the act of returning supplies to the Government as excess while ordering more (ECF No. 1 at 41-44, ECF No. 1-28). As such, the Court finds the Complaint sufficiently alleges KBR acted with at minimum "deliberate ignorance of the truth or falsity," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

## II. Federal Rule of Civil Procedure 9(b)

As mentioned above, Federal Rule of Civil Procedure 9(b) requires relators in FCA cases to allege the "who, what, when, where, and how of the fraudulent conduct, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011). In a multiple-defendant case a relator must "plead sufficient facts to notify each defendant of his alleged participation in the scheme[,] . . . [and] absent a compelling reason the [relator] is normally not entitled to treat multiple corporate defendants as one entity." *Sanford-Brown, Ltd.*, 788 F.3d at 705-06.

Furthermore, in regards to the invoices that are the grounds upon which the Relators' false claim is premised, the Seventh Circuit has held relators need not produce invoices and the accompanying representations at the outset of a suit.  *Lusby*, 570 F.3d at 854.

KBR argues the Relators' Complaint fails to meet the particularity requirements of Rule 9(b), and in the alternative, even if the Court were to accept the fact that the Relators have pled with sufficient particularity, at minimum Defendant KBR, Inc. should be dismissed.  KBR argues Defendant KBR, Inc. never held the LOGCAP III contract, and instead Defendant Kellogg Brown & Root Services, Inc. is the entity that actually holds the contract.  KBR argues Defendant KBR SI is the entity that submits the claims and is paid by the Government.  (ECF No. 49 at 91).

First, with respect to Rule 9(b) the Court finds the Relators' Complaint meets the particularity pleading requirements.  Specifically, as mentioned above with respect to "who", the Complaint and the exhibits attached thereto demonstrates KBR acted through at least Mr. Kaye, Mr. Faris, Mr. O'Muirgheasa, Mr. Roy, Ms. Sullivan, Ms. Hays, Ms. Townsend, Mr. Brennan, Mr. Weaver, Mr. Haught, and Ms. Knight.  With respect to "what", as mentioned throughout this Order, the Complaint and the exhibits attached thereto allege KBR violated the FCA by knowingly submitting and presenting to the Government invoices (i.e. claims) for reimbursement of unallowable and unreasonable costs.  With respect to "when", the Complaint alleges the fraudulent acts occurred during the time the Relators worked for KBR.  With respect to "how", the Complaint and one exhibit attached thereto, shows a step-by-step PowerPoint presentation detailing how KBR was submitting purchase orders for specific new goods that it was simultaneously returning to the Government.  *See* (ECF No. 1-34).  As such, the Court finds the Complaint meets the particularity requirements of Rule 9(b).

Finally, with respect to whether Defendant KBR, Inc. should be dismissed from this action the Complaint alleges Defendant Kellogg Brown & Root Services, Inc. is a wholly-owned subsidiary of KBR, Inc, and on December 14, 2001, LOGCAP III was awarded to Brown & Root Services, Inc., who later transferred its responsibilities under the contract to Defendant Kellogg Brown & Root Services, Inc. While this fact on its face would seem to support KBR's argument that the Complaint unequivocally alleges Defendant Kellogg Brown & Root Services, Inc. is the sole entity that held the LOGCAP III contract and billed the Government for services provided therein at all relevant times of alleged fraudulent conduct in the Complaint, the Court also is required to take into consideration the attachment submitted with the Complaint.

When looking at such attachments, many of the high ranking individuals alleged to have knowledge of KBR's fraudulent activities list KBR, Inc. in the signature of block of their emails. Such individuals consist of Mr. Kaye, Richard Abraham, Mr. Faris, Ms. Sullivan, Mr. Roy, Mr. O'Muirgheasa, Mr. Hernandez, Shon Shannon, Ms. Townsend, Mr. Vujic, Mr. Shelton, Thomas Sellars, Jim Luchsinger. (ECF No. 1-10, ECF No. 1-12, ECF No. 1-14, ECF No. 1-16, ECF No. 1-20, ECF No. 1-22, ECF No. 1-26, ECF No. 1-28). It is hard to imagine why such individuals would lists Defendant KBR, Inc. in their email signature if they do not work for the company, and this suggests the aforementioned individuals were employed by Defendant KBR, Inc. even though Defendant Kellogg Brown & Root Services, Inc. is alleged to have held the LOGCAP III contract. Furthermore, when looking at *Watkins*, a case relied upon by KBR in support of their Motion to Dismiss, that case states "KBR, Inc. . . . holds the LOGCAP III contract and has assigned responsibilities for that contract to KBRSI." *Watkins*, 2015 WL 2455533 at *2. The Complaint and the attachments thereto have supplied KBR with enough information to notify Defendant KBR, Inc. of the circumstances of its alleged participation in the scheme. As such,

the Court finds at this time, Defendant KBR, Inc. will remain in this case along with Defendant Kellogg Brown & Root Services, Inc. and KBR's Motion to Dismiss is denied.

## CONCLUSION

For the reasons stated above, KBR, Inc. and Kellogg Brown & Root Services, Inc.'s Motion to Dismiss (ECF No. 38) is DENIED and the Relators' Motion to Compel (ECF No. 47) is MOOT.  This matter is referred to the Magistrate Judge for further handling.

ENTERED this 15th day of October, 2015.

    /s/ Michael M. Mihm    
       Michael M. Mihm
    United States District Judge