UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. GEOFFREY HOWARD, and ZELLA HEMPHILL, <br><br> Plaintiffs, <br><br> v. <br><br> KBR, INC., and KELLOGG BROWN & ROOT SERVICES, INC., <br><br> Defendants. | Case No. 11-4022 |

## ORDER AND OPINION

This matter is now before the Court on Defendants KBR, Inc. and Kellogg Brown & Root Services, Inc.'s ("KBR" or "Defendants") Motion to Dismiss Relators Geoffrey Howard and Zella Hemphill's ("Relators'") Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. ECF No. 197. For the reasons stated below, Defendants' Motion to Dismiss is DENIED.

### BACKGROUND AND PROCEDURAL HISTORY

In 1985, the Government established the Logistics Civil Augmentation Program ("LOGCAP"), a United States Army initiative for the use of civilian contractors to provide combat support and services to armed forces in wartime and other contingencies.[1] Since its initiation, LOGCAP has grown exponentially as the Government has increasingly relied on private contractors to support military missions in Iraq and elsewhere.

---

[1] The facts in the Background section are derived from Relators' Complaint and this Court's October 15, 2015 Order. ECF Nos. 1, 52.

In 2001, KBR was awarded the third prime contract ("LOGCAP III") by the U.S. Army. Under this contract, KBR received task orders that required services, such as delivering food and fuel, providing dining and housing services, and supporting communication networks, transportation, and cargo services. KBR purchased materials necessary to provide those services including large, relatively immobile items, such as construction materials for facilities maintenance, and small, everyday materials, such as detergent for laundry services and pencils.

Relators allege that LOGCAP III was a cost-plus-award-fee contract. This meant that KBR billed the Government for the actual costs it incurred in carrying out its tasks, and that it could also receive additional base and award fees. In 2001, LOGCAP III was anticipated to entail task orders lasting no more than 180 days and supporting no more than 50,000 personnel across eight sites. Due to an unprecedented expansion in the scope of LOGCAP III, KBR ultimately provided support for up to 187,900 troops and operated on more than eight sites. LOGCAP III initially was designed to last up to ten years; however, KBR's performance under the contract was subject to criticism on multiple fronts. Beginning in 2004, the governmental audit agencies found multiple deficiencies by KBR across a wide spectrum of responsibilities under LOGCAP III. Various governmental audits discovered more than $1 billion in questionable costs. The U.S. Army eventually terminated LOGCAP III early and awarded LOGCAP IV in 2007 to three prime contractors – Fluor, DynCorp, and KBR – who all compete for task orders under the contract. KBR did not earn a LOGCAP IV task order until February 27, 2010.

Relators claim that KBR failed to redistribute, or "cross-level,"[2] excess property and materials under the LOGCAP III contract, which resulted in over-purchasing. According to the Relators, this knowing failure to cross-level violates the False Claims Act ("FCA") because KBR

---

[2] "Cross-leveling" is the process of filling a requisition for materials from KBR's existing set of stockpiles, instead of ordering new materials. ECF No. 1 at ¶ 35.

billed for unreasonable and unallowable costs that the Government would not have paid for otherwise.

On March 22, 2011, the Relators filed a one-count sealed Complaint alleging violations of the FCA. ECF No. 1. The Complaint was filed under seal to allow the Government time to conduct its own investigation to determine whether to join the action. *Id.* at 3. On October 7, 2014, the Government filed its notice of election to decline to intervene. ECF No. 25. On October 9, 2014, the Complaint and the Government's notice of election to decline to intervene were unsealed. ECF No. 26. On March 30, 2015, KBR filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. ECF No. 38. On October 15, 2015, the Court denied KBR's motion. ECF No. 52. On November 9, 2015, KBR filed a motion requesting certification for interlocutory appeal under 28 U.S.C. § 1292(b) of this Court's October 15, 2015 Order. ECF No. 60. On February 29, 2016, the Court denied KBR's request. ECF No. 75. Subsequently, the Parties engaged in extensive discovery for the past five years. On May 7, 2020, KBR filed this instant Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. ECF No. 197. On June 4, 2020, the Relators filed their response. ECF No. 207. On June 25, 2020, KBR filed its reply. ECF No. 211. This Opinion follows.

## STANDARD OF REVIEW

When deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a court must accept the factual allegations made in the complaint as true and construe reasonable inferences in favor of the non-movant. *Rueth v. EPA*, 13 F.3d 227, 229 (7th Cir. 1993). A court is not, however, restricted to the jurisdictional contentions asserted in the complaint but may use other evidence that has been submitted to determine whether it has subject matter jurisdiction. *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). The party asserting jurisdiction

has the burden of proof, and the court is free to weigh the evidence to determine whether jurisdiction has been established. *United Phosphorus Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003).

## ANALYSIS

### I.   Public Disclosure Bar

To combat fraud, the FCA imposes civil liability on any party who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" paid by the government. 31 U.S.C. §§ 3729(a)(1)(A)–(B). The FCA provides for a *qui tam* enforcement mechanism, which allows a private party (also known as a "relator") to bring a lawsuit on behalf of the government to recover money that the government paid as a result of fraudulent claims. *See* 31 U.S.C. § 3730(b). To encourage private citizens to come forward with knowledge of fraudulent activity, the FCA entitles prevailing relators to receive a share of the funds they recover. *See* §§ 3730(d)(1)–(2).

A *qui tam* action would serve no purpose, however, if "the government is already aware that it might have been defrauded and can take responsive action." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009). Accordingly, a *qui tam* suit is barred when the allegations in the complaint are based on information already known to the government. *Id.* This "public disclosure" bar provides that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions . . . unless . . . the person bringing the action is an original source of the information." § 3730(e)(4).

On March 23, 2010, section 3730(e)(4) was amended. The Seventh Circuit held that the amendment was not retroactive and the version that applies is that which was "in force when the

events underlying [the] suit took place." *U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 934 (7th Cir. 2012). Here, the Parties agree that the pre-amendment version applies because the allegations in the Complaint encompass dates before and after March 23, 2010. *See Bellevue v. Universal Health Servs. of Hartgrove, Inc.,* 867 F.3d 712, 717 (7th Cir. 2017) (stating that when the alleged conduct straddles the date of amendment, the pre-amendment version applies).

Courts must conduct a three-step inquiry to determine whether a suit is precluded by the public disclosure bar. First, a court must examine whether the relator's allegations have been "publicly disclosed." *Glaser*, 570 F.3d at 913. If so, the court must then ask whether the lawsuit is "based upon" those publicly disclosed allegations. *Id.* If it is, the court must determine whether the relator is considered an "original source" of the information upon which their lawsuit is based. *Id*.

### A.     Public Disclosure

KBR contends that Relators' allegations were well known to the Government before the suit was filed through a series of reports, audits, and letters from several different governmental agencies. KBR states that these documents should be considered public disclosures under section 3730(e)(4). Relators argue that the public disclosures identified by KBR, at most, reveal isolated instances of a breach of contract rather than an FCA violation.

Section 3730(e)(4) provides that no court shall have jurisdiction over a *qui tam* action that is:

> based upon the public disclosure of allegations or transactions [1] in a criminal, civil, or administrative hearing, [2] in a congressional, administrative, or . . . report, hearing, audit, or investigation, or [3] from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,* 559 U.S. 280, 286 (2010) (quoting § 3730(e)(4)(A)). A public disclosure occurs when "the critical elements exposing the

transaction as fraudulent are placed in the public domain." *U.S. ex rel. Feingold v. AdminaStar Fed., Inc.,* 324 F.3d 492, 495 (7th Cir. 2003). The Seventh Circuit has held that allegations are considered to be publicly disclosed when they appear in a warning letter from an agency, are the subject of a governmental audit, were included in reports prepared by a governmental agency, or when information about fraudulent behavior has been provided to a public official who has managerial responsibility for the claim. *U.S. ex rel. Gross v. AIDS Research All.-Chicago*, 415 F.3d 601, 606 (7th Cir. 2005) (agency warning letter); *United States v. Emergency Med. Assocs. of Illinois, Inc.*, 436 F.3d 726, 728 (7th Cir. 2006) (governmental audit); *Feingold*, 324 F.3d at 496 (governmental agency reports); *United States v. Bank of Farmington*, 166 F.3d 853, 861 (7th Cir. 1999), *overruled on other grounds by Glaser*, 570 F.3d 907 (information provided to a public official with managerial responsibility). Furthermore, a "public disclosure reveals fraud if the information is sufficient to put the government on notice of the likelihood of related fraudulent activity." *U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 512 (6th Cir. 2009) (internal citation and quotations omitted). The disclosure need not specifically allege fraud and may come from more than one source, as long as the information leads to an inference of fraud. *Id*; *see also Bellevue*, 867 F.3d at 718 (fraud could be inferred from result of governmental audits).

Here, there were several governmental audits, reports, and letters conducted of KBR's performance under the LOGCAP III contract. While KBR does not concede to the truth of the assertions in these documents, KBR provided a comprehensive list that highlighted several instances where governmental agencies raised concerns over KBR's failure to cross-level, track inventory, and properly dispose of government property. ECF No. 198-2. Examples include: (1) an Army Audit Agency ("AAA") report from November 16, 2006, stating that KBR had up to $113.3 million in excess non-tactical vehicles; (2) an AAA audit from November 21, 2006,

reporting that the amount of KBR's equipment "exceeded requirements and usage of equipment was below established standards;"(3) a Defense Contract Management Agency ("DCMA") audit from August 24, 2007, reporting "major deficiencies," failure to follow cross-leveling, and failure to "meet the necessary basic standards of an acceptable receiving process under . . . the LOGCAP contract;" (4) an Award Fee Determining Official letter from October 17, 2007, reporting "there is no evidence of cross leveling" from KBR and "Government property control, validation, and serviceability are major concerns," among several other concerns; (5) a DMCA audit from January 10, 2008, reporting that KBR employees populated data fields with "erroneous information in what appears to be an attempt to simply populate the data fields with any kind of information at the expense of accurate posting entries;" (6) an AAA audit from March 12, 2008, reporting deficiencies in KBR's utilization of heavy material handling equipment; (7) a DCMA audit from April 29, 2008, reporting that "excessive quantities of material are being unreasonably procured;" (8) an AAA audit from September 30, 2009, reporting KBR's cross-leveling deficiencies and that KBR substantially over ordered generators worth $18.5 million;  (9) an AAA audit from September 28, 2010, reporting that KBR could not account for $100 million in government property; and (10) a Performance Evaluation Board ("PEB") report from January 19, 2011, that stated KBR held $5 million worth of excess government property at a site until the last day and that KBR kept "a lot of what went on behind their walls secretive," among many other examples. *Id;* ECF Nos. 198-11 at 2-3; 198-13 at 3; 198-14 at 4; 198-25 at 9-10; 198-29 at 3-6; 198-31 at 2; 198-32 at 1; 198-33 at 12; 198-34 at 2; 198-41 at 2, 11. Many of these audits were also summarized in quarterly reports that were delivered to Congress and published online. ECF No. 198-39.

  The Seventh Circuit has repeatedly held that facts are in the public domain if they are in the possession of the government. *Bank of Farmington*, 166 F.3d at 861; *see also Cause of Action*

*v. Chicago Transit Auth.*, 815 F.3d 267, 278 (7th Cir. 2016); *Feingold*, 324 F.3d at 496. Although it has acknowledged that the majority view is that disclosure to the government alone does not constitute public disclosure, and that the view has "significant force," the Seventh Circuit has maintained its position that the government's "possession of the information exposing a fraud is alone sufficient to trigger the public disclosure bar." *Cause of Action*, 815 F.3d at 275, 277. The Seventh Circuit has also rejected the argument that "unless the allegations of wrongdoing have been widely disseminated, the government must take some affirmative step to publicize its investigation." *Glaser*, 570 F.3d at 913.

Applying the existing circuit precedent, the Court finds that the allegations against KBR regarding its failure to cross-level, track inventory, and properly dispose of government property were publicly disclosed through governmental audits, reports, and letters. *See* § 3730(e)(4)(A). Relators claim that none of the documents disclose that KBR's failures were knowing, intentional, and covered up; however, the Seventh Circuit has held that audits and similar documents concerning regulatory violations were public disclosures because they provided a "sufficient basis to infer" the defendant presented false information. *Bellevue*, 867 F.3d at 719. As seen in the aforementioned paragraph, KBR provided a plethora of instances where it was flagged for failing to cross-level, track inventory, and properly dispose of property.

The Seventh Circuit has also held that the public disclosure must be made to an official or body with "direct responsibility" for the claim in question. *Bank of Farmington*, 166 F.3d at 861. "Assuming no other public promulgation of the information, the public official to whom the information is disclosed must be one whose duties extend to the claim in question in some significant way." *Id.* Once information is in the hands of someone "authorized to act for or to represent the community," it is considered disclosed to the public. *Id.*

Here, many of the officials who prepared the audits, reports, and letters had managerial authority over KBR and the LOGCAP III contract. *See* ECF Nos.198-2; 198-4; 198-35. While Relators argue that the Government employee "most responsible for monitoring KBR's performance," Maria McNamara, was unaware that KBR was failing to cross-level, the Court finds that there are other employees who were also responsible for supervising and assessing KBR's performance and were aware of KBR's failures. These included Administrative Contracting Officers, DCMA officials, and more. ECF Nos. 198-4; 198-35-38. Relators have not cited any cases where it must be the public official with the "most" responsibility.

Based on the foregoing, the Court finds that a public disclosure has occurred. As such, the Court finds that the first prong of the public disclosure bar is met.

### B.  Lawsuit Based Upon Public Disclosure

KBR claims that DCMA and U.S. Army officials previously noted concerns about KBR's purported failures to cross-level property and underutilize equipment. KBR states that Relators' allegations are based upon these previous concerns that the Government was already aware of, and the Complaint's additional details do not save the case from the public disclosure bar.

The next step in the Court's inquiry is to "determine[s] whether the . . . lawsuit is 'based upon,' *i.e.*, 'substantially similar to,' those publicly disclosed allegations." *Cause of Action*, 815 F.3d at 274. The public disclosure bar may not be avoided by adding "extra details" or "additional instances" of false claims. *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 691 (7th Cir. 2014). The public disclosure bar will apply even where the *qui tam* relator's "allegations are only partly based upon publicly-disclosed allegations." *Singer v. Progressive Care*, SC, 202 F. Supp. 3d 815, 823 (N.D. Ill. 2016); *see also Heath*, 760 F.3d at 691 ("based upon does not mean solely based upon, for a *qui tam* action even partly based upon publicly disclosed allegations or

9

transactions is nonetheless based upon such allegations or transactions.") (internal quotations and citation omitted). Factors used to determine whether a relator's allegations are based upon those already publicly disclosed include: "(1) whether the time periods for the allegations. . . overlap; (2) whether the relator has first-hand knowledge of the allegations; (3) whether the allegations are similar . . .; and (4) whether the relator presents genuinely new and material information than that previously disclosed." *U.S. ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 659 (N.D. Ill. 2015).

Here, all four factors are met indicating the Relators' allegations are based upon previously publicly disclosed documents. The first standard is met as the allegations in the Complaint and the audits, reports, and letters referenced by KBR all involve overlapping time periods. *See* ECF Nos. 1, 198-2. The second standard is also met as the Relators have first-hand knowledge of the allegations. Specifically, Relator Howard was a desktop analyst for KBR's IT department and prepared reports on KBR's materials usage. ECF No. 1 at 4-5. In 2008, while working for KBR, he discovered hundreds of millions of dollars in idle government property. *Id.* at 5. On August 2, 2009, due to pressure from KBR resulting from his complaints about excessive ordering and underutilization of government property under the LOGCAP III contract, Relator Howard resigned. *Id.* Additionally, Relator Hemphill also worked for KBR. *Id.* On July 27, 2005, Relator Hemphill worked as an administrative specialist for the LOGCAP III contract and subsequently managed KBR's government property. *Id.* During her employment, Relator Hemphill discovered significant problems in how KBR was ordering, using, and accounting for government property. *Id.* In May 2008, Relator Hemphill was transferred to KBR's Distribution Management Center ("DMC") and was promoted to senior materials control specialist. *Id.* Her job at the DMC was to facilitate usage of KBR's excess government property by matching internal demand for materials

with available supplies in KBR storerooms. *Id*. She worked closely with Relator Howard to increase KBR's cross-leveling and correspondingly decrease duplicative purchasing. *Id.*

The Court also finds that the third and fourth standard are met. While Relators provide additional examples of KBR's failures, the allegations are the type of additional instances that the Seventh Circuit has held will not overcome the public disclosure bar. *See Heath*, 760 F.3d at 691. For example, Relators allege that one of the ways KBR lost accountability for government property was through virtual holding areas within the MAXIMO/STEAM software program and that KBR concealed these issues from the Government. ECF No. 1 at 25-28. However, starting in 2009, the AAA and DCMA disclosed problems with property accountability in reports. ECF Nos. 198-7; 198-28; 198-34. Some disclosures specifically noted problems caused by inaccurate MAXIMO/STEAM records regarding these virtual holding areas. ECF Nos. 198-6; 198-12; 198-16; 198-20. The Court found several other instances where Relators' allegations were based on, or were substantially similar, to the publicly disclosed audits, reports, and letters. *Compare* ECF No. 1 at 26-28, 31-33, 41, *and Id.* at 41-47, *with* ECF Nos. 198-11; 198-14; 198-19; 198-24, *and* ECF Nos. 198-10; 198-15; 198-17; 198-43.

Based on the foregoing, the Court finds Relators' allegations are based upon previously publicly disclosed documents. As such, the Court finds that the second prong of the public disclosure bar is met.

   C. *Original Source*

KBR argues that the Relators are not an original source because their allegations do not materially add to those that have been publicly disclosed and are not independent of the public disclosures. In turn, Relators state that they are original sources and their allegations materially

added to the public disclosures because they revealed deliberate and systemic failures that KBR attempted to cover up.

"The original source exception permits jurisdiction over an FCA action even if the relator's lawsuit is based upon publicly disclosed information provided that the relator is 'an original source of the information.' " *Glaser*, 570 F.3d at 916 (quoting § 3730(e)(4)(A)). The pre-2010 FCA defined "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the [g]overnment before filing an [FCA] action." *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 828-29 (7th Cir. 2013) (quoting § 3730(e)(4)(B)) (internal quotations omitted). Accordingly, relators have the burden of showing that they have "(1) direct knowledge of fraudulent activity; (2) independent knowledge of fraudulent activity; and (3) voluntarily provided their information to the government before filing a *qui tam* action." *Glaser*, 570 F.3d at 917.

"Direct" knowledge is that which is "based on [a relator's] own investigative efforts and not derived from the knowledge of others." *Id.* For a relator to establish that he or she has independent knowledge, the relator must be "someone who would have learned of the allegation or transactions independently of the public disclosure." *Id.* at 921. However, "potential relators rarely will have direct and independent knowledge of all essential elements in an FCA action." *U.S. ex rel. Lamers v. City of Green Bay*, 998 F.Supp. 971, 982 (E.D.Wis.1998), *aff'd*, 168 F.3d 1013 (7th Cir. 1999). As such, while "[o]riginal sources should be independently aware of some essential piece of information, [they] need not have direct knowledge of *all* of the vital ingredients in a fraudulent transaction." *Id.* (emphasis added).

The Court finds that Relators are original sources. As described in the foregoing section, Relators worked for KBR and directly on the LOGCAP III contract. Thus, they had direct and

independent knowledge of the fraudulent activity. In 2010, the Relators also voluntarily disclosed the information to the Government. ECF No. 169-8. Many of the allegations and documents produced through five years of discovery reflect that Relators have materially added to the audits, reports, and letters that were publicly disclosed. For example, (1) the head of KBR's Kuwait Support Office deleted Relator Howard's reports that showed over $600 million in unnecessary materials stockpiled in KBR's warehouses, because it was "too dangerous" to risk the Government finding the report during an audit; (2) emails from 2009 where a KBR manager stated it should not show underutilization on anything; (3) emails where KBR directed its employees not to speak to anyone outside of KBR about internal business allegedly after Relator Howard alerted KBR's senior management about KBR's cross-leveling failures; and (4) KBR not correcting hundreds of millions of dollars of excess materials in virtual storerooms because doing so would risk governmental audits. ECF Nos. 1 at 37, 39-40; 1-28; 1-30; 1-14; 1-15. Relators also submitted an extensive list of emails and conversations they were privy to, many of which were not disclosed in governmental audits, reports, or letters. *See* ECF No. 207 at 13-42.

Based on the foregoing, the Court finds that the information presented by Relators materially added to the publicly disclosed information. *See generally U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 308 (3d Cir. 2016) (holding that relator's independent knowledge of alleged fraud materially added to publicly disclosed information). As such, the Court finds that the original source exception to the public disclosure bar is met and declines to dismiss Plaintiff's Complaint.

## CONCLUSION

For the reasons stated above, [197] Defendants' Motion to Dismiss is DENIED.

ENTERED this 9th day of July, 2020.

/s/ Michael M. Mihm
Michael M. Mihm
United States District Judge
