E-FILED
Monday, 29 August, 2022  11:59:13 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT FOR
## THE CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* GEOFFREY HOWARD AND | ) | |
| ZELLA HEMPHILL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:11-cv-04022 |
| | ) | |
| KBR, INC., and KELLOGG BROWN & | ) | |
| ROOT SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jennifer L. Saulino
David N. Sneed
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Phone: (202) 662-6000
jsaulino@cov.com
dsneed@cov.com

Craig D. Margolis
Tirzah S. Lollar
Owen Dunn
Emily Reeder-Ricchetti
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
(202) 942-5000
(202) 942-5999 (facsimile)
craig.margolis@arnoldporter.com
tirzah.lollar@arnoldporter.com
owen.dunn@arnoldporter.com
emily.reeder-ricchetti@arnoldporter.com

*Attorneys for Defendants KBR, Inc. and Kellogg Brown & Root Services, Inc.*

August 29, 2022

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION .................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ....................................... 4

    I.      The LOGCAP III Contract.......................................................... 5

         A.      KBR's Purchases of Property & Materials ........................ 7

         B.      DCMA Administration of the LOGCAP III Contract ............. 10

    II.      Cross-Leveling Requirements ................................................... 11

         A.      Federal Regulations ........................................................ 11

         B.      LOGCAP III Contract, Task Orders, and Statements of Work ............... 11

    III.      KBR's Efforts To Cross-Level ................................................. 16

    IV.      The Government Did Not Provide Cross-Level Guidance to KBR.................... 19

         C.      DCMA Audits of KBR's Property Management System ........................ 20

         D.      Army Audit of Contractor Acquired Property in Iraq ............................ 21

         E.      DCAA Audits of KBR's Costs ................................................. 21

ARGUMENT ........................................................................................................ 22

    I.      Legal Standard ........................................................................ 22

    II.      Relators Cannot Establish Bedrock FCA Elements of Falsity and Scienter......... 23

         A.      Relators Cannot Establish Falsity ......................................... 24

             1.      Relators' "Factual Falsity" Theory Is Not Viable........................ 26

             2.      Relators Cannot Survive Summary Judgment Under an Implied False Certification Theory ................................ 27

         B.      Relators Cannot Establish Scienter ....................................... 35

         C.      Relators Must Establish the Elements for Every Alleged False Claim................................ 41

CONCLUSION .................................................................................................... 43

CERTIFICATE OF COMPLIANCE ................................................................... 45

CERTIFICATE OF SERVICE ............................................................................ 46

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................................23

*Beraha v. Baxter Health Care Corp.*,
  956 F.2d 1436 (7th Cir. 1992) ...........................................................................33

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)......................................................................................22, 23

*Daubert v. Merrell Dow Pharmaceuticals*,
  509 U.S. 579 (1993).....................................................................................37, 42

*Gen. Dynamics Corp. v. United States*,
  671 F.2d 474 (Ct. Cl. 1982) .........................................................................23, 32

*Hagood v. Sonoma County Water Agency*,
  81 F.3d 1465 (9th Cir. 1996) .............................................................................33

*Harrison v. Westinghouse Savannah River Co.*,
  176 F.3d 776 (4th Cir. 1999) .............................................................................24

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)............................................................................................23

*Mikes v. Straus*,
  27 F.3d 687 (2d Cir. 2001)..................................................................................25

*Safeco Ins. Co. of America v. Burr*,
  551 U.S. 47 (2007)........................................................................................35, 41

*Serir v. Illinois Cent. College*,
  Case No. 20-cv-1031, 2021 WL 3782891 (C.D. Ill. Aug. 25, 2021) (Mihm, J.)....................23

*Specialty Earth Scis., LLC v. Carus Corp.*,
  No. 15-CV-06133, 2021 WL 4804076 (N.D. Ill. Oct. 14, 2021) ...........................................33

*U.S. ex rel. Carter v. Halliburton Co.*,
  No. 1:08CV1162 (JCC), 2009 WL 2240331 (E.D. Va. July 23, 2009)..................................33

*U.S. ex rel. Crews v. NCS Healthcare of Illinois, Inc.*,
  460 F.3d 853 (7th Cir. 2006) .............................................................................41

*U.S. ex rel. Garzione* v. *PAE Gov't Servs., Inc.*,
    164 F. Supp. 3d 806 (E.D. Va. 2016) ...................................................................31

*U.S. ex rel. Godfrey v. KBR, Inc.*,
    No. 1:05-cv-1418, 2008 WL 9878351 (E.D. Va. 2008) ........................................29

*U.S. ex rel. Howard v. KBR*,
    139 F.Supp.3d 917 (C.D. Ill. 2015) .....................................................................26

*U.S. ex rel. Ketroser v. Mayo Found.*,
    729 F.3d 825 (8th Cir. 2013) ................................................................................39

*U.S. ex rel. Lamers v. City of Green Bay*,
    168 F.3d 1013 (7th Cir. 1999) .........................................................................24, 39

*U.S. ex rel. Lisitza v. Par Pharm. Companies, Inc.*,
    276 F. Supp. 3d 779 (N.D. Ill. 2017) ...............................................26, 31, 34, 41

*U.S. ex rel. Morton v A Plus Benefits, Inc.*,
    139 F. App'x 980 (10th Cir. 2005) ......................................................................39

*U.S. ex rel. Proctor v. Safeway, Inc.*,
    30 F.4th 649 (7th Cir. 2022) ................................................................................39

*U.S. ex. rel. Schutte v. SuperValu Inc.*,
    9 F.4th 455 (7th Cir. 2021) ........................................................................ *passim*

*U.S. ex rel. Sheldon v. Allergan Sales*,
    LLC, 24 F.4th 340 (4th Cir. 2022), *reh'g en banc granted*, No. 20-2330, 2022
    WL 1467710 (4th Cir. May 10, 2022) ..................................................................40

*U.S. ex rel. Watkins v. KBR, Inc.*,
    106 F. Supp. 3d 946 (C.D. Ill. 2015) ...................................................................29

*U.S. ex rel. Wilson v. KBR*,
    525 F.3d 370 (4th Cir. 2008) ..................................................................... *passim*

*U.S. ex rel. Wilson v. KBR, Inc.*,
    1:04-cv-595 (E.D. Va. Feb. 5, 2007) (unpub. op.)...............................................29

*U.S. ex rel. Yannacopoulos v. Gen. Dynamics*,
    652 F.3d 818 (7th Cir. 2011) .................................................23, 24, 25, 27, 34

*United Health Services, Inc. v. U.S. ex rel. Escobar*,
    579 U.S. 176 (2016)................................................................................... *passim*

*United States ex rel. Barko v. Haliburton Co.*,
    241 F. Supp. 3d 37 (D.D.C. 2017) ...................................................................8, 29

*United States ex rel. Heath v. Wisconsin Bell, Inc.*,
  No. 08-CV-0724, 2022 WL 860621 (E.D. Wis. Mar. 23, 2022) ......................................23, 41

*United States v. AseraCare, Inc.*,
  938 F.3d 1278 (11th Cir. 2019) ...........................................................................31, 33, 41, 42

*United States v. Long Grove Manor, Inc.*,
  No. 10 C 368, 2019 WL 2774149 (N.D. Ill. July 2, 2019) ......................................................41

*United States v. Northrop Grumman Sys. Corp.*,
  No. 09 CV 7306, 2015 WL 5916871 (N.D. Ill. Oct. 8, 2015) ....................................31, 33, 34

*United States v. Sanford-Brown, Ltd.*,
  840 F.3d 445 (7th Cir. 2016) (*Sanford-Brown II*) ..........................................................27, 29

*United States v. Sci. Apps. Int'l Corp.*,
  626 F.3d 1257 (D.C. Cir. 2010) ...........................................................................................25

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
  529 U.S. 765 (2000) ..............................................................................................................40

## Statutes

31 U.S.C. § 3729(a)(1)(A) ...........................................................................................23, 34

31 U.S.C. § 3729(b)(1) .................................................................................................23, 35

False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ......................................................... *passim*

## Other Authorities

Defense Federal Acquisition Regulation Supplement .................................................11, 15, 19, 37

FAR 31.201 ...........................................................................................................................8

FAR 45.101 ...........................................................................................................................7

FAR 45.502(a) (1984) ....................................................................................................10, 16

FAR 52.216-7 ........................................................................................................................8

FAR 52.232-20 ..................................................................................................................6, 32

FAR 52.232-22 ..................................................................................................................6, 32

FAR 52.245-1 (2007)...................................................................................................7, 10, 16

FAR 52.245-5 (1986)...................................................................................................7, 10, 16

Fed. Procurement Law 1639 (3d ed. 1980)..................................................................32

Fed. R. Civ. P. 56(a) ..............................................................................................22

Local Civ. R. 5.1(C)................................................................................................45

Local Civ. R. 7.1(B)(4)(b)(1)..................................................................................45

Pursuant to Federal Rule of Civil Procedure 56, Defendants KBR, Inc. and Kellogg Brown & Root Services, Inc. (collectively, "KBR") submit this motion for summary judgment.

## **INTRODUCTION**

This is a False Claims Act ("FCA") case about "cross-leveling" in a warzone. Under the Logistics Civil Augmentation Program ("LOGCAP") III contract, KBR supported the warfighter by providing every conceivable life support service, including facility and vehicle maintenance, food service, laundry, and scores of others. To meet this sweeping mission over the course of *years*, KBR purchased billions of dollars' worth of materials for the Government and for which it was reimbursed under the contract. To save money, KBR "cross-leveled," that is, tried to avoid purchasing by using existing stock. There is no dispute that KBR cross-leveled *at least* $495 million in materials alone (the figure is likely much higher). And, KBR worked to improve cross-leveling performance; indeed, the bulk of Relators' evidence consists of internal communications by managers and other employees exhorting their colleagues to increase cross-leveling. Nevertheless, Relators contend KBR should have cross-leveled even more. Whether or not grist for a breach of contract claim, "insufficient" cross-leveling is not fraud. To proceed to trial under the FCA, Relators must show that KBR's invoices to the Government were objectively false and that KBR knew (or was at least reckless) of this falsity. For the reasons discussed below, Relators cannot satisfy these requirements, and KBR is entitled to summary judgment.

First and foremost, the FCA requires proof of objective falsity, that is, that KBR's invoices included objectively false representations. But, KBR's invoices make no representations or certifications of any kind. KBR's costs were submitted on a standard Government "public voucher" that simply "rolls up" all costs incurred by KBR on a task order in a given period. The form includes no representation by KBR; indeed, the only certification is by a Government official

1

after KBR submits the bill.  And, even if there were representations, there was no contractual or legal standard to evaluate their truth or falsity, nor is there any objective yardstick against which to measure whether KBR cross-leveled "enough."

When KBR's motion to dismiss was denied in 2015, the Court characterized Relators' theory as factual falsity—that "KBR was required to cross-level and transfer materials internally before billing the Government for materials it already had," and that KBR knowingly "violated a statute or regulation that contains, on its face, a direct nexus to the Government's payment decision[.]"  Since then, the Supreme Court decided *United Health Services, Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016), which shows Relators' claim instead is implied false certification. This is because KBR's invoices do not include any express certification about cross-leveling (or anything else) and are not alleged to be facially false, for example, by including costs for an item that KBR did not buy.  There is no evidence or reason to believe that any of the costs claimed on those invoices were not actually incurred.  Relators are left with the theory that the invoices were false by implication, that is, when KBR invoiced it impliedly certified compliance with an underlying legal or contractual requirement, here, cross-leveling.

*Escobar* requires more.  Relators must point to a "specific representation" in KBR's invoices that was an "objective falsehood," which KBR knew to be false (or at least was reckless as to its truth or falsity).  As noted, there is no "specific representation" about cross-leveling.  And, there is no objective standard for cross-leveling in the contract, in law, or regulation.  The LOGCAP contract itself never uses the term "cross-leveling."  It appears only in certain task orders at certain times, but is never defined and is qualified.  At most, KBR is to cross-level to the "maximum extent possible" and this requirement (like all others under LOGCAP) is subject to KBR's "best efforts."  Therefore, KBR's only requirement relevant here was to use its "best

efforts" to "cross-level" to the "maximum extent possible" at certain times, under certain task orders.

This amorphous requirement is not fleshed out by Government regulation, publication, or policy. Government witnesses and *both* parties' experts have testified that KBR had discretion in when, whether, and how to cross-level; and that the Government itself did not limit the exercise of that discretion. With KBR having cross-leveled at least $495 million in materials exclusive of equipment or other assets, and Relators asserting KBR should have cross-leveled more, the jury would be asked to assess KBR's performance subjectively. The FCA is a quasi-criminal, punitive statute, and bedrock principles of FCA law and fundamental fairness preclude a trial over whether KBR submitted false claims without objective standards on which a jury could base its findings.

Relators also cannot prove "knowledge" for similar reasons. KBR could not have knowingly or recklessly failed to meet ambiguous and ill-defined cross-leveling requirements when it in fact cross-leveled a minimum of a half a billion dollars in materials alone. Contractual terms like "best efforts" and "maximum possible extent" are, by their very nature, subject to interpretation. Relators' evidence—a series of vignettes in which some KBR employees criticized others' performance—is irrelevant as a matter of law. KBR's requirement— again only in certain task orders at certain times—was to use its best efforts to cross level to the maximum possible extent, and as long as its implementation was compatible with any objectively reasonable interpretation of the relevant contractual or legal requirement, KBR cannot have knowingly submitted false claims.[1]

---

[1] Relators also must prove the alleged non-compliance was material to payment; however, KBR is not moving for summary judgment on materiality, except on the ground discussed below that Relators have not established each of the elements—falsity, knowledge, and materiality—for the public vouchers they allege to be false. If the case were to proceed to trial, KBR will insist Relators meet their burden on every element.

Relators' evidence falls short in a final respect.  They must present evidence to prove each FCA element (*i.e.*, falsity, knowledge, and materiality) for each particular claim alleged.  It is not enough for Relators to point to isolated documents, untethered to any particular claim for payment, that criticize KBR's cross-leveling in general.  Relators must, for each individual invoice alleged to be false, establish what KBR specifically represented to the Government, why the representation was objectively false, and who at KBR knew and what did they know of this falsity.  They also must show how the billing of the particular cost was material to the Government.

The FCA is not an all-purpose antifraud statute or a vehicle for punishing breach-of-contract.  Thus, the FCA does not provide a forum for Relators to enforce a subjective interpretation of KBR's obligations and claim as damages hundreds of millions of dollars' worth of alleged "over-ordering"—another concept not in law, regulation, or contract—subject to trebling and penalties.  Instead, the FCA's purpose is to target and redress specific false claims, and for each and every false claim alleged, Relators must prove each and every element necessary to establish liability.  Because Relators' evidence comes nowhere close, KBR is entitled to summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     The relevant time period in this case is January 2007 to January 2012.  Ex. 20, Relators' First Set of Requests for Production ("RFP") at 1 (Oct. 22, 2015).

2.     In this case, the term "cross-leveling" means the process by which KBR fulfilled demands for wartime supplies by using available materials in KBR storerooms instead of purchasing new supplies.  Compl. ¶ 9.

3.     The war theater consisted of numerous bases of various sizes, known as "sites," which were spread across Iraq, Afghanistan, Kuwait, Jordan, Djibouti, Turkey, Georgia, and

Uzbekistan.  Ex. 1, Booth Decl. ¶ 3 (Aug. 29, 2022).  In the relevant time period, KBR supported

the military at over 200 sites in the war theater, with the majority located in Iraq and Afghanistan.

*Id.* at ¶ 4; *see also* Ex. 33, Vollmecke Dep. (Oct. 23, 2020) at 33:14-37:12 (describing the

environment as "quite challenging" with "elements of weather, the enemy, and constant, again,

mortar rocket attacks," creating "extremely complicated" logistical support operations "spread

across 426,105 miles between two [war] theaters" during his tenure as DCMA commander).

4.     KBR cross-leveled at least $495 million dollars in materials during the relevant

time period.  Ex. 39, Gaukler Rebuttal Rep. at 5 (stating that KBR cross-leveled $495 million in

materials); Ex. 28, Walter Rep. at 2-3 (summarizing analysis finding that KBR cross-leveled

approximately $1.2 billion in materials, and as much as $4.9 billion overall); Ex. 36, Hemphill

Dep. (Apr. 13, 2018) at 151:7-14 (testifying that  KBR cross-leveled at least $240 million of

items).[2]

## I.     The LOGCAP III Contract

5.     On December 14, 2001, the Army Operations Support Command, Rock Island,

Illinois ("ACC") awarded the LOGCAP III contract to Brown & Root Services, Inc, a subsidiary

of Defendant Kellogg Brown & Root Services, Inc. ("KBR")  Ex. 17, Contract DAAA09-02-D-

0007 (Dec. 14, 2001) ("LOGCAP III Contract").  LOGCAP utilizes civilian contractors to perform

life support and other services for the warfighter.  *Id.* at Base Statement of Work ("Base SOW")

at §1.0 (KBR-HOW-7104387); Ex. 32, Wade Dep. (Sept. 15, 2020) at 13:23-24; Ex. 34, Larkin

Dep. (Nov. 5, 2020) at 43:4-45:14.

---

[2]  The parties disagree about the exact quantity of materials KBR cross-leveled during the relevant
time period, with KBR's own expert, Bill Walter, calculating cross-leveling of materials alone as
at least $700 million and potentially exceeding $1 billion..  KBR includes Dr. Gaukler's calculation
here only to show that the parties agree KBR cross-leveled hundreds of millions of dollars' worth
of supplies even if all of Relators' proffered expert testimony is accepted.

6.      LOGCAP III is an indefinite delivery, indefinite quantity ("IDIQ") contract. Ex. 33, Vollmecke Dep. (Oct. 23, 2020) at 23:13-16.  This IDIQ contract served as an umbrella contract, and KBR performed work under it pursuant to individually-awarded task orders.  Ex. 26, Branch Rep. at 19; Ex. 32,Wade Dep. (Sept. 15, 2020) at 26:17-19; Ex. 34, Larkin Dep. (Nov. 5, 2020) at 64:8-16.

7.      Each task order included a statement of work ("SOW"), which was a document drafted by the Government that articulated KBR's specific responsibilities for the particular task order.  Ex. 32, Wade Dep. (Sept. 15, 2020) at 32:19-34:10.

8.      Under the task orders at issue in this case, KBR was required to use its "best efforts" to deliver supplies and services that complied with the contract specifications and statements of work.  Ex. 17, LOGCAP III Contract at KBR-HOW-7104369 (incorporating by reference FAR 52.232-20 & 52.232-22); FAR 52.232-20 ("The Contractor agrees to use its best efforts to perform the work specified in the Schedule and all obligations under this contract within the estimated costs); FAR 52.232-22 (same).  Neither LOGCAP III nor the FAR define "best efforts." *See generally* FAR 52.232-20 & 52.232-22 and Ex. 17, LOGCAP III Contract; *see also* Ex. 26, Branch Rep. at 27-29 (discussing the contract and FAR clauses relating to "best efforts"); Ex. 43, Zakheim Dep. (Jul. 29, 2022) at 127:10-128:15 (Relators' expert testifying that the contract had a "general requirement for best efforts" which "could easily be interpreted as being cross-leveling," that "best efforts is a squishy term," and KBR was required to "make the best effort to be efficient"); Ex. 40, Rudolph Rep. at 44 (describing "concerted and dedicated supervision/management and efforts" as the "level of effort required to successfully execute and fulfill the LOGCAP III contract and its task orders").

6

9.      The Federal Acquisition Regulation ("FAR") is the primary regulation setting forth the Government's requirements for contractors' acquisition and procurement of supplies and services.  *See* Ex. 44, FAR Foreword (1984); Ex. 34, Larkin Dep. (Nov. 5, 2020) at 28:13-29:11. LOGCAP III incorporates certain clauses from the FAR.  Ex. 17, LOGCAP III Contract at KBR-HOW-7104367 through KBR-HOW-7104379.  From the time of contract award through September 30, 2009, LOGCAP III incorporated FAR 52.245-5 (1986), the "Government property clause."  *Id.* at KBR-HOW-7104378.  After a contract modification effective September 30, 2009, and in effect through the end of the relevant time period, LOGCAP III incorporated a revised version of the Government property clause, renumbered as FAR 52.245-1 (2007).  Ex. 9, LOGCAP III Contract Mod. 36 at KBR-HOW-0001598.

### A.      KBR's Purchases of Property & Materials

10.      KBR purchased property and materials to provide the services required by the task order statements of work.  Ex. 32, Wade Dep. (Sept. 15, 2020) at 23:12-25:3; Ex. 23, KBR 30(b)(6) Dep. (Sept. 28, 2021) at 21:17-22:14.

11.      Relators' allegations in this case are limited to KBR's alleged "over-purchasing" of materials.  *See* Compl. ¶ 4; Ex. 37, Gaukler Rep. at ¶¶ 7, 11.  Materials are items of Government property that are consumed or expended during the performance of the contract, ranging from large, relatively immobile items (such as construction materials and mattresses) to small, everyday materials (such as nails, laundry detergent, and pencils).  FAR 45.101; Ex. 23, KBR 30(b)(6) Dep. (Sept. 28, 2021) at 21:17-22:14.  Relators are not making any allegations regarding equipment, which are items of Government property that are durable and not expendable, such as trucks and generators.  FAR 45.101; Ex. 33, Vollmecke Dep. (Oct. 23, 2020) at 27:4-21 (equipment included a "military truck" or "commercial based acquired leased equipment" including generators, trucks, and other non-tactical vehicles"); *id.* at 90:19-91:5 (distinguishing between equipment and

material); *id.* at 95:9-15 (noting that movement of equipment required government approval); Ex. 37, Gaukler Rep. ¶ 7 (describing Relators' allegations as relating to "materials"); Ex. 39, Gaukler Reb. Rep. ¶¶ 24, 69 (stating that Relators' expert analysis was limited to materials).

12.     KBR purchased materials for twenty-three task orders during the relevant time period:  task orders 104, 110, 114, 116, 117, 118, 121, 122, 129, 130, 131, 137, 138,  139, 142, 145, 147, 151, 152, 155, 157, 159, and 161.  Ex. 1, Booth Decl. ¶ 5.  These task orders were cost-reimbursable contracts, *id.*, meaning KBR was entitled to reimbursement for the costs incurred during its performance of the task orders as long as the costs were reasonable, among other things. FAR 52.216-7; FAR 31.201; Ex. 26, Branch Rep. at 26-27.

13.     During the relevant time period, KBR sought reimbursement from the Government for its incurred costs, and any applicable fee, through invoices called "public vouchers."  Ex. 29, KBR 30(b)(6) Dep. (Sept. 23, 2021) at 17:5-21, 21:11-22:3; *see also* FAR 52.216-7.  A public voucher is a standard Government form and does not contain any certification to the Government as a condition of receiving payment or any specific representation regarding the goods or services invoiced on the public voucher.  Ex. 2, Walter Decl. ¶ 4; *see also U.S. ex rel. Barko v. Haliburton Co.*, 241 F. Supp. 3d 37, 58-59 (D.D.C. 2017) (citing cases).  The public voucher also does not contain any representations relating to cross-leveling or statements about whether KBR did or did not attempt to cross-level prior to purchasing the property and materials that are invoiced on the voucher.  Ex. 2, Walter Decl. ¶ 4;

14.     The public voucher consists solely of a standard Government Form 1034 and standard Government Form 1035.  Ex. 29, KBR 30(b)(6) Dep. (Sept. 23, 2021) at 155:4-159:2. An SF 1034 is a roll-up of all costs incurred by the contractor for the task order covered by the public voucher for a particular period of time, which was typically two weeks under LOGCAP III.

*Id.* at 12:20-13:4; 107:19-108:4; Ex. 2, Walter Decl. ¶ 4. During the relevant time period, KBR voluntarily submitted a supplemental billing "package" with the public voucher that included worksheets listing the individual incurred costs summarized on the Form 1034. *Id.* at ¶ 5.

15.     The public voucher packages that KBR submitted to the Government for reimbursement under LOGCAP III do not contain any certifications as a condition of receiving payment, nor any specific representations regarding the goods or services invoiced on the voucher. *Id.* The public voucher packages also do not contain any representations relating to cross-leveling, let alone statements about whether KBR did or did not attempt to cross-level prior to purchasing the property and materials that are invoiced on the voucher. *Id.*; *see, e.g.*, Ex. 18, Task Order 139 Voucher Package (PDF of Native Excel produced at KBR-HOW-0043594); Ex. 19, Task Order 159 Voucher Package (PDF of Native Excel produced at KBR-HOW-0044437).

16.     The Form 1034 contained in each public voucher includes a statement that "Pursuant to the authority vested in me, I certify that this voucher is correct and proper for payment." *See, e.g.*, Ex. 18, Task Order 139 Voucher Package (PDF of Native Excel produced at KBR-HOW-0043594); Ex. 19, Task Order 159 Voucher Package (PDF of Native Excel produced at KBR-HOW-0044437). The Government was responsible for executing this part of the voucher. Ex. 29, KBR 30(b)(6) Dep. (Sept. 23, 2021) at 165:9-167:8. This section could only be completed by a Government official from the Defense Contract Audit Agency ("DCAA") after the official had reviewed and "provisionally approved" the purchases reflected by the voucher, meaning that DCAA approved the voucher for payment but retained the right to later perform an "incurred cost audit." *Id.* at 165:22-169:22.

**B.      DCMA Administration of the LOGCAP III Contract**

17.      Due to the size and scope of LOGCAP III, the Army delegated aspects of contract administration, including property management oversight, to the Defense Contract Management Agency ("DCMA").  Ex. 33, Vollmecke Dep. (Oct. 23, 2020) at 21:23-24:19; *id.* at 66:21-67:13.

18.      LOGCAP III incorporated the FAR Government property clause and thus required KBR to establish and maintain an adequate property management system (PMS) approved by the DCMA Government Property Administrator (GPA).   Ex. 16, DOD 4161.2-M, Dept. of Def. Manual for the Performance of Contract Property Admin. at 1-2 to 1-3 ("DOD Property Manual"); *see also* FAR 52.245-5(e)(2) (1986) & FAR 45.502(a) (1984); FAR 52.245-1 (2007).

19.      DCMA evaluated the adequacy of KBR's property management system through Property Management Systems Analyses ("PMSAs") and Property Control Systems Analyses ("PCSAs") performed at KBR sites in theater and at KBR corporate headquarters.  Ex. 24, Goetz Rep. at 16-17; Ex. 33, Vollmecke Dep. (Oct. 23, 2020) at 24:11-19; Ex. 35, McNamara Dep. (Nov. 13, 2019) at 48:1-50:11l, 51:16-70:20.

20.      During the relevant time period, PMSAs and PCSAs assessed KBR's compliance with the property functions of the FAR, as detailed in DOD 4161.2-M, DOD Manual for the Performance of Contract Property Administration ("the DOD Property Manual").  Ex. 16, DOD Property Manual, Chs. 3 & 4; Ex. 24, Goetz Rep. at 21-23; Ex. 35, McNamara Dep. (Nov. 13, 2019) at 86:8-87:6.

21.      At the request of the Office of Undersecretary of Defense Industrial Operations, KBR expert Dr. Douglas N. Goetz, Certified Professional Property Manager (CPPM), Consulting Fellow (CF), chaired a committee that wrote the DOD Property Manual that DCMA auditors used in conducting property audits during the relevant time period.  Ex. 24, Goetz Rep. at 4-5.  Dr. Goetz also served as special counsel in the rewrite effort for the Government property clause that

resulted in the issuance of FAR 52.245-1 (2007), and trained Government employees in the oversight of contractors' property management systems. *Id.*

22.     Neither the FAR nor the DOD Property Manual called for DCMA to impose a 100% accuracy level for any of the DOD property functions. Ex. 16, DOD Property Manual, Chs. 3 & 4; Ex. 24, Goetz Rep. at 23.  Rather, DCMA's evaluation was based on its assessment of KBR's "performance/conformance across the board," the magnitude and frequency of deficiencies, and the implementation (or lack thereof) of corrective action. *See generally* Ex. 16, DOD Property Manual at Chs. 3& 4; *see also* Ex. 24, Goetz Rep. at 16-17, 19-23; Ex. 25, Goetz Dep. (May 19, 2022) at 19:11-21:16, 59:14-60:3, 67:4-68:13, 262:7-11.

## II.    Cross-Leveling Requirements

### A.     Federal Regulations

23.     The FAR Government property clause does not contain or define the term "cross-leveling." Ex. 25, Goetz Dep. (May 19, 2022) at 8:14-9:18, 10:13-22, 77:11-19; Ex. 34, Larkin Dep. (Nov. 5, 2020) at 104:1-105:8.

24.     The Defense Federal Acquisition Regulation Supplement ("DFARS"), which is the DOD's regulation implementing the FAR, does not contain or define the term "cross-leveling." Ex. 24, Goetz Rep. at 23; Ex. 25, Goetz Dep. (May 19, 2022) at 77:11-19.

### B.     LOGCAP III Contract, Task Orders, and Statements of Work

25.     The LOGCAP III contract does not contain or define the term "cross-leveling" and does not set any objective criteria or standards for assessing KBR's cross-leveling of materials. *See generally* Ex. 17, LOGCAP III Contract; *see also* Ex. 26, Branch Rep. at 60; Ex. 27, Branch Dep. (Jun. 24, 2022) at 63:15-25.

26.     The majority of the LOGCAP III task order statements of work in effect in the relevant time period do not even include the term "cross-level." Ex. 1, Booth Decl. ¶ 6.  While

there are some task order statements of work that discuss the concept of trying to fill needs through existing stock rather than making a purchase, there are many task order statements of work that do not mention this at all.  *Id.* at ¶¶ 6-7.; Ex. 26, Branch Rep. at 36 ("[S]everal of the smaller task orders did not contain the terms related to cross-leveling at all, including [task orders] 130 (US Embassy Baghdad, Iraq), 138 and 161 (Afghanistan and Iraq), and 131 (Kuwait/Afghanistan/Iraq)".  Further, the language in the task order statements of work relating to cross-leveling changed over time and among different task order statements of work.  Ex. 1, Booth Decl. ¶ 6.

27.    There are certain task order statements of work that do not reference "cross-leveling," but directed KBR to use "due diligence" to determine if a site's need for *equipment* (which is not the subject of Relators' allegations, *see* SOF ¶ 11), could be fulfilled by equipment *available* from other sites covered by the *same task order*.  Ex. 1, Booth Decl. ¶ 8 (citing Ex. 4, Task Order 118 SOW .v2 at ¶ 3.0 (Aug. 2, 2007) ("Prior to procurement of *equipment* to support all efforts described in this task order, the contractor shall exercise *due diligence* in verifying that the required items cannot be satisfied from existing stock *available* from other sites covered by this task order") (emphasis added)).

28.    There are certain task order statements of work that do not reference "cross-leveling," but directed KBR to use "due diligence" to determine if *equipment* needs could be fulfilled with equipment in existing stock *available* from other sites, presumably regardless of task order.  Ex. 1, Booth Decl. ¶ 9 (citing Ex. 5, Task Order 118 SOW v1.2 at ¶ 3.0 (Jan. 28, 2008) ("Prior to procurement of *equipment* to support all efforts described in this task order, the contractor shall exercise *due diligence* in verifying that the required items cannot be satisfied from

existing stock available from other sites") (emphasis added) and Ex. 8, Task Order 151 SOW v2 at ¶ 3.0 (Jan. 25, 2010) (same meaning)).

29.     The task orders and statements of work do not define the term "due diligence." Ex. 1, Booth Decl. ¶ 10; *see, e.g.,* Exs.3-8 (SOWs); Ex. 27, Branch Dep. (Jun. 24, 2022) at 127:11-16; 138:24-139:10.

30.     The task orders and statements of work do not define when an item is "available" for cross-level. Ex. 1, Booth Decl. ¶ 11; *see, e.g.* Exs. 3-8 (SOWs); Ex. 26, Branch Rep. at 39 ("In other words, the LOGCAP III Task Orders specified that [KBR] exercise reasonable care and attention in a given situation. And while whether an item existed at another site was an objective determination, whether the item was excess and available for transfer was a subjective determination. The task orders did not tell [KBR] how to make that subjective determination.").

31.     There are only two task orders with statements of work that address "cross-leveling" without limitation to equipment. Ex. 1, Booth Decl. ¶ 12 (citing Ex. 6, Task Order 139 SOW v6 ¶ 3.1.1 (Apr. 22, 2008), Ex. 7, Task Order 159 Basic SOW ¶ 3.1.1 (Aug. 25, 2008) . Those statements of work state: "The contractor shall adhere to the requirement priorities listed in TABLE 3.1.1 *to the maximum extent possible*." *Id.* Table 3.1.1 lists "REQUIREMENTS PRIORITIES" as (1) USG military unit, organic, green suit; (2) "Cross level within LOGCAP Task Order;" (3) "Other Task Orders within LOGCAP," followed by purchasing sources. *Id.* These statements of work do not specify whether the "REQUIREMENTS PRIORITIES" apply to equipment or other types of Government property. *Id.*; *see also* Ex. 26, Branch Rep. at 35-36 (noting that many task orders had no task order language about cross-leveling, and those that did at most asked KBR to adhere "to the maximum extent possible" to certain "requirement priorities," the third of which was "cross-leveling," a term left undefined."). These statements of work also

13

require the contractor to "exercise *due diligence* in verifying" whether required items can be satisfied from existing stock "[p]rior to procurement of *equipment*." Ex. 6, Task Order 139 SOW v6 ¶ 3.0 (Apr. 22, 2008); Ex. 7, Task Order 159 Basic SOW ¶ 3.0 (Aug. 25, 2008) (emphasis added).

32.    The task orders and statements of work do not define when cross-leveling is "possible," particularly while operating in a war time theater. Ex.1, Booth Decl. ¶ 13; *see, e.g.*, Exs. 3-8 (SOWs).

33.    The statements of work for the twenty-three task orders at issue in this case do not contain any objective standards or metrics for evaluating KBR's cross-leveling. *See, e.g.,* Exs. 3-8 (SOWs); Ex. 26, Branch Rep. at 35-36 ("[T]here was never any overarching contractual requirement to actually transfer any or all equipment and material found at a site in theater whenever any other site had such a need. Rather, [KBR's] "cross-leveling" obligation, as I use the term throughout this report, centered on conducting due diligence checks prior to purchasing items, to determine whether items could be found in theater, those items were excess to its current location, and whether transferring them would enhance contract performance. Although this concept was introduced in various task orders, nothing in the base LOGCAP contract required transferring or even "cross-leveling" due diligence checks discussed in this section. Moreover, during the relevant time-frame, there were inconsistencies regarding the scope and limits of [KBR's] obligations related to this "cross-leveling" due diligence process"); *id.* at 38-39 ("[T]he Task Orders, like the LOGCAP III base contract, did not establish any specific objectives or requirements for when, how often or how many items [KBR] was required to transfer items between sites, or any specific procedures for how [KBR] was required to accomplish cross-leveling."); *id.* at 60 ("[KBR's] obligation, at most, was to use its best efforts to exercise due

diligence to verify and certify that material requirements could not be satisfied from existing inventory, or in some cases to provide its best efforts to the 'maximum extent practical' to adhere to a hierarchy of requirement priorities [. . . . ] The base contract, modifications, and task orders neither defined cross-leveling nor offered any basis or guidance for when or how cross-leveling must have been accomplished."); *id.* at 62 ("Under cost-plus-award-fee task orders, LOGCAP III required [KBR] to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock").

34.    No expert in this case, including Relators' experts, nor any of the fact witnesses have identified an objective requirement for cross-leveling.  Ex. 34, Larkin Dep. (Nov. 5, 2020) at118:5-120:7 (Government fact witness testifying that the cross-leveling language in the task order statements of work gave "KBR discretion to determine when it can satisfy a requirement from cross-leveling."); *id.* at 113:14-19 (Government fact witness agreeing that "due diligence" means that "KBR has discretion in making the determination of whether equipment is available to cross-level or not"); Ex. 24, Goetz Rep. at 23-24  ("In all of my 40+ years of experience in dealing with Government property, I have not seen the term "cross leveling" used. That term is not used or defined in the FAR or the DFARS. [. . . ] I understand that cross-leveling is not defined in the LOGCAP III base contract, modifications, or task orders."); Ex. 26, Branch Rep. at 38  ("[T]he Task Orders, like the LOGCAP III base contract, did not establish any specific objectives or requirements for when, how often or how many items [KBR] was required to transfer items between sites, or any specific procedures for how [KBR] was required to accomplish cross-leveling."); Ex. 40, Rudolph Rep. at 4, 21 (Relators' expert citing a 2019 document published by the Joint Chiefs of Staff, Joint Publication 4-0 (May 8, 2019), that did not apply to contractors, did

not apply in the relevant time period, and did not contain an objective requirement for cross-leveling); Ex. 42, Rudolph Rebuttal Rep. at 2 (citing a different Joint Publication (4-7) that did not apply to contractors and did not contain an objective requirement for cross-leveling); Ex. 41, Rudolph Dep. (Mar. 28, 2022) at 54:4-55:15, 57:16-58:19 (acknowledging that 2019 publication would not be relevant to this case and if "cross-leveling" is not in earlier versions, Joint Publication 4-0 is not relevant for this lawsuit); *id.* at 112:7-114:9 (testifying that a requirement to cross-level to the "maximum extent possible" would not require KBR to cross-level "every single time" and that KBR would need to consider other factors such as whether cross-leveling "doesn't make sense economically"); Ex. 43, Zakheim Dep. (Jul. 29, 2022) at 132:3-133:11 (Relators' expert testifying that the government would have left KBR "room" for discretion in cross-leveling).

35.     Cross-leveling is not a standard practice for contractors managing Government property, particularly in a war zone.  Ex. 25,Goetz Dep. (May 19, 2022) at 242:22-243:9 (testifying that he had advised between "500 to 1,000" government contractors during his career and had never encountered a contractor that had a cross-leveling program similar to KBR's, and had never encountered a contractor that cross-leveled in a war zone); Ex. 24, Goetz. Rep. at 24 ("I also have not seen that term [cross-leveling] in any of my dealings with the hundreds or potentially thousands of contracts or contractors over the course of my career.").

## III.     KBR's Efforts To Cross-Level

36.     KBR implemented cross-leveling as part of its property management system. Ex. 10, 2006 PCP at ¶ 4.6 (KBR-HOW-0046019); Ex. 11, 2008 PCP at ¶¶ 4.3-4.4 (KBR-HOW-0046231).

37.     KBR implemented its property management system based on written property control procedures ("PCPs").  Ex. 10, 2006 PCP at ¶ 1.0 (KBR-HOW-0045990); Ex. 11, 2008 PCP

at ¶ 1.0 (KBR-HOW-004166).  There is no language in the FAR, LOGCAP III, or any modification to LOGCAP III incorporating KBR's internal property control procedures as part of the contract or otherwise setting any benchmark for KBR's compliance with these procedures.  FAR 52.245-5(e)(2) (1986) & FAR 45.502(a) (1984); FAR 52.245-1 (2007); Ex. 26, Branch Rep. at 41.  Indeed, KBR's PCPs make clear they were not part of the LOGCAP III contract.  Ex. 10, 2006 PCP at ¶ 1.0 (KBR-HOW-0045990) ("In the event of inconsistencies between this procedure and the terms of the contract under which the Government property is provided or acquired, or the FAR, the terms of the contract shall prevail."); Ex. 11, 2008 PCP at ¶ 1.0 (KBR-HOW-0046166) (similar).

38.    During the relevant time period, KBR reasonably implemented the contractual requirement (contained in only two of the relevant task orders at certain times) to use "best efforts" to cross-level to the "maximum extent possible" by conducting due diligence checks as to whether items could be cross-leveled, not perfectly and not in every instance, as the contract never required perfection.  Ex. 23, KBR 30(b)(6) Dep. (Sept. 29, 2021) at 154:14-155:7 (interpreting "possible" to mean "it wasn't absolute that you had to do it.  It was to the extent possible."); Ex. 26, Branch Rep. at 35-36 ("KBR[] conducted theater-wide cross-leveling due diligence checks during LOGCAP III beyond the requirements of the individual Task Orders."); Ex. 24, Goetz Rep. at 23 ("the Government does not require or expect contractors to achieve perfection in their management of Government property").  That included cross-leveling both equipment and materials without regard to whether individual task order statements of work imposed narrower requirements.  Ex. 23, KBR 30(b)(6) Dep. (Sept. 28, 2021) at 29:13-19 ("We'd go beyond what was required of us to cross level anything across the -- all the task orders we had."); *id.* at 34:24-35:7 ("It was cross-leveling, period.  We did not make a distinction whether it was bedtween task orders or within task orders.  Cross-leveling was cross-leveling across the LOGCAP III program.")).

39.    The property control procedures were not detailed and required interpretation at each individual site based on the judgment of site-level personnel and their particular circumstances.  Ex. 30,  Hippert Dep. (Sept. 17, 2020) at 72:3-75:11. The property control procedures do not include an objective standard or requirement for cross-leveling.  Ex. 10, 2006 PCP ¶ 4.6.1 (KBR-HOW-0046019) & Ex. 11, 2008 PCP at ¶ 4.3. (KBR-HOW-0046230).

40.    The property control procedures instructed KBR employees to check the theater inventory to determine if there was "suitable" material prior to starting the purchasing process.  *Id.* If a "suitable" item was located at another site, personnel were instructed to "verify via the owning site" that the item was "truly excess and available" before moving forward with the cross-leveling process.  Ex. 10, 2006 PCP ¶ 4.6.1 (KBR-HOW-0046019); *see also* Ex. 11 2008 PCP at ¶ 4.3 (KBR-HOW-0046231) (instructing employees to look for "suitable property" "available for issue" and verification that any located item is "excess to that site's need" and "available for cross utilization").; *see also* Ex. 41, Rudolph Dep. (Mar. 28, 2022) at 146:15-21 (Relators' expert agreeing that "if you look in the inventory management system and see that there is inventory, that doesn't necessarily answer the question as to whether it is available to cross-level.").  Cross-leveling was sometimes limited for particular sites due to individual circumstances including security concerns, mortar attacks, or because the storeroom was 'frozen' in anticipation of a major wartime event, such as a troop surge or base closure.  *See, e.g.*, Ex. 23, KBR 30(b)(6) Dep. (Sept. 29, 2021) at 102:23-103:16.

41.    Relators allege that KBR submitted a false claim every time "KBR submitted an invoice to the Government requesting payment" for an item that could potentially have been cross-leveled, but was purchased instead.  Ex. 21, Hemphill Response to KBR Interrogatory ("ROG") 1; Ex. 22, Howard Response to KBR ROG 1; Ex. 37, Gaukler Rep. at ¶¶ 10-12, 140; *see also*

Compl. ¶ 136.  Utilizing a never been done before, non-peer reviewed computer modeling system, Relators' expert witness generated a list of allegedly "overordered" items that he stated KBR could have cross-leveled based on the robotic application of a series of logic rules to the model's recreation of KBR's "historical inventory balances."   Ex. 37, Gaukler Rep. ¶¶ 76-151 (list of purchases generated through computer model, based on his model's application of logic rules to a reconstruction of "historical inventory balances"); Ex. 38, Gaukler Dep. (Apr. 1, 2022) at 99:24-100:2 (testifying that his model was not peer reviewed); *id.* at 285:2-25 (testifying that he had not performed an "overordering" analysis before, was not aware of any other "overordering" model in academic literature, and was not aware whether the approach used for his analysis had ever been accepted in any peer-reviewed literature); *id.* at 287:2-16 (testifying that he was not aware of whether the government uses historical inventory balance reconstruction to evaluate a contractor's property management system or cross-leveling); *id.* at 98:5-11 (testifying that model code was not reviewed by anyone other than expert himself); *id.* at 107:22-108:7 (testifying that he is not an expert in government contracts, contract interpretation, or the FAR); *id.* at 13:12-18 (testifying that he does not consider himself an expert witness on damages).

## IV.     The Government Did Not Provide Cross-Level Guidance to KBR

42.     None of the expert or fact witnesses in this case has identified objective standards (nor even any concrete guidance) about cross-leveling from any of the agencies relevant to this litigation—the Defense Contract Management Agency ("DCMA"), the Defense Contract Audit Agency ("DCAA"), and the Army.  Ex. 24, Goetz Rep. at 23-24 ("In all of my 40+ years of experience in dealing with Government property, I have not seen the term "cross leveling" used. That term is not used or defined in the FAR or the DFARS.  It was not a term used in the DOD Property Manual, nor is it used in the current DoD Contract Property Guidebook or the DCMA

Guidebook for Contract Property used today. [. . .] I understand that cross-leveling is not defined in the LOGCAP III base contract, modifications, or task orders. The Property faculty at [the Air Force Institute of Technology/Defense Acquisition University] did not train [property administrators] to perform analysis of cross-leveling and neither does the DOD Property Manual require them to do so. I am aware of no objective, applicable criteria for assessing KBR's "cross-leveling" on LOGCAP III. [. . .] Accordingly, in my opinion, it is improper today to apply a cross-leveling standard to KBR's performance on LOGCAP III that did not exist and was not applied by [the Government] during the relevant time period."); Ex. 40, Rudolph Rep. at 43-46 (surveying Government and industry standards and identifying no objective standards pertaining to cross-leveling); Ex. 42, Rudolph Rebuttal Rep. at 2 (identifying no objective standards pertaining to cross-leveling).

### C.     DCMA Audits of KBR's Property Management System

43.     DCMA regularly audited KBR's property management system through PMSAs and PCSAs. Ex. 16, DOD Property Manual at 3-16 through 3-17, 4-10 to 4-23; Ex. 33, Vollmecke Dep. (Oct. 23, 2020) at 54:4-22.

44.     The DOD Property Manual used by DCMA to audit KBR during the relevant time period does not contain or define the term "cross-leveling," nor do similar documents used by DCMA at the time Dr. Goetz issued his report (the current DOD Contract Property Guidebook and the DCMA Guidebook for Contract Property). Ex. 24, Goetz Rep. at 23; Ex. 16, DOD Property Manual; Ex. 45, Guidebook for Contract Prop. Admin., DOD (Dec. 2014); Ex. 46, DCMA Guidebook for Govt. Prop. Admin., Rev. 1, Def. Contract Mgmt. Agency (Oct. 2020); Ex. 47, DCMA Guidebook for Govt. Prop. Admin., Rev. 2, Def. Contract Mgmt. Agency (Aug. 2022)

45.     Although DCMA's audit reports sometimes include information on the amount of cross-leveling KBR did in the period reviewed, DCMA did not apply any objective standard or

metric when commenting on KBR's cross-level performance.  Ex. 16, DOD Property Manual, Chs. 3 & 4; *see, e.g.*, Ex. 12 at KBR-HOW-3585727 (Aug. 18, 2009 PCSA stating that "[m]aterial transfers between contracts are being documented and $2,350,890.26 worth of material has been cross leveled over the past six months" at Bagram, an Afghanistan-based KBR site); Ex. 13 at DCMA-HOWARD-00012729 (Sept. 2, 2009 DCMA PCSA noting that "$372,189.54 worth of material has been cross leveled over the past six months" at Salerno, an Afghanistan-based KBR site).

### D.     Army Audit of Contractor Acquired Property in Iraq

46.     The U.S. Army Audit Agency ("AAA") conducted a series of audits to "address the visibility, management, and use of property in the possession of contractors" under LOGCAP III.  Ex. 14, AAA Rep. at KBR-HOW-8650674 (Sept. 28, 2010).  One of the audit reports said that KBR "sometimes didn't follow its processes and procedures to cross-level" even though the "LOGCAP contract requires the contractor to fill requirements with existing stock."  *Id.* at KBR-HOW-8650683.  The audit report further noted that although AAA's review was limited in terms of time and location, "similar results could occur at other [KBR] locations within theater."  *Id.* at KBR-HOW-8650675.  The AAA issued no formal warning or guidance to KBR about its cross-leveling as a result of this audit.  *Id.* at KBR-HOW-8650683—KBR-HOW-865068684 (issuing recommendations for DCMA "to improve *government* oversight and management of existing stock available at sites covered by the task order") (emphasis added).

### E.     DCAA Audits of KBR's Costs

47.     KBR's costs under LOGCAP III are subject to audit and evaluation by the Defense Contract Audit Agency ("DCAA").  Ex. 31, Walter Dep. (Apr. 23, 2021) at 146:16-19.  DCAA has the authority to question particular costs claimed by KBR and issue a "Form 1," which

suspends payment and recommends that the contracting officer disallow payment.  Ex. 29, KBR 30(b)(6) Dep. (Sept. 23, 2021) at 18:5-9.

48.    The DCAA Audit Manuals used by DCAA during the relevant time period do not contain or define the term "cross-leveling," and do not set any objective criteria or standards for assessing KBR's cross-leveling of materials.  *See generally* DCAA Contract Audit Manual - Archives, https://bit.ly/3AfKhEb (accessed Aug. 21, 2022).

49.    During KBR's performance of LOGCAP III, DCAA issued Form 1s questioning the reasonableness of KBR's costs on variety of issues.  Ex. 48, Booth Oct. 23, 2019 Decl. at ¶ 11. Although DCAA reviewed KBR's invoices for property and materials, DCAA never issued a Form 1 or recommended the Government not pay any costs based on KBR's purchases of property and materials or its cross-leveling performance.  *Id.*; *see also* Ex. 29, KBR 30(b)(6) Dep. (Sept. 23, 2021) at 170:15-17.

50.    In April 2011, DCAA published the results of an audit regarding the "efficiency and reasonableness" of KBR's cross-levelling in Iraq in response to the military's troop drawdown under LOGCAP III Task Order 159.  Ex. 15, DCAA Rep. at DCAA-HOWARD-00019194 (Apr. 10, 2011).  In its report, DCAA stated that (1) KBR "has a process to use cross leveling on equipment," and "(2) based on a review of 47 procurement files," KBR failed to attempt to cross-level before making 1 out of 47 purchases.  *Id.*  DCAA concluded that it would "close [the] audit assignment "as a NO GO."  *Id.* at DCAA-HOWARD-00019195.

## ARGUMENT

### I.    Legal Standard

The Court "shall grant summary judgment" when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and "mandates the entry of summary judgment" for the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). Once "the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact." *Serir v. Illinois Cent. College*, Case No. 20-cv-1031, 2021 WL 3782891, at *2 (C.D. Ill. Aug. 25, 2021) (Mihm, J.) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Surviving summary judgment requires the non-moving party to "go beyond the pleadings and produce evidence of a genuine issue for trial." *Serir*, 2021 WL 3782891 at *2 (citing *Celotex Corp.*, 477 U.S. at 322). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.    Relators Cannot Establish Bedrock FCA Elements of Falsity and Scienter

The False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, imposes liability for the submission of false claims to the federal government. 31 U.S.C. § 3729(a)(1)(A). To survive summary judgment, a relator must establish genuine questions of material fact regarding the FCA's "two primary elements: (1) falsity and (2) scienter." *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, No. 08-CV-0724, 2022 WL 860621 (E.D. Wis. Mar. 23, 2022).

Relators' FCA claim fails for a lack of sufficient evidence of these critical elements that would allow a jury to return a verdict in their favor. As to falsity, even viewing the facts in Relators' favor, KBR indisputably cross-leveled hundreds of millions of dollars of materials. Although Relators fault KBR for not cross-leveling even more, there is no objective standard imposed by law, regulation, or contract to measure how much cross-leveling was required under LOGCAP and to inform KBR when the failure to cross-level would render its invoices false.

Absent such standards, there cannot be an "objective falsehood," *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011), required to establish falsity under the FCA. As to scienter, the FCA requires proof that KBR "knowingly" submitted false claims, or at least was reckless as to their truth or falsity, 31 U.S.C. § 3729(b)(1), which again requires some objective standard that KBR could have recklessly ignored. There was no objective standard for cross-leveling. Rather the requirement—appearing only in certain task orders at certain times— was that KBR follow a matrix of procurement priorities to the "maximum extent possible," which included cross-leveling. And for this requirement, like all others in LOGCAP, KBR was to use its "best efforts." Therefore, the requirement was that KBR use its "best efforts" to obtain materials through cross-leveling to the "maximum extent possible." This is inherently subjective. KBR did cross-level hundreds of millions of dollars' worth of materials, and a debate over whether KBR could and should have cross-leveled more, or whether KBR met its own internal cross-leveling procedures, cannot give rise to objective falsity. KBR also cannot have knowingly failed, or recklessly disregarded, a non-existent standard. The FCA was written for objective wrongdoing— like selling the Army "artillery shells filled with sawdust instead of explosives," *see Yannacopoulos*, 652 F.3d at 823 n.3, not amorphous requirements susceptible to subjective interpretation.

A.    **Relators Cannot Establish Falsity**

The FCA's falsity element requires proof of an "objective falsehood." *Yannacopoulos*, 652 F.3d at 836 (quoting *U.S. ex rel. Wilson v. KBR*, 525 F.3d 370, 376 (4th Cir. 2008)). "Although a breached contractual term may be considered a falsehood in a looser sense—a false promise—a mere breach of a contractual duty does not satisfy this standard." *Id.* Thus, a contractor's "poor and inefficient management of contractual duties" does not give rise to FCA liability, nor do "differences in interpretation" regarding the applicable requirements. *Id.* (quoting *Harrison v.*

24

*Westinghouse Savannah River Co.*, 176 F.3d 776, 789 (4th Cir. 1999) and *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999)); *see also Wilson*, 525 F.3d at 377 (holding there can be no objective falsehood regarding relator's "subjective interpretation of KBR's contractual duties").

Falsity can be proven in two ways. First, "[i]n the paradigmatic case, a claim is false because it 'involves an incorrect description of goods or services paid or a request for reimbursement for goods or services never provided.'" *United States v. Sci. Apps. Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) (quoting *Mikes v. Straus*, 27 F.3d 687, 697 (2d Cir. 2001)). Such allegations raise the "factual falsity" of the claim itself, the shells filled with sawdust instead of explosives posited above. *Yannacopoulos,* 652 F.3d at 823 n.3. Second, in *Escobar*, the Supreme Court recognized the viability of an "implied false certification" theory, *see Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 188 (2016), under which a claim may be implicitly false for non-compliance with underlying material legal or contractual requirements. In so doing, however, the Court set out limitations for this potentially expansive theory of liability, holding "at least in certain circumstances" "[w]hen . . . a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's misrepresentations misleading with respect to the goods or services provided." *Id.* at 186-87.

As described below, Relators proceeded to discovery under a "factual falsity" theory. However, that was before *Escobar*, which clarified the law in critical respects. Because Relators do not allege, and have no evidence to show, that KBR's public vouchers are false on their face (i.e., themselves include an "objective falsehood"), Relators must resort to implied false

4:11-cv-04022-MMM-JEH    # 293    Filed: 08/29/22    Page 32 of 52

certification theory of liability  *See* 579 U.S. at 188.  But here they face several insurmountable

hurdles, each of which presents independent grounds to grant summary judgment.

### 1.    *Relators' "Factual Falsity" Theory Is Not Viable*

This case involves no allegation or evidence that KBR's invoices were factually false.

Relators do not contend KBR's claims—the public vouchers—incorrectly described KBR's costs

for which KBR sought reimbursement from the Government.  Nor do Relators allege that KBR

requested reimbursement for goods or services that it never actually bought or provided to the

Government.  Relators' sweeping allegation is that KBR "purchas[ed] hundreds of millions of

dollars [*sic*] worth of materials under the LOGCAP III contract that were duplicative for the

performance of its work" by failing to implement a "mandatory and necessary" process called

"cross-leveling."  Compl. ¶¶ 4, 13; *see* Statement of Undisputed Material Facts ("SOF") ¶¶ 11, 41.

In 2015, the Court allowed Relators to proceed, characterizing Relators' complaint as

alleging "factual falsity" based on a theory that KBR's alleged statutory or regulatory violation

had a "direct nexus" to payment:

> [T]he Relators' theory of liability is based on factual falsity, and the condition
> of payment is KBR's submission of invoices directly to the Government that are
> supposed to include allowable and reasonable costs, which effects the
> Government's payment decision.  The Complaint alleges KBR was required to
> cross-level and transfer materials internally before billing the Government for
> materials it already had, which it did not do on numerous occasions.  Therefore,
> even in the absence of an express certification of compliance, KBR's act of
> knowingly submitting claims to the Government for payment when it violated a
> statute or regulation that contains, on its face, a direct nexus to the Government's
> payment decision is actionable under the FCA.

*U.S. ex rel. Howard v. KBR*, 139 F.Supp.3d 917, 946 (C.D. Ill. 2015) (emphases added).

However, courts have clarified post-*Escobar* that "a 'direct nexus' theory of false claim

liability . . . cannot be meaningfully differentiated from the implied false certification theory."

*U.S. ex rel. Lisitza v. Par Pharm. Companies, Inc.*, 276 F. Supp. 3d 779, 793 (N.D. Ill. 2017)

(collecting cases). The implied false certification framework—not factual falsity—applies where relators "assert that a facially accurate and non-misleading claim is nevertheless false or fraudulent within the meaning of the FCA if there are underlying regulatory violations with a direct nexus to the government's decision to pay the claim." *Id.* at 791.

Relators do not allege that KBR's claims expressly certified compliance with any cross-leveling requirement (the claims do not certify compliance whatsoever, SOF ¶ 13. KBR's claims for payment include no express certifications and say nothing about cross-leveling. *Id.* Relators also do not allege or present any evidence that KBR's invoices were facially false or include any factual misstatements. SOF ¶ 11. The costs claimed were the costs that KBR incurred. Thus, the claims are not "false" on their face; they can only be false by implication. At worst, Relators allege KBR submitted claims "without disclosing violations of statutory, regulatory, or contractual requirements" regarding cross-leveling. *See Escobar*, 579 U.S. at 188. This is an implied-false certification theory, and it must be analyzed under that framework. Properly characterized, Relators' claim cannot meet the exacting requirements for implied false certification liability.

### 2. Relators Cannot Survive Summary Judgment Under an Implied False Certification Theory

Implied false certification liability requires at least two conditions: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those statements misleading half-truths." *Escobar*, 579 U.S. at 190; *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) (*Sanford-Brown II*). Absent both, a FCA claim collapses into breach-of-contract. *See Yannacopoulos*, 652 F.3d at 836 ("[A] mere breach of a contractual duty does not satisfy this [FCA] standard.").

Relators cannot meet either requirement.  First, they cannot show that KBR's invoices made "specific representations" relating to cross-leveling.  KBR's invoices include no such representation; indeed they include no representation at all other than these were the costs that KBR incurred.  Second, they cannot show that these non-existent "specific representations" were "objective falsehoods," that is, that they were false as measured against an objective standard. Here too Relators fail, as there is no objective standard for cross-leveling.

(i)    <u>Relators' Claim Fails Because KBR's Bills Did Not Contain Specific Representations</u>

From the outset, Relators' implied false certification theory founders because KBR's claims merely requested payment without making representations about cross-leveling.  In *Escobar*, the Supreme Court provided examples of specific representations.  One example was "the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property."  *Escobar*, 579 U.S. at 189.  By making a specific representation about *two* new roads, the seller implied a conclusion about *other* roads—specifically that there were "no others, and certainly . . . no others materially affecting the value of the purchase."  *See id.* (internal citations and quotation marks omitted).  Similarly, in *Escobar* itself, a company submitted invoices to state Medicaid identifying health care providers by National Provider Identification ("NPI") numbers, thereby specifically representing the providers were properly licensed.  *See id.*   Thus, the company's claims made specific representations about providers without disclosing the objective truth—that the providers were unlicensed.  *See id.*

Here, by contrast, KBR's invoices said nothing about "cross-leveling."  They were submitted on a "public voucher," a standard Government form called the SF 1034.  SOF ¶ 13.  It did not mention cross-leveling and did not call for any representations by the contractor.  *Id.*  The

28

SF 1034 was a roll-up of all costs incurred by the contractor for the task order covered by the public voucher for a particular period of time (typically two weeks under LOGCAP). SOF ¶ 14. It made no assertion, certification, or representation about the underlying costs. SOF ¶ 13. Though not part of the public voucher itself, KBR voluntarily provided additional detail as part of "billing packages" that went along with the public voucher, and these packages listed out the individual costs summed in the public voucher. SOF ¶ 14. These too made no representations about "cross-leveling." SOF ¶ 15. The only certification anywhere on the SF 1034 was a blank to be filled out by a government official that the costs were proper for payment—after KBR submitted the bill. SOF ¶ 16. There was no corresponding certification by KBR. SOF ¶¶ 13, 16.

Accordingly, the SF 1034 "merely request[s] payment," *Escobar*, 579 U.S. at 190, and the Supreme Court expressly declined to hold that such a mere request "implicitly represent[s] that the billing party is legally entitled to payment," *id.* at 188. Indeed, shortly after *Escobar* in *Sanford-Brown II*, the Seventh Circuit reaffirmed its prior pre-*Escobar* dismissal of a FCA case because, among other things, Relator "offered no evidence that defendant . . . made any representations at all in connection with its claims for payment, much less false or misleading representations." *Sanford-Brown II*, 840 F.3d at 447. Several courts both pre-and-post *Escobar* have recognized that the SF 1034 "simply stated the cost" that KBR incurred under LOGCAP. *See U.S. ex rel. Barko v. Halliburton Co.*, 241 F. Supp. 3d 37, 59 (D.D.C. 2017); *U.S. ex rel. Watkins v. KBR, Inc.*, 106 F. Supp. 3d 946, 964-67 (C.D. Ill. 2015) (holding KBR's public vouchers under LOGCAP do not make an "affirmative statement that the cost is allowable or reasonable"); *U.S. ex rel. Godfrey v. KBR, Inc.*, No. 1:05-cv-1418, 2008 WL 9878351, at *4 (E.D. Va. 2008) (confirming court's earlier holding in *U.S. ex rel. Wilson v. KBR, Inc.*, 1:04-cv-595 (E.D. Va. Feb. 5, 2007) (unpub. op.), that public voucher does not "certify as a condition of receiving payment anything other than

that the voucher was correct and proper"). Thus, because Relators cannot show that KBR's claims contained a "specific representation" about cross-leveling, they cannot satisfy *Escobar*'s first requirement for implied false certification liability.

(ii)    <u>Relators Cannot Demonstrate an Objective Falsehood</u>

Even assuming the public vouchers included specific representations about cross-leveling, Relators cannot show objective falsity. Although KBR made a substantial effort to cross-level in a war zone, the Government did not impose, nor did KBR represent that it was following, any objective cross-leveling requirement or standard. *See generally* SOF ¶¶ 23-34, 37-39. The LOGCAP III contract contains no cross-leveling requirement, and indeed, it does not even use the term. SOF ¶ 25. The concept can be found, if at all, in certain task order statements of work ("SOWs"). SOF ¶ 26. And even here, the language related to cross-leveling changed over time and among different task order SOWs. *Id.*

At most, SOWs for two task orders at certain times included a matrix specifying the order by which KBR was to procure items, including by "cross-leveling," and directing adherence to the matrix to the "maximum extent possible." SOF ¶ 31. Even here, there is no contractual direction as to what "cross-leveling" means to the "maximum extent possible." There is no Government regulation, law, or policy that governs, or even explains, how contractors are to cross-level Government property in a war theater. SOF ¶¶ 23-24, 34; SOF ¶ 3 (DCMA Commander describing the environment as "quite challenging" with "elements of weather, the enemy, and constant, again, mortar rocket attacks," creating "extremely complicated" logistical support operations "spread across 426,105 miles between two [war] theaters"). There also was no requirement in the DOD Property Manual for DCMA auditors to audit for cross-leveling, let alone any objective standard or metric for them to apply. SOF ¶ 44; *see* SOF ¶ 48 (DCAA audit manuals during relevant time period do not use the term "cross-leveling" or set objective criteria for assessing cross-leveling).

30

Lacking too is any objective measure for determining how much cross-leveling is enough. SOF ¶¶ 33-34.  Even Relators' own proffered expert, Colonel Michael Rudolph (Ret.), could not articulate an objective standard for cross-level performance under LOGCAP III, its task orders, or the FAR.  SOF ¶ 34.  Further, Government witnesses testified that KBR had discretion whether, when, and how to cross-level.  For example, a former Procuring Contracting Officer forward (a senior Army official for LOGCAP in Iraq), Kevin Larkin, testified that the cross-leveling language in the SOWs gave "KBR discretion to determine when it can satisfy a requirement from cross-leveling."  *Id.*

Absent an objective measure, Relators' case hinges on subjective interpretation of various terms that governed KBR's performance, such as "best efforts," "due diligence," and "maximum extent possible."  SOF ¶¶ 8, 33, 27-34.  But as courts have consistently held, a contractor cannot make an objectively false statement about a subjective requirement.  *See, e.g.*, *Wilson*, 525 F.3d at 377; *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1288-89 (11th Cir. 2019) (holding trial improperly determined falsity through "battle of experts" in which "jury was to decide which expert it thought to be more persuasive, with the less persuasive opinion being deemed to be false").

For example, imposing FCA liability on a contractor for not being "efficient"—even when a contractor is subject to regulatory or contractual requirements of efficiency—would "read[] the requirement of a false or misleading statement out of the False Claims Act."  *Lisitza*, 276 F. Supp. 3d at 781-82 (entering summary judgment for defendant because contractor does not violate FCA merely by failing to provide services in most "economical" fashion, regardless of evidence that inefficiency led to "overcharging"); *see, e.g.*, *U.S. ex rel. Garzione* v. *PAE Gov't Servs., Inc.*, 164 F. Supp. 3d 806, 812-13 (E.D. Va. 2016) (holding relator failed to plead falsity and emphasizing

that "[t]he regulations applicable to . . . what constitutes a 'reasonable' price are general and by their terms confer a great deal of discretion and judgment on the selecting contractor"). Similarly, in *United States v. Northrop Grumman Sys. Corp.*, No. 09 CV 7306, 2015 WL 5916871, at *6 (N.D. Ill. Oct. 8, 2015), the court explained that it was insufficient for a relator to show the contractor did not "exert[] its 'best efforts' on the project and was not performing its obligations.'" *Id*. Rather, the court required the relator to prove that "best efforts" actually "meant what [the relator] says it meant." *Id.* That is to say, "best efforts" by itself is too amorphous a concept to be objectively measured.

"Best efforts" here is particularly instructive as it was the overarching LOGCAP standard that governed all others. SOF ¶ 8. Under a cost-reimbursement contract such as LOGCAP and its task orders, the contractor does not promise a particular result, only that it will make its "best efforts" to meet the cost, schedule, and performance goals set forth in the contract and SOWs. *Id.*; *see Gen. Dynamics Corp. v. United States*, 671 F.2d 474, 480-81 (Ct. Cl. 1982) (distinguishing cost-reimbursement and fixed-price contracts) (citing Nash & Cibinic, 2 Fed. Procurement Law 1639 (3d ed. 1980)). The LOGCAP task orders that mention cross-leveling are therefore subject to KBR's "best efforts." SOF ¶¶ 8, 33, 27-34.

Each of the parties' experts appear to agree on this point. KBR's procurement expert, Elliott Branch, opined the "best efforts" requirement applied: "Under cost-plus-award-fee task orders, LOGCAP III required KBRSI to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock." SOF ¶ 8. One of Relators' experts (Dr. Zakheim) said KBR was required to make its "best effort to be efficient." *Id.* He then admitted that "best efforts is a squishy term." *Id.* Another of Relators' experts (Colonel Rudolph) surveyed Government and

32

industry standards for inventory management, found no objective standards pertaining to cross-leveling, and opined that the "level of effort" necessary to fulfill contractual requirements involved "concerted and dedicated supervision/management and efforts." SOF ¶¶ 8, 33-34. These opinions move this case squarely within the orbit of cases such as *Northrop Grumman*, which hold there cannot be falsity without an objectively measurable standard.[3]

In *Wilson*, the Fourth Circuit considered a theory similar to that of Relators here. KBR had allegedly failed to conduct sufficient vehicle maintenance to satisfy the "maintenance and repair" provision of the applicable SOWs. *Wilson*, 525 F.3d at 374. However, there was no objective standard for what constituted adequate "maintenance and repair," other than that KBR was required to keep vehicles "in a safe operating condition and good appearance." *Id.* The contract did not set forth "anything resembling a specific maintenance program." *Id.* at 377. Relators' allegations therefore "rest[ed] not on an objective falsehood, as required by the FCA, but rather on Relators' subjective interpretation of KBR's contractual duties." *Id.* "Consequently," the circuit court explained, "the question of whether KBR performed sufficient maintenance under the contract represents, at the very least, 'a disputed legal question' about the 'inefficient management of [one's] contractual duties'" and was "precisely the sort of claim that courts have determined not to be a false statement under the FCA." *Id.* (quoting *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996)); *see U.S. ex rel. Carter v. Halliburton Co.*, No. 1:08CV1162 (JCC), 2009 WL 2240331, at *11 (E.D. Va. July 23, 2009) ("The FCA was not implemented to

---

[3] This rule is consistent with a longstanding limitation in breach-of-contract law, where courts have held subjective terms—including "best efforts"—as "too indefinite and uncertain to be an enforceable standard." *Specialty Earth Scis., LLC v. Carus Corp.*, No. 15-CV-06133, 2021 WL 4804076, at *13 (N.D. Ill. Oct. 14, 2021) (citing *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992)).

involve relators in determining the terms of government contracts and whether they have been breached.").  The same analysis and outcome apply to Relators' claims.[4]

No doubt Relators will assert that KBR's property control procedures provide the objective yardstick by which to measure KBR's cross-level performance.  But, as Relators cannot dispute, these procedures are not themselves in the contract or task order SOWs.  SOF ¶ 37.  These are internal documents that instruct KBR employees how to attempt to cross-level, without objective performance standards.  SOF ¶ 38.  Even these procedural requirements include "squishy" terms, directing sites to request cross-leveling only if they find a "suitable" item in inventory and directing sites to fulfill cross-level requests only if they determine, in their judgment, that the requested item is "truly excess" and "available for cross-leveling."  SOF ¶¶ 39-40.  Contractually, KBR once again was required only to make its "best efforts" to meet its obligations, even those it set for itself.  SOF ¶ 8.  As a result of its efforts, KBR successfully cross-leveled hundreds of millions of dollars' worth of materials.  SOF ¶ 4.  Whether KBR followed its procedures well "enough" or should have cross-leveled "more" are precisely the types of questions excluded from the FCA's ambit.  *See Yannacopoulos*, 652 F.3d at 836; *Wilson*, 525 F.3d at 376-77; *Lisitza*, 276 F. Supp. 3d at 781-82; *Northrop Grumman*, 2015 WL 5916871 at *6.

---

[4] There are circuits that apply the same principle in the health care context.  For example, in *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1282 (11th Cir. 2019), the Government alleged that a hospice provider misapplied its judgment about which patients were "terminally ill," but the court explained that the contractor's "claim cannot be 'false'—and thus cannot trigger FCA liability— if the underlying clinical judgment does not reflect an objective falsehood."  *Id.* at 1296-97.  The court held that "a reasonable difference of opinion among physicians reviewing medical documentation *ex post* is not sufficient on its own to suggest that those judgments [about hospice eligibility]—or any claim based on them—are false under the FCA."  *Id.* at 1297.  Rather, to prove objective falsity, the Government needed to bring forth "verifiable facts" to show that "the clinical judgment on which the claim is based contains a flaw."  *Id.*

34

In the absence of any objective requirements or standards for cross-leveling, Relators cannot establish an objective falsehood, and therefore, falsity.

**B.     Relators Cannot Establish Scienter**

For similar reasons, Relators also cannot establish scienter.  The FCA imposes liability only where the defendant "knowingly" submits false claims.  31 U.S.C. § 3729(a)(1)(A).  A defendant acts knowingly if it (1) "has actual knowledge" of falsity; (2) "acts in deliberate ignorance of the truth or falsity of the information;" or (3) "acts in reckless disregard of the truth or falsity of the information."  *Id.* § 3729(b)(1)(A).  Even for the lesser standards of knowledge, the question remains—exactly what "information" did KBR act in deliberate ignorance or reckless disregard of?  That, in turn, feeds back to the lack of an objective standard for cross-leveling that KBR could have deliberately ignored or recklessly disregarded.

As the Supreme Court and the Seventh Circuit recently explained, a contractor does not knowingly violate the FCA if it offers an interpretation of the relevant requirement that is "objectively reasonable" and if no "authoritative guidance" warned the defendant away from that interpretation.  *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 49-80 (2007); *U.S. ex. rel. Schutte v. SuperValu Inc.*, 9 F.4th 455, 464-65 (7th Cir. 2021) (applying *Safeco* standard to FCA).  Because "the inquiry is an objective one," "a defendant's subjective intent does not matter," and a relator cannot survive summary judgment by raising questions about whether the contractor "believed it was violating the requirement" at the time it submitted claims to the Government.  *SuperValu*, 9 F.4th at 470.  The Seventh Circuit's dictate is clear—the internal KBR emails on which Relators almost exclusively rely are irrelevant and cannot defeat summary judgment if KBR followed an objectively reasonable interpretation of the purported contractual cross-leveling requirement.

As already discussed, the contractual requirement (contained in only two of the relevant task orders at certain times) was that KBR use its "best efforts" to cross-level to the "maximum

extent possible." SOF ¶ 8. KBR reasonably implemented this requirement by conducting due diligence as to whether items could be cross-leveled (not perfectly and not in every instance, SOF ¶ 38), and the contract never required perfection.

As noted, the Government did not impose any clear requirement to cross-level in any particular way. Testifying as an expert witness for KBR, Mr. Branch, the Navy's former senior-most contracting officer, explained the Government's instructions for cross-leveling were inconsistent both in terms of scope and application:

> [T]here was never any overarching contractual requirement to actually transfer any or all equipment and material found at a site in theater whenever any other site had such a need. Rather, KBR[]'s "cross-leveling" obligation, as I use the term throughout this report, centered on conducting due diligence checks prior to purchasing items, to determine whether items could be found in theater, those items were excess to its current location, and whether transferring them would enhance contract performance. ***Although this concept was introduced in various task orders, nothing in the base LOGCAP contract required transferring or even "cross-leveling" due diligence checks discussed in this section. Moreover, during the relevant time-frame, there were inconsistencies regarding the scope and limits of KBR[]'s obligations related to this "cross-leveling" due diligence process.***

SOF ¶ 33 (emphasis added). The witness further catalogued the various changes over time of the task order SOW "requirements" for cross-leveling. Many SOWs had no language about cross-leveling, and those that did at most asked KBR to adhere "to the maximum extent possible" to certain "requirement priorities," the second and third of which was "cross-leveling," a term left undefined. SOF ¶¶ 26-34. And, as noted, KBR had significant latitude how and when to cross-level. This was confirmed by former PCO Forward Kevin Larkin who testified that "KBR has discretion in making the determination of whether equipment is available to cross-level or not." SOF ¶ 34.

KBR also had significant latitude because cross-leveling is not a standard practice for contractors managing Government property. SOF ¶ 35. Another expert witness testifying for

KBR, Dr. Goetz, was one of the authors of the 2007 FAR Government Property Clause and trained

Government employees in the oversight of contractors' property management systems.  SOF ¶ 21.

He explained:

> In all of my 40+ years of experience in dealing with Government property, I have not seen the term "crossleveling" used. That term is not used or defined in the FAR or the DFARS. It was not a term used in the DOD Property Manual, nor is it used in the current DoD Contract Property Guidebook or the DCMA Guidebook for Contract Property used today. To my knowledge, there is no discussion or coverage of cross-leveling in any of the training or certification materials written and published by the National Property Management Association (NPMA), the premier property management association. I also have not seen that term used in any of my dealings with the hundreds or potentially thousands of contracts or contractors over the course of my career. It appears to be a term peculiar to the Military Services and their internal operations. I understand that cross-leveling is not defined in the LOGCAP III base contract, modifications, or task orders.  The Property faculty at [Air Force Institute of Technology]/[Defense Acquisition University] did not train PAs to perform analysis of cross-leveling and neither does the DOD Property Manual require them to do so. I am aware of no objective, applicable criteria for assessing KBR's "cross-leveling" on LOGCAP III.

SOF ¶ 34.

It would be a closer case if KBR knowingly failed to cross-level entirely.  But there is no

dispute that KBR did, in fact, cross-level a significant amount during the relevant time period.  A

KBR expert estimates that KBR cross-leveled more than a ***billion dollars*** in materials and assets

in the relevant period, SOF ¶ 4, and Relators' own expert in rebuttal conceded KBR cross-leveled

$495 million worth of materials.  *Id.*[5]  As to fact witnesses, even one of the Relators, Zella

Hemphill, offered an off-the-cuff estimate that KBR cross-leveled hundreds of millions of dollars'

---

[5] KBR's expert, Mr. Walter, offered several cross-leveling calculations ranging from more than $700 million for materials up to more than $4.9 billion for assets and materials.  SOF ¶ 4.  Dr. Gaukler, Relator's expert, criticized aspects of Mr. Walter's analysis but conceded $495 million in materials cross-levels in the relevant period.  Dr. Gaukler also purported to perform an "overordering" analysis, which KBR will separately move to strike under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

worth of materials.  *Id.*  This cross-leveling was the product of KBR's best efforts to use due diligence to cross-level to the maximum extent possible.  SOF ¶ 38.

Relators hope to parse these procedures and directives but without any clearly-articulated legal or contractual standard for how much is "enough," it is inconceivable that KBR "knowingly" fell short.  Relators cite in their complaint (and no doubt will reiterate in opposition) various inflammatory internal email communications suggesting KBR did not perfectly follow its own procedures.  That some employees believed KBR fell short of its own self-imposed procedures— and that KBR management pushed for better cross-level performance—cannot establish that KBR, concededly having cross-leveled substantially, somehow knowingly failed to meet an objective, Government-imposed cross-leveling obligation.  Relators' subjective evidence plays no part in the scienter analysis absent an objective standard to compare it against.  For this reason, the Seventh Circuit banned consideration of any such evidence.  *SuperValu*, 9 F.4th at 470.  All such evidence about KBR employees' subjective beliefs is "irrelevant" as a matter of law.  *Id.*  In other words, if KBR did indeed substantially cross-level, what individual employees believed about its efforts is irrelevant.  *See id.*

Faced with the FCA's objective scienter inquiry, Relators' claim fails.  Not only can Relators not provide an objective standard for cross-leveling, they also cannot point to any clear, "authoritative guidance" from the Government that would have warned KBR that its conduct, which was compatible with a reasonable interpretation of the requirements, nevertheless needed to change.  *See SuperValu*, 9 F.4th at 471.

In *SuperValu*, the court of appeals applied an analogous concept—where a contractor has an objectively reasonable interpretation of a statute or regulation, it cannot act "knowingly" absent "authoritative guidance" from the Government to the contrary.  *See id.*  Such guidance can come

from only two sources: (1) circuit court precedent, and (2) guidance from the relevant agency. *Id.* The guidance "must come from a source with authority to interpret the relevant text" and "must be sufficiently specific." *Id.* Sources far attenuated from the contract and its performance are irrelevant, meaning, for example, that "a solitary footnote in a lengthy, nonbinding manual that changed over time" does not overcome a contractor's reasonable interpretation. *See U.S. ex rel. Proctor v. Safeway, Inc.*, 30 F.4th 649 (7th Cir. 2022). Ambiguous guidance also does not suffice. *See U.S. ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 829 (8th Cir. 2013) (holding ambiguous requirements cannot give rise to FCA liability because a "[defendant's] reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud under the FCA"); *Wilson*, 525 F.3d at 377 (explaining that "differences in interpretation growing out of a disputed legal question," such as disputes concerning the proper interpretation of an ambiguous statute, regulation, or contract term, are "not false under the FCA" (quoting *Lamers*, 168 F.3d at 1018)); *U.S. ex rel. Morton v A Plus Benefits, Inc.*, 139 F. App'x 980, 984 (10th Cir. 2005) ("Expression of a legal opinion . . . depending . . . on the resolution of two sets of inherently ambiguous determinations by defendants[] cannot form the basis for an FCA claim.").

There was no authoritative guidance whatsoever regarding cross-leveling—let alone any that required KBR to cross-level differently. SOF ¶¶ 23-34. There is no circuit court precedent about cross-leveling. There is nothing about cross-leveling in any federal statute or regulation. SOF ¶ 23-24, 42. Meanwhile, none of the experts or fact witnesses in this case has identified authoritative guidance about cross-leveling from any of the agencies relevant to this litigation— the Defense Contract Management Agency ("DCMA"), the Defense Contract Audit Agency ("DCAA"), and the Army. SOF ¶ 34. DCAA and the Army audited KBR's cross-leveling during LOGCAP III and found that although KBR generally cross-leveled, it did not always do so before

purchasing—yet neither agency issued cross-leveling standards.  SOF ¶¶ 46-50.  In fact, despite finding that KBR made "unnecessary purchases," the Army paid KBR's invoices in full.  SOF ¶ 49.

Noting the lack of agency guidance, KBR's Government property management expert opined, unrebutted by Relators, that it would be "improper today to apply a cross-leveling standard to KBR's performance on LOGCAP III that did not exist and was not applied by [the Government] during the relevant time period."  SOF ¶ 42.  Similar concerns animated the Fourth Circuit's recent holding that FCA liability cannot exist without authoritative guidance because "defendants must be put on notice before facing liability for allegedly failing to comply with complex legal requirements," and it would be "profoundly troubling to impose such massive liability on individuals or companies without any proper notice as to what is required."  *See U.S. ex rel. Sheldon v. Allergan Sales*, LLC, 24 F.4th 340, 350 (4th Cir. 2022), *reh'g en banc granted*, No. 20-2330, 2022 WL 1467710 (4th Cir. May 10, 2022); *see also Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000) (noting FCA is a punitive, quasi-criminal statute that imposes both treble damages and per violation monetary penalties).

Relators' experts too looked for authoritative guidance and found none.  One of Relators' experts, Colonel Rudolph, invoked a document published by the Joint Chiefs of Staff, which merely contains a general definition of cross-leveling.  SOF ¶ 34.  The Seventh Circuit has declined to treat mere definitions as authoritative guidance.  *See SuperValu*, 9 F.4th at 471.  Regardless, this document could not have warned KBR about its purportedly insufficient cross-leveling because it includes no standards or guidance for how to implement cross-leveling.  *See id.* at 471; *Safeway*, 30 F.4th 649.  Moreover, the definition discusses cross-leveling in the context of "military element[s]," that is, different elements of the armed forces.  It does not refer to contractors at all.

SOF ¶ 34.  Another of Relators' experts, Dr. Zakheim, when asked whether the Government gave

KBR any cross-leveling guidance, admitted that the Government gave KBR room to exercise its

judgment about how to implement cross-leveling: "Oh, I think the government would have left

them room.  The issue is does that -- how much room is there to give?"  SOF ¶ 34.  Once again,

Dr. Zakheim proves the point—his question cannot be answered objectively.  The answer devolves

hopelessly to subjectivity.  Was KBR required to cross-level one-hundred percent of the time

before purchasing?  Some lesser percentage, and, if so, what?  Absent a clear answer derived from

judicial precedent or binding agency guidance, the case cannot proceed.  *See SuperValu*, 9 F.4th

at 471.

In sum, KBR's broad implementation of cross-leveling, which successfully led to at least

half a billion dollars' worth of materials being cross-leveled, cannot be a "knowing" violation

without an objective requirement, and KBR cannot have "knowingly" ignored authoritative

guidance about cross-leveling when there was no authoritative guidance to ignore.  Relators cannot

establish scienter, and KBR is entitled to summary judgment.  *See Allergan,* 24 F.4th at 350

(holding, following *Safeco*, that a defendant "cannot *know* that its claim is false if the requirements

for that claim are unknown") (citation and internal quotation marks omitted); *U.S. ex rel. Heath v.

Wisconsin Bell, Inc.*, No. 08-CV-0724, 2022 WL 860621 at *3 (E.D. Wis. Mar. 23, 2022) ("Heath

does not identify any authoritative guidance cautioning Wisconsin Bell against these

interpretations. Accordingly, Heath does not show scienter.").

### C.     Relators Must Establish the Elements for Every Alleged False Claim

The FCA requires proof of every element for every particular claim that is alleged to be

false.  *See Lisitza*, 276 F. Supp. 3d at 802-03; *AseraCare*, 938 F.3d at 1297 (requiring government

to establish objective facts on falsity claim by claim).  Even where a relator relies on "statistical

and probabilistic evidence," it cannot avoid summary judgment without "present[ing]

individualized evidence" for at least one claim alleged to violate the FCA. *United States v. Long Grove Manor, Inc.*, No. 10 C 368, 2019 WL 2774149, at *4-5 (N.D. Ill. July 2, 2019) (citing *U.S. ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853 (7th Cir. 2006) and other cases). And here, Relators do not even purport to rely on statistical sampling or extrapolation, and therefore have to meet their burden of proof claim-by-claim.

Relators allege KBR "over-ordered" hundreds of millions of dollars' worth of items, yet they do not attempt to meet their elements for even a single public voucher. Relators instead attempt to show cross-leveling insufficiency on a macro-level, through subjective evidence that KBR did not cross-level "enough." As discussed above, the lack of any objective requirement for falsity dooms Relators' case. Regardless, the FCA does not allow Relators to paint with a broad brush; for every claim for which Relators seek to recover, they must prove every element. Damages and penalties, if any, are limited to each claim proven knowingly false and material. Even a single "false claim," if proven, is not a ticket to hundreds of millions in claimed damages.

Relators' only evidence that remotely attempts to satisfy this burden comes from their proffered expert, Dr. Gaukler, whom KBR will separately move under *Daubert* to exclude. Dr. Gaukler, who admitted he performed a novel analysis and himself is not an expert on cross-leveling, used a computer model to generate a list of purchases he says KBR could have been avoided if it had perfectly cross-leveled. SOF ¶ 41. But this list at most shows KBR purchased items that purportedly appeared elsewhere in KBR's inventory. *Id.* Dr. Gaukler's list does not establish the elements of the FCA for any of these supposed "overorders." It does not, for example, demonstrate an objective falsity. Nor does it show "facts and circumstances surrounding" KBR's purchase of items were "inconsistent with the proper exercise of" KBR's judgment. *See AseraCare, Inc.*, 938 F.3d at 1296-97. Relators' expert witnesses concede that KBR had the right

to exercise judgment when to purchase new and when to cross-level, SOF ¶ 34, but they make no attempt to link that discretion or judgment to any item on Dr. Gaukler's list. They would impose liability for every instance in which KBR bought an item somewhere already in stock, regardless of the individualized circumstances (such as, for example, whether there was an urgent need for the item, whether there was transportation available for cross-leveling, or whether the requested item was "frozen" in anticipation of a major wartime event, SOF ¶ 40).

Rather than meeting their claim-by-claim burden, Relators offer a series of vignettes to show a "scheme" to avoid cross-leveling. *See, e.g.*, Rels.' Opp. to Mot. to Dismiss (Dkt. 207), at 2 (arguing there was a "scheme by certain KBR employees to hoard and needlessly reorder material that was already available, and to conceal those machinations from Government oversight."). Even if such subjective evidence were not excluded as a matter of law, the FCA is not a "scheme" statute. The gravamen of a violation is the submission of a false or fraudulent claim, and Relators must prove the elements for each invoice they allege to have violated the FCA. Relators seek to bring KBR to trial on a single-count complaint alleging the fraudulent purchase of literally thousands of items over a multi-year period. *See generally* Compl.; *see also* SOF ¶¶ 10-14, 41. Relators must tackle the assertedly-false claims individually. There is no evidence that would allow them to do so.

Relators survived KBR's motions to dismiss by peddling vague notions of "scheme" liability. Now, they lack the specific, individualized evidence the FCA requires. Therefore, there are no genuine disputes of material fact, and KBR is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, KBR respectfully requests that the Court grant summary judgment for KBR.

Respectfully submitted,


*/s/ Craig D. Margolis*
Craig D. Margolis
Tirzah S. Lollar
Owen Dunn
Emily Reeder-Ricchetti
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
(202) 942-5000
(202) 942-5999 (facsimile)
craig.margolis@arnoldporter.com
tirzah.lollar@arnoldporter.com
owen.dunn@arnoldporter.com
emily.reeder-ricchetti@arnoldporter.com

Jennifer L. Saulino
David N. Sneed
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Phone: (202) 662-6000
jsaulino@cov.com
dsneed@cov.com

*Attorneys for Defendants KBR, Inc. and Kellogg Brown & Root Services, Inc.*


Date:    August 29, 2022

### <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type volume limitations of C.D. Ill. Local Civ. R.

7.1(B)(4)(b)(1) because Section(1)(c), as defined under the Rule, contains less than 7,000

words.

2.      This brief complies with the typeface and type-style requirements of C.D. Ill. Local Civ.

R. 5.1(C) because it has been prepared in proportionally spaced typeface using Microsoft

Word 365 in Times New Roman 12-point font.

*/s/ Craig D. Margolis*

Date:  August 29, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of August, 2022, I caused the foregoing Memorandum In Support of KBR's Motion for Summary Judgment to be served upon all counsel of record through the Court's Electronic Case Filing System.

*/s/ Craig D. Margolis*