# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

UNITED STATES OF AMERICA, *ex rel.*
GEOFFREY HOWARD and ZELLA
HEMPHILL,

               Plaintiffs,

       v.

KBR INC. and KELLOGG BROWN AND
ROOT SERVICES INC.,

              Defendants.

Case No. 4:11-cv-04022-MMM-JEH

Judge Michael M. Mihm
Magistrate Judge Jonathan E. Hawley

## PLAINTIFFS/RELATORS' OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ iv

INTRODUCTION ........................................................................................................... 1

RESPONSE TO KBR's STATEMENT OF FACTS ....................................................... 4

    I.     UNDISPUTED MATERIAL FACTS ..................................................... 4

    II.    DISPUTED MATERIAL FACTS ........................................................... 6

    III.   DISPUTED IMMATERIAL FACTS ................................................... 117

    IV.   UNDISPUTED IMMATERIAL FACTS .............................................. 141

ADDITIONAL MATERIAL FACTS ......................................................................... 172

    I.     KBR Had a Financial Incentive to Over-Order Supplies on
        LOGCAP III ............................................................................... 172

    II.    The Government Hired KBR to be the Army's Inventory Manager, and
        Inventory Managers Have to Cross-Level ............................................ 175

        A.    KBR Knew That the Government Would Not Pay for
              Unnecessary Purchases of Inventory ..................................... 180

        B.    The Task Orders Issued by the Government Required KBR to
              Cross Level ........................................................................ 183

        C.    KBR Developed and Was Required to Follow Specific
              Procedures for Acquiring and Managing Inventory, Including
              Cross-Leveling .................................................................... 184

        D.    Overview of KBR's Process for Cross-Leveling .................... 187

    III.   KBR Systematically Failed to Make Use of Existing, Excess Inventory ........... 194

        A.    KBR Inexplicably Operated for Years without an Integrated
              Inventory Management System, and Its Transition to an
              Integrated Inventory Management System Was Fraught with
              Delays and Problems ............................................................ 194

        B.    Overview of KBR's Systemic Failures ................................. 195

        C.    KBR Did Not Even Check Its Existing Inventory Before
              Making New Purchases ........................................................ 200

D.     KBR Sites Ignored Efforts to Use Existing Inventory to Avoid Making New Purchases, Instead Hoarding Inventory ........................... 203

E.     KBR Misclassified Its Inventory, Causing It to Unnecessarily Purchase New Inventory Instead of Using Existing Inventory ............... 205

F.     KBR Misused TRECs To Hide Its Abundance of Inventory ................. 207

G.     KBR Knew That the Government Would Have Demanded Funds Back Via Forms 1 Had the Government Known of KBR's Systemic Inventory Management Failures ................................. 209

IV.     KBR Hid Its Failures From the Government ...................................... 212

A.     KBR Controlled the Information Provided to the Government in Order to Hide What It Did Not Want the Government to See ............... 212

B.     KBR Hid That It Had Misused TRECs for Years .................................. 215

C.     KBR Hid That It Discovered an "Extensive Cover Up" regarding Two Warehouses Full of Unused Inventory at One of Its Sites When It Had $1 Billion of Inventory "Lying Around Unused" ............................................................................................. 219

D.     KBR Concealed That the Form It Provided to the Government When Returning Unused Inventory Was Full of False Statements ............................................................................................. 220

V.     KBR Never Disclosed Its Systemic Problems With Purchasing New Inventory When It Had Excess Inventory Available ........................................... 223

VI.     The Government Did Not Know About KBR's Systemic Inventory Management Failures ..................................................................................... 227

VII.     KBR's Statements to the Government Falsely Represented Compliance with Its Cross-Leveling Obligations ................................................................. 232

A.     KBR's Statements to the Government on Public Vouchers Falsely Represented Compliance with Its Cross-Leveling Obligations ............................................................................................. 232

B.     KBR's Statements to the Government on Materials Requisitions Falsely Represented Compliance with Its Cross-Leveling Obligations ............................................................................................. 237

C.     PCARSS ........................................................................................... 239

D.     Award Fees ...................................................................................... 240

VIII. Financial Impact of KBR's Requests for Reimbursement of Items Purchased When It Already Had Excess Amounts of Inventory on Hand ........................................................................................................ 241

LEGAL STANDARDS .............................................................................................. 245

ARGUMENT ............................................................................................................ 246

I. KBR Submitted Thousands of False Claims for Payment.................................. 246

A. KBR Submitted Implied False Claims through Its Public Vouchers. ...................................................................................... 247

B. KBR Submitted Implied False Claims through Its Award Fee Applications. .................................................................................. 250

C. Buying Material Without Checking for Excess on Hand Violates A Core Requirement of LOGCAP III, Like Guns That "Do Not Shoot." ............................................................................ 251

D. As This Court Previously Held, KBR Violated Objective Requirements, and Falsity Does Not Require A Quantitatively Measurable Performance Standard. ................................................. 252

II. The Evidence of Scienter Is Overwhelming, and *SuperValu* Does Not Preclude The Court from Considering That Evidence......................................... 257

A. There Is Overwhelming Evidence of Scienter. ........................................ 258

B. *SuperValu* Does Not Apply Because The Parties Do Not Dispute The Meaning of Legal Terms; The Parties Dispute Whether KBR's Performance Satisfied The Legal Requirements of The Contract. ................................................................................. 259

C. *SuperValu* Does Not Apply to "Reasonable Interpretations" of Contract Terms......................................................................................... 260

D. KBR Fails to Demonstrate That It Acted in Accordance with Its Purportedly "Reasonable" Interpretation of The Contract...................... 263

III. Relators Have Identified Thousands of False Claims......................................... 265

CERTIFICATE OF COMPLIANCE ........................................................................ 269

APPENDIX A – PLAINTIFFS-RELATORS' APPENDIX OF KEY TERMS AND ACRONYMS

INDEX OF EXHIBITS TO PLAINTIFFS/RELATORS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

<u>**TABLE OF AUTHORITIES**</u>

Page

**Cases**

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988) ................................................................................... 261

*Dennison v. MONY Life Ret. Income Sec. Plan for Emps.*,
  710 F.3d 741 (7th Cir. 2013) ...................................................................... 261

*Grossman v. Smart*,
  807 F. Supp. 1404 (C.D. Ill. 1992) (Mihm, J.) .................................... 245, 258

*Illinois ex rel. Elder v. JPMorgan Chase Bank, N.A.*,
  No. 21 C 85, 2022 WL 3908675 (N.D. Ill. Aug. 30, 2022) ........................... 263

*Kellogg Brown & Root Services, Inc. v. United States*,
  728 F.3d 1348 (Fed. Cir. 2013) ............................................................ 253, 254

*Lupinetti v. Exeltis USA*,
  No. 19 C 825, 2021 WL 5407424 (N.D. Ill. Nov. 19, 2021) ......................... 263

*McBride v. Barnes*,
  No. 1:18-CV-1424, 2021 WL 4750570 (C.D. Ill. Oct. 12, 2021) (Mihm, J.) ................ 245

*Metro. Area Transit, Inc. v. Nicholson*,
  463 F.3d 1256 (Fed. Cir. 2006) ................................................................... 261

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) ............................................................................... 262, 263

*Specialty Earth Scis., LLC v. Carus Corp.*,
  No. 15-CV-06133, 2021 WL 4804076 (N.D. Ill. Oct. 14, 2021) ................... 253

*Stewart v. Wexford Health Sources, Inc.*,
  14 F.4th 757 (7th Cir. 2021) ....................................................................... 245

*United States ex rel. Barko v. Halliburton Co.*,
  241 F. Supp. 3d 37 (D.D.C. 2017) ............................................................... 250

*United States ex rel. Campie v. Gilead Scis., Inc.*,
  862 F.3d 890 (9th Cir. 2017) ...................................................................... 249

*United States ex rel. Donegan v. Anesthesia Assocs. of Kan. City, PC*,
  833 F.3d 874 (8th Cir. 2016) ...................................................................... 263

*United States ex rel. Garzione v. PAE Gov't Servs., Inc.*,
  164 F. Supp. 3d 806 (E.D. Va. 2016) .......................................................... 257

*United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*,
  318 F. Supp. 3d 680 (S.D.N.Y. 2018) ........................................................... 249

*United States ex rel. Lisitza v. Par Pharm. Cos., Inc.*,
  276 F. Supp. 3d 799 (N.D. Ill. 2017) ............................................................ 257

*United States ex rel. McGrath v. Microsemi Corp.*,
  690 F. App'x 551 (9th Cir. 2017) .................................................................. 263

*United States ex rel. Olhausen v. Arriva Med. LLC*,
  No. 21-10366, 2022 WL 1203023 (11th Cir. 2022) ....................................... 263

*United States ex rel. Proctor v. Safeway*,
  30 F.4th 649 (7th Cir. 2022) ................................................... 259, 260, 262, 263

*United States ex rel. Purcell v. MWI Corp.*,
  807 F.3d 281 (D.C. Cir. 2015) ...................................................................... 263

*United States ex rel. Schutte v. SuperValu Inc.*,
  9 F.4th 455 (7th Cir. 2021) ..................................................................... passim

*United States ex rel. Sheldon v. Allergan Sales, LLC*,
  24 F.4th 340 (4th Cir. 2022), *opinion vacated and judgment affirmed*,
  No. 20-2330, 2022 WL 4396367 (4th Cir. Sept. 23, 2022) ........................... 263

*United States ex rel. Streck v. Allergan*,
  746 F. App'x 101 (3d Cir. 2018) ................................................................... 263

*United States ex rel. Wilson v. KBR*,
  525 F.3d 370 (4th Cir. 2008) ........................................................................ 255

*United States ex rel. Yannacopoulos v. General Dynamics*,
  652 F.3d 818 (7th Cir. 2011) ........................................................................ 255

*United States v. Academi Training Ctr., Inc.*,
  220 F. Supp. 3d 676 (E.D. Va. 2016) .................................................... 249, 250

*United States v. AseraCare, Inc.*,
  938 F.3d 1278 (11th Cir. 2019) .................................................................... 256

*United States v. Molina Healthcare of Ill., Inc.*,
  17 F.4th 732 (7th Cir. 2021) ............................................... 249, 250, 251, 252

*United States v. Nat'l Steel Corp.*,
  75 F.3d 1146 (7th Cir. 1996) ........................................................................ 261

*United States v. Northrop Grumman Systems Corporation*,
  9 CV 7306, 2015 WL 5916871 (N.D. Ill. 2015) ............................................ 256

*United States v. Rogan*,
    517 F.3d 449 (7th Cir. 2008) ...................................................... 266

*United States v. Sanford-Brown, Ltd.*,
    840 F.3d 445 (7th Cir. 2016) ...................................................... 250

*United States v. Triple Canopy, Inc.*,
    857 F.3d 174 (4th Cir. 2017), *cert. dismissed*, 138 S. Ct. 370 (2017) ........................ 249

*United States v. Wisconsin Bell Inc.*,
    No. 08-CV-0724, 2022 WL 860621 (E.D. Wis. Mar. 23, 2022) ................................. 263

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
    579 U.S. 176 (2016) ................................................................ passim

**Statutes**

31 U.S.C. § 3729(a)(1)(B) ......................................................... 247

31 U.S.C. § 3729(b)(1) ............................................................ 259

31 U.S.C.A. § 3731(d) ............................................................. 265

**Other Authorities**

Restatement (Second) of Contracts § 202(4) ........................................ 261

**Regulations**

FAR § 31.201-3 ................................................................... 254

FAR § 31.201-3(b) ................................................................ 254

## INTRODUCTION

At the core of this case lies a basic tenet: An inventory manager, seeking billions of dollars in reimbursement from the Government, cannot simply order as much material as it chooses, knowing that there already exists massive excess of that same material in an accessible storeroom. An inventory manager cannot order more spools of electrical cable when it knows it has enough of that cable to last over 800 months. An inventory manager cannot deliberately bypass available stockpiles for more than half the value of items it purchases, or deliberately misclassify and hide material to justify purchasing even more. But this is exactly what KBR did. KBR and the Government used the term "cross-leveling" to describe KBR's fundamental obligation to look for excess material and use it before spending taxpayer dollars to buy more. KBR's failure to meet this obligation cost the Government over $340 million in unnecessary purchases.

Cross-leveling is a basic function, not an esoteric or technical concept that need be spelled out. Yet, that requirement is explicit in many LOGCAP III contract provisions. KBR's expert claims that KBR was obligated to expend "the good faith maximum effort" to cross-level. That requirement surely exists, but so do others that are even more specific. For example, each payment demand that KBR made for Government funds represented that the materials invoiced were "necessary for performance" of the contract. Specific Task Orders, Statements of Work, and Government-approved Property Control Procedures all required cross-leveling "to the maximum extent possible."

This Court has already validated the legal theories underpinning KBR's liability under the False Claims Act ("FCA"). The Court previously held that regulations incorporated into the contract required that all costs be "reasonable," a representation that the Court found to be objectively false assuming the truth of allegations of KBR's knowing and systemic failure to

cross-level. Overwhelming evidence now proves the truth of those allegations and KBR's misrepresentations to the Government are even clearer.

KBR seeks to avoid the Court's prior legal ruling by arguing that the Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016) somehow undermines it. *Escobar* was a 9-0 decision *in favor of the relator*, expanding the scope of FCA liability. As explained below, *Escobar* not only supports this Court's ruling, it dictates the conclusion that KBR submitted false claims.

In an attempt at factual distortion, KBR frames this case as quibbling over whether KBR was "efficient" enough in cross-leveling. But even a brief overview of the evidence shows a deliberate, systemic scheme to overcharge the Government by hundreds of millions of dollars. According to KBR "Senior Leadership Team" member Rich Kaye (one of three top executives on LOGCAP III), KBR simply bypassed cross-leveling requirements for 50% of its dollar purchases in 2009, with even worse performance in previous years. It did so by failing to put new requisitions in Material Control ("MATCON") status, thus circumventing KBR's Distribution Management Center ("DMC"), whose job was to check for excess in theater. According to Kaye himself, this failure meant that KBR was not even looking at whether material was available in theater for half (or more) of all material purchases.

Even when KBR looked for excess, the DMC was blind to much of what was available because KBR deliberately misclassified material to shield it from cross-leveling. KBR fraudulently placed material off limits to cross-leveling in four key ways: (1) KBR classified tens of millions of dollars of lower demand "non-stock" items as frequently-consumed "stock" items, making that material far more difficult to cross-level; (2) KBR placed items on "reserve" without justification, which made them unavailable to cross-level; (3) KBR improperly left over $350 million of

material in TRECs for over 60 days, where it was unavailable for cross-leveling, when the allowed maximum TREC time was 48 hours "in transit"; and (4) near the end of the contract, when KBR began to return some materials to the Government, it falsely certified that those materials had no use for the mission, while continuing to order more of the same materials. KBR personnel identified all four practices early in the contract, yet they remained uncorrected for years. In its prior Order denying KBR's motion to dismiss, this Court cited all four as supporting an FCA violation.

KBR lamented these problems internally, noting that if the Government knew of them, it would seek refunds or "put KBR out of business." But KBR never disclosed these issues to the Government; it concealed them. The summary judgment record contains a mountain of devastating evidence that KBR submitted false claims to the Government, seeking reimbursement to which it knew it was not entitled. KBR's summary judgment motion should be denied.

## RESPONSE TO KBR'S STATEMENT OF FACTS

## I.    UNDISPUTED MATERIAL FACTS

Relators do not dispute the KBR Statements of Fact listed in this section solely for the purposes of deciding KBR's summary judgment motion.

The following facts from KBR's Statement of Facts ("KBR's SOF") are undisputed and material:

KBR SOF 2.  "In this case, the term 'cross-leveling' means the process by which KBR fulfilled demands for wartime supplies by using available materials in KBR storerooms instead of purchasing new supplies. Compl. ¶ 9."

KBR SOF 3.  "The war theater consisted of numerous bases of various sizes, known as 'sites,' which were spread across Iraq, Afghanistan, Kuwait, Jordan, Djibouti, Turkey, Georgia, and Uzbekistan. [KBR] Ex. 1, Booth Decl. ¶ 3 (Aug. 29, 2022). In the relevant time period, KBR supported the military at over 200 sites in the war theater, with the majority located in Iraq and Afghanistan. *Id.* at ¶ 4; *see also* [KBR] Ex. 33, Vollmecke Dep. (Oct. 23, 2020) at 33:14-37:12 (describing the environment as 'quite challenging' with 'elements of weather, the enemy, and constant, again, mortar rocket attacks,' creating 'extremely complicated' logistical support operations 'spread across 426,105 miles between two [war] theaters' during his tenure as DCMA commander)."

KBR SOF 5.  "On December 14, 2001, the Army Operations Support Command, Rock Island, Illinois ('ACC') awarded the LOGCAP III contract to Brown & Root Services, Inc, a subsidiary of Defendant Kellogg Brown & Root Services, Inc. ('KBR') [KBR] Ex. 17, Contract DAAA09-02-D-0007 (Dec. 14, 2001) ('LOGCAP III Contract'). LOGCAP utilizes civilian contractors to perform life support and other services for the warfighter. *Id.* at Base Statement of Work ("Base SOW") at §1.0 (KBR-HOW-7104387); [KBR] Ex. 32, Wade Dep. (Sept. 15, 2020) at 13:23-24; [KBR] Ex. 34, Larkin Dep. (Nov. 5, 2020) at 43:4-45:14.

KBR SOF 6.  "LOGCAP III is an indefinite delivery, indefinite quantity ('IDIQ') contract. [KBR] Ex. 33, Vollmecke Dep. (Oct. 23, 2020) at 23:13-16. This IDIQ contract served as an umbrella contract, and KBR performed work under it pursuant to individually-awarded task orders. [KBR] Ex. 26, Branch Rep. at 19; [KBR] Ex. 32, Wade Dep. (Sept. 15, 2020) at 26:17-19; [KBR] Ex. 34, Larkin Dep. (Nov. 5, 2020) at 64:8-16.

KBR SOF 12.  "KBR purchased materials for twenty-three task orders during the relevant time period: task orders 104, 110, 114, 116, 117, 118, 121, 122, 129, 130, 131, 137, 138, 139, 142, 145, 147, 151, 152, 155, 157, 159, and 161. [KBR] Ex. 1, Booth Decl. ¶ 5. These task orders were cost-reimbursable contracts, *id.*, meaning KBR was entitled to reimbursement for the costs incurred during its performance of the task orders as long as the costs were reasonable, among other things. FAR 52.216-7; FAR 31.201; [KBR] Ex. 26, Branch Rep. at 26-27."

KBR SOF 16.  "The Form 1034 contained in each public voucher includes a statement that 'Pursuant to the authority vested in me, I certify that this voucher is correct and proper for payment.'  *See, e.g.*, [KBR] Ex. 18, Task Order 139 Voucher Package (PDF of Native Excel produced at KBR-HOW-0043594); [KBR] Ex. 19, Task Order 159 Voucher Package (PDF of Native Excel produced at KBR-HOW-0044437). The Government was responsible for executing this part of the voucher. [KBR] Ex. 29, KBR 30(b)(6) Dep. (Sept. 23, 2021) at 165:9-167:8. This section could only be completed by a Government official from the Defense Contract Audit Agency ('DCAA') after the official had reviewed and 'provisionally approved' the purchases reflected by the voucher, meaning that DCAA approved the voucher for payment but retained the right to later perform an 'incurred cost audit.'  *Id.* at 165:22-169:22."

KBR SOF 17.  "Due to the size and scope of LOGCAP III, the Army delegated aspects of contract administration, including property management oversight, to the Defense Contract Management Agency ('DCMA'). [KBR] Ex. 33, Vollmecke Dep. (Oct. 23, 2020) at 21:23-24:19; *id.* at 66:21-67:13."

KBR SOF 18.  "LOGCAP III incorporated the FAR Government property clause and thus required KBR to establish and maintain an adequate property management system (PMS) approved by the DCMA Government Property Administrator (GPA). [KBR] Ex. 16, DOD 4161.2-M, Dept. of Def. Manual for the Performance of Contract Property Admin. at 1-2 to 1-3 ('DOD Property Manual'); *see also* FAR 52.245-5(e)(2) (1986) & FAR 45.502(a) (1984); FAR 52.245-1 (2007)."

KBR SOF 47.  "KBR's costs under LOGCAP III are subject to audit and evaluation by the Defense Contract Audit Agency ('DCAA'). [KBR] Ex. 31, Walter Dep. (Apr. 23, 2021) at 146:16-19. DCAA has the authority to question particular costs claimed by KBR and issue a 'Form 1,' which suspends payment and recommends that the contracting officer disallow payment. [KBR] Ex. 29, KBR 30(b)(6) Dep. (Sept. 23, 2021) at 18:5-9."

KBR SOF 49.  "During KBR's performance of LOGCAP III, DCAA issued Form 1s questioning the reasonableness of KBR's costs on variety of issues. [KBR] Ex. 48, Booth Oct. 23, 2019 Decl. at ¶ 11. Although DCAA reviewed KBR's invoices for property and materials, DCAA never issued a Form 1 or recommended the Government not pay any costs based on KBR's purchases of property and materials or its cross-leveling performance. *Id.*; *see also* [KBR] Ex. 29, KBR 30(b)(6) Dep. (Sept. 23, 2021) at 170:15-17."

## II.    DISPUTED MATERIAL FACTS

The following facts from KBR's SOF are material and disputed, for the following reasons.

<u>KBR SOF 4.</u>  "KBR cross-leveled at least $495 million dollars in materials during the relevant time period. [KBR] Ex. 39, Gaukler Rebuttal Rep. at 5 (stating that KBR cross-leveled $495 million in materials); [KBR] Ex. 28, Walter Rep. at 2-3 (summarizing analysis finding that KBR cross-leveled approximately $1.2 billion in materials, and as much as $4.9 billion overall); [KBR] Ex. 36, Hemphill Dep. (Apr. 13, 2018) at 151:7-14 (testifying that KBR cross-leveled at least $240 million of items)." Footnote 2: "The parties disagree about the exact quantity of materials KBR cross-leveled during the relevant time period, with KBR's own expert, Bill Walter, calculating cross-leveling of materials alone as at least $700 million and potentially exceeding $1 billion. KBR includes Dr. Gaukler's calculation here only to show that the parties agree KBR cross-leveled hundreds of millions of dollars' worth of supplies even if all of Relators' proffered expert testimony is accepted."

**Relators' Response to KBR SOF 4:**

The statement of fact, including the footnote, is disputed.

First, KBR Exhibit 39, the rebuttal report of Relators' expert, Dr. Gary Gaukler, supports neither KBR's statement that "KBR cross-leveled at least $495 million dollars in materials during the relevant time period," nor KBR's parenthetical characterizing that rebuttal report as "stating that KBR cross-leveled $495 million in materials," nor KBR's statement that "the parties agree KBR cross-leveled hundreds of millions of dollars' worth of supplies even if all of Relators' proffered expert testimony is accepted." That was not Dr. Gaukler's opinion or conclusion at all. Instead, Dr. Gaukler, among other things, opined that the calculations of KBR's proffered expert, Mr. William Walter, "contain numerous errors and overstate the number and value of KBR's cross-level transactions." Ex. 105 (Expert Rebuttal Report of G. Gaukler) ¶ 5. Dr. Gaukler then proceeded to identify no fewer than seven different categories of Mr. Walter's errors and overstatements. *Id.* Dr. Gaukler then opined that, "Correcting the number and value of cross-leveled materials transactions that Mr. Walter improperly included reduces their value from approximately $1.2 billion to approximately $495 million." *Id.* ¶ 6. Dr. Gaukler's identification of certain errors and overstatements in the work of KBR's proffered expert, Mr. Walter, and

Dr. Gaukler's analysis and calculation of the impact of correcting for Mr. Walter's errors and overstatements, does not equate to Dr. Gaukler or Relators agreeing that KBR cross-leveled approximately $495 million in materials, as KBR states. Neither Dr. Gaukler nor Relators agree that KBR cross-leveled approximately $495 million in materials.

Second, KBR Exhibit 28, the report of KBR expert Mr. Walter, supports neither KBR's statement that "KBR cross-leveled at least $495 million dollars in materials during the relevant time period," nor its statement that "KBR's own expert, Bill Walter, calculat[ed] cross-leveling of materials alone as at least $700 million and potentially exceeding $1 billion," because Mr. Walter's report is fundamentally flawed and subject to at least the multiple errors and overstatements that Dr. Gaukler identified in his rebuttal report, including that Mr. Walter:

> (a) identifies "inside the wire" transactions as cross-levels despite acknowledging that the transactions appear to involve a single warehouse that issued materials to a group of sites within a common security perimeter, as opposed to materials transactions between independent sites;

> (b) includes transfers of property that did not fill a requisition and thereby avoid the need to order more goods—thus contradicting the very purpose of a cross-level. Specifically, Mr. Walter's totals include numerous transactions that simply disposed of excess property from the LOGCAP III contract;

> (c) includes numerous other transactions that do not reflect Mr. Walter's own definition of a cross-level, including administrative transactions in Maximo relating to item research and counterfeits;

> (d) includes pervasive double-counting of cross-level transactions for materials. Mr. Walter includes transactions in which KBR was returning materials to a storeroom from a worksite, such that he counts as a cross-level both the issue to fill a requisition and the return after the item was not used. Mr. Walter further double-counts transactions that KBR recorded in Maximo as both assets and materials, inflating the number and value of materials that KBR cross-leveled;

> (e) includes materials transactions that occurred within the same physical site, including materials that warehouses issued to "missions" located at their sites. Such transactions do not meet Mr. Walter's own definition of a cross-level;

(f) includes transactions involving items that KBR has asserted in this litigation are not subject to cross-leveling, including non-tangible items and TRECs; [and]

(g) overstates the value of transactions by failing to correct errors in the materials' purchase price listed in Maximo.

Ex. 105 (Expert Rebuttal Report of G. Gaukler) ¶ 5. Mr. Walter also "overstates the number of cross-levels involving assets." *Id.* ¶ 5 n.9.

Third, KBR Exhibit 36, excerpts of the deposition of Relator Hemphill, does not support KBR's statement that "KBR cross-leveled at least $495 million dollars in materials during the relevant time period." Relator Hemphill's testimony at the transcript range KBR cites was as follows:

Q. Okay. Do you have a figure in your mind that you -- for the -- do you have a figure in your mind for the value of the items that you helped cross-level while you were working at the DMC?

A. I always thought it was about 240 mil. I'm not sure.

Q. About $240 million worth of items?

A. Yes.

KBR Ex. 36 (excerpts of Relator Hemphill Dep.) at 151:7-14. Relator Hemphill did not testify that "KBR cross-leveled at least $495 million dollars in materials during the relevant time period," as KBR asserts; Relator Hemphill testified as to a number less than half that amount. Furthermore, Relator Hemphill stated that she was "not sure" about that number. *Id.* KBR's parenthetical characterizing Relator Hemphill's testimony is likewise disputed. As the above testimony makes clear, Relator Hemphill did *not* "testify[] that KBR cross-leveled *at least* $240 million of items," as KBR says in its parenthetical characterization (emphasis added). Relator Hemphill simply testified that she "always thought it was about 240 mil[lion worth of items]," and added that she was "not sure." *Id.*

Fourth, there is substantial evidence in the record showing that KBR systemically failed to cross-level, including bypassing the cross-leveling process half the time and manipulating inventory to artificially decrease items available to cross-level. *See, e.g.*, Ex. 66 (Feb. 28, 2010 internal KBR email from KBR's Head of the DMC, C. O'Muirgheasa) at '4132 ("In 2009, 65% of Requisitions] were put into MATCON, representing 51% of the dollars. So, **35% of the Req[uisitions] bypassed us [KBR's DMC], representing almost 50% of the dollars**.") (emphasis added); Ex. 67 (KBR data) at '4133 (quantifying that in 2007, out of 65,372 Material Requisitions valued at $1,237,891,670.75, a total of 52,488 (80.3%) of those Material Requisitions valued at $949,886,655.51 (76.7% of the dollars) were not checked for cross-leveling; in 2008, out of 90,025 Material Requisitions valued at $1,171,737,717.95, a total of 49,683 (55.2%) of those Material Requisitions valued at $647,308,265.68 (55.2% of the dollars) were not checked for cross-leveling; and in 2009, out of 65,526 Material Requisitions valued at $ 812,554,107.70, a total of 23,124 (35.3%) of the Material Requisitions valued at $401,484,184.06 (49.4% of the dollars) did not go to the DMC for the cross-leveling check); Ex. 3 (Internal KBR email containing Dec. 29, 2008 email from KBR's Head of the DMC, B. Simmons) at '4448 ("The three major factors impeding the DMC's ability to Cross Level under utilized materials are as follows: 1) Categorization of ASL/Inventory Lines (i.e. reflecting [STK] when demands indicates [SP] or [NS] category)[;] 2) Unresponsive Sites/Projects to Tasking leading to Denials[;] 3) Sites/Projects resistant to place Material Requisitions in MATCON Status; consequently, sending the Majority (if not All) directly through Procurement Channels."); Ex. 81 (Mar. 20, 2010 email from KBR Deputy Program manager – Support, R. Kaye, to KBR Deputy Principal Program Manager, Larry Lust) at '9112 ("Last year, fully **35% of all requisitions (with an extended value of $401M[illion]) by-passed the cross-leveling check**. As we start to turn over more and more

materials to GOI [Government of Iraq], we are facing an **increasing risk of being Formed 1 for buying items we just declared excess and gave away**. … [A]s of yesterday, we [had] **43,801 lines across Iraq being carried as STK that have 2 or fewer demands in the past 360 days**. We did a trial run on three sites and determined that 80% of their STK lines had RO [Requisition Objectives] and ROP [Reorder Points] set above what it should be based upon demand history. … We've got **$71M[illion] in reserved stock of which less than 50% is legitimate**. The rest is against cancelled ACLs, completed ACLs, or just plain **'hidden' from cross-leveling**. **TREC storerooms is going to be my biggest challenge….we've currently got $331M[illion] in them as of yesterday**. I've told Guy [LaBoa, KBR Principal Program Manager] this is the **Mother of all Forms 1**.") (emphasis added); Ex. 82 (Apr. 1, 2010 internal KBR email from KBR Deputy Program Manager – Support, R. Kaye, to KBR Principal program Manager, G. LaBoa) at '7417 ("The deeper I dig, the more uncomfortable I become that we really do know what's going on. We've got **continuing issues with RO [Requisition Objective], ROP [Reorder Point], Stk vs Non-Stk, reservations and TRECs**.") (emphasis added); Ex. 7 (June 2009 email from KBR employee) at ECF Page 4 ("He said they are **placing everything on reserve so DMC won't ask for it CL [cross-level]**.") (emphasis added); Ex. 8 (Internal KBR email containing Feb. 25, 2010 email from KBR's Deputy Program Manager – Support, R. Kaye) at '0062 ("We are purchasing $5 M per day when we've got $1.2 B i[n] excess on hand. At some point, the DCAA is going to put KBR out of business if we keep doing this."); Ex. 96 (Expert Report of G. Gaukler) at 5 (concluding that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling); *see also, e.g.*, Plaintiffs/Relators' Statement of Additional Material Facts ("SOF") ¶¶ 52-86.

<u>KBR SOF 7.</u>   "Each task order included a statement of work ('SOW'), which was a document drafted by the Government that articulated KBR's specific responsibilities for the particular task order. [KBR] Ex. 32, Wade Dep. (Sept. 15, 2020) at 32:19-34:10."

**<u>Relators' Response to KBR SOF 7.</u>**

The statement of fact is disputed.

In addition to the specific responsibilities articulated in the statement of work for each task order, when performing a task order under LOGCAP III, KBR also has specific responsibilities under the LOGCAP III base contract. *See, e.g.*, Ex.95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."); Ex. 62 (July 22, 2004 Amendment P00008 to LOGCAP III Base Contract) at '3166 ("The purpose of this modification is to incorporate Task Order Cross Utilization of Government Property into the basic contract and is applicable to all current and future task orders awarded under this contract. . . . <u>Definition:</u> Cross Utilized Property is government property purchased against one task order which is subsequently loaned to another task order on a temporary basis. Cross-utilized property shall remain accountable to the task order against which it was purchased, unless it has been duly transferred to another task order, in which case it will remain accountable to the task order to which it has been transferred."); Ex. 100 (Aug. 21, 2006 Task Order 139) at '1481 ("[A]ll other clauses, terms and conditions set forth in the Basic LOGCAP contract DAAA09-02-D-0007 apply."); Ex. 48 (Task Order 139 Statement Of Work Change 6) at '5606 ("The contractor shall provide all resources and management necessary to perform the mission in accordance with basic Contract No. DAAA09-02-D-0007 and the Task Order (TO) Statement of Work (SOW) described herein."); Ex. 40 (Sept. 1, 2008 Task Order 159) at '5828 ("All clauses and terms and conditions set forth in the Basic LOGCAP contract DAAA09-02-D-0007 apply.");

Ex. 41 (Aug. 25, 2008 Task Order 159 SOW) at '5486 ("The contractor shall provide all resources and management necessary to perform the mission in accordance with basic Contract No. DAAA09-02-D-0007 and the Task Order (TO) Statement of Work (SOW) described herein.").

KBR SOF 8. "Under the task orders at issue in this case, KBR was required to use its 'best efforts' to deliver supplies and services that complied with the contract specifications and statements of work. [KBR] Ex. 17, LOGCAP III Contract at KBR-HOW-7104369 (incorporating by reference FAR 52.232-20 & 52.232-22); FAR 52.232-20 ('The Contractor agrees to use its best efforts to perform the work specified in the Schedule and all obligations under this contract within the estimated costs); FAR 52.232-22 (same). Neither LOGCAP III nor the FAR define 'best efforts.' *See generally* FAR 52.232-20 & 52.232-22 and [KBR] Ex. 17, LOGCAP III Contract; *see also* [KBR] Ex. 26, Branch Rep. at 27-29 (discussing the contract and FAR clauses relating to 'best efforts'); [KBR] Ex. 43, Zakheim Dep. (Jul. 29, 2022) at 127:10-128:15 (Relators' expert testifying that the contract had a 'general requirement for best efforts' which 'could easily be interpreted as being cross-leveling,' that 'best efforts is a squishy term,' and KBR was required to 'make the best effort to be efficient'); [KBR] Ex. 40, Rudolph Rep. at 44 (describing 'concerted and dedicated supervision/management and efforts' as the 'level of effort required to successfully execute and fulfill the LOGCAP III contract and its task orders')."

**Relators' Response to KBR SOF 8.**

The statement of fact is disputed.

FAR 52.232-20 states that the contractor "agrees to use its best efforts to perform the work specified in the Schedule and all obligations under this contract *within the estimated costs*." (emphasis added). Thus, the only thing subject to any sort of "best efforts" requirement was efforts to keep overall costs to within the definitized amount. There is nothing to suggest that all aspects of KBR's performance are modified by a "best efforts" standard.

In addition, Zakheim and Rudolph are not contracting experts, and therefore lack the foundation to support this statement of fact.

Further, under the LOGCAP III contract, the supplies and materials KBR purchased had to be (1) "necessary for performance" of the contract, (2) cross-leveled to the "maximum extent possible" per the contract's Statements of Work (as KBR concedes, KBR Br. at 2), and in the case of larger purchases, (3) expressly certified to have been cross-leveled. If "best efforts" goes beyond keeping within estimated costs, these additional requirements may be viewed either as providing more specific meaning to "best efforts" or as the variety of considerations and circumstances used to determine reasonableness. Taken together or individually, these requirements objectively

require KBR to check for available material and use it before buying more, and to only buy supplies and materials necessary for performance under the contract, as both KBR and the Government agreed. Ex. 138 (McNamara Dep.) 279:7-280:2 ("Q. . . . [D]id you have a view on . . . whether KBR was appropriately cross-leveling property in the 2007 to 2012 time period? [Objection.] A. . . . They needed to have been doing it . . . because it was part of . . . their property procedure. It was part of what was required of them as a prudent contractor."), 590:13-19 ("If you are purchasing something and you know that you have a large operation, then as a prudent contractor, you would be required to screen through your system to see if there is any availability of . . . these items or property that you're currently trying to buy . . . ."), 597:20-598:9 ("Q. Do you know . . . when KBR was required to certify that it had attempted to cross-level before making purchase? A. There was a modification to the contract. I don't remember exactly when. It was sometime after 2006. I don't know if it was 2007 or 2008. . . . [I]t is part of the contract."); Ex. 136 (Lust Dep.) 30:13-17 ("Q. . . . [W]ere you aware that the obligation to cross-level was a contractual requirement in KBR's contract with the United States Government? [Objection.] A. Yes."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 38:22-39:8 ("Q. . . . Any other generally applicable instructions from the U.S. Government concerning KBR cross leveling between task orders other than those that you just referenced? [Objection.] A. . . . Mary Wade, who was the contract administrator for the LOGCAP III contract in Houston, had said that we were to make maximum use of cross leveling where possible. She understood you couldn't do it all the time but where possible."); Ex. 135 (LaBoa Dep.) 70:24-71:21 (agreeing cross-leveling was part of KBR's property control procedures); Ex. 127 (Hippert Dep.) 162:24-163:20 (agreeing his "view at the time" was that cross-leveling was expected); Ex. 134 (King Dep.) 16:21-17:2 ("Q. . . . With respect to KBR's work on LOGCAP-III, was KBR supposed to try to cross-level materials and property

before purchasing new materials and property? [Objection.] A. Yes."); Ex. 142 (Rock Dep.) 520:17-22 ("Q. And it was KBR's obligation under LOGCAP III to cross level property [and materials]; is that right, sir? [Objection.] A. I think . . . where possible, yes."); Ex. 141 (Ritondale Dep.) 105:22-106:5 ("Q. . . . [I]s it your understanding that KBR was supposed to try to cross-level property and materials at some point in the procurement process? [Objection.] A. My understanding is at some point in time the cross-leveling was something that was supposed to occur."); Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."), '0037-38 (incorporating FAR 52.216-7, FAR 52.232-20, FAR 52.232-22); FAR 52.216-7; FAR 52.232-20; FAR 52.232-22; Ex. 48 (Task Order 139 Statement Of Work Change 6) at '5609 ("3.0 CONTRACTOR ACQUIRED OR GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY. Prior to procurement of equipment to support all efforts described in this task order, the contractor shall exercise due diligence in verifying **and certify** that the required items cannot be satisfied from existing stock available from other sites covered by this task order. **This certification shall be provided to the [government] ACO [Administrative Contracting Officer]**. . . . 3.1.1. **The Contractor shall adhere to the requirement priorities listed in TABLE 3.1.1. to the maximum extent possible**. For purchases that cannot be obtained **through cross leveling or** from the **Host Country** sources, the contractor shall make maximum use of the Federal Supply System (FSS). **REQUIREMENTS PRIORITIES 1 USG military unit, organic, green suit[;] 2 Cross level within LOGCAP Task Order[;] 3 Other Task Orders within LOGCAP[;] 4 Host Country sources[;] 5 FSS[;] 6 Commercial**.") (emphasis in original); Ex. 41

(Task Order 159 Statement Of Work) at '5488-89 (same, without emphasis); Ex. 101 (Nov. 2, 2007 DCMA Letter of Technical Directive to KBR) at '6706 ("All equipment MRs [material requisitions] shall be initially submitted to the site ACO. . . . All equipment MRs [material requisitions] shall contain the following information: . . . (3) Has KBR checked for theater-wide re-distribution under the cross-leveling process?"); Ex. 24 (July 1, 2009 KBR Technical Direction Bulletin re: PCARSS) at '4270 ("KBR has a responsibility to cross level before purchase."); Ex. 34 (containing June 4, 2011 email from KBR's Head of the DMC, C. O'Muirgheasa) at '3826 ("It is a contractual requirement on LOGCAP III to cross level items in order to reduce spending, eliminate excess, and, nowadays just as importantly, get available material to other[] sites ASAP."); Ex. 44 (June 30, 2011 internal KBR email from T. Hippert to M. Wade) at '0608 ("LOGCAP III . . . is reporting cost avoidance on material that is excess in one camp and moved to another, we call that cross-leveling. These slides are being briefed to the Government and I don't think it's a true cost avoidance. My concern is that the government paid for the material and we are expected to be good stewards and properly manage the inventory. So c[ross]-level is expected."); Ex. 71 (July 2, 2009 Analysis by KBR's Head of the DMC) at '1369 ("Our mission is to cross level materials from locations where there is redistributable material to locations where there is a need for those materials."); Ex. 94 (Expert Report of M. Rudolph) at 19 ("KBR was obligated to cross level property and materials on LOGCAP III.") (citing sources); *see also* Ex. 104 (Expert Report of E. Branch) at 8 ("LOGCAP III required KBRSI to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock."); KBR SOF 46 (U.S. Army Audit Agency report: "LOGCAP contract requires the contractor to fill requirements

with existing stock."); Ex. 121 (Branch Dep.) at 70:12-71:10 (KBR's proffered expert defining standard as "the good faith maximum effort that could be given in any stated context.").

Furthermore, KBR developed and was required to follow specific procedures for acquiring and managing inventory, including cross-leveling. KBR understood its contractual requirement to cross-level supplies, incorporating the requirement into a Government-approved set of Property Control Procedures, and into detailed "Desktop Operating Procedures" and "Technical Directives" for its personnel. Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5992 ("All property, whether government furnished or KBR acquired, must be: . . . Reasonable quantities, commensurate with the work to be accomplished."), at '5993 ("Consuming: Quantities of material/supplies produced or procured for incorporation into an end item or otherwise consumed will . . . Be reasonable when compared to the work/job at hand and Material Requisitions . . . Be promptly returned to stock and recorded when determined to be excess."), at '5994 ("Government property will be disposed of by: . . . Screening items against existing and anticipated needs . . . Promptly reporting excess items . . . .Receiving property authority from the Government . . . prior to disposal."), at '6015 ("Requisitions for all property, whether government furnished or KBR acquired, must: . . . Be contractually authorized and necessary for performance of the prime contract . . . Be for the quantities required for said performance . . . ."), at '6017-021 ("Warehouse personnel will first attempt to fill requisitions from stock on-hand. . . . If suitable property is available for issue, warehouse personnel will [take specific steps] . . . Property may not be available, or there may not be sufficient stock on-hand to fill the entire quantity. When this happens, Material Control takes action to obtain the property for the requester. . . . Material Control – Processing Requisitions for cross leveling or Purchasing. . . . Upon return Materials Control will first check the theater inventory to determine if the requisition

can be filled from existing stock. If suitable material is located, materials control will forward a copy of the approved Materials Requisitions. . . . If suitable material/equipment can not be located in the Theater Inventory, Material Control processes the approved MR [material requisition], establishes a manual record file by MR [material requisition] number and forwards to Procurement for purchase action." ); Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6168 ("All property, whether government furnished or KBR acquired, must be: . . . Reasonable quantities, commensurate with the work to be accomplished."), at '6169 ("Consuming: Quantities of material/supplies produced or procured for incorporation into an end item or otherwise consumed will be: . . . reasonable when compared to the work/job at hand and Material Requisitions. . . . promptly returned to stock and recorded when determined to be excess."), at '6170 ("Government property will be disposed of by: . . . Screening items against existing and anticipated needs. . . . Promptly reporting excess items. . . . Receiving property authority from the Government . . . prior to disposal."), at '6227 ("Requisitions for all property, whether government furnished or KBR acquired, must: . . . Be contractually authorized and necessary for performance of the prime contract; . . . Be for the quantities required for said performance . . . ."), at '6230-32 ("Material Control personnel will first attempt to fill the requisitions from stock on-hand and will also check the Automated Inventory Control System for Theater wide availability of the item(s) being requested. . . . If suitable property is available for issue, from on hand stock, warehouse personnel will [take specific steps]. . . . If suitable property is found at another site, the Material Manager or designee will . . . Verify via the owning Site Material Manager that the requested item(s) are excess to that site's need and is available for cross utilization [and take specific steps] . . . . Property may not be available, or there may not be sufficient stock on-hand to fill the entire quantity. When this happens, Material Control takes

action to obtain the property for the requester. . . . All requisitions must be coordinated with cost control and approvals obtained from project management, government LOTD'S, and contract modifications, before submitting for procurement action. . . . Upon return Materials Control processes the approved MR [material requisitions], establish a manual record file by MR [material requisition] number and forwards to Procurement for purchase action."), at '6313 ("Consumption of Government property shall be reasonable when compared to requirements. . . . Quantities of property produced or procured for incorporation into an end item or otherwise consumed will . . . Be reasonable when compared to Material Requisitions. On hand stocks in the Materials warehouses will be maintained in reasonable quantities to support contractual requirements and in accordance with specific project policies or replenishment lead time. Stock levels will be based on equipment density, population to be supported, recurring demands or the history of a previous project with like property. . . . Unused Materials from trades on hand stock, special projects, ACL's LOTD's etc must be returned to the Material Warehouse within a reasonable period of time after the work is completed or no demands. Material Control department will ensure returned unused materials are posted to the automated inventory system with appropriate documentation within 48 hrs. Materials determined to be excess must be disposed of in accordance with Disposition Tab."); Ex. 103 (July 2006 KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures") at '9114 ("After a Materiel Requisition has been approved but prior to being turned over to procurement for purchase, Materiel Control will check the Theater Wide inventory and the Redistribution cell to determine if a requisition can be filled from existing stock. *Every effort* to fill requisitions within the theater shall be taken utilizing inventories on the KBR portal. If items are found within these inventories every reasonable effort shall be taken to redistribute these items.") (Emphasis added); Ex. 132 (KBR 30(b)(6) (Lust)

(Sept. 28, 2021) Dep.) 34:3-14 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that *every effort* to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal.") (Emphasis added); Ex. 90 (KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures," revised June 2007) at '0992 ("**Cross Level Requisitioning Process**. Upon receipt of a material requisition Materiel Control will check the theater-wide inventory through STEAM [KBR's inventory management program, also referred to as MAXIMO] to determine if items can be filled from excess stock. Found items will be cross leveled through the procedures in 5.1 and 5.2. ") (Emphasis in original); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 34:3-14 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that every effort to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal. . . . And then in June of '07, we did a revision which added STEAM – MAXIMO/STEAM to this process."); Ex. 91 ("KBR Distribution of Government Property DESKTOP OPERATING PROCEDURE," dated Aug. 23, 2008) at '0251 ("The DMC (Distribution Management Center) will be responsible for screening _all_ requests for procurement action for possible Cross Level support. . . . All requisitions for procurement action will flow through the DMC and be screened for availability within theater prior to purchase.") (Emphasis in original), at '0256 ("If a site foresees a need for an item(s), it is contractually obligated to attempt to obtain the items through cross utilization within its project (group of sites).").

In addition, KBR cites pages 127-128 of the deposition transcript of Relators' expert, Dr. Dov Zakheim. However, KBR fails to cite Dr. Zahkeim's testimony on pages 126-127, which stated that the standard for unallowable costs is "not squishy at all":

Q. Because you have given me what's a fairly squishy email, charging more than they should have done. And I just want to be clear. Can you give me what the actual standard is for an unallowable cost, as that seems to be the thrust of your opinion here?

A Well [Objection.] -- it's not squishy at all. An unallowable cost is a charge for which the government should not be paying. Simple as that.

…

Q Sir. Please. Can you articulate the actual standard beyond just what you said?

A The standard is that when -- let me see if I can articulate this clearly. The standard for something that is unallowable is any charge to the government that is not justified in terms of the contractual demand and that involves expenditures by the government for which it needn't have spent the money.

Ex. 149 (Zakheim Dep.) 126:2-127:1.

<u>KBR SOF 9.</u>  "The Federal Acquisition Regulation ('FAR') is the primary regulation setting forth the Government's requirements for contractors' acquisition and procurement of supplies and services. *See* [KBR] Ex. 44, FAR Foreword (1984); [KBR] Ex. 34, Larkin Dep. (Nov. 5, 2020) at 28:13-29:11. LOGCAP III incorporates certain clauses from the FAR. [KBR] Ex. 17, LOGCAP III Contract at KBR-HOW-7104367 through KBR-HOW-7104379. From the time of contract award through September 30, 2009, LOGCAP III incorporated FAR 52.245-5 (1986), the 'Government property clause.' *Id.* at KBR-HOW-7104378. After a contract modification effective September 30, 2009, and in effect through the end of the relevant time period, LOGCAP III incorporated a revised version of the Government property clause, renumbered as FAR 52.245-1 (2007). [KBR] Ex. 9, LOGCAP III Contract Mod. 36 at KBR-HOW-0001598."

**<u>Relators' Response to KBR SOF 9.</u>**

The statement of fact is disputed.

KBR Exhibit 4, the FAR Foreword, and KBR Exhibit 34, excerpts of the deposition of Kevin Larkin, state that the FAR is the primary regulation setting for the Government's or Executive agencies' requirements for their acquisition and procurement of supplies and services; rather than "the Government's requirements for contractors' acquisition and procurement of supplies and services," as KBR states. *See* KBR Ex. 4 (FAR Foreword (1984)) at ECF Page 3 ("The Federal Acquisition Regulation (FAR) is the primary regulation for us by all Federal Executive *agencies in their* acquisition of supplies and services with appropriated funds.") (Emphasis added); KBR Ex. 34 (Larkin Dep.) at 28:13-23 ("Q. … So broad strokes, what's the Federal Acquisition Regulation? A. The Federal Acquisition Regulation is a contracting officer's or an acquisition official's firm set of guidelines of what is allowed, what is not allowed, and how to formulate and put in place an action required.  Q. Is it fair to say that they're essentially *the government's rules of the road for government contracting*; is that right? A.  Absolutely. Absolutely, yes, sir.") (Emphasis added).

KBR SOF 10. "KBR purchased property and materials to provide the services required by the task order statements of work. [KBR] Ex. 32, Wade Dep. (Sept. 15, 2020) at 23:12-25:3; [KBR] Ex. 23, KBR 30(b)(6) Dep. (Sept. 28, 2021) at 21:17-22:14."

**Relators' Response to KBR SOF 10.**

The statement of fact is disputed.

KBR purchased hundreds of millions of dollars' worth of property and materials that were not necessary to perform the LOGCAP III contract and its task orders, and when KBR failed to check whether an item was available in theater prior to purchasing that item new, or manipulated the process established to look for excess inventory, the item was not purchased "to provide the services required by the task order statements of work," as KBR states.

Relators' expert, Dr. Gaukler, analyzed KBR's inventory and purchasing data to identify specific cases when KBR over-ordered materials that it had available for cross-leveling under KBR's then-existing procedures. *See* Ex. 96 (Expert Report of G. Gaukler). Analyzing 34.5 million transactions found in this data, Dr. Gaukler determined KBR's inventory balances at every given point in time between May 28, 2007 and March 5, 2013. Ex. 96 (Expert Report of G. Gaukler) § IV.A. Dr. Gaukler validated his analysis of KBR's inventory balances by using corroborating information in the transactions. 98.5% of the transactions were internally consistent, and Dr. Gaukler conservatively screened the remaining 1.5% in order to block balance reconstruction when the transactions suggested any uncertainty. *Id*. § IV.B. He also compared his conclusions to KBR's ASL [authorized stock list] reports, and found that they matched 98% of the time and that when there was a discrepancy his model typically underestimated inventory balances. 105 (Expert Rebuttal Report of G. Gaukler) § IV.E.

Dr. Gaukler then applied KBR's own procedures to the inventory levels in order to classify KBR's inventory as Stock, Non-Stock, or Special at any given point in time according to KBR's own procedures and standards. Ex. 96 (Expert Report of G. Gaukler) § IV.C. Under KBR's

procedures, these classifications determine how much of an item's inventory is available for cross-leveling. *Id.* § IV.D.

Dr. Gaukler then analyzed KBR's purchase order data over the same period of time to identify cases when KBR purchased something new even though the item being purchased was available for cross-leveling according to KBR's own procedures. *Id*. § IV.D. Dr. Gaukler applied KBR's procedures as KBR had defined them in its Rule 30(b)(6) testimony, including additional "restrictions" on cross-leveling that do not appear in KBR's procedures. *Id*. This means that Dr. Gaukler's analysis is highly conservative, as the restrictions he accepted included ones that the Government did not know about and that the Government would have referred to DCAA had it known. Ex. 143 (Sheridan Dep.) 155:5-156:13. On the occasions when KBR actually followed its cross-leveling procedures, and the database showed cross-level was supportable, the underlying circumstances rarely led KBR to deny a cross-level request. Moreover, Dr. Gaukler's model incorporates KBR's documented cross-level denials, and it reduces the value of KBR's $341 million in over-ordering by a mere $800,000. Ex. 105 (Rebuttal Report of G. Gaukler) at ¶¶ 132-135; Ex. 106 (Supplemental Rebuttal Report of G. Gaukler) at ¶ 4.

Dr. Gaukler concluded that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that should not have been purchased if KBR had followed its own procedures and standards regarding cross-leveling. Ex. 96 (Expert Report of G. Gaukler) at 5. Dr. Gaukler later adjusted the total amount of excess purchases to $338 million (a reduction of less than 1%) after applying corrections that he had identified in rebuttal of KBR's expert William Walter. Ex. 96 (Expert Rebuttal Report of G. Gaukler) § IV.C.viii.

KBR submitted its costs to the Government for reimbursement. *See* Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) at 31:7-14, 37:5-10; Ex. 84 (KBR Response to Interrogatory No. 10). Consequently,

the Government reimbursed KBR for the entire $341 million it had incurred unnecessarily. *See* Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 24:9-14 ("Q. . . . Are you aware sitting here today of any pieces of property and materials that KBR bought and received on LOGCAP III that the government paid less than a hundred percent of what KBR spent buying the property and material? A. I am not aware."), 31:7-14 ("Q. . . . [A]s a general matter were KBR's costs spent procuring property and materials that KBR procured and received on LOGCAP III, did those costs ultimately end up on the public vouchers KBR submitted to the U.S. Government? A. In general the costs incurred based on receipts of materials and equipment were included on a public voucher, in general."). Moreover, Dr. Gaukler was able to directly trace $226 million of the $341 million of unnecessary purchased items to specific public vouchers. Ex. 96 (Expert Report of G. Gaukler) at 39. Those public vouchers expressly represented that these $226 million of over-ordered supplies were "necessary for performance" of LOGCAP III. SOF ¶¶ 151-157.

Dr. Gary Gaukler identified 899 public vouchers associated with unnecessary costs incurred because KBR purchased items despite existing excess material being available in theater. For example, on July 14, 2008, KBR submitted Public Voucher No. 47 for Task Order 139. That Public Voucher requested reimbursement for the cost of purchase order line ("POLINE") (#771983), on purchase order number ("PONUM") #4750053582 for 15 1.5HP blower motors ordered on July 1, 2008 (item number 1001331456), for a total cost of $7,725, despite the fact that the 15 blower motors were all available in excess in other KBR storerooms. Ex. 120 (Expert Rebuttal Report of G. Gaukler, Output 3); Ex. 118 (Expert Report of G. Gaukler, Output 1); Ex. 114 (ZBILL20080714-044718-GC00GY) at Tab "ZBILL20080714-044718-GC00GY," Row 1376 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: GOLDEN ARROW GENERAL TRADING C"; PostDate:

"20080701"; Ref Doc: "5000339056"; Trns Amt: "7,725.00"); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57," at Tab "Yr 2 Detail 2008," Row 128 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: "GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Obj Amt: "7,725.00"). Dr. Gaukler concluded that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling. On the occasions when KBR actually followed its cross-leveling procedures, and the database showed cross-level was supportable, the underlying circumstances rarely led KBR to deny a cross-level request. Moreover, Dr. Gaukler's model incorporates KBR's documented cross-level denials, and it reduces the value of KBR's $341 million in over-ordering by a mere $800,000. Ex. 96 (Expert Report of G. Gaukler) at 5; Ex. 105 (Expert Rebuttal Report of G. Gaukler) ¶¶ 132-135; Ex. 106 (Supplement to Expert Rebuttal Report of G. Gaukler) ¶ 4.

<u>KBR SOF 11.</u> "Relators' allegations in this case are limited to KBR's alleged 'over-purchasing' of materials. *See* Compl. ¶ 4; [KBR] Ex. 37, Gaukler Rep. at ¶¶ 7, 11. Materials are items of Government property that are consumed or expended during the performance of the contract, ranging from large, relatively immobile items (such as construction materials and mattresses) to small, everyday materials (such as nails, laundry detergent, and pencils). FAR 45.101; [KBR] Ex. 23, KBR 30(b)(6) Dep. (Sept. 28, 2021) at 21:17-22:14. Relators are not making any allegations regarding equipment, which are items of Government property that are durable and not expendable, such as trucks and generators. FAR 45.101; [KBR] Ex. 33, Vollmecke Dep. (Oct. 23, 2020) at 27:4-21 (equipment included a 'military truck' or 'commercial based acquired leased equipment' including generators, trucks, and other non-tactical vehicles'); *id.* at 90:19-91:5 (distinguishing between equipment and material); *id.* at 95:9-15 (noting that movement of equipment required government approval); [KBR] Ex. 37, Gaukler Rep. ¶ 7 (describing Relators' allegations as relating to 'materials'); [KBR] Ex. 39, Gaukler Reb. Rep. ¶¶ 24, 69 (stating that Relators' expert analysis was limited to materials)."

**<u>Relators' Response to KBR SOF 11.</u>**

The statement of fact is disputed.

As to KBR's first sentence, the Complaint describes Relators' allegations in this case, and they are not "limited to KBR's alleged 'over-purchasing' of materials," as KBR states. Relators' allegations include that KBR purchased unnecessary property and materials. *See, e.g.*, Compl. ¶ 4 ("KBR violated the FCA by purchasing hundreds of millions of dollars['] worth of materials under the LOGCAP III contract that were duplicative for the performance of its work. These wasteful purchased filled KBR's storerooms in Iraq and Afghanistan with excess materials. By June 2009, KBR had over $600 million in idle government property in its warehouse. KBR built and sustained this stockpile of excess materials through widespread fraud in its ordering, use, and disposition of government property."); *id.* ¶ 5 ("Through this course of fraud, KBR has billed the government for thousands of purchases of materials it did not need to buy. Accordingly, the government has paid KBR twice or more for goods under the LOGCAP contract, including hundreds of millions of dollars in idle materials and equipment in Iraq and Afghanistan that nobody needs."); *id.* ¶ 85 ("The TRECs, now larger than ever, could not unwind their property into KBR's active storerooms in Iraq because those storerooms were drawing down their inventory. Property that might have

found a use in 2009 was totally unneeded in 2010."); *id.* ¶ 90 ("Property that is reserved ceases to be available for cross-leveling, even when it is otherwise classified as non-stock. The property KBR's managers reserve, however, is often unassociated with any work order and therefore cannot be properly reserved."); *id.* ¶ 114 ("In this effort to quietly reduce its massive stocks of idle materials, KBR returned millions of dollars' worth of property to the government . . . ."); *id.* ¶ 115 ("KBR prepared and submitted PCARSS forms attesting that the property was surplus to its requirements and asking for disposition instructions."); Ex. 107 (Relator Hemphill's Feb. 10, 2020 Suppl. Resp. to Interrog. 9) at 2 ("[T]he funds paid by the Government for unnecessary or unallowable materials that KBR ordered under LOGCAP III may be measured as the cost of property and materials that KBR bought to fill requisitions under the LOGCAP III contract when it had existing property and materials available to fill the requisitions through cross-leveling."); *id.* at 4 ("If the Government had known that KBR had failed to screen a high percentage of its PRs [Purchase Requisitions] for potential cross-leveling, that KBR regularly failed to cross-level PRs [Purchase Requisitions] when required even when it had screened those PRs [Purchase Requisitions] for potential cross-leveling, and that KBR's failures resulted in its purchasing property and materials that were not allowed or authorized under the contract, the Government would not have paid the award fees to KBR, or would have paid smaller award fee amounts.").

Relators' allegations also include that KBR billed the government for its purchase of unnecessary property and materials. Compl. ¶ 5 ("Through this course of fraud, KBR has billed the government for thousands of purchases of materials it did not need to buy."); *id.* ¶ 136 ("By virtue of the acts described above, Defendants knowingly submitted or caused to be submitted to the United States Government false or fraudulent claims for payment of services performed under the LOGCAP III contract when those services did not qualify for payment. Each of these requests

for payment constitutes an actionable false claim under the False Claims Act."); *id.* ¶ 137 ("Through the acts described above and otherwise, Defendants and their agents and employees knowingly made, used, and/or caused to be made or used false records and statements in order to get such false and fraudulent claims paid and approved by the United States Government."); *id.* ¶ 138 ("The United States, unaware of the falsity of the records, statements or claims made by the Defendants, paid the Defendants for claims that would otherwise not have been allowed.").

Relators' allegations also include that KBR concealed its misconduct and its unnecessary purchases of property and materials from the Government. *See, e.g.*, Compl. ¶ 70 ("KBR, however, did not address the problem or tell the government about it."); *id.* ¶ 82 ("KBR concealed its TREC issues from the government."); *id.* ¶ 83 ("KBR did not want to perform inventory adjustments in its TRECs because it did not want the government to know the amount of property the TRECs contained. . . . Through this sleight of hand, the government did not learn that KBR's D and F site TRECs had stockpiled over $153 million worth of materials."); *id.* ¶ 85 ("Despite knowing about the problems with its TRECs in the first half of 2009, KBR delayed cleaning out the TRECs until mid-2010 because it did not want to notify the government of the problem . . . . At no point has KBR told the government about the waste its TRECs caused."); *id.* ¶¶ 104-114 (section titled "**KBR CONCEALED ITS EXCESS INVENTORY FROM THE GOVERNMENT**," including quotation of KBR employee who wrote, "I don't think we should be showing underutilized on anything that can be seen by USG."); *id.* ¶ 130 ("KBR tried to conceal this failure to reduce stock levels from the government.").

As to KBR's second sentence, materials are not only "items of Government property that are consumed or expended during the performance of the contract," but also include any such items that *could be* consumed or expended during the performance of a contract. For example, cable or

nails are materials even if the cable or nails are not actually consumed or expended during the performance of the contract. FAR 45.1 (cited by KBR), defines "Material" as "property that *may be* consumed or expended during the performance of a contract, component parts of a higher assembly, or items that lose their individual identity through incorporation into an end-item. Material does not include equipment, special tooling, special test equipment or real property." FAR 45.101 (emphasis added). However, the FAR regulation KBR cites is not "documentary evidence that supports" KBR's assertion, in violation of Local Rule 7.1(D)(1)(b). KBR's only other citation for KBR's second sentence is to 21:17-22:14 of the testimony from KBR's 30(b)(6) deposition on September 28, 2001. However, that testimony does not support KBR's assertion as that testimony does not define "Materials":

> Q. Okay. Did KBR procure property and materials in connection with KBR's performance on certain task orders under LOGCAP III? [Objection.]
>
> A. Yes, sir.
>
> Q. Did KBR manage property and materials in connection with KBR's performance on certain task orders . . . under LOGCAP III?
>
> A. Yes, sir. Excuse me. [Objection.] A. Yes, sir.
>
> . . .
>
> Q. . . . Did KBR issue property and materials in connection with KBR's performance on certain task orders under LOGCAP III?
>
> A. Yes, sir.

*See* KBR Ex. 23 (KBR 30(b)(6) Dep.) at 21:17-22:14. KBR failed to "provide citations to the documentary evidence that supports it," in violation of Local Rule 7.1(D)(1)(b).

As to KBR's third sentence, the Complaint contains the full scope of Relators' allegations in this case, and they are not limited as KBR states. *See supra*. Furthermore, KBR's assertion that "Relators are not making any allegations regarding equipment, which are items of Government

property that are durable and not expendable, such as trucks and generators," and KBR's citation to the reports of Dr. Gaukler are incomplete or incorrect. Dr. Gaukler does address generators, as well as incinerators and Reverse Osmosis Water Purification Units ("ROWPUs"), for example, in his rebuttal report. *See* Ex. 105 (Expert Rebuttal Report of G. Gaukler) ¶ 69 ("Whether incinerators, ROWPUs, and generators are subject to cross-leveling when classified as assets is not relevant to my analysis. Because my Affirmative Report does not analyze cross-leveled assets, I only included incinerators, ROWPUs, and generators when KBR had tracked them in its materials inventory system.").

KBR SOF 13. "During the relevant time period, KBR sought reimbursement from the Government for its incurred costs, and any applicable fee, through invoices called 'public vouchers.' [KBR] Ex. 29, KBR 30(b)(6) Dep. (Sept. 23, 2021) at 17:5-21, 21:11-22:3; *see also* FAR 52.216-7. A public voucher is a standard Government form and does not contain any certification to the Government as a condition of receiving payment or any specific representation regarding the goods or services invoiced on the public voucher. [KBR] Ex. 2, Walter Decl. ¶ 4; *see also U.S. ex rel. Barko v. Haliburton Co.*, 241 F. Supp. 3d 37, 58-59 (D.D.C. 2017) (citing cases). The public voucher also does not contain any representations relating to cross-leveling or statements about whether KBR did or did not attempt to cross-level prior to purchasing the property and materials that are invoiced on the voucher. [KBR] Ex. 2, Walter Decl. ¶ 4;"

**Relators' Response to KBR SOF 13.**

The statement of fact is disputed.

As to KBR's first sentence, the statement of fact is not disputed.

The remainder of the statement of fact is disputed. Each public voucher KBR submitted to the Government under LOGCAP III contained representations to the Government and specific representations regarding the goods or services invoiced on the public voucher, including through KBR's use and identification of particular Cost-Reimbursable Contract Line Item Numbers ("CLINs") on its public vouchers seeking reimbursement, which represented that the supplies and materials purchased were "necessary" for performance under the contract. *See, e.g.*, Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."); KBR Ex. 18 (Nov. 30, 2007 Public Voucher No. 32 for Task Order 139) at ECF page 2 (requesting "$155,199,325.83" in this public voucher for Task Order 139 for "Cost[s] for October & November 2007"), at ECF pages 3-6 (listing CLINs 4005, 4009, 5005, 5009, 6005, 6009, and associated dollar values currently billed and cumulatively billed, among other things), at ECF pages 20-657 (listing non-labor and labor costs included in this public voucher, with associated cost elements, descriptions, object amounts, and invoice

identifications); KBR Ex. 19 (May 13, 2010 Public Voucher No. 40 for Task Order 159) at ECF page 2 (requesting "$97,021,332.00" in this public voucher for Task Order 159 for "Cost[s] for April-May 2010"), at ECF pages 3-4 (listing CLINs 7005, 7009, 8005, 8009, 9005, 9009, 1005, 1009, 1105, 1109, 1205, 1209, and associated dollar values currently billed and cumulatively billed, among other things), at ECF pages 7-14, 106-588) (listing non-labor and labor costs included in this public voucher, with associated cost elements, descriptions, object amounts, and invoice identifications); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57" (requesting $145,074,262.22 in this public voucher for Task Order 139 for "Cost for June-July 2008"), at Tab "1035-Task57" (listing CLINs 4005, 4009, 5005, 5009, 6005, 6009, and associated dollar values currently billed and cumulatively billed, among other things), at e.g., Tab "Prior MonthYr1 Details 2008" (listing non-labor and labor costs included in this public voucher, with associated object, cost elements, documents, vendor names, object amounts, item descriptions, and invoice identifications, among others).

Furthermore, KBR purports to support its second sentence with a citation to an opinion from the United States District Court for the District of Columbia. The judicial opinion KBR cites is not "documentary evidence that supports" KBR's assertion, in violation of Local Rule 7.1(D)(1)(b). In any event, that case did not consider or analyze whether KBR's use and identification of particular CLINs on its public vouchers seeking reimbursement represented that the materials purchased were "necessary" for performance under the contract, as indicated in the LOGCAP III base contract. *See* Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."). Notably,

in that case, "the relevant public voucher . . . submitted by KBR as part of the record," which the court "ha[d] examined," was "KBR Ex. 114, Purchase Voucher, ECF 136-11." *United States ex rel. Barko v. Halliburton Co.*, 241 F. Supp. 3d 37, 58 (D.D.C. 2017). That exhibit 114 containing the public voucher did not contain the CLINs that KBR submitted with its public vouchers in this case. *United States ex rel. Barko v. Halliburton Co.*, 1:05-cv-01276-RCL, ECF No. 136-11 (Ex. 114 to Defs.' Mem. In Supp. Of Defs.' Mot. For Summ. J.).

KBR SOF 14.  "The public voucher consists solely of a standard Government Form 1034 and standard Government Form 1035. [KBR] Ex. 29, KBR 30(b)(6) Dep. (Sept. 23, 2021) at 155:4-159:2. An SF 1034 is a roll-up of all costs incurred by the contractor for the task order covered by the public voucher for a particular period of time, which was typically two weeks under LOGCAP III. *Id.* at 12:20-13:4; 107:19-108:4; [KBR] Ex. 2, Walter Decl. ¶ 4. During the relevant time period, KBR voluntarily submitted a supplemental billing 'package' with the public voucher that included worksheets listing the individual incurred costs summarized on the Form 1034. *Id.* at ¶ 5."

**Relators' Response to KBR SOF 14.**

The statement of fact is disputed.

The public vouchers do not "solely" consist of "standard" Government forms and are not only "a roll-up of all costs incurred by the contractor for the task order covered by the public voucher for a particular period of time, which was typically two weeks under LOGCAP III," as KBR states. Each public voucher KBR submitted to the Government under LOGCAP III also contained certifications to the Government and specific representations regarding the goods or services invoiced on the public voucher, including through KBR's use and identification of particular Cost-Reimbursable Contract Line Item Numbers ("CLINs") on its public vouchers seeking reimbursement, which represented that the supplies and materials purchased were "necessary" for performance under the contract. *See, e.g.*, Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."); KBR Ex. 18 (Nov. 30, 2007 Public Voucher No. 32 for Task Order 139) at ECF page 2 (requesting "$155,199,325.83" in this public voucher for Task Order 139 for "Cost[s] for October & November 2007"), at ECF pages 3-6 (listing CLINs 4005, 4009, 5005, 5009, 6005, 6009, and associated dollar values currently billed and cumulatively billed, among other things), at ECF pages 20-657 (listing non-labor and labor costs included in this public voucher, with

associated cost elements, descriptions, object amounts, and invoice identifications); KBR Ex. 19 (May 13, 2010 Public Voucher No. 40 for Task Order 159) at ECF page 2 (requesting "$97,021,332.00" in this public voucher for Task Order 159 for "Cost[s] for April-May 2010"), at ECF pages 3-4 (listing CLINs 7005, 7009, 8005, 8009, 9005, 9009, 1005, 1009, 1105, 1109, 1205, 1209, and associated dollar values currently billed and cumulatively billed, among other things), at ECF pages 7-14, 106-588) (listing non-labor and labor costs included in this public voucher, with associated cost elements, descriptions, object amounts, and invoice identifications); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57" (requesting $145,074,262.22 in this public voucher for Task Order 139 for "Cost for June-July 2008"), at Tab "1035-Task57" (listing CLINs 4005, 4009, 5005, 5009, 6005, 6009, and associated dollar values currently billed and cumulatively billed, among other things), at e.g., Tab "Prior MonthYr1 Details 2008" (listing non-labor and labor costs included in this public voucher, with associated object, cost elements, documents, vendor names, object amounts, item descriptions, and invoice identifications, among others).

Furthermore, KBR's public vouchers did not only contain "costs incurred by the contractor for the task order," as KBR states. KBR's public vouchers also included purchases that were not necessary for performance under the contract. KBR purchased hundreds of millions of dollars' worth of property and materials that were not necessary to perform the LOGCAP III contract and its task orders; KBR failed to check whether an item was available in theater prior to purchasing that item new, and manipulated the process established to look for excess inventory.

Relators' expert, Dr. Gaukler, analyzed KBR's inventory and purchasing data to identify specific cases when KBR over-ordered materials that it had available for cross-leveling under KBR's then-existing procedures. *See* Ex. 96 (Expert Report of G. Gaukler). Analyzing 34.5 million

transactions found in this data, Dr. Gaukler determined KBR's inventory balances at every given point in time between May 28, 2007 and March 5, 2013. *Id*. § IV.A. Dr. Gaukler validated his analysis of KBR's inventory balances by using corroborating information in the transactions. 98.5% of the transactions were internally consistent, and Dr. Gaukler conservatively screened the remaining 1.5% in order to block balance reconstruction when the transactions suggested any uncertainty. *Id*. § IV.B. He also compared his conclusions to KBR's ASL [authorized stock list] reports, and found that they matched 98% of the time and that when there was a discrepancy his model typically underestimated inventory balances. Ex. 105 (Expert Rebuttal Report of G. Gaukler) § IV.E.

Dr. Gaukler then applied KBR's own procedures to the inventory levels in order to classify KBR's inventory as Stock, Non-Stock, or Special at any given point in time according to KBR's own procedures and standards. Ex. 96 (Expert Report of G. Gaukler) § IV.C. Under KBR's procedures, these classifications determine how much of an item's inventory is available for cross-leveling. *Id.* § IV.D.

Dr. Gaukler then analyzed KBR's purchase order data over the same period of time to identify cases when KBR purchased something new even though the item being purchased was available for cross-leveling according to KBR's own procedures. *Id*. § IV.D. Dr. Gaukler applied KBR's procedures as KBR had defined them in its Rule 30(b)(6) testimony, including additional "restrictions" on cross-leveling that do not appear in KBR's procedures. *Id*. This means that Dr. Gaukler's analysis is highly conservative, as the restrictions he accepted included ones that the Government did not know about and that the Government would have referred to DCAA had it known. Ex. 143 (Sheridan Dep.) 155:5-156:13.

Dr. Gaukler concluded that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that should not have been purchased if KBR had followed its own procedures and standards regarding cross-leveling. Ex. 96 (Expert Report of G. Gaukler) at 5. Dr. Gaukler later adjusted the total amount of excess purchases to $338 million (a reduction of less than 1%) after applying corrections that he had identified in rebuttal of KBR's expert William Walter. Ex. 105 (Expert Rebuttal Report of G. Gaukler) § IV.C.viii.

KBR submitted its costs to the Government for reimbursement. *See* Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) at 31:7-14, 37:5-10; Ex. 84 (KBR Response to Interrogatory No. 10). Consequently, the Government reimbursed KBR for the entire $341 million it had incurred unnecessarily. *See* Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 24:9-14 ("Q. . . . Are you aware sitting here today of any pieces of property and materials that KBR bought and received on LOGCAP III that the government paid less than a hundred percent of what KBR spent buying the property and material? A. I am not aware."), 31:7-14 ("Q. . . . [A]s a general matter were KBR's costs spent procuring property and materials that KBR procured and received on LOGCAP III, did those costs ultimately end up on the public vouchers KBR submitted to the U.S. Government? A. In general the costs incurred based on receipts of materials and equipment were included on a public voucher, in general."). Moreover, Dr. Gaukler was able to directly trace $226 million of the $341 million of unnecessary purchased items to specific public vouchers. Ex. 96 (Expert Report of G. Gaukler) at 39. Those public vouchers expressly represented that these $226 million of over-ordered supplies were "necessary for performance" of LOGCAP III. SOF ¶¶ 151-157.

Dr. Gary Gaukler identified 899 public vouchers associated with unnecessary costs incurred because KBR purchased items despite existing excess material being available in theater. For example, on July 14, 2008, KBR submitted Public Voucher No. 47 for Task Order 139. That

Public Voucher requested reimbursement for the cost of purchase order line ("POLINE") (#771983), on purchase order number ("PONUM") #4750053582 for 15 1.5HP blower motors ordered on July 1, 2008 (item number 1001331456), for a total cost of $7,725, despite the fact that the 15 blower motors were all available in excess in other KBR storerooms. Ex. 120 (Expert Rebuttal Report of G. Gaukler, Output 3); Ex. 118 (Expert Report of G. Gaukler, Output 1); Ex. 114 (ZBILL20080714-044718-GC00GY) at Tab "ZBILL20080714-044718-GC00GY," Row 1376 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Trns Amt: "7,725.00"); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57," at Tab "Yr 2 Detail 2008," Row 128 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: "GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Obj Amt: "7,725.00"). Dr. Gaukler concluded that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling. On the occasions when KBR actually followed its cross-leveling procedures, and the database showed cross-level was supportable, the underlying circumstances rarely led KBR to deny a cross-level request. Moreover, Dr. Gaukler's model incorporates KBR's documented cross-level denials, and it reduces the value of KBR's $341 million in over-ordering by a mere $800,000. Ex. 96 (Expert Report of G. Gaukler) at 5; Ex. 105 (Expert Rebuttal Report of G. Gaukler) ¶¶ 132-135; Ex. 106 (Supplement to Expert Rebuttal Report of G. Gaukler) ¶ 4.

<u>KBR SOF 15.</u> "The public voucher packages that KBR submitted to the Government for reimbursement under LOGCAP III do not contain any certifications as a condition of receiving payment, nor any specific representations regarding the goods or services invoiced on the voucher. *Id.* The public voucher packages also do not contain any representations relating to cross-leveling, let alone statements about whether KBR did or did not attempt to cross-level prior to purchasing the property and materials that are invoiced on the voucher. *Id.*; *see, e.g.*, Ex. 18, Task Order 139 Voucher Package (PDF of Native Excel produced at KBR-HOW-0043594); Ex. 19, Task Order 159 Voucher Package (PDF of Native Excel produced at KBR-HOW-0044437)."

**<u>Relators' Response to KBR SOF 15.</u>**

The statement of fact is disputed.

Each public voucher KBR submitted to the Government under LOGCAP III contained specific representations regarding the goods or services invoiced on the public voucher, and representations relating to cross-leveling and whether KBR did or did not attempt to cross-level prior to purchasing the property and materials that are invoiced on the voucher, including through KBR's use and identification of particular Cost-Reimbursable Contract Line Item Numbers ("CLINs") on its public vouchers seeking reimbursement, which represented that the materials purchased were "necessary" for performance under the contract. *See, e.g.*, Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."); KBR Ex. 18 (Nov. 30, 2007 Public Voucher No. 32 for Task Order 139) at ECF page 2 (requesting "$155,199,325.83" in this public voucher for Task Order 139 for "Cost[s] for October & November 2007"), at ECF pages 3-6 (listing CLINs 4005, 4009, 5005, 5009, 6005, 6009, and associated dollar values currently billed and cumulatively billed, among other things), at ECF pages 20-657 (listing non-labor and labor costs included in this public voucher, with associated cost elements, descriptions, object amounts, and invoice identifications); KBR Ex. 19 (May 13, 2010 Public Voucher No. 40 for Task Order 159) at ECF

page 2 (requesting "$97,021,332.00" in this public voucher for Task Order 159 for "Cost[s] for April-May 2010"), at ECF pages 3-4 (listing CLINs 7005, 7009, 8005, 8009, 9005, 9009, 1005, 1009, 1105, 1109, 1205, 1209, and associated dollar values currently billed and cumulatively billed, among other things), at ECF pages 7-14, 106-588) (listing non-labor and labor costs included in this public voucher, with associated cost elements, descriptions, object amounts, and invoice identifications); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57" (requesting $145,074,262.22 in this public voucher for Task Order 139 for "Cost for June-July 2008"), at Tab "1035-Task57" (listing CLINs 4005, 4009, 5005, 5009, 6005, 6009, and associated dollar values currently billed and cumulatively billed, among other things), at e.g., Tab "Prior MonthYr1 Details 2008" (listing non-labor and labor costs included in this public voucher, with associated object, cost elements, documents, vendor names, object amounts, item descriptions, and invoice identifications, among others).

<u>KBR SOF 25.</u>  "The LOGCAP III contract does not contain or define the term 'cross-leveling' and does not set any objective criteria or standards for assessing KBR's cross-leveling of materials. *See generally* [KBR] Ex. 17, LOGCAP III Contract; *see also* [KBR] Ex. 26, Branch Rep. at 60; Ex. 27, Branch Dep. (Jun. 24, 2022) at 63:15-25."

**<u>Relators' Response to KBR SOF 25.</u>**

This statement of fact is disputed.

KBR was required under LOGCAP III to check to see if it had a particular material on hand and available before ordering more. *See, e.g.*, Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."), '0037-38 (incorporating FAR 52.216-7, FAR 52.232-20, FAR 52.232-22); FAR 52.216-7; FAR 52.232-20; FAR 52.232-22; Ex. 48 (Task Order 139 Statement Of Work Change 6) at '5609 ("3.0 CONTRACTOR ACQUIRED OR GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY. Prior to procurement of equipment to support all efforts described in this task order, the contractor shall exercise due diligence in verifying and certify that the required items cannot be satisfied from existing stock available from other sites covered by this task order. This certification shall be provided to the ACO. . . . 3.1.1. The Contractor shall adhere to the requirement priorities listed in TABLE 3.1.1. to the maximum extent possible. For purchases that cannot be obtained through cross leveling or from the Host Country sources, the contractor shall make maximum use of the Federal Supply System (FSS). REQUIREMENTS PRIORITIES 1 USG military unit, organic, green suit[;] 2 Cross level within LOGCAP Task Order[;] 3 Other Task Orders within LOGCAP[;] 4 Host Country sources[;] 5 FSS[;] 6 Commercial."); Ex. 41 (Task Order 159 Statement Of Work) at '5488-89 ("3.0 CONTRACTOR ACQUIRED OR GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY. Prior to procurement of

equipment to support all efforts described in this task order, the contractor shall exercise due diligence in verifying and certify that the required items cannot be satisfied from existing stock available from other sites covered by this task order. This certification shall be provided to the ACO. . . . 3.1.1. The contractor shall adhere to the requirement priorities listed in TABLE 3.1.1. to the maximum extent possible. For purchases that cannot be obtained through cross leveling or from the Host Country sources, the contractor shall make maximum use of the Federal Supply System (FSS). REQUIREMENTS PRIORITIES 1 USG military unit, organic, green suit[;] 2 Cross level within LOGCAP Task Order[;] 3 Other Task Orders within LOGCAP[;] 4 Host Country sources[;] 5 FSS[;] 6 Commercial."); Ex. 136 (Lust Dep.) 28:19-22 ("Q. Can you explain what cross-leveling is? A. When a requirement is generated at one location, . . . material from another location is used to satisfy the requirement at the first location."), 30:13-17 ("Q. . . . [W]ere you aware that the obligation to cross-level was a contractual requirement in KBR's contract with the United States Government? [Objection.] A. Yes."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 23:18-24:4 ("Cross leveling is when you move an item from one site to another site to satisfy a demand at the second site . . . without going to the procurement system to get an item."), 38:22-39:8 ("Q. . . . Any other generally applicable instructions from the U.S. Government concerning KBR cross leveling between task orders other than those that you just referenced? [Objection.] A. . . . Mary Wade, who was the contract administrator for the LOGCAP III contract in Houston, had said that we were to make maximum use of cross leveling where possible. She understood you couldn't do it all the time but where possible."); Ex. 134 (King Dep.) 16:21-17:2 ("Q. . . . With respect to KBR's work on LOGCAP-III, was KBR supposed to try to cross-level materials and property before purchasing new materials and property? [Objection.] A. Yes."); Ex. 101 (Nov. 2, 2007 DCMA Letter of Technical Directive to KBR) at '6706 ("All equipment MRs [material

requisitions] shall be initially submitted to the site ACO. . . . All equipment MRs [material requisitions] shall contain the following information: . . . (3) Has KBR checked for theater-wide re-distribution under the cross-leveling process?"); Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5992 ("All property, whether government furnished or KBR acquired, must be: . . . Reasonable quantities, commensurate with the work to be accomplished."), at '5993 ("Consuming: Quantities of material/supplies produced or procured for incorporation into an end item or otherwise consumed will . . . Be reasonable when compared to the work/job at hand and Material Requisitions . . . Be promptly returned to stock and recorded when determined to be excess."), at '5994 ("Government property will be disposed of by: . . . Screening items against existing and anticipated needs . . . Promptly reporting excess items . . . .Receiving property authority from the Government . . . prior to disposal."), at '6015 ("Requisitions for all property, whether government furnished or KBR acquired, must: . . . Be contractually authorized and necessary for performance of the prime contract . . . Be for the quantities required for said performance . . . ."), at '6017-021 ("Warehouse personnel will first attempt to fill requisitions from stock on-hand. . . . If suitable property is available for issue, warehouse personnel will [take specific steps] . . . Property may not be available, or there may not be sufficient stock on-hand to fill the entire quantity. When this happens, Material Control takes action to obtain the property for the requester. . . . Material Control – Processing Requisitions for cross leveling or Purchasing. . . . Upon return Materials Control will first check the theater inventory to determine if the requisition can be filled from existing stock. If suitable material is located, materials control will forward a copy of the approved Materials Requisitions. . . . If suitable material/equipment can not be located in the Theater Inventory, Material Control processes the approved MR [material requisition], establishes a manual record file by MR [material requisition] number and forwards to

Procurement for purchase action."); Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6168 ("All property, whether government furnished or KBR acquired, must be: . . . Reasonable quantities, commensurate with the work to be accomplished."), at '6169 ("Consuming: Quantities of material/supplies produced or procured for incorporation into an end item or otherwise consumed will be: . . . reasonable when compared to the work/job at hand and Material Requisitions. . . . promptly returned to stock and recorded when determined to be excess."), at '6170 ("Government property will be disposed of by: . . . Screening items against existing and anticipated needs. . . . Promptly reporting excess items. . . . Receiving property authority from the Government . . . prior to disposal."), at '6227 ("Requisitions for all property, whether government furnished or KBR acquired, must: . . . Be contractually authorized and necessary for performance of the prime contract; . . . Be for the quantities required for said performance . . . ."), at '6230-32 ("Material Control personnel will first attempt to fill the requisitions from stock on-hand and will also check the Automated Inventory Control System for Theater wide availability of the item(s) being requested. . . . If suitable property is available for issue, from on hand stock, warehouse personnel will [take specific steps]. . . . If suitable property is found at another site, the Material Manager or designee will . . . Verify via the owning Site Material Manager that the requested item(s) are excess to that site's need and is available for cross utilization [and take specific steps] . . . . Property may not be available, or there may not be sufficient stock on-hand to fill the entire quantity. When this happens, Material Control takes action to obtain the property for the requester. . . . All requisitions must be coordinated with cost control and approvals obtained from project management, government LOTD'S, and contract modifications, before submitting for procurement action. . . . Upon return Materials Control processes the approved MR [material requisitions], establish a manual record file by MR [material

requisition] number and forwards to Procurement for purchase action."), at '6313 ("Consumption of Government property shall be reasonable when compared to requirements. . . . Quantities of property produced or procured for incorporation into an end item or otherwise consumed will . . . Be reasonable when compared to Material Requisitions. On hand stocks in the Materials warehouses will be maintained in reasonable quantities to support contractual requirements and in accordance with specific project policies or replenishment lead time. Stock levels will be based on equipment density, population to be supported, recurring demands or the history of a previous project with like property. . . . Unused Materials from trades on hand stock, special projects, ACL's LOTD's etc must be returned to the Material Warehouse within a reasonable period of time after the work is completed or no demands. Material Control department will ensure returned unused materials are posted to the automated inventory system with appropriate documentation within 48 hrs. Materials determined to be excess must be disposed of in accordance with Disposition Tab."); Ex. 91 ("KBR Distribution of Government Property DESKTOP OPERATING PROCEDURE," dated Aug. 23, 2008) at '0251 ("The DMC (Distribution Management Center) will be responsible for screening all requests for procurement action for possible Cross Level support. . . . All requisitions for procurement action will flow through the DMC and be screened for availability within theater prior to purchase.") (emphasis in original), at '0256 ("If a site foresees a need for an item(s), it is contractually obligated to attempt to obtain the items through cross utilization within its project (group of sites)."); Ex. 24 (July 1, 2009 KBR Technical Direction Bulletin re: PCARSS) at '4270 ("KBR has a responsibility to cross level before purchase."); Ex. 34 (containing June 4, 2011 email from KBR's Head of the DMC, C. O'Muirgheasa) at '3826 ("It is a contractual requirement on LOGCAP III to cross level items in order to reduce spending, eliminate excess, and, nowadays just as importantly, get available material to other[] sites

ASAP."); Ex. 71 (July 2, 2009 Analysis by KBR's Head of the DMC) at '1369 ("Our mission is to cross level materials from locations where there is redistributable material to locations where there is a need for those materials."); Ex. 94 (Expert Report of M. Rudolph) at 19 ("KBR was obligated to cross level property and materials on LOGCAP III.") (citing sources). Indeed, KBR's own experts concede that KBR had a contractual obligation to check for such availability, using, at a minimum, "best efforts" to do so. Ex. 121 (Branch Dep.) 71:7-10.

It was further required under LOGCAP III that all of KBR's purchases be (1) "necessary for performance" of the contract (based on CLINs), (2) cross-leveled to the "maximum extent possible" per the contract's Statements of Work (as KBR concedes, Br. at 2), and in the case of larger purchases, (3) expressly certified to have been cross-leveled. Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."); KBR Ex. 6 (Apr. 22, 2008 Task Order 139 SOW Change 6) at '5609 ("3.0 CONTRACTOR ACQUIRED OR GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY. Prior to procurement of equipment to support all efforts described in this task order, the contractor shall exercise due diligence in verifying **and certify** that the required items cannot be satisfied from existing stock available from other sites covered by this task order. **This certification shall be provided to the ACO**. . . . 3.1.1 **The contractor shall adhere to the requirement priorities listed in TABLE 3.1.1. to the maximum extent possible**. For purchases that cannot be obtained **through cross leveling or** from the **Host County** sources, the contractor shall make maximum use of the Federal Supply System (FSS). **REQUIREMENTS PRIORITIES 1 USG military unit, organic, green suit[;] 2 Cross level**

**within LOGCAP Task Oroder[;] 3 Other Task Orders within LOGCAP[;] 4 Host Country sources[;] 5 FSS[;] 6 Commercial**."); KBR Ex. 7 (Aug. 25, 2008 Task Order 159 SOW, KBR-HOW-0039632-9782) at '9638-39 (same without emphasis).

<u>KBR SOF 27.</u>   "There are certain task order statements of work that do not reference 'crossleveling,' but directed KBR to use 'due diligence' to determine if a site's need for *equipment* (which is not the subject of Relators' allegations, *see* SOF ¶ 11), could be fulfilled by equipment *available* from other sites covered by the *same task order*. Ex. 1, Booth Decl. ¶ 8 (citing [KBR] Ex. 4, Task Order 118 SOW .v2 at ¶ 3.0 (Aug. 2, 2007) ("Prior to procurement of *equipment* to support all efforts described in this task order, the contractor shall exercise *due diligence* in verifying that the required items cannot be satisfied from existing stock *available* from other sites covered by this task order") (emphasis added))."

**<u>Relators' Response to KBR SOF 27.</u>**

The statement of fact is disputed.

Relators dispute this statement because it is not supported by the cited materials. KBR selectively quotes paragraph 3.0 of Task Order 118 SOW .v2 to misleadingly suggest that the paragraph pertains only to "equipment." Instead, as the full quote shows, it plainly covers all "government furnished property," not just "equipment." The paragraph reads in full (with the words KBR omitted in bold): "**3.0 GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY.** Prior to procurement of equipment to support all efforts described in this task order, the contractor shall exercise due diligence in verifying that the required items cannot be satisfied from existing stock available from other sites covered by this task order, **or as Government Furnished Property (GFP).**" KBR's Ex. 4 ¶ 3.0.

Finally, LOGCAP III was amended on July 22, 2004, three years prior to the SOW cited by KBR. The July 22, 2004 amendment explicitly made cross-leveling among task orders a requirement for KBR for all current and future task orders: "Task Order Cross Utilization of Government Property into the basic contact **and is applicable to all current and future task orders awarded under this contract**." Ex. 62 (July 22, 2004 Amendment P00008 to LOGCAP III Base Contract) at '3166 (emphasis added). That July 22, 2004 amendment to LOGCAP III provided: "<u>Definition:</u> Cross Utilized Property is government property purchased against one task order which is subsequently loaned to another task order on a temporary basis. Cross-utilized

property shall remain accountable to the task order against which it was purchased, unless it has been duly transferred to another task order, in which case it will remain accountable to the task order to which it has been transferred." *Id*. In addition, KBR's 30(b)(6) corporate representative confirmed that KBR was required to cross-level between task orders. *See* KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep. 37:23-38:4.

It is further disputed because KBR's cross-leveling obligations were part of the LOGCAP III contract, and applied to all task orders. *See, e.g.*, Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."); Ex. 138 (McNamara Dep.) 279:7-280:2 ("Q. . . . [D]id you have a view on . . . whether KBR was appropriately cross-leveling property in the 2007 to 2012 time period? [Objection.] A. . . . They needed to have been doing it . . . because it was part of . . . their property procedure. It was part of what was required of them as a prudent contractor."), 590:13-19 ("If you are purchasing something and you know that you have a large operation, then as a prudent contractor, you would be required to screen through your system to see if there is any availability of . . . these items or property that you're currently trying to buy . . . ."), 597:20-598:9 ("Q. Do you know . . . when KBR was required to certify that it had attempted to cross-level before making purchase? A. There was a modification to the contract. I don't remember exactly when. It was sometime after 2006. I don't know if it was 2007 or 2008. . . . [I]t is part of the contract."); Ex. 136 (Lust Dep.) 30:13-17 ("Q. . . . [W]ere you aware that the obligation to cross-level was a contractual requirement in KBR's contract with the United States Government? [Objection.] A. Yes."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 38:22-39:8 ("Q. . . . Any other generally

applicable instructions from the U.S. Government concerning KBR cross leveling between task orders other than those that you just referenced? [Objection.] A. . . . Mary Wade, who was the contract administrator for the LOGCAP III contract in Houston, had said that we were to make maximum use of cross leveling where possible. She understood you couldn't do it all the time but where possible."); Ex. 135 (LaBoa Dep.) 70:24-71:21 (agreeing cross-leveling was part of KBR's property control procedures); Ex. 127 (Hippert Dep.) 162:24-163:20 (agreeing his "view at the time" was that cross-leveling was expected); Ex. 134 (King Dep.) 16:21-17:2 ("Q. . . . With respect to KBR's work on LOGCAP-III, was KBR supposed to try to cross-level materials and property before purchasing new materials and property? [Objection.] A. Yes."); Ex. 142 (Rock Dep.) 520:17-22 ("Q. And it was KBR's obligation under LOGCAP III to cross level property [and materials]; is that right, sir? [Objection.] A. I think . . . where possible, yes."); Ex. 141 (Ritondale Dep.) 105:22-106:5 ("Q. . . . [I]s it your understanding that KBR was supposed to try to cross-level property and materials at some point in the procurement process? [Objection.] A. My understanding is at some point in time the cross-leveling was something that was supposed to occur.").

<u>KBR SOF 28.</u>   "There are certain task order statements of work that do not reference 'crossleveling,' but directed KBR to use 'due diligence' to determine if *equipment* needs could be fulfilled with equipment in existing stock *available* from other sites, presumably regardless of task order. [KBR] Ex. 1, Booth Decl. ¶ 9 (citing [KBR] Ex. 5, Task Order 118 SOW v1.2 at ¶ 3.0 (Jan. 28, 2008) ('Prior to procurement of *equipment* to support all efforts described in this task order, the contractor shall exercise *due diligence* in verifying that the required items cannot be satisfied from existing stock available from other sites') (emphasis added) and [KBR] Ex. 8, Task Order 151 SOW v2 at ¶ 3.0 (Jan. 25, 2010) (same meaning))."

**<u>Relators' Response to KBR SOF 28.</u>**

This statement of fact is disputed. The assertion that something is "presumably" true is not a proper fact, but instead KBR's characterization of documents, and violates Local Civil Rule 7.1(D)(1)(b).

Further, this statement of fact is not supported by the cited materials. KBR selectively quotes paragraph 3.0 of Task Order 118 SOW v1.2 to misleadingly suggest that the paragraph pertains only to "equipment." Instead, as the full quote shows, it plainly covers all "government furnished property," not just "equipment." The paragraph reads in full (with the words KBR omitted in bold): "**3.0 GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY.** Prior to procurement of equipment to support all efforts described in this task order, the Contractor shall exercise due diligence in verifying that the required items cannot be satisfied from existing stock available from other sites, **or as Government Furnished Property (GFP).**" KBR's Ex. 5 ¶ 3.0.

Finally, LOGCAP III was amended on July 22, 2004, four to six years prior to the SOWs cited by KBR. The July 22, 2004 amendment explicitly made cross-leveling among task orders a requirement for KBR for all current and future task orders: "Task Order Cross Utilization of Government Property into the basic contact **and is applicable to all current and future task orders awarded under this contract**." Ex. 62 (July 22, 2004 Amendment P00008 to LOGCAP III Base Contract) at '3166 (emphasis added). That July 22, 2004 amendment to LOGCAP III provided: "<u>Definition:</u> Cross Utilized Property is government property purchased against one task

order which is subsequently loaned to another task order on a temporary basis. Cross-utilized property shall remain accountable to the task order against which it was purchased, unless it has been duly transferred to another task order, in which case it will remain accountable to the task order to which it has been transferred." *Id*. In addition, KBR's 30(b)(6) corporate representative confirmed that KBR was required to cross-level between task orders. *See* KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep. 37:23-38:4.

It is further disputed because KBR's cross-leveling obligations were part of the LOGCAP III contract, and applied to all task orders. *See, e.g.*, Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."); Ex. 138 (McNamara Dep.) 279:7-280:2 ("Q. . . . [D]id you have a view on . . . whether KBR was appropriately cross-leveling property in the 2007 to 2012 time period? [Objection.] A. . . . They needed to have been doing it . . . because it was part of . . . their property procedure. It was part of what was required of them as a prudent contractor."), 590:13-19 ("If you are purchasing something and you know that you have a large operation, then as a prudent contractor, you would be required to screen through your system to see if there is any availability of . . . these items or property that you're currently trying to buy . . . ."), 597:20-598:9 ("Q. Do you know . . . when KBR was required to certify that it had attempted to cross-level before making purchase? A. There was a modification to the contract. I don't remember exactly when. It was sometime after 2006. I don't know if it was 2007 or 2008. . . . [I]t is part of the contract."); Ex. 136 (Lust Dep.) 30:13-17 ("Q. . . . [W]ere you aware that the obligation to cross-level was a contractual requirement in KBR's contract with the United States Government? [Objection.] A. Yes.");

Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 38:22-39:8 ("Q. . . . Any other generally applicable instructions from the U.S. Government concerning KBR cross leveling between task orders other than those that you just referenced? [Objection.] A. . . . Mary Wade, who was the contract administrator for the LOGCAP III contract in Houston, had said that we were to make maximum use of cross leveling where possible. She understood you couldn't do it all the time but where possible."); Ex. 135 (LaBoa Dep.) 70:24-71:21 (agreeing cross-leveling was part of KBR's property control procedures); Ex. 127 (Hippert Dep.) 162:24-163:20 (agreeing his "view at the time" was that cross-leveling was expected); Ex. 134 (King Dep.) 16:21-17:2 ("Q. . . . With respect to KBR's work on LOGCAP-III, was KBR supposed to try to cross-level materials and property before purchasing new materials and property? [Objection.] A. Yes."); Ex. 142 (Rock Dep.) 520:17-22 ("Q. And it was KBR's obligation under LOGCAP III to cross level property [and materials]; is that right, sir? [Objection.] A. I think . . . where possible, yes."); Ex. 141 (Ritondale Dep.) 105:22-106:5 ("Q. . . . [I]s it your understanding that KBR was supposed to try to cross-level property and materials at some point in the procurement process? [Objection.] A. My understanding is at some point in time the cross-leveling was something that was supposed to occur.").

KBR SOF 31. "There are only two task orders with statements of work that address 'crossleveling' without limitation to equipment. [KBR] Ex. 1, Booth Decl. ¶ 12 (citing Ex. 6, Task Order 139 SOW v6 ¶ 3.1.1 (Apr. 22, 2008), [KBR] Ex. 7, Task Order 159 Basic SOW ¶ 3.1.1 (Aug. 25, 2008). Those statements of work state: 'The contractor shall adhere to the requirement priorities listed in TABLE 3.1.1 *to the maximum extent possible.' Id*. Table 3.1.1 lists 'REQUIREMENTS PRIORITIES' as (1) USG military unit, organic, green suit; (2) 'Cross level within LOGCAP Task Order;' (3) 'Other Task Orders within LOGCAP,' followed by purchasing sources. *Id*. These statements of work do not specify whether the 'REQUIREMENTS PRIORITIES' apply to equipment or other types of Government property. *Id*.; *see also* Ex. 26, Branch Rep. at 35-36 (noting that many task orders had no task order language about cross-leveling, and those that did at most asked KBR to adhere 'to the maximum extent possible' to certain 'requirement priorities,' the third of which was 'cross-leveling,' a term left undefined.'). These statements of work also require the contractor to 'exercise *due diligence* in verifying' whether required items can be satisfied from existing stock '[p]rior to procurement of *equipment*." [KBR] Ex. 6, Task Order 139 SOW v6 ¶ 3.0 (Apr. 22, 2008); [KBR] Ex. 7, Task Order 159 Basic SOW ¶ 3.0 (Aug. 25, 2008) (emphasis added)."

**Relators' Response to KBR SOF 31.**

This statement of fact is disputed.

As an initial matter, Task Orders 139 and 159 are not the only two task orders with statements of work that address cross-leveling "without limitation to equipment." As just one additional example, Task Order 118 SOW .v2 (a task order that KBR attached to its brief) states: "3.0 GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY. Prior to procurement of equipment to support all efforts described in this task order, the contractor shall exercise due diligence in verifying that the required items cannot be satisfied from existing stock available from other sites covered by this task order, or as Government Furnished Property (GFP)." KBR's Ex. 4, ¶ 3.0. Additionally, LOGCAP III was amended on July 22, 2004. The July 22, 2004 amendment explicitly made cross-leveling among task orders a requirement for KBR for all current and future task orders: "Task Order Cross Utilization of Government Property into the basic conta**ct and is applicable to all current and future task orders awarded under this contract.**" Ex. 62 (July 22, 2004 Amendment P00008 to LOGCAP III Base Contract,) at '3166. That July 22, 2004 amendment to LOGCAP III provided: "Definition: Cross Utilized Property is government property

purchased against one task order which is subsequently loaned to another task order on a temporary basis. Cross-utilized property shall remain accountable to the task order against which it was purchased, unless it has been duly transferred to another task order, in which case it will remain accountable to the task order to which it has been transferred." *Id.*

It is further disputed that Task Orders 139 and 159 "do not specify whether the 'REQUIREMENTS PRIORITIES' apply to equipment or other types of Government property." The sub-sections quoted by KBR are in the main section titled "CONTRACTOR ACQUIRED OR GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY," and plainly the sub-sections, including the sub-sections on "REQUIREMENTS PRIORITIES," apply to all types of Government property. KBR's Ex. 6, Task Order 139 SOW v6 ¶ 3.1.1 (Apr. 22, 2008), KBR's Ex. 7, Task Order 159 Basic SOW ¶ 3.1.1 (Aug. 25, 2008).

It is further disputed because KBR's cross-leveling obligations were part of the LOGCAP III contract, and applied to all task orders. *See, e.g.*, Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."); Ex. 138 (McNamara Dep.) 279:7-280:2 ("Q. . . . [D]id you have a view on . . . whether KBR was appropriately cross-leveling property in the 2007 to 2012 time period? [Objection.] A. . . . They needed to have been doing it . . . because it was part of . . . their property procedure. It was part of what was required of them as a prudent contractor."), 590:13-19 ("If you are purchasing something and you know that you have a large operation, then as a prudent contractor, you would be required to screen through your system to see if there is any availability of . . . these items or property that you're currently trying to buy . . . ."), 597:20-598:9 ("Q. Do

you know . . . when KBR was required to certify that it had attempted to cross-level before making purchase? A. There was a modification to the contract. I don't remember exactly when. It was sometime after 2006. I don't know if it was 2007 or 2008. . . . [I]t is part of the contract."); Ex. 136 (Lust Dep.) 30:13-17 ("Q. . . . [W]ere you aware that the obligation to cross-level was a contractual requirement in KBR's contract with the United States Government? [Objection.] A. Yes."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 38:22-39:8 ("Q. . . . Any other generally applicable instructions from the U.S. Government concerning KBR cross leveling between task orders other than those that you just referenced? [Objection.] A. . . . Mary Wade, who was the contract administrator for the LOGCAP III contract in Houston, had said that we were to make maximum use of cross leveling where possible. She understood you couldn't do it all the time but where possible."); Ex. 135 (LaBoa Dep.) 70:24-71:21 (agreeing cross-leveling was part of KBR's property control procedures); Ex. 127 (Hippert Dep.) 162:24-163:20 (agreeing his "view at the time" was that cross-leveling was expected); Ex. 134 (King Dep.) 16:21-17:2 ("Q. . . . With respect to KBR's work on LOGCAP-III, was KBR supposed to try to cross-level materials and property before purchasing new materials and property? [Objection.] A. Yes."); Ex. 142 (Rock Dep.) 520:17-22 ("Q. And it was KBR's obligation under LOGCAP III to cross level property [and materials]; is that right, sir? [Objection.] A. I think . . . where possible, yes."); Ex. 141 (Ritondale Dep.) 105:22-106:5 ("Q. . . . [I]s it your understanding that KBR was supposed to try to cross-level property and materials at some point in the procurement process? [Objection.] A. My understanding is at some point in time the cross-leveling was something that was supposed to occur.").

KBR SOF 33. "The statements of work for the twenty-three task orders at issue in this case do not contain any objective standards or metrics for evaluating KBR's cross-leveling. *See, e.g.*, [KBR] Exs. 3-8 (SOWs); [KBR] Ex. 26, Branch Rep. at 35-36 ('[T]here was never any overarching contractual requirement to actually transfer any or all equipment and material found at a site in theater whenever any other site had such a need. Rather, [KBR's] 'cross-leveling' obligation, as I use the term throughout this report, centered on conducting due diligence checks prior to purchasing items, to determine whether items could be found in theater, those items were excess to its current location, and whether transferring them would enhance contract performance. Although this concept was introduced in various task orders, nothing in the base LOGCAP contract required transferring or even 'cross-leveling' due diligence checks discussed in this section. Moreover, during the relevant time-frame, there were inconsistencies regarding the scope and limits of [KBR's] obligations related to this 'cross-leveling' due diligence process'); *id.* at 38-39 ('[T]he Task Orders, like the LOGCAP III base contract, did not establish any specific objectives or requirements for when, how often or how many items [KBR] was required to transfer items between sites, or any specific procedures for how [KBR] was required to accomplish crossleveling.'); *id.* at 60 ('[KBR's] obligation, at most, was to use its best efforts to exercise due diligence to verify and certify that material requirements could not be satisfied from existing inventory, or in some cases to provide its best efforts to the 'maximum extent practical' to adhere to a hierarchy of requirement priorities [. . . . ] The base contract, modifications, and task orders neither defined cross-leveling nor offered any basis or guidance for when or how cross-leveling must have been accomplished.'); *id.* at 62 ('Under cost-plus-award-fee task orders, LOGCAP III required [KBR] to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock')."

**Relators' Response to KBR SOF 33.**

This statement of fact is disputed because there were objective standards or metrics in certain task orders. For instance, the two main task orders under which KBR completed the great bulk of work under LOGCAP III both contain standards for evaluating KBR's cross-leveling performance, and specifically that KBR cross-level "to the maximum extent possible." KBR Ex. 6 (Apr. 22, 2008 Task Order 139 SOW Change 6) at '609 ("3.1.1 **The contractor shall adhere to the requirement priorities listed in TABLE 3.1.1. to the maximum extent possible.** For purchases that cannot be obtained **through cross leveling or** from the **Host County** sources, the contractor shall make maximum use of the Federal Supply System (FSS). [**TABLE 3.1.1.**] REQUIREMENTS PRIORITIES 1. USG military unit, organic, green suit 2. Cross level within LOGCAP Task Order 3. Other Task Orders within LOGCAP 4. Host County sources

**5. FSS 6. Commercial**.") (emphasis in original); KBR Ex. 7 (Aug. 25, 2008 Task Order 159 SOW, KBR-HOW-0039632-9782) at '641 (same, without emphasis). KBR's PCPs and DOPs also contained cross-leveling standards. KBR's PCPs required KBR to order inventory in "[r]easonable quantities, commensurate with the work to be accomplished." Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5992; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6168. They similarly required KBR to order inventory that was "contractually authorized and necessary for performance of the prime contract" and "for the quantities required for said performance." Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6015; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6227. KBR's PCPs required KBR to dispose of excess, unneeded inventory only after "[s]creening items against existing and anticipated needs," "[p]romply reporting excess items," and receiving Government approval. Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5994; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6170. KBR's PCPs required that when filling a requisition, KBR "personnel will first attempt to fill requisitions from stock on-hand." Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6017; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6230. KBR's PCPs required checking theater-wide inventory as well when filling a requisition. Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6019 ("Material Control – Processing Requisitions for cross leveling or Purchasing . . . Upon return Materials Control will first check the theater inventory to determine if the requisition can be filled from existing stock."); Ex. 89 (KBR's Government-Approved Property Control Procedures, dated

July 15, 2008) at '6230-31 ("Material Control personnel . . . will also check the Automated Inventory Control System for Theater wide availability of the item(s) being requested. . . . Material Control – Filling Requisitions from Theater Stock. . . . If suitable property is found at another site, the Material Manager or designee will: . . . Verify via the owning Site Material manager that the requested item(s) are excess to that's need and is available for cross utilization."). Thus, KBR's PCP expressly required KBR to screen requisitions against its existing inventory and to fill the requisitions through cross-leveling when it had supplies available in the theater. As an example of a DOP setting forth KBR's cross-leveling obligations with specific criteria and procedures for KBR to follow, in July 2006, KBR's Redistribution of Government Property DOP required KBR to make "every effort" to cross-level with existing inventory before purchasing new items. Ex. 103 (July 2006 KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures") at '9114 ("After a Materiel Requisition has been approved but prior to being turned over to procurement for purchase, Materiel Control will check the Theater Wide inventory and the Redistribution cell to determine if a requisition can be filled from existing stock. Every effort to fill requisitions within the theater shall be taken utilizing inventories on the KBR portal. If items are found within these inventories every reasonable effort shall be taken to redistribute these items."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 34:3-14 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that every effort to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal."). *See also* SOF ¶¶ 24-33.

In addition, under the FAR, "A cost is allowable *only* when the cost complies with all of the following requirements: (1) Reasonableness[;] (2) Allocability[;] (3) Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices

appropriate to the circumstances[;] (4) Terms of the contract[; and] (5) Any limitations set forth in this subpart. FAR § 31.201-2 (emphasis added). "A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. . . . No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable." FAR § 31.201-3.

KBR SOF 34. "No expert in this case, including Relators' experts, nor any of the fact witnesses have identified an objective requirement for cross-leveling. [KBR] Ex. 34, Larkin Dep. (Nov. 5, 2020) at 118:5-120:7 (Government fact witness testifying that the cross-leveling language in the task order statements of work gave 'KBR discretion to determine when it can satisfy a requirement from cross-leveling.'); *id.* at 113:14-19 (Government fact witness agreeing that 'due diligence' means that 'KBR has discretion in making the determination of whether equipment is available to cross-level or not'); [KBR] Ex. 24, Goetz Rep. at 23-24 ('In all of my 40+ years of experience in dealing with Government property, I have not seen the term 'cross leveling' used. That term is not used or defined in the FAR or the DFARS. [. . . ] I understand that cross-leveling is not defined in the LOGCAP III base contract, modifications, or task orders.'); [KBR] Ex. 26, Branch Rep. at 38 ('[T]he Task Orders, like the LOGCAP III base contract, did not establish any specific objectives or requirements for when, how often or how many items [KBR] was required to transfer items between sites, or any specific procedures for how [KBR] was required to accomplish crossleveling.'); [KBR] Ex. 40, Rudolph Rep. at 4, 21 (Relators' expert citing a 2019 document published by the Joint Chiefs of Staff, Joint Publication 4-0 (May 8, 2019), that did not apply to contractors, did not apply in the relevant time period, and did not contain an objective requirement for crossleveling); [KBR] Ex. 42, Rudolph Rebuttal Rep. at 2 (citing a different Joint Publication (4-7) that did not apply to contractors and did not contain an objective requirement for cross-leveling); [KBR] Ex. 41, Rudolph Dep. (Mar. 28, 2022) at 54:4-55:15, 57:16-58:19 (acknowledging that 2019 publication would not be relevant to this case and if 'cross-leveling' is not in earlier versions, Joint Publication 4-0 is not relevant for this lawsuit); *id.* at 112:7-114:9 (testifying that a requirement to cross-level to the 'maximum extent possible' would not require KBR to cross-level 'every single time' and that KBR would need to consider other factors such as whether cross-leveling 'doesn't make sense economically'); [KBR] Ex. 43, Zakheim Dep. (Jul. 29, 2022) at 132:3-133:11 (Relators' expert testifying that the government would have left KBR 'room' for discretion in cross-leveling)."

**Relators' Response to KBR SOF 34.**

This statement of fact is disputed.

The record is replete with testimony and admissions by fact and expert witnesses regarding KBR's cross-leveling duties and requirements. Ex. 136 (Lust Dep.) 30:13-17 ("Q. . . . [W]ere you aware that the obligation to cross-level was a contractual requirement in KBR's contract with the United States Government? [Objection.] A. Yes."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 34:3-14 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that every effort to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal. . . . And then in June of '07, we did a revision which added STEAM – MAXIMO/STEAM to this

process."), 38:22-39:8 ("Q.  . . . Any other generally applicable instructions from the U.S. Government concerning KBR cross leveling between task orders other than those that you just referenced? [Objection.] A.  . . . Mary Wade, who was the contract administrator for the LOGCAP III contract in Houston, had said that we were to make maximum use of cross leveling where possible. She understood you couldn't do it all the time but where possible."); Ex. 135 (LaBoa Dep.) 70:24-71:21 (agreeing cross-leveling was part of KBR's property control procedures); Ex. 127 (Hippert Dep.) 162:24-163:20 (agreeing his "view at the time" was that cross-leveling was expected); Ex. 134 (King Dep.) 16:21-17:2 ("Q. . . . With respect to KBR's work on LOGCAP-III, was KBR supposed to try to cross-level materials and property before purchasing new materials and property? [Objection.] A.  Yes."); Ex. 142 (Rock Dep.) 520:17-22 ("Q.  And it was KBR's obligation under LOGCAP III to cross level property [and materials]; is that right, sir? [Objection.] A.  I think . . . where possible, yes."); Ex. 141 (Ritondale Dep.) 105:22-106:5 ("Q.  . . . [I]s it your understanding that KBR was supposed to try to cross-level property and materials at some point in the procurement process? [Objection.] A.  My understanding is at some point in time the cross-leveling was something that was supposed to occur."); Ex. 146 (Vollmecke Dep.) 91:13-92:10 ("It was a contractual requirement to cross level . . . to the maximum extent possible"), 316:15-18 ("The contract had a requirement for cross leveling, but to the maximum extent possible."); McNamara 279:7-280:2; Ex. 104 (Expert Report of E. Branch) at 62 ("KBRSI's contractual requirement under LOGCAP III was to exercise 'due diligence' in verifying that required items could not be satisfied from existing, available stock. As a cost-plus-award-fee contract, LOGCAP III required KBRSI to make its 'best efforts' to perform its obligated work, including its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock."); Ex. 121 (Branch Dep.) at 65:7-15 (|"Q. Okay. And your

opinion is that pursuant to the contract, the contract required KBR to make its best efforts to perform its obligated work, and that included the obligation to exercise due diligence in verify that required items could not be satisfied from existing stock; correct? A. Yes, that's correct."); Ex.121 (Branch Dep.) at 71:7-10 ("best efforts means . . . the good faith maximum effort that could be given in any stated context."); Ex. 149 (Zakheim Dep.) 132:8-9 ("The requirement was explicit that KBR should be cross-leveling wherever possible."); Ex. 94 (Expert Report of M. Rudolph) at 34 ("LOGCAP III tasked DMC to screen all procurement requests for possible cross-leveling."), 45 (KBR's PCP "required cross-leveling 'to the maximum extent possible'"); Ex. 96 (Expert Report of G. Gaukler) at 7 ("KBR was responsible for purchasing supplies for which it would be reimbursed by the government. … [LOGCAP III] provided for reimbursement only if the items purchased are necessary for performance.").

In addition, under the FAR, "A cost is allowable *only* when the cost complies with all of the following requirements: (1) Reasonableness[;] (2) Allocability[;] (3) Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstances[;] (4) Terms of the contract[; and] (5) Any limitations set forth in this subpart. FAR § 31.201-2 (emphasis added). "A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. . . . No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable." FAR § 31.201-3.

<u>KBR SOF 35.</u>  "Cross-leveling is not a standard practice for contractors managing Government property, particularly in a war zone. [KBR] Ex. 25, Goetz Dep. (May 19, 2022) at 242:22-243:9 (testifying that he had advised between '500 to 1,000' government contractors during his career and had never encountered a contractor that had a cross-leveling program similar to KBR's, and had never encountered a contractor that cross-leveled in a war zone); [KBR] Ex. 24, Goetz. Rep. at 24 ('I also have not seen that term [cross-leveling] in any of my dealings with the hundreds or potentially thousands of contracts or contractors over the course of my career.')"

**<u>Relators' Response to KBR SOF 35.</u>**

This statement of fact is disputed. The only source cited for this fact is Goetz; however, he lacks the foundation to make this statement, as he is not and has never been an inventory manager. Ex. 125 (Goetz Dep.) at 7:18-21. Cross-leveling is a standard practice for contractors managing Government property in any environment, even in a war zone. *See, e.g.*, Ex. 94 (Expert Report of M. Rudolph) at 3 ("Publicly available literature documents industry standards for Inventory Management, Control, and Cross-leveling. Many certified professionals exist in the United States fully capable of performing these functions in entry-level, middle management, and senior leadership roles, capable of overseeing and executing a contract like LOGCAP III, even in austere and security challenged environments. Logistics professionals understand the trade-offs inherent in managing stock and service levels vs. costs, including cross-leveling practices in multi-echelon enterprises and systems."), 4-5 ("Cross-leveling in the private sector and public sector, to include the deployed environments of Iraq and Afghanistan as directed in Joint Doctrine, is critical to effective enterprise inventory management. When you do not consistently enforce adherence to cross-leveling, the result is the creation of islands of inventory that are independent of each other. In other words, throughout the enterprise you end up creating many islands of inventory that basically operate independently without regard for any other islands of inventory within the enterprise. This leads to the accumulation of excess inventory across the enterprise, increases dependency on procurement from external sources, extends lead times, fails to take advantage of inventory already bought, paid-for, and on-hand elsewhere in the enterprise, and reduces

responsiveness. Cross-leveling is not unique to LOGCAP III – it is a practice employed across the private and public sectors (especially within DoD) for effectively and efficiently managing enterprise inventories and operations of the magnitude, breadth, depth, and geographic dispersion required by LOGCAP III. When adherence to crossleveling requirements and opportunities are enforced, the enterprise becomes more responsive to the local customer and more cost effective and efficient to the ultimate bill-payer."), 43-44 ("Cross-leveling, in enterprise scenarios like LOGCAP III that include multiple and disparate inventory locations, distribution/transportation challenges, and unpredictable operational tempos/consumption rates is an industry standard and a standard practice. . . . Cross-leveling in austere and contested environments like Iraq and Afghanistan during Operation Iraqi Freedom (OIF) and Operation Enduring Freedom (OEF, Afghanistan) are in reality not too dissimilar to the non-austere and non-contested normal business operating environment in the United States. The same principles and standards apply to both environments, with some caveats for distribution/transportation challenges. The bottom line is that the operating environments for OIF and OEF did not present circumstances that were insurmountable for a vendor that employed industry standards for inventory management, inventory control, and cross-leveling. The means and capabilities needed to cross-level were available to move cargo and assets throughout the theater of operations."); Ex. 97 (Expert Rebuttal Report of M. Rudolph) at 2 ("Cross-leveling by any name (inventory balancing, lateral redistribution, crosssourcing, etc.,) is an accepted fundamental inventory management practice. Cross-leveling is a requisite tenet of the requirement to perform inventory management functions in any scenario or environment, but especially for a contract like LOGCAP III which from the outset included multiple geographically-separated locations, tens of thousands of troops to support, many inventory lines, and austere, non-permissive environments."); 7 ("Cross-leveling is yet

another force-multiplier that prevents the systemic growth of excess inventories while at the same time significantly improves the response time, effectiveness, and efficiency of supporting the warfighter."), 11 ("Cross-leveling is in almost every circumstance the fastest, most responsive, and most cost effective method of fulfilling material requirements to the warfighter, even in an austere warzone environment like LOGCAP III."), 13 ("Cross-leveling is obviously the prudent option when excess inventory is available to fulfill requirements instead of buying new items."); Ex. 127 (Hippert Dep.) 101:14-104:21 ("Q. . . . Why was the requirement of cross-leveling part of the property control procedures? [Objection.] A. Just, . . . it's common sense.").

<u>KBR SOF 36.</u>  "KBR implemented cross-leveling as part of its property management system. [KBR] Ex. 10, 2006 PCP at ¶ 4.6 (KBR-HOW-0046019); [KBR] Ex. 11, 2008 PCP at ¶¶ 4.3-4.4 (KBR-HOW-0046231)."

**Relators' Response to KBR SOF 36.**

The statement of fact is disputed, since KBR did not successfully "implement" cross-leveling at any point under LOGCAP III, and instead systematically failed to cross-level.

Relators' expert, Dr. Gaukler, analyzed KBR's inventory and purchasing data to identify specific cases when KBR over-ordered materials that it had available for cross-leveling under KBR's then-existing procedures. *See* Ex. 96 (Expert Report of G. Gaukler). Analyzing 34.5 million transactions found in this data, Dr. Gaukler determined KBR's inventory balances at every given point in time between May 28, 2007 and March 5, 2013. *Id*. § IV.A. Dr. Gaukler validated his analysis of KBR's inventory balances by using corroborating information in the transactions. 98.5% of the transactions were internally consistent, and Dr. Gaukler conservatively screened the remaining 1.5% in order to block balance reconstruction when the transactions suggested any uncertainty. *Id*. § IV.B. He also compared his conclusions to KBR's ASL [authorized stock list] reports, and found that they matched 98% of the time and that when there was a discrepancy his model typically underestimated inventory balances. Ex. 105 (Expert Rebuttal Report of G. Gaukler) § IV.E.

Dr. Gaukler then applied KBR's own procedures to the inventory levels in order to classify KBR's inventory as Stock, Non-Stock, or Special at any given point in time according to KBR's own procedures and standards. Ex. 96 (Expert Report of G. Gaukler) § IV.C. Under KBR's procedures, these classifications determine how much of an item's inventory is available for cross-leveling. *Id.* § IV.D.

Dr. Gaukler then analyzed KBR's purchase order data over the same period of time to identify cases when KBR purchased something new even though the item being purchased was

available for cross-leveling according to KBR's own procedures. *Id.* § IV.D. Dr. Gaukler applied KBR's procedures as KBR had defined them in its Rule 30(b)(6) testimony, including additional "restrictions" on cross-leveling that do not appear in KBR's procedures. *Id.* This means that Dr. Gaukler's analysis is highly conservative, as the restrictions he accepted included ones that the Government did not know about and that the Government would have referred to DCAA had it known. Ex. 143 (Sheridan Dep.) 155:5-156:13.

Dr. Gaukler concluded that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that should not have been purchased if KBR had followed its own procedures and standards regarding cross-leveling. Ex. 96 (Expert Report of G. Gaukler) at 5. Dr. Gaukler later adjusted the total amount of excess purchases to $338 million (a reduction of less than 1%) after applying corrections that he had identified in rebuttal of KBR's expert William Walter. Ex. 105 (Expert Rebuttal Report of G. Gaukler) § IV.C.viii.

KBR submitted its costs to the Government for reimbursement. *See* Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) at 31:7-14, 37:5-10; Ex. 84 (KBR Response to Interrogatory No. 10). Consequently, the Government reimbursed KBR for the entire $341 million it had incurred unnecessarily. *See* Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 24:9-14 ("Q. . . . Are you aware sitting here today of any pieces of property and materials that KBR bought and received on LOGCAP III that the government paid less than a hundred percent of what KBR spent buying the property and material? A. I am not aware."), 31:7-14 ("Q. . . . [A]s a general matter were KBR's costs spent procuring property and materials that KBR procured and received on LOGCAP III, did those costs ultimately end up on the public vouchers KBR submitted to the U.S. Government? A. In general the costs incurred based on receipts of materials and equipment were included on a public voucher, in general."). Moreover, Dr. Gaukler was able to directly trace $226 million of the $341 million of

unnecessary purchased items to specific public vouchers. Ex. 96 (Expert Report of G. Gaukler) at 39. Those public vouchers expressly represented that these $226 million of over-ordered supplies were "necessary for performance" of LOGCAP III. SOF ¶¶ 151-157.

Dr. Gary Gaukler identified 899 public vouchers associated with unnecessary costs incurred because KBR purchased items despite existing excess material being available in theater. For example, on July 14, 2008, KBR submitted Public Voucher No. 47 for Task Order 139. That Public Voucher requested reimbursement for the cost of purchase order line ("POLINE") (#771983), on purchase order number ("PONUM") #4750053582 for 15 1.5HP blower motors ordered on July 1, 2008 (item number 1001331456), for a total cost of $7,725, despite the fact that the 15 blower motors were all available in excess in other KBR storerooms. Ex. 120 (Expert Rebuttal Report of G. Gaukler, Output 3); Ex. 118 (Expert Report of G. Gaukler, Output 1); Ex. 114 (ZBILL20080714-044718-GC00GY) at Tab "ZBILL20080714-044718-GC00GY," Row 1376 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Trns Amt: "7,725.00"); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57," at Tab "Yr 2 Detail 2008," Row 128 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: "GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Obj Amt: "7,725.00"). Dr. Gaukler concluded that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling. On the occasions when KBR actually followed its cross-leveling procedures, and the database showed cross-level was supportable, the underlying circumstances rarely led KBR to

deny a cross-level request. Moreover, Dr. Gaukler's model incorporates KBR's documented cross-level denials, and it reduces the value of KBR's $341 million in over-ordering by a mere $800,000. Ex. 96 (Expert Report of G. Gaukler) at 5; Ex. 105 (Expert Rebuttal Report of G. Gaukler) ¶¶ 132-135; Ex. 106 (Supplement to Expert Rebuttal Report of G. Gaukler) ¶ 4.

KBR SOF 37.  "KBR implemented its property management system based on written property control procedures ('PCPs'). [KBR] Ex. 10, 2006 PCP at ¶ 1.0 (KBR-HOW-0045990); [KBR] Ex. 11, 2008 PCP at ¶ 1.0 (KBR-HOW-004166). There is no language in the FAR, LOGCAP III, or any modification to LOGCAP III incorporating KBR's internal property control procedures as part of the contract or otherwise setting any benchmark for KBR's compliance with these procedures. FAR 52.245-5(e)(2) (1986) & FAR 45.502(a) (1984); FAR 52.245-1 (2007); [KBR] Ex. 26, Branch Rep. at 41. Indeed, KBR's PCPs make clear they were not part of the LOGCAP III contract. [KBR] Ex. 10, 2006 PCP at ¶1.0 (KBR-HOW-0045990) ('In the event of inconsistencies between this procedure and the terms of the contract under which the Government property is provided or acquired, or the FAR, the terms of the contract shall prevail.'); [KBR] Ex. 11, 2008 PCP at ¶ 1.0 (KBR-HOW-0046166) (similar)."

**Relators' Response to KBR SOF 37.**

This statement of fact is disputed.

With respect to the first sentence, while KBR had written property control procedures that were supposed to guide its property management system, KBR systematically failed to "implement" a property management system that fulfilled its obligations under LOGCAP III. Relators' expert Dr. Gaukler concluded that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling. Ex. 96 (Expert Report of G. Gaukler) at 5. Further, there is substantial evidence in the record showing that KBR systemically failed "implement" a property management system. *See, e.g.*, Ex. 66 (Feb. 28, 2010 internal KBR email from KBR's Head of the DMC, C. O'Muirgheasa) at '4132 ("In 2009, 65% of Requisitions] were put into MATCON, representing 51% of the dollars. So, **35% of the Req[uisitions] bypassed us [KBR's DMC], representing almost 50% of the dollars**.") (emphasis added); Ex. 67 (KBR data) at '4133 (quantifying that in 2007, out of 65,372 Material Requisitions valued at $1,237,891,670.75, a total of 52,488 (80.3%) of those Material Requisitions valued $949,886,655.51 (76.7% of the dollars) were not checked for cross-leveling; in 2008, out of 90,025 Material Requisitions valued at $1,171,737,717.95, a total of 49,683 (55.2%) of those Material Requisitions valued at $647,308,265.68 (55.2% of the dollars) were not checked for

cross-leveling; and in 2009, out of 65,526 Material Requisitions valued at $ 812,554,107.70, a total of 23,124 (35.3%) of the Material Requisitions valued at $401,484,184.06 (49.4% of the dollars) did not go to the DMC for the cross-leveling check); Ex. 3 (Internal KBR email containing Dec. 29, 2008 email from KBR's Head of the DMC, B. Simmons) at '4448 ("The three major factors impeding the DMC's ability to Cross Level under utilized materials are as follows: 1) Categorization of ASL/Inventory Lines (i.e. reflecting [STK] when demands indicates [SP] or [NS] category)[;] 2) Unresponsive Sites/Projects to Tasking leading to Denials[;] 3) Sites/Projects resistant to place Material Requisitions in MATCON Status; consequently, sending the Majority (if not All) directly through Procurement Channels."); Ex. 81 (Mar. 20, 2010 email from KBR Deputy Program manager – Support, R. Kaye, to KBR Deputy Principal Program Manager, Larry Lust) at '9112 ("Last year, fully **35% of all requisitions (with an extended value of $401M[illion]) by-passed the cross-leveling check**. As we start to turn over more and more materials to GOI [Government of Iraq], we are facing an **increasing risk of being Formed 1 for buying items we just declared excess and gave away**. … [A]s of yesterday, we [had] **43,801 lines across Iraq being carried as STK that have 2 or fewer demands in the past 360 days**. We did a trial run on three sites and determined that 80% of their STK lines had RO [Requisition Objectives] and ROP [Reorder Points] set above what it should be based upon demand history. … We've got **$71M[illion] in reserved stock of which less than 50% is legitimate**. The rest is against cancelled ACLs, completed ACLs, or just plain **'hidden' from cross-leveling**. **TREC storerooms is going to be my biggest challenge….we've currently got $331M[illion] in them as of yesterday**. I've told Guy [LaBoa, KBR Principal Program Manager] this is the **Mother of all Forms 1**.") (emphasis added); Ex. 82 (Apr. 1, 2010 internal KBR email from KBR Deputy Program Manager – Support, R. Kaye, to KBR Principal program Manager, G. LaBoa) at '7417

("The deeper I dig, the more uncomfortable I become that we really do know what's going on. We've got **continuing issues with RO [Requisition Objective], ROP [Reorder Point], Stk vs Non-Stk, reservations and TRECs**.") (emphasis added); Ex. 82 (June 2009 email from KBR employee) at ECF Page 4 ("He said they are **placing everything on reserve so DMC won't ask for it CL [cross-level]**.") (emphasis added); Ex. 8 (Internal KBR email containing Feb. 25, 2010 email from KBR's Deputy Program Manager – Support, R. Kaye) at '0062 ("We are purchasing $5 M per day when we've got $1.2 B i[n] excess on hand. At some point, the DCAA is going to put KBR out of business if we keep doing this."); Ex. 96 (Expert Report of G. Gaukler) at 5 (concluding that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling); *see also, e.g.*, SOF ¶¶ 52-86.

With respect to the second sentence, it is disputed, because the FAR required KBR to implement property control procedures, the Government had to approve the property control procedures, and KBR had to adhere to the property control procedures. FAR 52.245-1 ("Government Property"); Ex. 126 (Haught Dep.) 44:10-12 (contractual requirement to follow the PCP); Ex. 137 (Mayo Dep.) 83:10-84:8; Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) (approved by Government); Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) (same).

Additionally, Relators dispute that LOGCAP III and its modifications did not provide any "benchmarks" for KBR's performance. *See, e.g.*, Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR)

31.205-26."), '0037-38 (incorporating FAR 52.216-7, FAR 52.232-20, FAR 52.232-22); Ex. 62 (July 22, 2004 Amendment P00008 to LOGCAP III Base Contract) at '3166 ("The purpose of this modification is to incorporate Task Order Cross Utilization of Government Property into the basic contract and is applicable to all current and future task orders awarded under this contract. . . . Definition: Cross Utilized Property is government property purchased against one task order which is subsequently loaned to another task order on a temporary basis. Cross-utilized property shall remain accountable to the task order against which it was purchased, unless it has been duly transferred to another task order, in which case it will remain accountable to the task order to which it has been transferred.").

The third sentence of the statement of fact is disputed and immaterial because the language cited in the PCP does not support the statement. Whether or not there is an "inconsistency" between the PCP and LOGCAP III has no bearing on whether or not the PCP is part of LOGCAP III, and further there is no "inconsistency" identified by KBR that is relevant to any issue in this lawsuit.

KBR SOF 38.  "During the relevant time period, KBR reasonably implemented the contractual requirement (contained in only two of the relevant task orders at certain times) to use 'best efforts' to cross-level to the 'maximum extent possible' by conducting due diligence checks as to whether items could be cross-leveled, not perfectly and not in every instance, as the contract never required perfection. [KBR] Ex. 23, KBR 30(b)(6) Dep. (Sept. 29, 2021) at 154:14-155:7 (interpreting 'possible' to mean 'it wasn't absolute that you had to do it. It was to the extent possible.'); [KBR] Ex. 26, Branch Rep. at 35-36 ('KBR[] conducted theater-wide cross-leveling due diligence checks during LOGCAP III beyond the requirements of the individual Task Orders.'); [KBR] Ex. 24, Goetz Rep. at 23 ('the Government does not require or expect contractors to achieve perfection in their management of Government property'). That included cross-leveling both equipment and materials without regard to whether individual task order statements of work imposed narrower requirements. [KBR] Ex. 23, KBR 30(b)(6) Dep. (Sept. 28, 2021) at 29:13-19 ('We'd go beyond what was required of us to cross level anything across the – all the task orders we had.'); *id.* at 34:24-35:7 ('It was crossleveling, period. We did not make a distinction whether it was bedtween (sic) task orders or within task orders. Cross-leveling was cross-leveling across the LOGCAP III program.'))."

**Relators' Response to KBR SOF 38.**

The statement of fact is disputed. There is substantial evidence in the record showing that KBR systematically failed to cross-level, and at no time had it "reasonably implemented the contractual requirement" to cross-level, regardless of whether "individual task order statements of work imposed narrower requirements." *See, e.g.*, Ex. 66 (Feb. 28, 2010 internal KBR email from KBR's Head of the DMC, C. O'Muirgheasa) at '4132 ("In 2009, 65% of Requisitions] were put into MATCON, representing 51% of the dollars. So, **35% of the Req[uisitions] bypassed us [KBR's DMC], representing almost 50% of the dollars**.") (emphasis added); Ex. 67 (KBR data) at '4133 (quantifying that in 2007, out of 65,372 Material Requisitions valued at $1,237,891,670.75, a total of 52,488 (80.3%) of those Material Requisitions valued at $949,886,655.51 (76.7% of the dollars) were not checked for cross-leveling; in 2008, out of 90,025 Material Requisitions valued at $1,171,737,717.95, a total of 49,683 (55.2%) of those Material Requisitions valued at $647,308,265.68 (55.2% of the dollars) were not checked for cross-leveling; and in 2009, out of 65,526 Material Requisitions valued at $ 812,554,107.70, a total of 23,124 (35.3%) of the Material Requisitions valued at $401,484,184.06 (49.4% of the dollars) did not go

to the DMC for the cross-leveling check); Ex. 3 (Internal KBR email containing Dec. 29, 2008 email from KBR's Head of the DMC, B. Simmons) at '4448 ("The three major factors impeding the DMC's ability to Cross Level under utilized materials are as follows: 1) Categorization of ASL/Inventory Lines (i.e. reflecting [STK] when demands indicates [SP] or [NS] category)[;] 2) Unresponsive Sites/Projects to Tasking leading to Denials[;] 3) Sites/Projects resistant to place Material Requisitions in MATCON Status; consequently, sending the Majority (if not All) directly through Procurement Channels."); Ex. 81 (Mar. 20, 2010 email from KBR Deputy Program manager – Support, R. Kaye, to KBR Deputy Principal Program Manager, Larry Lust) at '9112 ("Last year, fully **35% of all requisitions (with an extended value of $401M[illion]) by-passed the cross-leveling check**. As we start to turn over more and more materials to GOI [Government of Iraq], we are facing an **increasing risk of being Formed 1 for buying items we just declared excess and gave away**. … [A]s of yesterday, we [had] **43,801 lines across Iraq being carried as STK that have 2 or fewer demands in the past 360 days**. We did a trial run on three sites and determined that 80% of their STK lines had RO [Requisition Objectives] and ROP [Reorder Points] set above what it should be based upon demand history. … We've got **$71M[illion] in reserved stock of which less than 50% is legitimate**. The rest is against cancelled ACLs, completed ACLs, or just plain **'hidden' from cross-leveling**. **TREC storerooms is going to be my biggest challenge….we've currently got $331M[illion] in them as of yesterday**. I've told Guy [LaBoa, KBR Principal Program Manager] this is the **Mother of all Forms 1**.") (emphasis added); Ex. 82 (Apr. 1, 2010 internal KBR email from KBR Deputy Program Manager – Support, R. Kaye, to KBR Principal program Manager, G. LaBoa) at '7417 ("The deeper I dig, the more uncomfortable I become that we really do know what's going on. We've got **continuing issues with RO [Requisition Objective], ROP [Reorder Point], Stk vs Non-Stk, reservations and**

**TRECs**.") (emphasis added); Ex. 7 (June 2009 email from KBR employee) at ECF Page 4 ("He said they are **placing everything on reserve so DMC won't ask for it CL [cross-level].**") (emphasis added); Ex. 8 (Internal KBR email containing Feb. 25, 2010 email from KBR's Deputy Program Manager – Support, R. Kaye) at '0062 ("We are purchasing $5 M per day when we've got $1.2 B i[n] excess on hand. At some point, the DCAA is going to put KBR out of business if we keep doing this."); Ex. 96 (Expert Report of G. Gaukler) at 5 (concluding that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling); *see also, e.g.*, SOF ¶¶ 52-86.

KBR SOF 39.  "The property control procedures were not detailed and required interpretation at each individual site based on the judgment of site-level personnel and their particular circumstances. [KBR] Ex. 30, Hippert Dep. (Sept. 17, 2020) at 72:3-75:11. The property control procedures do not include an objective standard or requirement for cross-leveling. [KBR] Ex. 10, 2006 PCP ¶ 4.6.1 (KBR-HOW-0046019) & [KBR] Ex. 11, 2008 PCP at ¶ 4.3. (KBR-HOW-0046230)."

**Relators' Response to KBR SOF 39.**

This statement of fact is disputed. KBR understood its contractual requirement to cross-level supplies, incorporating the requirement into a Government-approved set of Property Control Procedures ("PCP"), and into detailed "Desktop Operating Procedures" ("DOPs") and "Technical Directives" ("TDs") for its personnel. LOGCAP III required that KBR implement and maintain a PCP, which the Government reviewed and approved. *See* Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0039 (incorporating FAR 52.245-1); FAR 52.245-1 ("Government Property"); Ex. 142 (Rock Dep.) 84:4-13 ("Q. . . . [W]hat were the PCPs? A. . . . [T]he property control procedures were a process by which [KBR] accounted for our property . . . on our sites. Q. And were the PCPs approved by the government? [Objection.] A. Yes."); Ex. 134 (King Dep.) 21:18-22:2 ("Q. What are the PCPs? A. It's a government-approved document that's a – property control document . . . – we write what we're going to do to protect and – from A to Z . . . from cradle to grave as we call it, on all procedures for handling U.S. government property. And that document is reviewed by the government, the corporate government property administrator for her review, and she signs off on it concurring with everything we're going to do."); Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5978; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6157.

KBR's PCPs required KBR to cross-level, and included specific cross-leveling procedures KBR was to follow. *See* Ex. 135 (LaBoa Dep.) 70:24-71:21 (agreeing cross-leveling was part of KBR's property control procedures); Ex. 138 (McNamara Dep.) 279:7-280:2 ("Q. . . . [D]id you

have a view on . . . whether KBR was appropriately cross-leveling property in the 2007 to 2012 time period? [Objection.] A. . . . They needed to have been doing it . . . because it was part of . . . their property procedure. It was part of what was required of them as a prudent contractor."); Ex. 76 (containing Feb. 23, 2010 email from KBR's Deputy Program Manager – Support, R. Kaye) at '3447 ("Going forward and in accordance with the PCP, not issuing something because you are 'under inventory' is not acceptable. We can not continue to order in material that we know to already be here in country.").

KBR's PCPs required KBR to order inventory in "[r]easonable quantities, commensurate with the work to be accomplished." Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5992; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6168. They similarly required KBR to order inventory that was "contractually authorized and necessary for performance of the prime contract" and "for the quantities required for said performance." Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6015; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6227.

KBR's PCPs required KBR to dispose of excess, unneeded inventory only after "[s]creening items against existing and anticipated needs," "[p]romply reporting excess items," and receiving Government approval. Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5994; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6170.

KBR's PCPs required that when filling a requisition, KBR "personnel will first attempt to fill requisitions from stock on-hand." Ex. 1 (KBR's Government-Approved Property Control

Procedures, dated Sept. 21, 2006) at '6017; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6230.

KBR's PCPs required checking theater-wide inventory as well when filling a requisition. Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6019 ("Material Control – Processing Requisitions for cross leveling or Purchasing . . . Upon return Materials Control will first check the theater inventory to determine if the requisition can be filled from existing stock."); Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6230-31 ("Material Control personnel . . . will also check the Automated Inventory Control System for Theater wide availability of the item(s) being requested. . . . Material Control – Filling Requisitions from Theater Stock. . . . If suitable property is found at another site, the Material Manager or designee will: . . . Verify via the owning Site Material manager that the requested item(s) are excess to that's need and is available for cross utilization."). Thus, KBR's PCP expressly required KBR to screen requisitions against its existing inventory and to fill the requisitions through cross-leveling when it had supplies available in the theater.

In performing its duties under LOGCAP III, KBR issued formal written documents for use by its employees to standardize processes across its sites DOPs. *See* Ex. 133 (KBR 30(b)(6) (Lust) (Sept. 29, 2021) Dep.) 193:23-194:8. The DOPs told KBR employees how to do their jobs correctly. *Id.*

As an example of a DOP setting forth KBR's cross-leveling obligations with specific criteria and procedures for KBR to follow, in July 2006, KBR's Redistribution of Government Property DOP required KBR to make "every effort" to cross-level with existing inventory before purchasing new items. Ex. 103 (July 2006 KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures") at '9114 ("After a Materiel

Requisition has been approved but prior to being turned over to procurement for purchase, Materiel Control will check the Theater Wide inventory and the Redistribution cell to determine if a requisition can be filled from existing stock. Every effort to fill requisitions within the theater shall be taken utilizing inventories on the KBR portal. If items are found within these inventories every reasonable effort shall be taken to redistribute these items."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 34:3-14 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that every effort to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal.").

As another example, KBR's "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures," revised June 2007, stated:

> **Cross Level Requisitioning Process**. Upon receipt of a material requisition Materiel Control will check the theater-wide inventory through STEAM [KBR's inventory management program, also referred to as MAXIMO] to determine if items can be filled from excess stock. Found items will be cross leveled through the procedures in 5.1 and 5.2.

Ex. 90 (KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures," revised June 2007) at '0992 (emphasis in original); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 34:3-14 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that every effort to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal. . . . And then in June of '07, we did a revision which added STEAM – MAXIMO/STEAM to this process.").

As another example, KBR's "Distribution of Government Property DESKTOP OPERATING PROCEDURE," dated August 23, 2008, stated:

The DMC (<u>Distribution Management Center</u>) will be responsible for screening <u>*all*</u> requests for procurement action for possible Cross Level support. . . .

All requisitions for procurement action will flow through the DMC and be screened for availability within theater prior to purchase. . . .

If a site foresees a need for an item(s), it is contractually obligated to attempt to obtain the items through cross utilization within its project (group of sites). . . .

Ex. 91 ( "KBR Distribution of Government Property DESKTOP OPERATING PROCEDURE," dated Aug. 23, 2008) at '0251, '0256 (emphasis in original).

<u>KBR SOF 40.</u>  "The property control procedures instructed KBR employees to check the theater inventory to determine if there was 'suitable' material prior to starting the purchasing process. *Id*. If a 'suitable' item was located at another site, personnel were instructed to 'verify via the owning site' that the item was 'truly excess and available' before moving forward with the cross-leveling process. [KBR] Ex. 10, 2006 PCP ¶ 4.6.1 (KBR-HOW-0046019); *see also* [KBR] Ex. 11 2008 PCP at ¶ 4.3 (KBR-HOW-0046231) (instructing employees to look for 'suitable property' 'available for issue' and verification that any located item is 'excess to that site's need' and "available for cross utilization').; *see also* [KBR] Ex. 41, Rudolph Dep. (Mar. 28, 2022) at 146:15-21 (Relators' expert agreeing that 'if you look in the inventory management system and see that there is inventory, that doesn't necessarily answer the question as to whether it is available to cross-level.'). Crossleveling was sometimes limited for particular sites due to individual circumstances including security concerns, mortar attacks, or because the storeroom was 'frozen' in anticipation of a major wartime event, such as a troop surge or base closure. *See, e.g.*, [KBR] Ex. 23, KBR 30(b)(6) Dep. (Sept. 29, 2021) at 102:23-103:16."

**Relators' Response to KBR SOF 40.**

The statement of fact is disputed.

As to the first and second sentence, the statement of fact is not disputed.

As to the third sentence, the statement of fact is disputed. There were not any additional security concerns with cross-leveling as opposed to procuring new items, as cross-leveling used the same supply road network that all supplies were transported on, traveling via truck convoys. Ex. 138 (McNamara Dep.) 106:8-9 ("All of the property moved from camp to camp under a convoy that the military were in charge of."), 411:10-15 ("Q. . . . [I]f one of the bases wants to buy some new material, how does that get to them? [Objection.] A.  It . . . gets there by convoy. Everything gets there by convoy."); Ex. 140 (Pagonis Dep.) 92:12-93:12 ("I never – I never separated the two [transporting new inventory versus transporting existing inventory]. It was all one system."); Ex. 142 (Rock Dep.) 92:5-16 ("Q.  . . . [W]hat kind of support did the U.S. Military provide [for the trucks when they were moving property and materials between sites]? A.  Armed escort. Q.  And was that each and every time a KBR truck moved from site to site to transport property and materials? A.  Yes."), 94:17-95:10 ("Each location or each base cluster had a [KBR Theater Transportation Mission] operations site. And at each one of those locations, every day convoys

moved to various locations throughout the Theater. . . . [I]t was on a regular schedule that [KBR] moved materials and equipment from sites to sites. Q. . . . [I]rrespective of whether the item was purchased new or whether it was cross-leveled, it would travel by truck and by convoy to the receiving site; is that correct? A. To the best of my knowledge, now, yes."), 410:4-20 (questioning by KBR's counsel) ("Q. . . . Were there regular convoys among all the different bases in Iraq? A. Yes, there were. Q. Okay. Was the frequency different than, for example, the frequency of convoys that were available on the main supply route? A. We had daily movements between all bases and on the main supply route.").

<u>KBR SOF 41.</u>  "Relators allege that KBR submitted a false claim every time 'KBR submitted an invoice to the Government requesting payment' for an item that could potentially have been crossleveled, but was purchased instead. [KBR] Ex. 21, Hemphill Response to KBR Interrogatory ('ROG') 1; [KBR] Ex. 22, Howard Response to KBR ROG 1; [KBR] Ex. 37, Gaukler Rep. at ¶¶ 10-12, 140; *see also* Compl. ¶ 136. Utilizing a never been done before, non-peer reviewed computer modeling system, Relators' expert witness generated a list of allegedly 'overordered' items that he stated KBR could have cross-leveled based on the robotic application of a series of logic rules to the model's recreation of KBR's 'historical inventory balances.' [KBR] Ex. 37, Gaukler Rep. ¶¶ 76-151 (list of purchases generated through computer model, based on his model's application of logic rules to a reconstruction of "historical inventory balances"); [KBR] Ex. 38, Gaukler Dep. (Apr. 1, 2022) at 99:24-100:2 (testifying that his model was not peer reviewed); *id.* at 285:2-25 (testifying that he had not performed an 'overordering' analysis before, was not aware of any other 'overordering' model in academic literature, and was not aware whether the approach used for his analysis had ever been accepted in any peer-reviewed literature); *id.* at 287:2-16 (testifying that he was not aware of whether the government uses historical inventory balance reconstruction to evaluate a contractor's property management system or cross-leveling); *id.* at 98:5-11 (testifying that model code was not reviewed by anyone other than expert himself); *id.* at 107:22-108:7 (testifying that he is not an expert in government contracts, contract interpretation, or the FAR); *id.* at 13:12-18 (testifying that he does not consider himself an expert witness on damages).

## **Relators' Response to KBR SOF 41.**

The statement of fact is disputed. Relators do not allege that each and every time an item could *potentially* have been cross-leveled, but KBR instead purchased the item, that KBR's request for payment constituted a false claim. To the contrary, Relators' allege that KBR submitted a false claim each and every time it submitted an invoice to the Government requesting payment for an item it purchased when KBR should have cross-leveled that item according to its own rules and standards.

KBR submitted claims for reimbursement to the Government for the inventory that KBR purchased and received in performing LOGCAP III. *See* Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 12:9-16 ("A. A cost-reimbursable program is one in which the government reimburses the contractor for incurred costs. Q. . . . LOGCAP III was a cost-reimbursable contract for KBR; is that right? A. Correct. Q. So the government reimbursed KBR for its costs on LOGCAP III; is that correct? A. Correct."), 21:11-13 ("Q. . . . Why did KBR submit public vouchers to the

U.S. Government on LOGCAP III? A. For reimbursement of incurred costs."), 21:20-22:3 ("Q.

. . . [T]he U.S. Government reimbursed KBR for the money that KBR spent procuring property

and materials on LOGCAP III, correct? [Objection.] A. The government reimbursed KBR for

materials and equipment received, therefore incurred, thus the government reimbursed KBR for

costs incurred for that period."), 22:7-11 ("Q. The U.S. Government reimbursed KBR for the

money KBR spent procuring property and materials on LOGCAP III if those property and

materials were received by KBR; is that correct, sir? A. Correct."), 24:9-14 ("Q. . . . Are you

aware sitting here today of any pieces of property and materials that KBR bought and received on

LOGCAP III that the government paid less than a hundred percent of what KBR spent buying the

property and material? A. I am not aware.").

All requests for reimbursement submitted by KBR to the Government were made via public

vouchers. *See* Ex. 84 (KBR Response to Interrogatory Number 10) ("[W]hen KBR incurred costs

on LOGCAP III, those costs were entered into its SAP accounting system. In accordance with

FAR 52.216-7, twice each month KBR extracted from its accounting system all allowable direct

costs, (such as those for property and materials) incurred on each cost reimbursable Task Order

and used that data to create invoices to the government, known as a 'public vouchers.' The public

vouchers listed all direct cost items plus allowable indirect costs (general and administrative

expenses) on the Task Order for that billing period. For any single voucher, there may be thousands

of individual transactions listed. In the public vouchers, KBR would provisionally bill the

government for a portion of its base fee of 1% of estimated costs. KBR would then submit the

public vouchers to the government for payment. See KBR-HOW-0042610 to -0044521."); Ex. 131

(KBR 30(b)(6) (Jacobs) Dep.) 31:7-14 ("Q. . . . [A]s a general matter were KBR's costs spent

procuring property and materials that KBR procured and received on LOGCAP III, did those costs

ultimately end up on the public vouchers KBR submitted to the U.S. Government? A.  In general the costs incurred based on receipts of materials and equipment were included on a public voucher, in general."), 37:5-10 ("Q.  . . . Is that [amount listed on a particular public voucher] the total amount that KBR is asking the government to pay in response to this particular public voucher? [Objection.] A.  That's the total cost incurred for the period in which KBR is billing to the U.S. Government.").

The public vouchers submitted by KBR broke down the total dollar amount requested into specific dollar amounts charged to particular contract line item numbers, or "CLINs." *See, e.g.*, KBR's Ex. 18 (ECF No. 294-31, Public Voucher No. 32 for LOGCAP III Task Order 139) at ECF Page 2 (requesting total amount of "$155,199,325.83" for KBR's "Cost[s] for October & November 2007" for Task Order 139), at ECF Pages 3-6 (identifying dollar amounts "CURRENT[LY] BILLED" and dollar amounts "CUMULATIVE[LY] BILLED" for CLINs 4005, 4009, 4011, 5005, 5009, 5011, 6005, and 6009); KBR's Ex. 19 (ECF No. 294-32, Public Voucher No. 40 for LOGCAP III Task Order 159) at ECF Page 2 (requesting total amount of "$97,021,332.00" for KBR's "Cost[s] for April-May 2010" on Task Order 159), at ECF Page at ECF Pages 3-4 (identifying dollar amounts "CURRENT[LY] BILLED" and dollar amounts "CUMULATIVE[LY] BILLED" for CLINs 7005, 7009, 8005, 8009, 9005, 9009, 1005, 1009, 1105, 1109, 1205, 1209); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57" (requesting $145,074,262.22 in this public voucher for Task Order 139 for "Cost for June-July 2008"), at Tab "1035-Task57" (listing CLINs 4005, 4009, 5005, 5009, 6005, 6009, and associated dollar values currently billed and cumulatively billed, among other things), at e.g., Tab "Prior MonthYr1 Details 2008" (listing non-labor and labor costs included in this public voucher, with associated object, cost elements, documents, vendor names,

object amounts, item descriptions, and invoice identifications, among others). Every amount charged by KBR to the Government during LOGCAP III was assigned to a particular CLIN. *See, e.g.*, KBR's Exhibits 18 and 19; Exs. 111-113; 115 (public vouchers). Below is an excerpt of KBR's Public Voucher No. 40 for LOGCAP III Task Order 159, which KBR attached as KBR's Ex. 19 (ECF No. 294-32):

| Standard Form 1035 SEPTEMBER 1973 4 TREASURY FRM 2000 1035-113 | PUBLIC VOUCHER FOR PURCHASES AND SERVICES OTHER THAN PERSONAL MEMORANDUM | VOUCHER NO. 40 |
| --- | --- | --- |
| | | SCHEDULE NO. 1005304UT128 1005304UT129 1005304UT130 1005304UT131 1005304UT132 1005304UT133 1005304UT134 1005304UT135 1005304UT136 1005304UT137 1005304UT138 1005304UT139 SHEET NO. 2 |
| | CONTINUATION SHEET | |

DFAS, Columbus Operating Location, Attn: DFAS-CO/West Entitlement Operations, P.O.Box 182381, Columbus, OH 43218-2317

CONTRACT NO. DAAA09-02-D-0007

KELLOGG BROWN & ROOT CORPORATION
P.O. BOX 203145
Houston, TEXAS 77216-3145

Task Order 0159

| CLIN | SUBCLIN | ACRN | DESCRIPTION | CURRENT BILLED | CUMULATIVE BILLED |
| --- | --- | --- | --- | --- | --- |
| 7005 | 7005AA | AA | Multinational Force/Multinational Coalition - Iraq | | $ 693,423,772.94 |
| 7009 | 7009AA | AA | Base Fee | | $ 6,934,237.73 |
| 8005 | 8005AA | AF | Multinational Force/Multinational Coalition - Iraq | $ 1,273,849.77 | $ 2,903,277,697.48 |
| 8009 | 8009AA | AF | Base Fee | $ 12,738.25 | $ 28,793,749.89 |
| 7005 | 7005AB | AA | Multinational Force/Multinational Coalition - G3&G6 Sites | | $ 19,417,480.00 |
| 7009 | 7009AB | AA | Base Fee - G3&G6 Sites | | $ 194,174.80 |
| 8005 | 8005AB | AF | Multinational Force/Multinational Coalition - G3&G6 Sites | $ 64.02 | $ 123,193,772.22 |
| 8009 | 8009AB | AF | Base Fee - G3&G6 Sites | $ 0.64 | $ 1,231,916.23 |
| 7005 | 7005AC | AB | Multinational Force/Multinational Coalition - MEF 017 | $ - | $ 45,220,547.16 |
| 7009 | 7009AC | AB | Base Fee - MEF 017 | $ - | $ 452,197.90 |
| 7005 | 7005AD | AC | Multinational Force/Multinational Coalition - Bucca ICO | $ - | $ 545,077.91 |
| 7009 | 7009AD | AC | Base Fee - Bucca ICO | $ - | $ 5,450.71 |
| 7005 | 7005AE | AC | Multinational Force/Multinational Coalition - Cropper ICO | $ - | $ 195,110.76 |
| 7009 | 7009AE | AC | Base Fee - Cropper ICO | $ - | $ 3,355.38 |
| 8005 | 8005AE | AG | Multinational Force/Multinational Coalition - Cropper ICO | $ - | $ 140,433.27 |
| 8009 | 8009AE | AG | Base Fee - Cropper ICO | $ - | $ - |
| 7005 | 7005ZZ | AD | Multinational Force/Multinational Coalition - LOGCAP LSA 195 | $ - | $ 1,712,631.92 |
| 7009 | 7009ZZ | AD | Base Fee - LOGCAP LSA 195 | $ - | $ 17,126.02 |
| 7005 | 7005AF | AE | Multinational Force/Multinational Coalition - A Sites Balad | $ 4,909.81 | $ 199,124,397.97 |
| 7009 | 7009AF | AE | Base Fee - A Sites Balad | $ 49.10 | $ 1,991,208.83 |
| 8005 | 8005AF | AH | Multinational Force/Multinational Coalition - ICOTA | $ - | $ 1,422,398.62 |
| 8009 | 8009AF | AH | Base Fee - ICOTA | $ - | $ 14,223.70 |
| 8005 | 8005AG | AC | Multinational Force/Multinational Coalition - Taji ICO | $ - | $ 7,218.37 |
| 8009 | 8009AG | AC | Base Fee - Taji ICO | $ - | $ 72.18 |
| 9005 | 9005AA | AF | Multinational Force/Multinational Coalition - Iraq Yr2 | | $ 451,456,410.00 |
| 9009 | 9009AA | AF | Base Fee Yr2 | | $ 4,514,564.10 |
| 1105 | 1105AA | AQ | Multinational Force/Multinational Coalition - Iraq Yr2 | $ 88,753,663.17 | $ 1,504,188,887.49 |
| 1109 | 1109AA | AQ | Base Fee Yr2 | $ 887,519.20 | $ 15,041,504.76 |

As shown in this excerpt, KBR identified the specific dollar amounts it currently billed and cumulatively billed for each particular CLIN. KBR's Ex. 19 (ECF No. 294-32) at ECF Page 3.

The LOGCAP III base contract specified that "For Cost-Reimbursable Contract line Item Numbers (CLINs) only supplies and materials **necessary for performance under this contract** will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) § 31.205-26." Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 (emphasis added).

The LOGCAP III Task Orders defined the CLINs and provided funding for the CLINs, which could be increased. Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 38:2-20 ("Q. This is listing certain CLIN or CLIN numbers; is that right, sir? A. Correct. Q. And those are contract line item numbers; is that right? A. That is correct. Q. And I found the eight different CLIN numbers reflected in this public voucher to be 4005, 4009, 5005, 5009, 6005, 6009, 4011 and 5011. Do you know what those CLIN numbers mean, sir? A. I would need the contract mod to tell you exactly what those CLIN numbers mean. Q. And so when you say the contract mod is that the form task order modification for Task Order 139? A. Yes. Yes. Q. And so it's your testimony that those form task order modifications for Task Order 139 will define what these CLIN numbers represent? A. Yes, sir."); Ex. 148 (Wade Dep.) 18:9-20 (describing funding as "the government . . . put[ting] funds on the contract to pay for the performance [KBR] w[as] doing," which would entail "seeing if there were sufficient funds obligated on the contract to cover [KBR's] costs and if they weren't, [KBR would] notify the government that additional funds would be required"). For example, Task Order 139 defines CLINs and provides funding for those CLINs:

| ITEM NO | SUPPLIES/SERVICES … | AMOUNT |
|---|---|---|
| 4005AA | NOT TO EXCEED COST | $ 388,349,600.00 |
| … | … | … |
| 4009AA | BASE FEE | $ 3,883,496.00 |
| … | … | … |
| 4011AA | AWARD FEE POOL | $ 7,766,904.00 |

Ex. 100 (Aug. 21, 2006 Task Order 139) at '1486-493. For another example, Task Order 159

defines CLINs and provides funding for those CLINs:

> Funding is provided for the POP [Period of Performance] of
> 01 September 08 to 31 August 2009 in the Amounts listed
> below:

| CLIN | Title | Amount |
|---|---|---|
| 7005AA | BLS NTE [Base Life Support Not To Exceed] | $531,093,640.14 |
| 7009AA | BLS Base Fee [Base Life Support 1% Base Fee] | $ 5,310,936.40 |
| 7011AA | BLS Award Fee Pool [Base Life Support 2% Award Fee Pool] | $ 10,621,752.46 |
| 7005AB | Coalition NTE | $ 19,417,480.00 |
| 7009AB | Coalition Base Fee | $ 194,174.80 |
| 7011AB | Coalition Award Fee Pool | $ 388,345.20 |
| 7005AC | MEF NTE | $ 46,753,408.34 |
| 7009AC | MEF Base Fee | $ 467,534.08 |
| 7011AC | MEF Award Fee Pool | $ 935,057.58 |
| 7005AD | Bucca ICO NTE | $ 253,202.97 |
| 7009AD | Bucca ICO Base Fee | $ 2,532.03 |
| 7011AD | Bucca ICO Award Fee Pool | $ 5,064.00 |
| 7005AE | Cropper ICO NTE | $ 573,994.30 |
| 7009AE | Cropper ICO Base Fee | $ 5,739.94 |
| 7011AE | Cropper ICO Award Fee Pool | $ 11,479.76 |
| 7005ZZ | LOGCAP LSA NTE | $ 2,481,114.14 |
| 7009ZZ | LOGCAP LSA Base Fee | $ 24,811.14 |
| 7011ZZ | LOGCAP LSA Award Fee Pool | $ 49,621.72 |

Ex. 40 (Sept. 1, 2008 Task Order 159) at '5826.

Thus, when KBR submitted Public Vouchers associated with Task Orders with billings

specific to cost-reimbursable CLINs authorized by the Task Orders, KBR was representing that

those supplies and materials purchased were "necessary for performance." Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006.

Dr. Gary Gaukler identified 899 public vouchers associated with unnecessary costs incurred because KBR purchased items despite existing excess material being available in theater. For example, on July 14, 2008, KBR submitted Public Voucher No. 47 for Task Order 139. That Public Voucher requested reimbursement for the cost of purchase order line ("POLINE") (#771983), on purchase order number ("PONUM") #4750053582 for 15 1.5HP blower motors ordered on July 1, 2008 (item number 1001331456), for a total cost of $7,725, despite the fact that the 15 blower motors were all available in excess in other KBR storerooms. Ex. 120 (Expert Rebuttal Report of G. Gaukler, Output 3); Ex. 118 (Expert Report of G. Gaukler, Output 1); Ex. 114 (ZBILL20080714-044718-GC00GY) at Tab "ZBILL20080714-044718-GC00GY," Row 1376 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Trns Amt: "7,725.00"); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57," at Tab "Yr 2 Detail 2008," Row 128 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: "GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Obj Amt: "7,725.00"). Dr. Gaukler concluded that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling. On the occasions when KBR actually followed its cross-leveling procedures, and the database showed cross-level was supportable, the underlying circumstances rarely led KBR to deny a cross-level request. Moreover, Dr. Gaukler's model incorporates KBR's documented cross-

level denials, and it reduces the value of KBR's $341 million in over-ordering by a mere $800,000. Ex. 96 (Expert Report of G. Gaukler) at 5; Ex. 105 (Expert Rebuttal Report of G. Gaukler) ¶¶ 132-135; Ex. 106 (Supplement to Expert Rebuttal Report of G. Gaukler) ¶ 4.

Before purchasing materials for use on the LOGCAP III contract, KBR was required to obtain approval from the Government Administrative Contracting Officer ("ACO") if the purchase would exceed a minimum dollar threshold. Ex. 99 (Jan. 31, 2006 Amendment P00015 to LOGCAP III Base Contract) at '4058 ("For the purpose of purchasing supplies/non-durable goods, the Contractor shall obtain approval from the on-site ACO/COR for each line item on the material requisition exceeding the threshold of $25,000.00 on either a unit or cumulative effort."); Ex. 49 (July 10, 2007 DCMA Memorandum) at '1658 (same). While the LOGCAP III contract set baseline thresholds for approval of material requisitions, "individual Task Orders [could] require more stringent approval thresholds." Ex. 49 (July 10, 2007 DCMA Memorandum) at '1659.

To obtain approval from the ACO, KBR was required to submit its proposed materials requisition to the ACO and certify that it had attempted to fill the requisition through cross-leveling before purchasing. Ex. 138 (McNamara Dep.) 416:10-20. KBR's requisitions specified, among other things, the items that KBR intended to purchase, their quantities, unit price, and total amount. *See, e.g.*, Ex. 2 (sample purchase requisition). KBR submitted the material requisitions together with a cross-leveling certification, which was "always part of the contract." Ex. 138 (McNamara Dep.) 421:3-11. In the certifications, KBR was required to attest it had "checked for theater-wide redistribution under cross-leveling process." Ex. 138 (McNamara Dep.) 413:17-414:18; Ex. 2 (sample purchase requisition) at 3. The certification was a requirement for KBR to purchase the property in question. Ex. 138 (McNamara Dep.) 414:19-415:6.

KBR additionally certified that it had attempted to fill material requisitions through cross-leveling via a "Commercial Purchase Justification," which KBR was required to prepare for all material requisitions that included a commercial item. Ex. 17 (Nov. 26, 2008 DCMA Memorandum) at '6903-04; Ex. 126 (Haught Dep.) 58:5-13. The Commercial Purchase Justification required KBR to represent that "Local Cross Level, DMC, and Theatre Inventory was checked" for the items KBR in the requisition. Ex. 17 (Nov. 26, 2008 DCMA Memorandum) at '6905. Making clear the Government's expectations, the Commercial Purchase Justification advised KBR that "[t]he purpose of this form is to follow the priorities as listed in the SOW, and show due diligence in verifying that items cannot be filled through existing stocks available." *Id*. The Government required KBR to include the Commercial Purchase Justification "in all MR packets provided to the Administrative Contracting Officer (ACO) for approval." *Id*. at '6903; Ex. 64 (reflecting ACO approval of MR with Commercial Purchase Justification).

Following ACO approval of a material requisition, KBR incorporated the materials into a purchase order. Ex. 96 (Expert Report of G. Gaukler) at 23. Once it had purchased the items, KBR incorporated the cost of the purchased items into the public vouchers it presented to the Government for payment. *Id*. at 22–23.

The materials that KBR systemically overordered under the LOGCAP III contract appear in tens of thousands of separate purchase requisitions. The MAXIMO/STEAM system records the requisitions that KBR prepared, including the cost of the items in the requisition. *Id*. at 23. Relators' expert witness, Dr. Gary Gaukler, has compared the requisitions in MAXIMO/STEAM to the lines of inventory that KBR overordered. Ex. 96 (Expert Report of G. Gaukler) at 39. From the results of that comparison, Professor Gaukler assessed whether the requisitions that included overordered lines of inventory had been subject to ACO approval, either because the material

requisition went through WACOAPPR status in MAXIMO/STEAM or the requisition's amount exceeded the Government's threshold for ACO approval. *Id*. at 39. Applying this analysis, Professor Gaukler identified 10,468 requisitions that contained overordered items and that went through WACOAPPR status, exceeded the threshold for ACO approval based on their cost characteristics, or both. *Id*. at 40. Each of those requisitions falsely certified to the ACO that KBR had "checked for theater-wide redistribution under cross-leveling process."

The process of returning unneeded, excess inventory to the Government was called the Plant Clearance Automated Reutilization Screening System, or "PCARSS." Ex. 127 (Hippert Dep.) 156:6-24. "The intent of the PCARSS process is to demonstrate that all reasonable steps possible have been taken to ensure that all of the items being sent to the PCARSS process have no remaining use on the LOGCAP III project, that KBR has done everything possible to maximize the usage of these items . . . ." Ex. 88 (containing June 18, 2009 internal KBR email) at '4356. When returning items to the Government by declaring them as excess, KBR certified that "[i]t has been determined that this property is excess to the contract and there is no further use in support of the mission requirements," "[t]he attached list of item(s) have been screened for cross level requirements throughout the theater of operation," and "[a]t this time, there are no foreseeable requirements in support of the current mission." Ex. 45 (PCARSS Form) at '4258. In other words, when KBR sent items into PCARSS, it was representing to the Government that there was "no longer [] a need for it." Ex. 133 (KBR 30(b)(6) (Lust) (Sept. 29, 2021) Dep.) 88:25-89:17.

Relators' expert, Dr. Gaukler, analyzed KBR's inventory and purchasing data to identify specific cases when KBR over-ordered materials that it had available for cross-leveling under KBR's then-existing procedures. *See* Ex. 96 (Expert Report of G. Gaukler). Analyzing 34.5 million transactions found in this data, Dr. Gaukler determined KBR's inventory balances at every given

point in time between May 28, 2007 and March 5, 2013. *Id*. § IV.A. Dr. Gaukler validated his analysis of KBR's inventory balances by using corroborating information in the transactions. 98.5% of the transactions were internally consistent, and Dr. Gaukler conservatively screened the remaining 1.5% in order to block balance reconstruction when the transactions suggested any uncertainty. *Id*. § IV.B. He also compared his conclusions to KBR's ASL [authorized stock list] reports, and found that they matched 98% of the time and that when there was a discrepancy his model typically underestimated inventory balances. Ex. 105 (Expert Rebuttal Report of G. Gaukler) § IV.E.

Dr. Gaukler then applied KBR's own procedures to the inventory levels in order to classify KBR's inventory as Stock, Non-Stock, or Special at any given point in time according to KBR's own procedures and standards. Ex. 96 (Expert Report of G. Gaukler) § IV.C. Under KBR's procedures, these classifications determine how much of an item's inventory is available for cross-leveling. *Id.* § IV.D.

Dr. Gaukler then analyzed KBR's purchase order data over the same period of time to identify cases when KBR purchased something new even though the item being purchased was available for cross-leveling according to KBR's own procedures. *Id*. § IV.D. Dr. Gaukler applied KBR's procedures as KBR had defined them in its Rule 30(b)(6) testimony, including additional "restrictions" on cross-leveling that do not appear in KBR's procedures. *Id*. This means that Dr. Gaukler's analysis is highly conservative, as the restrictions he accepted included ones that the Government did not know about and that the Government would have referred to DCAA had it known. Ex. 143 (Sheridan Dep.) 155:5-156:13.

Dr. Gaukler concluded that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that should not have been purchased if KBR had followed its

own procedures and standards regarding cross-leveling. Ex. 96 (Expert Report of G. Gaukler) at 5. Dr. Gaukler later adjusted the total amount of excess purchases to $338 million (a reduction of less than 1%) after applying corrections that he had identified in rebuttal of KBR's expert William Walter. Ex. 105 (Expert Rebuttal Report of G. Gaukler) § IV.C.viii.

KBR submitted its costs to the Government for reimbursement. *See* Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) at 31:7-14, 37:5-10; Ex. 84 (KBR Response to Interrogatory No. 10). Consequently, the Government reimbursed KBR for the entire $341 million it had incurred unnecessarily. *See* Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 24:9-14 ("Q. . . . Are you aware sitting here today of any pieces of property and materials that KBR bought and received on LOGCAP III that the government paid less than a hundred percent of what KBR spent buying the property and material? A. I am not aware."), 31:7-14 ("Q. . . . [A]s a general matter were KBR's costs spent procuring property and materials that KBR procured and received on LOGCAP III, did those costs ultimately end up on the public vouchers KBR submitted to the U.S. Government? A. In general the costs incurred based on receipts of materials and equipment were included on a public voucher, in general."). Moreover, Dr. Gaukler was able to directly trace $226 million of the $341 million of unnecessary purchased items to specific public vouchers. Ex. 96 (Expert Report of G. Gaukler) at 39. Those public vouchers expressly represented that these $226 million of over-ordered supplies were "necessary for performance" of LOGCAP III. SOF ¶¶ 151-157.

Dr. Gary Gaukler identified 899 public vouchers associated with unnecessary costs incurred because KBR purchased items despite existing excess material being available in theater. For example, on July 14, 2008, KBR submitted Public Voucher No. 47 for Task Order 139. That Public Voucher requested reimbursement for the cost of purchase order line ("POLINE") (#771983), on purchase order number ("PONUM") #4750053582 for 15 1.5HP blower motors

ordered on July 1, 2008 (item number 1001331456), for a total cost of $7,725, despite the fact that the 15 blower motors were all available in excess in other KBR storerooms. Ex. 120 (Expert Rebuttal Report of G. Gaukler, Output 3); Ex. 118 (Expert Report of G. Gaukler, Output 1); Ex. 114 (ZBILL20080714-044718-GC00GY) at Tab "ZBILL20080714-044718-GC00GY," Row 1376 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Trns Amt: "7,725.00"); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57," at Tab "Yr 2 Detail 2008," Row 128 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: "GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Obj Amt: "7,725.00"). Dr. Gaukler concluded that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling. On the occasions when KBR actually followed its cross-leveling procedures, and the database showed cross-level was supportable, the underlying circumstances rarely led KBR to deny a cross-level request. Moreover, Dr. Gaukler's model incorporates KBR's documented cross-level denials, and it reduces the value of KBR's $341 million in over-ordering by a mere $800,000. Ex. 96 (Expert Report of G. Gaukler) at 5; Ex. 105 (Expert Rebuttal Report of G. Gaukler) ¶¶ 132-135; Ex. 106 (Supplement to Expert Rebuttal Report of G. Gaukler) ¶ 4.

KBR's attacks on Dr. Gaukler's methodology are meritless. Far from being "never been done before," Dr. Gaukler's model is a straightforward application of fundamental principles of inventory management which are at the core of his expertise.

The first step of the model uses "transactional" data in MAXIMO/STEAM—time-stamped records of inventory counts, issues, returns, transfers, and receipts—in order to conservatively reconstruct how much inventory was sitting in KBR's warehouses at various points during the LOGCAP III contract. Gaukler Report § IV.A. MAXIMO/STEAM does not record the historical balances themselves, but its transactional tables contain the information necessary to reconstruct what those balances were. *Id.* Doing so is equivalent to determining someone's past monthly bank balances given a starting and ending balance and a list of debits and credits.

MAXIMO/STEAM also contains corroborating information which allowed Dr. Gaukler, in conjunction with KBR's procedures, to objectively establish a very high degree of confidence in the reconstruction results. Gaukler Report § IV.B; Gaukler Rebuttal Report § IV.E; Gaukler Dep. § 114:14–115:11. This information allowed him to identify a small set of discrepant transactions (less than 1.5% of the data set) which he handled conservatively. Gaukler Report § IV.B; Gaukler Dep. 75:19–76:1. Dr. Gaukler also compared his balance reconstructions to KBR's Authorized Stock List ("ASL") reports, which are contemporaneous records generated by KBR using the MAXIMO data that show KBR's inventory balances on the date of the report. Gaukler Rebuttal Report § IV.E. Dr. Gaukler's model matched the ASL inventory balances over 98% of the time, and when there was a discrepancy, the modeled balance was lower than the recorded ASL balance two thirds of the time. *Id.* These observations confirm both the model's accuracy and its conservativism.

Dr. Gaukler's reconstruction approach is "never before done" only insofar as it was being done on KBR's data, which would not be the subject of peer-reviewed research. Gaukler Dep. 99:24–100:2. The methods and concepts the model uses, on the other hand, are as old and familiar as addition and subtraction. Gaukler Report § IV.A.1.iii.

The second step of the model is, if anything, even more straightforward than the first. It consists of applying KBR's stated cross-leveling procedures to the inventory balances reconstructed in the first step, and evaluating KBR's approved purchase orders based on those procedures to see whether some or all of those purchase orders could have been fulfilled by inventory which was available for cross-leveling at the time of the purchase. Gaukler Report § IV.D. He then determined the cost of those items and linked them to KBR's purchase requisitions and, where possible, to public vouchers, using KBR's ZBILL data and a crosswalk which it provided. Gaukler Report §§ V–VI. Here, again, Dr. Gaukler's analysis is as simple as "make the system do what the documents say should be done."

Dr. Gaukler is well-qualified to perform this analysis. He is a recognized expert in inventory management and analyzes inventory data as part of his professional research, and he has the programming skills necessary to apply that expertise to large data sets such as MAXIMO/STEAM. Gaukler Report§ I. KBR's complaints that the analysis has "never been done before" and is "non-peer reviewed" entirely miss the mark. KBR's LOGCAP III database is unique and specific; it is unremarkable that an expert has not analyzed it before in litigation, and it is unthinkable that it would have been the subject of peer-reviewed studies. Gaukler Dep. 99:24–100:2. The methodology that Dr. Gaukler applies to the MAXIMO/STEAM database is not novel. Gaukler Dep 107:16–17 (describing the analysis as "fairly straightforward"). He applies simple arithmetic—addition and subtraction—to the voluminous records KBR produced and follows the instructions set forth in KBR's own procedures. Gaukler Report § IV.A.1.iii, § IV.D. Though informed by his expertise in inventory management, Dr. Gaukler had no need to rely on outside research to determine KBR's inventory balances, apply its cross-leveling procedures, and assess whether its purchases should have been cross-leveled according to those procedures, because he

relied on KBR's own data and documents. Gaukler Report § IV; Gaukler Rebuttal Report § IV.E (analysis "process[es] each and every transaction . . . under the rules reflective of KBR's policies and procedures"); Gaukler Dep. 113:1–12 (analysis is based on "documentation from KBR").

<u>KBR SOF 42.</u>  "None of the expert or fact witnesses in this case has identified objective standards (nor even any concrete guidance) about cross-leveling from any of the agencies relevant to this litigation—the Defense Contract Management Agency ('DCMA'), the Defense Contract Audit Agency ("DCAA"), and the Army. [KBR] Ex. 24, Goetz Rep. at 23-24 ('In all of my 40+ years of experience in dealing with Government property, I have not seen the term 'cross leveling' used. That term is not used or defined in the FAR or the DFARS. It was not a term used in the DOD Property Manual, nor is it used in the current DoD Contract Property Guidebook or the DCMA Guidebook for Contract Property used today. [. . . ] I understand that cross-leveling is not defined in the LOGCAP III base contract, modifications, or task orders. The Property faculty at [the Air Force Institute of Technology/Defense Acquisition University] did not train [property administrators] to perform analysis of cross-leveling and neither does the DOD Property Manual require them to do so. I am aware of no objective, applicable criteria for assessing KBR's 'crossleveling' on LOGCAP III. [. . . ] Accordingly, in my opinion, it is improper today to apply a crossleveling standard to KBR's performance on LOGCAP III that did not exist and was not applied by [the Government] during the relevant time period.'); [KBR] Ex. 40, Rudolph Rep. at 43-46 (surveying Government and industry standards and identifying no objective standards pertaining to crossleveling); [KBR] Ex. 42, Rudolph Rebuttal Rep. at 2 (identifying no objective standards pertaining to cross-leveling)."

**Relators' Response to KBR SOF 42.**

The statement of fact is disputed.

Cross-leveling describes a basic and fundamental concept of inventory management—if you have more items on hand than needed, use those available items before ordering more. Put simply, it is the process of filling a need for items at one site with excess from another site. *See* Ex. 136 (Lust Dep.) 28:19-22 22: (Q. Can you explain what cross-leveling is? A.  When a requirement is generated at one location, . . . material from another location is used to satisfy the requirement at the first location."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 23:18-24:4: ("Cross leveling is when you move an item from one site to another site to satisfy a demand at the second site . . . . without going to the procurement system to get an item."); Ex. 142 (Rock Dep.) 52:20-53:4: ("My familiarity with cross-leveling is that when various bases had material that they weren't using that another based had obligation for due to projects by the government, et cetera, and that base could allow them to use that material, we cross-level it from one base to another."); Ex. 94 (Expert Report of M. Rudolph) at 43-47.

Cross-leveling is a fundamental and standard part of inventory management in both public and private sectors, and especially in the Department of Defense. Ex. 94 (Expert Report of M. Rudolph) at 4-5 ("Cross-leveling is not unique to LOGCAP III – it is a practice employed across the private and public sectors (especially within DoD) for effectively and efficiently managing enterprise inventories and operations of the magnitude, breadth, depth, and geographic dispersion required by LOGCAP III."), at 43 ("Cross-leveling is an industry concept and standard for fulfilling demands and, *balancing/rebalancing* enterprise inventories across multiple and disparate site locations to fulfill emerging demands on the system without buying inventory from external sources when it already exists in an excess posture within the enterprise.") (emphasis in original).

In addition to being a standard and expected inventory management practice, under the LOGCAP III contract and in connection with its duties to manage inventory on LOGCAP III, KBR was required to check for available material and use it before buying more, and to only buy supplies and materials necessary for performance under the contract, as both KBR and the Government agreed. Ex. 138 (McNamara Dep.) 279:7-280:2 ("Q. . . . [D]id you have a view on . . . whether KBR was appropriately cross-leveling property in the 2007 to 2012 time period? [Objection.] A. . . . They needed to have been doing it . . . because it was part of . . . their property procedure. It was part of what was required of them as a prudent contractor."), 590:13-19 ("If you are purchasing something and you know that you have a large operation, then as a prudent contractor, you would be required to screen through your system to see if there is any availability of . . . these items or property that you're currently trying to buy . . . ."), 597:20-598:9 ("Q. Do you know . . . when KBR was required to certify that it had attempted to cross-level before making purchase? A. There was a modification to the contract. I don't remember exactly when. It was sometime

after 2006. I don't know if it was 2007 or 2008. . . . [I]t is part of the contract."); Ex. 136 (Lust Dep.) 30:13-17 ("Q. . . . [W]ere you aware that the obligation to cross-level was a contractual requirement in KBR's contract with the United States Government? [Objection.] A. Yes."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 38:22-39:8 ("Q. . . . Any other generally applicable instructions from the U.S. Government concerning KBR cross leveling between task orders other than those that you just referenced? [Objection.] A. . . . Mary Wade, who was the contract administrator for the LOGCAP III contract in Houston, had said that we were to make maximum use of cross leveling where possible. She understood you couldn't do it all the time but where possible."); Ex. 135 (LaBoa Dep.) 70:24-71:21 (agreeing cross-leveling was part of KBR's property control procedures); Ex. 127 (Hippert Dep.) 162:24-163:20 (agreeing his "view at the time" was that cross-leveling was expected); Ex. 134 (King Dep.) 16:21-17:2 ("Q. . . . With respect to KBR's work on LOGCAP-III, was KBR supposed to try to cross-level materials and property before purchasing new materials and property? [Objection.] A. Yes."); Ex. 142 (Rock Dep.) 520:17-22 ("Q. And it was KBR's obligation under LOGCAP III to cross level property [and materials]; is that right, sir? [Objection.] A. I think . . . where possible, yes."); Ex. 141 (Ritondale Dep.) 105:22-106:5 ("Q. . . . [I]s it your understanding that KBR was supposed to try to cross-level property and materials at some point in the procurement process? [Objection.] A. My understanding is at some point in time the cross-leveling was something that was supposed to occur."); Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."), '0037-38 (incorporating FAR 52.216-7, FAR 52.232-20, FAR 52.232-22); FAR 52.216-7; FAR 52.232-20;

FAR 52.232-22; Ex. 48 (Task Order 139 Statement Of Work Change 6) at '5609 ("3.0 CONTRACTOR ACQUIRED OR GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY. Prior to procurement of equipment to support all efforts described in this task order, the contractor shall exercise due diligence in verifying **and certify** that the required items cannot be satisfied from existing stock available from other sites covered by this task order. **This certification shall be provided to the [government] ACO [Administrative Contracting Officer].** . . . 3.1.1. **The Contractor shall adhere to the requirement priorities listed in TABLE 3.1.1. to the maximum extent possible.** For purchases that cannot be obtained **through cross leveling or** from the **Host Country** sources, the contractor shall make maximum use of the Federal Supply System (FSS). **REQUIREMENTS PRIORITIES 1 USG military unit, organic, green suit[;] 2 Cross level within LOGCAP Task Order[;] 3 Other Task Orders within LOGCAP[;] 4 Host Country sources[;] 5 FSS[;] 6 Commercial**.") (emphasis in original); Ex. 41 (Task Order 159 Statement Of Work) at '5488-89 (same, without emphasis); Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5992 ("All property, whether government furnished or KBR acquired, must be: . . . Reasonable quantities, commensurate with the work to be accomplished."), at '5993 ("Consuming: Quantities of material/supplies produced or procured for incorporation into an end item or otherwise consumed will . . . Be reasonable when compared to the work/job at hand and Material Requisitions . . . Be promptly returned to stock and recorded when determined to be excess."), at '5994 ("Government property will be disposed of by: . . . Screening items against existing and anticipated needs . . . Promptly reporting excess items . . . .Receiving property authority from the Government . . . prior to disposal."), at '6015 ("Requisitions for all property, whether government furnished or KBR acquired, must: . . . Be contractually authorized and necessary for performance of the prime

contract . . . Be for the quantities required for said performance . . . ."), at '6017-021 ("Warehouse personnel will first attempt to fill requisitions from stock on-hand.  . . . If suitable property is available for issue, warehouse personnel will [take specific steps] . . . Property may not be available, or there may not be sufficient stock on-hand to fill the entire quantity. When this happens, Material Control takes action to obtain the property for the requester.  . . . Material Control – Processing Requisitions for cross leveling or Purchasing.  . . . Upon return Materials Control will first check the theater inventory to determine if the requisition can be filled from existing stock. If suitable material is located, materials control will forward a copy of the approved Materials Requisitions.  . . . If suitable material/equipment can not be located in the Theater Inventory, Material Control processes the approved MR [material requisition], establishes a manual record file by MR [material requisition] number and forwards to Procurement for purchase action."); Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6168 ("All property, whether government furnished or KBR acquired, must be: . . . Reasonable quantities, commensurate with the work to be accomplished."), at '6169 ("Consuming: Quantities of material/supplies produced or procured for incorporation into an end item or otherwise consumed will be: . . . reasonable when compared to the work/job at hand and Material Requisitions. . . . promptly returned to stock and recorded when determined to be excess."), at '6170 ("Government property will be disposed of by: . . . Screening items against existing and anticipated needs. . . . Promptly reporting excess items. . . . Receiving property authority from the Government . . . prior to disposal."), at '6227 ("Requisitions for all property, whether government furnished or KBR acquired, must: . . . Be contractually authorized and necessary for performance of the prime contract; . . . Be for the quantities required for said performance . . . ."), at '6230-32 ("Material Control personnel will first attempt to fill the requisitions from stock on-hand and will

also check the Automated Inventory Control System for Theater wide availability of the item(s) being requested. . . . If suitable property is available for issue, from on hand stock, warehouse personnel will [take specific steps]. . . . If suitable property is found at another site, the Material Manager or designee will . . . Verify via the owning Site Material Manager that the requested item(s) are excess to that site's need and is available for cross utilization [and take specific steps] . . . . Property may not be available, or there may not be sufficient stock on-hand to fill the entire quantity. When this happens, Material Control takes action to obtain the property for the requester. . . . All requisitions must be coordinated with cost control and approvals obtained from project management, government LOTD'S, and contract modifications, before submitting for procurement action. . . . Upon return Materials Control processes the approved MR [material requisitions], establish a manual record file by MR [material requisition] number and forwards to Procurement for purchase action."), at '6313 ("Consumption of Government property shall be reasonable when compared to requirements. . . . Quantities of property produced or procured for incorporation into an end item or otherwise consumed will . . . Be reasonable when compared to Material Requisitions. On hand stocks in the Materials warehouses will be maintained in reasonable quantities to support contractual requirements and in accordance with specific project policies or replenishment lead time. Stock levels will be based on equipment density, population to be supported, recurring demands or the history of a previous project with like property. . . . Unused Materials from trades on hand stock, special projects, ACL's LOTD's etc must be returned to the Material Warehouse within a reasonable period of time after the work is completed or no demands. Material Control department will ensure returned unused materials are posted to the automated inventory system with appropriate documentation within 48 hrs. Materials determined to be excess must be disposed of in accordance with Disposition Tab."); Ex. 91 ("KBR Distribution

of Government Property DESKTOP OPERATING PROCEDURE," dated Aug. 23, 2008) at '0251 ("The DMC (<u>Distribution Management Center</u>) will be responsible for screening *all* requests for procurement action for possible Cross Level support. . . . All requisitions for procurement action will flow through the DMC and be screened for availability within theater prior to purchase.") (emphasis in original), at '0256 ("If a site foresees a need for an item(s), it is contractually obligated to attempt to obtain the items through cross utilization within its project (group of sites)."); Ex. 101 (Nov. 2, 2007 DCMA Letter of Technical Directive to KBR) at '6706 ("All equipment MRs [material requisitions] shall be initially submitted to the site ACO. . . . All equipment MRs [material requisitions] shall contain the following information: . . . (3) Has KBR checked for theater-wide re-distribution under the cross-leveling process?"); Ex. 24 (July 1, 2009 KBR Technical Direction Bulletin re: PCARSS) at '4270 ("KBR has a responsibility to cross level before purchase."); Ex. 34 (containing June 4, 2011 email from KBR's Head of the DMC, C. O'Muirgheasa) at '3826 ("It is a contractual requirement on LOGCAP III to cross level items in order to reduce spending, eliminate excess, and, nowadays just as importantly, get available material to other[] sites ASAP."); Ex. 44 (June 30, 2011 internal KBR email from T. Hippert to M. Wade) at '0608 ("LOGCAP III . . . is reporting cost avoidance on material that is excess in one camp and moved to another, we call that cross-leveling. These slides are being briefed to the Government and I don't think it's a true cost avoidance. My concern is that the government paid for the material and we are expected to be good stewards and properly manage the inventory. So c[ross]-level is expected."); Ex. 71 (July 2, 2009 Analysis by KBR's Head of the DMC) at '1369 ("Our mission is to cross level materials from locations where there is redistributable material to locations where there is a need for those materials."); Ex. 94 (Expert Report of M. Rudolph) at 19 ("KBR was obligated to cross level property and materials on LOGCAP III.") (citing sources).

KBR SOF 46. "The U.S. Army Audit Agency ('AAA') conducted a series of audits to 'address the visibility, management, and use of property in the possession of contractors' under LOGCAP III. [KBR] Ex. 14, AAA Rep. at KBR-HOW-8650674 (Sept. 28, 2010). One of the audit reports said that KBR 'sometimes didn't follow its processes and procedures to cross-level' even though the 'LOGCAP contract requires the contractor to fill requirements with existing stock.' *Id*. at KBR-HOW-8650683. The audit report further noted that although AAA's review was limited in terms of time and location, 'similar results could occur at other [KBR] locations within theater.' *Id*. at KBR-HOW-8650675. The AAA issued no formal warning or guidance to KBR about its crossleveling as a result of this audit. *Id*. at KBR-HOW-8650683—KBR-HOW-865068684 (issuing recommendations for DCMA 'to improve government oversight and management of existing stock available at sites covered by the task order') (emphasis added)."

**Relators' Response to KBR SOF 46.**

This statement of fact is disputed. The AAA is charged with auditing the Government, not contractors like KBR. Further, this statement is disputed to the extent that through it KBR implies that it did not systemically fail to cross-level, or that the Government was aware of KBR's systemic failures in that regard. The AAA made no finding of the key fact in this case: that each time KBR ordered new supplies it knew it had hundreds of millions of dollars' worth of supplies in its warehouses it had improperly placed off-limits from cross-leveling. The AAA makes no findings of manipulation of KBR's inventory management system, a cover-up by KBR, or that the scope of KBR's failure might have cost the Government hundreds of millions of dollars in unjustified reimbursement. In short, the AAA discovered merely that "sometimes" KBR "didn't follow its own procedures when cross-leveling." In addition, KBR's failures to cross level were not isolated incidents but were pervasive and systemic. *See, e.g.*, Ex. 66 (Feb. 28, 2010 internal KBR email from KBR's Head of the DMC, C. O'Muirgheasa) at '4132 ("In 2009, 65% of Requisitions] were put into MATCON, representing 51% of the dollars. So, **35% of the Req[uisitions] bypassed us [KBR's DMC], representing almost 50% of the dollars.**") (emphasis added); Ex. 67 (KBR data) at '4133 (quantifying that in 2007, out of 65,372 Material Requisitions valued at $1,237,891,670.75, a total of 52,488 (80.3%) of those Material Requisitions valued at $949,886,655.51 (76.7% of the dollars) were not checked for cross-leveling; in 2008, out of 90,025

Material Requisitions valued at $1,171,737,717.95, a total of 49,683 (55.2%) of those Material Requisitions valued at $647,308,265.68 (55.2% of the dollars) were not checked for cross-leveling; and in 2009, out of 65,526 Material Requisitions valued at $ 812,554,107.70, a total of 23,124 (35.3%) of the Material Requisitions valued at $401,484,184.06 (49.4% of the dollars) did not go to the DMC for the cross-leveling check); Ex. 3 (Internal KBR email containing Dec. 29, 2008 email from KBR's Head of the DMC, B. Simmons) at '4448 ("The three major factors impeding the DMC's ability to Cross Level under utilized materials are as follows: 1) Categorization of ASL/Inventory Lines (i.e. reflecting [STK] when demands indicates [SP] or [NS] category)[;] 2) Unresponsive Sites/Projects to Tasking leading to Denials[;] 3) Sites/Projects resistant to place Material Requisitions in MATCON Status; consequently, sending the Majority (if not All) directly through Procurement Channels."); Ex. 81 (Mar. 20, 2010 email from KBR Deputy Program manager – Support, R. Kaye, to KBR Deputy Principal Program Manager, Larry Lust) at '9112 ("Last year, fully **35% of all requisitions (with an extended value of $401M[illion]) by-passed the cross-leveling check**. As we start to turn over more and more materials to GOI [Government of Iraq], we are facing an **increasing risk of being Formed 1 for buying items we just declared excess and gave away**. … [A]s of yesterday, we [had] **43,801 lines across Iraq being carried as STK that have 2 or fewer demands in the past 360 days**. We did a trial run on three sites and determined that 80% of their STK lines had RO [Requisition Objectives] and ROP [Reorder Points] set above what it should be based upon demand history. … We've got **$71M[illion] in reserved stock of which less than 50% is legitimate**. The rest is against cancelled ACLs, completed ACLs, or just plain **'hidden' from cross-leveling**. **TREC storerooms is going to be my biggest challenge….we've currently got $331M[illion] in them as of yesterday**. I've told Guy [LaBoa, KBR Principal Program Manager] this is the **Mother of all Forms 1**.") (emphasis

added); Ex. 82 (Apr. 1, 2010 internal KBR email from KBR Deputy Program Manager – Support, R. Kaye, to KBR Principal program Manager, G. LaBoa) at '7417 ("The deeper I dig, the more uncomfortable I become that we really do know what's going on. We've got **continuing issues with RO [Requisition Objective], ROP [Reorder Point], Stk vs Non-Stk, reservations and TRECs**.") (emphasis added); Ex. 82 (June 2009 email from KBR employee) at ECF Page 4 ("He said they are **placing everything on reserve so DMC won't ask for it CL [cross-level]**.") (emphasis added); Ex. 8 (Internal KBR email containing Feb. 25, 2010 email from KBR's Deputy Program Manager – Support, R. Kaye) at '0062 ("We are purchasing $5 M per day when we've got $1.2 B i[n] excess on hand. At some point, the DCAA is going to put KBR out of business if we keep doing this."); Ex. 96 (Expert Report of G. Gaukler) at 5 (concluding that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling); *see also, e.g.*, SOF ¶¶ 52-86.

Second, the Government was not aware of the fact that KBR's failure to cross-level was pervasive and systemic. Indeed, KBR took steps to hide its failures to cross-level from the Government. *See, e.g.*, Ex. 26 (May 4, 2009 internal KBR email containing May 4, 2009 email from J. Haught) at ECF Page 2 ("I don't think we should be showing underutilized on anything that can be seen by USG"); Ex. 43 (internal KBR email) at '6463 (June 18, 2008 email from KBR's Director of Supply Management, T. Hippert, to KBR Senior Vice President, Bill Walter, and others, stating "I'm not providing the Internal audit and I explained that to DCMA . . . . Maria [McNamara of DCMA] wants the actual Audit's (sic) that we perform, I told her we can not provide them."), '6464 (email from Michael Mayo) ("We approach the SMART reports the same as the Procurement Compliance reports and corrective action plans. Those are not released from

the Project to [the] USG."); Ex. 19 (June 2008 internal KBR email) at '4711-12 (KBR's Head of its SMART Audit Team, Jim King, stating "I need copies of all the site(s) corrective actions/milestones of all the reviews that have been conducted by the SMART team. The Government is asking for these and we agree to provide them but we will not provide a copy of the actual Review/checklist."), at '4711 (KBR's Director of Supply Management, Ty Hippert, stating "I explained that we can not release any internal reviews at this point, but I see no harm in releasing corrective action reports."); Ex. 54 (Internal KBR email containing Mar. 19, 2009 email from KBR's Senior Manager – Government Compliance, John Webb) at '0916 ("[T]here were some concerns with the details in the report Reggie [KBR SMART Audit Team member] prepared. It was very well written, but Compliance wants more of a summary with a positive spin because corrective actions have been taken. Attached are the original reports that Reggie [KBR SMART Audit Team member] prepared and a revision prepared by Compliance."). KBR's head of its SMART Audit Team, Jim King, did not agree with what Government Compliance did, stating that it "tried to soften the report too much" and that the rewritten report was "too vague in what was found during the [KBR SMART Audit] review," but ultimately decided not to make any changes to the Compliance group's version of the report. *Id*. at '0915; *see also* Ex. 134 (King Dep.) 255:22-256:22 (describing report ultimately given to the Government as a "more watered down version"; "[n]ot hiding anything, but not enough detail either."). KBR's Director of Supply Management, Ty Hippert, described Government Compliance's "softening" of the report as "turn[ing] Chicken crap into Chicken soup…" Ex. 54 (internal email) at '0914; Ex. 134 (King Dep.) 272:1-10 ("Q. . . . Turning chicken crap into chicken soup means taking something that's in fact something bad and trying to turn it into something good, that's what that means? A. Yes. [Objection.] Q. You write

at the top: [']Bingo HAAAAA.['] So you [a]greed with Mr. Hippert's assessment regarding chicken soup, correct? A.  That's correct."); *see also* SOF ¶¶ 87-136.

<u>KBR SOF 48.</u>  "The DCAA Audit Manuals used by DCAA during the relevant time period do not contain or define the term 'cross-leveling,' and do not set any objective criteria or standards for assessing KBR's cross-leveling of materials. *See generally* DCAA Contract Audit Manual – Archives, https://bit.ly/3AfKhEb (accessed Aug. 21, 2022)."

**<u>Relators' Response to KBR SOF 48.</u>**

This statement of fact is disputed. The archives KBR cites to contains 20 different versions, published between 2005 and 2018, of purported "DCAA Contract Audit Manuals." It is not clear which version or versions KBR is citing. Moreover, contrary to KBR's assertion, the manuals provide that all contractor audits will emphasize determining "the overall acceptability of the contractor's claimed costs with respect to: (1) the reasonableness of nature and amount … " *See* DCAA Contract Audit Manual July 2009, Volume 1, at 6-102.2.

KBR SOF 50.  "In April 2011, DCAA published the results of an audit regarding the 'efficiency and reasonableness' of KBR's cross-levelling in Iraq in response to the military's troop drawdown under LOGCAP III Task Order 159. [KBR] Ex. 15, DCAA Rep. at DCAA-HOWARD-00019194 (Apr. 10, 2011). In its report, DCAA stated that (1) KBR 'has a process to use cross leveling on equipment,' and '(2) based on a review of 47 procurement files," KBR failed to attempt to crosslevel before making 1 out of 47 purchases. *Id*. DCAA concluded that it would 'close [the] audit assignment 'as a NO GO.' *Id*. at DCAA-HOWARD-00019195."

**Relators' Response to KBR SOF 50.**

This statement is disputed. While this statement reflects what the language of the DCAA report states, what the DCAA observed and reported was based on the limited information that KBR provided to it, and the DCAA was not aware of KBR's efforts to keep its systemic failures hidden from discovery. *See* SOF ¶¶ 87-136.

## III. DISPUTED IMMATERIAL FACTS

The following facts from KBR's SOF are both immaterial and disputed, for the following reasons.

KBR SOF 1. "The relevant time period in this case is January 2007 to January 2012. [KBR] Ex. 20, Relators' First Set of Requests for Production ("RFP") at 1 (Oct. 22, 2015)."

**Relators' Response to KBR SOF 1.**

The statement of fact is immaterial. The definition of the relevant time period does not "bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter. The definition of the relevant time period does not "bear directly" on the issues of falsity or scienter raised by KBR's motion.

The statement of fact is disputed. As an initial matter, KBR's statement of fact is not supported with citation to evidence in the record as required by Fed. R. Civ. P. 56(c). The only material KBR cites is Relators' First Set of Requests for Production to KBR. However, those document requests for discovery merely define the term "Relevant Time Period" for purposes of the document requests themselves. *See* KBR Ex. 20 (Relators' First Set of Requests for Production, dated Oct. 22, 2015) at 1 ("*As used herein*, the terms listed below are defined as follows: . . . The term 'Relevant Time Period' means January 1, 2007 to January 1, 2012.") (Emphasis added). The definition of "Relevant Time Period" for purposes of Relators' document requests did not purport to, nor did it, limit the relevant time period in this case.

Furthermore, events and documents that pre-date January 1, 2007, and that post-date January 1, 2012, are relevant to this case. For example, the LOGCAP III "base contract" is dated December 14, 2001. *See* Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0001 ("Date Signed 12/14/01" and "14 Dec. 2001"). For another example, KBR submitted public vouchers (KBR's invoices to the Government) under LOGCAP III after January 1, 2012. *See*

Ex. 112 (PDF of Native Excel Spreadsheet KBR-HOW-9031407 KBR Public Voucher #89 for Task Order 159) at '1407, Tab "1034-Task 159" ("DATE VOUCHER PREPARED 2/28/12"; "**Cost for Jan – Feb 12**") (emphasis in original).

KBR's Statements of Fact 3, 4, 9, 12, 13, 14, 20, 21, 26, 34, 38, 44, and 48 also use the uncapitalized phrase "relevant time period." Relators dispute KBR's use of the phrase "relevant time period" in those Statements of Fact for the same reason described here. For the Court's convenience, Relators do not repeat their same response every time KBR used the phrase "relevant time period."

KBR SOF 20. "During the relevant time period, PMSAs and PCSAs assessed KBR's compliance with the property functions of the FAR, as detailed in DOD 4161.2-M, DOD Manual for the Performance of Contract Property Administration ("the DOD Property Manual"). [KBR] Ex. 16, DOD Property Manual, Chs. 3 & 4; [KBR] Ex. 24, Goetz Rep. at 21-23; [KBR] Ex. 35, McNamara Dep. (Nov. 13, 2019) at 86:8-87:6."

**Relators' Response to KBR SOF 20.**

The statement of fact is immaterial. The PMSAs and PCSAs do not "bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter. Whether or not PMSAs or PCSAs assessed KBR's compliance with the property functions of the FAR do not "bear directly" on the issues of falsity or scienter raised by KBR's motion. Irrespective of such PMCAs or PCSAs, KBR knowingly submitted claims for payment that were false, particularly insofar as KBR systemically failed to cross-level, including bypassing the cross-leveling process half the time and manipulating inventory to artificially decrease items available to cross-level. *See, e.g.*, Ex. 66 (Feb. 28, 2010 internal KBR email from KBR's Head of the DMC, C. O'Muirgheasa) at '4132 ("In 2009, 65% of Requisitions] were put into MATCON, representing 51% of the dollars. So, **35% of the Req[uisitions] bypassed us [KBR's DMC], representing almost 50% of the dollars**.") (emphasis added); Ex. 67(KBR data) at '4133 (quantifying that in 2007, out of 65,372 Material Requisitions valued at $1,237,891,670.75, a total of 52,488 (80.3%) of those Material Requisitions valued at $949,886,655.51 (76.7% of the dollars) were not checked for cross-leveling; in 2008, out of 90,025 Material Requisitions valued at $1,171,737,717.95, a total of 49,683 (55.2%) of those Material Requisitions valued at $647,308,265.68 (55.2% of the dollars) were not checked for cross-leveling; and in 2009, out of 65,526 Material Requisitions valued at $ 812,554,107.70, a total of 23,124 (35.3%) of the Material Requisitions valued at $401,484,184.06 (49.4% of the dollars) did not go to the DMC for the cross-leveling check); Ex. 3 (Internal KBR email containing Dec. 29, 2008 email from KBR's Head of the DMC, B. Simmons) at '4448 ("The three major factors impeding

the DMC's ability to Cross Level under utilized materials are as follows: 1) Categorization of ASL/Inventory Lines (i.e. reflecting [STK] when demands indicates [SP] or [NS] category)[;] 2) Unresponsive Sites/Projects to Tasking leading to Denials[;] 3) Sites/Projects resistant to place Material Requisitions in MATCON Status; consequently, sending the Majority (if not All) directly through Procurement Channels."); Ex. 81 (Mar. 20, 2010 email from KBR Deputy Program manager – Support, R. Kaye, to KBR Deputy Principal Program Manager, Larry Lust) at '9112 ("Last year, fully **35% of all requisitions (with an extended value of $401M[illion]) by-passed the cross-leveling check**. As we start to turn over more and more materials to GOI [Government of Iraq], we are facing an **increasing risk of being Formed 1 for buying items we just declared excess and gave away**. … [A]s of yesterday, we [had] **43,801 lines across Iraq being carried as STK that have 2 or fewer demands in the past 360 days**. We did a trial run on three sites and determined that 80% of their STK lines had RO [Requisition Objectives] and ROP [Reorder Points] set above what it should be based upon demand history. … We've got **$71M[illion] in reserved stock of which less than 50% is legitimate**. The rest is against cancelled ACLs, completed ACLs, or just plain **'hidden' from cross-leveling**. **TREC storerooms is going to be my biggest challenge….we've currently got $331M[illion] in them as of yesterday**. I've told Guy [LaBoa, KBR Principal Program Manager] this is the **Mother of all Forms 1**.") (emphasis added); Ex. 82 (Apr. 1, 2010 internal KBR email from KBR Deputy Program Manager – Support, R. Kaye, to KBR Principal program Manager, G. LaBoa) at '7417 ("The deeper I dig, the more uncomfortable I become that we really do know what's going on. We've got **continuing issues with RO [Requisition Objective], ROP [Reorder Point], Stk vs Non-Stk, reservations and TRECs**.") (emphasis added); Ex. 7 (June 2009 email from KBR employee) at ECF Page 4 ("He said they are **placing everything on reserve so DMC won't ask for it CL [cross-level]**.")

(emphasis added); Ex. 8 (Internal KBR email containing Feb. 25, 2010 email from KBR's Deputy Program Manager – Support, R. Kaye) at '0062 ("We are purchasing $5 M per day when we've got $1.2 B i[n] excess on hand. At some point, the DCAA is going to put KBR out of business if we keep doing this."); Ex. 96 (Expert Report of G. Gaukler) at 5 (concluding that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling); *see also, e.g.*, SOF ¶¶ 52-86.

The statement of fact is also disputed.

First, the purported DOD 4161.2-M, DOD Manual for the Performance of Contract Property Administration, which KBR has attached as KBR Exhibit 16, does not control the inventory management function, which KBR was required to perform under LOGCAP III and task orders. Ex. 125 (Goetz Dep.) 7:22-8:3 ("Q. You understand that one of KBR's functions under LOGCAP III, which is the subject of this lawsuit, is KBR's responsibility to manage inventory; correct? A. Yes, sir.").

Second, KBR's expert, Dr. Douglas Goetz, has never been responsible for managing inventory and therefore lacks personal or expert knowledge of, and would have no basis to write a manual governing, the inventory management function. Ex. 125 (Goetz Dep.) 7:18-8:3 ("Q. Have you ever been responsible for directly managing inventory? A. No, sir. Q. You understand that one of KBR's functions under LOGCAP III, which is the subject of this lawsuit, is KBR's responsibility to manage inventory; correct? A. Yes, sir.").

Third, the purported DOD 4161.2-M, DOD Manual for the Performance of Contract Property Administration that KBR has attached as KBR Exhibit 16 itself identifies that the relevant

yardstick for evaluating the contractor's application and/or compliance is the contractor's written property control procedures:

> The property control system established and maintained by the contractor normally consists of written property control procedures, and the application and/or compliance with those procedures. It is normal industry practice to provide for the control of property by means of written procedures that communicate company standards, techniques, and instructions to operational personnel. These procedures provide the PA [Property Administrator] with the yardstick by which the contractor's application and/or compliance shall be evaluated. The PA [Property Administrator] shall evaluate the contractor's written procedures and the application and/or compliance thereof.

KBR Ex. 16 ("DoD Manual for the Performance of Contract Property Administration," "December 1991") at 4-1. This conflicts with the statement of KBR's expert, Dr. Goetz, that "the relevant yardstick ultimately for a PMSA was not whether KBR was following its own procedures, but whether it was adequately meeting the obligations imposed by the FAR Government property clause." *See* KBR Ex. 24 (Goetz Rep.) at 7.

Finally, Relators dispute KBR's assertion that the "PMSAs and PCSAs assessed KBR's compliance with the property functions of the FAR . . . ." Substantial evidence shows that KBR hid its failures from the Government and that the Government did not have complete information. *See, e.g.*, Ex. 26 (May 4, 2009 internal KBR email containing May 4, 2009 email from J. Haught) at ECF Page 2 ("I don't think we should be showing underutilized on anything that can be seen by USG"); Ex. 43 (internal KBR email) at '6463 (June 18, 2008 email from KBR's Director of Supply Management, T. Hippert, to KBR Senior Vice President, Bill Walter, and others, stating "I'm not providing the Internal audit and I explained that to DCMA . . . . Maria [McNamara of DCMA] wants the actual Audit's (sic) that we perform, I told her we can not provide them."), '6464 (email from Michael Mayo) ("We approach the SMART reports the same as the Procurement Compliance reports and corrective action plans. Those are not released from the Project to [the] USG."); Ex. 19 (June 2008 internal KBR email) at '4711-12 (KBR's Head of its SMART Audit Team, Jim King,

stating "I need copies of all the site(s) corrective actions/milestones of all the reviews that have been conducted by the SMART team. The Government is asking for these and we agree to provide them but we will not provide a copy of the actual Review/checklist."), at '4711 (KBR's Director of Supply Management, Ty Hippert, stating "I explained that we can not release any internal reviews at this point, but I see no harm in releasing corrective action reports."); Ex. 54 (Internal KBR email containing Mar. 19, 2009 email from KBR's Senior Manager – Government Compliance, John Webb) at '0916 ("[T]here were some concerns with the details in the report Reggie [KBR SMART Audit Team member] prepared. It was very well written, but Compliance wants more of a summary with a positive spin because corrective actions have been taken. Attached are the original reports that Reggie [KBR SMART Audit Team member] prepared and a revision prepared by Compliance."). KBR's head of its SMART Audit Team, Jim King, did not agree with what Government Compliance did, stating that it "tried to soften the report too much" and that the rewritten report was "too vague in what was found during the [KBR SMART Audit] review," but ultimately decided not to make any changes to the Compliance group's version of the report. *Id*. at '0915; *see also* Ex. 134 (King Dep.) 255:22-256:22 (describing report ultimately given to the Government as a "more watered down version"; "[n]ot hiding anything, but not enough detail either."). KBR's Director of Supply Management, Ty Hippert, described Government Compliance's "softening" of the report as "turn[ing] Chicken crap into Chicken soup…" Ex. 54 at '0914; Ex. 134 (King Dep.) 272:1-10 ("Q. . . . Turning chicken crap into chicken soup means taking something that's in fact something bad and trying to turn it into something good, that's what that means? A.   Yes. [Objection.] Q.   You write at the top: [']Bingo HAAAAA.['] So you [a]greed with Mr. Hippert's assessment regarding chicken soup, correct? A.  That's correct."); *see also* SOF ¶¶ 87-136.

Furthermore, KBR also did its best to clean-up any site that it knew the Government was going to examine before the Government could get there; it received a list of sites that the DCMA was going to audit, in advance of those audits, and sent its own internal audit team to those sites before the DCMA got there, in order to fix any problems before the Government auditors saw them. Ex. 126 (Haught Dep.) 73:23-76:24 ("Q. . . . [W]as that a typical practice at KBR, that if the Government was going to go out and do a site audit that you would try to get your internal SMART team out there ahead of time? [Objection.] A. They were either scheduled or they would have said yes, we need to get out there early. Sometimes they were scheduled already. Q. The SMART team? A. SMART teams. . . . Q. . . . [I]sn't the reason you want [the SMART teams] out there ahead of the Government so that problems can be fixed by the sites before the Government auditor get[s] there? [Objection.] A. Generally, that would be a correct answer."), 79:1-14 ("I would think that we had some notification that that they were going to go do it [Government audits to inspect KBR's property system], so yes, I would say yes. Q. And you had those conversations with others at KBR? A. With the people on those sites."), 81:6-19 ("Q. . . . And you were going to assist [the sites] to get ready for . . . the Government audits? . . . A. Yes, yes. I'm sorry. Yes. . . . Q. And what concrete steps did you want KBR to take to assist those sites? A. We would have . . . put our trainers . . . . we would have gone out and conducted inventories. We would have helped the sites get ready in some way by providing support that the sites needed."), 84:18-24 ("Q. . . . So you send this to [Jim Luchsinger, KBR's Project Manager in Afghanistan,] and you say, 'DCMA has pretty much given us their blueprint.' What did you mean by that? A. The locations. Q. Locations where the audit was going to happen? A. Yes."), 86:1-25 ("Q. . . . So you're trying to figure out how to get help out to all these places in advance of the audit. Right? A. Yeah. Q. You say, 'I have another call added tonight at 8:00 p.m. on

[MAXIMO/]STEAM, which I thought I had nothing to do with, but guess again. I wonder if I can get people to understand the significance of the comments from DCMA.' So you were trying to give people kind of a wake-up call DCMA has really got us in the cross-hairs here. Right? [Objection.] A. Yes."); Ex. 19 (June 2008 internal KBR email) at '4711-12 (KBR's Head of its SMART Audit Team, Jim King, listing the sites where the Government will "conduct a PCSA [Property Control System Analysis] starting July 26, 2008"; "as you know it is extremely urgent that we [KBR's SMART Audit Team] get to these sites ASAP before this [Government] audit and ensure that they are ready for this [Government] PCSA [Property Control System Analysis], if we get an unsatisfactory rating they will disapprove our Property system."), at '4711 (James Haught, stating "DCMA has pretty much given us the[ir] blueprint. Salerno and Bagram will be the sites they will attack. The areas to be analyzed are listed in the email train. The review will occur between 26 Jul and 4 Aug."); Ex. 134 (King Dep.) 34:15-35:8 ("Q. . . . How did KBR determine which site the SMART team would audit when? A. That was my call with the headquarters and senior leadership as to their priorities. The headquarters had more direct information from the government property administrators as to when they were going to conduct their property control system analysis. So I would coordinate with them to see what sites are going to be audited by the government, and I would try and get my team in front of that to do a review before the government did. Q. And why would you try and get your teams to do a SMART review before the government performed its audit on a particular site? A. For the obvious reason . . . if there's any deficiencies or issues on site, try to get them corrected. Q. Before the government got there? A. Yes.").

Finally, Relators' expert, Dr. Zakheim, opined and testified that the DCMA was understaffed and DCMA personnel were still getting up to speed. Ex. 98 (Expert Rebuttal Report of D. Zakheim) at 1 ("It is my opinion that the fact that DCMA … had approved KBR's property

management system is no indication that KBR was actually in compliance with its contractual obligations to the United States Government or entitled to reimbursement for all the materials it had purchased."), at 7 ("DCMA's Williams' testimony essentially explained why not all contractor practices were visible to the government. He pointed out that LOGCAP III covered 'a multitude of countries' as well as a 'variety of contract functions' previously described as service support. He acknowledged that 'with the DCMA mission traditionally framed in industrial plant operations, our LOGCAP learning curve has been steep.' Yet he was stating this in 2009, seven years after LOGCAP III had been awarded.") (Footnote omitted, citing Testimony of Charlie Williams, Director DCMA, before the Commission on Wartime Contracting in Iraq and Afghanistan (May 4, 2009) (Williams Testimony), p. 42.); at 7-8 ("One reason for the challenge that DCMA faced was that the agency had unfilled personnel requirements. Williams noted that there were unfilled requirements for 335 CORs in Iraq and 362 CORs in Afghanistan, yet these were Parson's 'eyes and ears' for contract oversight. Clearly, the DCMA could not cope with the demands of monitoring the massive contract. The agency could therefore easily overlook activities that for whatever reason that the contractor did not report. Thus the assertion that 'the Government through DCMA's Property Management System Analysis (PMSAs) was satisfied with KBR's performance managing government property,' only holds true insofar as DCMA had the wherewithal to evaluate the system. As Charlie Williams indicated before the Commission, however, his agency was both understaffed and not fully capable of addressing the complexities that were inherent in LOGCAP III.") (Footnotes omitted, citing Testimony of Charlie Williams, Director DCMA, before the Commission on Wartime Contracting in Iraq and Afghanistan (May 4, 2009) (Williams Testimony), p. 42; citing Report of KBR's proffered Expert Dr. Goetz at 7), at 8 ("[T]he ACO needed visibility into what the contractor already possessed in its storeroom, and this was not

necessarily the case."); Ex. 98 (Zakheim Dep.) 262:2-15 ("Q. Have you concluded that DCMA did not have the wherewithal to evaluate KBR's property management system? A. Yes. Q. And you can say that even though you've never looked at any of the PMSAs that were actually done? A. They were short of people. Not only were they short of people, Charlie Williams also pointed out they were still on a steep learning curve, which meant that even if they had looked at these systems, it doesn't necessarily mean they would have fully understood them or fully understood how to deal with them. So yes, I stand by my conclusion."), 266:7-18 ("Simply because they were short-staffed, number one. Number two, as I said, they were on the steep learning curve, so you would have to assume that they had all the people that they needed for PMSAs and that's not clear that they did. There is no evidence they did. Nor is there evidence that everybody who worked on these analyses was up to snuff. … I stand open to any information clarifying that, but to my knowledge they didn't have the personnel or the trained personnel to work these.").

<u>KBR SOF 22.</u>  "Neither the FAR nor the DOD Property Manual called for DCMA to impose a 100% accuracy level for any of the DOD property functions. Ex. 16, DOD Property Manual, Chs. 3 & 4; [KBR] Ex. 24, Goetz Rep. at 23. Rather, DCMA's evaluation was based on its assessment of KBR's 'performance/conformance across the board,' the magnitude and frequency of deficiencies, and the implementation (or lack thereof) of corrective action. *See generally* [KBR] Ex. 16, DOD Property Manual at Chs. 3 & 4; *see also* [KBR] Ex. 24, Goetz Rep. at 16-17, 19-23; [KBR] Ex. 25, Goetz Dep. (May 19, 2022) at 19:11-21:16, 59:14-60:3, 67:4-68:13, 262:7-11."

**Relators' Response to KBR SOF 22.**

The statement of fact is immaterial. Whether "the FAR" or "the DOD Property Manual called for DCMA to impose a 100% accuracy level for any of the DOD property functions," and whether DCMA's evaluation was based on its assessment of KBR's 'performance/conformance across the board,' the magnitude and frequency of deficiencies, and the implementation (or lack thereof) of corrective action," does not "bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter and these assertions do not "bear directly" on those issues. Irrespective of whether the FAR or the DOD Property manual called for DCMA to impose a 100% accuracy level, and irrespective of DCMA's evaluations, KBR knowingly submitted claims for payment that were false, particularly insofar as KBR systemically failed to cross-level, including bypassing the cross-leveling process half the time and manipulating inventory to artificially decrease items available to cross-level. *See, e.g.*, Ex. 66 (Feb. 28, 2010 internal KBR email from KBR's Head of the DMC, C. O'Muirgheasa) at '4132 ("In 2009, 65% of Requisitions] were put into MATCON, representing 51% of the dollars. So, **35% of the Req[uisitions] bypassed us [KBR's DMC], representing almost 50% of the dollars**.") (emphasis added); Ex. 67 ( KBR data) at '4133 (quantifying that in 2007, out of 65,372 Material Requisitions valued at $1,237,891,670.75, a total of 52,488 (80.3%) of those Material Requisitions valued at $949,886,655.51 (76.7% of the dollars) were not checked for cross-leveling; in 2008, out of 90,025 Material Requisitions valued at $1,171,737,717.95, a total of 49,683 (55.2%) of those Material Requisitions valued at $647,308,265.68 (55.2% of the dollars) were not

checked for cross-leveling; and in 2009, out of 65,526 Material Requisitions valued at $812,554,107.70, a total of 23,124 (35.3%) of the Material Requisitions valued at $401,484,184.06 (49.4% of the dollars) did not go to the DMC for the cross-leveling check); Ex. 3 (Internal KBR email containing Dec. 29, 2008 email from KBR's Head of the DMC, B. Simmons) at '4448 ("The three major factors impeding the DMC's ability to Cross Level under utilized materials are as follows: 1) Categorization of ASL/Inventory Lines (i.e. reflecting [STK] when demands indicates [SP] or [NS] category)[;] 2) Unresponsive Sites/Projects to Tasking leading to Denials[;] 3) Sites/Projects resistant to place Material Requisitions in MATCON Status; consequently, sending the Majority (if not All) directly through Procurement Channels."); Ex. 81 (Mar. 20, 2010 email from KBR Deputy Program manager – Support, R. Kaye, to KBR Deputy Principal Program Manager, Larry Lust) at '9112 ("Last year, fully **35% of all requisitions (with an extended value of $401M[illion]) by-passed the cross-leveling check**. As we start to turn over more and more materials to GOI [Government of Iraq], we are facing an **increasing risk of being Formed 1 for buying items we just declared excess and gave away**. … [A]s of yesterday, we [had] **43,801 lines across Iraq being carried as STK that have 2 or fewer demands in the past 360 days**. We did a trial run on three sites and determined that 80% of their STK lines had RO [Requisition Objectives] and ROP [Reorder Points] set above what it should be based upon demand history. … We've got **$71M[illion] in reserved stock of which less than 50% is legitimate**. The rest is against cancelled ACLs, completed ACLs, or just plain **'hidden' from cross-leveling**. **TREC storerooms is going to be my biggest challenge….we've currently got $331M[illion] in them as of yesterday**. I've told Guy [LaBoa, KBR Principal Program Manager] this is the **Mother of all Forms 1**.") (emphasis added); Ex. 82 (Apr. 1, 2010 internal KBR email from KBR Deputy Program Manager – Support, R. Kaye, to KBR Principal program Manager, G. LaBoa) at '7417

("The deeper I dig, the more uncomfortable I become that we really do know what's going on. We've got **continuing issues with RO [Requisition Objective], ROP [Reorder Point], Stk vs Non-Stk, reservations and TRECs**.") (emphasis added); Ex. 7 (June 2009 email from KBR employee) at ECF Page 4 ("He said they are **placing everything on reserve so DMC won't ask for it CL [cross-level]**.") (emphasis added); Ex. 8 (Internal KBR email containing Feb. 25, 2010 email from KBR's Deputy Program Manager – Support, R. Kaye) at '0062 ("We are purchasing $5 M per day when we've got $1.2 B i[n] excess on hand. At some point, the DCAA is going to put KBR out of business if we keep doing this."); Ex. 96 (Expert Report of G. Gaukler) at 5 (concluding that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling); *see also, e.g.*, SOF ¶¶ 52-86.

The statement of fact is also disputed. First, under the FAR, "A cost is allowable *only* when the cost complies with all of the following requirements: (1) Reasonableness[;] (2) Allocability[;] (3) Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstances[;] (4) Terms of the contract[; and] (5) Any limitations set forth in this subpart. FAR § 31.201-2 (emphasis added). "A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. . . . No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable." FAR § 31.201-3.

Second, under the LOGCAP III contract, the supplies and materials KBR purchased had to be (1) "necessary for performance" of the contract, (2) cross-leveled to the "maximum extent possible" per the contract's Statements of Work (as KBR concedes, KBR Br. at 2), and in the case of larger purchases, (3) expressly certified to have been cross-leveled. These requirements objectively require KBR to check for available material and use it before buying more, and to only buy supplies and materials necessary for performance under the contract, as both KBR and the Government agreed. Ex. 138 (McNamara Dep.) 279:7-280:2 ("Q. . . . [D]id you have a view on . . . whether KBR was appropriately cross-leveling property in the 2007 to 2012 time period? [Objection.] A. . . . They needed to have been doing it . . . because it was part of . . . their property procedure. It was part of what was required of them as a prudent contractor."), 590:13-19 ("If you are purchasing something and you know that you have a large operation, then as a prudent contractor, you would be required to screen through your system to see if there is any availability of . . . these items or property that you're currently trying to buy . . . ."); Ex. 136 (Lust Dep.) 30:13-17 ("Q. . . . [W]ere you aware that the obligation to cross-level was a contractual requirement in KBR's contract with the United States Government? [Objection.] A. Yes."); Ex. 135 (LaBoa Dep.) 70:24-71:21 (agreeing cross-leveling was part of KBR's property control procedures); Ex. 127 (Hippert Dep.) 162:24-163:20 (agreeing his "view at the time" was that cross-leveling was expected); Ex. 134 (King Dep.) 16:21-17:2 ("Q. . . . With respect to KBR's work on LOGCAP-III, was KBR supposed to try to cross-level materials and property before purchasing new materials and property? [Objection.] A. Yes."); Ex. 142 (Rock Dep.) 520:17-22 ("Q. And it was KBR's obligation under LOGCAP III to cross level property [and materials]; is that right, sir? [Objection.] A. I think . . . where possible, yes."); Ex. 141 (Ritondale Dep.) 105:22-106:5 ("Q. . . . [I]s it your understanding that KBR was supposed to try to cross-level property and materials at some point

in the procurement process? [Objection.] A. My understanding is at some point in time the cross-leveling was something that was supposed to occur."); Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."), '0037-38 (incorporating FAR 52.216-7, FAR 52.232-20, FAR 52.232-22); FAR 52.216-7; FAR 52.232-20; FAR 52.232-22; Ex. 48 (Task Order 139 Statement Of Work Change 6) at '5609 ("3.0 CONTRACTOR ACQUIRED OR GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY. Prior to procurement of equipment to support all efforts described in this task order, the contractor shall exercise due diligence in verifying **and certify** that the required items cannot be satisfied from existing stock available from other sites covered by this task order. **This certification shall be provided to the [government] ACO [Administrative Contracting Officer]**. . . . 3.1.1. **The Contractor shall adhere to the requirement priorities listed in TABLE 3.1.1. to the maximum extent possible**. For purchases that cannot be obtained **through cross leveling or** from the **Host Country** sources, the contractor shall make maximum use of the Federal Supply System (FSS). **REQUIREMENTS PRIORITIES 1 USG military unit, organic, green suit[;] 2 Cross level within LOGCAP Task Order[;] 3 Other Task Orders within LOGCAP[;] 4 Host Country sources[;] 5 FSS[;] 6 Commercial**.") (emphasis in original); Ex. 41 (Task Order 159 Statement Of Work) at '5488-89 (same, without emphasis); Ex. 101 (Nov. 2, 2007 DCMA Letter of Technical Directive to KBR) at '6706 ("All equipment MRs [material requisitions] shall be initially submitted to the site ACO. . . . All equipment MRs [material requisitions] shall contain the following information: . . . (3) Has KBR checked for theater-wide re-distribution under the cross-leveling process?"); Ex. 24 (July 1,

2009 KBR Technical Direction Bulletin re: PCARSS) at '4270 ("KBR has a responsibility to cross level before purchase."); Ex. 34 (containing June 4, 2011 email from KBR's Head of the DMC, C. O'Muirgheasa) at '3826 ("It is a contractual requirement on LOGCAP III to cross level items in order to reduce spending, eliminate excess, and, nowadays just as importantly, get available material to other[] sites ASAP."); Ex. 44 (June 30, 2011 internal KBR email from T. Hippert to M. Wade) at '0608 ("LOGCAP III . . . is reporting cost avoidance on material that is excess in one camp and moved to another, we call that cross-leveling. These slides are being briefed to the Government and I don't think it's a true cost avoidance. My concern is that the government paid for the material and we are expected to be good stewards and properly manage the inventory. So c[ross]-level is expected."); Ex. 71 (July 2, 2009 Analysis by KBR's Head of the DMC) at '1369 ("Our mission is to cross level materials from locations where there is redistributable material to locations where there is a need for those materials."); Ex. 94 (Expert Report of M. Rudolph) at 19 ("KBR was obligated to cross level property and materials on LOGCAP III.") (citing sources); *see also* Ex. 104 (Expert Report of E. Branch) at 8 ("LOGCAP III required KBRSI to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock."); KBR SOF 46 (U.S. Army Audit Agency report: "LOGCAP contract requires the contractor to fill requirements with existing stock."); Ex. 121 (Branch Dep.) at 70:12-71:10 (KBR's proffered expert defining standard as "the good faith maximum effort that could be given in any stated context.").

Finally, the purported DOD 4161.2-M, DOD Manual for the Performance of Contract Property Administration that KBR has attached as KBR Exhibit 16 itself identifies that the relevant yardstick for evaluating the contractor's application and/or compliance is the contractor's written property control procedures:

The property control system established and maintained by the contractor normally consists of written property control procedures, and the application and/or compliance with those procedures. It is normal industry practice to provide for the control of property by means of written procedures that communicate company standards, techniques, and instructions to operational personnel. These procedures provide the PA [Property Administrator] with the yardstick by which the contractor's application and/or compliance shall be evaluated. The PA [Property Administrator] shall evaluate the contractor's written procedures and the application and/or compliance thereof.

KBR Ex. 16 ("DoD Manual for the Performance of Contract Property Administration," "December 1991") at 4-1. This conflicts with the statement of KBR's expert, Dr. Goetz, that "the relevant yardstick ultimately for a PMSA was not whether KBR was following its own procedures, but whether it was adequately meeting the obligations imposed by the FAR Government property clause." *See* KBR Ex. 24 (Goetz Rep.) at 7.

<u>KBR SOF 26.</u>  "The majority of the LOGCAP III task order statements of work in effect in the relevant time period do not even include the term 'cross-level.' [KBR] Ex. 1, Booth Decl. ¶ 6. While there are some task order statements of work that discuss the concept of trying to fill needs through existing stock rather than making a purchase, there are many task order statements of work that do not mention this at all. *Id*. at ¶¶ 6-7.; [KBR] Ex. 26, Branch Rep. at 36 ('[S]everal of the smaller task orders did not contain the terms related to cross-leveling at all, including [task orders] 130 (US Embassy Baghdad, Iraq), 138 and 161 (Afghanistan and Iraq), and 131 (Kuwait/Afghanistan/Iraq)'. Further, the language in the task order statements of work relating to cross-leveling changed over time and among different task order statements of work. [KBR] Ex. 1, Booth Decl. ¶ 6."

**<u>Relators' Response to KBR SOF 26.</u>**

The statement that "there are some task order statements of work that discuss the concept of trying to fill need through existing stock rather than making a purchase" is disputed and material. The remainder of this statement of fact is disputed and immaterial. Whether task order statements of work contain the term "cross-leveling," or whether "language in the task order statements of work relating to cross-leveling changed over time and among different statements of work" do not "bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter and whether the statements of work contain the term "cross-leveling," or had language regarding cross-leveling that changed over time, do not "bear directly" on those issues. Irrespective of whether the statements of work contain the term "cross-leveling" or changed over time with respect to cross-leveling, KBR was required under LOGCAP III to check to see if it had a particular material on hand and available before ordering more. *See* SOF ¶¶ 14-23. Indeed, KBR's own experts concede that KBR had a contractual obligation to check for such availability, using, at a minimum, "best efforts" to do so. Ex. 104 (Expert Report of E. Branch) at 8 ("LOGCAP III required KBRSI to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock."). Further, it is immaterial that any "task order statements of work [] do not mention [cross-leveling] at all," since some task

orders have nothing to do with supply or inventory management. *See, e.g.*, Ex. 84 (KBR Response to Interrogatory Number 4) ("KBR objects to this Interrogatory as overly broad and burdensome to the extent that it requests information about *Task Orders during the Relevant Time Period that do not relate to the issues in this case, in that they did not require procurement of property or materials that would have been subject to transfer, cross-leveling, or cross-utilization in theater*.") (emphasis added). Further, the two main task orders under which KBR completed the great bulk of work under LOGCAP III both contain standards for evaluating KBR's cross-leveling performance, and specifically that KBR cross-level "to the maximum extent possible." KBR Ex. 6 (Apr. 22, 2008 Task Order 139 SOW Change 6) at '5609 ("3.1.1 **The contractor shall adhere to the requirement priorities listed in TABLE 3.1.1. to the maximum extent possible.** For purchases that cannot be obtained **through cross leveling or** from the **Host County** sources, the contractor shall make maximum use of the Federal Supply System (FSS). [**TABLE 3.1.1.**] **REQUIREMENTS PRIORITIES 1. USG military unit, organic, green suit 2. Cross level within LOGCAP Task Order 3. Other Task Orders within LOGCAP 4. Host County sources 5. FSS 6. Commercial**.") (emphasis in original); KBR Ex. 7 (Aug. 25, 2008 Task Order 159 SOW, KBR-HOW-0039632-9782) at '641 (same, without emphasis).

<u>KBR SOF 43.</u>  "DCMA regularly audited KBR's property management system through PMSAs and PCSAs. [KBR] Ex. 16, DOD Property Manual at 3-16 through 3-17, 4-10 to 4-23; [KBR] Ex. 33, Vollmecke Dep. (Oct. 23, 2020) at 54:4-22."

**<u>Relators' Response to KBR SOF 43.</u>**

The statement of fact is immaterial. The PMSAs and PCSAs do not "bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter. Whether or not PMSAs or PCSAs assessed KBR's compliance with the property functions of the FAR do not "bear directly" on the issues of falsity or scienter raised by KBR's motion. Irrespective of such PMCAs or PCSAs, KBR knowingly submitted claims for payment that were false, particularly insofar as KBR systemically failed to cross-level, including bypassing the cross-leveling process half the time and manipulating inventory to artificially decrease items available to cross-level.

<u>KBR SOF 44.</u>  "The DOD Property Manual used by DCMA to audit KBR during the relevant time period does not contain or define the term 'cross-leveling,' nor do similar documents used by DCMA at the time Dr. Goetz issued his report (the current DOD Contract Property Guidebook and the DCMA Guidebook for Contract Property). [KBR] Ex. 24, Goetz Rep. at 23; [KBR] Ex. 16, DOD Property Manual; [KBR] Ex. 45, Guidebook for Contract Prop. Admin., DOD (Dec. 2014); [KBR] Ex. 46, DCMA Guidebook for Govt. Prop. Admin., Rev. 1, Def. Contract Mgmt. Agency (Oct. 2020); [KBR] Ex. 47, DCMA Guidebook for Govt. Prop. Admin., Rev. 2, Def. Contract Mgmt. Agency (Aug. 2022)."

**<u>Relators' Response to KBR SOF 44.</u>**

The statement is immaterial. The "DOD Property Manual" is irrelevant to inventory management; instead, it pertains to property management. Ex. 97 (Rebuttal Report of M. Rudolph) at 18-19 ("Mr. Goetz relies solely on what he misrepresents and mistakes as the 'DoD Property Manual.' It is actually titled: 'DoD Manual for Performance of Contract Property Administration.' It does not govern DoD inventory management. It only addresses contract 'property administration,' not the significant inventory management that LOGCAP III required.") Thus, the DOD Property Manual does not "bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter. Whether the DOD Property Manual contains the term "cross-leveling" does not "bear directly" on the issues of falsity or scienter raised by KBR's motion.

The statement of fact is disputed. Contrary to KBR's assertion, multiple DCMA documents used "at the time" of LOGCAP III dealt with cross-leveling. For instance, before purchasing materials for use on the LOGCAP III contract, KBR was required to obtain approval from the ACO if the purchase would exceed a minimum dollar threshold. Amendment P00015 to Contract DAAA09-02-D-0007, dated January 31, 2006, DCAA-HOWARD-00004057, -58 ("For the purpose of purchasing supplies/non-durable goods, the Contractor shall obtain approval from the on-site ACO/COR for each line item on the material requisition exceeding the threshold of $25,000.00 on either a unit or cumulative effort."); Deposition Exhibit 353 (July 10, 2007 DCMA

Memorandum) at '658 (same). While the LOGCAP III contract set baseline thresholds for approval of MRs, "individual Task Orders [could] require more stringent approval thresholds." Deposition Exhibit 353 (July 10, 2007 DCMA Memorandum) at '659.

To obtain approval from the ACO, KBR was required to submit its proposed materials requisition ("MR") to the ACO and certify that it had attempted to fill the requisition through cross-leveling. McNamara Dep. 416:10–20. The MR (also known as a Purchase Requisition, or "PR") specified, among other things, the items that KBR intended to purchase, their quantities, unit price, and total amount. *See, e.g.*, Deposition Exhibit 77 (sample Purchase Requisition). KBR submitted the MRs together with a cross-leveling certification, which was "always part of the contract." McNamara Dep. 421:3–11. In the certifications, KBR was required to attest it had "checked for theater-wide redistribution under cross-leveling process." McNamara Dep. 413:17–414:18; Deposition Exhibit 77 (sample Purchase Requisition) at 3. The certification was a requirement for KBR to purchase the property in question. McNamara Dep. 414:19–415:6.

KBR additionally certified that it had attempted to fill MRs through cross-leveling via a "Commercial Purchase Justification," which KBR was contractually required to prepare for all MRs that included a commercial item. Deposition Exhibit 126 (November 26, 2008 DCMA Memorandum) at '903–04; Haught Dep. 58:5-13. The Commercial Purchase Justification required KBR to represent that "Local Cross Level, DMC, and Theatre Inventory was checked" for the items KBR in the requisition. Deposition Exhibit 126 (November 26, 2008 DCMA Memorandum) at '905. Making clear the Government's expectations, the Commercial Purchase Justification advised KBR that "[t]he purpose of this form is to follow the priorities as listed in the SOW, and show due diligence in verifying that items cannot be filled through existing stocks available." *Id*. The Government required KBR to include the Commercial Purchase Justification "in all

MR packets provided to the Administrative Contracting Officer (ACO) for approval." *Id*. at '903; KBR-HOW-8467960–75 (reflecting ACO approval of MR with Commercial Purchase Justification).

Further, before a site declared an item of inventory to be unnecessary and returned it to the Government, KBR had to perform a check and verify that it was not needed elsewhere in the theater. *See*, *e.g.*, McNamara Dep. 73:22-74:10.

The process of returning unneeded, excess inventory to the Government was called the Plant Clearance Automated Reutilization Screening System, or "PCARSS." Ex. 127 (Hippert Dep.) 156:6-24. "The intent of the PCARSS process is to demonstrate that all reasonable steps possible have been taken to ensure that all of the items being sent to the PCARSS process have no reaming use on the LOGCAP III project, that KBR has done everything possible to maximize the usage of these items[.]" Indeed, beginning in 2009, when returning items declared as excess to the Government, KBR certified to the Government that "The attached list of item(s) have been screened for cross level requirements throughout the theater of operation. At this time, there are no foreseeable requirements in support of the current mission." Ex. 45 (PCARSS Form) at '4258. In other words, when KBR sent items into PCARSS, it was saying to the Government that "we no longer had a need for it[.]" KBR 30(b)(6) (Lust) (Sept. 29, 2021) Dep. 88:25-89:17.

## IV.     UNDISPUTED IMMATERIAL FACTS

The following facts from KBR's SOF are undisputed, but are immaterial for the following

reasons.

KBR SOF 19.  "DCMA evaluated the adequacy of KBR's property management system through Property Management Systems Analyses ('PMSAs') and Property Control Systems Analyses ('PCSAs') performed at KBR sites in theater and at KBR corporate headquarters. [KBR] Ex. 24, Goetz Rep. at 16-17; [KBR] Ex. 33, Vollmecke Dep. (Oct. 23, 2020) at 24:11-19; [KBR] Ex. 35, McNamara Dep. (Nov. 13, 2019) at 48:1-50:11l, 51:16-70:20."

**Relators' Response to KBR SOF 19.**

The statement of fact is immaterial. Whether or not DCMA evaluated KBR's property

management system through Property Management Systems Analyses ("PMSAs") or Property

Control Systems Analyses ("PCSAs") does not "bear directly on the legal issue raised by the

motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and

scienter and whether or not DCMA evaluated KBR's property management system through

PMSAs or PCSAs does not "bear directly" on those issues. Irrespective of whether the DCMA

performed any such evaluations of KBR's property management system, KBR knowingly

submitted claims for payment that were false, particularly insofar as KBR systemically failed to

cross-level, including bypassing the cross-leveling process half the time and manipulating

inventory to artificially decrease items available to cross-level. *See, e.g.*, Ex. 66 (Feb. 28, 2010

internal KBR email from KBR's Head of the DMC, C. O'Muirgheasa) at '4132 ("In 2009, 65% of

Requisitions] were put into MATCON, representing 51% of the dollars. So, **35% of the**

**Req[uisitions] bypassed us [KBR's DMC], representing almost 50% of the dollars**.")

(emphasis added); Ex. 67 (KBR data) at '4133 (quantifying that in 2007, out of 65,372 Material

Requisitions valued at $1,237,891,670.75, a total of 52,488 (80.3%) of those Material Requisitions

valued at $949,886,655.51 (76.7% of the dollars) were not checked for cross-leveling; in 2008, out

of 90,025 Material Requisitions valued at $1,171,737,717.95, a total of 49,683 (55.2%) of those

Material Requisitions valued at $647,308,265.68 (55.2% of the dollars) were not checked for cross-leveling; and in 2009, out of 65,526 Material Requisitions valued at $ 812,554,107.70, a total of 23,124 (35.3%) of the Material Requisitions valued at $401,484,184.06 (49.4% of the dollars) did not go to the DMC for the cross-leveling check); Ex. 3 (Internal KBR email containing Dec. 29, 2008 email from KBR's Head of the DMC, B. Simmons) at '4448 ("The three major factors impeding the DMC's ability to Cross Level under utilized materials are as follows: 1) Categorization of ASL/Inventory Lines (i.e. reflecting [STK] when demands indicates [SP] or [NS] category)[;] 2) Unresponsive Sites/Projects to Tasking leading to Denials[;] 3) Sites/Projects resistant to place Material Requisitions in MATCON Status; consequently, sending the Majority (if not All) directly through Procurement Channels."); Ex. 81 (Mar. 20, 2010 email from KBR Deputy Program manager – Support, R. Kaye, to KBR Deputy Principal Program Manager, Larry Lust) at '9112 ("Last year, fully **35% of all requisitions (with an extended value of $401M[illion]) by-passed the cross-leveling check**. As we start to turn over more and more materials to GOI [Government of Iraq], we are facing an **increasing risk of being Formed 1 for buying items we just declared excess and gave away**. … [A]s of yesterday, we [had] **43,801 lines across Iraq being carried as STK that have 2 or fewer demands in the past 360 days**. We did a trial run on three sites and determined that 80% of their STK lines had RO [Requisition Objectives] and ROP [Reorder Points] set above what it should be based upon demand history. … We've got **$71M[illion] in reserved stock of which less than 50% is legitimate**. The rest is against cancelled ACLs, completed ACLs, or just plain **'hidden' from cross-leveling**. **TREC storerooms is going to be my biggest challenge….we've currently got $331M[illion] in them as of yesterday**. I've told Guy [LaBoa, KBR Principal Program Manager] this is the **Mother of all Forms 1**.") (emphasis added); Ex. 82 (Apr. 1, 2010 internal KBR email from KBR Deputy

Program Manager – Support, R. Kaye, to KBR Principal program Manager, G. LaBoa) at '7417 ("The deeper I dig, the more uncomfortable I become that we really do know what's going on. We've got **continuing issues with RO [Requisition Objective], ROP [Reorder Point], Stk vs Non-Stk, reservations and TRECs**.") (emphasis added); Ex. 7 (June 2009 email from KBR employee) at ECF Page 4 ("He said they are **placing everything on reserve so DMC won't ask for it CL [cross-level]**.") (emphasis added); Ex. 8 (Internal KBR email containing Feb. 25, 2010 email from KBR's Deputy Program Manager – Support, R. Kaye) at '0062 ("We are purchasing $5 M per day when we've got $1.2 B i[n] excess on hand. At some point, the DCAA is going to put KBR out of business if we keep doing this."); Ex. 96 (Expert Report of G. Gaukler) at 5 (concluding that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling); *see also, e.g.*, SOF ¶¶ 52-86.

<u>KBR SOF 21.</u>  "At the request of the Office of Undersecretary of Defense Industrial Operations, KBR expert Dr. Douglas N. Goetz, Certified Professional Property Manager (CPPM), Consulting Fellow (CF), chaired a committee that wrote the DOD Property Manual that DCMA auditors used in conducting property audits during the relevant time period. [KBR] Ex. 24, Goetz Rep. at 4-5. Dr. Goetz also served as special counsel in the rewrite effort for the Government property clause that resulted in the issuance of FAR 52.245-1 (2007), and trained Government employees in the oversight of contractors' property management systems. *Id.*

**Relators' Response to KBR SOF 21.**

This statement of fact is immaterial.

The purported experience, certifications, and positions of KBR's proffered expert, Dr. Goetz, does not "bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter and neither Dr. Goetz's experience, nor his certifications, nor his positions "bear directly" on those issues. Irrespective of Dr. Goetz's experience, certifications, or positions, KBR knowingly submitted claims for payment that were false, particularly insofar as KBR systemically failed to cross-level, including bypassing the cross-leveling process half the time and manipulating inventory to artificially decrease items available to cross-level. *See, e.g.*, Ex. 66 (Feb. 28, 2010 internal KBR email from KBR's Head of the DMC, C. O'Muirgheasa) at '4132 ("In 2009, 65% of Requisitions] were put into MATCON, representing 51% of the dollars. So, **35% of the Req[uisitions] bypassed us [KBR's DMC], representing almost 50% of the dollars**.") (emphasis added); Ex. 67 (KBR data) at '4133 (quantifying that in 2007, out of 65,372 Material Requisitions valued at $1,237,891,670.75, a total of 52,488 (80.3%) of those Material Requisitions valued at $949,886,655.51 (76.7% of the dollars) were not checked for cross-leveling; in 2008, out of 90,025 Material Requisitions valued at $1,171,737,717.95, a total of 49,683 (55.2%) of those Material Requisitions valued at $647,308,265.68 (55.2% of the dollars) were not checked for cross-leveling; and in 2009, out of 65,526 Material Requisitions valued at $ 812,554,107.70, a total of 23,124 (35.3%) of the Material Requisitions valued at $401,484,184.06 (49.4% of the dollars) did not go

to the DMC for the cross-leveling check); Ex. 3 (Internal KBR email containing Dec. 29, 2008 email from KBR's Head of the DMC, B. Simmons) at '4448 ("The three major factors impeding the DMC's ability to Cross Level under utilized materials are as follows: 1) Categorization of ASL/Inventory Lines (i.e. reflecting [STK] when demands indicates [SP] or [NS] category)[;] 2) Unresponsive Sites/Projects to Tasking leading to Denials[;] 3) Sites/Projects resistant to place Material Requisitions in MATCON Status; consequently, sending the Majority (if not All) directly through Procurement Channels."); Ex. 81 (Mar. 20, 2010 email from KBR Deputy Program manager – Support, R. Kaye, to KBR Deputy Principal Program Manager, Larry Lust) at '9112 ("Last year, fully **35% of all requisitions (with an extended value of $401M[illion]) by-passed the cross-leveling check**. As we start to turn over more and more materials to GOI [Government of Iraq], we are facing an **increasing risk of being Formed 1 for buying items we just declared excess and gave away**. ... [A]s of yesterday, we [had] **43,801 lines across Iraq being carried as STK that have 2 or fewer demands in the past 360 days**. We did a trial run on three sites and determined that 80% of their STK lines had RO [Requisition Objectives] and ROP [Reorder Points] set above what it should be based upon demand history. ... We've got **$71M[illion] in reserved stock of which less than 50% is legitimate**. The rest is against cancelled ACLs, completed ACLs, or just plain **'hidden' from cross-leveling**. **TREC storerooms is going to be my biggest challenge....we've currently got $331M[illion] in them as of yesterday**. I've told Guy [LaBoa, KBR Principal Program Manager] this is the **Mother of all Forms 1**.") (emphasis added); Ex. 82 (Apr. 1, 2010 internal KBR email from KBR Deputy Program Manager – Support, R. Kaye, to KBR Principal program Manager, G. LaBoa) at '7417 ("The deeper I dig, the more uncomfortable I become that we really do know what's going on. We've got **continuing issues with RO [Requisition Objective], ROP [Reorder Point], Stk vs Non-Stk, reservations and**

**TRECs**.") (emphasis added); Ex. 7 (June 2009 email from KBR employee) at ECF Page 4 ("He said they are **placing everything on reserve so DMC won't ask for it CL [cross-level]**.") (emphasis added); Ex. 8 (Internal KBR email containing Feb. 25, 2010 email from KBR's Deputy Program Manager – Support, R. Kaye) at '0062 ("We are purchasing $5 M per day when we've got $1.2 B i[n] excess on hand. At some point, the DCAA is going to put KBR out of business if we keep doing this."); Ex. 96 (Expert Report of G. Gaukler) at 5 (concluding that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling); *see also, e.g.*, SOF ¶¶ 52-86.

Furthermore, Dr. Goetz has never been responsible for managing inventory and therefore lacks personal or expert knowledge of, and would have no basis to write a manual governing, the inventory management function. Ex. 125 (Goetz Dep.) 7:18-8:3 ("Q.   Have you ever been responsible for directly managing inventory? A.   No, sir. Q.   You understand that one of KBR's functions under LOGCAP III, which is the subject of this lawsuit, is KBR's responsibility to manage inventory; correct? A.   Yes, sir."); *see also id.* 205:12-206:6 ("Q.   Does this memorandum affect your view as to whether or not the DCMA found it material as to whether KBR was cross-leveling items before purchasing them? A.  . . . [T]his is directed to the ACO. I have no responsibility or concerns or control over ACOs. And as I explained a number of times now, cross-leveling was not in the purview of a property administrator. So I would have no knowledge of what the ACO did to address this review. And I'm just looking at it. It's talking about the pricing reference guide. Not in my wheelhouse there. ACOs will estimate the estimated price, not in my wheelhouse, sir."). Indeed, none of KBR's proffered experts has any direct experience as an inventory manager. *See* Ex. 97 (Expert Rebuttal Report of M. Rudolph) at 2 ("By their own

admission, none of KBR's four expert witnesses (Mr. Brennan, Mr. Goetz, LTG Vines, Mr. Branch) ha[s] ever been responsible for inventory management, none of them have any relevant experience in inventory management, nor do any of them have any credible ability to opine on the decision processes for analyzing inventory posture and the choice to cross-level or purchase new."); Ex. 133 (Brennan Dep.) 46:9-16 ("Q. And to be clear, you are not a logistician; is that correct? A. That is correct. Q. And you've never been responsible for managing inventory during the war time mission or even during peace time; correct? A That's correct."); Ex. 125(Goetz Dep.) 7:18-21 ("Q. Have you ever been responsible for directly managing inventory? A. No, sir."); Ex. 145(Vines Dep.) 8:13-18 ("Q. General Vines, have you ever been directly responsible for managing inventory of government property? A. I've had inventory managers under my command. But I have not personally managed it."); Ex. 121 (Branch Dep.) 50:4-7 ("Q. . . . Have you had experience managing inventory? A. I would -- I would say 'no' to that question.").

<u>KBR SOF 23.</u>  "The FAR Government property clause does not contain or define the term "cross-leveling." [KBR] Ex. 25, Goetz Dep. (May 19, 2022) at 8:14-9:18, 10:13-22, 77:11-19; [KBR] Ex. 34, Larkin Dep. (Nov. 5, 2020) at 104:1-105:8.

**Relators' Response to KBR SOF 23.**

The statement of fact is immaterial. Whether the FAR Government property clause contains or defines the term "cross-leveling" does not "bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter and whether the FAR Government property clause contains or defines the term "cross-leveling" does not "bear directly" on those issues. Irrespective of whether the FAR Government property clause contains or defines the term "cross-leveling," KBR was required under LOGCAP III to check to see if it had a particular material on hand and available before ordering more. Under the LOGCAP III contract, the supplies and materials KBR purchased had to be (1) "necessary for performance" of the contract, (2) cross-leveled to the "maximum extent possible" per the contract's Statements of Work (as KBR concedes, KBR Br. at 2), and in the case of larger purchases, (3) expressly certified to have been cross-leveled. These additional requirements may be viewed either as providing more specific meaning to "best efforts" or as the variety of considerations and circumstances used to determine reasonableness. Taken together or individually, these requirements objectively require KBR to check for available material and use it before buying more, and to only buy supplies and materials necessary for performance under the contract, as both KBR and the Government agreed. Ex. 138 (McNamara Dep.) 279:7-280:2 ("Q. . . . [D]id you have a view on . . . whether KBR was appropriately cross-leveling property in the 2007 to 2012 time period? [Objection.] A. . . . They needed to have been doing it . . . because it was part of . . . their property procedure. It was part of what was required of them as a prudent contractor."), 590:13-19 ("If you are purchasing something and you know that you have a large operation, then as a prudent contractor, you would be required to screen through your system to

see if there is any availability of . . . these items or property that you're currently trying to buy . . . ."), 597:20-598:9 ("Q. Do you know . . . when KBR was required to certify that it had attempted to cross-level before making purchase? A. There was a modification to the contract. I don't remember exactly when. It was sometime after 2006. I don't know if it was 2007 or 2008. . . . [I]t is part of the contract."); Ex. 136 (Lust Dep.) 30:13-17 ("Q. . . . [W]ere you aware that the obligation to cross-level was a contractual requirement in KBR's contract with the United States Government? [Objection.] A. Yes."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 38:22-39:8 ("Q. . . . Any other generally applicable instructions from the U.S. Government concerning KBR cross leveling between task orders other than those that you just referenced? [Objection.] A. . . . Mary Wade, who was the contract administrator for the LOGCAP III contract in Houston, had said that we were to make maximum use of cross leveling where possible. She understood you couldn't do it all the time but where possible."); Ex. 135 (LaBoa Dep.) 70:24-71:21 (agreeing cross-leveling was part of KBR's property control procedures); Ex. 127 (Hippert Dep.) 162:24-163:20 (agreeing his "view at the time" was that cross-leveling was expected); Ex. 134 (King Dep.) 16:21-17:2 ("Q. . . . With respect to KBR's work on LOGCAP-III, was KBR supposed to try to cross-level materials and property before purchasing new materials and property? [Objection.] A. Yes."); Ex. 142 (Rock Dep.) 520:17-22 ("Q. And it was KBR's obligation under LOGCAP III to cross level property [and materials]; is that right, sir? [Objection.] A. I think . . . where possible, yes."); Ex. 141 (Ritondale Dep.) 105:22-106:5 ("Q. . . . [I]s it your understanding that KBR was supposed to try to cross-level property and materials at some point in the procurement process? [Objection.] A. My understanding is at some point in time the cross-leveling was something that was supposed to occur."); Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials

necessary for performance under this contract will be reimbursed as stated in each individual Task

Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."), '0037-

38 (incorporating FAR 52.216-7, FAR 52.232-20, FAR 52.232-22); FAR 52.216-7; FAR 52.232-

20; FAR 52.232-22; Ex. 48 (Task Order 139 Statement Of Work Change 6) at '5609

("3.0 CONTRACTOR ACQUIRED OR GOVERNMENT FURNISHED EQUIPMENT AND

PROPERTY. Prior to procurement of equipment to support all efforts described in this task order,

the contractor shall exercise due diligence in verifying **and certify** that the required items cannot

be satisfied from existing stock available from other sites covered by this task order. **This

certification shall be provided to the [government] ACO [Administrative Contracting

Officer]**. . . . 3.1.1. **The Contractor shall adhere to the requirement priorities listed in TABLE

3.1.1. to the maximum extent possible**. For purchases that cannot be obtained **through cross

leveling or** from the **Host Country** sources, the contractor shall make maximum use of the Federal

Supply System (FSS). **REQUIREMENTS PRIORITIES 1 USG military unit, organic, green

suit[;] 2 Cross level within LOGCAP Task Order[;] 3 Other Task Orders within LOGCAP[;]

4 Host Country sources[;] 5 FSS[;] 6 Commercial**.") (emphasis in original); Ex. 41 (Task Order

159 Statement Of Work) at '5488-89 (same, without emphasis); Ex. 101 (Nov. 2, 2007 DCMA

Letter of Technical Directive to KBR) at '6706 ("All equipment MRs [material requisitions] shall

be initially submitted to the site ACO. . . . All equipment MRs [material requisitions] shall contain

the following information: . . . (3) Has KBR checked for theater-wide re-distribution under the

cross-leveling process?"); E Ex. 24 (July 1, 2009 KBR Technical Direction Bulletin re: PCARSS)

at '4270 ("KBR has a responsibility to cross level before purchase."); Ex. 34 (containing June 4,

2011 email from KBR's Head of the DMC, C. O'Muirgheasa) at '3826 ("It is a contractual

requirement on LOGCAP III to cross level items in order to reduce spending, eliminate excess,

and, nowadays just as importantly, get available material to other[] sites ASAP."); Ex. 44 (June 30, 2011 internal KBR email from T. Hippert to M. Wade) at '0608 ("LOGCAP III . . . is reporting cost avoidance on material that is excess in one camp and moved to another, we call that cross-leveling. These slides are being briefed to the Government and I don't think it's a true cost avoidance. My concern is that the government paid for the material and we are expected to be good stewards and properly manage the inventory. So c[ross]-level is expected."); Ex. 71 (July 2, 2009 Analysis by KBR's Head of the DMC) at '1369 ("Our mission is to cross level materials from locations where there is redistributable material to locations where there is a need for those materials."); Ex. 94 (Expert Report of M. Rudolph) at 19 ("KBR was obligated to cross level property and materials on LOGCAP III.") (citing sources); *see also* Ex. 104 (Expert Report of E. Branch) at 8 ("LOGCAP III required KBRSI to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock."); KBR SOF 46 (U.S. Army Audit Agency report: "LOGCAP contract requires the contractor to fill requirements with existing stock."); Ex. 121 (Branch Dep.) at 70:12-71:10 (KBR's proffered expert defining standard as "the good faith maximum effort that could be given in any stated context.").

Furthermore, KBR developed and was required to follow specific procedures for acquiring and managing inventory, including cross-leveling. KBR understood its contractual requirement to cross-level supplies, incorporating the requirement into a Government-approved set of Property Control Procedures, and into detailed "Desktop Operating Procedures" and "Technical Directives" for its personnel. Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5992 ("All property, whether government furnished or KBR acquired, must be: . . . Reasonable quantities, commensurate with the work to be accomplished."), at '5993

("Consuming: Quantities of material/supplies produced or procured for incorporation into an end item or otherwise consumed will . . . Be reasonable when compared to the work/job at hand and Material Requisitions . . . Be promptly returned to stock and recorded when determined to be excess."), at '5994 ("Government property will be disposed of by: . . . Screening items against existing and anticipated needs . . . Promptly reporting excess items . . . .Receiving property authority from the Government . . . prior to disposal."), at '6015 ("Requisitions for all property, whether government furnished or KBR acquired, must: . . . Be contractually authorized and necessary for performance of the prime contract . . . Be for the quantities required for said performance . . . ."), at '6017-021 ("Warehouse personnel will first attempt to fill requisitions from stock on-hand. . . . If suitable property is available for issue, warehouse personnel will [take specific steps] . . . Property may not be available, or there may not be sufficient stock on-hand to fill the entire quantity. When this happens, Material Control takes action to obtain the property for the requester. . . . Material Control – Processing Requisitions for cross leveling or Purchasing. . . . Upon return Materials Control will first check the theater inventory to determine if the requisition can be filled from existing stock. If suitable material is located, materials control will forward a copy of the approved Materials Requisitions. . . . If suitable material/equipment can not be located in the Theater Inventory, Material Control processes the approved MR [material requisition], establishes a manual record file by MR [material requisition] number and forwards to Procurement for purchase action." ); Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6168 ("All property, whether government furnished or KBR acquired, must be: . . . Reasonable quantities, commensurate with the work to be accomplished."), at '6169 ("Consuming: Quantities of material/supplies produced or procured for incorporation into an end item or otherwise consumed will be: . . . reasonable when compared to the work/job at hand

and Material Requisitions. . . . promptly returned to stock and recorded when determined to be excess."), at '6170 ("Government property will be disposed of by: . . . Screening items against existing and anticipated needs. . . . Promptly reporting excess items. . . . Receiving property authority from the Government . . . prior to disposal."), at '6227 ("Requisitions for all property, whether government furnished or KBR acquired, must: . . . Be contractually authorized and necessary for performance of the prime contract; . . . Be for the quantities required for said performance . . . ."), at '6230-32 ("Material Control personnel will first attempt to fill the requisitions from stock on-hand and will also check the Automated Inventory Control System for Theater wide availability of the item(s) being requested. . . . If suitable property is available for issue, from on hand stock, warehouse personnel will [take specific steps]. . . . If suitable property is found at another site, the Material Manager or designee will . . . Verify via the owning Site Material Manager that the requested item(s) are excess to that site's need and is available for cross utilization [and take specific steps] . . . . Property may not be available, or there may not be sufficient stock on-hand to fill the entire quantity. When this happens, Material Control takes action to obtain the property for the requester. . . . All requisitions must be coordinated with cost control and approvals obtained from project management, government LOTD'S, and contract modifications, before submitting for procurement action. . . . Upon return Materials Control processes the approved MR [material requisitions], establish a manual record file by MR [material requisition] number and forwards to Procurement for purchase action."), at '6313 ("Consumption of Government property shall be reasonable when compared to requirements. . . . Quantities of property produced or procured for incorporation into an end item or otherwise consumed will . . . Be reasonable when compared to Material Requisitions. On hand stocks in the Materials warehouses will be maintained in reasonable quantities to support contractual requirements and in

accordance with specific project policies or replenishment lead time. Stock levels will be based on equipment density, population to be supported, recurring demands or the history of a previous project with like property. . . . Unused Materials from trades on hand stock, special projects, ACL's LOTD's etc must be returned to the Material Warehouse within a reasonable period of time after the work is completed or no demands. Material Control department will ensure returned unused materials are posted to the automated inventory system with appropriate documentation within 48 hrs. Materials determined to be excess must be disposed of in accordance with Disposition Tab."); Ex. 103 (July 2006 KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures") at '9114 ("After a Materiel Requisition has been approved but prior to being turned over to procurement for purchase, Materiel Control will check the Theater Wide inventory and the Redistribution cell to determine if a requisition can be filled from existing stock. *Every effort* to fill requisitions within the theater shall be taken utilizing inventories on the KBR portal. If items are found within these inventories every reasonable effort shall be taken to redistribute these items.") (Emphasis added); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 34:3-14 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that *every effort* to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal.") (Emphasis added); Ex. 90 (KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures," revised June 2007) at '0992 ("**Cross Level Requisitioning Process**. Upon receipt of a material requisition Materiel Control will check the theater-wide inventory through STEAM [KBR's inventory management program, also referred to as MAXIMO] to determine if items can be filled from excess stock. Found items will be cross leveled through the procedures in 5.1 and 5.2. ") (Emphasis in original); Ex. 132 (KBR 30(b)(6)

(Lust) (Sept. 28, 2021) Dep.) 34:3-14 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that every effort to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal. . . . And then in June of '07, we did a revision which added STEAM – MAXIMO/STEAM to this process."); Ex. 91 ("KBR Distribution of Government Property DESKTOP OPERATING PROCEDURE," dated Aug. 23, 2008) at '0251 ("The DMC (<u>Distribution Management Center</u>) will be responsible for screening *<u>all</u>* requests for procurement action for possible Cross Level support. . . . All requisitions for procurement action will flow through the DMC and be screened for availability within theater prior to purchase.") (Emphasis in original), at '0256 ("If a site foresees a need for an item(s), it is contractually obligated to attempt to obtain the items through cross utilization within its project (group of sites).").

Indeed, KBR's own experts concede that KBR had a contractual obligation to check for such availability, using, at a minimum, "best efforts" to do so. Ex. 104 (Expert Report of E. Branch) at 8 ("LOGCAP III required KBRSI to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock.").

<u>KBR SOF 24.</u>  "The Defense Federal Acquisition Regulation Supplement ('DFARS'), which is the DOD's regulation implementing the FAR, does not contain or define the term 'cross-leveling.' Ex. 24, Goetz Rep. at 23; Ex. 25, Goetz Dep. (May 19, 2022) at 77:11-19.

**Relators' Response to KBR SOF 24.**

The statement of fact is immaterial. Whether the Defense Federal Acquisition Regulation Supplement ("DFARS") contains or defines the term "cross-leveling" does not "bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter and whether the DFARS contains or defines the term "cross-leveling" does not "bear directly" on those issues. Irrespective of whether the DFARS contains or defines the term "cross-leveling," KBR was required under LOGCAP III to check to see if it had a particular material on hand and available before ordering more. Under the LOGCAP III contract, the supplies and materials KBR purchased had to be (1) "necessary for performance" of the contract, (2) cross-leveled to the "maximum extent possible" per the contract's Statements of Work (as KBR concedes, KBR Br. at 2), and in the case of larger purchases, (3) expressly certified to have been cross-leveled. These additional requirements may be viewed either as providing more specific meaning to "best efforts" or as the variety of considerations and circumstances used to determine reasonableness. Taken together or individually, these requirements objectively require KBR to check for available material and use it before buying more, and to only buy supplies and materials necessary for performance under the contract, as both KBR and the Government agreed. Ex. 138 (McNamara Dep.) 279:7-280:2 ("Q.  . . . [D]id you have a view on . . . whether KBR was appropriately cross-leveling property in the 2007 to 2012 time period? [Objection.] A.  . . . They needed to have been doing it . . . because it was part of . . . their property procedure. It was part of what was required of them as a prudent contractor."), 590:13-19 ("If you are purchasing something and you know that you have a large operation, then as a prudent contractor, you would be required to screen through your system to see if there is any availability of . . . these items or property that

-156-

you're currently trying to buy . . . ."), 597:20-598:9 ("Q. Do you know . . . when KBR was required to certify that it had attempted to cross-level before making purchase? A. There was a modification to the contract. I don't remember exactly when. It was sometime after 2006. I don't know if it was 2007 or 2008. . . . [I]t is part of the contract."); Ex. 136 (Lust Dep.) 30:13-17 ("Q. . . . [W]ere you aware that the obligation to cross-level was a contractual requirement in KBR's contract with the United States Government? [Objection.] A. Yes."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 38:22-39:8 ("Q. . . . Any other generally applicable instructions from the U.S. Government concerning KBR cross leveling between task orders other than those that you just referenced? [Objection.] A. . . . Mary Wade, who was the contract administrator for the LOGCAP III contract in Houston, had said that we were to make maximum use of cross leveling where possible. She understood you couldn't do it all the time but where possible."); Ex. 135 (LaBoa Dep.) 70:24-71:21 (agreeing cross-leveling was part of KBR's property control procedures); Ex. 127 (Hippert Dep.) 162:24-163:20 (agreeing his "view at the time" was that cross-leveling was expected); Ex. 134 (King Dep.) 16:21-17:2 ("Q. . . . With respect to KBR's work on LOGCAP-III, was KBR supposed to try to cross-level materials and property before purchasing new materials and property? [Objection.] A. Yes."); Ex. 142 (Rock Dep.) 520:17-22 ("Q. And it was KBR's obligation under LOGCAP III to cross level property [and materials]; is that right, sir? [Objection.] A. I think . . . where possible, yes."); Ex. 141 (Ritondale Dep.) 105:22-106:5 ("Q. . . . [I]s it your understanding that KBR was supposed to try to cross-level property and materials at some point in the procurement process? [Objection.] A. My understanding is at some point in time the cross-leveling was something that was supposed to occur."); Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated

-157-

in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."), '0037-38 (incorporating FAR 52.216-7, FAR 52.232-20, FAR 52.232-22); FAR 52.216-7; FAR 52.232-20; FAR 52.232-22; Ex. 48 (Task Order 139 Statement Of Work Change 6) at '5609 ("3.0 CONTRACTOR ACQUIRED OR GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY. Prior to procurement of equipment to support all efforts described in this task order, the contractor shall exercise due diligence in verifying **and certify** that the required items cannot be satisfied from existing stock available from other sites covered by this task order. **This certification shall be provided to the [government] ACO [Administrative Contracting Officer]**. . . . 3.1.1. **The Contractor shall adhere to the requirement priorities listed in TABLE 3.1.1. to the maximum extent possible**. For purchases that cannot be obtained **through cross leveling or** from the **Host Country** sources, the contractor shall make maximum use of the Federal Supply System (FSS). **REQUIREMENTS PRIORITIES 1 USG military unit, organic, green suit[;] 2 Cross level within LOGCAP Task Order[;] 3 Other Task Orders within LOGCAP[;] 4 Host Country sources[;] 5 FSS[;] 6 Commercial**.") (emphasis in original); Ex. 41 (Task Order 159 Statement Of Work) at '5488-89 (same, without emphasis); Ex. 101 (Nov. 2, 2007 DCMA Letter of Technical Directive to KBR) at '6706 ("All equipment MRs [material requisitions] shall be initially submitted to the site ACO. . . . All equipment MRs [material requisitions] shall contain the following information: . . . (3) Has KBR checked for theater-wide re-distribution under the cross-leveling process?"); Ex. 24 (July 1, 2009 KBR Technical Direction Bulletin re: PCARSS) at '4270 ("KBR has a responsibility to cross level before purchase."); Ex. 34 (containing June 4, 2011 email from KBR's Head of the DMC, C. O'Muirgheasa) at '3826 ("It is a contractual requirement on LOGCAP III to cross level items in order to reduce spending, eliminate excess, and, nowadays just as importantly, get available

material to other[] sites ASAP."); Ex. 44 (June 30, 2011 internal KBR email from T. Hippert to M. Wade) at '0608 ("LOGCAP III . . . is reporting cost avoidance on material that is excess in one camp and moved to another, we call that cross-leveling. These slides are being briefed to the Government and I don't think it's a true cost avoidance. My concern is that the government paid for the material and we are expected to be good stewards and properly manage the inventory. So c[ross]-level is expected."); Ex. 71 (July 2, 2009 Analysis by KBR's Head of the DMC) at '1369 ("Our mission is to cross level materials from locations where there is redistributable material to locations where there is a need for those materials."); Ex. 94 (Expert Report of M. Rudolph) at 19 ("KBR was obligated to cross level property and materials on LOGCAP III.") (citing sources); *see also* Ex. 104 (Expert Report of E. Branch) at 8 ("LOGCAP III required KBRSI to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock."); KBR SOF 46 (U.S. Army Audit Agency report: "LOGCAP contract requires the contractor to fill requirements with existing stock."); Ex. 121 (Branch Dep.) at 70:12-71:10 (KBR's proffered expert defining standard as "the good faith maximum effort that could be given in any stated context.").

Furthermore, KBR developed and was required to follow specific procedures for acquiring and managing inventory, including cross-leveling. KBR understood its contractual requirement to cross-level supplies, incorporating the requirement into a Government-approved set of Property Control Procedures, and into detailed "Desktop Operating Procedures" and "Technical Directives" for its personnel. Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5992 ("All property, whether government furnished or KBR acquired, must be: . . . Reasonable quantities, commensurate with the work to be accomplished."), at '5993 ("Consuming: Quantities of material/supplies produced or procured for incorporation into an end

item or otherwise consumed will . . . Be reasonable when compared to the work/job at hand and Material Requisitions . . . Be promptly returned to stock and recorded when determined to be excess."), at '5994 ("Government property will be disposed of by: . . . Screening items against existing and anticipated needs . . . Promptly reporting excess items . . . .Receiving property authority from the Government . . . prior to disposal."), at '6015 ("Requisitions for all property, whether government furnished or KBR acquired, must: . . . Be contractually authorized and necessary for performance of the prime contract . . . Be for the quantities required for said performance . . . ."), at '6017-021 ("Warehouse personnel will first attempt to fill requisitions from stock on-hand. . . . If suitable property is available for issue, warehouse personnel will [take specific steps] . . . Property may not be available, or there may not be sufficient stock on-hand to fill the entire quantity. When this happens, Material Control takes action to obtain the property for the requester. . . . Material Control – Processing Requisitions for cross leveling or Purchasing. . . . Upon return Materials Control will first check the theater inventory to determine if the requisition can be filled from existing stock. If suitable material is located, materials control will forward a copy of the approved Materials Requisitions. . . . If suitable material/equipment can not be located in the Theater Inventory, Material Control processes the approved MR [material requisition], establishes a manual record file by MR [material requisition] number and forwards to Procurement for purchase action." ); Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6168 ("All property, whether government furnished or KBR acquired, must be: . . . Reasonable quantities, commensurate with the work to be accomplished."), at '6169 ("Consuming: Quantities of material/supplies produced or procured for incorporation into an end item or otherwise consumed will be: . . . reasonable when compared to the work/job at hand and Material Requisitions. . . . promptly returned to stock and recorded when determined to be

excess."), at '6170 ("Government property will be disposed of by: . . . Screening items against existing and anticipated needs. . . . Promptly reporting excess items. . . . Receiving property authority from the Government . . . prior to disposal."), at '6227 ("Requisitions for all property, whether government furnished or KBR acquired, must: . . . Be contractually authorized and necessary for performance of the prime contract; . . . Be for the quantities required for said performance . . . ."), at '6230-32 ("Material Control personnel will first attempt to fill the requisitions from stock on-hand and will also check the Automated Inventory Control System for Theater wide availability of the item(s) being requested. . . . If suitable property is available for issue, from on hand stock, warehouse personnel will [take specific steps]. . . . If suitable property is found at another site, the Material Manager or designee will . . . Verify via the owning Site Material Manager that the requested item(s) are excess to that site's need and is available for cross utilization [and take specific steps] . . . . Property may not be available, or there may not be sufficient stock on-hand to fill the entire quantity. When this happens, Material Control takes action to obtain the property for the requester. . . . All requisitions must be coordinated with cost control and approvals obtained from project management, government LOTD'S, and contract modifications, before submitting for procurement action. . . . Upon return Materials Control processes the approved MR [material requisitions], establish a manual record file by MR [material requisition] number and forwards to Procurement for purchase action."), at '6313 ("Consumption of Government property shall be reasonable when compared to requirements. . . . Quantities of property produced or procured for incorporation into an end item or otherwise consumed will . . . Be reasonable when compared to Material Requisitions. On hand stocks in the Materials warehouses will be maintained in reasonable quantities to support contractual requirements and in accordance with specific project policies or replenishment lead time. Stock levels will be based on

equipment density, population to be supported, recurring demands or the history of a previous project with like property. . . . Unused Materials from trades on hand stock, special projects, ACL's LOTD's etc must be returned to the Material Warehouse within a reasonable period of time after the work is completed or no demands. Material Control department will ensure returned unused materials are posted to the automated inventory system with appropriate documentation within 48 hrs.  Materials determined to be excess must be disposed of in accordance with Disposition Tab."); Ex. 103 (July 2006 KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures") at '9114 ("After a Materiel Requisition has been approved but prior to being turned over to procurement for purchase, Materiel Control will check the Theater Wide inventory and the Redistribution cell to determine if a requisition can be filled from existing stock. *Every effort* to fill requisitions within the theater shall be taken utilizing inventories on the KBR portal. If items are found within these inventories every reasonable effort shall be taken to redistribute these items.") (Emphasis added); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 34:3-14 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that *every effort* to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal.") (Emphasis added); Ex. 90 (KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures," revised June 2007) at '0992 ("**Cross Level Requisitioning Process**. Upon receipt of a material requisition Materiel Control will check the theater-wide inventory through STEAM [KBR's inventory management program, also referred to as MAXIMO] to determine if items can be filled from excess stock. Found items will be cross leveled through the procedures in 5.1 and 5.2. ") (Emphasis in original); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 34:3-14 ("Q. . . . [C]an you describe what the instructions were in

that particular desktop operating procedure you just referenced? A. . . . I can sum it up that every effort to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal. . . . And then in June of '07, we did a revision which added STEAM – MAXIMO/STEAM to this process."); Ex. 91 ("KBR Distribution of Government Property DESKTOP OPERATING PROCEDURE," dated Aug. 23, 2008) at '0251 ("The DMC (<u>Distribution Management Center</u>) will be responsible for screening <u>*all*</u> requests for procurement action for possible Cross Level support. . . . All requisitions for procurement action will flow through the DMC and be screened for availability within theater prior to purchase.") (Emphasis in original), at '0256 ("If a site foresees a need for an item(s), it is contractually obligated to attempt to obtain the items through cross utilization within its project (group of sites).").

Indeed, KBR's own experts concede that KBR had a contractual obligation to check for such availability, using, at a minimum, "best efforts" to do so. Ex. 104 (Expert Report of E. Branch) at 8 ("LOGCAP III required KBRSI to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock.")

<u>KBR SOF 29.</u>  "The task orders and statements of work do not define the term 'due diligence.' Ex. 1, Booth Decl. ¶ 10; *see, e.g.*, Exs.3-8 (SOWs); Ex. 27, Branch Dep. (Jun. 24, 2022) at 127:11-16; 138:24-139:10."

**Relators' Response to KBR SOF 29.**

This statement of fact is immaterial. Whether the task orders or SOWs define the term "due diligence" does not bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter and whether the task orders or SOWs define the term "due diligence" does not "bear directly" on those issues. Irrespective of whether the task orders or SOWs define the term "due diligence," KBR was required under LOGCAP III to exercise due diligence including to check to see if it had a particular material on hand and available before ordering more. *See, e.g.* SOF ¶¶ 10, 23. Indeed, KBR's own experts concede that KBR's "contractual requirement under LOGCAP III task orders was to exercise 'due diligence' in verifying that required items could not be satisfied from existing, available stock. Ex. 104 (Expert Report of E. Branch) at 8.

KBR SOF 30. "The task orders and statements of work do not define when an item is 'available' for cross-level. Ex. 1, Booth Decl. ¶ 11; *see, e.g.* Exs. 3-8 (SOWs); Ex. 26, Branch Rep. at 39 ('In other words, the LOGCAP III Task Orders specified that [KBR] exercise reasonable care and attention in a given situation. And while whether an item existed at another site was an objective determination, whether the item was excess and available for transfer was a subjective determination. The task orders did not tell [KBR] how to make that subjective determination.')."

**Relators' Response to KBR SOF 30.**

This statement of fact is immaterial. Whether the task orders or SOWs define the term "available" does not bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter and whether the task orders or SOWs define the term "available" does not "bear directly" on those issues. Irrespective of whether the task orders and SOWs contains or defines the term "available," KBR was required under LOGCAP III to check to see if it had a particular material on hand and available before ordering more. *See* SOF ¶ 10. Indeed, KBR's own experts concede that KBR had a contractual obligation to check for such availability, using, at a minimum, "best efforts" to do so. Ex. 104 (Expert Report of E. Branch) at 8 ("LOGCAP III required KBRSI to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock.").

Furthermore, KBR's Government-approved PCPs and DOPs provided objective standards for when an item was available and KBR's procedures/standards/criteria for when an item was available. KBR's PCPs required KBR to order inventory in "[r]easonable quantities, commensurate with the work to be accomplished." Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5992; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6168. They similarly required KBR to order inventory that was "contractually authorized and necessary for performance of the prime contract" and "for the quantities required for said performance." Ex. 1 (KBR's Government-Approved

Property Control Procedures, dated Sept. 21, 2006) at '6015; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6227. KBR's PCPs required KBR to dispose of excess, unneeded inventory only after "[s]creening items against existing and anticipated needs," "[p]romply reporting excess items," and receiving Government approval. Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5994; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6170. KBR's PCPs required that when filling a requisition, KBR "personnel will first attempt to fill requisitions from stock on-hand." Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6017; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6230. KBR's PCPs required checking theater-wide inventory as well when filling a requisition. Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6019 ("Material Control – Processing Requisitions for cross leveling or Purchasing . . . Upon return Materials Control will first check the theater inventory to determine if the requisition can be filled from existing stock."); Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6230-31 ("Material Control personnel . . . will also check the Automated Inventory Control System for Theater wide availability of the item(s) being requested. . . . Material Control – Filling Requisitions from Theater Stock. . . . If suitable property is found at another site, the Material Manager or designee will: . . . Verify via the owning Site Material manager that the requested item(s) are excess to that's need and is available for cross utilization."). Thus, KBR's PCP expressly required KBR to screen requisitions against its existing inventory and to fill the requisitions through cross-leveling when it had supplies available in the theater. As an example of a DOP setting forth KBR's cross-leveling obligations with specific criteria and procedures for KBR to follow, in July 2006, KBR's

Redistribution of Government Property DOP required KBR to make "every effort" to cross-level with existing inventory before purchasing new items. Ex. 103 (July 2006 KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures") at '9114 ("After a Materiel Requisition has been approved but prior to being turned over to procurement for purchase, Materiel Control will check the Theater Wide inventory and the Redistribution cell to determine if a requisition can be filled from existing stock. Every effort to fill requisitions within the theater shall be taken utilizing inventories on the KBR portal. If items are found within these inventories every reasonable effort shall be taken to redistribute these items."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 34:3-14 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that every effort to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal.").

<u>KBR SOF 32.</u> "The task orders and statements of work do not define when cross-leveling is 'possible,' particularly while operating in a war time theater. Ex.1, Booth Decl. ¶ 13; *see, e.g.*, Exs. 3-8 (SOWs)."

**Relators' Response to KBR SOF 32.**

This statement of fact is immaterial. Whether the task orders or SOWs define the term "available" does not bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter and whether the task orders or SOWs define when cross-leveling is "possible" does not "bear directly" on those issues. Irrespective of whether the task orders and SOWs contains or defines when cross-leveling is "possible," KBR was required under LOGCAP III to check to see if it had a particular material on hand and available before ordering more. *See* SOF ¶ 10. Indeed, KBR's own experts concede that KBR had a contractual obligation to check for such availability, using, at a minimum, "best efforts" to do so. Ex. 104 (Expert Report of E. Branch) at 8 ("LOGCAP III required KBRSI to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing, available stock.").

Furthermore, KBR's Government-approved PCPs and DOPs provided objective standards for when an item was available and KBR's procedures/standards/criteria for when an item was available, and therefore when cross-leveling was possible. KBR's PCPs required KBR to order inventory in "[r]easonable quantities, commensurate with the work to be accomplished." Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5992; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6168. They similarly required KBR to order inventory that was "contractually authorized and necessary for performance of the prime contract" and "for the quantities required for said performance." Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6015; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated

July 15, 2008) at '6227. KBR's PCPs required KBR to dispose of excess, unneeded inventory only after "[s]creening items against existing and anticipated needs," "[p]romply reporting excess items," and receiving Government approval. Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5994; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6170. KBR's PCPs required that when filling a requisition, KBR "personnel will first attempt to fill requisitions from stock on-hand." Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6017; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6230. KBR's PCPs required checking theater-wide inventory as well when filling a requisition. Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6019 ("Material Control – Processing Requisitions for cross leveling or Purchasing . . . Upon return Materials Control will first check the theater inventory to determine if the requisition can be filled from existing stock."); Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6230-31 ("Material Control personnel . . . will also check the Automated Inventory Control System for Theater wide availability of the item(s) being requested. . . . Material Control – Filling Requisitions from Theater Stock. . . . If suitable property is found at another site, the Material Manager or designee will: . . . Verify via the owning Site Material manager that the requested item(s) are excess to that's need and is available for cross utilization."). Thus, KBR's PCP expressly required KBR to screen requisitions against its existing inventory and to fill the requisitions through cross-leveling when it had supplies available in the theater. As an example of a DOP setting forth KBR's cross-leveling obligations with specific criteria and procedures for KBR to follow, in July 2006, KBR's Redistribution of Government Property DOP required KBR to make "every effort" to cross-level with existing inventory before purchasing new items. Ex. 103

(July 2006 KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures") at '9114 ("After a Materiel Requisition has been approved but prior to being turned over to procurement for purchase, Materiel Control will check the Theater Wide inventory and the Redistribution cell to determine if a requisition can be filled from existing stock. Every effort to fill requisitions within the theater shall be taken utilizing inventories on the KBR portal. If items are found within these inventories every reasonable effort shall be taken to redistribute these items."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 34:3-14 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that every effort to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal.").

<u>KBR SOF 45.</u>  "Although DCMA's audit reports sometimes include information on the amount of cross-leveling KBR did in the period reviewed, DCMA did not apply any objective standard or metric when commenting on KBR's cross-level performance. Ex. 16, DOD Property Manual, Chs. 3 & 4; *see, e.g.*, Ex. 12 at KBR-HOW-3585727 (Aug. 18, 2009 PCSA stating that '[m]aterial transfers between contracts are being documented and $2,350,890.26 worth of material has been cross leveled over the past six months' at Bagram, an Afghanistan-based KBR site); Ex. 13 at DCMA-HOWARD-00012729 (Sept. 2, 2009 DCMA PCSA noting that '$372,189.54 worth of material has been cross leveled over the past six months' at Salerno, an Afghanistan-based KBR site)."

**<u>Relators' Response to KBR SOF 45.</u>**

The Statement of facts is undisputed but immaterial. The dollar amount of cross leveling performed by KBR, in isolation, does not prove that KBR was fulfilling its contractual obligations. Further, the dollar amount of cross-leveling performed by KBR does not bear directly on the legal issue raised by the motion." *See* Local Civil Rule 7.1(D)(1)(b). KBR's motion concerns the elements of falsity and scienter and the dollar amount that KBR cross-leveled does not "bear directly" on those issues.

<u>**ADDITIONAL MATERIAL FACTS**</u>

**I.     KBR Had a Financial Incentive to Over-Order Supplies on LOGCAP III**

1.     Through LOGCAP III, the United States Government (the "Government") hired KBR, a private contractor, to be the Army's inventory manager, and to order, store, and distribute materials efficiently for use in its operations, primarily in Iraq and Afghanistan.[1]

2.     LOGCAP III was a "cost plus award fee" contract which reimbursed KBR for all of its allowable costs, plus 1% of the "definitized" costs as a "base fee," and up to an additional 2% of the "definitized" costs as an "award fee" based on certain performance criteria.[2]

3.     KBR prepared proposals of all cost elements for the work that the Government requested that it perform under LOGCAP III, including labor, material, equipment, subcontracts, and other direct costs.[3] To develop these estimates, including on Task Order 139 and Task

---

[1]     *See* Ex. 135 (LaBoa Dep.) 24:23-25:10 (agreeing "logistics functions under LOGCAP III included ordering materials that needed to be used at the various sites," "storing and distributing those materials," and "controlling the cost of those materials that needed to be ordered . . . so that they were ordered in an efficient and cost effective way"), 37:7-25; Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0068 ("The Contractor will plan to provide equipment, ancillary supplies, personnel, administration, and management required to perform supply services necessary to requisition, receive, store, account, issue and manage Class I (Rations and Water), Class II (Organizational Clothing and Equipment and Administrative Supplies), Class III (Petroleum, Oil and Lubricants – both Bulk and Package), Class IV (Construction Materials), Class V (Ammunition – to include Ammunition Supply Point Operations), Class VI ( Personal Demand Items), Class VII (Major Items), Class VIII (Medical Supplies), and Class IX (Repair Partners) in accordance with Army supply policy and doctrine.").

[2]     Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 12:6-16 (agreeing LOGCAP III was a "cost-reimbursable contract," which "is one in which the government reimburses the contractor for incurred costs"; agreeing "the government reimbursed KBR for its costs on LOGCAP III"), 16:20-17:12 (agreeing under LOGCAP III "KBR also received a base fee" of "[o]ne percent of the definitized cost of a task order"; agreeing under LOGCAP III KBR may have also received "award fees"), 58:7-59:12 (testifying KBR's "award fee was . . . potentially two percent of the definitized amount. . . . The government has an award fee board which evaluates the contractor's performance for the period based on criteria in the contract."); Ex. 83 (Sept. 27, 2007 Walter Decl.), ¶¶ 7-10.

[3]     Ex. 130 (KBR 30(b)(6) (Ferrazas) Dep.) 17:17-19 (agreeing "KBR developed cost proposals in connection with LOGCAP III"), 20:17-21:2 ("Basis of estimate is a document that

Order 159, KBR used "material burn rates," whereby it looked to past performance, usage of

materials, and actual historical costs, to estimate future needs and costs.[3a]

4. Once a KBR cost estimate was finalized and agreed upon by the Government, the

proposal became the "definitized amount," and that proposal became part of the contract.[4] Further,

if KBR's costs increased, the definitized amount could be modified and increased.[4a] Thus, by

---

would list out the requirements necessary in order to perform the provided scope of work for the requested proposal. . . . It would include requirements for all cost elements, labor, material, equipment, subcontracts and other direct costs.").

[3a] Ex. 130 (KBR 30(b)(6) (Ferrazas) Dep.) 14:1-10 (testifying "material burn rates" involves "[u]tilizing historical cost, actual cost for materials utilized to develop future cost in the KBR proposals"; agreeing KBR used material burn rates for Task Orders 139 and 159), 27:23-28:6 (testifying the "source data" for analyzing the material burn rate "is the actual material cost that was incurred for that period"), 44:24-45:11 (agreeing that for Task Orders 139 and 159, "the amount of money KBR previously spent performing similar work [wa]s used as an input when KBR [wa]s developing its cost proposals for future work"); Ex. 93 ("KBR Government and Infrastructure Estimating Manual") at '7789 ("The estimating system receives data from three business system modules: 1. **SAP Project System Module**: Provides incurred (actual) cost in [Work Breakdown Structure] format by cost element. This is used for historical pricing data (i.e. for similar work previously executed by the company) and for proposals which include incurred cost as part of the proposal. 2. **SAP Procurement Module**: Provides price history data for purchase orders and subcontracts."); Ex. 92 (identifying "Materials burn rate" used for Task Orders 139 and 159). Thus, by spending more money on materials in a current period, KBR could use that spending to increase the value of the contract in future periods.

[4] Ex. 130 (KBR 30(b)(6) (Ferrazas) Dep.) 20:9-16 ("Q. . . . What is definitization or definitized amount? [Objection.] A. Once a proposal was negotiated and agreed upon, that cost, that proposal was put on modification and made part of the contract."). Regardless of what the definitized amount was, KBR was reimbursed for its costs up to the funding cap. *See, e.g.*, Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 22:4-11 (agreeing that "The U.S. Government reimbursed KBR for the money KBR spent procuring property and materials on LOGCAP III if those property and materials were received by KBR"), 58:2-6 ("Q. . . . And if the funding went up then KBR's costs would be reimbursed up to that funding cap, whatever that funding cap is; is that fair to say? A. KBR's cost if it was approved, KBR's cost would be reimbursed, that's it, cost, not fee but cost.").

[4a] *See* Ex. 148 (Wade Dep.) 18:9-20 (describing funding as "the government . . . put[ting] funds on the contract to pay for the performance [KBR] w[as] doing," which would entail "seeing if there were sufficient funds obligated on the contract to cover [KBR's] costs and if they weren't, [KBR would] notify the government that additional funds would be required"), 48:25-49:12 (agreeing Sept. 15, 2010 modification to Task Order 159 "indicate[d] that the . . . total task order

over-spending in the current period, KBR could use that over-spending to increase the value of the contract in future periods.

5.    KBR received its 1% base fee of the total definitized amount, which consisted of profit for KBR, regardless of whether or not it actually incurred all of the definitized costs; the base fee was fixed at 1% of the total definitized amount, regardless of what KBR actually spent. The higher the definitized amount, the higher KBR's guaranteed, 1% base fee.[5]

6.    How much of the 2% "award fee" KBR received from the Government was based on the Government's evaluation of KBR's performance under LOGCAP III.[6] Thus, KBR was incentivized to make its performance appear as good as possible to the Government, in order to maximize the award fee that it would receive.

7.    KBR employees believed that by spending more money, KBR could increase its profits:

> **Backlog of materials –** I've raised my **red flag** over this time-and-time again with HQ due to this **problem being systemic** to how KBR does business in Afghanistan. This is due to the position of some that KBR is here to make money,

---

funding for Task Order 159 had increased by $67,500,000"); *see also, e.g.*, Ex. 42 (Sept. 15, 2010 Modification to Task Order 159) at '1235 ("Total task order #0159 funding increased by $67,500,000.00 from $7,549,311,059.00 to $7,616,811,059.00").

[5]    Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 55:8-56:11 ("[T]he base fee is a fixed fee which is calculated based on a definitized amount . . . With that definitized amount KBR then is entitled to one percent of that definitized amount as fee or its profit.").

[6]    Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 58:7-59:12 ("[T]hat award fee was limited to . . . potentially two percent of the definitized amount.  . . . The government has an award fee board which evaluates the contractor's performance for the period based on criteria in the contract. One criterion contained in the LOGCAP III contract was cost management . . . . KBR would submit its performance, self-assessment of this performance for the period. The award fee board would evaluate it and have their own evaluations and render an award fee score. Based on that award fee score they would then submit a contract modification with the amount awarded which will then be billed to the U.S. Government by KBR.").

which we are. **The more money we spend… the more profit we turn over under a cost + contract.**[7]

## II.     The Government Hired KBR to be the Army's Inventory Manager, and Inventory Managers Have to Cross-Level

8.      Cross-leveling describes a basic and fundamental concept of inventory management—if you have more items on hand than needed, use those available items before ordering more. Put simply, it is the process of filling a need for items at one site with excess from another site.[8]

9.      Cross-leveling is a fundamental and standard part of inventory management in both public and private sectors, and especially in the Department of Defense.[9]

---

[7]     Ex. 18 (containing July 9, 2008 internal KBR email from E. Denton to J. Haught) at '0584 (emphasis added); *see also* Ex. 22 (Apr. 12, 2008 internal KBR email from P. Powell to J. Haught) at '4011 ("I am not aware that the government has ever allowed us to stockpile anything for many reasons . . . . This reminds me of every time we get new funding, [KBR] Project Controls advises all departments to spend their burn rate or we will loose [sic] the money; hence, one reason why we have all the excess in the theater.").

[8]     *See* Ex. 136 (Lust Dep.) 28:19-22 ("Q. Can you explain what cross-leveling is? A.  When a requirement is generated at one location, . . . material from another location is used to satisfy the requirement at the first location."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 23:18-24:4 ("Cross leveling is when you move an item from one site to another site to satisfy a demand at the second site . . . without going to the procurement system to get an item."); Ex. 142 (Rock Dep.) 52:22-53:4 ("My familiarity with cross-leveling is that when various bases had material that they weren't using that another based had obligation for due to projects by the government, et cetera, and that base could allow them to use that material, we cross-level it from one base to another."); Ex. 94 (Expert Report of M. Rudolph) at 43-47.

[9]     Ex. 94 (Expert Report of M. Rudolph) at 4-5 ("Cross-leveling is not unique to LOGCAP III – it is a practice employed across the private and public sectors (especially within DoD) for effectively and efficiently managing enterprise inventories and operations of the magnitude, breadth, depth, and geographic dispersion required by LOGCAP III."), at 43 ("Cross-leveling is an industry concept and standard for fulfilling demands and, *balancing/rebalancing* enterprise inventories across multiple and disparate site locations to fulfill emerging demands on the system without buying inventory from external sources when it already exists in an excess posture within the enterprise.") (emphasis in original).

10.      In addition to being a standard and expected inventory management practice, under the LOGCAP III contract and in connection with its duties to manage inventory on LOGCAP III, KBR was required to check for available material and use it before buying more, and to only buy supplies and materials necessary for performance under the contract, as both KBR and the Government agreed.[10]

---

[10]      Ex. 138 (McNamara Dep.) 279:7-280:2 ("Q. . . . [D]id you have a view on . . . whether KBR was appropriately cross-leveling property in the 2007 to 2012 time period? [Objection.] A. . . . They needed to have been doing it . . . because it was part of . . . their property procedure. It was part of what was required of them as a prudent contractor."), 590:13-18 ("If you are purchasing something and you know that you have a large operation, then as a prudent contractor, you would be required to screen through your system to see if there is any availability of . . . these items or property that you're currently trying to buy . . . ."), 597:20-598:9 ("Q. Do you know . . . when KBR was required to certify that it had attempted to cross-level before making purchase? A. There was a modification to the contract. I don't remember exactly when. It was sometime after 2006. I don't know if it was 2007 or 2008. . . . [I]t is part of the contract."); Ex. 136 (Lust Dep.) 30:13-17 ("Q.   . . . [W]ere you aware that the obligation to cross-level was a contractual requirement in KBR's contract with the United States Government? [Objection.] A.  Yes."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 38:22-39:8 ("Q.  . . . Any other generally applicable instructions from the U.S. Government concerning KBR cross leveling between task orders other than those that you just referenced? [Objection.] A.  . . . Mary Wade, who was the contract administrator for the LOGCAP III contract in Houston, had said that we were to make maximum use of cross leveling where possible. She understood you couldn't do it all the time but where possible."); Ex. 135 (LaBoa Dep.) 70:24-71:21 (agreeing cross-leveling was part of KBR's property control procedures); Ex.127 (Hippert Dep.) 162:24-163:20 (agreeing his "view at the time" was that cross-leveling was expected); Ex. 134 (King Dep.) 16:21-17:2 ("Q. . . . With respect to KBR's work on LOGCAP-III, was KBR supposed to try to cross-level material and property before purchasing new materials and property? [Objection.] …  A.  Yes."); Ex. 142 (Rock Dep.) 520:17-22 ("Q.  And it was KBR's obligation under LOGCAP III to cross level property [and materials]; is that right, sir? [Objection.] A.  I think . . . where possible, yes."); Ex. 141 (Ritondale Dep.) 105:23-106:6 ("Q. . . . [I]s it your understanding that KBR was supposed to try to cross-level property and materials at some point in the procurement process? [Objection.] A.  My understanding is at some point in time the cross-leveling was something that was supposed to occur."); Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."), '0037-38 (incorporating FAR 52.216-7, FAR 52.232-20, FAR 52.232-22); FAR 52.216-7 ("Allowable Cost and Payment"); FAR 52.232-20 ("Limitation of Cost"); FAR 52.232-22 ("Limitation of Funds"); Ex. 48 (Task Order 139 Statement Of Work Change 6) at '5609 ("3.0. CONTRACTOR ACQUIRED OR GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY. Prior to

-176-

procurement of equipment to support all efforts described in this task order, the contractor shall exercise due diligence in verifying **and certify** that the required items cannot be satisfied from existing stock available from other sites covered by this task order. **This certification shall be provided to the [government] ACO [Administrative Contracting Officer].** . . . 3.1.1. **The Contractor shall adhere to the requirement priorities listed in TABLE 3.1.1. to the maximum extent possible.** For purchases that cannot be obtained **through cross leveling or** from the **Host Country** sources, the contractor shall make maximum use of the Federal Supply System (FSS). **REQUIREMENTS PRIORITIES 1 USG military unit, organic, green suit[;] 2 Cross level within LOGCAP Task Order[;] 3 Other Task Orders within LOGCAP[;] 4 Host Country sources[;] 5 FSS[;] 6 Commercial.**") (emphasis in original); Ex. 41 (Task Order 159 Statement Of Work) at '5488-89 (same, without emphasis); Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5992 ("All property, whether government furnished or KBR acquired, must be: . . . Reasonable quantities, commensurate with the work to be accomplished."), at '5993 ("Consuming: Quantities of material/supplies produced or procured for incorporation into an end item or otherwise consumed will . . . Be reasonable when compared to the work/job at hand and Material Requisitions . . . Be promptly returned to stock and recorded when determined to be excess."), at '5994 ("Government property will be disposed of by: . . . Screening items against existing and anticipated needs . . . Promptly reporting excess items . . . .Receiving property authority from the Government . . . prior to disposal."), at '6015 ("Requisitions for all property, whether government furnished or KBR acquired, must: . . . Be contractually authorized and necessary for performance of the prime contract . . . Be for the quantities required for said performance . . . ."), at '6017-021 ("Warehouse personnel will first attempt to fill requisitions from stock on-hand. . . . If suitable property is available for issue, warehouse personnel will [take specific steps] . . . Property may not be available, or there may not be sufficient stock on-hand to fill the entire quantity. When this happens, Material Control takes action to obtain the property for the requester. . . . Material Control – Processing Requisitions for cross leveling or Purchasing. . . . Upon return Materials Control will first check the theater inventory to determine if the requisition can be filled from existing stock. If suitable material is located, materials control will forward a copy of the approved Materials Requisitions. . . . If suitable material/equipment can not be located in the Theater Inventory, Material Control processes the approved MR [material requisition], establishes a manual record file by MR [material requisition] number and forwards to Procurement for purchase action."); Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6168 ("All property, whether government furnished or KBR acquired, must be: . . . Reasonable quantities, commensurate with the work to be accomplished."), at '6169 ("Consuming: Quantities of material/supplies produced or procured for incorporation into an end item or otherwise consumed will be: . . . reasonable when compared to the work/job at hand and Material Requisitions. . . . promptly returned to stock and recorded when determined to be excess."), at '6170 ("Government property will be disposed of by: . . . Screening items against existing and anticipated needs. . . . Promptly reporting excess items. . . . Receiving property authority from the Government . . . prior to disposal."), at '6227 ("Requisitions for all property, whether government furnished or KBR acquired, must: . . . Be contractually authorized and necessary for performance of the prime contract; . . . Be for the quantities required for said performance . . . ."), at '6230-32 ("Material Control personnel will first attempt to fill the requisitions from stock on-hand and will also check the Automated Inventory Control System for Theater wide availability of the item(s) being requested. . . . If suitable property is available for

issue, from on hand stock, warehouse personnel will [take specific steps]. . . . If suitable property is found at another site, the Material Manager or designee will . . . Verify via the owning Site Material Manager that the requested item(s) are excess to that site's need and is available for cross utilization [and take specific steps] . . . . Property may not be available, or there may not be sufficient stock on-hand to fill the entire quantity. When this happens, Material Control takes action to obtain the property for the requester. . . . All requisitions must be coordinated with cost control and approvals obtained from project management, government LOTD'S, and contract modifications, before submitting for procurement action. . . . Upon return Materials Control processes the approved MR [material requisitions], establish a manual record file by MR [material requisition] number and forwards to Procurement for purchase action."), at '6313 ("Consumption of Government property shall be reasonable when compared to requirements. . . . Quantities of property produced or procured for incorporation into an end item or otherwise consumed will . . . Be reasonable when compared to Material Requisitions. On hand stocks in the Materials warehouses will be maintained in reasonable quantities to support contractual requirements and in accordance with specific project policies or replenishment lead time. Stock levels will be based on equipment density, population to be supported, recurring demands or the history of a previous project with like property. . . . Unused Materials from trades on hand stock, special projects, ACL's LOTD's etc must be returned to the Material Warehouse within a reasonable period of time after the work is completed or no demands. Material Control department will ensure returned unused materials are posted to the automated inventory system with appropriate documentation within 48 hrs. Materials determined to be excess must be disposed of in accordance with Disposition Tab."); Ex. 91 ("KBR Distribution of Government Property DESKTOP OPERATING PROCEDURE," dated Aug. 23, 2008) '0251 ("The DMC (Distribution Management Center) will be responsible for screening _all_ requests for procurement action for possible Cross Level support. . . . All requisitions for procurement action will flow through the DMC and be screened for availability within theater prior to purchase.") (emphasis in original), at '0256 ("If a site foresees a need for an item(s), it is contractually obligated to attempt to obtain the items through cross utilization within its project (group of sites)."); Ex. 101 (Nov. 2, 2007 DCMA Letter of Technical Directive to KBR) at '6706 ("All equipment MRs [material requisitions] shall be initially submitted to the site ACO. . . . All equipment MRs [material requisitions] shall contain the following information: . . . (3) Has KBR checked for theater-wide re-distribution under the cross-leveling process?"); Ex. 24 (July 1, 2009 KBR Technical Direction Bulletin re: PCARSS Process) at '4270 ("KBR has a responsibility to cross level before purchase."); Ex. 34 (containing June 4, 2011 email from KBR's Head of the DMC, C. O'Muirgheasa) at '3826 ("It is a contractual requirement on LOGCAP III to cross level items in order to reduce spending, eliminate excess, and, nowadays just as importantly, get available material to other[] sites ASAP."); Ex. 44 (June 30, 2011 internal KBR email from T. Hippert to M. Wade) at '0608 ("LOGCAP III . . . is reporting cost avoidance on material that is excess in one camp and moved to another, we call that cross-leveling. These slides are being briefed to the Government and I don't think it's a true cost avoidance. My concern is that the government paid for the material and we are expected to be good stewards and properly manage the inventory. So c[ross]-level is expected."); Ex. 71 (July 2, 2009 Analysis by KBR's Head of the DMC) at '1369 ("Our mission is to cross level materials from locations where there is redistributable material to locations where there is a need for those materials."); Ex. 94 (Expert Report of M. Rudolph) at 19 ("KBR was obligated to cross level property and materials on LOGCAP III.") (citing sources).

11.     It is "common sense" for an inventory manager to cross-level where possible.[11]

12.     Cross-leveling saved KBR and the Government both time and money, as transferring existing inventory to where it was needed was faster than bringing new inventory into the theater, and it reduced costs by using existing, excess inventory rather than purchasing new items.[12]

---

[11]     Ex. 127 (Hippert Dep.) 101:14-104:21 ("Q. . . . Why was the requirement of cross-leveling part of the property control procedures? [Objection.] A. Just, . . . it's common sense.").

[12]     *See, e.g.*, Ex. 127 (Hippert Dep.) 103:5-104:21 ("Q. And the reason it's common sense to check to see if you have it from other sources is because it's cheaper to get it from your other sources, when you've already purchased it, than to go out and purchase it again, right? [Objection.] A. Correct. It just makes sense. . . . [Y]ou wouldn't expend anything that you don't need to. . . . [I]t's equally as important is, it's faster. If it's immediately available, you get it a lot faster than if you have to requisition it."); Ex. 134 (King Dep.) 15:12-16:3 ("Q. . . . What are the benefits of cross-leveling? A. There's many benefits. You know, cost savings would be one major one. A quicker method of getting materials to a site at a given time would be the next crucial thing."); Ex. 142 (Rock Dep.) 60:18-61:24 ("[T]he benefits of cross-leveling, primarily, number one, is the cost savings it gives the government. Now we don't have to purchase any new material, we can use the material we have already purchased, it can be cross leveled to a project. . . . [T]he number two is that we can immediately begin a project because the material is available and there's no delay"; "Q. . . . [A]re you saying in general . . . one of the benefits of cross-leveling was that the location that needed the item would receive it faster via cross level than via new procurement? [Objection.] A. Yes."); Ex. 126 (Haught Dep.) 41:15-24 ("Q. . . . As a general rule, was it true that it was faster to get the material through cross-leveling if it was available than it was to buy it new? [Objection.] A. Yes. Q. And did it save the Government money in general to get things through cross-leveling if they were available? A. It could, yes."); Ex. 144 (Sullivan Dep.) 45:10-24 ("Most of the vendors either came from Kuwait or Dubai and the travel time for goods from Kuwait or Dubai was several weeks. So, if we could cross-level internally, it would have been quicker. It would have been more efficient and we could have used materials instead of ordering"; "Q. So one of the reasons you cross-level is because it could be quicker, right? A. Quicker and it saved money. Q. And it saved money because you're using what you already have on-hand instead of buying something else, right? A. Yes."); Ex. 136 (Lust Dep.) 30:18-24 ("The purpose of cross-leveling is . . . you get material to the site who needed it the quickest way possible. In the process if you could . . . you would save money and not have to buy a second time."), 33:18-22 ("Q. So if there were supplies that were excess, would it save money to cross-level those excess supplies instead of purchasing those same supplies anew? A. Yes. [Objection.]"), 34:1-34:5 ("Q. [Was s]aving money an important objective under LOGCAP III? [Objection.] A. Yes."); Ex. 71 (July 2, 2009 Analysis by KBR's Head of the DMC, C. O'Muirgheasa) at '1368 ("[C]ross leveling provides materials to the end user much faster than if the materials are purchased. The average time for cross leveling is in the range of 16 – 20 days, whereas for purchasing the average time is 90 – 120 days"); Ex. 39 (Mar. 3, 2008 email containing draft KBR "Distribution Management

13.     There were not any additional security concerns with cross-leveling as opposed to procuring new items, as cross-leveling used the same supply road network that all supplies were transported on, traveling via truck convoys.[13]

### A.     KBR Knew That the Government Would Not Pay for Unnecessary Purchases of Inventory

14.     An improper failure to cross-level leads to costs that are not reimbursable under the terms of LOGCAP III. In order to be reimbursable, KBR's costs under LOGCAP III had to be "allowable" in accordance with FAR Subpart 31.2.[14]

---

Center Proof of Principle – CJOA" presentation) at '0733 ("Not only will [the DMC's cross-leveling] speed the requisition cycle time, but will also reduce the delivery lead time as well. **Benefits** • Reduction of excess material across theatre. Reduction of delivery lead time for materials. • Immediate and emergent requirements (P1) will be filled immediately. . . . • Shorter handling time for the requisitions with new process.").

[13]     Ex. 138 (McNamara Dep.) 106:8-9 ("All of the property moved from camp to camp under a convoy that the military were in charge of."), 411:10-15 ("Q. . . . [I]f one of the bases wants to buy some new material, how does that get to them? [Objection.] A. It . . . gets there by convoy. Everything gets there by convoy."); Ex. 140 (Pagonis Dep.) 92:12-93:12 ("I never – I never separated the two [transporting new inventory versus transporting existing inventory]. It was all one system."); Ex. 142 (Rock Dep.) 92:10-16 ("Q. . . . [W]hat kind of support did the U.S. Military provide [for the trucks when they were moving property and materials between sites]? A. Armed escort. Q. And was that each and every time a KBR truck moved from site to site to transport property and materials? A. Yes."), 94:17-95:10 ("Each location or each base cluster had a [KBR Theater Transportation Mission] operations site. And at each one of those locations, every day convoys moved to various locations throughout the Theater. . . . [I]t was on a regular schedule that [KBR] moved materials and equipment from sites to sites. Q. . . . [I]rrespective of whether the item was purchased new or whether it was cross-leveled, it would travel by truck and by convoy to the receiving site; is that correct? A. To the best of my knowledge, now, yes."), 410:13-20 (questioning by KBR's counsel) ("Q. . . . Were there regular convoys among all the different bases in Iraq? A. Yes, there were. Q. Okay. Was the frequency different than, for example, the frequency of convoys that were available on the main supply route? A. We had daily movements between all bases and on the main supply route.").

[14]     Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0037 (incorporating FAR 52.216-7); FAR 52.216-7 ("Allowable cost and payment"); *see also* Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be

15.     Subpart 31.2 of the FAR details that to be "allowable," a cost must be "reasonable."

FAR 31.201-2 ("Determining Allowability"). Subpart 31.2 provides additional information about

what "reasonable" means:

> (a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business…. No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.
>
> (b) What is reasonable depends upon a variety of considerations and circumstances, including (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance; (2) Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations; (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and (4) Any significant deviations from the contractor's established practices.

FAR 31.201-3 ("Determining Reasonableness"). KBR's expert agreed that significant deviations

from the contractor's own established practices are a component of determining whether a cost is

"reasonable."[15]

16.     Ordering new supplies when KBR already had excess amounts of that same supply

on hand was not "reasonable," and thus such expenses were not "allowable" under LOGCAP III.[16]

---

reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26.").

[15]     Ex. 121 (Branch Dep.) 233:15-21.

[16]     FAR 52.216-7 ("Allowable Cost and Payment"); FAR 31.201-3 ("Determining Reasonableness").

17.     Rich Kaye, a member of KBR's Senior Leadership Team on LOGCAP III, knew that the Government would not pay KBR for purchasing new items if the item was already in stock:

> If C-Sites has an item(s) that can fill a [material requisition] ....and you are the only place it can come from ....and we don't cross-level it, we're going to create a [purchase order] (and expend $$) for items that have on hand. Sure as we're having this conversation, the DCAA is going to audit our excess disposition process. **To have something on hand and to not use it in lieu of purchasing more is a recipe for the DCAA to find fault with us and collect back what we paid for the item via a Form 1**.[17]

18.     In addition to being "allowable," LOGCAP III specified that KBR would be reimbursed only for those items purchased which were "necessary for performance" of KBR's duties under the contract.[18]

19.     According to Maria McNamara, the Defense Contract Management Agency's ("DCMA's") Prime Property Administrator assigned to KBR from 1997 to 2014, if a contractor does not cross-level, and buys new materials rather than use existing and already purchased excess materials, the contractor has purchased items "that may not be necessary for – for the contract," and has increased the Government's costs.[19]

---

[17]     Ex. 70 (Mar. 3, 2010 internal KBR email from KBR's Deputy Program Manager, R. Kaye) at '2915 (emphasis added); Ex. 129 (Kaye Dep.) 24:11-25:8 (agreeing R. Kaye was member of KBR's "Senior Leadership Team" and directly reported to KBR's Principal Program Manager, G. LaBoa). The DCAA is the Defense Contract Audit Agency. *See* Ex. 138 (McNamara Dep.) 109:14-15. A "Form 1" is a letter "issued by the government for potentially unallowable costs" after review by the DCAA. Ex. 131 (KBR 30(b)(6) (Jacobs) Dep. ) at 18:3-17.

[18]     Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) § 31.205-26.").

[19]     Ex. 138 (McNamara Dep.) 23:12-18, 582:3-11.

**B.  The Task Orders Issued by the Government Required KBR to Cross Level**

20.  To initiate work under LOGCAP III, the Government issued task orders to KBR.[20]

21.  When performing a task order, KBR has specific responsibilities under the LOGCAP III base contract in addition to the specific responsibilities articulated in the statement of work for each task order.[21]

22.  The Statements of Work ("SOW") were another part of the LOGCAP III contract.[22]

---

[20]  Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 20:20-21:13 ("Task orders were the document[s] issued from the government to KBR that told us what we were supposed to do, the time frame we were supposed to do it in and the amount of money we had to do it with."). Task orders were incorporated into the LOGCAP III contract. Ex. 148 (Wade Dep.) 26:23-25.

[21]  *See, e.g.*, Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 ("For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) 31.205-26."); Ex. 62 (July 22, 2004 Amendment P00008 to LOGCAP III Base Contract) at '3166 ("The purpose of this modification is to incorporate Task Order Cross Utilization of Government Property into the basic contract and is applicable to all current and future task orders awarded under this contract.  . . . Definition: Cross Utilized Property is government property purchased against one task order which is subsequently loaned to another task order on a temporary basis. Cross-utilized property shall remain accountable to the task order against which it was purchased, unless it has been duly transferred to another task order, in which case it will remain accountable to the task order to which it has been transferred."); Ex. 100 (Task Order 139) at '1481 ("[A]ll other clauses, terms and conditions set forth in the Basic LOGCAP contract DAAA09-02-D-0007 apply."); Ex. 48 (Task Order 139 Statement Of Work Change 6) at '5606 ("The contractor shall provide all resources and management necessary to perform the mission in accordance with basic Contract No. DAAA09-02-D-0007 and the Task Order (TO) Statement of Work (SOW) described herein."); Ex. 40 (Sept. 1, 2008 Task Order 159 Statement Of Work) at '5828 ("All clauses and terms and conditions set forth in the Basic LOGCAP contract DAAA09-02-D-0007 apply."); Ex. 41 (Aug. 25, 2008 Task Order 159) at '5486 ("The contractor shall provide all resources and management necessary to perform the mission in accordance with basic Contract No. DAAA09-02-D-0007 and the Task Order (TO) Statement of Work (SOW) described herein.").

[22]  Ex. 142 (Rock Dep.) 179:9-11 ("They [Statements of Work, or SOWs] were part of the contract. It stated the exact things we were supposed to do, required to do."). An SOW is a more specific articulation of KBR's responsibilities under a task order. Ex. 148 (Wade Dep.) 32:19-22.

23.     The two main task orders in this case, Task Order 139 and Task Order 159, both had accompanying SOWs that required KBR to cross-level.[23]

### C.     KBR Developed and Was Required to Follow Specific Procedures for Acquiring and Managing Inventory, Including Cross-Leveling

24.     KBR understood its contractual requirement to cross-level supplies, incorporating the requirement into a Government-approved set of Property Control Procedures ("PCP"), and into detailed "Desktop Operating Procedures" ("DOPs") and "Technical Directives" ("TDs") for its personnel. LOGCAP III required that KBR implement and maintain a PCP, which the Government reviewed and approved.[24]

---

[23]     *See*, *e.g.*, Ex. 48 (Task Order 139 Statement of Work Change 6) at '5609 ("3.0. CONTRACTOR ACQUIRED OR GOVERNMENT FURNISHED EQUIPMENT AND PROPERTY. Prior to procurement of equipment to support all efforts described in this task order, the contractor shall exercise due diligence in verifying **and certify** that the required items cannot be satisfied from existing stock available from other sites covered by this task order. **This certification shall be provided to the [government] ACO [Administrative Contracting Officer].** . . . **The contractor shall adhere to the requirement priorities listed in TABLE 3.1.1. to the maximum extent possible.** For purchases that cannot be obtained **through cross leveling or** from the **Host Country** sources, the contractor shall make maximum use of the Federal Supply System (FSS). **REQUIREMENTS PRIORITIES 1 USG military unit, organic, green suit[;] 2 Cross level within LOGCAP Task Order[;] 3 Other Task Orders within LOGCAP[;] 4 Host Country sources[;] 5 FSS[;] 6 Commercial ...** ") (emphasis in original); Ex. 41 (Task Order 159 Statement of Work) at '5488-89 (same, without emphasis).

[24]     *See* Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0039 (incorporating FAR 52.245-1); FAR 52.245-1 ("Government Property"); Ex. 142 (Rock Dep.) 84:4-13 ("Q. . . . [W]hat were the PCPs? A. . . . [T]he property control procedures were a process by which [KBR] accounted for our property . . . on our sites. Q. And were the PCPs approved by the government? [Objection.] A. Yes."); Ex. 134 (King Dep.) 21:18-22:2 ("Q. What are the PCPs? A. It's a government-approved document that's a -- property control document . . . . -- we write what we're going to do to protect and -- from A to Z . . . from cradle to grave as we call it, on all procedures for handling U.S. government property. And that document is reviewed by the government, the corporate government property administrator for her review, and she signs off on it concurring with everything we're going to do."); Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5978; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6157.

25.     KBR's PCPs required KBR to cross-level, and included specific cross-leveling procedures KBR was to follow. This point was understood at the highest levels of KBR and by the DCMA.[25]

26.     KBR's PCPs required KBR to order inventory in "[r]easonable quantities, commensurate with the work to be accomplished."[26]

27.     KBR's PCPs required KBR to dispose of excess, unneeded inventory only after "[s]creening items against existing and anticipated needs," "[p]romply reporting excess items," and receiving Government approval.[27]

28.     KBR's PCPs required that when filling a requisition, KBR "personnel will first attempt to fill requisitions from stock on-hand."[28]

---

[25]     *See* Ex. 135 (LaBoa Dep.) 70:24-71:21 (agreeing cross-leveling was part of KBR's property control procedures); Ex. 138 (McNamara Dep.) 279:7-280:2 ("Q. . . . [D]id you have a view on . . . whether KBR was appropriately cross-leveling property in the 2007 to 2012 time period? [Objection.] A. . . . They needed to have been doing it . . . because it was part of . . . their property procedure. It was part of what was required of them as a prudent contractor."); Ex. 76 (containing Feb. 23, 2010 email from KBR's Deputy Program Manager – Support, R. Kaye) at '3447 ("Going forward, and in accordance with the PCP, not issuing something because you are 'under inventory' is not acceptable. We can not continue to order in material that we know to already be here in country.").

[26]     Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5992; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6168. They similarly required KBR to order inventory that was "contractually authorized and necessary for performance of the prime contract" and "for the quantities required for said performance." Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6015; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6227.

[27]     Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '5994; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6170.

[28]     Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6017; Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6230.

29.     KBR's PCPs required checking theater-wide inventory as well when filling a requisition.[29] In sum, KBR's PCP expressly required KBR to screen requisitions against its existing inventory and to fill the requisitions through cross-leveling when it had supplies available in the theater.

30.     In performing its duties under LOGCAP III, KBR issued formal written documents for use by its employees to standardize processes across its sites DOPs.[30]

31.     As an example of a DOP setting forth KBR's cross-leveling obligations with specific criteria and procedures for KBR to follow, in July 2006, KBR's Redistribution of Government Property DOP required KBR to make "every effort" to cross-level with existing inventory before purchasing new items.[31]

---

[29]    Ex. 1 (KBR's Government-Approved Property Control Procedures, dated Sept. 21, 2006) at '6019 ("Material Control – Processing Requisitions for cross leveling or Purchasing . . . Upon return Materials Control will first check the theater inventory to determine if the requisition can be filled from existing stock."); Ex. 89 (KBR's Government-Approved Property Control Procedures, dated July 15, 2008) at '6230-31 ("Material Control personnel . . . will also check the Automated Inventory Control System for Theater wide availability of the item(s) being requested. . . . Material Control – Filling Requisitions from Theater Stock. . . . If suitable property is found at another site, the Material Manager or designee will: . . . Verify via the owning Site Material manager that the requested item(s) are excess to that's need and is available for cross utilization.").

[30]    *See* Ex. 133 (KBR 30(b)(6) (Lust) (Sept. 29, 2021) Dep.) 193:22-194:8. The DOPs told KBR employees how to do their jobs correctly. *Id.*

[31]    Ex. 103 (July 2006 KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures") at '9114 ("After a Materiel Requisition has been approved but prior to being turned over to procurement for purchase, Materiel Control will check the Theater Wide inventory and the Redistribution cell to determine if a requisition can be filled from existing stock. Every effort to fill requisitions within the theater shall be taken utilizing inventories on the KBR portal. If items are found within these inventories every reasonable effort shall be taken to redistribute these items."); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 34:3-24 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that every effort to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal.").

32.     As another example, KBR's "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures," revised June 2007, stated:

> **Cross Level Requisitioning Process**. Upon receipt of a material requisition Materiel Control will check the theater-wide inventory through STEAM [KBR's inventory management program, also referred to as MAXIMO] to determine if items can be filled from excess stock. Found items will be cross leveled through the procedures in 5.1 and 5.2.[32]

33.     As another example, KBR's "Distribution of Government Property DESKTOP OPERATING PROCEDURE," dated August 23, 2008, stated:

> The DMC (<u>Distribution Management Center</u>) will be responsible for screening <u>*all*</u> requests for procurement action for possible Cross Level support. . . .
>
> All requisitions for procurement action will flow through the DMC and be screened for availability within theater prior to purchase. . . .
>
> If a site foresees a need for an item(s), it is contractually obligated to attempt to obtain the items through cross utilization within its project (group of sites). . . .[33]

### D.     Overview of KBR's Process for Cross-Leveling

34.     Initially, KBR did not have an integrated inventory management system; instead of keeping track of inventory in a centralized system, each site maintained its own "property book,"

---

[32]     Ex. 90 (KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures," revised June 2007) at '0992 (emphasis in original); Ex. 132 (KBR 30(b)(6) (Lust) (Sept. 28, 2021) Dep.) 34:3-23 ("Q. . . . [C]an you describe what the instructions were in that particular desktop operating procedure you just referenced? A. . . . I can sum it up that every effort to fill requisition[s] within the theater shall be taken to utilize the inventory that is in KBR's portal. . . . And then in June of '07, we did a revision which added STEAM – MAXIMO/STEAM to this process.").

[33]     Ex. 91 ("KBR Distribution of Government Property DESKTOP OPERATING PROCEDURE," dated Aug. 23, 2008) '0251, '0256 (emphasis in original).

typically an Excel spreadsheet. These ad-hoc systems—one per KBR site—were maintained by KBR personnel at the site, and one site did not have visibility into another site's inventory.[34]

35. Cross-leveling is very difficult, if not impossible, without an integrated inventory management system.[35]

36. Under KBR's ad-hoc, non-centralized system, cross-leveling was laborious, tedious, and largely unsuccessful. There was no centralized, standard process; instead, if a site had a need for an item, and wanted to see if it was available elsewhere within the theater, someone would pick up the phone and call another site or send an email to another site, to see if that site had the needed item in excess.[36]

37. In October 2005, KBR requested and received approval to implement an integrated inventory management system, called MAXIMO/STEAM, for use in LOGCAP III. "The purpose of [MAXIMO/]STEAM was to get everybody on the same system so that [KBR] would see across

---

[34] Ex. 127 (Hippert Dep.) 19:21-20:25. Ex. 128 (Hurd Dep.) 15:19-24.

[35] Ex. 94 (Expert Report of M. Rudolph) at 5 ("Cross-leveling is extremely difficult to accomplish without the use of an integrated inventory management system. Without near real-time visibility of enterprise inventory requirements and levels, cross-leveling is very difficult, if not impossible, to do.").

[36] Ex. 127 (Hippert Dep.) 71:8-72:2 ("Q. . . . [W]hat you were saying is, prior to the Maximo[/STEAM] automation, the cross-leveling process could only occur at sort of an informal, ad hoc basis. Is that correct? [Objection.] A. To the best of my knowledge. I can't recall anything early on that we had electronically that they could go in and search -- or especially if we're talking . . . toilet paper, or . . . cleaning powder and stuff. No. . . . I think the majority of it would have been manual, yes."); Ex. 144 (Sullivan Dep.) 86:10-15 ("Q. . . . Prior to the implementation of Maximo[/STEAM], it was much more difficult to cross-level, correct? [Objection.] A. Prior to Maximo[/STEAM], it would have been a word of mouth."); Ex. 132 (KBR 30(b)(6) (Lust) Sept. 28, 2021) at 24:13-26:8 ("Before MAXIMO[/STEAM], it was all run by spreadsheets, so . . . this would have to be done by either E-mail or phone call . . . ."); Ex. 94 (Expert Report of M. Rudolph) at 51 ("[Manual implementation] options are cumbersome at best and are extremely labor intensive"; identifying multiple problems with manual implementations).

the entire theater, Afghanistan and Kuwait included, what everybody had, not just look at 13 different databases and see what everybody had in 13 different places."[37]

38.     KBR classified its inventory in MAXIMO/STEAM as either "Stock" (or "STK"), "Non-stock" (or "NS"), or "Special Order Items" (or "SP").[38]

39.     "Stock" or STK items were "demand-supported item[s]," or items with a certain "recurring demand," that KBR replenished when used or consumed. For an item of inventory to qualify as "Stock," there had to be at least nine demands for that item in the previous 360 days.[39]

40.     When a KBR site could replenish STK items and how much it could order depended on three metrics: the "Requisition Objective" (or "RO"), the "Reorder Point" (or "ROP"), and the "Safety Stock Level" (or "SSL"). The RO was the maximum quantity of the piece of inventory that was authorized to be on hand at a site at any given time. The ROP was the level of inventory that would trigger a reordering of the STK item; once a STK item hit its ROP, it would be reordered. The SSL was the amount of the item's inventory expected to be on hand when the

---

[37]     Ex. 20 (Sept. 14, 2007 Memorandum by KBR Principal Program Manager, Michael Mayo) at '0550 ("The decentralized approach used Excel, Access and other local spreadsheets and databases to capture receipts and issues of inventories. In October 2005 a decision was made and funded to use MAXIMO/STEAM . . . to provide total Project visibility of property and materials.").

Ex. 122 (Brannen Dep.) 38:9-16. MAXIMO/STEAM was initially implemented in connection with Task Order 139 in September 2006. Ex. 20 (Sept. 14, 2007 Memorandum by KBR Principal Program Manager, Michael Mayo) at '0550-51 ("In September, Task Order 139 sites began using the service order module. In September and October 2006, property inventories were loaded into the system; and in October and November, the materials were loaded.").

[38]     Ex. 102 (KBR Materials Stock Plan Desktop Operating Procedure Rev. #0) at '4398-99; Ex. 56 (KBR Materials Stock Plan Desktop Operating Procedure Rev. #2) at '0599-0601; Ex. 57 (KBR Materials Stock Plan Desktop Operating Procedure Rev. 03) at '5066-70.

[39]     Ex. 102 (KBR Materials Stock Plan Desktop Operating Procedure Rev. #0) at '4398; Ex. 56 (KBR Materials Stock Plan Desktop Operating Procedure Rev. #2) at '0599; Ex. 57 (KBR Materials Stock Plan Desktop OPERATING Procedure Rev. 03) at '5066.

reorder arrived. The SSL was intended to ensure there was a minimum amount of the STK inventory on hand in case of a delay in resupply or a sudden increase in demand.[40]

41.     KBR's procedures identified specific objective criteria for when items classified as STK could be cross-leveled. For example, when a request to cross level is received and the shipping site can fill the request out of inventory above the safety level, "then the cross leveling request *will be filled*."[41]

42.     "Non-stock" or NS items were "non-demand supported" items that were not replenished when used. If an item of inventory received three or fewer demands in the previous 360 days, it was "Non-stock."[42]

---

[40]     Ex. 102 (KBR Materials Stock Plan Desktop Operating Procedure Rev. #0) at '4399-4400; Ex. 56 (KBR Materials Stock Plan Desktop Operating Procedure Rev. #2) at '0604-05; Ex. 57 (KBR Materials Stock Plan Desktop Operating Procedure Rev. 03) at '5072; *see also, e.g.*, Ex. 126 (Haught Dep.) 206:9-13.

[41]     *See, e.g.*, Ex. 90 (KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures," revised June 2007) at '0993 ("All sites are required to support cross leveling requirements. When a request to cross level is received and the shipping site can fill the request out of inventory above the safety level then the cross leveling request will be filled."); Ex. 47 (KBR Desktop Operating Procedures: Distribution of Government Property, dated June 2008) at '2887 ("The Safety Stock Level (SSL) is the determining factor when filling cross level material requests. The shipping site must fill request if the requested item is above the SSL in [MAXIMO/]STEAM."); Ex. 16 (KBR Distribution of Government Property Desktop Operating Procedure, Rev. #01, dated Aug. 23, 2008) at '9179 ("The Safety Stock Level (SSL) is the determining factor when filling Cross Level material requests;" cross-level requests must be filed "if the requested item is above the SSL in [MAXIMO/]STEAM."). (emphasis added)

[42]     Ex. 102 (KBR Materials Stock Plan Desktop Operating Procedure Rev. #0) at '4399; Ex. 56 (KBR Materials Stock Plan Desktop Operating Procedure Rev. #2) at '0599-0600; Ex. 57 (KBR Materials Stock Plan Desktop Operating Procedure Rev. 03) at '5069-070.

43. KBR's procedures identified specific objective criteria for when items classified as NS could be cross-leveled; items classified as "non-stock" could be cross-leveled and sent to sites that needed the item, regardless of the quantity of the item that the site had on hand.[43]

44. In addition to the STK and NS classifications, KBR could classify an item of inventory as "reserved" if it met certain criteria. Under KBR's procedures, items that were "reserved" could not be cross-leveled.[44]

45. When an item of inventory was in transit from one place to another, that inventory could be placed in a temporary, virtual storeroom called a "TREC" in KBR's inventory management program.[45]

---

[43] Ex. 65 (containing Sept. 11, 2009 email from L. Lust, Deputy Principal Program Manager) at '4478 (directing cross-level requests to be filled from "non-stock lines down to zero").

[44] Ex. 33 (internal KBR email containing May 19, 2011 email from KBR Theater Manager PSM-Supply, E. Faris) at '9202 ("You must have a valid ACL [Authorized Change Letter] to reserve items . . . ."); Ex. 124 (Faris Dep.) 160:11-161:2 ("A. Having a valid ACL [Authorized Change Letter]. That means their ACL came through, they had an ACL. That ACL might have gotten closed out. They didn't go in there and close it out. They have left it in there. Q. And again, the ACL . . . is like a work order. If you put material under that category of an ACL, it's not available for any purpose other than to work on that ACL until you close that out? A. Correct."); *see also* Ex. 30 (internal KBR email containing June 18, 2009 email from KBR Material Control Supervisor, T. Hayes) at '2483 ("He said they are placing everything on reserve so DMC won't ask for it CL [cross-leveled].").

[45] Ex. 144 (Sullivan Dep.) 88:11-18 (testifying a TREC is "a temporary receiving storeroom"; "TRECs were created because they were meant to be used as a virtual reminder of material that was in transit."); 93:6-10 (agreeing "TRECs were created to show that it was somewhere in the possession of KBR but not at the actual site where its ultimate destination was"), 97:12-98:1 ("Q. Ideally, once the material in question arrived at its final destination at a particular site, you would want to move it from a TREC into the storeroom electronically in Maximo as quickly as possible, right? [Objection.] A. You would want to . . . put it on the shelf physically. You would want to perform in Maximo the transfer or the receipt as quickly as you could after you had placed it on the shelf. Q. Because that's the way people know that . . . the material is actually there at the site, right, they can see it in Maximo? A. Yes. [Objection.]"). KBR's proper accounting of TRECs was of critical importance; according to a KBR Technical Directive Bulletin issued in May 2009, "The integrity of the TRECs is the cornerstone of a valid receiving and inventory control system." Ex. 11 (May 2009 KBR Technical Direction Bulletin re: TRECs) at ECF Page 1.

46.     Under KBR's procedures, upon physical receipt of an item and within 48 hours from receipt, KBR personnel were required to change the inventory data to reflect that the item was no longer in the TREC, but in the storeroom where the item was physically located.[46]

47.     While inventory remained in TRECs, it could not be cross-leveled because the system regarded it as unavailable.[47]

48.     In 2008, KBR established a Distribution Management Center ("DMC") and gave it explicit responsibility for cross-leveling before purchasing any new material. The DMC was responsible for screening all requests for material procurement to determine if the requested material was available in theater.[48]

---

[46]     Ex. 11 (May 2009 KBR Technical Direction Bulletin re: TRECs) at ECF Page 1 ("Material must be received within 24 hours and entered into STEAM within 48 hours in accordance with the KBR PCP. . . . Material should be received in the TREC and when physically accounted for on the Daily Dock Report, be transferred to the appropriate storeroom and managed by Warehouse personnel.").

[47]     Ex. 139 (O'Muirgheasa Dep.) 166:24-167:5 ("Q. . . . [I]f something was in a TREC, your understanding was you weren't allowed to Cross Level it or weren't able to Cross Level it, I should say? [Objection.] A.  That is my understanding, yes."); Ex. 124 (Faris Dep.) 207:11-18 ("Q. . . . [Y]ou're aware that if a site . . . wanted some material and that material was in the TREC and it was plenty of material there . . . that the . . . site would not be able to see that material was available for cross-leveling? [Objection.] A.  Correct."); Ex. 126 (Haught Dep.) 233:15-234:3 ("A.  A TREC is a temporary receiving place and the only time that it should stay in there for any length of time is if it's taking a while to move from physically one site to another site. But once it's received, it should be received and annotated in a storeroom at the receiving location. Q. . . . [L]et's say some material doesn't get . . . electronically moved into the correct storeroom in STEAM. . . . Can that material be seen if the DMC wants to cross-level it? A.  To my understanding, if it's in a TREC, they wouldn't necessarily be able to see it."); Ex. 127 (Hippert Dep.) 145:1-5 ("Q. . . . [W]hile a piece of property would be designated in a TREC, it was not available for cross-leveling, correct? A.  Well, that's correct because . . . it was not physically on ground, right.").

[48]     Ex. 139 (O'Muirgheasa Dep.) 29:20-23 (agreeing DMC was started in the time frame of February/March, 2008); Ex. 128 (Hurd Dep.) 55:2-58:4 ("Distribution management center was a project by senior leadership with the view of redistribution office being directly involved with tasking sites to cross-level by direction material or property with the visibility in [MAXIMO/]STEAM on a line-by-line item. . . . [T]hey directed me . . . to get it set up in Kuwait early '08."), 62:11-15 (agreeing DMC office in Kuwait opened after April 1, 2008); Ex. 16 (KBR Distribution of Government Property Desktop Operating Procedure, Rev #01, dated Aug. 23,

49.     Among other required steps in the cross-leveling process, a site requesting an item

of inventory had to place the request in "MATCON" status in [MAXIMO/]STEAM. If the request

was not put in MATCON status, it was not checked for cross-leveling.[49]

2008) ("The DMC (Distribution Management Center) will be responsible for screening _all_ requests
for procurement action for possible Cross Level support.") (Emphasis in original); Ex. 39 (Mar. 3,
2008 email containing draft KBR "Distribution Management Center Proof of Principle – CJOA"
presentation) at '0732 ("**What is the Distribution management center Proof of Principle?** It's
an augmentation of the Theatre Redistribution group. DMC will screen all requisitions submitted
by CJOA for cross leveling potential. To fill line items from available stock in Theater and cancel
the requested line items. . . . **When will this take place?** 2nd week of March."), at '0733 ("**Purpose**
The Distribution Management Center Initiative will check item availability on all requisitions and
cross level when possible, thereby reducing the amount of redistributable material. Not only will
this initiative speed the requisition cycle time, but will also reduce the delivery lead time as well.").
The purpose of the DMC was to centralize the cross-leveling function and make it more efficient;
by having a central office handle cross-leveling, it would be easier to compel sites to cross-level,
and monitor their performance in doing so. Ex. 63 (internal KBR email containing Aug. 2, 2010
email from KBR's Head of the DMC, C. O'Muirgheasa) at '0042 ("The DMC was created to
perform cross leveling theater-wide in order to compel sites to perform cross levels for material
requisitions . . . ."); Ex. 139 (O'Muirgheasa Dep.) 30:10-31:6; Ex. 39 (Mar. 3, 2008 email
containing draft KBR "Distribution Management Center Proof of Principle – CJOA" presentation)
at '0733 (Benefits of DMC include, "Supports the site in thoroughly checking theater for request.
Visibility of material across theatre. Material Management center will be accountable for tracking
cross leveled material with assistance from Log Cell. Shorter handling time for the requisitions
with new process.").

[49]     Ex. 16 (KBR Distribution of Government Property Desktop Operating Procedure,
Rev. #01, dated Aug. 23, 2008) at '9181. "Once coded 'MATCON' the DMC will screen the
requisition and task applicable sites to fill line items found available in theater." _Id._; _see also_
Ex. 132 (KBR 30(b)(6) (Lust) Sept. 28, 2021 Dep.) 30:4-32:3 ("The DMC would then get it, once
it was coded into MATCON, and take in that requisition, check across . . . the entire inventory we
had within LOGCAP III to see if . . . that demand could be satisfied."). In other words, placing a
requisition in MATCON status was a code to signify to the DMC to attempt to cross-level and fill
the request with excess inventory already on hand. _See_ Ex. 126 (Haught Dep.) 52:15-53:12
("Q. . . . MATCON, does that stand for material control? A. I believe so. Q. . . . Was that . . .
kind of the flag to the DMC that an item should be checked for cross-leveling if they . . . saw that
in the system? [Objection.] A. I believe that's correct."; agreeing KBR's policy was for DMC to
screen all requisitions for cross-level opportunity), 145:16-20 ("Q. . . . [S]o the
[MAXIMO/]STEAM system, if you put it in MATCON, that's a flag to the DMC to try to cross-
level. Right? [Objection.] A. I believe that's correct.").

50. Further, before a site declared an item of inventory to be unnecessary and return it to the Government, KBR had to perform a check and verify that it was not needed elsewhere in the theater.[50]

51. The process of returning unneeded, excess inventory to the Government was called the Plant Clearance Automated Reutilization Screening System, or "PCARSS." "The intent of the PCARSS process is to demonstrate that all reasonable steps possible have been taken to ensure that all of the items being sent to the PCARSS process have no remaining use on the LOGCAP III project, that KBR has done everything possible to maximize the usage of these items . . . ."[51]

### III. KBR Systematically Failed to Make Use of Existing, Excess Inventory

#### A. KBR Inexplicably Operated for Years without an Integrated Inventory Management System, and Its Transition to an Integrated Inventory Management System Was Fraught with Delays and Problems

52. Integrated inventory management systems have been available since at least 2000.[52]

---

[50]   *See, e.g.*, Ex. 138 (McNamara Dep.) 73:22-74:13 ("Q. . . . What's your understanding of what happens once an item is declared excess? [Objection.] A.   Then it goes into the disposal action. There are things that the contractor has to do. If it's declared excess, [the contractor] must screen first to see if [the contractor] needs it anywhere else. That's [the contractor's] first requirement. And then if there are no takers or . . . there's nothing that . . . it's needed for, it is truly excess, and [the contractor] has to schedule it. And [the contractor] has a time period to get that out.").

[51]   Ex. 127 (Hippert Dep.) 156:6-24.

Ex. 88 (containing June 18, 2009 internal KBR email) at '4356. Indeed, beginning in 2009, when returning items declared as excess to the Government, KBR certified to the Government that "The attached list of item(s) have been screened for cross level requirements throughout the theater of operation. At this time, there are no foreseeable requirements in support of the current mission." Ex. 45 (PCARSS Form) at '4258. In other words, when KBR sent items into PCARSS, it was representing to the Government that there was "no longer [] a need for it." Ex. 133 (KBR 30(b)(6) (Lust) (Sept. 29, 2021) Dep.) 88:20-89:17.

[52]   Ex. 97 (Expert Rebuttal Report of M. Rudolph) at 8 ("Integrated inventory management systems were abundant and available for use years prior to 2000 or 2001."), at 16 ("Integrated Inventory Management Systems were readily available and standard practice even for projects much smaller in scope, complexity, and challenges than the LOGCAP III contract, even as that

53.    Any reasonable inventory manager operating multiple sites across a region and managing hundreds of thousands of line items would have used an integrated inventory management system.[53]

54.    Though MAXIMO/STEAM was first authorized and approved in October 2005, KBR's transition to MAXIMO/STEAM took years; in October 2007, KBR was still in the process of upgrading its legacy systems to the centralized STEAM, and still facing resistance from KBR employees at various sites.[54]

55.    The effects of KBR's mismanagement of inventory, and failure to properly cross-level without a centralized inventory management program, caused hundreds of millions of dollars of excess inventory to build up in its warehouses. By May 2008, KBR had "nearly 900 million dollars worth of materials… we need to cross level instead of purchase."[55]

**B.    Overview of KBR's Systemic Failures**

56.    Even with MAXIMO/STEAM, KBR's cross-leveling efforts did not improve. An internal KBR report from July 2008 examining and analyzing inventory usage at several sites

---

contract may have been originally conceived leading up to award in 2001. For example, inventory management systems from Oracle, SAP, IBM, and other major providers were available and being used prior to 2001 when LOGCAP III was put in place.").

[53]    Ex. 94 (Expert Report of M. Rudolph) at 5, 51-54.

[54]    Ex. 122 (Brannen Dep.) 38:17-39:3 (testifying that as of September 2007, KBR was "still in the process of uploading [its] legacy systems" to STEAM); Ex. 55 (containing Oct. 16, 2007 internal KBR emails) at '5121 ("Our HQ response to the CAR [Corrective Action Request] on materials indicated that we would be off all legacy systems by the end of September. . . . DCMA visited a site and found the HVAC operation still using a legacy system (spreadsheet)."), at '5120 ("I just had my Material and Property Managers go to each site and we STILL have legacy systems in place.").

[55]    Ex. 58 (May 24, 2008 email from KBR Business Segment Manager Responsible for Operation of KBR's Integrated Inventory Management System, L. Sullivan).

found staggering proportions of underutilized and unused inventory in the following percentages: 63% of the total inventory at "A Sites JBB," 81% of the total inventory at "A Sites Ashraf," 63% of the total inventory at the "B Sites," 55% of the total inventory at the "C Sites," 53% of the total inventory at the "Taji" sites, 51% of the total inventory at the "D and F" sites, 45% of the total inventory at the "G Sites," 60% of the total inventory at the "H Sites," 77% of the total inventory at the "Kuwait" sites, 89% of the total inventory at the "T Sites," 77% of the total inventory at the Bucca site, 31% of the total inventory at the "USMI" sites, 69% of the total inventory at the "TTM" sites, and 56% of the total inventory at the "CLSS" sites.[56]

57.    In fact, KBR's systemic failures to use available inventory on hand culminated in **over $1 billion** of excess inventory on its shelves while, at the same time, KBR was ordering millions of dollars of new material—**every day** as noted by KBR's Deputy Program Manager, Rich Kaye:

> We are **purchasing $5 M per day when we've got $1.2B i[n] excess on hand**. At some point, **the DCAA [Defense**

---

[56]    Ex. 85 (July 27, 2008 internal KBR email from KBR's Theater PSM Manager-Supply, J. Haught) at report reproduced on pp. 3-18; Ex. 147 (Vujic Dep.) 57:11-60:9. An internal KBR "inventory analysis" from August 2008 found that across all of KBR's sites, fully 63% of the total inventory was underutilized. Ex. 86 (Aug. 17, 2008 email from T. Sellars) at "Site Roll Up" tab (p. 3); Ex. 147 (Vujic Dep. 73:1-79:21. An internal KBR report from May 2009 showed that the sites in Afghanistan had a 60% inventory underutilization rate. Ex. 87 (May 4, 2009 email from J. Haught attaching inventory analysis) at '3905; Ex. 147 (Vujic Dep.) 80:2-86:20. An internal KBR examination and "Analysis of Excess Inventory" of just the B sites' inventory in November 2009 found that 70% of its total inventory, totaling $70,309,058 in value, was "EXCESS." Ex. 72 (Nov. 6, 2009 internal KBR email from KBR's Head of the DMC, C. O'Muirgheasa, attaching "Analysis of Excess Inventory at B Sites") at '8710 (of $100,353,959 of "TOTAL INVENTORY," $70,309,058" was "TOTAL EXCESS"), at '8708 ("Of the over $100,000,000 of materials in inventory at B Sites, my analysis of the ASL report is that about $70,000,000 is Excess and $30,000,000 is Stock.").

**Contract Audit Agency] is going to put KBR out of business** if we keep doing this.[57]

58.     This incredible buildup of unused, excess inventory caused one KBR employee to observe: "We should build another warehouse to stock all the unnecessary material."[58]

59.     In June 2009, KBR's head of LOGCAP III, Principal Program Manager Guy LaBoa, was aware of, and communicated to other senior KBR managers about, the problematic excess of unused inventory (which he describes as "non-demand supported material") and its implications:

> **Fellows, this is going to cause a significant wrinkle for us with someone. I would like to talk you all on this before we start this train wreck ... The initial report for OPSDIR [Operations Directive] Removal of Non-Demand Supported Material yielded 130,000 lines, with 4.6 million items and an estimated value of $146 million.[59]**

60.     In 2008, Brandon Simmons, the manager of the DMC—the KBR group responsible for cross-leveling—identified and internally reported three systemic problems that "imped[ed]" KBR's cross-leveling efforts: (1) misclassifying NS items (which could be freely cross-leveled) as STK items (which could only be cross-leveled in certain situations); (2) sites simply ignoring

---

[57]     Ex. 8 (Internal KBR email containing Feb. 25, 2010 email from KBR's Deputy Program Manager – Support, R. Kaye) (emphasis added).

[58]     Ex. 30 (Internal KBR email containing June 18, 2009 emails from KBR Material Control Supervisor, T. Hayes) at '2483; *see also id.* ("He said they are placing everything on reserve so DMC won't ask for it CL [cross-leveled] . . . . Some MRN [material reference numbers], there are no issues in the last year and they are ordering material and we have stock available. Numerous items are way above reorder points and they are ordering more . . . . The above example is just one of many I have found. I have learned to not say anything as you will get demoted, sent away, or sent home."), at '2482 ("I am tired of seeing the abuse and waste going on here – I can no longer be a part of this . . . .").

[59]     Ex. 28 (internal KBR email containing June 11, 2009 email from G. LaBoa) (emphasis in original).

requests to send their unused materials to other sites for cross-leveling; and (3) sites not putting requisitions into MATCON status, thereby skipping the DMC and the cross-level system altogether. In Mr. Simmons' words:

> The three major factors impeding the DMC's ability to Cross Level under utilized materials are as follows:
>
> 1) Categorization of ASL/Inventory Lines (i.e. reflecting [STK] when demands indicates [SP] or [NS] category)
> 2) Unresponsive Sites/Projects to Tasking leading to Denials
> 3) Sites/Projects resistant to place Material Requisitions in MATCON Status; consequently, sending the Majority (if not All) directly through Procurement Channels[60]

61.     In March 2010, in an email to KBR Deputy Principal Program Manager, Larry Lust, discussing cross-leveling problems, KBR Deputy Program Manager – Support, Rich Kaye, confirmed that many of these same systemic problems continued and worsened:

> I have decide[d] to take over the management of materials since no one else here has a clue how that ought to be done . . . . **Last year, fully 35% of all requisitions (with an extended value of $401M[illion]) by-passed the cross-leveling check**. As we start to turn over more and more materials to GOI [Government of Iraq], **we are facing an increasing risk of being Formed 1 for buying items we just declared excess and gave away**.
>
> Tomorrow, I'm going in through the back door and enforcing the STK vs NS rules ….as of yesterday, we [had] **43,801 lines across Iraq being carried as STK that have 2 or fewer demands in the past 360 days**. Then, we are going to automatically calculate RO and ROP. We did a trial run on three sites and determined that **80% of their STK**

---

[60]     Ex. 3 (Internal KBR email containing Dec. 29, 2008 email from KBR's Head of the DMC, B. Simmons) at '4448. *Id.*; *see also* Ex. 79 (Internal KBR email containing Dec. 27, 2008 email from KBR's Head of the DMC, B. Simmons) at '3202 (same).

**lines had RO and ROP set above what it should be based upon demand history**.

Simultaneously, we are unreserving all reserved stock that does not have an active work order or ACL against it. **We've got $71M[illion] in reserved stock of which less than 50% is legitimate**. The rest is against cancelled ACLs, completed ACLs, or just plain **"hidden" from cross-leveling**.

**TREC storerooms is going to be my biggest challenge ….we've currently got $331M[illion] in them as of yesterday**. I've told Guy [LaBoa, KBR Principal Program Manager] this is the **Mother of all Forms 1**. As you know, someone at a primary receiving site (Dubai, Kuwait or Houston) had to enter it into [MAXIMO/]STEAM. The causative research will be brutal.

These same problems were reflected and quantified in other documents as well.[61]

62.     In April 2010, in an email to KBR Principal Program Manager, Guy LaBoa, discussing cross-leveling problems, KBR Deputy Program Manager – Support, Rich Kaye, again confirmed that many of these same systemic problems continued and worsened:

The deeper I dig, the more uncomfortable I become that we really do know what's going on. We've got **continuing issues with RO, ROP, Stk vs Non-Stk, reservations and TRECs**.

---

[61]     Ex. 81 (Mar. 20, 2010 email from KBR Deputy Program manager – Support, R. Kaye, to KBR Deputy Principal Program Manager, L. Lust) at '9112 (emphasis added). *See also* Ex. 46 (March 13, 2010 KBR "Supply Discipline PSM Supply - Areas of Opportunity") at '6110 ("Currently, there are 22,832 line items in the amount of $93,768,841.05 that are in reserve. Of 3,553 total line items, only 15% in the amount of $83,852,852.63 that [] are justified by an ACL."), at '6111 ("There are several items that are in the TREC storerooms that have not been transferred to the end destination storerooms. As a result, there is a lack of accountability of the items, inaccurate current balances, and unnecessary IARs [Inventory Adjustment Reports] reviewed and signed by the PM and the Client."), at '6112 (identifying "43,653 [STK] lines that should be updated to NS. This reflects as an inventory error as the STK category is improperly categorized. … Changing the item category to NS will depict a true picture of the actual excess items available for cross level."), at '6116 ("[T]rades areas have materials/equipment that could be excess to their area based on the demand history.").

LaBoa made clear that the people who reported to him were straight shooters and did not exaggerate.[62]

### C. KBR Did Not Even Check Its Existing Inventory Before Making New Purchases

63.     In 2009, KBR spent over $401 million—representing half of the value of all material requisitions for that year—without even checking its existing inventory to see if it already had an excessive amount of a needed item in theater before purchasing that item new. This problem was discussed internally among KBR's senior leadership team who were in possession of the quantitative analysis of the problem.[63]

64.     Even higher percentages of KBR's material requisitions and of the value of the requisitions bypassed the cross-level check in 2007 and 2008. In 2007, out of 65,372 Material Requisitions valued at $1,237,891,670.75, a total of 52,488 (80.3%) of those Material Requisitions valued at $949,886,655.51 (76.7% of the dollars) were not checked for cross-leveling. In 2008, out of 90,025 Material Requisitions valued at $1,171,737,717.95, a total of 49,683 (55.2%) of

---

[62]     Ex. 82 (Apr. 1, 2010 internal KBR email from KBR Deputy Program Manager – Support, R. Kaye, to KBR Principal Program Manager, G. LaBoa) (emphasis added); Ex. 135 (LaBoa Dep.) 16:11-17:7.

[63]     Ex. 38 (Mar. 5, 2010 internal KBR email from KBR Deputy Program Manager – Support, R. Kaye, to KBR Principal Program Manager, G. LaBoa, and others) at '4744 ("The objective of this directive is to ensure that 100% of all requisitions are screened against in theater excess before being released to either the DOD wholesale system . . . or commercial purchase. In 2009, 35% of all requisitions (having an extended cost of $401M[illion] bypassed this review."); Ex. 66 (Feb. 28, 2010 internal KBR email from KBR's Head of the DMC, C. O'Muirgheasa) at '4132 ("In 2009, 65% of [Requisitions] were put into MATCON, representing 51% of the dollars. So, 35% of the [Requisitions] bypassed us [KBR's DMC], representing almost 50% of the dollars."); Ex. 67 (KBR data) at '4133 (quantifying that in 2009, out of 65,526 Material Requisitions valued at $812,554,107.70, a total of 23,124 (35.3%) of the Material Requisitions valued at $401,484,184.06 (49.4% of the dollars) did not go to the DMC for the cross-leveling check).

those Material Requisitions valued at $647,308,265.68 (55.2% of the dollars) were not checked for cross-leveling.[64]

65.    The problem of skipping the cross-level check was so pervasive that in March 2010, KBR issued a Technical Directive to address it. In that directive, KBR admitted that in 2009 it did not even try to cross-level 35% of the time (representing approximately 50% of the dollar volume of purchases), which could result in purchasing new items that it already had in excess:

> The use of Material Control **(MATCON) status in MAXIMO is being bypassed 35% of the time. When MATCON is bypassed**, requisitions move directly from Awaiting Approval (WAPPR) to Approved (APPR) **without giving the Distribution Management Center (DMC) the opportunity to screen for asset availability and to cross-level** stocks within Iraq Joint Operations Area (IJOA). **Bypassing MATCON potentially results in purchasing property and material items that are excess** elsewhere in the IJOA.[65]

66.    KBR's internal audit team, the "SMART" team, found repeated instances of sites abjectly failing to cross-level.[66] As noted below at paragraphs 87-90, KBR refused to provide

---

[64]    Ex. 67 (KBR data) at '4133.

[65]    Ex. 4 (KBR Mar. 2010 Materials Control Technical Directive), at ECF Page 1 (emphasis added).

[66]    *See, e.g.*, Ex. 50 (Internal KBR email attaching 2008 SMART Reports) at '3901 (for site B1: "Based on the amount of excess material in the lay down yard and throughout the site to include the crafts, and that is not recorded in [MAXIMO/]Steam, there is no indication that Requisitions are screened internally or Theater wide."), at '3969 (for site B6: "Inspection and review found multiple items in materials possession, as well as (Trades) tool rooms found to have increased stock levels with no procedures in place to cross level excess property."), at '4017 (for site B9: same); Ex. 51 (Internal KBR email attaching 2008 SMART Report for site B3) at '4809 ("According to the material requisitions reviewed, indication shown that they have been screened against the Theater and Warehouse stock. However, based on the amount of excess items throughout the Site and Central Materials Yard, this process is not being completed sufficiently"), at '4823 ("Multiple assets in Materials possession . . . were found to have increased stock levels with no procedures in place to cross level excess property properly-not in STEAM"); Ex. 134 (King Dep.) 150:19-151:12 (referencing 2008 SMART Report for site D5) ("Q. . . . [O]ne of [the observations the SMART team found] is requisitions not being screened through warehouse or

copies of these SMART and other internal audit reports to the Government despite requests to do so.

67. KBR continued to buy new property and materials while failing to attempt to cross-level; as of February 2010, "approximately five million dollars worth of materials and

---

theater-wide, is that right? A. That's correct. . . . Q. And of the 78 material requisition samples pulled, only 1 passed and 77 failed, is that correct? A. Right. Q. Is that a good result, sir? A: Not -- [Objection]. [A.] No, it's not."), 153:25-154:6 (referencing 2008 SMART Report for site G3) ("Q. So of the 100 material requisitions . . . samples pulled by the SMART team for this audit, only 7 passed and 93 failed, is that correct? A. That's correct, according to their report. Q. Is that a good result, sir? [Objection]. [A.] No, sir."), 156:21-157:8 (referencing 2008 SMART Report for site C1) ("Q. . . . [O]ne of the key observations the SMART team made in connection with this audit of site C1 was numerous material requisition files did not indicate if internal screening of local and theater stock were conducted prior to submission for approval, is that correct? A. I believe it is. Q. And that means prior to submission of the material requisition for approval for procurement, is that right? [Objection]. [A.] I believe so."), 160:1-13 (referencing email concerning SMART audits and results for site C7) ("Q. . . . [O]ne of the deficiencies that you're reporting to senior management here for site C7 was that the site wasn't screening inhouse or theater-wide prior to submitting material requisitions for purchase, is that correct? [Objection]. [A.] That's correct."), 164:3-21 (referencing 2008 SMART Report for site F3-3) ("Q. The fourth bullet down [on page 027] says: 22 of the 45 . . . material requisition files reviewed did not reflect stock or other theater locations had been screened for cross-leveling prior to submittal for purchase. Do you see that, sir? . . . A. I did see it. Q. So these 45 material requisition samples that would be looked at are new material requisition samples that the SMART team is looking at in connection with this relook, is that correct? A. That's correct. Q. And even on this relook, is it correct that 22 of those 45 material requisition files did not reflect that the items had been cross-leveled prior to purchase? [Objection]. [A.] Correct, but I don't know . . . was that an admin issue or something more."), 174:22-175:13 (referencing internal KBR email concerning SMART audits) ("Q. And if you go down to the fourth bullet, it says: Stores reflecting materials that have not had any issues in some cases over 2 years. Do you see that? A. I do. Q. What does that mean for materials not to have an issue in over 2 years? A. The items have been sitting in a bin and no movement. Q. Meaning nobody's asked to make use of it or use it? A. Exactly. Q. . . . And why is that an issue? Why is that a problem? A. It should have been declared excess and should have been turned in or attempted to cross-level to someone."), 181:8-22 (referencing internal KBR email chain) ("Q. So you're reporting here that you can see that some of these material requisitions were not screened for cross level prior to submitting the material requisition for procurement action, is that what that means, sir? A. Yes, it does. Q. And you say: This is a major area that I will be addressing to you and senior management when I get back to Baghdad early this month. Do you see that? A. I do. Q. Why was this a major area for you to address? A. I'm going to get -- the thing is still not being screened is number 1. And it -- why that's not happening this is causing all kind of problems still . . . .").

supplies are ordered each day" by KBR, but "[o]nly minimal review is exercised at the regional or theater level to [e]nsure that all possible cross-levels are performed and the consequence of weak management is a growing excess."[67]

### D. KBR Sites Ignored Efforts to Use Existing Inventory to Avoid Making New Purchases, Instead Hoarding Inventory

68. In February 2009, Mark Brannen, KBR's Deputy Program Manager – Support and a member of its Senior Leadership Team, described to numerous KBR employees, including its senior managers, the systemic problem of sites ignoring cross-leveling requests from the DMC on behalf of other sites, thus frustrating all attempts to use excess inventory:

> The DMC was established to speed the process of cross-leveling across Theater, while also reducing our stockage of materials prior to transitioning to LCIV [LOGCAP IV]. Although we have made progress, we have taken some steps backward in the past few months… That evolution has led us to the point where **Sites are ignoring DMC requests** and allowing the action to be cancelled through neglect, rather than through formal denials approved by the SLT [KBR's Senior Leadership Team].[68]

69. Sites also ignored cross-leveling obligations by hiding inventory from other sites. A 2009 SMART Audit Report of Site C7 noted "There are containers in different storage areas throughout the camp . . . that have **material that should have been returned to Materials for proper accountability. The reason given for not turning the material in is because they do not want Materials to cross level the assets to other sites.**"[69]

---

[67] Ex. 69 (Feb. 20, 2010 internal KBR email) at '4446.

[68] Ex. 5 (Internal KBR email containing Feb. 2, 2009 email from KBR's Deputy Program Manager – Support and a member of its Senior Leadership Team, M. Brannen, to numerous KBR employees, including its senior managers) at ECF Page 1 (emphasis added).

[69] Ex. 52 (Aug. 24, 2009 internal KBR email attaching SMART Audit Report of Site C7) at '9046 (emphasis in original).

70. In August 2009, James Haught, then KBR's Theater PSM Manager-Supply, wrote of the SMART Audit Report of Site C7 that "[t]he most troubling aspect of this report is the **site attempt to hide material to prevent it from being cross leveled**. I believe that is close to a COBC [Code of Business Conduct] violation and I may request an investigation." In a separate email, Haught wrote:

> I am very concerned about comments that indicate **the site is hiding material to prevent it from being cross-leveled**. That kind of activity takes more than one person to pull off and that smacks of unethical behavior and collusion and may justify a COBC investigation.[70]

71. Similarly, in August 2009, KBR's Deputy Principal Program Manager, Larry Lust, wrote:

> The deficiencies within the SMART report concern me; however, none more so than the comments that indicate **the site is hiding material to prevent it from being cross-leveled**.[71]

72. In May 2009, another KBR employee wrote about hoarding of materials at another site:

> Someone must be responsible for the **hording [sic] of equipment** that is taking place in that upstairs warehouse. They are not even using [MAXIMO/]STEAM I don't know how this was able to happen; this is not the kind of publicity USMI needs right now. It must be rectified. I encourage the materials dept. leaders to work with IT folks to get them in

---

[70] Ex. 21 (Aug. 23, 2009 internal KBR email from KBR's Theater PSM Manager-Supply, J. Haught, to KBR's Deputy Principal Program Manager, L. Lust, copying KBR's Chief of Staff, J. Rock) (emphasis added); *see also* Ex. 31 (Aug. 23, 2009 internal KBR email from J. Haught) at '6990-1 ("The most troubling aspect of this report is the site attempt to hide material to prevent it from being cross leveled. I believe that is close to a COBC [Code of Business Conduct] violation and I may request an investigation. Collusion which is unethical at best is the only way that kind of activity can occur.").

[71] Ex. 60 (Aug. 24, 2009 internal email from KBR's Deputy Principal Program Manager, L. Lust) (emphasis added).

compliance. That place is a **disaster waiting to be discovered**.[72]

### E.   KBR Misclassified Its Inventory, Causing It to Unnecessarily Purchase New Inventory Instead of Using Existing Inventory

73.   KBR misclassified inventory as "reserved," which improperly prevented tens of

millions of dollars of excess inventory from being cross-leveled. As an example, in March 2010,

KBR's Deputy Program Manager – Support, Rich Kaye, reported to KBR's Deputy Principal

Program Manager, Larry Lust:

> We've got $71M[illion] in reserved stock of which less than 50% is legitimate. The rest is against cancelled ACLs, completed ACLs, or just plain "hidden" from cross-leveling.

This problem was quantified in other documents as well.[73]

74.   In June 2009, a KBR employee wrote about misclassification problems and

expressed fear of retribution for speaking out about it:

> The ordering at TMP is a mess . . . I called Ernie and asked him what was up with the orders that were being placed. He said they are **placing everything on reserve so DMC won't ask for it CL [cross-level]**. . . . . Some MRN [material reference number], there are no issues in the last year and they are ordering material and we have stock available. Numerous items are way above reorder points and they are ordering more. . . . The above example is just one of many

---

[72]   Ex. 27 (May 10, 2009 internal KBR email) at '3629 (emphasis added); *see also* Ex. 78 (Feb. 26, 2010 internal KBR email) at '5864 ("It still looks like people are trying to 'hide' things so they don't get cross leveled.").

[73]   Ex. 81 (Mar. 20, 2010 email from KBR Deputy Program Manager – Support, R. Kaye, to KBR Deputy Principal Program Manager, L. Lust) at '110. *See also* Ex. 46 (Supply Discipline, PSM Supply – Areas of Opportunity) at '110 ("Currently, there are 22,832 line items in the amount of $93,768,841.05 that are in reserve. Of 3,553 total line items, only 15% in the amount of $83,852,852.63 that that are justified by an ACL. … The reserved items are subtracted from the current balance therefore reducing the possibility of being cross leveled and increases MR [material requisition] requests for the items in need.").

I have found. I have learned to not say anything as you will get demoted, sent away or sent home.[74]

75.     KBR sites also misclassified items that should have been "Non-stock" as "Stock," thereby limiting their ability to be cross-leveled. For instance, in November 2009, KBR's Head of the DMC, Conor O'Muirgheasa, prepared a slide deck that highlighted this problem:

> Slide 2 of 3 shows the number of MRNs in theater – 56,810 – that are currently **classified as STK but that should be classified as NS**. The new slide shows the dollar impact of this misclassification – **over $80,000,000 of inventory unavailable for cross leveling**…. The fact that those STK items should really be classified as NS is **causing us to not be able to cross level** over $50,000,000 of inventory."[75]

Similarly, a KBR report stated the problem as follows:

> To date, there are 43,653 lines [classified as STK] that should be updated to NS. This reflects as an inventory error as the STK category is improperly categorized. . . . Changing the item category to NS will depict a true picture of the actual excess items available for cross level.[75a]

76.     KBR sites also would set safety stock levels for certain items artificially high, thereby preventing that item from appearing available for cross-leveling, even though great amounts of it were sitting unused. For instance, in July 2008, KBR's Theatre Materials Manager reported internally that Site C7 had in its possession enough of a certain type of cable to last it **over 800 months**, a second type of cable to last 378 months, and a third type of cable to last 90 months.[76]

---

[74]     Ex. 7 (June 18, 2009 email from KBR's T. Hays) at ECF Page 4 (emphasis added).

[75]     Ex. 6 (Nov. 4, 2009 internal KBR email from C. O'Muirgheasa) at '2532 (emphasis added).

[75a]     Ex. 46 (Supply Discipline, PSM Supply – Areas of Opportunity) at '6112.

[76]     Ex. 9 (July 14, 2008 internal KBR email containing July 14, 2008 email from KBR Theatre Materials Manager S. Hurd) at '5653. Yet the site was never even asked to send its excess cable to other sites that needed it, because "their reorder points and safety stock levels are drastically

**F.    KBR Misused TRECs To Hide Its Abundance of Inventory**

77.    An internal KBR memorandum, titled "TREC CRIPPLER," documented how KBR

exploited the fact that items in TRECs could not be cross-leveled, and described how "Personnel

utilizing the TREC to conceal inventory qty's from DMC for cross level" was one of the systemic

problems that "haunt" KBR, despite "[n]umerous attempts throughout the YRS" to fix it.[77]

78.    In February 2010, KBR's PSM Manager-Supply, Elias Faris, wrote about KBR

exploiting this feature of TRECs to prevent items from being cross-leveled:

> In looking into the system, it has been discovered that you
> are utilizing the TRECs storerooms as a storage location. . .
> **Utilization of TREC as a storage facility to hide product**
> will not be tolerated. This is a misrepresentation of the
> inventory quantity which relates to funds.[78]

79.    In "2007 alone," there were "over $93,000,000.00 . . . in the TRECs," which KBR's

Deputy STEAM/MAXIMO Manager, Shon Shannon, said in 2010 "would be considerably outside

of any 'reasonable' window." Shon Shannon continued by stating "2008 has $145,000,000 plus

---

high." *Id*. at '5646. As a result, KBR personnel concluded that Site C7 had been "hording this
cable[.]" *Id*. at '5652. *See also* Ex. 53 (Mar. 22, 2010 internal KBR email from KBR's Head of
KBR's SMART Audit Team, J. King, attaching 2010 SMART Audit Report of Site F2) at '9155-
56 ("Economic ordering practices are not being properly applied. Materials and End Users are
ordering material that is currently on the project. The information provided below is based on
demands within the D & F Sites," showing requisitions for one item despite having "32.9" "Years
of Supply in D&F [Sites]," for another item despite having "15.6" "Years of Supply in D&F
[Sites]," for another item despite having "13.0" "Years of Supply in D&F [Sites]," and for another
item despite having "12.7" "Years of Supply in D&F [Sites].").

[77]    Ex. 10 (Oct. 7, 2011 internal KBR email attaching Business Case for Process Design
Initiative, TREC CRIPPLER) at '9580.

[78]    Ex. 77 (Feb. 18, 2010 internal KBR email) at '7433 (emphasis added).

and 2009 has $68,000,000 plus [in the TRECs]. I don't think we can justifiably explain doing a ROD [Report of Discrepancy] this late in the game on any of that material."[79]

80.     KBR records show that in January 2010, over $340 million worth of property and materials had been in TRECs for more than 60 days.[80]

81.     In February 2010, KBR had $350 million worth of inventory had been in TRECs for over 90 days, a problem which KBR recognized internally.[81]

82.     KBR's Theater PSM Manager-Supply, James Haught, wrote the following in May 2009 concerning KBR's TRECs and KBR's management of materials:

> We are **not fulfilling our roles and responsibilities for the management of material for this Project**. A recent review showed over 174,000 items recorded in TREC's. . . . Some of these **items have been in TREC's for over 60 days. That is unacceptable**. As Material Managers, it is your duty to conduct business in a professional manner that means using good business practices and ethical behavior. The lack of attention to detail suggests we are **not using good business practices** and have become complacent. The

---

[79]     Ex. 14 (Internal KBR email re: TREC transactions) at '5547.

[80]     Ex. 15 (Feb. 21, 2010 internal KBR email attaching analysis of KBR's "Theater Temporary Receiving (TREC) Storeroom Inventory") at '0109 (p.8) (calculating across multiple sites "67,381" line items valued at "$342,381,068.37" "IN TREC OVER 60 DAYS"); Ex. 68 (Jan. 23, 2010 internal KBR email attaching analysis of TRECs) at '0866 (same); Ex. 147 (Vujic Dep.) 129:14-19 ("Q. . . . [D]oes this chart show that KBR had, at this time, $342,381,068.37 worth of property and materials recorded in the TRECs [in] MAXIMO for more than 60 days? [Objection.] A.  According to the report, yes.").

[81]     Ex. 73 (Feb. 21, 2010 internal KBR email) at '5540 ("We currently have about 350 million dollars in our TREC's. I strongly believe about 80% of the items left aging over 90 days inside our TRECS are pending IAR's [Inventory Adjustment Reports]. The problem is, no one wants to take accountability of taking care of their TREC's . . . ."); Ex. 144 (Sullivan Dep.) 106:18-107:12 ("Q. . . . [I]n this February 21st, 2010 e-mail chain, it's ultimately being reported to you that there is about $350 million in TREC, correct? A.  That is what the e-mail says.  . . . Q.  And [a KBR employee] is indicating that he believed about 80 percent of the items were left aging over 90 days in the TREC, correct? A.  That's what he says in the e-mail. Q.  And did you have any reason to dispute that? A.  I did not dispute it.").

> **TREC example [is] only symptomatic of the systemic issues** I have seen in the last couple of weeks.[82]

83.     In March 2010, KBR's Deputy Program Manager – Support, Rich Kaye, wrote to

KBR's Deputy Principal Program Manager, Larry Lust, about KBR's TRECs:

> **TREC storerooms is going to be my biggest challenge**. ….
> we've **currently got $331 M[illion] in them** as of yesterday.
> I've told Guy [LaBoa, KBR's Principal Program Manager]
> this is the **Mother of all Forms 1**. As you know, someone at
> a primary receiving site (Dubai, Kuwait or Houston) had to
> enter it into [MAXIMO/]STEAM. The causative research
> will be brutal.[83]

**G.      KBR Knew That the Government Would Have Demanded Funds Back Via Forms 1 Had the Government Known of KBR's Systemic Inventory Management Failures**

84.     As LOGCAP III was winding down, on March 2, 2010, KBR's Deputy Program

Manager – Support, Rich Kaye, summarized to KBR's Deputy Principal Program Manager,

Larry Lust, how the effects of KBR's systemic failures in managing the Government's property

had only gotten worse over time, and how they were culminating, including the Government

potentially issuing Forms 1 for potentially unallowable costs:

> This place is getting wackier and wackier as we start to wind
> down… **My greatest frustration is that no one other
> tha[n] a select few are committed to doing this right …
> too many simply won't change**, six time returnees to
> LOGCAP who just want to "get er done" without any regard
> to the long term consequences. Every day we get more and
> more objective evidence from the various audit agencies that
> **short cuts and expediencies taken years ago are now
> coming home to roost in the form of Form 1s**. At times,
> the auditors are young, inexperienced and clueless … but
> other times, they get it right and we don't have a rationale
> (sic) defense. And then we let go the only people trying to

---

[82]     Ex. 25 (internal May 19, 2009 KBR email) at '7111-12 (emphasis added).

[83]     Ex. 81 (Mar. 20, 2010 internal KBR email from KBR Deputy Program Manager – Support, R. Kaye to KBR Deputy Principal Program Manager, L. Lust) at '9112 (emphasis added).

mount a defense. I suppose the old maxim applies, "If you
want it bad, you'll get it bad."

Lust agreed with Kaye's assessment.[84]

85.     This is not the only time that KBR acknowledged that had the Government known

of KBR's systemic failures, it would have demanded funds back via Forms 1, or "put KBR out of

business". This point was acknowledged repeatedly by KBR's senior leadership team:

> We are **purchasing $5 M per day when we've got $1.2B
> i[n] excess on hand**. At some point, **the DCAA [Defense
> Contract Audit Agency] is going to put KBR out of
> business** if we keep doing this.[85]
>
> * * *
>
> **Last year, fully 35% of all requisitions (with an extended
> value of $401M[illion]) by-passed the cross-leveling
> check**. As we start to turn over more and more materials to
> GOI [Government of Iraq], **we are facing an increasing
> risk of being Formed 1 for buying items we just declared
> excess and gave away**.
>
> * * *
>
> **TREC storerooms is going to be my biggest challenge
> ….we've currently got $331M[illion] in them as of
> yesterday**. I've told Guy [LaBoa, KBR Principal Program
> Manager] this is the **Mother of all Forms 1**.[85a]

---

[84]     Ex. 80 (Mar. 2010 internal KBR email chain between L. Lust and R. Kaye) at '5534
(emphasis added). *See also id*. (KBR Deputy Principal Program Manager L. Lust agreeing with
R. Kaye's assessment: "I believe your assessment of the workforce and what is to come to be on
target. In reference to audits and investigations, I see things getting much tougher before they get
better, and I do not see them getting better for a couple three years[.]"); Ex. 131 (KBR 30(b)(6)
(Jacobs) at 18:3-17 (defining a "Form 1" as a letter "issued by the government for potentially
unallowable costs" after review by the DCAA").

[85]     Ex. 8 (Internal KBR email containing Feb. 25, 2010 email from KBR's Deputy Program
Manager – Support, R. Kaye) (emphasis added).

[85a]    Ex. 81 (Mar. 20, 2010 email from KBR Deputy Program manager – Support, R. Kaye, to
KBR Deputy Principal Program Manager, Larry Lust) at '9112 (emphasis added).

* * *

We need to insure [sic] we are not buying something that can be cross leveled. If we give away one item and order something as a back fill will surly [sic] be a Form-1 against KBR.[85b]

* * *

To have something on hand and to not use it in lieu of purchasing more is a recipe for the DCAA to find fault with us and collect back what we paid for the item via a Form 1.[85c]

* * *

Point and case is that Taji looked good on the surface but this was due to **an extensive cover up versus fixing what was broken.** Keep in mind the magnitude of **hiding two warehouses full of parts/tools and illegally procured items** to keep in good standing with auditors instead of getting the items out to someone that can use them... **There are more PCP and FAR violations in those two warehouses than I care to mention** and it is no wonder we have **a billion in stock lying around unused in theater**...

…

The problems in Maintenance we are finding are very disturbing and leave this company open to a **high level of Risk**.[85d]

86. Relators' expert, Dr. Dov S. Zakheim, former Department of Defense Under Secretary of Defense (Comptroller) and Chief Financial Officer, opined:

KBR's own internal emails indicate that its practices likely would have generated a DCAA Form 1. It would appear, therefore, that DCAA did not issue a Form 1 in this regard only due to the fact that it was unaware of KBR's cross-leveling issues…. In addition to disallowing the costs of

---

[85b]   Ex. 32 (containing Feb. 16, 2010 email from HQ-PSM Manager-Supply, E. Faris) at '5280.

[85c]   Ex. 70 (Mar. 3, 2010 internal KBR email from KBR's Deputy Program Manager, R. Kaye).

[85d]   Ex. 59 (internal KBR email) at '3832-33 (June 6 and 23, 2008 emails from KBR's Business Segment Manager for Theater Maintenance, B. McGarry) (emphasis added).

duplicative materiel, had DCAA been aware of KBR's management practices, DCAA could have imposed additional penalties on KBR. Such penalties could have included suspension or disbarment from LOGCAP IV.[86]

## IV. KBR Hid Its Failures From the Government

### A. KBR Controlled the Information Provided to the Government in Order to Hide What It Did Not Want the Government to See

87. KBR took special care to avoid giving the Government information that would tip it off to KBR's systemic inventory management problems, such as the excessive amount of inventory that sat unused, or "underutilized," on its shelves. An internal KBR report from July 2008 examining inventory usage at several sites found that underutilization was as high as 89% of the total inventory at KBR's T Sites.[87] Yet when it came time to provide information to the Government, including potentially a similar report showing that 60% of inventory sat "underutilized" at five sites, James Haught was quick to ensure the Government never saw it:

> I don't think we should be showing underutilized on anything that can be seen by USG.[87a]

88. KBR also strove to keep its internal audits and analyses—often showing systemic cross-leveling failures—from the Government, refusing to share its internal audits despite the

---

[86]     Ex. 98 (Expert Rebuttal Report of D. Zakheim) at 5.

[87]     Ex. 85 (July 27, 2008 email from J. Haught) at report reproduced on pp. 3-18; Ex. 147 (Vujic Dep.) 57:11-60:9; *see also* SOF ¶ 56. KBR knew that such information was a useful metric; KBR's Theater PSM Manager-Supply, James Haught, wanted to share the underutilization report internally among KBR personnel, reasoning that "It is very telling – look at the underutilization of stock at T sites as an example." Ex. 85 (July 27, 2008 internal KBR email from J. Haught) at '3925. At his deposition, James Haught commented that "This report would have drawn attention." Ex. 126 (Haught Dep.) 251:11.

[87a]     Ex. 26 (May 5, 2009 internal KBR email containing May 4, 2009 email from J. Haught) at ECF Page 2.

DCMA's Prime Property Administrator assigned to KBR, Maria McNamara, asking for them in June 2008.[88]

89.     When it did provide results of its internal audits to the Government, KBR manipulated certain reports. For instance, KBR's Government Compliance group intervened before KBR employees sent the Government a report summarizing KBR's internal SMART audits, and KBR's Government Compliance group rewrote the report because "Compliance wants more of a summary with a positive spin[.]"[89] KBR's Head of its SMART Audit Team, Jim King, did not agree with what Government Compliance did, stating that it "tried to soften the report too much" and that the rewritten report was "too vague in what was found during the [KBR SMART Audit] review," but ultimately decided not to make any changes to the Compliance group's version of the

---

[88]     Ex. 43 (internal KBR email) at '6463 (June 18, 2008 email from KBR's Director of Supply Management, T. Hippert, to KBR Senior Vice President, Bill Walter, and others, stating "I'm not providing the Internal audit and I explained that to DCMA . . . . Maria [McNamara of DCMA] wants the actual Audit's (sic) that we perform, I told her we can not provide them."), '6464 (email from KBR's Principal Program Manager, Michael Mayo) ("We approach the SMART reports the same as the Procurement Compliance reports and corrective action plans. Those are not released from the Project [to the] USG."); Ex. 19 (June 2018 internal KBR email) at '4711-12 (KBR's Head of its SMART Audit Team, Jim King, stating "I need copies of all the site(s) corrective actions/milestones of all the reviews that have been conducted by the SMART team. The Government is asking for these and we agree to provide them but we will not provide a copy of the actual Review/checklist."), at '4711 (KBR's Director of Supply Management, Ty Hippert, stating "I explained that we can not release any internal reviews at this point, but I see no harm in releasing corrective action reports.").

[89]     Ex. 54 (Internal KBR email containing Mar. 19, 2009 email from KBR's Senior Manager – Government Compliance, John Webb) at '0916 ("[T]here were some concerns with the details in the report Reggie [KBR SMART Audit Team member] prepared. It was very well written, but Compliance wants more of a summary with a positive spin because corrective actions have been taken. Attached are the original reports that Reggie [KBR SMART Audit Team member] prepared and a revision prepared by Compliance.").

report. Another senior leadership team member, Ty Hippert, described the report submitted to the government as "[t]urning chicken crap into chicken soup".[89a]

90. KBR also framed the narrative by doing its best to clean-up any site that it knew the Government was going to examine before the Government could get there; it received a list of sites that the DCMA was going to audit, in advance of those audits, and sent its own internal audit team to those sites before the DCMA got there, in order to fix any problems before the Government auditors saw them.[90]

---

[89a]    Ex. 54 (Mar. 2009 internal KBR email) at '0915; *see also* Ex. 134 (King Dep.) 255:19-257:5 (describing report ultimately given to the Government as a "more watered down version"; "[n]ot hiding anything, but not enough detail either"). KBR's Director of Supply Management, Ty Hippert, described Government Compliance's "softening" of the report as "turn[ing] Chicken crap into Chicken soup…" Ex. 54 (Mar. 2009 internal KBR email) at '0914; Ex. 134 (King Dep.) 272:1-10 ("Q.  . . . Turning chicken crap into chicken soup means taking something that's in fact something bad and trying to turn it into something good, that's what that means? A.   Yes. [Objection.] Q.  You write at the top: [']Bingo HAAAAA.['] So you [a]greed with Mr. Hippert's assessment regarding chicken soup, correct? A.   That's correct.").

[90]    Ex. 126 (Haught Dep.) 74:20-76:24 ("Q.  . . . [W]as that a typical practice at KBR, that if the Government was going to go out and do a site audit that you would try to get your internal SMART team out there ahead of time? [Objection.] A.   They were either scheduled or they would have said yes, we need to get out there early. Sometimes they were scheduled already. Q.   The SMART team? A.   SMART teams.  . . . Q.  . . . [I]sn't the reason you want [the SMART teams] out there ahead of the Government so that problems can be fixed by the sites before the Government auditor get[s] there? [Objection.] A.   Generally, that would be a correct answer."), 79:1-14 ("I would think that we had some notification that that they were going to go do it [Government audits to inspect KBR's property system], so yes, I would say yes. Q.  And you had those conversations with others at KBR? A.   With the people on those sites."), 81:6-19 ("Q.  . . . And you were going to assist [the sites] to get ready for . . . the Government audits? . . . A.   Yes, yes. I'm sorry. Yes.  . . . Q. And what concrete steps did you want KBR to take to assist those sites? A.   We would have . . . put our trainers . . . . we would have gone out and conducted inventories. We would have helped the sites get ready in some way by providing support that the sites needed."), 84:18-24 ("Q.  . . . So you send this to [Jim Luchsinger, KBR's Project Manager in Afghanistan,] and you say, 'DCMA has pretty much given us their blueprint.' What did you mean by that? A.   The locations. Q.  Locations where the audit was going to happen? A.   Yes."), 86:13-25 ("Q.  . . . So you're trying to figure out how to get help out to all these places in advance of the audit. Right? A.   Yeah. Q.   You say, 'I have another call added tonight at 8:00 p.m. on [MAXIMO/]STEAM, which I thought I had nothing to do with, but guess again. I wonder if I can get people to understand the significance of the comments from DCMA.' So you were trying to give people kind of a wake-up call DCMA has really got us in the cross-hairs here. Right?

-214-

## B. KBR Hid That It Had Misused TRECs for Years

91. In 2010, KBR had approximately $350 million dollars of materials remaining improperly in TRECs. KBR knew that this was improper, and it wanted to do something to correct the situation.[91]

92. KBR's Business Planning Manager responsible for KBR's Integrated Inventory Management System, Lynellen Sullivan, made very clear in February 2010 that whatever KBR did to "fix" the TRECs, it must be careful not to use "IARs," or inventory adjustment reports, as those would draw the attention and audits of the Government, and KBR did not want the Government focusing on TRECs for fear it would uncover KBR's malfeasance:

---

[Objection.] A. Yes."); Ex. 19 (June 2018 internal KBR email) at '4711-12 (KBR's Head of its SMART Audit Team, Jim King, listing the sites where the Government will "conduct a PCSA [Property Control System Analysis] starting July 26, 2008"; "as you know it is extremely urgent that we [KBR's SMART Audit Team] get to these sites ASAP before this [Government] audit and ensure that they are ready for this [Government] PCSA [Property Control System Analysis], if we get an unsatisfactory rating they will disapprove our Property system."), at '4711 (James Haught, stating "DCMA has pretty much given us the[ir] blueprint. Salerno and Bagram will be the sites they will attack. The areas to be analyzed are listed in the email train. The review will occur between 26 Jul and 4 Aug."); Ex. 134 (King Dep.) 34:15-35:8 ("Q. . . . How did KBR determine which site the SMART team would audit when? A. That was my call with the headquarters and senior leadership as to their priorities. The headquarters had more direct information from the government property administrators as to when they were going to conduct their property control system analysis. So I would coordinate with them to see what sites are going to be audited by the government, and I would try and get my team in front of that to do a review before the government did. Q. And why would you try and get your teams to do a SMART review before the government performed its audit on a particular site? A. For the obvious reason . . . if there's any deficiencies or issues on site, try to get them corrected. Q. Before the government got there? A. Yes.").

[91]  *See* Ex. 13 (internal KBR email) at '0265 (KBR's Business Planning Manager Responsible for KBR's Integrated Inventory management System, L. Sullivan, stating, "I would like to discuss TREC transactions . . . We must take a firm stand with no exceptions and no transactions except receipts and transfers is the best way to avoid DCMA reviews of TREC's."), at '0264 (KBR employee stating "We currently have about 350 million dollars in our TREC's. I strongly believe about 80% of the items left aging over 90 days inside our TRECS are pending IAR's [Inventory Adjustment Reports]. The problem is, no one wants to take accountability of taking care of their TREC's"; referencing "over 50,000 lines [of inventory] aging inside our TREC's").

We want to avoid audits in TREC's.

…

If we take IAR's in a TREC we open the TREC's up to audit. I don't want that … I do[n't] want DCMA examining the TREC's … do you?

…

We must take a firm stand with no exceptions and no transactions except receipts and transfers is the best way to avoid DCMA reviews of TREC's.[92]

In a separate email, Sullivan further explained the risk of drawing the Government's attention to the TRECs:

We have to [do] an IAR [Inventory Adjustment Report] and I don't want IAR's in a TREC because I do not want DCMA looking at the TREC's. I like Shon's suggestion of transferring it all to the main storeroom if they don't know the storeroom and taking the IAR's there. **No blanket IAR's. I know this is a lot of work, but we have no option if we expect to get it past the [Government] ACO [Administrative Contracting Officer].**[92a]

Sullivan feared that if the Government found out about KBR's issues in the TRECs, it would issue a "corrective action request," or "CAR": "I think performing an IAR in a TREC is begging for a CAR and DCMA oversight of the TRECs…"[92b]

---

[92]    *See* Ex. 13 (internal KBR email) at ''0262-63, '0265; Ex. 144 (Sullivan Dep.) at 31:13-17. An "IAR" is an inventory adjustment report, and it is a report created when the inventory physically on the shelves does not match what is shown in the computer system. *See, e.g.*, Ex. 140 (Pagonis Dep.) 462:13-463:22.

[92a]    Ex. 12 (February 21, 2010 internal KBR email from L. Sullivan) at '5543 (emphasis added). The "ACO" is the Administrative Contracting Officer, and is a DCMA employee. Ex. 138 (McNamara Dep.) 22:3-5; Ex. 146 (Vollmecke Dep.) 41:8-23.

[92b]    Ex. 14 (Feb. 21, 2010 internal KBR email from L. Sullivan) at '5547.

93.     In October 2009, KBR's PSM Manager-Supply, Elias Faris, reported to KBR's Deputy Program Manager – Support, Rich Kaye, concerns with inventory adjustments done to keep the Government in the dark, in an internal KBR email chain with the subjects of "Avoiding Positive IARs" and "G-Sites system violations!!":

> **I am recommending this be turned over for investigation.**
>
> **This was brought to my attention and a major issue as it undermines processes we have in place and a direct violation of the [Government-approved] PCP [Property Control Procedures]. Please note the email starting with a Sr. MCS [Material Control Specialist] and then a second Sr. MCS [Material Control Specialist] provided guidance on how to <u>manipulate</u> the system. There is also a BPA's [Business Process Analysts], supervisors and managers on the email traffic with no one coming back and contradicting the process with almost 3 hours between first and second email.**
>
> **This is a root cause of problems theatre wide with our inventories. The process mentioned below *takes the Project Manager and Government GPA out of the process* resulting in a[n] undocumented adjustment to the system. *This is considered fraud as adjustments are being made without any accountability or a gain or loss by line item or dollar value which has to be reported in accordance to PCP and FAR requirements*. This process only changes number[s] in the system and not a true reflection of accurately accounting for gains or losses which could balance out over time if done correctly. They are using a WO [Work Order] to return items if they have a gain or issue the times out if they have a shortage. This inflates or decreases the values against that WO [Work Order] which is not even related to the items being adjusted.**
>
> **...**

**The information I am getting tells me that this is a very systemic problem at the G-Sites with increased data manipulation prior to year end close out.[93]**

94.     In May 2010, KBR's Lynellen Sullivan continued to stress that KBR's improper use of TRECs must be kept from the Government:

> We created [two storerooms] to avoid taking inventory adjustments in a TREC. We can do the same for every site. I really don't want to have TREC audits occur especially not right now.
>
> I advise against inventory adjustments in a TREC.[94]

That same day, Sullivan twice more warned her KBR colleagues what would happen if KBR was not careful about how it went about cleaning up the TRECs:

> Decide what you will, but know that we risk TREC audits if we begin consciously taking adjustments in TREC storerooms.[94a]
>
> An IAR is a transaction. . . . If you begin performing other transactions the TREC becomes liable for auditing. Do you want DCMA auditing your TREC?[94b]
>
> I am very concerned about the potential for auditing a place not currently audited…I know you understand…

---

[93]     Ex. 61 (Oct. 21, 2009 internal KBR email) at '5491-95 (bolding and underlining in original; italics added).

[94]     Ex. 36 (May 28, 2010 internal KBR emails from L. Sullivan) at ECF Pages 1-2.

[94a]    Ex. 35 (May 28, 2010 email from L. Sullivan) at ECF Page 1.

[94b]    Ex. 37 (May 28, 2010 emails from L. Sullivan) at '1506.

95.     The next year, Sullivan wrote about KBR's efforts to clean up TRECs in a way that improperly avoided IARs, and candidly admitted to herself in writing: "**They are committing fraud**…"[95]

**C.     KBR Hid That It Discovered an "Extensive Cover Up" regarding Two Warehouses Full of Unused Inventory at One of Its Sites When It Had $1 Billion of Inventory "Lying Around Unused"**

96.     In June 2008, a KBR Theater Maintenance Business Segment Manager, who KBR's Chief of Staff described as "very thorough, detailed, professional… excellent," uncovered an extensive cover up related to improper over-ordering practices, resulting in two warehouses full of "illegally procured items":

> This is the Taji write up and it is intended for SLT [Senior Leadership Team] only. Point and case is that Taji looked good on the surface but this was due to **an extensive cover up versus fixing what was broken.** Keep in mind the magnitude of **hiding two warehouses full of parts/tools and illegally procured items** to keep in good standing with auditors instead of getting the items out to someone that can use them... **There are more PCP and FAR violations in those two warehouses than I care to mention** and it is no wonder we have **a billion in stock lying around unused in theater**...
>
> …
>
> The problems in Maintenance we are finding are very disturbing and leave this company open to a high level of Risk.
>
> Summary of Failures . . .
>
> • Accountability: Maintenance Managers not held accountable for SOP/PCP violations, systemic failures, and

---

[95]     Ex. 74 (Feb. 9, 2011 email from L. Sullivan to herself) at '8542 (emphasis added); *see also* Ex. 75 (internal KBR email) at '8559 (Feb. 9, 2011 email from L. Sullivan stating, "I wonder if they realize **they are committing fraud**…") (emphasis added).

high risks caused from neglect and improper management of the Maintenance Department.

• Multiple FAR, PCP, SOP and SOW violations **that can still cause KBR to be issued multiple CARs, or have adverse PEB/AFEB affects (or both)**

• **Risks and core failures have been covered up** at the maintenance department level.[96]

**D.     KBR Concealed That the Form It Provided to the Government When Returning Unused Inventory Was Full of False Statements**

97.     As part of the PCARSS process, before KBR declared an item of inventory to be unnecessary and return it to the Government, KBR had to first make sure that it was not needed elsewhere in the theater.[97]

98.     An internal KBR email, dated June 18, 2009, stated the following concerning KBR's PCARSS process:

> The intent of the PCARSS process is to demonstrate that all reasonable steps possible have been taken to ensure that all of the items being sent to the PCARSS process have no remaining use on the LOGCAP III project, that KBR has done everything possible to maximize the usage of these items – currently the way the system has been set up **it is not being done with the due diligence**.[98]

---

[96]     Ex. 59 (internal KBR email) at '3832-33 (June 23, 2008 emails from KBR's Business Segment Manager for Theater Maintenance, B. McGarry) (emphasis added); Ex. 142 (Rock Dep.) at 174:8-21.

[97]     *See*, *e.g.*, Ex. 138 (McNamara Dep.) 73:22-74:13 ("Q. . . . What's your understanding of what happens once an item is declared excess? [Objection.] . . . A.  Then it goes into the disposal action. There are things a contractor has to do. If it's declared excess, [the contractor] must screen first to see if [the contractor] needs it anywhere else. That's [the contractor's] first requirement. And then if there are no takers or . . . there's nothing that . . . it's needed for, it is truly excess, and [the contractor] has to schedule it. And [the contractor] has a time period to get that out."); *see also* SOF ¶¶ 50-51.

[98]     Ex. 88 (containing June 18, 2009 internal KBR email) at '4356 (emphasis added).

99.     Later in June 2009, KBR's Head of the DMC, Conor O'Muirgheasa, documented

three concerns he had with KBR's PCARSS form that KBR submitted to the Government when

returning excess inventory to the Government. He noted in an internal email: "When I read the

new proposed wording for future PCARSS schedules, unless you propose to design some other

PCARSS screening process of which I am unaware, there are three statements contained in it that

concern me." First, the form attested:

> It has been determined that this property is excess to the
> contract and there is no further use in support of the mission
> requirements.

O'Muirgheasa knew this to be a false statement, writing:

> Given the current process, that statement will only be true
> for the particular site, and it is **highly unlikely to be true for
> the entire theater**.

Second, the PCARSS form attested:

> The attached list of item(s) have been screened for cross
> level requirements throughout the theater of operation.

O'Muirgheasa knew this second statement to be false like the first, writing:

> Given the current process, that step will not be done for this
> item, **it is not a true statement**.

Third, the PCARSS form attested:

> At this time, there are no foreseeable requirements in support
> of the current mission.

O'Muirgheasa knew this third statement was false, writing:

> Given the current process, **this is not a true statement**.[99]

After documenting his concerns, Mr. O'Muirgheasa stated: "[t]he proposed action is not in

accordance with Jim Haught's direction to me, which was to ensure that all steps reasonable had

---

[99]     Ex. 23 (June 24, 2009 internal KBR email) at '4817. *Id.* at '4817 (emphasis added).

been taken to ensure that there was absolutely no further need for items anywhere in theater before sending them to PCARSS. I strongly urge reconsideration of the steps about to be taken." *Id*. Mr. O'Muirgheasa concluded: "[t]here, I have assuaged my conscience by doing this." *Id*. In a separate email to Relator Howard, Mr. O'Muirgheasa remarked that reporting internally these fundamental flaws and misrepresentations in KBR's systems "will probably get me in a lot of trouble. Still, I felt that it was the right thing to do."[99a]

100.    In response to a request from KBR's Elias Faris as to the current processes, Conor O'Muirgheasa further detailed the "issues with [KBR's] process":

> 1. By running the ASL [authorized stock list] report for only the storeroom (rather than for the MRN [material reference number] across the entire theater), we missed the fact that there can be demand for that exact same MRN in other storerooms in theater, even though there is no demand for that MRN in that particular storeroom … Thus we could be sending items for PCARSS from one storeroom, while those same items were being consumed every day at another storeroom.
>
> 2. The DMC screening process did not actually screen all of the MRs [material requisitions] placed in MATCON status over the last 30 days. Instead, it screened all of the MRNs that were STILL IN MATCON status after 30 days, which is a far smaller number. I did not realize at the time that this was going on. When I did realize it, I stopped signing the PCARSS schedules, because I could not truthfully validate what I was signing …
>
> 3. We started to see materials on PCARSS schedules that we KNEW was being consumed regularly in theater. We could not justify this …

---

[99a]    Ex. 29 (June 24, 2009 email from C. O'Muirgheasa, to Relator Howard) at '4786.

> In the end, I became convinced that the entire process that I
> had helped to design was badly flawed, and needed to be
> revamped.[100]

101. Elias Faris responded to Mr. O'Muirgheasa that same day: "It has already been

discussed with Tracy [Townsend] and agreed to by Sr. Management for the path forward which

we are taking."[101]

102. The "path forward" referenced by Elias Faris was articulated that same day,

June 24, 2009, when KBR circulated its "new memo for PCARSS," stating "[i]t is no longer a

requirement to send to the DMC."[102]

## V. KBR Never Disclosed Its Systemic Problems With Purchasing New Inventory When It Had Excess Inventory Available

103. As described in detail below, a host of KBR employees were aware, both generally,

and specifically; qualitatively and quantitatively, the systemic cross-leveling failures. But no one

disclosed these failures to the government. KBR's Principal Program Manager—the person

responsible for overseeing all of KBR's operations in theater—Guy LaBoa testified that he would

expect a contractor to tell the Government if the contractor felt it received money from the

Government that it was not entitled to, but, tellingly, he testified that he doubts that the contractor

---

[100]    Ex. 23 (June 24, 2009 internal KBR email) at '4815-16.

[101]    Ex. 23 (June 24, 2009 internal KBR email) at '4814.

[102]    Ex. 45 (containing June 24, 2009 email from J. Vujic) at '4256. KBR's "new memo" contained the same three statements that Conor O'Muirgheasa reported internally were "not [] true statement[s]." Ex. 23 (June 24, 2009 internal KBR email) at '4817; Ex. 45 (containing June 24, 2009 email from J. Vujic) at '4258. *See also* Ex. 24 (July 1, 2009 KBR Technical Direction Bulletin re: PCARSS Process) at '4270 ("Cross level of PCARSS has been a concern and although the effort has been performed by site warehouse staff to prepare the materials for PCARSS KBR has a responsibility to cross level before purchase. The below serves as clarification of the Non Demand Supported Stock Removal OPSDIR [Operation Directive]. . . . The attached supporting memo is a change from what was previously used.").

would ever do so. Indeed, LaBoa never suggested to the Government that KBR should not be reimbursed for some of the inventory that it ordered because it did not do an adequate job following its Government-approved PCP.[103]

104.    Similarly, according to KBR's Director of Supply Management, Ty Hippert, KBR admitted that he would not correct the Government if the Government thought KBR's performance was better than it actually was.[104]

105.    Not only is KBR's Deputy Principal Program Manager—the person second in command over KBR's operations—Larry Lust unaware of anyone at KBR telling the Government that KBR bypassed MATCON status 35% of the time, but he would not have disclosed that to the Government, and he does not think anyone at KBR should have told the Government.[105] Likewise, Guy LaBoa does not remember ever disclosing to the Government that 35% of all requisitions in 2009 bypassed MATCON and the cross-leveling step (as referenced in a March 5, 2010 email).[105a] KBR's Head of the DMC, Conor O'Muirgheasa, did not recall anyone at KBR saying that KBR should disclose to the Government that it bypassed the DMC 35% of the time.[105b]

106.    Guy LaBoa saw no reason to send KBR's internal audit reports to the Government.[106]

---

[103]    Ex. 135 (LaBoa Dep.) 214:14-22. Ex. 135 (LaBoa Dep.) 135:20-136:1.

[104]    Ex. 127 (Hippert Dep.) 89:21-91:2.

[105]    Ex. 136 (Lust Dep.) 98:8-99:12.

[105a]    Ex. 135 (LaBoa Dep.) 83:6-13.

[105b]    Ex. 139 (O'Muirgheasa Dep.) 251:5-17.

[106]    Ex. 135 (LaBoa Dep.) 85:24-86:7.

107.     Guy LaBoa never discussed any of KBR's TREC issues with the Government, nor did he ever direct anyone at KBR to discuss TREC issues with the Government.[107]

108.     Guy LaBoa did not disclose to the Government that he reprimanded an employee who ordered millions of dollars of materials that KBR concluded were unneeded.[108]

109.     KBR's Senior Contracts Manager, Mary Wade, never told the Government about any compliance issues related to KBR's property control procedures (PCPs).[109]

110.     Mary Wade never told the Government that she believed KBR had an issue with purchasing more inventory than what was needed under the LOGCAP III contract.[110]

111.     Mary Wade attended award fee presentations KBR made to the Government, but is not aware of any disclosure ever made by KBR at those presentations to the Government that KBR had problems with its PCP, with cross-leveling, or TRECs.[111]

112.     Ty Hippert did not acknowledge that KBR had any systemic issues with over-ordering inventory, and did not disclose any systemic problems with KBR's inventory management to Maria McNamara.[112]

---

[107]     Ex. 135 (LaBoa Dep.) 94:5-18.

[108]     Ex. 135 (LaBoa Dep.) 89:15-90:7; *see also* Ex. 30 (May 4, 2010 internal KBR email attaching Letter of Reprimand from G. LaBoa) at '2477.

[109]     Ex. 148 (Wade Dep.) 26:9-12.

[110]     Ex. 148 (Wade Dep.) 73:5-15.

[111]     Ex. 148 (Wade Dep.) 122:16-19, 124:24-125:3, 128:7-129:8, 130:14-131:24.

[112]     Ex. 127 (Hippert Dep.) 25:3-9, 108:8-109:14.

113. Ty Hippert never disclosed to the Government any calculation or analysis of the value of property that KBR ordered new, that could have otherwise been acquired through a cross-leveling process.[113]

114. KBR's Business Segment Manager Responsible for Operation of KBR's Integrated Inventory Management System, Lynellen Sullivan, never told the DCMA about issues that KBR was having with TRECs.[114]

115. Lynellen Sullivan was unaware of anyone at KBR suggesting that KBR should tell the DCMA about issues that KBR was having with TRECs.[115]

116. Lynellen Sullivan never disclosed to the Government the amount of over ordering that resulted from problems with MAXIMO.[116]

117. KBR did not disclose its inventory underutilization to the Government because, according to KBR's Theater PSM Manager-Supply, James Haught, "It wasn't a requirement" to do so.[117]

118. KBR's Chief of Staff, Jeff Rock, was unaware of anyone at KBR ever disclosing to the Government that KBR used work orders to avoid inventory adjustment reports and the attention of the Government.[118]

---

[113]    Ex. 127 (Hippert Dep.) 139:3-11.

[114]    Ex. 144 (Sullivan Dep.) 120:2-5.

[115]    Ex. 144 (Sullivan Dep.) 140:22-141:6.

[116]    Ex. 144 (Sullivan Dep.) 265:14-267:22.

[117]    Ex. 126 (Haught Dep.) 255:18-24, 259:9-15.

[118]    Ex. 142 (Rock Dep.) 260:6-17.

119.    Jeff Rock did not disclose, and was unaware of anyone else at KBR disclosing, to the Government that sites or individuals were improperly reserving inventory to keep inventory from being cross-leveled, testifying that "it wasn't the government's business."[119]

120.    Jeff Rock did not disclose, and was unaware of anyone else at KBR disclosing, to the Government that KBR had found an instance of $1 million of excess supplies being ordered.[120]

121.    KBR's Deputy Program Manager – Support and a member of KBR's Senior Leadership Team, Rich Kaye, was unaware of KBR ever disclosing to the Government that KBR bypassed MATCON status, improperly characterized non-stock inventory as stock, reserved items without justification, or had materials sitting in TRECs for extended periods of time.[121]

## VI.    The Government Did Not Know About KBR's Systemic Inventory Management Failures

122.    As a result of KBR's failure to disclose material and systemic failures with over-ordering new material, the government was not aware of the nature of the problems. Mary Sheridan, who at times served as DCMA's Theater Administrative Contracting Officer during LOGCAP III and was the senior-most DCMA person in the field responsible for administering the LOGCAP III contract on behalf of DCMA (Ex. 143 (Sheridan Dep.) at 21:21-25), testified that she was not aware that in February 2010, KBR was purchasing $5 million of material daily even though it had $1.2 billion in excess, and that it "[a]bsolutely" concerned her:

> [T]his is government money, **taxpayer money that is being spent and it is – it's being spent and then it's excessively**, if you will, if I'm looking at this documentation and I believe the facts that I'm reading here then – **they're not operating**

---

[119]    Ex. 142 (Rock Dep.) 330:21-332:10.

[120]    Ex. 142 (Rock Dep.) 313:13-314:4.

[121]    Ex. 129 (Kaye Dep.) 229:1-15.

**in the best interest of the government or within the contract of what they signed up to do, in my opinion**.[122]

123. Maria McNamara, the DCMA's Prime Property Administrator assigned to KBR from 1997 to 2014, testified (1) that she was "not aware" that in February 2010, KBR was purchasing $5 million of material daily even though it had $1.2 billion in excess; (2) that she would have taken action to correct this practice if she had been aware; and (3) the fact that KBR was doing this caused her concern.[123]

124. Maria McNamara did not know KBR was resisting placing material requisitions in MATCON status and sending the majority of requisitions directly through the procurement channels without going through the cross-level process, but if she had found out about it, "that would have caused a red flag to go up, and we would have – our audits would have been earmarking more intense coverage of – of these things."[124]

125. Maria McNamara was not aware of the concerns expressed by KBR's Head of the DMC, Conor O'Muirgheasa, regarding KBR's three false statements on the PCARSS form, but had she been aware, it would have concerned her and caused her to implement a corrective action and "elevating the situation if it were not" fixed.[125] If Ms. McNamara had found out that KBR had systematically failed to screen items for need before returning them, she would have declared their system to be "noncompliant."[125a]

---

[122]  Ex. 143 (Sheridan Dep.) at 166:18-168:15 (emphasis added).

[123]  Ex. 138 (McNamara Dep.) 555:3-17.

[124]  Ex. 138 (McNamara Dep.) 518:11-519:15.

[125]  Ex. 138 (McNamara Dep.) 556:7-561:1.

[125a]  Ex. 138 (McNamara Dep.) 407:11-408:5.

126.     Mary Sheridan was not aware of the concerns expressed by KBR's Head of the DMC, Conor O'Muirgheasa, regarding KBR's three false statements on the PCARSS form, but if she had been made aware, she would have brought it to the attention of DCMA leadership and informed the DCAA.[126]

127.     Maria McNamara testified that she was not aware that KBR was using TRECs to conceal inventory from cross-leveling, but that had she known, "something would have had to have been corrected by following the DCMA process" and it would have caused her concern. Ms. McNamara also did not know there was $342 million worth of property sitting in TRECs for more than 60 days, but if she did know, it would have concerned her and caused her to issue a corrective action.[127]

128.     Mary Sheridan also was not aware of KBR's misuse of TRECs, and if she had been aware, she "would have had a conversation with the PCO, the PMO, theater personnel, DCAA, property, corporate office, and this is something . . . I most likely would have had a conversation with CID [Criminal Investigation Division] about."[128]

129.     Colonel Kirk Vollmecke, the DCMA Commander who "was responsible as the senior contracting official for contract administration in theater," was also not aware of KBR's

---

[126]     Ex. 143 (Sheridan Dep.) 170:6-172:11 ("Based on this email traffic, . . . I would have brought this to the PCO's attention, the program offices' attention, as well as DCMA leadership, definitely property and plant clearance because PCARSS is a part of the plant clearance process for excess property. Q.  And CID [Criminal Investigation Division]? . . . [Objection.] A.  I would have brought it to DCAA's attention. I would have had a discussion with everyone I just mentioned. . . . [A]nd based [on] whatever would have come from that discussion, I would have made that decision at that time.").

[127]     Ex. 138 (McNamara Dep.) 569:4-18. Ex. 138 (McNamara Dep.) 580:13-581:4.

[128]     Ex. 143 (Sheridan Dep.) 179:7-180:21, 165:24-166:5 (defining "CID" as Criminal investigation Division).

misuse of TRECs or that KBR personnel were concealing inventory from the DMC for cross-leveling, and if he had been aware, he "would have immediately conducted an audit on the fundamental deficiencies[.]"[129]

130.     Mary Sheridan did not recall seeing the internal KBR document identifying issues KBR uncovered at its Taji site, but if she had seen it, she would have contacted the Department of Defense's Inspector General because of "[e]xactly what the document said[, t]hat they hid two warehouses of equipment and it was violations to the FAR," and she would have called the DCAA auditors "because they also had the right to audit what's being procured on the contract because it's [a] cost type contract."[130]

131.     Maria McNamara did not recall seeing the internal KBR document identifying issues KBR uncovered at its Taji site and was not aware of the issues at Taji, but if she had been aware, she "would have been very concerned."[131]

132.     Colonel Kirk Vollmecke was not aware of the issues KBR uncovered at its Taji site, but if he had been, he "would have then turned [his] property administrators onto it first so we could go back in and forensically understand everything…"[132]

133.     Maria McNamara did not know that KBR was misclassifying "Non-stock" items as "Stock" with an impact of over $80,000,000 of inventory unavailable for cross-leveling, and did not know that this misclassification, along with KBR's rule against cross-leveling Stock items for priority 3 requests, was causing KBR to not be able to cross-level over $50,000,000 of inventory,

---

[129]     Ex. 146 (Vollmecke Dep.) 21:20-22:4, 367:1-15.

[130]     Ex. 143 (Sheridan Dep.) 141:3-143:13.

[131]     Ex. 138 (McNamara Dep.) 509:4-510:16.

[132]     Ex. 146 (Vollmecke Dep.) 320:1-323:20.

but had Ms. McNamara known, she would have been concerned and "a corrective action . . . would have taken place of some sort."[133]

134.     Maria McNamara was not aware that KBR employees put items on reserve so that they could not be cross-leveled, and was not aware that a KBR location was ordering material despite having stock available, but had Ms. McNamara known, it would have concerned her and she would have started the process to have the issue corrected.[134]

135.     Maria McNamara was not aware that KBR had up to 70 years of cable in inventory, but if Ms. McNamara had been aware of that and that no request had been sent out by the DMC to cross-level this cable, it would have concerned her and caused her to take corrective action.[135]

136.     When asked about her reaction to the various internal KBR documents shown to her during the deposition, Mary Sheridan testified that she was "appalled." Based on certain documents that KBR made available to the DCAA auditors, the DCAA was under the false impression that KBR's cross-level rate was 46 out of 47.[136]

---

[133]     Ex. 138 (McNamara Dep.) 547:2-549:10.

[134]     Ex. 138 (McNamara Dep.) 551:11-553:16.

[135]     Ex. 138 (McNamara Dep.) 561:4-565:3.

[136]     Ex. 143 (Sheridan Dep.) 308:21-309:15 ("Q. What was your reaction to seeing the other emails that I showed you about KBR putting $80 million off limits by misclassifying nonstock items as stock and some of those other things, how about the impact that those documents had on your view? [Objection.] A. I was appalled, I was appalled…. Q. Can you explain why you were appalled by what you saw today compared to what you had previously been seeing? A. When you compile it all together, the impact is what appalls me as a taxpayer."); *see also* KBR SOF, ¶ 50.

## VII. KBR's Statements to the Government Falsely Represented Compliance with Its Cross-Leveling Obligations

### A. KBR's Statements to the Government on Public Vouchers Falsely Represented Compliance with Its Cross-Leveling Obligations

137. KBR submitted claims for reimbursement to the Government for the inventory that KBR purchased and received in performing LOGCAP III.[137]

138. All requests for reimbursement submitted by KBR to the Government were made via a form known as "public vouchers".[138]

---

[137] *See* Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 12:9-16 ("A.  A cost-reimbursable program is one in which the government reimburses the contractor for incurred costs. Q.  . . . LOGCAP III was a cost-reimbursable contract for KBR; is that right? A.  Correct. Q.  So the government reimbursed KBR for its costs on LOGCAP III; is that correct? A.  Correct."), 21:11-13 ("Q.  . . . Why did KBR submit public vouchers to the U.S. Government on LOGCAP III? A.  For reimbursement of incurred costs."), 21:20-22:3 ("Q.  . . . [T]he U.S. Government reimbursed KBR for the money that KBR spent procuring property and materials on LOGCAP III, correct? [Objection.] A.  The government reimbursed KBR for materials and equipment received, therefore incurred, thus the government reimbursed KBR for costs incurred for that period."), 22:4-11 ("Q.  The U.S. Government reimbursed KBR for the money KBR spent procuring property and materials on LOGCAP III if those property and materials were received by KBR; is that correct, sir? A.  Correct."), 24:9-14 ("Q.  . . . Are you aware sitting here today of any pieces of property and materials that KBR bought and received on LOGCAP III that the government paid less than a hundred percent of what KBR spent buying the property and material? A.  I am not aware.").

[138] *See* Ex. 84 (KBR Response to Interrogatory Number 10) ("[W]hen KBR incurred costs on LOGCAP III, those costs were entered into its SAP accounting system. In accordance with FAR 52.216-7, twice each month KBR extracted from its accounting system all allowable direct costs, (such as those for property and materials) incurred on each cost reimbursable Task Order and used that data to create invoices to the government, known as a 'public vouchers.' The public vouchers listed all direct cost items plus allowable indirect costs (general and administrative expenses) on the Task Order for that billing period. For any single voucher, there may be thousands of individual transactions listed. In the public vouchers, KBR would provisionally bill the government for a portion of its base fee of 1% of estimated costs. KBR would then submit the public vouchers to the government for payment. See KBR-HOW-0042610 to -0044521."); Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 31:7-14 ("Q.  . . . [A]s a general matter were KBR's costs spent procuring property and materials that KBR procured and received on LOGCAP III, did those costs ultimately end up on the public vouchers KBR submitted to the U.S. Government? A.  In general the costs incurred based on receipts of materials and equipment were included on a public voucher, in general."), 37:3-10 ("Q.  . . . Is that [amount listed on a particular public voucher] the total amount that KBR

139.    The public vouchers submitted by KBR broke down the total dollar amount requested into specific dollar amounts charged to particular contract line item numbers, or "CLINs."[139]

---

is asking the government to pay in response to this particular public voucher? [Objection.] A.  That's the total cost incurred for the period in which KBR is billing to the U.S. Government.").

[139]    *See, e.g.*, KBR's Exhibit 18 (ECF No. 294-31, Public Voucher No. 32 for LOGCAP III Task Order 139) at ECF Page 2 (requesting total amount of "$155,199,325.83" for KBR's "Cost[s] for October & November 2007" for Task Order 139), at ECF Pages 3-6 (identifying dollar amounts "CURRENT[LY] BILLED" and dollar amounts "CUMULATIVE[LY] BILLED" for CLINs 4005, 4009, 4011, 5005, 5009, 5011, 6005, and 6009); KBR's Exhibit 19 (ECF No. 294-32, Public Voucher No. 40 for LOGCAP III Task Order 159) at ECF Page 2 (requesting total amount of "$97,021,332.00" for KBR's "Cost[s] for April-May 2010" on Task Order 159), at ECF Pages 3-4 (identifying dollar amounts "CURRENT[LY] BILLED" and dollar amounts "CUMULATIVE[LY] BILLED" for CLINs 7005, 7009, 8005, 8009, 9005, 9009, 1005, 1009, 1105, 1109, 1205, 1209); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57" (requesting $145,074,262.22 in this public voucher for Task Order 139 for "Cost for June-July 2008"), at Tab "1035-Task57" (listing CLINs 4005, 4009, 5005, 5009, 6005, 6009, and associated dollar values currently billed and cumulatively billed, among other things), at e.g., Tab "Prior MonthYr1 Details 2008" (listing non-labor and labor costs included in this public voucher, with associated object, cost elements, documents, vendor names, object amounts, item descriptions, and invoice identifications, among others). Every amount charged by KBR to the Government during LOGCAP III was assigned to a particular CLIN. *See, e.g.*, KBR's Exhibits 18 and 19; Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57." Below is an excerpt of KBR's Public Voucher No. 40 for LOGCAP III Task Order 159, which KBR attached as KBR's Exhibit 19 (ECF No. 294-32):

Standard Form 1035
SEPTEMBER 1973
4 TREASURY FRM 2000

1035-113

**PUBLIC VOUCHER FOR PURCHASES AND
SERVICES OTHER THAN PERSONAL
MEMORANDUM**

CONTINUATION SHEET

VOUCHER NO. 40

SCHEDULE NO.
1005304UT128
1005304UT129
1005304UT130
1005304UT131
1005304UT132
1005304UT133
1005304UT134
1005304UT135
1005304UT136
1005304UT137
1005304UT138
1005304UT139
SHEET NO. 2

DFAS, Columbus Operating Location, Attn: DFAS-CO/West Entitlement Operations, P.O.Box 182381, Columbus, OH 43218-2317

CONTRACT NO. DAAA09-02-D-0007

KELLOGG BROWN & ROOT CORPORATION
P.O. BOX 203145
Houston, TEXAS 77216-3145

Task Order 0159

| CLIN | SUBCLIN | ACRN | DESCRIPTION | CURRENT BILLED | | CUMULATIVE BILLED | |
|------|---------|------|-------------|----------------|--|-------------------|--|
| 7005 | 7005AA | AA | Multinational Force/Multinational Coalition - Iraq | | | $ | 693,423,772.94 |
| 7009 | 7009AA | AA | Base Fee | | | $ | 6,934,237.73 |
| 8005 | 8005AA | AF | Multinational Force/Multinational Coalition - Iraq | $ | 1,273,849.77 | $ 2,903,277,697.48 | |
| 8009 | 8009AA | AF | Base Fee | $ | 12,738.25 | $ | 28,793,749.89 |
| 7005 | 7005AB | AA | Multinational Force/Multinational Coalition - G3&G6 Sites | | | $ | 19,417,480.00 |
| 7009 | 7009AB | AA | Base Fee - G3&G6 Sites | | | $ | 194,174.80 |
| 8005 | 8005AB | AF | Multinational Force/Multinational Coalition - G3&G6 Sites | $ | 64.02 | $ | 123,193,772.22 |
| 8009 | 8009AB | AF | Base Fee - G3&G6 Sites | $ | 0.64 | $ | 1,231,916.23 |
| 7005 | 7005AC | AB | Multinational Force/Multinational Coalition - MEF 017 | $ | - | $ | 45,220,547.16 |
| 7009 | 7009AC | AB | Base Fee - MEF 017 | $ | - | $ | 452,197.90 |
| 7005 | 7005AD | AC | Multinational Force/Multinational Coalition - Bucca ICO | $ | - | $ | 545,077.91 |
| 7009 | 7009AD | AC | Base Fee - Bucca ICO | $ | - | $ | 5,450.71 |
| 7005 | 7005AE | AC | Multinational Force/Multinational Coalition - Cropper ICO | $ | - | $ | 195,110.76 |
| 7009 | 7009AE | AC | Base Fee - Cropper ICO | $ | - | $ | 3,355.38 |
| 8005 | 8005AE | AG | Multinational Force/Multinational Coalition - Cropper ICO | $ | - | $ | 140,433.27 |
| 8009 | 8009AE | AG | Base Fee - Cropper ICO | $ | - | $ | - |
| 7005 | 7005ZZ | AD | Multinational Force/Multinational Coalition - LOGCAP LSA 195 | $ | - | $ | 1,712,631.92 |
| 7009 | 7009ZZ | AD | Base Fee - LOGCAP LSA 195 | $ | - | $ | 17,126.02 |
| 7005 | 7005AF | AE | Multinational Force/Multinational Coalition - A Sites Balad | $ | 4,909.81 | $ | 199,124,397.97 |
| 7009 | 7009AF | AE | Base Fee - A Sites Balad | $ | 49.10 | $ | 1,991,208.83 |
| 8005 | 8005AF | AH | Multinational Force/Multinational Coalition - ICOTA | $ | - | $ | 1,422,398.62 |
| 8009 | 8009AF | AH | Base Fee - ICOTA | $ | - | $ | 14,223.70 |
| 8005 | 8005AG | AC | Multinational Force/Multinational Coalition - Taji ICO | $ | - | $ | 7,218.37 |
| 8009 | 8009AG | AC | Base Fee - Taji ICO | $ | - | $ | 72.18 |
| 9005 | 9005AA | AF | Multinational Force/Multinational Coalition - Iraq Yr2 | | | $ | 451,456,410.00 |
| 9009 | 9009AA | AF | Base Fee Yr2 | | | $ | 4,514,564.10 |
| 1105 | 1105AA | AQ | Multinational Force/Multinational Coalition - Iraq Yr2 | $ | 88,753,663.17 | $ 1,504,188,887.49 | |
| 1109 | 1109AA | AQ | Base Fee Yr2 | $ | 887,519.20 | $ | 15,041,504.76 |

-234-

As shown in this excerpt, KBR identified the specific dollar amounts it currently billed and cumulatively billed for each particular CLIN.[139a]

140.    The LOGCAP III base contract specified that "For Cost-Reimbursable Contract line Item Numbers (CLINs) only supplies and materials **necessary for performance under this contract** will be reimbursed as stated in each individual Task Order's Scope of Work (SOW) and Federal Acquisition Regulation (FAR) § 31.205-26."[140]

141.    The LOGCAP III Task Orders defined the CLINs and provided funding for the CLINs, which could be increased.[141] For example, Task Order 139 defines CLINs and provides funding for those CLINs:

| ITEM NO | SUPPLIES/SERVICES ... | AMOUNT |
| --- | --- | --- |
| 4005AA | NOT TO EXCEED COST | $ 388,349,600.00 |
| ... | ... | ... |
| 4009AA | BASE FEE | $    3,883,496.00 |
| ... | ... | ... |
| 4011AA | AWARD FEE POOL | $    7,766,904.00 |

[141a] For another example, Task Order 159 defines CLINs and provides funding for those CLINs:

---

[139a]    KBR's Exhibit 19 (ECF No. 294-32) at ECF Page 3.

[140]    Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006 (emphasis added).

[141]    Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 38:2-20 ("Q. This is listing certain CLIN or CLIN numbers; is that right, sir? A. Correct. Q. And those are contract line item numbers; is that right? A. That is correct. Q. And I found the eight different CLIN numbers reflected in this public voucher to be 4005, 4009, 5005, 5009, 6005, 6009, 4011 and 5011. Do you know what those CLIN numbers mean, sir? A. I would need the contract mod to tell you exactly what those CLIN numbers mean. Q. And so when you say the contract mod is that the form task order modification for Task Order 139? A. Yes. Yes. Q. And so it's your testimony that those form task order modifications for Task Order 139 will define what these CLIN numbers represent? A. Yes, sir."); Ex. 148 (Wade Dep.) 18:9-20 (describing funding as "the government . . . put[ting] funds on the contract to pay for the performance [KBR] w[as] doing," which would entail "seeing if there were sufficient funds obligated on the contract to cover [KBR's] costs and if they weren't, [KBR would] notify the government that additional funds would be required").

[141a]    Ex. 100 (Aug. 21, 2006 Task Order 139) at '1486-493.

Funding is provided for the POP [Period of Performance] of
01 September 08 to 31 August 2009 in the Amounts listed
below:

| CLIN | Title | Amount |
|------|-------|--------|
| 7005AA | BLS NTE [Base Life Support Not To Exceed] | $531,093,640.14 |
| 7009AA | BLS Base Fee [Base Life Support 1% Base Fee] | $ 5,310,936.40 |
| 7011AA | BLS Award Fee Pool [Base Life Support 2% Award Fee Pool] | $ 10,621,752.46 |
| 7005AB | Coalition NTE | $ 19,417,480.00 |
| 7009AB | Coalition Base Fee | $ 194,174.80 |
| 7011AB | Coalition Award Fee Pool | $ 388,345.20 |
| 7005AC | MEF NTE | $ 46,753,408.34 |
| 7009AC | MEF Base Fee | $ 467,534.08 |
| 7011AC | MEF Award Fee Pool | $ 935,057.58 |
| 7005AD | Bucca ICO NTE | $ 253,202.97 |
| 7009AD | Bucca ICO Base Fee | $ 2,532.03 |
| 7011AD | Bucca ICO Award Fee Pool | $ 5,064.00 |
| 7005AE | Cropper ICO NTE | $ 573,994.30 |
| 7009AE | Cropper ICO Base Fee | $ 5,739.94 |
| 7011AE | Cropper ICO Award Fee Pool | $ 11,479.76 |
| 7005ZZ | LOGCAP LSA NTE | $ 2,481,114.14 |
| 7009ZZ | LOGCAP LSA Base Fee | $ 24,811.14 |
| 7011ZZ | LOGCAP LSA Award Fee Pool | $ 49,621.72 |

[141b]

142.    Thus, when KBR submitted Public Vouchers associated with Task Orders with
billings specific to cost-reimbursable CLINs authorized by the Task Orders, KBR was representing
that those supplies and materials purchased were "necessary for performance."[142]

143.    Relators' expert Dr. Gary Gaukler identified 899 public vouchers associated with
unnecessary costs incurred because KBR purchased items despite existing excess material being
available in theater. For example, on July 14, 2008, KBR submitted Public Voucher No. 47 for
Task Order 139. That Public Voucher requested reimbursement for the cost of purchase order line

---

[141b]    Ex. 40 (Sept. 1, 2008 Task Order 159) at '5826.

[142]    Ex. 95 (LOGCAP III Base Contract and Statement of Work) at '0006. *See also* Ex. 119
(Supplemental Rebuttal Report of G. Gaukler, Output 2).

("POLINE") (#771983), on purchase order number ("PONUM") #4750053582 for 15 1.5HP

blower motors ordered on July 1, 2008 (item number 1001331456), for a total cost of $7,725,

despite the fact that the 15 blower motors were all available in excess in other KBR storerooms.[143]

**B.    KBR's Statements to the Government on Materials Requisitions Falsely Represented Compliance with Its Cross-Leveling Obligations**

144.    Before purchasing materials for use on the LOGCAP III contract, KBR was

required to obtain approval from the Government Administrative Contracting Officer ("ACO") if

the purchase would exceed a minimum dollar threshold.[144] While the LOGCAP III contract set

baseline thresholds for approval of material requisitions, "individual Task Orders [could] require

more stringent approval thresholds."[144a]

145.    To obtain approval from the ACO, KBR was required to submit its proposed

materials requisition to the ACO and certify that it had attempted to fill the requisition through

---

[143]    Ex. 120 (Expert Rebuttal Report of G. Gaukler, Output 3); Ex. 118 (Expert Report of G. Gaukler, Output 1); Ex. 114 (ZBILL20080714-044718-GC00GY) at Tab "ZBILL20080714-044718-GC00GY," Row 1376 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Trns Amt: "7,725.00"); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57," at Tab "Yr 2 Detail 2008," Row 128 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: "GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Obj Amt: "7,725.00").

[144]    Ex. 99 (Jan. 31, 2006 Amendment to LOGCAP III Base Contract) at '4058 ("For the purpose of purchasing supplies/non-durable goods, the Contractor shall obtain approval from the on-site ACO/COR for each line item on the material requisition exceeding the threshold of $25,000.00 on either a unit or cumulative effort."); Ex. 49 (July 10, 2007 DCMA Memorandum) at '1658 (same).

[144a]    Ex. 49 (July 10, 2007 DCMA Memorandum) at '1659.

cross-leveling before purchasing.[145] KBR submitted the material requisitions together with a cross-leveling certification, which was "always part of the contract."[145a] In the certifications, KBR was required to attest it had "checked for theater-wide redistribution under cross-leveling process."[145b] The certification was a requirement for KBR to purchase the property in question.[145c]

146.    KBR additionally certified that it had attempted to fill material requisitions through cross-leveling via a "Commercial Purchase Justification," which KBR was required to prepare for all material requisitions that included a commercial item.[146] The Commercial Purchase Justification required KBR to represent that "Local Cross Level, DMC, and Theatre Inventory was checked" for the items KBR in the requisition.[146a] Making clear the Government's expectations, the Commercial Purchase Justification advised KBR that "[t]he purpose of this form is to follow the priorities as listed in the SOW, and show due diligence in verifying that items cannot be filled through existing stocks available." *Id*. The Government required KBR to include the Commercial Purchase Justification "in all MR packets provided to the Administrative Contracting Officer (ACO) for approval."[146b]

---

[145]    Ex. 138 (McNamara Dep.) 416:10-20. KBR's requisitions specified, among other things, the items that KBR intended to purchase, their quantities, unit price, and total amount. *See, e.g.*, Ex. 2 (sample purchase requisition).

[145a]    Ex. 138 (McNamara Dep.) 421:3-11.

[145b]    Ex. 138 (McNamara Dep.) 413:17-414:18; Ex. 2 (sample purchase requisition) at 3.

[145c]    Ex. 138 (McNamara Dep.) 414:19-415:6.

[146]    Ex. 17 (Nov. 26, 2008 DCMA Memorandum) at '6903-04; Ex; Ex. 126 (Haught Dep.) 58:5-13.

[146a]    Ex. 17 (Nov. 26, 2008 DCMA Memorandum) at '6905.

[146b]    *Id*. at '6903; Ex. 64 (reflecting ACO approval of MR with Commercial Purchase Justification).

147. Following ACO approval of a material requisition, KBR incorporated the materials into a purchase order.[147] Once it had purchased the items, KBR incorporated the cost of the purchased items into the public vouchers it presented to the Government for payment. *Id*. at 22–23.

148. The materials that KBR systemically overordered under the LOGCAP III contract appear in tens of thousands of separate purchase requisitions. The MAXIMO/STEAM system records the requisitions that KBR prepared, including the cost of the items in the requisition. *Id*. at 23. Relators' expert witness, Dr. Gary Gaukler, has compared the requisitions in MAXIMO/STEAM to the lines of inventory that KBR overordered.[148] From the results of that comparison, Professor Gaukler assessed whether the requisitions that included overordered lines of inventory had been subject to ACO approval, either because the material requisition went through WACOAPPR status in MAXIMO/STEAM or the requisition's amount exceeded the Government's threshold for ACO approval. *Id*. at 39. Applying this analysis, Professor Gaukler identified 10,468 requisitions that contained overordered items and that went through WACOAPPR status, exceeded the threshold for ACO approval based on their cost characteristics, or both. *Id*. at 40. Each of those requisitions falsely certified to the ACO that KBR had "checked for theater-wide redistribution under cross-leveling process."

### C. PCARSS

149. The process of returning unneeded, excess inventory to the Government was called the Plant Clearance Automated Reutilization Screening System, or "PCARSS."[149] "The intent of

---

[147]  Ex. 96 (Expert Report of G. Gaukler) at 23.

[148]  Ex. 96 (Expert Report of G. Gaukler) at 39.

[149]  Ex. 127 (Hippert Dep.) 156:6-24.

the PCARSS process is to demonstrate that all reasonable steps possible have been taken to ensure that all of the items being sent to the PCARSS process have no remaining use on the LOGCAP III project, that KBR has done everything possible to maximize the usage of these items . . . ."[149a] When returning items to the Government by declaring them as excess, KBR certified that "[i]t has been determined that this property is excess to the contract and there is no further use in support of the mission requirements," "[t]he attached list of item(s) have been screened for cross level requirements throughout the theater of operation," and "[a]t this time, there are no foreseeable requirements in support of the current mission."[149b] In other words, when KBR sent items into PCARSS, it was representing to the Government that there was "no longer [] a need for it."[149c]

### D. Award Fees

150.     The LOGCAP III contract entitled KBR to periodically request an award fee based on KBR's performance for up to 2% of the definitized costs.[150] To request the award, KBR made presentations to award fee evaluation boards that contained specific affirmative representations from KBR about its performance. These presentations included representations about the efficiency with which KBR was managing inventory.[150a] As of December 2012, KBR had billed

---

[149a]     Ex. 88 (containing June 18, 2009 internal KBR email) at '4356.

[149b]     Ex. 45 (PCARSS Form) at '4258.

[149c]     Ex. 133 (KBR 30(b)(6) (Lust) (Sept. 29, 2021) Dep.) 88:20-89:17.

[150]     Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 58:17-59:12 (testifying KBR's "award fee was . . . potentially two percent of the definitized amount. . . . The government has an award fee board which evaluates the contractor's performance for the period based on criteria in the contract"); Ex. 83 (Sept. 27, 2007 Walter Decl.), ¶¶ 7-10

[150a]     *See, e.g.*, Ex. 108 (presentation to Award Fee Evaluation Board LOGCAP III – TO 139/159, for the period May 1, 2008 thru December 31, 2008) and Ex. 109 (presentation to Award Fee Evaluation Board LOGCAP III – TO 118 – CJOA, for the period May 2, 2007 thru October 31, 2007).

the Government $87.7 million for award fees on Task Order 139 alone.[150b] As of August 2014, KBR had billed the Government $102.8 million for award fees on Task Order 159 alone.[150c] But KBR's representations about its performance were misleading "half-truths" because KBR failed to disclose its systemic failures, often lamented internally, to check for excess material before ordering new. Instead, KBR advised the Award Fee Evaluation Board that:

- Resources are optimally used to provide maximum benefit … Cross-leveled $2,275,563 worth of needed assets from other Task Orders;[150d]

- Assumed SSA mission by cross-leveling personnel and property … Reduced lead times for materials resulting in increased operational readiness.[150e]

## VIII. Financial Impact of KBR's Requests for Reimbursement of Items Purchased When It Already Had Excess Amounts of Inventory on Hand

151. Dr. Gaukler analyzed KBR's inventory and purchasing data to identify specific cases when KBR over-ordered materials that it had available for cross-leveling under KBR's then-existing procedures.[151]

152. KBR produced its inventory data in connection with this case.[152]

---

[150b] Ex. 111 (PDF of Native Excel produced at KBR-HOW-9030564) at Tab "Form 1035."

[150c] Ex. 113 (PDF of Native Excel produced at KBR-HOW-9031445) at Tab "Form 1035."

[150d] Ex. 109 (presentation to Award Fee Evaluation Board LOGCAP III – TO 118 – CJOA, for the period May 2, 2007 thru October 31, 2007) at '8800.

[150e] Ex. 108 (presentation to Award Fee Evaluation Board LOGCAP III – TO 139/159, for the period May 1, 2008 thru December 31, 2008) at '1764.

[151] *See* Ex. 96 (Expert Report of G. Gaukler).

[152] *See* Ex. 116 (MAXIMO/STEAM Database).

153. Analyzing 34.5 million transactions found in this data, Dr. Gaukler determined KBR's inventory balances at every given point in time between May 28, 2007 and March 5, 2013.[153] Dr. Gaukler validated his analysis of KBR's inventory balances using corroborating information in the transactions. 98.5% of the transactions were internally consistent, and Dr. Gaukler conservatively screened the remaining 1.5% in order to block balance reconstruction when the transactions suggested any uncertainty. *Id.* § IV.B. He also compared his conclusions to KBR's ASL [authorized stock list] reports, and found that they matched 98% of the time and that when there was a discrepancy his model typically underestimated inventory balance. Ex. 105 (Expert Rebuttal Report of G. Gaukler) § IV.E.

154. Dr. Gaukler then applied KBR's own procedures to the inventory levels in order to classify KBR's inventory as Stock, Non-Stock, or Special at any given point in time according to KBR's own procedures and standards.[154] Under KBR's procedures, these classifications determine how much of an item's inventory is available for cross-leveling. *Id.* § IV.D.

155. Dr. Gaukler then analyzed KBR's purchase order data over the same period of time to determine the number of times that KBR purchased something new when, at the same time, that same item was available for cross-leveling, according to KBR's own procedures.[155] For sake of caution, Dr. Gaukler applied KBR's procedures as KBR had defined them in its Rule 30(b)(6) testimony, including additional "restrictions" on cross-leveling that do not appear in KBR's procedures. *Id.* Dr. Gaukler's analysis is highly conservative, as the restrictions he accepted

---

[153]    Ex. 96 (Expert Report of G. Gaukler), § IV.A.

[154]    Ex. 96 (Expert Report of G. Gaukler) § IV.C.

[155]    Ex. 96 (Expert Report of G. Gaukler) § IV.D.

included ones that the Government did not know about and that the Government would have referred to DCAA had it known.[155a]

156.    Dr. Gaukler identified 899 public vouchers associated with unnecessary costs incurred because KBR purchased items despite the same items being available, in excess, in theater. For example, on July 14, 2008, KBR submitted Public Voucher no. 47 for Task Order 139. That Public Voucher requested reimbursement for the cost of purchase order line ("POLINE") (#771983) on purchase order number ("PONUM") #4750053582 for 15 1.5HP blower motors ordered on July 1, 2008 (item number 1001331456), for a total cost of $7,725, despite the fact that the 15 blower motors were all available in excess in other KBR storerooms.[156] Dr. Gaukler concluded that on 73,530 separate purchase orders, KBR had purchased $341 million of excess inventory that it never should have purchased if KBR had followed its own procedures and standards regarding cross-leveling. On the occasions when KBR actually followed its cross-leveling procedures, and the database showed cross-level was supportable, the underlying circumstances rarely led KBR to deny a cross-level request. Moreover, Dr. Gaukler's model incorporates KBR's documented cross-level denials, and it reduces the value of KBR's

---

[155a]    Ex. 143 (Sheridan Dep.) 155:5-156:13.

[156]    Ex. 120 (Expert Rebuttal Report of G. Gaukler, Output #3); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "1034-Task 57"; Ex. 118 (Expert Report of G. Gaukler, Output #1); Ex. 114 (ZBILL20080714-044718-GC00GY) at Tab "ZBILL20080714-044718-GC00GY," Row 1376 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Trns Amt: "7,725.00"); Ex. 110 (PDF of Native Excel Spreadsheet Public Voucher No. 47 for Task Order 139) at Tab "Yr 2 Detail 2008," Row 128 (identifying Object: "GCA8YM-BAD9D1602-5"; Cost Elem: "550451"; Document: "1030466893"; Vendor Name: "GOLDEN ARROW GENERAL TRADING C"; PostDate: "20080701"; Ref Doc: "5000339056"; Obj Amt: "7,725.00").

$341 million in over-ordering by a mere $800,000.[156a] Dr. Gaukler later adjusted the total amount of excess purchases to $338 million (a reduction of less than 1%) after applying corrections that he had identified in rebuttal of KBR's expert William Walter. Ex. 96 (Expert Rebuttal Report of G. Gaukler) § IV.C.viii.

157. The Government paid for the cost of property and materials that KBR acquired on the LOGCAP III contract.[157] Consequently, the Government paid for the entire $341 million that KBR had incurred unnecessarily.[157a] Moreover, Dr. Gaukler was able to directly trace $226 million of the $341 million of unnecessary purchases to specific public vouchers that KBR submitted to the Government for reimbursement.[157b] As set forth above, those public vouchers in turn represented that these $226 million of over-ordered supplies were "necessary for performance" of LOGCAP III. SOF ¶¶ 10, 137-143. There is little doubt that the Government also paid for the remaining $115 million in unnecessary purchases, given that every materials order under the contract was subject to Government payment. *See*, *supra*, at ¶ 137.

---

[156a] Ex. 96 (Expert Report of G. Gaukler) at 5; Ex. 105 (Expert Rebuttal Report of G. Gaukler) ¶¶ 132-135; Ex. 106 (Supplement to Expert Rebuttal Report of G. Gaukler) ¶ 4.

[157] *See* Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) at 31:7-14, 37:3-10; Ex. 84 (KBR Response to Interrogatory No. 10).

[157a] *See* Ex. 131 (KBR 30(b)(6) (Jacobs) Dep.) 24:9-14 ("Q. . . . Are you aware sitting here today of any pieces of property and materials that KBR bought and received on LOGCAP III that the government paid less than a hundred percent of what KBR spent buying the property and material? A. I am not aware."), 31:7-14 ("Q. . . . [A]s a general matter were KBR's costs spent procuring property and materials that KBR procured and received on LOGCAP III, did those costs ultimately end up on the public vouchers KBR submitted to the U.S. Government? A. In general the costs incurred based on receipts of materials and equipment were included on a public voucher, in general.")

[157b] Ex. 96 (Expert Report of G. Gaukler) at 39.

## <u>LEGAL STANDARDS</u>

In resolving a summary judgment motion, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *McBride v. Barnes*, No. 1:18-CV-1424, 2021 WL 4750570, at *3 (C.D. Ill. Oct. 12, 2021) (Mihm, J.) (citation omitted). "The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue may be resolved against the moving party." *Grossman v. Smart*, 807 F. Supp. 1404, 1407 (C.D. Ill. 1992) (Mihm, J.); *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021) ("We have reminded judges that 'no matter how tempting it might be on summary judgment to be distracted by the sparkle of seemingly compelling facts, our assigned task is to take the facts in the light most favorable to the non-moving party.'") (citation omitted). Moreover, "summary judgment generally is not an appropriate means of resolving questions of motive and intent." *Grossman*, 807 F. Supp. at 1407.

<u>**ARGUMENT**</u>

I.    **KBR Submitted Thousands of False Claims for Payment**

KBR violated the FCA in three distinct ways. First, KBR submitted public vouchers to the Government, falsely representing that the tens of thousands of newly purchased items that already existed in excess in theater storerooms were "necessary for the performance under the contract." KBR argues that these vouchers "included no representations at all other than these were the costs that KBR incurred." Br. at 28. That is demonstrably false. All of the material at issue in this case was charged to the Government on public vouchers, and the vouchers assigned each reimbursement request to a specific billing code, known as a Contract Line Item Number ("CLIN"). SOF 137-143. The LOGCAP III "Base Contract," which applied to all work at issue in this case, provides that "For Cost-Reimbursable Contract Line Item Numbers (CLINs) only supplies and materials necessary for performance under this contract will be reimbursed ...." SOF 140. By assigning each purchase of material to a cost-reimbursable CLIN, KBR's vouchers represented that materials associated with those CLINs were "necessary" for performance of LOGCAP III.

That representation was false because KBR failed even to check for excess materials at least 50% of the time. SOF 63-67. Moreover, for the other half of its purchases KBR used the four fraudulent practices identified above to misclassify hundreds of millions of dollars of material and place it off limits to cross-leveling. SOF 52-83; 97-102. Using KBR's inventory data, Relators' expert identified more than 70,000 purchase orders placed by KBR worth over $341 million, when, according to KBR's own records, procedures, and criteria, excess inventory of the precise items purchased was already available in KBR's storerooms. SOF 151-157. Every one of those unnecessary purchases was included in a public voucher reimbursement request that misrepresented that the items were "necessary." SOF 137-143; 151-157.

Second, under LOGCAP III, KBR was entitled to an "Award Fee" of up to 2% of the definitized costs on the contract. SOF 2. To receive that fee, KBR made periodic presentations about its performance to Government "Award Fee Boards." SOF 6; 150. In those presentations, KBR falsely represented its performance as an inventory manager, never revealing the systemic failures that it had acknowledged internally. SOF 111; 150. It omitted this material information to seek and receive higher Award Fees.

Third, KBR made "false statements" to the Government to get false claims paid, in violation of 31 U.S.C. § 3729(a)(1)(B). For purchases above a dollar threshold, KBR expressly represented to the Government that it had checked supplies on hand and the item was not already available. SOF 144-147. Relators' expert identified 10,468 requisitions for which this specific representation was false because the purchased items existed in excess in KBR's storerooms. SOF 148. In addition, in connection with "PCARSS" disposition of items, KBR expressly represented to the Government that "[i]t ha[d] been determined that this equipment is excess serviceable items to the contract and there is no further use for the property in support of the mission requirements," that "[t]he attached lists of item(s) ha[d] been screened for cross level requirements throughout the theater of operations," and that "[t]he items have been screened and verified there [we]re no foreseeable requirements in support of the current mission at this time." SOF 149. As KBR's head of the DMC reported internally, these were "not … true statement[s]" and KBR knew it. SOF 99. This Court relied on the PCARSS misrepresentations in finding that Relators properly stated an FCA claim. Dkt. 52, Order Denying MTD at 33-38, 52-53 ("Order").

A.    **KBR Submitted Implied False Claims through Its Public Vouchers.**

KBR's requests for payment for unnecessary items are paradigmatic implied false claims under the Supreme Court's holding in *Escobar*:

> When, as here, a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided.

579 U.S. at 187. *Escobar* reiterated "the rule that half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations." *Id.* at 188. The representations in *Escobar* were "payment codes that corresponded to specific counseling services" and "numbers corresponding to specific job titles." *Id.* at 189. The *Escobar* defendant submitted the codes "without disclosing [its] many violations of basic [Medicaid] staff and licensing requirements." *Id.* at 190. The Court termed the payment codes "clearly misleading in context," noting that anyone reading them "would *probably—but wrongly*—conclude that the clinic had complied with core Massachusetts Medicaid requirements ...." *Id.* (emphasis added).

This case precisely parallels *Escobar*. KBR submitted reimbursement requests with billing codes (CLINs) representing that the materials for which it sought reimbursement were "necessary" for performance of the contract. But KBR omitted that it had failed at one of its core contractual requirements—using the materials it already had in excess before ordering those same materials again. Any Government bursar reviewing the reimbursement request would have "probably but wrongly" concluded that it was "necessary" to purchase the items because KBR had first checked to make sure the items were not available in excess elsewhere in the theater. As discussed above, however, KBR systematically bypassed the cross-level process and fraudulently placed hundreds of millions of dollars of material off limits when it did check for excess. SOF 52-83; 97-102. Not even the most generous reading suggests that KBR was truthful in representing that its purchases were "necessary for performance" of the contract.

The Seventh Circuit's recent decision in *United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732 (7th Cir. 2021), is also instructive. There, the defendant health plan contracted with the Government to provide services that fell within various "rate cells," including one encompassing care at nursing facilities, but did not actually provide skilled nursing care. *Id.* at 743. The court held that by submitting enrollment forms for patients in the nursing category, the defendant "implicitly falsely certified that Nursing Facility enrollees had access to [skilled nursing facility] services," even though the forms did not explicitly represent that those services were available. *Id.* As the Seventh Circuit explained, "[t]his is akin to the defendant's actions in *Escobar*, in which the court found that the defendant 'misleadingly omit[ted] [the] critical facts' that its care providers were not qualified to render services for which it nevertheless requested payments." *Id.* (quoting *Escobar*, 579 U.S. at 191).

A number of other cases have invoked the Supreme Court's "probably but wrongly" reasoning when assessing whether a statement was a "half-truth." *See, e.g.*, *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017), *cert. dismissed*, 138 S. Ct. 370 (2017) ("Just as in [*Escobar*], anyone reviewing Triple Canopy's invoices [for guards] 'would probably—but wrongly—conclude that [Triple Canopy] had complied with core [contract] requirements' [for marksmanship].");  *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902-03 (9th Cir. 2017) (drug names which "necessarily refer to specific drugs under the FDA's regulatory regime" probably but wrongly imply proper manufacturing processes); *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 700-01 (S.D.N.Y. 2018) ("Fannie Mae 'would probably—but wrongly—conclude' that the expenses were the actual expenses incurred by [defendants], rather than the product of fraudulent mark-ups."); *United States v. Academi Training Ctr., Inc.*, 220 F. Supp. 3d 676, 681 (E.D. Va. 2016) ("[A]nyone informed

that [security guards] providing armed protection for governmental officials in a high-risk country or warzone like Afghanistan would probably—but wrongly—conclude that [they] were qualified to handle the very firearms they needed to protect those officials."). These decisions, like *Escobar* and *Molina*, make clear that KBR's representation that its purchases were "necessary for performance" of the contract was a misleading half-truth that supports implied false certification.[1]

## B. KBR Submitted Implied False Claims through Its Award Fee Applications.

KBR's Award Fee applications provide an additional basis for the Court to reject its motion. Like the public vouchers, these applications made affirmative statements but omitted material information, making those statements misleading half-truths under *Escobar*.

The LOGCAP III contract entitled KBR to periodically request an award fee based on KBR's performance for up to 2% of the definitized costs. SOF 2. To request the award, KBR made presentations to award fee evaluation boards that contained specific affirmative representations from KBR about its performance. SOF 6; 150. KBR billed the Government at least $87.7 million in award fees on Task Order 139 and at least $102.8 million on Task Order 159. SOF 150. But KBR's representations about its performance were misleading "half-truths" because KBR failed to disclose its systemic failures, often lamented internally, to check for excess material before

---

[1] KBR's reliance on *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445 (7th Cir. 2016) (*Sanford-Brown II*), is misplaced. As KBR itself notes, *Sanford-Brown II* rejected an implied false certification claim because the relator "offered no evidence that defendant ... made any representations at all in connection with its claims for payment, much less false or misleading representations." *Id*. at 447. That is not the case here, where KBR represented that purchases were "necessary" through its use of CLINs. KBR also argues that public vouchers never contain affirmative statements, citing other cases that discuss various aspects of the vouchers. But none of KBR's cases addressed CLINs, and none involved systemic purchases of excess materials. Moreover, KBR cites only one "voucher" case that post-dates *Escobar*: *United States ex rel. Barko v. Halliburton Co.*, 241 F. Supp. 3d 37 (D.D.C. 2017). KBR tellingly omits *Barko*'s discussion of implied certification, where the court agreed that "withholding information about noncompliance with such laws or provisions may give rise to liability under a theory of implied false certification," but dismissed the case because "evidence of noncompliance d[id] not exist." *Id*. at 60.

ordering new. SOF 11; 52-136; 150. These award fee presentations contained misleading half-truths sufficient for liability under *Escobar*.

### C. Buying Material Without Checking for Excess on Hand Violates A Core Requirement of LOGCAP III, Like Guns That "Do Not Shoot."

Apart from the misleading half-truths in KBR's public vouchers and Award Fee applications, KBR is liable under *Escobar*'s implied false certification theory for another reason. As noted above, many cases have noted that a key inquiry is whether the Government would "probably but wrongly" presume that goods or services were of a certain character. The *Escobar* Court offered the provision of guns that "do not shoot" as a situation where FCA liability would plainly attach. 579 U.S. at 191. In other words, even the most *general* description of goods or services can be a misleading half-truth where non-compliance goes to the heart of the bargain, like an invoice simply for "firearms" when the firearms are inoperative.[2] The Seventh Circuit recognized this concept in *Molina*, explaining that the defendant health plan's representations about the services provided in various rate tiers—where the services dictated the associated payment—were "essential if the capitation payments are to be actuarially sound." 17 F.4th at 743.

---

[2] Contrary to KBR's characterization, *Escobar* did not hold that a "specific representation" of goods/services is required. The Court left open the question whether "all claims for payment implicitly represent that the billing party is legally entitled to payment." 579 U.S. at 188. Instead, the Court held "that the implied certification theory can be a basis for liability, *at least* where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 190 (emphasis added). KBR bowdlerizes this quotation by removing "at least," then inserting those words in its paraphrase in a manner that entirely alters the Court's meaning: "[i]mplied false certification liability *requires at least two conditions* …." Br. at 27 (emphasis added). KBR's sharp editing transforms language intended to be illustrative (implied certification applies "at least" where two conditions are met) into a suggestion that the Court resolved an issue it expressly left open (implied certification can *only* arise where a specific representation is made).

This Court has already addressed this issue. In its 12(b)(6) motion, KBR argued that Relators had failed to identify "what falsehood was actually presented to the Government." Order at 42. Foreshadowing *Escobar*, this Court rejected that contention, holding that "the fraudulent claim in this case is premised upon the allegation that the invoices (i.e. requests or demands for payment) KBR submitted to the Government were themselves false because they contained unallowable and unreasonable costs." *Id*. at 46-47.

The Court got it right. KBR did not violate some arbitrary regulatory requirement untethered to its obligations or the Government's payments—it violated the core contractual requirement to check for existing excess materials before buying new. SOF 8-33. Managing and tracking inventory was a primary reason the Government hired KBR in the first place and KBR's failures went to the essence of that bargain. SOF 1; 14-19; 57, 84-86; Ex. 70 at '2915 (KBR Senior Manager: "To have something on hand and to not use it in lieu of purchasing more is a recipe for the DCAA to … collect back what we paid for the item via a Form 1."); Ex. 8 at '0062 (KBR Senior Manager: "We are purchasing $5M per day when we've got $1.2 B i[n] excess on hand. At some point, the DCAA is going to put KBR out of business …."). Like a gun-maker billing for guns that do not shoot, or a health plan seeking capitation payments despite not offering certain mandated services, KBR submitted false claims when it requested Government reimbursement for purchases of unnecessary items while not bothering to check for excess on hand.

**D.      As This Court Previously Held, KBR Violated Objective Requirements, and Falsity Does Not Require A Quantitatively Measurable Performance Standard.**

The binding decisions in *Escobar* and *Molina* foreclose KBR's falsity argument. With no options remaining, KBR implores this Court to adopt a position with no support in controlling law—a position which this Court and the Federal Circuit have already rejected. KBR contends it is impossible, as a matter of law, for KBR to face liability under the FCA because KBR had to use

only its "maximum best efforts" to comply with LOGCAP III and such a standard is "too amorphous a concept to be objectively measured." Br. at 32. KBR is wrong.[3]

This is not the first time that KBR has argued that the LOGCAP III requirements are not sufficiently "objective" to support FCA liability. This Court properly rejected that argument as applied to the cost reasonableness requirement. Order at 46 ("[T]here is no reason that KBR's representations concerning the reasonableness of the prices listed in the invoices submitted to the Government cannot be deemed objectively false."). KBR's excuse to ask the Court to revisit its prior decision—*Escobar*—is unpersuasive because that case never discussed "objective falsehood." This Court should not reverse its ruling simply because KBR has recast its "objective falsehood" argument as lack of "measurability." Indeed, the Court now has even greater reason to reject KBR's contention, because Relators have identified additional, more specific contract requirements that the Court did not previously evaluate. *See* SOF 14-19.

Moreover, the Federal Circuit has rejected KBR's assertion that "best efforts" is effectively a blank check for non-performance. In *Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348 (Fed. Cir. 2013) ("KBRSI"), KBR contended that "cost-reimbursement contracts require only that the contractor gives its 'best efforts' when performing, and its costs are payable absent gross misconduct" or "absent arbitrary action or a clear abuse of discretion." *Id.* at 1359.

---

[3]     KBR's expert defines the controlling standard as "the good faith maximum effort that could be given in any stated context." Ex. 121 (Branch Dep.) at 71:8-10. Contradicting its expert, KBR suggests that the FAR's "best efforts" clause may be unenforceable, citing *Specialty Earth Scis., LLC v. Carus Corp.*, No. 15-CV-06133, 2021 WL 4804076 (N.D. Ill. Oct. 14, 2021). That case actually explains that the term "best efforts" is enforceable when, as here, there are "criteria by which to judge whether the proper effort has been made." *Id.* at *13. KBR simply pretends such criteria did not exist, ignoring the wealth of evidence showing that KBR knew what, when, why, and how it had to cross-level. SOF 34-51.

The Federal Circuit soundly rejected KBR's argument that "best efforts" is a vague standard that relaxes the requirement of cost reasonableness:

> KBR's suggested standard of review finds no support in the text of section 31.201-3 or our precedent. Section 31.201-3 of the FAR affords the reviewing officer or court considerable flexibility in assessing the reasonableness of costs…. Although evidence of willful misconduct, gross negligence, or arbitrary conduct could well provide a basis for a contracting officer or court to disallow costs under the regulation, such evidence is not required.

*Id*. at 1359. The Federal Circuit explained the well-defined process for determining whether costs are reasonable, including whether they are "ordinary and necessary," "result from generally accepted sound business practices," or involve "significant deviations from the contractor's established practices." *Id.* (citing FAR § 31.201-3(b)). This Court previously pointed to these very FAR provisions in rejecting KBR's "objective falsity" arguments and finding that Relators had stated a claim under the FCA. Order at 44-45.

KBR also mischaracterizes Relators' argument as disagreement over whether KBR was "efficient" enough. Br. at 24, 31, 33. Not so. Purchased material must be (1) "necessary for performance" of the contract (based on CLINs, discussed above), (2) cross-leveled to the "maximum extent possible" per the contract's Statements of Work (as KBR concedes, Br. at 2), and in the case of larger purchases, (3) expressly certified to have been cross-leveled. *See* SOF 137-148. These additional requirements may be viewed either as providing more specific meaning to "best efforts," or as the "variety of considerations and circumstances" used to determine "reasonableness." *KBRSI*, 728 F.3d at 1359. Taken together or individually, they objectively require that KBR check for available excess before purchasing *any* new material, as even KBR's own expert concedes. *See* KBR Ex. 26 (Branch Report) at 8 ("LOGCAP III required KBRSI to make its 'best efforts' to perform its obligated work, which included its obligation to exercise due diligence in verifying that required items could not be satisfied from existing,

available stock."); *see also* KBR SOF 46 (U.S. Army Audit Agency report: "LOGCAP contract requires the contractor to fill requirements with existing stock."). Deliberate and systemic bypassing of required procedures and intentional manipulation of material descriptions is not "inefficiency," it is fraud, as this Court previously determined. Purchase of new material cannot truthfully be called "necessary" to the contract, or "reasonable," or the result of "maximum best efforts," when KBR systemically bypassed and manipulated the process established to look for excess inventory. These are not matters of subjective belief, but objective facts.

Finally, none of the hodgepodge of cases that KBR cites, many of which it previously cited in its failed motion to dismiss, stand for the radical "measurability" proposition KBR advocates. For example, KBR again relies on *United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818 (7th Cir. 2011), for its "objective falsity" argument. Br. at 24. But this Court properly found that Relators pled an objective falsehood, Order at 46, and *Yannacopoulos* says nothing about "measurability." Moreover, the *Yannacopoulos* relator's case did not fail because of an absence of "objective falsity"; it failed because, among other things, the relator lacked proof to support his allegations. *Id*. at 837.[4]

The same is true of KBR's renewed reliance on *United States ex rel. Wilson v. KBR*, 525 F.3d 370 (4th Cir. 2008), which this Court previously found unpersuasive. In *Wilson*, the claim failed because relators alleged only that KBR had violated "several general and relatively vague maintenance provisions, such as keeping vehicles 'in a safe operating condition and good appearance.'" *Id*. at 377. Here, in contrast, KBR's obligation to check for material availability

---

[4]     *Yannacopoulos* was decided when the Seventh Circuit rejected the implied certification theory later adopted by *Escobar*. The court nonetheless made clear, as did this Court, that the violation of a contract can, in fact, be a predicate for FCA liability when coupled with misrepresentations to the Government about "compliance with that contract," *id*. at 827, exactly the case here.

prior to submitting purchases was set forth explicitly in multiple specific contract requirements. *See* SOF 8-3. Moreover, KBR specifically and repeatedly represented to the Government on both its PCARSS forms and larger material requisitions that it had attempted to cross-level. SOF 144-149. These are "objective falsehoods."

Other cases cited by KBR support Relators. For example, the only FCA case KBR cites that even mentions a "best efforts" contract is *United States v. Northrop Grumman Systems Corporation*, 9 CV 7306, 2015 WL 5916871 (N.D. Ill. 2015). But that case rejects KBR's argument. There, the defendant originally moved to dismiss the case, arguing (like KBR) that the relator had "failed to allege an objective falsehood because 'best efforts' was an imprecise contractual term." *Id*. at *3. The court disagreed and therefore *denied* that motion. *Id*. The court later granted summary judgment only because the relator ultimately failed to prove that best efforts had the meaning that the relator posited. *Id*. at *7 ("[Relator] cannot show that his interpretation of the contract . . . was either correct or shared by both DHS and Northrop Grumman"). Here, there is no such failure of proof.

*United States v. AseraCare, Inc.*, 938 F.3d 1278 (11th Cir. 2019), similarly supports Relators and implicitly rejects KBR's argument that the FCA reaches only falsehoods about "objectively measurable" requirements. *AseraCare* held that a physician's clinical judgment can be "objectively" false where the physician "did not, in fact, subjectively believe" his or her clinical judgment; where "no reasonable physician" could have made the relevant judgment; or where the physician "fails to review the patient's medical records" or "familiarize himself with the patient's condition" before making the judgment. 938 F.3d at 1297. These circumstances are precisely analogous to KBR's predominant practice of ordering new material without even looking for available excess.

KBR's other cases, none of which based dismissal on lack of an "objective falsehood" or announced a "measurability" requirement, are inapposite. *See United States ex rel. Lisitza v. Par Pharm. Cos., Inc.*, 276 F. Supp. 3d 799, 800-01 (N.D. Ill. 2017) (dismissing claims under *Escobar* because alleged regulatory violations did "not go to the truth or falsity of the representations on the claim form itself"); *United States ex rel. Garzione v. PAE Gov't Servs., Inc.*, 164 F. Supp. 3d 806, 813-16 (E.D. Va. 2016) (finding no violation of "reasonable" price requirement because claim premised solely on failure to offer the cheapest price, where non-price factors were obviously relevant to defendant's decision).

In sum, the obligation to look for excess before ordering new material is an objective requirement and none of KBR's cases contradicts this conclusion or imposes a "measurability" rule. This Court previously rejected these arguments and the Court's reasoning aligns with the Federal Circuit—a key authority on Government contract law.

## II.    The Evidence of Scienter Is Overwhelming, and *SuperValu* Does Not Preclude The Court from Considering That Evidence.

As discussed above, KBR expressly acknowledges that it was required to attempt to cross-level before making new purchases. And KBR tacitly acknowledges the crushing volume of evidence showing that: (1) KBR knowingly, indeed intentionally bypassed and manipulated the cross-leveling procedures that KBR itself established and the Government approved, and (2) understood the financial consequences of such conduct and, therefore, hid it from the Government.

Conceding that "some employees believed KBR fell short," a risible understatement, KBR urges the Court to apply *United States ex rel. Schutte v. SuperValu Inc.*, 9 F.4th 455 (7th Cir. 2021), and ignore all evidence of KBR's acknowledgment of such failures as "subjective." *See* Br. at 38. But *SuperValu* provides no safe harbor for deliberate fraudsters like KBR.

First, *SuperValu* is irrelevant because it applies only to reasonable interpretations of *ambiguous* statutes and regulations. 9 F.4th at 464-66, 468 n.7. KBR's contractual obligations were unambiguously detailed in the contract, the task orders, the statements of work, and the Government-approved property control procedures. SOF 14-33. Moreover, even assuming this obligation were ambiguous at the margins, no reasonable interpretation of KBR's duties—not even the "best efforts" standard that KBR advocates—would justify KBR's routine practice of *not even looking* for excess material befo+re it ordered that same material new, and manipulating categories of materials to avoid the cross-level requirements.

Second, *SuperValu*'s doctrine that a defendant whose conduct falls within a "reasonable interpretation" of an ambiguous "statute or regulation" is entirely inapplicable because this case involves the application of contract provisions. At its core, interpreting an allegedly ambiguous contract requires examination of the contemporaneous course of dealing of the parties, including contemporaneous statements, to determine which party's interpretation is reasonable. But *SuperValu* disallows consideration of such evidence, making it unworkable and inapplicable to a contract provision.

## A. There Is Overwhelming Evidence of Scienter.

It is axiomatic that scienter is particularly ill-suited to summary adjudication. *See, e.g.*, *Grossman*, 807 F. Supp. at 1412 ("Summary judgment is not an appropriate means of resolving questions of motive and intent. Questions going to [defendant's] mental state are questions of fact."). In most cases, as in this one, a jury is best equipped to hear and evaluate all facts and circumstances to determine whether a defendant acted knowingly. Moreover, the FCA has a particularly expansive scienter standard encompassing three broadly articulated states of mind: (1) "actual knowledge" of falsity; (2) "deliberate ignorance of the truth or falsity of the

information;" or (3) "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). It requires "no proof of specific intent to defraud" *Id.*

As discussed above, the record amply demonstrates that KBR "knowingly" submitted false claims to the Government. By failing even to attempt to cross-level half the time, hiding hundreds of millions of dollars of material from cross-leveling, acknowledging the Government would seek refunds or "put KBR out of business," and consciously concealing its conduct from the Government, KBR acted at the very least with reckless disregard and willful blindness when seeking payment for new, purportedly "necessary" purchases. *See* SOF 52-102.

Faced with this overwhelming evidence of its subjective intent, KBR cannot win an FCA scienter motion. KBR's solution is to force this case into *SuperValu*'s framework to prevent the Court from even considering the evidence. But *SuperValu* does not support KBR's position.

**B.** **_SuperValu_ Does Not Apply Because The Parties Do Not Dispute The Meaning of Legal Terms; The Parties Dispute Whether KBR's Performance Satisfied The Legal Requirements of The Contract.**

*SuperValu* does not apply here because there is no dispute over the "meaning" of legal terms, either regulatory or contractual. Unlike the *SuperValu* and *Safeway* defendants, KBR never offers a "reasonable interpretation" of its legal obligations for the Court to choose over Relators' preferred construction. When KBR argues that its "interpretation" is reasonable, it really means that its *conduct* is reasonable. KBR offers excuses about why it was unable to cross-level more often, *e.g.*, because it was operating in a war zone or because in isolated instances it could have been faster to buy new material than to cross-level, both of which are contradicted by the evidence. *See* SOF 12-13. Because these disputes plainly highlight that a jury must decide whether KBR's performance met its clear contractual obligations, KBR imports *SuperValu* to an inapposite context.

*SuperValu* and *Safeway* both illustrate the distinction. In those cases the parties disagreed over the interpretation of the term "usual and customary" prices. The defendant in each case argued that certain discounts were excluded from the regulatory term. *SuperValu*, 9 F.4th at 469; *United States ex rel. Proctor v. Safeway*, 30 F.4th 649, 659 (7th Cir. 2022). While the cases were pending, a court resolved the definitional dispute against the defendants. *SuperValu*, 9 F.4th at 460-61. But the defendants argued that their contrary interpretations, albeit wrong, had been "reasonable," and the *SuperValu* and *Safeway* majorities agreed. *Id.* at 470; *Safeway*, 30 F.4th at 659.

Here, there is no comparable dispute over the meaning of a legal term. KBR offers rhetorical questions instead of reasonable interpretations—"Was KBR required to cross-level one-hundred percent of the time before purchasing? Some lesser percentage, and, if so, what?" Br. at 41—and asserts that it need make no showing that its performance satisfies any interpretation, let alone a reasonable one. KBR does concede that it had a contractual duty to use its "best efforts" to "cross level" to the "maximum extent possible," but simply points to the purported aggregate value of its cross-leveling as irrefutable evidence that it complied. *See, e.g.*, Br. at 2-3. This case does not present any disagreement over the meaning of "maximum best efforts," "necessary for performance" or "cost reasonableness," because KBR makes no attempt to define any of these terms. This case is simply a dispute over whether a course of conduct satisfies contract requirements or constitutes fraud. A jury must resolve that dispute, and *SuperValu* simply does not apply.

## C.     *SuperValu* Does Not Apply to "Reasonable Interpretations" of Contract Terms.

*SuperValu* is inapposite here for another reason. KBR argues that under *SuperValu*, "the internal KBR emails … are irrelevant and cannot defeat summary judgment if KBR followed an

objectively reasonable interpretation of the purported *contractual* cross-leveling requirement." Br. at 35 (emphasis added). But *SuperValu* analyzed a reasonable interpretation of "statutes and regulations," not "contractual" terms. This is not mere formalism. Expanding *SuperValu* to contract interpretation would distort and greatly expand its scienter defense in a manner inconsistent with the language of the case as well as decades of settled contract law.

If a *statute or regulation* is subject to two or more reasonable interpretations, a court can determine whether the defendant's interpretation was "reasonable" without reference to that defendant's actual belief. A court need not understand what a party "believed" the statute meant, because courts can interpret ambiguous statutes without extrinsic evidence from private parties. Contracts are another story. If a contract provision is ambiguous, courts do not resolve the ambiguity in a vacuum, providing a complete defense to a party that can offer a "reasonable interpretation" of the disputed term. Instead, under bedrock principles of contract interpretation, courts resolve contractual ambiguity by considering extrinsic evidence, including the parties' course of dealing and contemporaneous statements. *See, e.g.*, *Metro. Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006) ("Having found the contract [with the Government] ambiguous, we may appropriately look to extrinsic evidence to aid in our interpretation of the contract" including "the parties' course of performance.") (citing the Restatement (Second) of Contracts § 202(4)); *Dennison v. MONY Life Ret. Income Sec. Plan for Emps.*, 710 F.3d 741, 745 (7th Cir. 2013) (under "a general principle of contract interpretation," "[w]hen the consistent performance of parties to a contract accords with one of two alternative interpretations of the contract, that's strong evidence for that interpretation.").[5] In order to

---

[5]     Interpretation of contracts between the United States and private parties is governed by the federal common law. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988); *United States v. Nat'l Steel Corp.*, 75 F.3d 1146, 1150 (7th Cir. 1996).

determine whether a party's interpretation of an ambiguous contract provision is "reasonable," a court considers what the parties actually believed the contract meant. Even if KBR's contract obligations were ambiguous, and they were not, that would not suggest that KBR should escape liability, because the evidence here shows the parties shared the same understanding of KBR's duties. *See* SOF 14-51; 84-86; 120-136. For that reason, *SuperValu*'s disregard of a party's subjective belief is limited only to disputes over statutes or regulations.

The words used in *SuperValu* and *Safeway* support this position, *e.g.*, "A defendant who acted under an incorrect interpretation of the relevant *statute or regulation* did not act with reckless disregard if (1) the interpretation was objectively reasonable and (2) no authoritative guidance cautioned defendants against it." 9 F.4th at 464 (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007)) (emphasis added). *SuperValu* repeated that formulation several times. *See id.* at 465 (defense only applies where defendant holds objectively reasonable interpretation of "a statute or regulation"); *id.* at 468 (interpretation of "the text of the statute or regulation that the defendant allegedly violated"); *id.* at 470 ("Relators also err by calibrating objective reasonableness against the clarity of a statute or regulation's policy objective"). In the Seventh Circuit's later decision addressing the same issue, *Safeway*, the court consistently used the same "statute or regulation" language to describe the scope of the "reasonable interpretation" defense. 30 F.4th at 652 (describing *SuperValu*: "a defendant does not act with reckless disregard as long as its interpretation of the relevant statute or regulation was objectively reasonable"); *id.* at 657 (*Safeco* held "that a defendant does not act with 'reckless disregard' as long as its interpretation of the relevant statute or regulation is 'objectively reasonable'"); *id.* at 658 (*Safeco* "held that a defendant does not act with reckless disregard under the FCRA as long as its interpretation of the relevant statute or regulation was 'objectively reasonable'"). The consistent omission of "contract" was not

inadvertent. The rules articulated by *SuperValu* are impossible to reconcile with basic principles of contract law.

Here, evidence of the parties' course of dealing, KBR's own internal procedures, and KBR's contemporaneous statements all demonstrate that KBR was required to check for available excess before ordering new material. *See* SOF 14-51; 84-86; 120-136. KBR urges the Court simply to ignore that evidence, but the Court cannot possibly interpret a supposedly ambiguous contract without it. Nothing suggests that *SuperValu* intended to sweep away *sub silentio* decades of contract law, so extending that case to this case, which concerns the LOGCAP III contract, makes no sense. This Court should decline KBR's request to be the first court to do so.[6]

**D.      KBR Fails to Demonstrate That It Acted in Accordance with Its Purportedly "Reasonable" Interpretation of The Contract.**

KBR's motion would fail even if *SuperValu* applied. *SuperValu* requires more than just a showing that an alternative reasonable interpretation of a statute or regulation existed; it also requires the defendant to show that its actions complied with that alternative interpretation. *See*

---

[6]      Unsurprisingly, none of the cases that *SuperValu* relied upon, nor any case to rely upon *SuperValu*, have involved interpretations of negotiated contracts. *See Safeco*, 551 U.S. at 47 (interpreting Fair Credit Reporting Act); *United States ex rel. Olhausen v. Arriva Med. LLC*, No. 21-10366, 2022 WL 1203023 (11th Cir. 2022) (per curiam) (interpreting Medicare equipment supplier regulations); *Safeway*, 30 F.4th 649 (interpreting Medicaid "usual and customary" regulation); *United States ex rel. Sheldon v. Allergan Sales, LLC*, 24 F.4th 340 (4th Cir. 2022), *opinion vacated and judgment affirmed*, No. 20-2330, 2022 WL 4396367 (4th Cir. Sept. 23, 2022) (interpreting Medicaid "best price" statute and regulation); *United States ex rel. Streck v. Allergan*, 746 F. App'x 101 (3d Cir. 2018) (interpreting "average manufacturer price" in Medicaid statute); *United States ex rel. McGrath v. Microsemi Corp.*, 690 F. App'x 551 (9th Cir. 2017) (interpreting International Traffic in Arms Regulation); *United States ex rel. Donegan v. Anesthesia Assocs. of Kan. City, PC*, 833 F.3d 874 (8th Cir. 2016) (interpreting Medicare anesthesia regulation); *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281 (D.C. Cir. 2015) (interpreting Export-Import Bank certification); *Illinois ex rel. Elder v. JPMorgan Chase Bank, N.A.*, No. 21 C 85, 2022 WL 3908675 (N.D. Ill. Aug. 30, 2022) (interpreting escheat statute); *United States v. Wisconsin Bell Inc.*, No. 08-CV-0724, 2022 WL 860621 (E.D. Wis. Mar. 23, 2022) (interpreting federal Education Rate Program regulation); *Lupinetti v. Exeltis USA*, No. 19 C 825, 2021 WL 5407424 (N.D. Ill. Nov. 19, 2021) (interpreting statutes, regulations, and CMS guidance).

9 F.4th at 459 (defendant actually provided the Government pricing data consistent with its interpretation of "usual and customary"). Yet KBR offers no evidence of such compliance. KBR argues that its LOGCAP III obligations were content-free, subjective, meaningless—take your pick—such that *any* amount of cross-leveling would satisfy them. Br. at 37 ("It would be a closer case if KBR knowingly failed to cross-level entirely."). KBR argues that it cross-leveled at least $495 million in materials, and insists that is enough to settle the matter of "best efforts."[7] But under the FCA the question is not whether KBR cross-leveled some of the time. The question is whether it systematically failed to cross-level and then misrepresented that it had consistently done so. Under KBR's interpretation, if it arbitrarily decided it would cross-level only on Tuesdays, that would satisfy contract requirements. Bypassing the cross-level process for over half the value of items purchased is akin to cross-leveling only on certain days of the week. Neither practice is a "reasonable" interpretation of "maximum best efforts," "necessary for performance," or "cost reasonableness."[8]

On summary judgment, Relators are entitled to the reasonable inference that applicable contract provisions, regulations, the conduct of the parties, and the testimony of witnesses, all demonstrate that KBR was required at least to *check* the theater for excess material before buying new material. And KBR was required to do that for every purchase, subject of course to normal

---

[7]     KBR points to Relators' expert, Dr. Gary Gaukler, for this figure. As will be discussed at greater length in opposition to KBR's anticipated *Daubert* motion, KBR repeatedly mischaracterizes Dr. Gaukler's opinions.

[8]     KBR also argues, without offering any supporting evidence, that it "reasonably implemented [the duty to cross-level] by conducting due diligence as to whether items could be cross-leveled ...." Br. at 36. The Court, or a jury, may reasonably ask how less than 50% compliance, coupled with widespread manipulation, can be deemed "due diligence."

human error and isolated failures. That interpretation is the only reasonable one consistent with all the evidence, especially when that evidence is viewed in a light most favorable to Relators.

## III. Relators Have Identified Thousands of False Claims

Relators of course acknowledge that they must point to false claims—and they have. Dr. Gaukler has identified 899 public vouchers associated with unnecessary costs incurred because KBR purchased items when existing excess material was available in theater. SOF 143. For example, on July 14, 2008, KBR submitted Public Voucher No. 47 for Task Order 139. SOF 143. The voucher requested reimbursement for a purchase of fifteen blower motors ordered on July 1, 2008 with a total cost of $7,725, despite the fact that these items were available in excess in other KBR storerooms. SOF 143. In 2008, KBR was bypassing MATCON half the time and manipulating inventory to artificially decrease items available to cross-level. *See* SOF 56-83. Based on the evidence, it is well beyond more-likely-than-not that KBR knew the items on this voucher were not "necessary for performance" because KBR could have obtained them through cross-levelling.[9] This is all Relators must show under a preponderance of the evidence standard. *See* 31 U.S.C.A. § 3731(d).

KBR ignores the statutory standard, arguing that Relators must establish more than a knowing and systematic bypassing and manipulation of contract requirements; they must tie that knowledge to each individual voucher. No case remotely supports such a requirement. The evidence reveals KBR's pervasive scheme and Dr. Gaukler calculates how often that scheme resulted in charges to the Government for unnecessary material. Relators need not rule out every

---

[9]     Even without Dr. Gaukler's model, a jury could conclude that the preponderance of the evidence, showing a knowing scheme to bypass cross-leveling and manipulate inventory levels over a discrete time period, resulted in false claims.

purportedly legitimate reason for failing to cross-level each unnecessary item that KBR ordered.[10] "Ruling things out is not the standard in a civil suit (or even in a criminal prosecution)." *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (affirming FCA judgment against defendant who paid physicians kickbacks and rejecting the argument that defendant's "records do not 'rule out' the possibility that the four physicians provided some medical services"). KBR's proposed "absolute certainty" standard has no legal basis. The preponderance of the evidence shows that KBR submitted specific false claims and KBR cannot win summary judgment on this ground.

---

[10]   KBR speculates that particular cross-levels may have properly been denied for various unidentified reasons, notwithstanding the availability of excess material in theater. Such "justified" denials were extremely uncommon. Relators focus on KBR's bypassing and manipulating the cross-leveling system most of the time, but on the occasions when KBR actually followed its cross-leveling procedures, KBR rarely denied a cross-level request when its database showed a cross-level was supportable. Moreover, Dr. Gaukler's model incorporates KBR's documented cross-level denials, and it reduces the value of KBR's $341 million in overordering by a mere $800,000. SOF 156. This belies KBR's assertion that its exercise of "discretion" in cross-leveling somehow negates the falsity of its claims for unnecessary purchases.

Dated:  September 29, 2022

Respectfully submitted,

/s/ David J. Chizewer
_____

David J. Chizewer
Frederic R. Klein
William C. Meyers
W. Kyle Walther
**GOLDBERG KOHN LTD.**
55 East Monroe Street, Suite 3300
Chicago, IL  60603-5792
Telephone:  (312) 201-4000
Facsimile:  (312) 332-2196
david.chizewer@goldbergkohn.com
frederic.klein@goldbergkohn.com
william.meyers@goldbergkohn.com
kyle.walther@goldbergkohn.com

Eric R. Havian (Lead Attorney)
Leah L. Judge
**CONSTANTINE CANNON LLP**
150 California Street, 16th Floor
San Francisco, CA  94111
Telephone:  (415) 766-3589
Facsimile:  (415) 639-4002
ehavian@constantinecannon.com
ljudge@constantinecannon.com

Amianna Stovall
Joel A. Chernov
Daniel Vitelli
**CONSTANTINE CANNON LLP**
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701
astovall@constantinecannon.com
jchernov@constantinecannon.com
dvitelli@constantinecannon.com

Edward H. Arens
George Collins
Stephen S. Hasegawa
**PHILLIPS & COHEN LLP**
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Telephone: (415) 836-9000
Facsimile: (415) 836-9001
earens@pcsf.com
gcollins@pcsf.com
shasegawa@pcsf.com

*Attorneys for Relators Geoffrey Howard
and Zella Hemphill*

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.      This brief complies with the type volume limitations of C.D. Ill. Local Civ. R. 7.1(B)(4)(b)(1) and 7.1(D)(5) because Section (2)(c), as defined under the Rule, contains less than 7,000 words.

2.      This brief complies with the typeface and type-style requirements of C.D. Ill. Local Civ. R. 5.1(C) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 12-point font.

/s/ David J. Chizewer
_____

Dated:  September 29, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September, 2022, I caused the foregoing **PLAINTIFFS/RELATORS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to be served through the Court's Electronic Case Filing system upon all attorneys of record.

/s/ David J. Chizewer

# APPENDIX A

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

UNITED STATES OF AMERICA, *ex rel.*
GEOFFREY HOWARD and ZELLA
HEMPHILL,

        Plaintiffs,

       v.

KBR INC. and KELLOGG BROWN AND
ROOT SERVICES INC.,

        Defendants.

Case No. 4:11-cv-04022-MMM-JEH

Judge Michael M. Mihm
Magistrate Judge Jonathan E. Hawley


**PLAINTIFFS-RELATORS' APPENDIX OF
KEY TERMS AND ACRONYMS**


| | |
|---|---|
| AAA | Army Audit Agency |
| ACL | Administrative Change Letter |
| ACO | Administrative Contracting Officer |
| ACRN | Accounting Classification Reference number |
| AFEB | Award Fee Evaluation Board |
| ASL | Authorized Stock List |
| BLS | Base Life Support |
| BPA | Business Process Analyst |
| CAR | Corrective Action Request/Report |
| CAS | Cost Accounting Standards |
| CID | Criminal Investigation Division |
| CJOA | Combined Joint Operations Area |
| CLIN | Contract Line Item Number |
| CLSS | Corps Logistics Service Support |
| COBC | Code of Business Conduct |
| COR | Contracting Officer's Representative |
| CPAF | Cost Plus Award Fee |
| DCAA | Defense Contract Audit Agency |
| DCMA | Defense Contract Management Agency |
| DFAR | Defense Supplement to the FAR |
| DMC | Distribution Management Center |
| DoD | Department of Defense |
| DOP | Desktop Operating Procedures |

| | |
|---|---|
| FAR | Federal Acquisition Regulations |
| FOB | Forward Operating Base |
| FSS | Federal Supply System |
| GFP | Government Furnished Property |
| GOI | Government of Iraq |
| IAR | Inventory Adjustment Report |
| IDIQ | Indefinite delivery, indefinite quantity |
| IJOA | Iraq Joint Operations Area |
| ITEMNUM | Item Number |
| JBB | Joint Base Balad |
| LOGCAP | Logistics Civil Augmentation Program |
| LOTD | Letter of Technical Direction |
| MATCON | Material Control |
| MCS | Material Control Specialist |
| MR | Material Requisition |
| MRN | Material Reference Number |
| NS | Non-Stock |
| NTE | Not to Exceed |
| OEF | Operation Enduring Freedom |
| OIF | Operation Iraqi Freedom |
| OPSDIR | Operations Directive |
| PA | Property Administrator |
| PCARSS | Plant Clearance Automated Reutilization Screening System |
| PCP | Property Control Procedures |
| PCSA | Property Control System Analysis |
| PEB | Performance Evaluation Board |
| PM | Project/Program Manager |
| PMO | Program Management Office |
| PMSA | Property Management System Analysis |
| PO | Purchase Order |
| POLINE | Purchase Order Line |
| PONUM | Purchase Order Number |
| POP | Period of Performance |
| PPM | Principal Program Manager |
| PR | Purchase Requisition |
| PSM | Procurement and Supply Management |
| RO | Requisition Objective |
| ROD | Report of Discrepancy |
| ROP | Reorder Point |
| SAP | Systems, Applications, and Products |
| SLT | Senior Leadership Team |
| SMART | Supply Management Assistance and Review Team |
| SOP | Standard Operating Procedure |
| SOW | Statement/Scope of Work |
| SP | Special |
| SSA | Supply Support Activity |

| | |
|---|---|
| SSL | Safety Stock Level |
| STK | Stock |
| SUBCLIN | Sub-Contract Line Item Number |
| TACO | Theater Administrative Contracting Officer |
| TD | Technical Directives |
| TO | Task Order |
| TREC | Temporary Receiving Storerooms |
| TTM | Theater Transportation Mission |
| WACOAPPR | Waiting ACO Approval |
| WO | Work Order |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* GEOFFREY HOWARD and ZELLA HEMPHILL, <br><br> Plaintiffs, <br><br> v. <br><br> KBR INC. and KELLOGG BROWN AND ROOT SERVICES INC., <br><br> Defendants. | Case No. 4:11-cv-04022-MMM-JEH <br><br> Judge Michael M. Mihm <br> Magistrate Judge Jonathan E. Hawley |

**INDEX OF EXHIBITS TO**
**PLAINTIFFS/RELATORS' OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

| DESCRIPTION | RELATORS' EXHIBIT NO. |
|---|---|
| | |
| **VOLUME 1 - DOCUMENTS** | |
| KBR's Government-Approved Property Control Procedures, dated September 21, 2006 | 1 |
| Sample purchase requisition | 2 |
| Internal KBR email containing December 29, 2008 email from B. Simmons | 3 |
| KBR March 2010 Materials Control Technical Directive | 4 |
| Internal KBR email containing February 2, 2009 email from M. Brannen | 5 |
| November 4, 2009 internal KBR email from C. O'Muirgheasa | 6 |
| June 2009 email from KBR employee | 7 |
| Internal KBR email containing February 25, 2010 email from R. Kaye | 8 |
| Internal KBR email containing July 14, 2008 email from S. Hurd | 9 |
| October 7, 2011 internal KBR email attaching Business Case for Process Design Initiative, TREC CRIPPLER | 10 |
| May 2009 KBR Technical Direction Bulletin re: TRECs | 11 |
| February 21, 2010 internal KBR email from L. Sullivan | 12 |
| Internal KBR email | 13 |
| February 21, 2010 internal KBR email from L. Sullivan | 14 |

| DESCRIPTION | RELATORS' EXHIBIT NO. |
|---|---|
| February 21, 2010 internal KBR email attaching analysis of KBR's "Theater Temporary Receiving (TREC) Storeroom Inventory" | 15 |
| KBR Distribution of Government Property Desktop Operating Procedure, Rev. #01, dated August 23, 2008 | 16 |
| November 26, 2008 DCMA Memorandum | 17 |
| July 9, 2008 internal KBR email from E. Denton | 18 |
| June 2018 internal KBR email | 19 |
| September 14, 2007 Memorandum from M. Mayo | 20 |
| August 23, 2009 internal KBR email from J. Haught | 21 |
| April 12, 2008 internal email from P. Powell | 22 |
| June 24, 2009 internal KBR email | 23 |
| July 1, 2009 KBR Technical Direction Bulletin re: PCARSS | 24 |
| Internal May 19, 2009 KBR email | 25 |
| May 5, 2009 internal KBR email containing May 4, 2009 email from J. Haught | 26 |
| May 10, 2009 internal KBR email | 27 |
| Internal KBR email containing June 11, 2009 email from G. LaBoa | 28 |
| June 24, 2009 email from C. O'Muirgheasa | 29 |
| May 4, 2010 internal KBRM attaching Letter of Reprimand from G. LaBoa | 30 |
| August 23, 2009 internal KBR email from J. Haught | 31 |
| Internal KBR email containing February 16, 2010 email from E. Faris | 32 |
| Internal KBR email containing May 19, 2021 email from E. Faris | 33 |
| Internal KBR email containing June 4, 2011 email from C. O'Muirgheasa | 34 |
| May 28, 2010 email from L. Sullivan | 35 |
| May 28, 2010 internal KBR emails from L. Sullivan | 36 |
| May 28, 2010 emails from L. Sullivan | 37 |
| March 5, 2010 internal KBR email from R. Kaye | 38 |
| March 3, 2008 email containing draft KBR "Distribution Management Center Proof of Principle – CJOA presentation" | 39 |
| September 1, 2008 Task Order 159 Statement of Work | 40 |
| | |
| **VOLUME 2 – DOCUMENTS** | |
| Task Order 159 Statement of Work | 41 |
| September 15, 2010 Modification to Task Order 159 | 42 |
| Internal KBR email containing June 18, 2008 email from T. Hippert | 43 |
| June 30, 2011 internal KBR email from T. Hippert | 44 |
| Internal KBR email containing June 24, 2009 email from J. Vujic with attached PCARSS form | 45 |
| March 13, 2010 KBR "Supply Discipline, PSM Supply – Areas of Opportunity" | 46 |
| KBR Desktop Operating Procedures: Distribution of Government Property, dated June 2008 | 47 |
| Task Order 139 Statement of Work Change 6 | 48 |
| July 10, 2007 DCMA Memorandum | 49 |

| DESCRIPTION | RELATORS' EXHIBIT NO. |
|---|---|
| | |
| **VOLUME 3 - DOCUMENTS** | |
| Internal KBR email attaching 2008 SMART Reports | 50 |
| Internal KBR email attaching 2008 SMART Report for site B3 | 51 |
| August 24, 2009 internal KBR email attaching SMART Audit Report of Site C7 | 52 |
| March 22, 2010 internal KBR email from J. King attaching 2010 SMART Audit Report of Site F2 | 53 |
| Internal KBR email containing March 19, 2009 email from J. Webb | 54 |
| October 16, 2007 internal KBR emails | 55 |
| KBR Materials Stock Plan Desktop Operating Procedure Rev. #2 | 56 |
| | |
| **VOLUME 4 - DOCUMENTS** | |
| KBR Materials Stock Plan Desktop Operating Procedure Rev. 03 | 57 |
| May 24, 2008 email from L. Sullivan | 58 |
| June 23, 2008 internal KBR emails from B. McGarry | 59 |
| August 24, 2009 internal KBR email from L. Lust | 60 |
| October 21, 2009 internal KBR email | 61 |
| July 22, 2004 Amendment P00008 to LOGCAP III Base Contract | 62 |
| Internal KBR email containing August 2, 2010 email from C. O'Muirgheasa | 63 |
| Emails reflecting ACO approval of MR with Commercial Purchase Justification | 64 |
| Internal KBR email containing September 11, 2009 email from L. Lust | 65 |
| February 28, 2010 internal KBR email from C. O'Muirgheasa | 66 |
| KBR data | 67 |
| January 23, 2010 internal KBR email attaching analysis of TRECs | 68 |
| February 20, 2010 internal KBR email | 69 |
| March 3, 2010 email from R. Kaye | 70 |
| July 2, 2009 Analysis by KBR's Head of the DMC | 71 |
| November 6, 2009 internal KBR email from C. O'Muirgheasa | 72 |
| February 21, 2010 internal KBR email | 73 |
| February 9, 2011 email from L. Sullivan to herself | 74 |
| Internal KBR email containing February 9, 2011 email from L. Sullivan | 75 |
| Internal KBR email containing February 23, 2010 email from R. Kaye | 76 |
| February 18, 2010 internal KBR email | 77 |
| February 26, 2010 internal KBR email | 78 |
| December 27, 2008 email from B. Simmons | 79 |
| March 2010 internal KBR email chain between L. Lust and R. Kaye | 80 |
| March 20, 2010 email from R. Kaye | 81 |
| April 1, 2010 internal KBR email from R. Kaye | 82 |
| September 27, 2007 Walter Declaration | 83 |
| KBR Response to Interrogatory Number 10 | 84 |
| July 27, 2008 internal KBR email from J. Haught | 85 |
| August 17, 2008 email from T. Sellars | 86 |

| DESCRIPTION | RELATORS' EXHIBIT NO. |
|---|---|
| May 4, 2009 email from J. Haught attaching inventory analysis | 87 |
| June 18, 2009 internal KBR email | 88 |
| KBR's Government-Approved Property Control Procedures, dated July 15, 2008 | 89 |
| | |
| **VOLUME 5 – DOCUMENTS** | |
| KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures," Revised June 2007 | 90 |
| KBR Distribution of Government Property Desktop Operating Procedure, dated August 23, 2008 | 91 |
| "Materials Burn Rate" used for Task Orders 139 and 159 | 92 |
| KBR Government and Infrastructure Estimating Manual | 93 |
| February 25, 2022 Expert Report of M. Rudolph | 94 |
| LOGCAP III Base Contract and Statement of Work | 95 |
| March 1, 2022 Expert Report of G. Gaukler | 96 |
| | |
| **VOLUME 6 – DOCUMENTS** | |
| June 27, 2022 Expert Rebuttal Report of M. Rudolph | 97 |
| June 24, 2022 Expert Rebuttal Report of D. Zakheim | 98 |
| January 31, 2006 Amendment to LOGCAP III Base Contract | 99 |
| August 21, 2006 Task Order 139 | 100 |
| November 2, 2007 DCMA Letter of Technical Directive to KBR | 101 |
| KBR Materials Stock Plan Desktop Operating Procedure Rev. #0 | 102 |
| July 2006 KBR "Desktop Procedures: Redistribution of Government Property and Materiel to include FOB/Base Closures" | 103 |
| April 22, 2022 Expert Report of E. Branch | 104 |
| June 27, 2022 Expert Rebuttal Report of G. Gaukler | 105 |
| July 28, 2022 Expert Supplemental Rebuttal Report of G. Gaukler | 106 |
| Relator Hemphill's February 10, 2020 Supplemental Response to Interrogatory No. 9 | 107 |
| Presentation to Award Fee Evaluation Board LOGCAP III – TO 139/159, for the period May 1, 2008 thru December 31, 2008 | 108 |
| Presentation to Award Fee Evaluation Board LOGCAP III – TO 118, for the period May 2, 2007 thru October 31, 2007 | 109 |
| PDF of Native Excel Spreadsheet KBR-HOW-0043609, Tab "1034-Task 57," Tab "1035-Task57," Tab "Prior MonthYrl Details 2008" and Tab "Yr2 Detail 2008, Row 128" | 110 |
| PDF of Native Excel Spreadsheet KBR-HOW-9030564, Tab "1035-Task 57" | 111 |
| PDF of Native Excel Spreadsheet KBR-HOW-9031407, Tab "1034-Task 159" | 112 |
| PDF of Native Excel Spreadsheet KBR-HOW-9031445, Tab "1035-Task 159" | 113 |
| PDF of Native Excel Spreadsheet KBR-HOW-9159179, Tab "ZBILL20080714-044718-GC00GY," Row 1376 | 114 |
| Data Pursuant to Local Rule 7.1(C) – 899 Public Vouchers | 115 |

| DESCRIPTION | RELATORS' EXHIBIT NO. |
|---|---|
| Data Pursuant to Local Rule 7.1(C) – MAXIMO database files (2) | 116 |
| Data Pursuant to Local Rule 7.1(C) – ZBILL production | 117 |
| Data Pursuant to Local Rule 7.1(C) – Gaukler's Output 1 | 118 |
| Data Pursuant to Local Rule 7.1(C) – Gaukler's Output 2 | 119 |
| Data Pursuant to Local Rule 7.1(C) – Gaukler's Output 3 | 120 |
| | |
| **VOLUME 7 - DEPOSITION TRANSCRIPTS** | |
| Branch, Elliott – June 24, 2022 Deposition | 121 |
| Brannen, Mark – November 11, 2020 Deposition | 122 |
| Brennan, Richard – May 17, 2022 | 123 |
| Faris, Elias – February 13, 2020 Deposition | 124 |
| Goetz, Douglas – May 19, 2022 Deposition | 125 |
| Haught, James – February 11, 2020 Deposition | 126 |
| Hippert, Ty – September 17, 2020 Deposition | 127 |
| | |
| **VOLUME 8 - DEPOSITION TRANSCRIPTS** | |
| Hurd, Steve – February 21, 2020 Deposition | 128 |
| Kaye, Richard – March 9, 2021 Deposition | 129 |
| KBR 30(b)(6) Witness, Ferrazas, Jimmy – September 29, 2021 | 130 |
| KBR 30(b)(6) Witness, Jacobs, Gregory – September 23, 2021 | 131 |
| KBR 30(b)(6) Witness, Lust, Larry – September 28, 2021 | 132 |
| KBR 30(b)(6) Witness, Lust, Larry – September 29, 2021 | 133 |
| King, Jim – November 13, 2020 | 134 |
| LaBoa, Guy – February 19, 2020 and February 20, 2020 | 135 |
| | |
| **VOLUME 9 - DEPOSITION TRANSCRIPTS** | |
| Lust, Larry – February 12, 2020 | 136 |
| Mayo, Michael – October 15, 2020 | 137 |
| McNamara, Maria – November 13, 2019 and November 14, 2019 | 138 |
| O'Muirgheasa, Connor – December 17, 2020 | 139 |
| Pagonis, Gust – July 27, 2021 and July 29, 2021 | 140 |
| | |
| **VOLUME 10 - DEPOSITION TRANSCRIPTS** | |
| Ritondale, Cheryl – June 9, 2021 | 141 |
| Rock, Jeff – December 4, 2020 | 142 |
| Sheridan, Mary – January 13, 2021 | 143 |
| Sullivan, Lynellen – February 12, 2021 | 144 |
| Vines, John – May 20, 2022 | 145 |
| Vollmecke, Kirk – October 23, 2020 | 146 |

| DESCRIPTION | RELATORS' EXHIBIT NO. |
|---|---|
| | |
| **VOLUME 11 - DEPOSITION TRANSCRIPTS** | |
| Vujic, John – June 24, 2021 | 147 |
| Wade, Mary – September 15, 2020 | 148 |
| Zakheim Dov – July 29, 2022 | 149 |