## IN THE UNITED STATES DISTRICT COURT FOR
## THE CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* GEOFFREY HOWARD AND ZELLA HEMPHILL, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:11-cv-04022-MMM-JEH |
| KBR, INC., and KELLOGG BROWN & ROOT SERVICES, INC., | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT, SUPPLEMENTAL REPORT, AND PORTIONS OF THE REBUTTAL REPORT OF GARY M. GAUKLER, PH.D.

Craig D. Margolis
Tirzah S. Lollar
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
(202) 942-5000
craig.margolis@arnoldporter.com
tirzah.lollar@arnoldporter.com

David W. Ogden
Ronald C. Machen
Matthew T. Jones
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
david.ogden@wilmerhale.com
ronald.machen@wilmerhale.com
matt.jones@wilmerhale.com

Jennifer L. Saulino
David N. Sneed
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
jsaulino@cov.com
dsneed@cov.com

Felicia H. Ellsworth
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
felicia.ellsworth@wilmerhale.com

*Attorneys for Defendants KBR, Inc. and Kellogg Brown & Root Services, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

LEGAL STANDARDS .........................................................................................3

    A.    Admissibility of Expert Testimony...........................................................3

    B.    Striking Improper and Untimely Expert Opinion ....................................3

ARGUMENT ........................................................................................................4

I.    DR. GAUKLER'S "OVERORDERING" METHODOLOGY IS NOT
RELIABLE .....................................................................................................4

    A.    Summary of Dr. Gaukler's "Overordering" Opinions ..............................5

    B.    Dr. Gaukler's Unprecedented "Overordering" Methodology Was Invented
Solely for This Litigation........................................................................7

    C.    Dr. Gaukler's "Overordering" Model Cannot Be Meaningfully Tested.................9

    D.    Dr. Gaukler's Work is Unreliable Because it is Riddled With Obvious
Errors.....................................................................................................10

II.    DR. GAUKLER'S "OVERORDERING" OPINIONS ARE NOT RELEVANT .............12

    A.    Dr. Gaukler's Model Unrealistically Assumes KBR Could Have Achieved
Perfect Cross-Leveling Performance and Ignores KBR's Discretion...................13

    B.    "Overorders" Are Not the Proper Measure of Damages in an FCA Case ............15

III.    PORTIONS OF DR. GAUKLER'S REBUTTAL REPORT AND HIS ENTIRE
SUPPLEMENTAL REPORT MUST BE STRUCK AS IMPROPER AND
UNTIMELY.......................................................................................................16

    A.    Procedural History and Summary of Dr. Gaukler's Additional Reports ...............17

        1.    Revisions to the Original Report's "Overordering" Methodology ...........18

        2.    The Rebuttal Report's Entirely New Damages Estimate...........................19

    B.    Dr. Gaukler's Numerous New Opinions Attempting to Bolster his Flawed
"Overordering" Analysis are Improper Rebuttal ...................................20

    C.    Relators' Late Efforts to Shore Up Dr. Gaukler's Flawed Analyses Were
Neither Justified nor Harmless.............................................................21

i

1. Prejudice ....................................................................................................22

2. Ability to Cure ...........................................................................................23

3. Likelihood of Disruption to Trial .............................................................24

4. Bad Faith or Willfulness ...........................................................................24

IV. CONCLUSION.....................................................................................................27

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                                **Page(s)**

*Africano v. Atrium Med. Corp.*,
   No. 17 CV 7238, 2019 WL 5085338 (N.D. Ill. Oct. 10, 2019), *objections
   overruled*, No. 17-CV-7238, 2020 WL 5691596 (N.D. Ill. Sept. 3, 2020)...................4, 21, 25

*Allgood v. Gen. Motors Corp.*,
   No. 02 C 1077, 2007 WL 647496 (S.D. Ind. Feb. 2, 2007)....................................................22

*American Honda Motor Co. v. Allen*,
   600 F.3d 813 (7th Cir. 2010) .......................................................................................4, 8, 9

*Butler v. Sears Roebuck & Co.*,
   No. 06 C 7023, 2010 WL 2697601 (N.D. Ill. July 7, 2010) .................................................22

*Cty. of Cook v. Bank of Am. Corp.*,
   No. 14C2280, 2022 WL 408299 (N.D. Ill. Feb. 10, 2022)......................................................8

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)..................................................................................................... *passim*

*David v. Caterpillar, Inc.*,
   324 F.3d 851 (7th Cir. 2003) ................................................................................17, 23, 27

*Deimer v. Cincinnati Sub–Zero Prods., Inc.*,
   58 F.3d 341 (7th Cir. 1995) .................................................................................................13

*Durkin v. Equifax Check Servs., Inc.*,
   406 F.3d 410 (7th Cir. 2005) ..............................................................................................11

*Fidlar Tecnologies v. LPS Real Est. Data Sols., Inc.*,
   No. 4:13CV04021, 2015 WL 109835 (C.D. Ill. Jan. 6, 2015) .............................................25

*Flagstar Bank, FSB v. Freestar Bank, N.A.*,
   687 F. Supp. 2d 811 (C.D. Ill. 2009) ....................................................................................8

*Frerck v. Pearson Educ., Inc.*,
   No. 11 C 5319, 2014 WL 477419 (N.D. Ill. Feb. 6, 2014)..................................................22

*Hansen v. Country Mut. Ins. Co.*,
   No. 18 CV 244, 2022 WL 124564 (N.D. Ill. Jan. 13, 2022)................................................27

*Luke v. Family Care & Urgent Med. Clinics*,
   323 Fed. App'x 496 (9th Cir. 2009) ....................................................................................22

*McCann v. Cullinan*,
  No. 11 CV 50125, 2016 WL 4593835 (N.D. Ill. Sept. 2, 2016), *report and recommendation adopted sub nom. McCann v. Ogle Cnty.*, No. 11 C 50125, 2016 WL 5807922 (N.D. Ill. Oct. 5, 2016).............................................................27

*McCann v. Ogle Cnty.*,
  No. 11 C 50125, 2016 WL 5807922 (N.D. Ill. Oct. 5, 2016) ...........................22, 27

*Moore v. Ashland Chem. Inc.*,
  151 F.3d 269 (5th Cir. 1998) ......................................................................................4

*Nelson v. Ipalco Enter., Inc.*,
  No. IP02477CHK, 2005 WL 1924332 (S.D. Ind. Aug. 11, 2005) ............................24

*Noffsinger v. The Valspar Corp.*,
  No. 09 CV 916, 2011 WL 9795 (N.D. Ill. Jan. 3, 2011).............................................4

*Owens v. Auxilium Pharms., Inc.*,
  895 F.3d 971 (7th Cir. 2018) ....................................................................................13

*Peals v. Terre Haute Police Dep't*,
  535 F.3d 621 (7th Cir. 2008) ...............................................................................24, 26

*Salgado by Salgado v. Gen. Motors Corp.*,
  150 F.3d 735 (7th Cir. 1998) ....................................................................................26

*Target Mkt. Pub., Inc. v. ADVO, Inc.*,
  136 F.3d 1139 (7th Cir. 1998) ..................................................................................14

*United States ex rel. Dolan v. Long Grove Manor*,
  315 F. Supp. 3d 1107 (N.D. Ill. 2018) .....................................................................15

*United States v. Anchor Mortg. Corp.*,
  711 F.3d 745 (7th Cir. 2013) ....................................................................................16

*Zenith Elecs. Corp. v. WH–TV Broad. Corp.*,
  395 F.3d 416 (7th Cir.2005) .....................................................................................11

## **Statutes**

False Claims Act, 31 U.S.C. §§ 3729 et seq. ....................................................2, 15, 16

## **Rules**

Fed. R. Civ. P. 26 ........................................................................................... *passim*

Fed. R. Civ. P. 37 ........................................................................................... *passim*

Fed. R. Evid. 702 ........................................................................................... *passim*

**<u>INTRODUCTION</u>**

Relators have offered a novel, built-for-litigation model by Gary Gaukler, Ph.D. to argue that KBR "overordered" materials, which is the sole basis on which they hinge their claim for hundreds of millions of dollars in damages.  Because Dr. Gaukler's black-box model and the opinions he attempts to derive from it are unreliable, untestable, and error-filled, his original report should be excluded under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  And because the opinions added to his rebuttal and supplemental reports are an improper, untimely, and unsuccessful attempt to cure the defects in his original report, those opinions should be excluded under Federal Rules of Civil Procedure 26 and 37.

First, the convoluted computer model Dr. Gaukler developed to measure "overordering" is not reliable because it was invented specifically to corroborate Relators' allegations in this litigation, cannot be meaningfully parsed or tested, is not supported by a single academic publication, and has never been peer reviewed.  In addition to conceding that he has never attempted a similar analysis before, Dr. Gaukler admitted he has "no idea" whether anyone has *ever* created a comparable model, let alone whether the military or any other government agency has used or even would be able to use his method to evaluate contractors' performance or otherwise measure "overordering."  Finally, due to flaws in its design, Dr. Gaukler's model produces erroneous and absurd results that fall far short of the standards of care and reliability required by *Daubert* and its progeny.

Second, Dr. Gaukler's affirmative opinions and damages model would not assist the trier of fact in understanding the relevant evidence, as required under Fed. R. Evid. 702 and *Daubert*.[1]

---

[1] Relators represented to Magistrate Judge Hawley that Dr. Gaukler was their "damages expert," Ex. 6, Tr. of July 8, 2022 Proceedings Before Judge Hawley 26:5–6; however, at his deposition, Dr. Gaukler disclaimed offering an opinion on damages.  Ex. 2, Gaukler Tr. 13:12–18.  Indeed, he does not claim to proffer an opinion on anything other than "overordering." *Id.* at 13:19-14:18.

His "overordering" analysis does not fit the underlying factual circumstances here because it robotically and unreasonably tries to measure the volume of materials which should have been cross-leveled without regard for human discretion or even basic common sense. As one example of this absurd application, Dr. Gaukler's model posits that KBR should have cross-leveled *16 individual screws* valued at a total of *20 cents* in the context of a bulk purchase of *300,000 screws* for approximately *$2.4 million*. *See* Ex. 2, Gaukler Tr. 245:11–248:7. As shown by this example and repeated throughout his opinion, Dr. Gaukler's model categorically disregards KBR's discretion to determine whether, when, and where to cross-level under the LOGCAP III contract, an omission that is particularly glaring in light of the fact that Relators' other experts *concede* that KBR could exercise this very same discretion under the contract.[2]

Dr. Gaukler's analysis is also irrelevant because it does not address the appropriate measure of damages under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, where the key question is whether the government received the benefit of the purchase of any specific item KBR procured on its behalf—*i.e.*, whether the item was ever *used* or disposed of on the government's instruction, not whether there was excess on hand when KBR ordered it. It is undisputed that the government ultimately took title to all of the materials that KBR ordered under the contract. The only relevant question for the factfinder is whether the value of those materials to the government was somehow less than what the government paid for them. Because Dr.

---

[2] The "overordering" model ignores KBR's discretion regarding when and where to cross-level, which Dr. Gaukler admitted he did not account for in his Original Report. *Id.* at 236:21–237:13; *compare* Ex. 1, Gaukler Rpt. ¶ 34 (describing contract provision requiring KBR to "exercise due diligence in verifying that the required items cannot be satisfied from existing stock" prior to procurement) *with* Ex. 12, Deposition Transcript of Kevin Larkin, 112:3–113:19 (testimony of Army Contracting Command contracting officer equating "due diligence" with KBR having discretion in determining whether and when to cross-level). Relator's other expert, Col. William Rudolph, after what he purports to have been an extensive review of KBR's contract and procedures, confirms KBR had such discretion. Ex. 13, Rudolph Tr. 103:24–104:10 (agreeing with proposition that, even where KBR had existing inventory in its inventory management system, it was not required to cross-level "100 percent of the time.").

Gaukler's tabulation of alleged "overorders" ignores that fundamental issue, his opinions would only confuse a factfinder's attempt to measure any economic loss.

Finally, in addition to excluding Dr. Gaukler's opinion based on his original expert report, the Court should also strike the improper affirmative opinions designed to shore up Dr. Gaukler's flawed "overordering" methodology and to introduce completely new damages theories that Relators improperly included under the guise of "rebuttal" and "supplemental" reports well after the deadline to do so had passed. Allowing Relators to defy the Court's schedule and the rules for expert disclosures would cause KBR significant and irreversible prejudice—including but not limited to the substantial costs required to properly analyze Dr. Gaukler's numerous newfangled analyses. Dr. Gaukler's additional belated opinions must therefore be excluded under Fed. R. Civ. P. 37(c).

## LEGAL STANDARDS

### A.    Admissibility of Expert Testimony

An expert witness may testify only if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is based on reliable principles and methods; and (4) the expert has reliably applied the principles and methods. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589–594. In other words, the expert's opinion must be both reliable and relevant. *Daubert*, 509 U.S. at 597. The party offering the expert bears the burden to show that the expert's testimony meets these requirements. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

### B.    Striking Improper and Untimely Expert Opinion

The Federal Rules of Civil Procedure require each party to disclose its expert reports "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Under Rule

26(a)(2)(D)(ii), rebuttal expert reports must be "intended solely to contradict or rebut evidence on the same subject matter identified by another party." *See also Africano v. Atrium Med. Corp.*, No. 17 CV 7238, 2019 WL 5085338 at *1 (N.D. Ill. Oct. 10, 2019), *objections overruled*, No. 17-CV-7238, 2020 WL 5691596 (N.D. Ill. Sept. 3, 2020). Thus, evidence that is only offered as additional support for a party's argument and that does not contradict any evidence introduced by the opposing party is not proper rebuttal. *Noffsinger v. The Valspar Corp.*, No. 09 CV 916, 2011 WL 9795 at *6 (N.D. Ill. Jan. 3, 2011). Under Rule 37(c), the sanction of exclusion is automatic and mandatory unless the party in violation of Rule 26(a) can show that its conduct was either substantially justified or harmless. Fed. R. Civ. P. 37(c)(1).

## ARGUMENT

## I.  DR. GAUKLER'S "OVERORDERING" METHODOLOGY IS NOT RELIABLE

Dr. Gaukler's newly-minted "overordering" model falls short of every guideline set out in *Daubert* for assessing the reliability of expert testimony: his model and opinions have not been tested; they have not been subjected to peer review or publication; and they are not generally accepted in the relevant scientific, technical, or professional community. *American Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (citing *Daubert*, 509 U.S. at 593–594). The analysis is unreliable because Dr. Gaukler invented it expressly for the purpose of testifying against KBR in this case – which would be his first as an expert. The limited "overordering" results it does generate are chock full of errors and absurd results that persist despite arbitrary controls that Dr. Gaukler tried to impose, demonstrating that he did not exercise the degree of care required by Rule 702. *See* Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amends.) (suggesting as benchmarks for gauging reliability (i) whether the testimony relates to "matters growing naturally and directly out of research [experts] have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying" and (ii) "[w]hether the expert

is being as careful as he would be in his regular professional work outside his paid litigation consulting.") (internal citations omitted).[3]

A.      **Summary of Dr. Gaukler's "Overordering" Opinions**

To deliver an opinion critiquing KBR in this litigation, Dr. Gaukler created a novel, black-box data model that forms the basis for the opinions in his expert report dated March 1, 2022 (the "Original Report"). The Original Report essentially comprises a four-part analysis. First, Dr. Gaukler attempted to reconstruct the entire history of KBR's materials inventory on LOGCAP III for *six* years (2007–2013) by piecing together millions of individual transactions from three different tables within Maximo, the database KBR used to manage property. Ex. 1, Gaukler Rpt. ¶¶ 74–106.[4] Dr. Gaukler conceded Maximo itself does not do this, so he "reconstructed" an inventory for millions of items across hundreds of storerooms sorted by "item, location, bin" combination ("ILB"). *Id.* at ¶¶ 76–86. As a second step, Dr. Gaukler's model calculated alleged "overordering" by (a) by cherry picking certain parts of KBR's Property Control Procedures and Materials Stock Plans, (b) applying those selected parts of KBR's processes mechanically to the ILBs in his reconstructed historical inventory (described in step one), and then (c) analyzing on a transaction-by-transaction basis whether the items his rules mechanically identified as having been available for cross-leveling were purchased by KBR, without any assessment of the feasibility or costs of cross-leveling those items. *Id.* at ¶¶ 10, 97–151.[5]

---

[3] Dr. Gaukler also offered a report rebutting the testimony of KBR's affirmative expert witness, Bill Walter. KBR does not here seek exclusion of Dr. Gaukler's rebuttal to Mr. Walter except for the improper affirmative opinions that Dr. Gaukler added to his rebuttal report to try to address flaws in his "overordering" methodology that KBR identified during his deposition. *See* discussion *infra* at section III, page 17.

[4] Maximo was a commercially available work order management system developed by IBM that was implemented and customized by KBR for use in Iraq and Afghanistan.

[5] Relators define cross-leveling in their complaint as the process of filling a requisition for materials from an existing set of stockpiles, instead of ordering new materials. ECF No. 1 at ¶ 35. As discussed at length in KBR's separate motion for summary judgment, there is no objective contractual, legal, or regulatory standard for cross-leveling.

To execute steps one and two, Dr. Gaukler employed a purpose-built complex computer model, which, among other things, simulated thousands of cross-level opportunities that never actually occurred in real life. *Id.* at ¶¶ 79, 107–08, 136, 140. Because it was designed to iteratively reabsorb its own fictive, hypothetical outputs as inputs for each subsequent analysis, the model over time created an alternate universe in which its modeling of KBR's inventories strayed progressively further from reality. Furthermore, the assumptions the model makes are inscrutable: though Dr. Gaukler provided KBR with a copy of the model's Python script—a type of software coding language, running it against the Maximo database requires a process that is prohibitively burdensome at best, if even indiscernible by industry experts, Ex. 7, A. Gilika Decl., ¶¶ 2-8, and Dr. Gaukler produced only a single text file for analysis. *Id.* ¶ 4. But the output file provides such limited information for each alleged "overorder" that no meaningful analysis can be performed. *See* Ex. 1, Gaukler Rpt. at ¶ 150 (detailing limited fields available from text file). Specifically, as Dr. Gaukler conceded during his deposition, the output from his model does not include his historical reconstruction of inventory described as step one, *i.e.*, the foundation upon which his entire "overordering" analysis is built, *see* Ex. 2, Gaukler Tr. 178:11-14; 189:13-21, nor *any* information regarding the site and storeroom locations where his model purports to have found excess items that could have been cross-leveled, across thousands of inventory transactions that his model simulated. *See id.* at 241:14–242:18; 246:15–20. In other words, after almost a day of processing time, the model spits out a list of thousands of transactions where Dr. Gaukler's program claims KBR could have cross-leveled but did not, without even identifying the sites to or from which the supposed missed cross-leveling activity could or should have taken place. Dr. Gaukler then adds up everything in the "overordering" column—none of which can be compared to the reality in theater—to calculate damages.

As step three, Dr. Gaukler cross-checked the results of his model against certain accounting records to ascertain whether invoices containing his alleged "overorders" had been submitted to the government. Ex. 1, Gaukler Rpt. ¶¶ 11, 152–153. Finally, as step four, Dr. Gaukler again relied on his computer model to identify individual material requisitions containing alleged "overorders" that he determined were submitted (or should have been submitted) by KBR to a government contract administrator for approval prior to purchasing. *Id.* at ¶¶ 12, 154–157.[6]

## B.  Dr. Gaukler's Unprecedented "Overordering" Methodology Was Invented Solely for This Litigation

Not only is Dr. Gaukler's "overordering" methodology not generally accepted, but prior to this litigation, his stated methodology had apparently never been attempted anywhere, by anyone—including Dr. Gaukler himself. During his deposition, Dr. Gaukler admitted he had never performed an "overordering" analysis before in *any* context. Ex. 2, Gaukler Tr. 71:13-23; 285:2-4. He had never before attempted to re-create a company's historical inventory, much less six years' worth, using millions of lines of transaction data. *Id.* at 284:20–285:20. Dr. Gaukler testified that he had "no idea" whether anyone else had ever attempted to do so. *Id.* at 285:22–23. Dr. Gaukler also testified he was not aware of a single peer-reviewed publication supporting his methodology, *id.* at 286:10–25, and did not cite any across his three reports. Dr. Gaukler was also unable to identify any military or any other government agency using his proffered technique when evaluating contractors' property systems. Ex. 2, Gaukler Tr. 287:2–23.

Dr. Gaukler's "overordering" methodology cannot be said to bear the hallmarks of

---

[6] The summary section of Dr. Gaukler's Original Report alludes to an additional opinion relating to how much of KBR's inventory was disposed of as excess. *See* Ex. 1, Gaukler Rpt. ¶ 13. Dr. Gaukler admitted at his deposition, however, that he did not actually perform any analysis of that issue, nor did he attempt to calculate a damages figure relating to excess. Ex. 2, Gaukler Tr. 184:21–186:24. As discussed below, Relators have attempted to address this hole in Dr. Gaukler's Original Report through the improper submission of additional affirmative opinions in his rebuttal and supplemental reports. *See infra.*, section III, page 17.

reliability when there is no evidence suggesting that anyone else under any circumstances has even *contemplated* a similar analysis, much less undertaken it.  That no one has ever used or validated Dr. Gaukler's methodologies shows they are unreliable and should be excluded.  *Daubert*, 509 U.S. at 590; *see also Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F. Supp. 2d 811, 819–820 (C.D. Ill. 2009) (Mihm, J.) (an expert's approach "is acceptable if it leads to a report grounded in the accepted theory or method applicable to the field"); *Cty. of Cook v. Bank of Am. Corp.*, No. 14C2280, 2022 WL 408299, at *10 (N.D. Ill. Feb. 10, 2022) (excluding expert's statistical analysis in housing discrimination case where expert did not "identify a single peer-reviewed academic paper that supports, recommends, or discusses his methodology"); *Allen*, 600 F.3d at 817-18 (expert's opinion excluded where standard had only been published (by the expert) in one journal article and had not been adopted by any government, industry or professional organization).

Relatedly, Dr. Gaukler's analysis cannot be relied upon because it was invented specifically for his testimony in this litigation and has no value in any other context.  Dr. Gaukler admitted that "the circumstances of this particular model are unique to the situation at KBR."  Ex. 2, Gaukler Tr. 284:20-285:1.  Dr. Gaukler's analysis certainly did not grow "naturally and directly" out of work he conducted independent of this litigation, as expected by the Advisory Committee's Notes to Rule 702.[7]  In situations where a novel methodology is so specific as to be unusable in other contexts, courts generally exclude opinions based on that methodology.  *See Allen*, 600 F.3d at 817-18 (excluding testimony and noting that methodology in question had been originally developed for use in earlier lawsuit where expert testified against same defendant).

---

[7] Indeed, his prior academic research primarily focused on inventory optimization using RFID tagging—a type of radio identification device, including perishable produce at supermarkets.  Ex. 2, Gaukler Tr. 27:21–34:25. RFID has nothing to do with this case.

### C.    Dr. Gaukler's "Overordering" Model Cannot Be Meaningfully Tested

Dr. Gaukler's model is unreliable for the further reason that it is a black box, in computing terms—its inputs and outputs may be discernible, but its inner workings are not. His methodology therefore fails *Daubert*'s "testability" requirement. *See Allen*, 600 F.3d at 817 (citing *Daubert*, 509 U.S. at 593–594).

Dr. Gaukler wrote a novel piece of computer software to conduct his analysis. The work papers included with the Original Report did not include a copy of the historical stock inventory he attempted to reconstruct; instead, that information is buried within the 1,699 lines of computer code that make up the model, which takes 22 hours to run and cannot be modified to produce additional or different output files without altering (*i.e.*, inserting new, original lines of Python code into) Dr. Gaukler's scripts. *See* Ex. 7, A. Gilika Decl., ¶¶ 4–6. As a result, KBR had no reasonable extrinsic means of validating the accuracy of Dr. Gaukler's attempted inventory reconstruction by comparison to external sources of information, such as actual storeroom stock lists from the relevant time period. For his part, Dr. Gaukler admitted that he attempted no such validation in connection with his Original Report, either. Ex. 2, Gaukler Tr. 116:17–118:17. Instead, Dr. Gaukler's effort to test the accuracy of his inventory reconstruction effort was limited to comparing the model against itself, via an "internal" process where Dr. Gaukler had his algorithm flag any transaction where the inventory quantities he calculated did not match up. Ex. 1, Gaukler Rpt. ¶¶ 91, 93–96. During his deposition, however, Dr. Gaukler conceded that he did not identify those mismatched transactions for KBR, meaning they could be reviewed only by altering his bespoke computer code. Ex. 2, Gaukler Tr. 176:3–179:3. Thus, instead of being able to inspect any of the more than 500,000 self-admitted errors in Dr. Gaukler's historical inventory reconstruction, KBR just had to accept his "satisfaction" that the methodology was accurate. *See* Ex. 1, Gaukler Rpt. ¶¶ 95–96. That is hardly a "testable" process.

The inability to test Dr. Gaukler's model renders it unreliable: in a case about managing property in a war theater, the specific locations within Iraq and Afghanistan where Dr. Gaukler claims cross-leveling was possible yet not performed are critical to evaluating the reliability of his opinions. As discussed above, however, that information is also hidden within the model's black box. For example, Dr. Gaukler conceded that his model cross-leveled a particular product—three feet of wire—but his output provided no way of determining the location of the storeroom or site where excess wire had purportedly been available. He was not able to determine whether his model cross-leveled all three feet from a single site, or one foot each from three different sites. Ex. 2, Gaukler Tr. 241:20–242:18. Accordingly, his model could have assumed KBR should have cross-leveled a single foot of wire from three different sites across war-torn Iraq, or possibly just three feet of wire in one move across the country; no one can tell, and his model is thus unreliable and should be excluded.

Due to the design of the model, there is no way to know the pervasiveness of these types of errors or absurd results. Because Dr. Gaukler built a model that provides no means of assessing his inventory reconstruction efforts, or the thousands of computer-generated transactions that underpin his damages figures, his opinions are not sufficiently "testable" and should be excluded. *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 421 (7th Cir. 2005) (affirming exclusion of expert report under *Daubert* and Federal Rule of Evidence 702 where expert's proffered estimate was untestable); *see also Zenith Elecs. Corp. v. WH–TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

### D.    Dr. Gaukler's Work is Unreliable Because it is Riddled With Obvious Errors

A basic review of the limited "overordering" output Dr. Gaukler *did* provide with his Original Report reveals that his opinions are full of blatant errors and implausible results that demonstrate a failure to meet the standard of care required by Rule 702 and *Daubert*.

Multiple controls Dr. Gaukler attempted to impose on his model simply failed, for reasons that remain unknown.  For example, notwithstanding Dr. Gaukler's attempt to exclude transactions where the "overorder cost" would be less than $100 (in other words, excluding cross-leveling of small-value items), an attempt that recognizes the value of discretion that Dr. Gaukler otherwise ignores in his model, *see* Ex. 1, Gaukler Rpt. ¶ 143, his output nonetheless contained over 2,000 purported "overorders" valued below that figure.  As referenced earlier, for example, the model faulted KBR for not cross-leveling 16 individual screws worth a *total* of $0.20—even where that $0.20 "overorder cost" was $99.80 below the $100 threshold that Dr. Gaukler meant to include, and thus a blatant internal error.  *See* Ex. 2, Gaukler Tr. 245:11–248:7.[8]  Similarly, although Dr. Gaukler attempted to control for so-called "unit of measure" issues[9] in the underlying Maximo data, *see* Ex. 1, Gaukler Rpt. ¶¶ 118, 141, 146, his output erroneously included: (i) an $868,500 alleged "overorder" for not cross-leveling one roll of wire that other Maximo data establishes was actually worth a maximum of about $3,000; (ii) a single hydraulic pump his model identified as a $149,447 "overorder" that other Maximo data establishes actually cost no more than $1,720; and (iii) three meters of electrical cable his model identified as a $204,003 "overorder" that other Maximo data suggests actually cost no more than $1,140.  *See* Ex. 2, Gaukler Tr. 208:18–224:1.

In addition, during his deposition, Dr. Gaukler readily acknowledged that his "overordering" model treats all inventory items as fungible for cross-leveling purposes— regardless of whether the item in question could or should be moved.  *See* Ex. 2, Gaukler Tr.

---

[8] This restriction on the inclusion of "overorders" worth less than $100 has no methodological basis. When asked to explain his reasoning for setting the restriction at $100, Dr. Gaukler acknowledged he relied only on what seemed reasonable to him, as opposed to any industry literature or other benchmark establishing an appropriate figure.  Ex. 2, Gaukler Tr. 193:19–195:4.

[9] "Unit of measure" issues arise when a company's method for quantifying the amount of a particular item in inventory is incorrect or vague.  As a basic example, a company may purchase wire in both 100-foot and 500-foot rolls.  If the "unit of measure" for wire in the company's inventory management system does not distinguish between the two, "1 ROLL" in inventory could mean either 100 or 500 feet of wire.

184:6–19.  As a result of that choice, the output from his model included items that could not possibly have been sent from one place to the other, like a $60,000 departure tax KBR needed to pay in order to exit Iraq.  *See id.* at 203:7–206:23.  Dr. Gaukler conceded he did no investigation of the Maximo inventory data to determine whether it contained similar "intangible" items, and did not know the prevalence of similar errors in his output.  *Id.* at 206:24–208:6.

Dr. Gaukler's attempt to control for outliers in the Maximo data evidences his awareness of the shortcomings of a model that blindly applies rules without any context.  However, his failure to check to make sure his attempted controls actually *worked* demonstrates a lack of care required by Rule 702 and *Daubert*.  *See Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (holding that excluding an expert's testimony was proper because "the expert's failure to make any adjustment for [other] variables [that could have impacted the decision to terminate certain employees]…indicates a failure to exercise the degree of care that a statistician would use in his scientific work, outside of the context of litigation.").

In sum, Dr. Gaukler's "overordering" analysis should be excluded because it is unprecedented, untestable, and was not carefully applied.

## II.    DR. GAUKLER'S "OVERORDERING" OPINIONS ARE NOT RELEVANT

Even assuming Dr. Gaukler's methodology *were* reliable, his "overordering" opinions should be excluded as irrelevant.  An expert's testimony is admissible under *Daubert* only if it would assist the trier of fact in understanding the evidence; in other words, the testimony must be tied to the facts of the case.  *Deimer v. Cincinnati Sub–Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995) (citing *Daubert*, 509 U.S. at 591); *see also Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018) ("[S]ome questions regarding an expert's use of faulty assumptions or data should be left to a jury.  But whether an expert's approach lines up with the basic facts of the case goes to the relevance and admissibility of the testimony itself.  Gatekeeping of this sort is

properly left to the court.") (internal citation omitted).

### A.    Dr. Gaukler's Model Unrealistically Assumes KBR Could Have Achieved Perfect Cross-Leveling Performance and Ignores KBR's Discretion

As described above, Dr. Gaukler's "overordering" model is a software program that mechanically applies novel rules based on cherry-picked KBR policies to an immense historical inventory dataset that Dr. Gaukler reconstructed nearly a decade after the fact. Given the model's robotic, inflexible adherence to these rules—which was not at all how KBR applied them in fact, it should not be surprising that it produces results that are entirely divorced from reality. Dr. Gaukler does not claim otherwise: When asked whether it would be realistic—as the model demands—for KBR to cross-level 16 screws from one (unknown) base in Iraq or Afghanistan to another (unknown) base somewhere else, Dr. Gaukler replied: "*I have no opinion on whether this is reflective of reality or not.*" Ex. 2, Gaukler Tr. 245:22–246:13 (emphasis added). An expert who has "no opinion" whether his analysis reflects reality cannot possibly have sufficiently tied his opinions to the facts of a case such that it would be appropriate to allow a jury to hear his testimony. *See, e.g., Target Mkt. Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998) (affirming exclusion of lost profits expert report and endorsing appellee's argument that the report "relied upon assumptions that were unrealistic and divorced from the realities of the [] joint venture" at issue).

This example, one of many, springs from Dr. Gaukler's unsupported, implausible yet plainly material assumption that KBR robotically applied cross-leveling rules in a warzone and not only could, but should, have achieved computer-like perfection. The "overordering" model ignores KBR's discretion and assessment of other factors regarding when and where to cross-level, which Dr. Gaukler admitted he did not account for in his Original Report. *Id.* at 236:21–237:13. Indeed, Dr. Gaukler was confronted during his deposition with a sample contemporaneous daily

report showing multiple cross-level transactions in which KBR property managers assessed whether materials were available for cross-leveling, and concluded that they should not be cross-leveled, due to reasons such as the materials being previously designated for new onsite projects, maintenance of onsite equipment, materials not yet having arrived at the site with which they are associated, or the materials being incompatible with the needs of the project. *See id.* at 282:16-22. Dr. Gaukler admitted to having never seen such a document before and even conceded he did not know how KBR would go about comparing legitimate cross-level decisions with the simulated cross-levels executed by his model.  Ex. 2, Gaukler Tr. 280:14–284:15.[10]

As yet another example, Dr. Gaukler's model does not account for the fact that cross-leveling between certain LOGCAP III task orders was restricted by contract before 2010.  *See id.* 278:18–279:17.  As a result, his damages model improperly includes thousands of simulated cross-levels valued at millions of dollars where it is unclear whether the government would have even *permitted* KBR to move the items in question from one task order to another.

In the end, decisions that affect cross-leveling in a war zone depend on actual facts, context, and the exercise of *human* discretion.  Real-world factors such as the amount of time, effort, or risk to employees that moving potentially available materials would require were within the factors that KBR had to consider when exercising that discretion.  *See, e.g.*, Ex. 11, Operations Directive for Non-Demand Supported Stock Removal (Apr. 2009), ¶ 1 ("Unfriendly Situation: Insurgent activity hinders freedom of movement throughout the theater of operations.").  Because Dr. Gaukler's "overordering" model unjustifiably assumes otherwise, his opinions do not reflect the reality of operating in a war zone and should be excluded.  *See United States ex rel. Dolan v. Long*

---

[10] As perhaps a tacit admission that ignoring KBR's Cross-Level Denial Reports was a significant oversight, they feature prominently in the improper affirmative opinions Dr. Gaukler belatedly included in the two reports that followed the Original Report.  *See infra.*, section III, page 17.

*Grove Manor*, 315 F. Supp. 3d 1107, 1114 (N.D. Ill. 2018) (excluding regression analysis of FCA relator's expert in Medicare overbilling case because he did not consider individualized determinations of beneficiaries' medical needs).

### B.    "Overorders" Are Not the Proper Measure of Damages in an FCA Case

The "overordering" analysis contained Dr. Gaukler's Original Report also is irrelevant because it does not provide an appropriate measure of damages.[11]   Under the FCA, measuring economic harm to the government requires an assessment of *net* loss, *i.e.*, the difference between the amount the government paid out and the value of whatever it received.   *See United States v. Anchor Mortg. Corp.*, 711 F.3d 745, 749–751 (7th Cir. 2013).   In contrast, the model as described in Dr. Gaukler's Original Report considers only the amount KBR paid on the government's behalf for each allegedly "overordered" item, ignoring that the government ultimately received the benefit of each purchase.   By his own admission, Dr. Gaukler did not assess whether items his model concluded were "overordered" were ultimately consumed, nor did he attempt to calculate the dollar value of the items KBR had left over at the end of LOGCAP III.   Ex. 2, Gaukler Tr. 185:8–186:24, 288:6–290:6.   Even the latter calculation would not constitute a valid damages assessment in an FCA case because the process of closing out the LOGCAP III contract required that KBR return all remaining inventory to the government, which made the ultimate decision regarding disposition.   *See* Ex. 10, Deposition Transcript of Col. Gust Pagonis 192:5–195:19.   It is undisputed that the government received every single item purchased by KBR and decided ultimately what to do with each.   Notwithstanding that KBR may have had excess inventory on hand elsewhere in theater at the time it ordered new materials, if the items KBR ordered were

---

[11] As noted above, KBR adopts Relators' counsel's characterization of Dr. Gaukler as a damages expert.  *Compare* Ex. 2, Gaukler Tr. 13:12–18 *with* Ex. 6, Tr. of July 8, 2022 Proceedings Before Judge Hawley 26:5–6.

eventually consumed or were otherwise disposed of at the government's direction, "overordering" is not a legally cognizable measure of damages under the FCA.  *See United States v Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966) (affirming government was not entitled to recover damages under the FCA because the defendant contractor did not improperly divert funds it had been paid by government and used them to pay for actual work done under subcontracts).

## III.  PORTIONS OF DR. GAUKLER'S REBUTTAL REPORT AND HIS ENTIRE SUPPLEMENTAL REPORT MUST BE STRUCK AS IMPROPER AND UNTIMELY

In addition to excluding the entirety of the Original Report, the Court should also strike certain opinions included in two subsequent reports from Plaintiff's expert that belatedly address methodological flaws in Dr. Gaukler's initial "overordering" analysis.  As described below, after KBR laid bare the many flaws in Dr. Gaukler's analysis at his deposition, Relators (i) had him attempt to patch them up through a series of new analyses, including a brand-new method for calculating damages, and then (ii) improperly included the new results in Dr. Gaukler's rebuttal report to KBR's affirmative expert Bill Walter.  Mr. Walter expressly disclaimed offering any opinion in this case critiquing Dr. Gaukler's "overordering" analysis.  Instead, Mr. Walter, unlike Dr. Gaukler, quantified the "cross-leveling" KBR actually *did* perform.  Nevertheless, Relators used Dr. Gaukler's rebuttal to Mr. Walter to try to fix flaws in his original analysis and then, later, added entirely new analyses first *by email* and then in a "supplemental report," on the very last day of discovery, long after the expert disclosures were due.  Such opinions are prohibited by Fed. R. Civ. P. 26(a) because they support Relators' case-in-chief yet were not disclosed in Dr. Gaukler's Original Report.  Furthermore, allowing the belated and improper revised and supplemental opinions would cause significant and irreversible prejudice to KBR.  As such, Fed. R. Civ. P. 37(c) requires their exclusion. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (two primary factors in considering exclusion of belatedly disclosed evidence are "(1)

the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice"); *see also Gravitt v. Mentor Worldwide LLC*, No. 17 C 5428, 2022 WL 3584620, at *2 (N.D. Ill. Aug. 22, 2022).

### A.     Procedural History and Summary of Dr. Gaukler's Additional Reports

*Dr. Gaukler's Original Report and Deposition.*     When Relators served Dr. Gaukler's Original Report, in addition to the report itself, Relators produced 15 electronic files comprising 1.89 gigabytes of Dr. Gaukler's work papers, which included the Python scripts for his model and the limited "overordering" output described above.[12]  Ex. 7., A. Gilika Decl. ¶ 4.  At considerable cost, KBR hired technical consultants from the firm Analysis Group to evaluate Dr. Gaukler's report, model codes and output files prior to his deposition, which took place on April 1, 2022.  *Id.* ¶¶ 8-9.  During its questioning of Dr. Gaukler, KBR secured numerous damaging admissions relating to the reliability and relevance of his methodology and opinions, as discussed in detail above.  KBR decided not to retain a rebuttal expert to address Dr. Gaukler's "overordering" allegations because of its numerous, patent flaws.

*Bill Walter's Report and Deposition on Behalf of KBR*.  On April 22, 2022 KBR timely disclosed the report of its affirmative expert Bill Walter (the "Walter Report").  The Walter Report contains an analysis of transactions captured in Maximo and establishes that KBR executed hundreds of thousands of cross-level transactions during the relevant period.  *See generally* Ex. 3, Walter Rpt.  Importantly, the Walter Report provides no substantive critique of Dr. Gaukler's work.  Mr. Walter did not attempt to simulate any transactions or come up with his own estimate of "overordering," nor did he address the particular flaws in Dr. Gaukler's model.  Instead, he took

---

[12] These materials were not served until March 1, 2022, several days after the February 25 deadline for initial expert reports.

Dr. Gaukler's results (assuming them to be correct) and compared them to the total amount of KBR purchasing on LOGCAP III, as well as Mr. Walter's own cross-leveling analysis, in order to contextualize Dr. Gaukler's opinions.  *See id.* at 4, 21–23.

***Dr. Gaukler's Rebuttal Report.***    On June 27, 2022, the deadline for rebuttal reports, Relators produced an additional Dr. Gaukler report, ostensibly countering Mr. Walter's affirmative cross-leveling analysis (the "Rebuttal Report").  *See generally* Ex. 4, Rebuttal Rpt.  Much of the Rebuttal Report and the associated work papers, however, are in fact attempts to bolster Dr. Gaukler's Original Report—which no KBR expert challenged—by: (1) revising his model to attempt to account for the numerous methodological shortcomings identified during Dr. Gaukler's deposition; and (2) introducing an *entirely new opinion regarding the amount of "excess" property left over at the end of the contract* that was not included in the Original Report.  The affirmative opinions Dr. Gaukler improperly included in his Rebuttal Report are briefly summarized below.

1. <u>Revisions to the Original Report's "Overordering" Methodology</u>

In the Rebuttal Report, Dr. Gaukler details numerous new analyses he conducted to shore up his Original Report's flawed methodology, including, for example: (a) revising his "overordering" output to remove certain intangible items, *e.g.*, the stamp departure tax (¶ 72); (b) fixing an error with the $100 minimum cross-leveling threshold that he tried and failed to implement in his Original Report (¶ 82 n.112); (c) providing a new "overordering" estimate if he were to remove all transactions involving certain virtual storerooms from his analysis (¶ 77), or all transactions involving equipment that could not be relocated such as incinerators, generators, or water purification units (¶ 69); and (d) correcting his failed attempt to "smooth" unit conversion and pricing outliers, which he concedes resulted in a $2.5 million overestimation of "overordering" in his Original Report (¶¶ 95–96).  Dr. Gaukler also included with his Rebuttal Report a description

of a completely new effort to validate the historical inventory reconstruction element of his model against contemporaneous stock lists. *See id.* at ¶¶ 127–131.

2.    The Rebuttal Report's Entirely New Damages Estimate

Dr. Gaukler's Rebuttal Report also includes a brand-new affirmative analysis, not addressed in either Dr. Gaukler's Original Report *or* in the Walter Report, purporting to measure how much of the property Dr. Gaukler alleges KBR "overordered" was ultimately disposed of as excess. *Id.* at ¶ 41. Specifically, Dr. Gaukler estimates the amount of disposed excess was "greater than $170 million." *Id.* This is a new affirmative opinion—not proper rebuttal to Mr. Walter.

***The Gaukler Supplemental Report***. On July 7, 2022, without seeking leave of Court and in disregard of Rule 26, Relators provided KBR with yet another analysis by Dr. Gaukler, including several new data streams and computer program files, a full ten days past the deadline to serve rebuttal reports and months after the deadline for Relators' affirmative expert opinions. The additional analysis was not even in the form of a report signed by Dr. Gaukler, but instead was laid out by Relators' counsel in an email (the "July 7 Email"). *See* Ex. 5. The July 7 Email does not identify the KBR expert whose opinions the new analysis purports to rebut, presumably because it does not rebut any of them.[13] Then, on July 28, 2022, the very last day of expert discovery and long past any deadline to serve expert reports, Relators provided KBR with *yet another* expert report from Dr. Gaukler (the "Supplemental Report"). *See* Ex. 8, Gaukler Supplemental Rpt. According to the cover email from Relators' counsel, this Report's purpose was to formalize the cross-level denial analysis described in the July 7 Email. *See* Ex. 9, July 28 Email from E.

---

[13] During a status conference before Magistrate Judge Hawley on July 8, 2022, KBR asked the Court to postpone the end of expert discovery to allow for expedited briefing on the issue of whether certain portions of Dr. Gaukler's Rebuttal Report and the contents of Relators' July 7 Email should be struck. The Court declined to do so. *See* Ex. 6, Tr. of July 8 Conf. 32:7–11. On July 21, 2022, KBR sent Relators a letter announcing it would forego deposing Dr. Gaukler due to the substantial prejudice resulting from Relators' abuse of the discovery rules. Ex. 14 (C. Margolis Letter dated July 21, 2022).

19

Havian. In addition to a restatement of the content of the July 7 Email, the Supplemental Report provides more detail regarding Dr. Gaukler's *further* revisions of his "overordering" model. Ex. 8, Gaukler Supplemental Rpt. ¶¶ 4, 6. Both the cover email from Relators' counsel and the Supplemental Report itself note that Relators asked Dr. Gaukler to include that additional methodological detail *because KBR decided to forego his deposition*. *Compare* Ex. 9, July 28 Email from E. Havian *with* Ex. 8, Gaukler Supplemental Rpt. ¶ 5.

### B.     Dr. Gaukler's Numerous New Opinions Attempting to Bolster his Flawed "Overordering" Analysis are Improper Rebuttal

A party may not offer affirmative testimony under the guise of "rebuttal." Rather, the rebuttal report must address issues raised by the opposition's expert instead of simply bolstering support for issues for which the party already bears the burden of proof. *Africano*, 2019 WL 5085338, at *1–2. In circumstances where part of an expert's report constitutes improper bolstering while other parts fairly respond to the conclusions of the opposing party's experts, the appropriate course is to limit the proposed rebuttal expert's testimony. *Id.* at *4. Such is the appropriate course of action here.[14]

Relators bear the burden of proving damages, and any opinion of Dr. Gaukler relating to damages—*i.e.*, any opinion regarding his "overordering" analysis—needed to be in his Original Report. The time for identifying and fixing flaws in his methodology was when Dr. Gaukler prepared his Original Report.

Relators cannot argue that the various portions of the Rebuttal and Supplemental Reports pertaining to Dr. Gaukler's "overordering" analysis are a rebuttal to Mr. Walter's opinions because Dr. Gaukler expressly stated in his Rebuttal Report that the Walter Report was "irrelevant" to his

---

[14] The specific opinions of Dr. Gaukler that KBR seeks to strike as improper rebuttal include his entire Supplemental Report and the following paragraphs (inclusive of footnotes) in his Rebuttal Report: ¶¶ 9, 41, 66–84, 92–96, 100–102, 124–135.

analysis. *See* Ex. 4, Rebuttal Rpt. ¶ 5. Similarly, the completely new damages opinion Dr. Gaukler included at ¶ 41 of his Rebuttal Report purporting to measure how much of the property KBR allegedly "overordered" was ultimately disposed as excess must also be excluded. Submitting a new damages analysis under the guise of "rebuttal" is the paradigmatic example of an improper opinion under Rule 26(a)(2)(D)(ii). *See Frerck v. Pearson Educ., Inc.*, No. 11 C 5319, 2014 WL 477419, at *4 (N.D. Ill. Feb. 6, 2014) ("Of course, Frerck cannot submit a 'rebuttal' report advancing a new theory of damages now that Pearson has already produced its expert reports.").

Finally, Dr. Gaukler's attempts to overhaul his "overordering" methodology in the Rebuttal and Supplemental Reports are not permissible "supplemental" opinions under Rule 26(e), either. As the Ninth Circuit has held, Rule 26(e) is not "a loophole through which a party who submits partial expert witness disclosures, or who wishes to revise [its] disclosures in light of [its] opponent's challenges to the analysis and conclusions therein, can add to them to [its] advantage after the court's deadline for doing so has passed." *Luke v. Family Care & Urgent Med. Clinics*, 323 Fed. App'x 496, 500 (9th Cir. 2009); *see also McCann v. Ogle Cnty.*, No. 11 C 50125, 2016 WL 5807922, at *2 (N.D. Ill. Oct. 5, 2016); *Butler v. Sears Roebuck & Co.*, No. 06 C 7023, 2010 WL 2697601, at *1 (N.D. Ill. July 7, 2010); *Allgood v. Gen. Motors Corp.*, No. 02-cv-1077, 2007 WL 647496, at *3-4 (S.D. Ind. Feb. 2, 2007).

In sum, because Mr. Walter did not criticize Dr. Gaukler's "overordering" methodology, Dr. Gaukler's attempts to shore up that analysis through the guise of "rebuttal" or "supplemental" opinion are improper under Rule 26(a).

### C.    Relators' Late Efforts to Shore Up Dr. Gaukler's Flawed Analyses Were Neither Justified nor Harmless

Under Fed. R. Civ. P. 37(c), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply

evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The sanction of exclusion is automatic and mandatory unless the party in violation of Rule 26(a) can show that its conduct was either substantially justified or harmless. First, and foremost, there is nothing that "substantially justifies" Relators' attempt to revise their expert's flawed model in the guise of "rebuttal," nor the introduction of entirely new opinions well after deadlines had passed. And, as discussed below, there is nothing harmless about Relators having done so, as KBR has been put at a significant, unfair disadvantage due to Relators' discovery abuses.

In determining whether a Rule 26(a) violation is justified or harmless, the Court must consider: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). All four factors suggest Relators, as the violating party, cannot meet their burden here.

### 1.    Prejudice

Allowing Relators to improperly supplement and revise Dr. Gaukler's affirmative opinions would result in significant prejudice to KBR. As described above, in reliance on the scheduling order, KBR made the reasonable choice not to challenge the methodological flaws in Dr. Gaukler's Original Report through expert testimony. There was no need to do so, because KBR had already created a clear record at deposition of the Original Report's numerous failings. KBR had the right to expect that Relators could not, in the guise of "rebuttal," try to correct the flaws in Dr. Gaukler's work, especially when KBR's own expert accepted Dr. Gaukler's analysis at face value. Had KBR known Dr. Gaukler would be permitted to correct numerous methodological flaws, KBR would have been better off not deposing him at all, and instead waiting until trial to attack his credibility

in front of a jury.  The point of rigorous cross-examination during an expert deposition cannot be to provide a shaky expert with a roadmap for attempting to *Daubert*-proof a flawed analysis through the submission of new opinions.  *Peals v. Terre Haute Police Dep't,* 535 F.3d 621, 630 (7th Cir. 2008) ("Testimony offered only as additional support to an argument made in a case in chief, if not offered to contradict, impeach or defuse the impact of the evidence offered by an adverse party… is improper on rebuttal.") (internal quotation marks and citations omitted); *see also Lexington Ins. Co. v. Horace Mann Ins. Co.,* No. 11 C 2352, 2015 WL 5174159, at *6 (N.D. Ill. Aug. 27, 2015) ("Rule 26(e) does not give the producing party a license to disregard discovery deadlines and to offer new opinions under the guise of the supplement label") (internal quotation marks and citations omitted).

Furthermore, analyzing Dr. Gaukler's Original Report the first-time cost KBR roughly $230,000 for Analysis Group's services.  Ex. 7, A. Gilika Decl., ¶ 8.  This figure underestimates the time and effort spent by counsel and internal KBR resources analyzing Dr. Gaukler's original analysis.  Allowing Dr. Gaukler to revise his "overordering" methodology would require KBR to spend the *additional* time and money necessary to rework much of that analysis, at significant cost. *See id.* at ¶¶ 10–17; *see also Nelson v. Ipalco Enter., Inc.*, No. IP02477CHK, 2005 WL 1924332, at *8 (S.D. Ind. Aug. 11, 2005) (noting that plaintiff's "disregard of the schedule and the orderly development of the case" could not be deemed harmless because it provided a strategic advantage, and concluding that failing to strike improper rebuttal would have "contribute[d] to further delay, expense and complication in an already long, expensive, and complicated lawsuit.").  KBR should not have to bear the cost of Dr. Gaukler's insufficient attention to detail the first time around.

### 2.    Ability to Cure

KBR sought leave from Magistrate Judge Hawley to extend the expert discovery period in order to address this issue, but was denied.  Expert discovery is now closed.  Even if expert

discovery were still open, the prejudice to KBR could not be cured simply by allowing KBR more time to review Dr. Gaukler's new affirmative opinions and voluminous work papers, and to conduct a further deposition.  Courts have recognized that permitting improper bolstering opinion creates prejudice that is not cured simply by providing the aggrieved party additional time. *See Africano*, 2020 WL 5691596 at *3 n.4  ("Courts have long recognized that late disclosures are not harmless just because there is time to do further discovery."); *Fidlar Tecnologies v. LPS Real Est. Data Sols., Inc.*, No. 4:13CV04021, 2015 WL 109835, at *4 (C.D. Ill. Jan. 6, 2015) (Hawley, J.) ("Late disclosure is not harmless within the meaning of Rule 37 simply because there is time to reopen discovery.") (internal citation omitted).

### 3.    Likelihood of Disruption to Trial

If Relators are permitted to address the many flaws in Dr. Gaukler's "overordering" methodology through his Rebuttal and Supplemental Reports, fairness would dictate that KBR now be given the opportunity to depose Dr. Gaukler with the benefit of time and to retain potentially an entirely new expert to address his revamped "overordering" opinions.  Not only would such a step be prejudicial to KBR, it would necessarily change and re-open the schedule.[15] On the other hand, striking Dr. Gaukler's improper rebuttal opinions—and thereby rejecting Relators' attempt to turn the exchange of expert reports into an iterative, never-ending process— would not disrupt the current schedule.

### 4.    Bad Faith or Willfulness

There is ample evidence of bad faith or willfulness in Relators' misuse of the rebuttal schedule to try to address the flaws in Dr Gaukler's Original Report and introduce entirely new

---

[15] To be clear, KBR is *not* asking for such relief at this point.  It is entitled to enforcement of the *existing* schedule and the Federal Rules.  This option would be a last resort, if and only if the Court were to permit the belated and inappropriately disclosed opinions to be offered.

damages opinions.  Dr. Gaukler himself acknowledged outright that the Walter Report did not contain any criticism of his "overordering" methodology, yet Relators ignored the rules and the Court's scheduling order to attempt to rectify that analysis via improper rebuttal anyway.  This is flatly impermissible.  *See, e.g.*, *Peals* 535 F.3d at 630  ("Testimony offered only as additional support to an argument made in a case in chief, if not offered to contradict, impeach, or defuse the impact of the evidence offered by an adverse party, is improper on rebuttal.") (internal quotation marks omitted).  Additionally, Relators then lobbed in by email an additional opinion well past even the rebuttal deadline, not in the form of an expert report and not even signed by the expert himself.[16]

Further, Relators' and Dr. Gaukler's joint admission that he submitted a Supplemental Report "because KBR decided to forego his deposition" proves the point—that Relators intended to use KBR's deposition of Dr. Gaukler to purport to cure the prejudice from the improper supplemental and revised opinions.  When KBR declined to take the bait, Relators and Dr. Gaukler tried to slip in a third (completely unjustified and inexcusably overdue) report on the final day of discovery.  *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them"); *see also Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998) ("A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor.  . . . The report must be complete such that opposing counsel is not forced to depose an expert in order to avoid ambush at trial.") (internal citation omitted).  The latest report is a transparent attempt to belatedly satisfy Rule 26, long after the deadlines for

---

[16] In the cover email KBR received attaching the Supplemental Report, Relators' counsel stated his belief that it was "immaterial" that his July 7 communication purporting to contain additional opinions from Dr. Gaukler had not been signed by the expert.  Ex. 9, July 28 Email from E. Havian.  The Federal Rules dictate otherwise.  *See* Rule 26(a)(2)(B) (all written expert reports must be "prepared *and signed* by the witness") (emphasis added).

submission of expert reports had passed and after Relators knew that Dr. Gaukler would not be subject to re-deposition. This brazen disregard of the Rules and the Court's schedule should not be countenanced. *See, e.g.*, *Hansen v. Country Mut. Ins. Co.*, No. 18 CV 244, 2022 WL 124564, at *5 (N.D. Ill. Jan. 13, 2022) (excluding untimely rebuttal report where, in part, "plaintiffs have provided no explanation for their willful failure to more promptly inform [defendant] of their intent to rebut [defendants]'s experts' reports, even after [opposing expert's] deposition.").

Lastly, though not a Rule 37(c) factor under *David v. Caterpillar*, it should also be noted that striking Dr. Gaukler's various improper rebuttal opinions will cause no harm to Relators. *See McCann v. Cullinan*, No. 11 CV 50125, 2016 WL 4593835, at *3 (N.D. Ill. Sept. 2, 2016), *report and recommendation adopted sub nom. McCann v. Ogle Cnty.*, No. 11 C 50125, 2016 WL 5807922 (N.D. Ill. Oct. 5, 2016) ("Plaintiff will not be prejudiced by barring these reports. Plaintiff was given the opportunity to present expert witness opinions and did so; Plaintiff is just being prevented from improperly attempting to bolster previous opinions or presenting new opinions in the guise of rebuttal.").

Should the Court excuse Dr. Gaukler's improper and untimely revised and supplemental opinions, KBR reserves the right to submit a second *Daubert* motion relating specifically to those opinions. Although Dr. Gaukler has purported to fix some of his more obvious methodological flaws, which as discussed above KBR has not been able to meaningfully test, fundamental problems remain.[17] His overordering analysis, even as revised, fails to meet the standards set forth in *Daubert* and Rule 702 because it is still predicated on the fallacious assumption that cross-leveling could be executed robotically and perfectly, as his software model did, without the

---

[17] As just one illustration: in the example discussed above where Dr. Gaukler's original model erroneously cross-leveled 16 individual screws in the context of a $2.4 million bulk purchase of 300,000 screws, even with all the (purported) fixes Dr. Gaukler belatedly added to his analysis, his model would still cross-level a small set of screws, so long as the total value of the materials purportedly available for cross-leveling was more than $100.

exercise of human discretion and judgment in a war zone. No amount of tinkering with the model can remedy its deeply flawed underlying methodology.

## IV.    CONCLUSION

For the foregoing reasons, the Court should exclude each of Dr. Gaukler's affirmative opinions related to his "overordering" analysis as unreliable and insufficiently relevant under *Daubert.* The Court should also strike the Supplemental Report and those portions of the Rebuttal Report that constitute improper and untimely rebuttal for the additional, independent reason that their disclosure in contravention of the discovery schedule and Rule 26 was prejudicial and unjustified.

Dated:  September 29, 2022                    Respectfully submitted,


                                              *David W. Ogden*_____
                                              David W. Ogden
                                              Ronald C. Machen
                                              Matthew T. Jones
                                              WILMER CUTLER PICKERING HALE
                                              AND DORR LLP
                                              1875 Pennsylvania Avenue NW
                                              Washington, DC 20006
                                              Telephone: (202) 663-6000
                                              Facsimile: (202) 663-6363
                                              david.ogden@wilmerhale.com
                                              ronald.machen@wilmerhale.com
                                              matt.jones@wilmerhale.com

                                              Felicia H. Ellsworth
                                              WILMER CUTLER PICKERING HALE
                                              AND DORR LLP
                                              60 State Street
                                              Boston, MA 02109
                                              Telephone: (617) 526-6000
                                              Facsimile: (617) 526-5000
                                              felicia.ellsworth@wilmerhale.com

Craig D. Margolis
Tirzah S. Lollar
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
(202) 942-5000
(202) 942-5999 (facsimile)
craig.margolis@arnoldporter.com
tirzah.lollar@arnoldporter.com

Jennifer L. Saulino
David N. Sneed
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
jsaulino@cov.com
dsneed@cov.com

*Attorneys for Defendants KBR, Inc. and Kellogg Brown & Root Services, Inc.*