E-FILED
Thursday, 29 September, 2022  05:21:00 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 3



Dixon Hughes Goodman LLP
1410 Spring Hill Road, Suite 500
Tysons, VA 22102
P 703.970.0400
F 703.970.0401
dhg.com

April 22, 2022

**EXPERT REPORT OF BILL WALTER REGARDING United States of America, *ex rel.* Geoffrey Howard and Zella Hemphill v. KBR Inc. And Kellogg Brown & Root Services, Inc.**

**Qualifications**

I am a Certified Public Accountant and I have practiced from 1984 until the present in the accounting profession specifically as it relates to entities involved in providing products and services under contracts and subcontracts with the Federal government. I am a member of the American Institute of Certified Public Accountants (AICPA) as well as the Virginia Society of Certified Public Accountants (VSCPA). I am also a member of the American Bar Association Public Contract Law Section and other groups directly associated with government contracting requirements.

I began my career as an auditor for the Defense Contract Audit Agency (DCAA) as a field auditor in the northern Virginia area. As a DCAA auditor, I was introduced to the rules, regulations and standards associated with federal contracts and subcontracts. I performed comprehensive cost analysis and compliance reviews of the books and records of contractors providing a wide array of products and services to the Department of Defense.

After DCAA, I went to work for a CPA firm to help companies understand complex rules and regulations, including the Federal Acquisition Regulation (FAR), the Defense FAR Supplement (DFARS) and the Cost Accounting Standards (CAS). Since that time, I have consulted for companies new to government contracts and those that have been in the market for many decades. I worked for KBR in various capacities from 2003 through 2010. My responsibilities at KBR required me to visit contract sites, including numerous trips to Iraq and Afghanistan.

Over my 34-year career, I have been recognized as an expert in government contracting by federal judicial entities including US District Courts, the Armed Service Board of Contract Appeals (ASBCA), and the Civilian Board of Contract Appeals (CBCA). Several of my prior expert opinions included conducting numerical analyses from datasets.

Each year, I spend a significant amount of time training individuals from the government and private industry on the requirements of federal contracting. Many of these courses are taught through the Public Contracting Institute in coordination with George Mason University. I began teaching federal procurement topics very early in my career through The George Washington University and the Educational Services Institute. I also lead training through the AICPA, VSCPA and other training forums on topics associated with cost accounting and federal procurement requirements.

At DHG, in addition to leading the Government Contracting Advisory Practice, I am responsible for monthly webinars and a subscription based periodic newsletter titled the DHG GovCon Report.

**Compensation and Appendices**

My compensation rate for the analysis that follows was $675 per hour and my testimony is currently compensated at $775 per hour. I was assisted in preparing the opinions in this report by Mr. Rocky Williams-McClure, a manager at my firm specializing in forensics. Mr. Williams-McClure is compensated $290 per hour.

Appendix A to this report lists the data and other information I considered in forming my opinions.

Appendix B contains my resume and a list of prior expert engagements from the last five years.

**Scope of Assignment and Summary of Opinions**

I was asked by Counsel for KBR to conduct an analysis of Maximo data in order to assess KBR's cross-leveling activity in Iraq and Afghanistan under the LOGCAP III contract between 2007 and 2011. My analysis began by designing a set of database queries to extract relevant data from Maximo. I then applied a series of additional filters to isolate only intra-theater cross-level transactions for both assets and materials. I then tabulated the results. Section I of this report describes my analysis.

In summary, my analysis shows that KBR executed approximately 871,000 cross-level transactions involving assets and approximately 1.2 billion cross-level transactions involving materials in Iraq and Afghanistan during the relevant time period, as shown in Figure 1 and Figure 2, below.

I estimate that for the transactions described above, the cumulative value of the assets and material items that KBR cross-leveled was approximately $3.7 billion and $1.2 billion, respectively, as shown in Figure 3 and Figure 4.

In addition, I performed a related analysis evaluating materials transactions originating at the site IRQ-F2, located near the Baghdad airport, which I understand served as a regional hub storeroom. Specifically, I found that a significant number of materials cross-level transactions involved items being sent from IRQ-F2 to other nearby sites within the same security perimeter as IRQ-F2. I have generated a separate estimate of KBR's materials cross-leveling activity that conservatively <u>excludes</u> those transactions.

2



**Figure 1: Asset and Materials Cross-Leveling by Year**

| Year | Number of Asset Cross-Level Transactions | Number of Materials Cross-Level Transactions | Total Number of Cross-Level Transactions |
|---|---|---|---|
| **2007** | 105,009 | 35,305 | 140,314 |
| **2008** | 164,519 | 282,063 | 446,582 |
| **2009** | 194,062 | 423,815 | 617,877 |
| **2010** | 275,991 | 326,720 | 602,711 |
| **2011** | 130,041 | 197,745 | 327,786 |
| **Grand Total** | **869,622** | **1,265,648** | **2,135,270** |

**Figure 2: Number of Cross-Level Transactions by Year - Cumulative**



**Figure 3: Value of Items Cross-Leveled by Year**

| Year | Value of Assets Cross-Leveled | Value of Materials Cross-Leveled | Total Value |
|---|---|---|---|
| **2007** | $ 619,797,429 | $ 6,008,977 | $ 625,806,406 |
| **2008** | 902,342,600 | 175,974,924 | 1,078,317,524 |
| **2009** | 628,750,108 | 306,801,776 | 935,551,884 |
| **2010** | 971,405,452 | 479,690,137 | 1,451,095,590 |
| **2011** | 550,469,751 | 267,592,173 | 818,061,924 |
| **Grand Total** | **$ 3,672,765,341** | **$ 1,236,067,987** | **$ 4,908,833,328** |

DHG | government contracting

3

**Figure 4: Total Value of Items Cross-Leveled by Year, Cumulative**



I was also asked to review the work of Relators' expert, Dr. Gary Gaukler, and to compare the results of his "overordering" analysis with additional information in Maximo that provides context for KBR's overall purchasing activity in theater on LOGCAP III during the relevant period. Section II of this report summarizes that effort.

Although, based on my personal experience and review of evidence in this case, I do not personally accept the validity and premise of Dr. Gaukler's methodology and results, I was asked for purposes of my contextual analysis to accept at face value the output of his "overordering" model. His alleged "overorder" costs make up only 15.5% of the in-scope purchase order line dollars for materials. In other words, Dr. Gaukler does not challenge 84.5% of KBR's materials purchases on LOGCAP III.

Furthermore, the comparison of Dr. Gaukler's "overordering" estimates with my cross-leveling analysis suggests that KBR's cross-leveling activity was increasing at the same time that overall purchasing activity and Dr. Gaukler's alleged "overordering" were decreasing.

The overall trend is consistent with KBR's consumption of existing materials inventory, including through cross-leveling, as KBR wound down its activities in the LOGCAP III war theater.



**Section I – Maximo Cross Leveling Analysis**

<u>Background</u>

A cross-level is a transaction where an existing asset or material item already in inventory is transferred or moved from one site to another site to fulfill a need at the receiving site. This analysis documents my understanding of a series of cross-leveling reports exported from the KBR Maximo database.[1]

Maximo is an enterprise database software system that KBR used, in part, to track government-owned assets in its possession, as well as its materials inventory. I am personally familiar with Maximo from my time as a KBR employee. I understand that some of the data within Maximo was manually entered by KBR employees at numerous stages of the procurement and inventory management processes, at various sites and storerooms throughout the LOGCAP III theater of operations. My analyses that follow assume the accuracy of the data within Maximo generally, though I understand there is the possibility of human error that could affect any particular transaction included in my analyses.

In order to gain a better understanding of Maximo data, I met with KBR employee Mike Ramirez. Mr. Ramirez has held several roles in connection with Maximo including IT Process Analyst, Business Segment Manager and Material Control Specialist. My meetings with Mr. Ramirez lasted about 6 hours combined. After those meetings, I designed four queries with Mr. Ramirez's aid to pull data from Maximo regarding assets and materials transactions.

An "asset" is an item specifically identified with a government property tag and tracked individually within Maximo.[2] Generally, assets are durable, high dollar-value items.  Some typical assets include trucks, tractors, forklifts, generators, bullet proof vests, microwaves, televisions, telephones, welding equipment, air conditioners and refrigerators.

"Material" is generally a purchased item of supply that is consumed in the course of completing a work order, necessary to perform general maintenance of facilities and equipment, or a low-value commodity otherwise needed to support the military at a base in theater.  Individual Material items, unlike assets, are not given unique identifiers within Maximo. Examples of material items include construction materials such as nails, lumber, electrical wire, drywall, and plumbing supplies.  Day to day supplies such as toilet paper, soap, linens and office supplies are also identified as material items.

Due to these fundamental differences, assets and materials were tracked separately within Maximo.

---

[1] KBR-HOW-1288624

[2] Within Maximo, an asset is given a unique identifier indicated in the field *ASSETID*. I am aware from reviewing the data there are instances where what appear to be assets (*e.g.*, generators) were included in the Maximo tables associated with materials, including **MATUSETRANS**.  I also am aware there are instances of what appear to be materials, e.g. oil filters, included in the Maximo tables associated with assets, including **ASSETTRANS**.



Maximo Reports Generated

The goal of my analysis was to estimate actual cross-leveling KBR performed for both assets and materials in the relevant timeframe, in terms of number of transactions and monetary value.

Maximo version 5.2 was initially rolled out on the LOGCAP III program in 2007. On October 29, 2009, KBR upgraded to Maximo version 7.1. I refer to this transition throughout my report as the "cutover". During the cutover, KBR changed some of its processes and used new fields for tracking locations and transfers between sites.[3] Accordingly, to capture asset cross-levels, I needed to create two separate queries:

- Query A1 generates detailed information on assets cross-leveled before November 1, 2009.
- Query A2 generates detailed information on assets cross-leveled after November 1, 2009

My methodology for capturing materials cross-levels in Maximo was not affected by the cutover. However, I still needed to create two separate (though nearly-identical) queries with different date criteria because Microsoft Excel limits spreadsheets to just over a million rows and there were approximately 1.4 million relevant materials transactions:

- Query B1 generates detailed information on materials cross-leveled from 2006 to 2009.
- Query B2 generates detailed information on materials cross-leveled from 2010 to 2012.

I have included a copy of each query with my report, in text format.

My team consolidated the data contained within the material reports generated by queries B1 and B2 within RapidMiner, a data science platform, for ease of review and analysis.

The data generated by Queries A1, A2, B1, and B2 contain sufficient information to identify intra-theater cross-levels, including:

- a unique identifier for the transaction,
- the date of the cross-level,
- the originating site of the asset or material item cross-leveled,
- the receiving site of the asset or material item cross-leveled,
- the value of the cross-leveled asset or material item, and
- a description of the item cross-leveled.[4]

My team and I evaluated the data exported as a result of running each query for both accuracy and completeness.

As part of my analysis, I also asked for and received reports indicating:

> (a) for each unique LOGCAP III site, the corresponding value in the *DESCRIPTION* field from the **SITE** table, and

---

[3] The fields impacted by the Maximo cutover are discussed in Appendix C.
[4] A detailed explanation of the fields leveraged in my analysis is included in Appendix C.

DHG | government contracting

(b) for each unique LOGCAP III storeroom or location, the corresponding value in the *DESCRIPTION* field from the **LOCATIONS** table.

Before performing additional filtering, I merged the *DESCRIPTION* information into the data generated by the queries described above. As a result, when evaluating intra-theater cross-leveling, I could see, e.g., that site AFG-2 had the *DESCRIPTION* Bagram and the storeroom LC-AFG-BAF-0001 had the *DESCRIPTION* Bagram Materials Warehouse.[5]

As described in more detail below, my analysis of the data involved filtering out transactions unlikely to be intra-theater cross-levels, then calculating the total number of and value of the remaining transactions.

In the analysis that follows, where I reference asset values, those amounts are taken from the field *PURCHASEPRICE*.

<u>Asset Cross-Levels Before Cutover (October 29, 2009)</u>

As described in more detail in Appendix C, to filter out transactions where assets were not moved outside of their original locations, Query A1 requires that the fields *FROMLOC* and *TOLOC* for a given transaction do not match.[6]  Thus, each line within the data generated from Query A1 represents the transfer of a government tagged asset from one location to a different location within the Maximo system prior to the cutover.

To isolate intra-theater cross-levels only, I also filtered out transactions that did not involve a LC III facility within Iraq or Afghanistan.[7]  Specifically, I filtered out transactions containing prefixes <u>other than</u> IRQ (Iraq), USMI (United States Mission in Iraq) or AFG (Afghanistan) in the *FROMLOC* or *TOLOC* fields.[8]

I also removed 3,431 asset transactions from 2006.

My analysis of the remaining transactions, which I have provided in the file "Asset Cross-Levels Before Cutover.csv," demonstrates that KBR cross-leveled 433,739 assets within Iraq and Afghanistan with a total value of $2,058,986,705 prior to the Cutover.

In other words, $2,058,986,705 represents the amount the government would have had to spend on new purchases had KBR not cross-leveled existing assets.

For example, the transaction at *ASSETTRANSID* 5282399 represents the cross-leveling of a reverse-osmosis water purification unit (ROWPU) from Site T5 to Site T1 on May 7, 2009.  KBR purchased this specific ROWPU for $574,000.  Thus, had KBR not cross-leveled this asset, I

---

[5] Because the values in the *DESCRIPTION* fields were pulled from Maximo after completion of KBR's performance on LOGCAP III, many sites and locations have descriptions marked as "Inactive" or "Decommissioned."  My understanding from Mr. Ramirez, however, is that such designations signify only that a site or location was <u>eventually</u> removed as an active site in Maximo, not that the site or location was inactive at the time of the cross-level transaction at issue.

[6] Within the data generated by Query A1, I understand *FROMLOC* indicates the location an asset was transferred from and *TOLOC* indicates the location an asset was transferred to.

[7] The data received included transactions involving sites outside of Afghanistan and Iraq, such as sites in Kuwait and Dubai, which I excluded to limit my analysis to only cross-levels KBR executed within the war theater.

[8]  I also filtered out transactions involving USMI-KWI, which I understand is a location in Kuwait.

DHG | government contracting

assume that KBR would have had to purchase a new ROWPU at the receiving site. Accordingly, in this sample transaction, KBR saved $574,000 through this cross-level.

| TRANSDATE | FROMLOC | TOLOC | DESCRIPTION | PURCHASEPRICE | ASSETTRANSID |
|---|---|---|---|---|---|
| 5/7/2009 | ME-IRQ-T5 | ME-IRQ-T1 | ROWPU | 574000 | 5282399 |

As shown below, this asset was subsequently cross-leveled from Site T1 to Site F2, once again saving the government the cost of purchasing another ROWPU required at the receiving site.

| TRANSDATE | FROMLOC | TOLOC | DESCRIPTION | PURCHASEPRICE | ASSETTRANSID |
|---|---|---|---|---|---|
| 7/24/2009 | ME-IRQ-T1 | ME-IRQ-F23C | ROWPU | 574000 | 5638028 |

In this example, therefore, due to cross-leveling of this ROWPU, KBR saved a total of $1,148,000. My analysis followed this same methodology for all assets, several of which were cross-leveled multiple times. I was able to identify particular assets through their *ASSETID* and therefore track each time an asset was cross-leveled.

Figure 5 summarizes the number of asset cross-level transactions pre-cutover and the corresponding value of those cross-leveled assets.

**Figure 5: Asset Cross-Leveling by Year, Pre-Cutover**

| Years | Number of Asset Cross-Level Transactions | Value of Assets Cross-Leveled |
|---|---|---|
| 2007 | 107,611 | $ 619,797,429 |
| 2008 | 170,304 | 902,342,600 |
| 2009 | 166,512 | 536,846,676 |
| **Grand Total** | **444,427** | **$2,058,986,705** |

Asset Cross-Levels After Cutover (October 29, 2009)

As described in more detail in Appendix C, to filter out transactions where assets were not moved outside of their original locations, Query A2 requires that the fields *SITEID* and *TOSITEID* for a given transaction do not match.[9] I otherwise followed the same filtering methodology as described above for the pre-cutover asset cross-levels. In addition, I filtered out 1,219 transactions from 2012 and 2013.

My analysis of the remaining transactions, which I have provided in the file "Asset Cross-Levels After Cutover.csv," demonstrates that KBR cross-leveled 435,883 assets within Iraq and Afghanistan with a total value of $1,613,778,635 after the cutover.

In other words, $1,613,778,635 represents the amount the government would have had to spend on new purchases had KBR not cross-leveled existing assets.

---

[9] Within the data generated by Query A2, I understand *SITEID* indicates the location an asset was transferred from and *TOSITEID* indicates the location an asset was transferred to.



The table in Figure 6 summarizes the number of asset cross-level transactions post-cutover and the corresponding value of those cross-leveled assets.

**Figure 6: Asset Cross-Leveling by Year, Post-Cutover**

| Year | Number of Asset Cross-Level Transactions | Value of Assets Cross-Leveled |
|------|-----------------------------------------|-------------------------------|
| 2009 | 29,851 | $ 91,903,432 |
| 2010 | 275,991 | 971,405,452 |
| 2011 | 130,041 | 550,469,751 |
| **Grand Total** | **435,883** | **$ 1,613,778,635** |

Combined Asset Cross-Levels

The below table and graphs summarize the number of asset cross-level transactions and the corresponding value of those cross-leveled assets, both pre- and post-cutover.

**Figure 7: Asset Cross-Leveling by Year, Pre- and Post-Cutover**

| Year | Number of Asset Cross-Level Transactions | Value of Assets Cross-Leveled |
|------|-----------------------------------------|-------------------------------|
| **2007** | 107,611 | $ 619,797,429.46 |
| **2008** | 170,304 | 902,342,600 |
| **2009** | 196,363 | 628,750,108 |
| **2010** | 275,991 | 971,405,452 |
| **2011** | 130,041 | 550,469,751 |
| **Grand Total** | **880,310** | **$ 3,672,765,341** |

DHG | government contracting

9



Figure 8: Number of Asset Cross-Level Transactions by Year



Figure 9: Total Value of Assets Cross-Leveled by Year

## Material Cross-Levels

The Materials data generated by Queries B1 and B2 contain the field *ISSUETYPE*, which is populated with two primary values: Issues and Returns.[10]  Based on my review of Maximo training materials and my conversations with Mr. Ramirez, I understand Issues represent transactions in which material items would be removed from inventory and put to use in connection with a work order being performed, either at the site where the item had been stored, or at a different site somewhere else on LOGCAP III.  (The latter circumstance would be a cross-level.)  A Return represents a transaction where material items were intended to be used on a work order but were returned to the original location.

---

[10] The *ISSUETYPE* field also contains a third value: Transfers. Because the number of transfer transactions is de minimis I chose not to consider them in my analysis.

10

DHG | government contracting

To eliminate transactions where materials were not moved outside their original locations, both Materials queries include a limitation that requires the *SITEID* and *WO_SITEID* fields to not match.[11]

After receiving the Materials data, to isolate "in-scope" cross-level Issues and Returns, I first filtered all transactions where either the *SITEID* field or the *WO_SITEID* field indicated that the transaction involved a site located outside of theater–*i.e.*, outside of Iraq or Afghanistan.[12] The resulting Issues transactions are all assumed to constitute intra-theater cross-levels, whereas the Returns transactions required further filtering, as described below.

In the analysis that follows, where I reference the value of cross-leveled materials, those amounts are taken from the field *LINECOST*. In addition, I understand that in the Materials data, the values in the field *QUANTITY* represent the number of individual material items sent from one location to another location. For example, a hypothetical cross-level of 4 sheets of plywood captured by my analysis would constitute a single transaction with a *QUANTITY* of four.

<u>Material Issues</u>

After applying the filters noted above, I have determined that the remaining Issue transactions all represent intra-theater material cross-levels, as summarized in the below Figures. In addition to my report, I have provided a spreadsheet containing the relevant data for each transaction, titled "Materials Cross-Levels – Issues.csv."[13]

### Figure 10: Materials Cross-Leveling by Year – Issues Only

| Year | Number of Materials Cross-Level Transactions | *QUANTITY* of Materials Cross-Leveled | Value of Materials Cross-Leveled |
|---|---|---|---|
| 2007 | 35,305 | 230,532 | $ 6,008,977 |
| 2008 | 279,291 | 7,591,634 | 170,333,503 |
| 2009 | 413,761 | 11,985,875 | 285,931,611 |
| 2010 | 320,099 | 17,314,581 | 470,337,060 |
| 2011 | 191,497 | 13,274,892 | 259,802,060 |
| **Grand Total** | **1,239,953** | **50,397,513** | **$ 1,192,413,211** |

---

[11] Within the data generated by Queries B1 and B2, I understand *SITEID* indicates the site material items were transferred from, and *WO_SITEID* indicates the site where the Work Order requiring material items was performed–in other words, the site material items were transferred to.

[12] Specifically, I filtered out transactions containing prefixes *other than* IRQ (Iraq), USMI (United States Mission in Iraq) or AFG (Afghanistan) in the *SITEID* or *WO_SITEID* fields. I also filtered out transactions involving USMI-KWI, which I understand is a location in Kuwait.

[13] The total number of rows in "Materials Cross-Levels – Issues.csv" exceeds the maximum limit permitted by Microsoft Excel. Thus, to view the entire dataset, an alternative software program would need to be leveraged.



DHG | government contracting

**Figure 11: Number of Materials Cross-Leveled Transactions by Year - Issues Only**



**Figure 12: *QUANTITY* of Materials Cross-Leveled by Year – Issues Only**



DHG | government contracting



Figure 13: Value of Materials Cross-Leveled by Year – Issues Only

## Material Returns

To isolate Returns likely to have been cross-levels, I further filtered the data to include only transactions where the *MEMO* field contained text denoting that a cross-level had taken place. Based on my discussions with Mr. Ramirez, I understand that within the relevant table in Maximo, **MATUSETRANS**, the *MEMO* field for most transactions includes a manually-entered note describing the purpose of the transaction. I included in my analysis all Return transactions where (at least) one of the following terms appeared in the *MEMO* field: "x level", "cross-level", "x lvl", "xlvl", "crosslevel","x-lvl", "x-level", and "xl". I decided on the aforementioned terms after inspecting the *MEMO* field manually and with insight gained from my discussions with Mr. Ramirez.

The below table summarizes the Material Return Transactions likely to have been intra-theater cross-levels, a list of which I have provided in a report titled "Materials Cross-Levels – Returns.csv."

Figure 14: Materials Cross-Leveling by Year - Returns Only

| Year | Number of Materials Cross-Level Transactions | *QUANTITY* of Materials Cross-Leveled | Value of Materials Cross-Leveled |
|---|---|---|---|
| 2008 | 2,772 | 203,566 | $  5,641,421 |
| 2009 | 10,054 | 905,307 | 20,870,165 |
| 2010 | 6,621 | 607,462 | 9,353,077 |
| 2011 | 6,248 | 620,712 | 7,790,113 |
| **Grand Total** | **25,695** | **2,337,047** | **$  43,654,776** |

13

DHG | government contracting

**Figure 15: Number of Materials Cross-Level Transactions by Year – Returns Only**



**Figure 16:** *QUANTITY* **of Materials Cross-Leveled by Year – Returns Only**



DHG | government contracting

Figure 17: Value of Materials Cross-Leveled by Year – Returns Only



Materials Cross-Levels: Combined Issues and Returns

The below table and graphs represent all Materials cross-level transactions during the relevant period, combining both Issues and Returns.

Figure 18: Material Cross-Leveling by Year – Combined Issues and Returns

| Year | Number of Materials Cross-Level Transactions | *QUANTITY* of Materials Cross-Leveled | Value of Materials Cross-Leveled |
|---|---|---|---|
| 2007 | 35,305 | 230,532 | $ 6,008,977 |
| 2008 | 282,063 | 7,795,199 | 175,974,924 |
| 2009 | 423,815 | 12,891,182 | 306,801,776 |
| 2010 | 326,720 | 17,922,043 | 479,690,137 |
| 2011 | 197,745 | 13,895,604 | 267,592,173 |
| **Grand Total** | **1,265,648** | **52,734,560** | **$ 1,236,067,987** |

15

DHG | government contracting

Figure 19: Number of Materials Cross-Level Transactions by Year
– Combined Issues and Returns



Figure 20: *QUANTITY* of Materials Cross-Leveled by Year – Combined Issues and Returns



**DHG** | government contracting

**Figure 21: Value of Materials Cross-Leveled by Year – Combined Issues and Returns**



## Materials Cross-Levels Analysis – Site IRQ-F2

Site IRQ-F2 was located in Baghdad, Iraq at the Victory Base Complex, along with other LCIII sites. Based on my personal experience working there, my conversations with Mr. Ramirez and my review of documents, I understand that Site IRQ-F2 was a stand-alone site supporting military activity under LOGCAP III, but also functioned as a Regional Receiving Storeroom or hub, due to its central location at the Baghdad airport formerly known as Saddam International.

During my analysis, I noticed that a significant number of Materials cross-level transactions were performed where IRQ-F2 was identified as the originating site in the *SITE_ID* field.[14] To further assess those transactions, I analyzed the corresponding receiving sites, utilizing the field *WO_SITEID*. As a result, I found a high volume of cross-level transactions from IRQ-F2 to other sites in close proximity at the Victory Base Complex ("inside the wire").[15]

In the below image, taken from Deposition Exhibit D-3, sites I considered "inside the wire" are included in the red circle. I know from personal experience that to travel from the sites inside the red circle to other LOGCAP III locations in Baghdad required significant security measures including, *e.g.*, coordination with force protection. Accordingly, I assume the possibility that IRQ-F2 was used as a distribution hub to support the sites "inside the wire" but given the security constraints this site was not used to support sites "outside the wire." In other words, transfers of materials from IRQ-F2 to sites outside the red circle should be viewed as ordinary cross-levels.

---

[14] I did not see a similar pattern in the Asset cross-level transactions.
[15] Sites I identified as Inside the Wire include: F1, F2IZ, F23A, F23B, F23C, F2PK, F2WW, F3, D5, D5A, D5C, and D9.

**DHG** | government contracting



Because of the possibility that sites in the immediate vicinity were using IRQ-F2 as a central storeroom to support their work orders, and in the interest of being conservative, I performed a second analysis that excludes materials transactions where items originated at IRQ-F2 and were sent to other sites "inside the wire" from my overall estimate of materials cross-leveling.

Below is the summary of my analysis:

- Out of the 671,277 materials cross-level transactions originating at IRQ-F2, 607,929 were sent to other sites "inside the wire" (*i.e.*, inside the red circle), or 90.6%.

- If I were to exclude those "inside the wire" transactions, there would remain 657,719 total materials cross-levels, with a total value of $705,026,136. Of that sum, there are still a total of 63,370 cross-level transactions originating at IRQ-F2 (*i.e.*, where the receiving site was <u>outside</u> the red circle), with a total value of $93,187,632.

This conservative estimate almost certainly eliminates a number of legitimate material cross-level transactions.

18



**Figure 22: Materials Cross-Leveling Less F2 " Inside The Wire" Transactions – Combined Issues and Returns**

| Year | Number of Materials Cross-Level Transactions | *QUANTITY* of Materials Cross-Leveled | Value of Materials Cross-Leveled |
|---|---|---|---|
| 2007 | 25,260 | 196,403 | $ 4,100,943 |
| 2008 | 157,198 | 6,178,243 | 145,565,326 |
| 2009 | 245,956 | 8,311,054 | 220,727,541 |
| 2010 | 158,528 | 7,927,681 | 238,467,568 |
| 2011 | 70,777 | 5,906,950 | 96,164,757 |
| **Grand Total** | **657,719** | **28,520,331** | **$ 705,026,136** |

**Figure 23: Total Materials Cross-Leveling v. Materials Cross-Leveling Less F2 "Inside the Wire" – Combined Issues and Returns Transactions**



DHG | government contracting

**Figure 24: Total Materials Cross-Leveling v. Materials Cross-Leveling Less F2 "Inside the Wire" – Combined Issues and Returns** *QUANTITY*



**Figure 25: Total Materials Cross-Leveling v. Materials Cross-Leveling Less F2 "Inside the Wire" – Combined Issues and Returns Value**



DHG | government contracting

**Section II - POLINE Analysis**

As discussed above, KBR counsel asked me to review the analysis of Dr. Gary Gaukler, who drafted an expert report on behalf of Relators purporting to estimate the dollar value of items KBR allegedly "overordered" during the relevant period in this case.  Based on my own experience and review of evidence in this case, I do not personally believe there was "overordering nor do I accept the premise of Dr. Gaukler's analysis; however, for the purposes of my analysis that follows, I have been asked to accept Dr. Gaukler's methodology and results at face value.

I reviewed Dr. Gaukler's overordering output file (OOC_Relators.txt) and compared it to the information contained in the Maximo table POLINE, which I have been provided a copy of.  My analysis calculated the percentage of Dr. Gaukler's alleged overorder costs as a share of total purchase order costs as reflected in POLINE.  The purpose is to put Dr. Gaukler's alleged overorder costs into context.

In this analysis, I utilize the same assumptions as Dr. Gaukler:

- My "period of interest" is May 28, 2007 to December 31, 2011.

- For the purpose of analyzing POLINE data, I exclude POLINEIDs for locations outside of Afghanistan and Iraq.  Locations in Afghanistan are identified by SITEIDs containing "AFG". Locations in Iraq are identified by SITEIDs that: either (i) equal "USMI-CEN" and (LOCATION is missing OR has 'IRQ' in it), or (ii) contain one of the following terms: 'IRQ', 'USMI-ALH', 'USMI-BAS', 'USMI-BSR', 'USMI-ERB', 'USMI-IRB', 'USMI-KIK', 'USMI-MOS', 'USMI-SAT', 'USM-SHD', 'USMI-UMQ'.

- The month and year are based on the ENTERDATE field in the "POLINE" table (Dr. Gaukler's primary "overordering" output file, "OOC_Relators.txt," does not contain field headings).

My analysis calculates Dr. Gaukler's alleged overorder costs as a share of total purchase order line dollars, as reflected in POLINE.  Specifically, Dr. Gaukler alleges $340,960,849.96 of overorders, whereas the summed *RECEIVEDTOTALCOST* of all in-scope purchase order lines (as described above) is $2.19B.  Thus, as shown in Figure 26 and Figure 27, Dr. Gaukler's alleged overorder costs make up only 15.5% of the in-scope purchase order line dollars.

Again, for the purpose of this analysis, I have been asked to accept Dr. Gaukler's report on its face, but I do not concede its accuracy, reliability or relevance.  However, even accepting the accuracy and validity of his model, it still does not challenge 84.5% of KBR's materials purchases on LOGCAP III, by dollar amount, in the relevant period.

Further, by comparing the cross-level analysis I have performed against the POLINE data and Dr. Gaukler's model output, I have been able to identify several trends relevant to this case.  For ease of description, I have included several charts that I describe separately below:



DHG | government contracting

**Figure 26: Total Monthly In-Scope Purchase Order Dollars[16] v.
Dr. Gaukler's Alleged 'Overorder' Costs[17]**



As already noted, Dr. Gaukler's model does not question the vast majority of KBR's purchases over the entire relevant period. In addition, the graph indicates that the alleged overordering decreases significantly – and flattens out beginning in May 2009. From there forward, except for a couple of isolated peaks, the trend for alleged overorders approaches close to zero in July 2010 and remains there through the rest of the relevant period.

The chart also shows that KBR's purchasing activity peaked in late 2007 and trended downward thereafter, essentially flattening out in mid-2010.

The data alone indicate a decrease in KBR's purchasing activity in the relevant period and a sharper associated decrease of alleged "overorders."

I then overlaid the results of my cross-leveling analysis to determine whether KBR's cross-leveling activity was increasing at the same time that its overall purchasing activity and Dr. Gaukler's "overorders" were decreasing. Figure 27 below adds the more conservative of my two cross-leveling analyses which excludes the IRQ-F2 "inside the wire" transactions.

---

[16] In-Scope Purchase Order Dollars taken from *RECEIVEDTOTALCOST* within **POLINE** table.
[17] Gaukler Report ¶149

**DHG** government contracting

**Figure 27 - Total Monthly In-Scope Purchase Order Dollars v.**
**Dr. Gaukler's Alleged 'Overorder' Costs v.**
**Value of Materials KBR Cross-Leveled Less IRQ-F2 "Inside the Wire" Transactions**



Figure 27 demonstrates that KBR's cross-levels began to exceed Dr. Gaukler's alleged overorders in mid-2008 and, as "overorders" decreased and then flattened out, KBR's cross-levels increased. Further, KBR's cross-levels began to exceed purchasing in early 2010. These trends are consistent with continuous improvement of KBR's cross-leveling performance associated with a corresponding decrease in purchasing. Moreover, these trends are consistent with KBR's consumption of existing inventory, including through cross-leveling, as KBR approached the end of its active performance in Iraq and Afghanistan on LOGCAP III.

Bill Walter, CPA
April 22, 2022

23

**DHG** | government contracting

**Appendix A**

**Materials Considered**

<u>Motions & Pleadings</u>
- Complaint (ECF #1 - March 24, 2011)
- Complaint Exhibits 3, 16, 19, 25, 28, 30
- ECF #211-4 (Reply Memorandum in Support of Defendant's Motion to Dismiss Complaint for Lack of Subject Matter Jurisdiction, Exhibit 50)

<u>Deposition Transcripts & Exhibits</u>
- James Haught Deposition Transcript (Feb. 11, 2020)
- Lynellen Sullivan Deposition Transcript (Feb. 12, 2021)
- Jeffrey Rock Deposition Transcript (Dec. 4, 2020)
- Elias Faris Deposition Transcript (Feb. 13, 2020)
- Larry Lust Deposition Transcript (Feb. 12, 2020)
- Richard Kaye Deposition Transcript (Mar. 9, 2021)
- Tyus Hippert Deposition Transcript (Sept. 17, 2020)
- Maria McNamara Deposition Transcript (Nov. 13, 2019)
- Mark Brannen Deposition Transcript (Nov. 20, 2020)
- Col. Gust Pagonis Deposition Transcript (July 27, 2021)
- Kevin Larkin Deposition Transcript (Nov. 5, 2020)
- Trina Hays Deposition Transcript (Jan. 29, 2021)
- Conor O'Muirgheasa Deposition Transcript (Dec. 17, 2020)
- Michael Ramirez 30(b)(6) Deposition Transcript (Sept. 22, 2021)
- Deposition Exhibits D-3, 101, 102, 103, 104, 105, 107, 108, 109, 110, 111, 112, 113, 114, 116, 121, 168, 229, 240, 242, 488, 555, 592

<u>Maximo Database & Training Materials</u>

- KBR-HOW-1288624
- KBR-HOW-3952570
- KBR-HOW-3952761
- KBR-HOW-3982651
- KBR-HOW-9154504
- KBR-HOW-9156498
- KBR-HOW-6073009
- KBR-HOW-0984329
- KBR-HOW-3984477
- KBR-HOW-3616082
- KBR-HOW-4018255

Award Fee Letters

- KBR-HOW-0047108
- KBR-HOW-0047544
- KBR-HOW-3060666
- KBR-HOW-7772515
- KBR-HOW-0050001
- KBR-HOW-0050433
- KBR-HOW-0051618
- KBR-HOW-0051603
- KBR-HOW-0051607
- KBR-HOW-0051612
- KBR-HOW-0051935
- KBR-HOW-0051938
- KBR-HOW-0052315
- KBR-HOW-0052554
- KBR-HOW-2989804
- KBR-HOW-9059810
- KBR-HOW-2983058

Other Bates-Stamped Documents

- KBR-HOW-0050449
- KBR-HOW-0052719
- KBR-HOW-0240522
- KBR-HOW-0241140
- KBR-HOW-0277047
- KBR-HOW-0310069
- KBR-HOW-0326836
- KBR-HOW-0407474
- KBR-HOW-0507485
- KBR-HOW-0567450
- KBR-HOW-0575124
- KBR-HOW-0577057
- KBR-HOW-0705782
- KBR-HOW-0706345
- KBR-HOW-0709203
- KBR-HOW-0796524
- KBR-HOW-0806147
- KBR-HOW-0812798
- KBR-HOW-0821176
- KBR-HOW-0836108
- KBR-HOW-0837010
- KBR-HOW-0837014
- KBR-HOW-0907110

- KBR-HOW-0911195
- KBR-HOW-0925931
- KBR-HOW-0982043
- KBR-HOW-0993925
- KBR-HOW-0993926
- KBR-HOW-0994722
- KBR-HOW-1114406
- KBR-HOW-1133395
- KBR-HOW-1173560
- KBR-HOW-1195004
- KBR-HOW-1216600
- KBR-HOW-1308440
- KBR-HOW-1313018
- KBR-HOW-1313136
- KBR-HOW-1313218
- KBR-HOW-1313339
- KBR-HOW-1313776
- KBR-HOW-1314067
- KBR-HOW-1327793
- KBR-HOW-1329009
- KBR-HOW-1329112
- KBR-HOW-1343460
- KBR-HOW-1343463
- KBR-HOW-1355448
- KBR-HOW-1394707
- KBR-HOW-1416843
- KBR-HOW-1427133
- KBR-HOW-1456969
- KBR-HOW-1492529
- KBR-HOW-1572039
- KBR-HOW-1575100
- KBR-HOW-1576727
- KBR-HOW-1803862
- KBR-HOW-1826337
- KBR-HOW-1865398
- KBR-HOW-1870081
- KBR-HOW-2065021
- KBR-HOW-2065211
- KBR-HOW-2301140
- KBR-HOW-2313053
- KBR-HOW-2313170
- KBR-HOW-2313603
- KBR-HOW-2313651
- KBR-HOW-2377586
- KBR-HOW-2377617
- KBR-HOW-2687560

- KBR-HOW-2742136
- KBR-HOW-2838880
- KBR-HOW-2876223
- KBR-HOW-2877710
- KBR-HOW-3097672
- KBR-HOW-3098542
- KBR-HOW-3131302
- KBR-HOW-3266123
- KBR-HOW-3356816
- KBR-HOW-3374744
- KBR-HOW-3399169
- KBR-HOW-3410334
- KBR-HOW-3411505
- KBR-HOW-3414668
- KBR-HOW-3455204
- KBR-HOW-3491547
- KBR-HOW-3491549
- KBR-HOW-3510570
- KBR-HOW-3590110
- KBR-HOW-3590818
- KBR-HOW-3591601
- KBR-HOW-3592391
- KBR-HOW-3622331
- KBR-HOW-3642270
- KBR-HOW-3794852
- KBR-HOW-3807238
- KBR-HOW-3807239
- KBR-HOW-3814185
- KBR-HOW-3854208
- KBR-HOW-3861812
- KBR-HOW-3875146
- KBR-HOW-3927051
- KBR-HOW-3951562
- KBR-HOW-3975547
- KBR-HOW-3979222
- KBR-HOW-3982552
- KBR-HOW-4013944
- KBR-HOW-4024072
- KBR-HOW-4056704
- KBR-HOW-4064277
- KBR-HOW-4200864
- KBR-HOW-4234293
- KBR-HOW-4325352
- KBR-HOW-4470262
- KBR-HOW-4677450
- KBR-HOW-4693805

- KBR-HOW-4767463
- KBR-HOW-4908889
- KBR-HOW-5223612
- KBR-HOW-5556248
- KBR-HOW-5971779
- KBR-HOW-5996182
- KBR-HOW-6353496
- KBR-HOW-6633267
- KBR-HOW-6856934
- KBR-HOW-7028585
- KBR-HOW-8086988
- KBR-HOW-8086990
- KBR-HOW-1329021
- KBR-HOW-8113887
- KBR-HOW-8122477
- KBR-HOW-8123221
- KBR-HOW-8561551
- KBR-HOW-8650572
- KBR-HOW-8650674
- KBR-HOW-9033840
- KBR-HOW-8602207
- KBR-HOW-3266123
- KBR-HOW-0806147
- KBR-HOW-0994722
- KBR-HOW-1576727
- KBR-HOW-0706345
- KBR-HOW-0955337
- KBR-HOW-0657233
- KBR-HOW-6627075
- KBR-HOW-3510570
- KBR-HOW-0001597
- KBR-HOW-0046157
- KBR-HOW-4763906
- KBR-HOW-1830914
- KBR-HOW-9022233
- KBR-HOW-3505735
- KBR-HOW-0934133
- KBR-HOW-4913071
- KBR-HOW-3097672
- KBR-HOW-5971778
- KBR-HOW-6091367
- KBR-HOW-3510570
- KBR-HOW-1327346
- DCAA-HOWARD-00015315
- DCAA-HOWARD-00016496
- DCAA-HOWARD-00019137

- DCAA-HOWARD-00019194
- DCMA-HOWARD-00279828
- DCMA-HOWARD-00064383
- DCMA-HOWARD-00008031
- DCMA-HOWARD-00008076
- DCMA-HOWARD-00010236
- DCMA-HOWARD-00010274
- DCMA-HOWARD-00010437
- DCMA-HOWARD-0010341
- DCMA-HOWARD-00117272
- DCMA-HOWARD-00148437
- DCMA-HOWARD-00279828
- DCMA-HOWARD-00294066
- RELATORS00004323
- RELATORS00013221
- RELATORS00058307

Expert Reports

- Expert Report of Michael Rudolph (February 25, 2022)
- Expert Report and Work Papers of Gary M. Gaukler, Ph.D. (March 1, 2022)



Appendix B

Dixon Hughes Goodman LLP
1410 Spring Hill Road, Suite 500
Tysons, VA 22102
**P** 703.970.0400
**F** 703.970.0401
**dhg.com**

### WILLIAM R. (BILL) WALTER

## PROFESSIONAL EXPERIENCE

**DHG, Managing Director, Government Contract Advisory Practice**          **2010-Present**

*Managing Director in charge of the Government Contract Consulting practice for the firm. Current activities involve the development of policies and procedures, training, defending audit allegations of noncompliance with rules and regulations and assisting companies with compliance with FAR and CAS requirements. Provide support on strategic issues such as indirect cost rates and providing a sounding board to support challenges faced in government contracting matters. Provides expert contract accounting support for litigation matters as an expert witness in state and federal courts including the Court of Claims and the Armed Services Board of Contract Appeals.*

**KBR, Inc. – Arlington, Virginia**

| | |
|---|---|
| **Senior Vice President, Government Compliance** | **2006 – 2010** |
| **Senior Vice President, Finance** | **2005 - 2006** |
| **Vice-President, Finance** | **2004 – 2005** |
| **Director, Government Compliance** | **2003 – 2004** |

*Over a seven-year period with KBR, led the Government Compliance program for the $7B Government & Infrastructure business group. Provided leadership and guidance to Project Managers and functional leadership across all Government programs to include procurement, project controls, accounting and IT for the division. Testified before Congress and the Wartime Commission on Contracting in Iraq and Afghanistan on contracting issues.*

**Government Contract Consulting, Northern Virginia**

| | |
|---|---|
| **Goodman & Company** | **2001 – 2003** |
| **T.A. Carlson & Company** | **1986 – 2001** |

*Provided advice and consulting services to companies regarding compliance with the unique requirements associated with contracting with the Federal Government. Businesses ranged in size from Fortune 100 to sole proprietors. Activities involved the development of policies and procedures, training, defending allegations of defective pricing and noncompliance with FAR and CAS requirements. Also provided cost accounting expertise in support of litigation matters from bid protests, prime and subcontractor disputes and False Claim Act allegations.*

**Defense Contract Audit Agency – Fairfax Branch Office, Virginia**

| | |
|---|---|
| **Auditor** | **1984 – 1986** |

*In a "mobile" office audited numerous companies in the Northern Virginia for all contract accounting needs from cost proposals, incurred cost audits, defective pricing reviews and system audits. While with DCAA provided training in the region on statistical sampling and EDP audit requirements. Took advantage of all training opportunities presented during tenure with the agency.*

DHG is registered in the U.S. Patent and Trademark office to Dixon Hughes Goodman LLP.



## EDUCATION & CREDENTIALS

**The Pennsylvania State University – University Park, PA**                    **1983**
  *Bachelor of Science, Accounting*

**Certified Public Accountant (CPA) – Commonwealth of Virginia - #10114**

**Government Contracts Programs - Faculty Member/Instructor/Advisor**

- The George Washington University/Educational Services Institute    1995 – 2003
- George Mason University/Public Contracting Institute                2010 - Present

## PROFESSIONAL ASSOCIATIONS

American Institute of CPAs - #01609306

American Bar Association, Public Contract Law Section - #01810089

Virginia Society of CPAs - #10114

Professional Services Council – #121076

National Defense Industrial Association, Contract Finance Committee - #1111514

National Contract Management Association - #674828

## PUBLICATIONS

2018 – Present, *DHG GovCon Report* and *DHG Govcon Digest*

2018 August, *DHG Advisory Bulletin,* Contracting Purchasing System Reviews: What are They and What's New?

2018 January, *DHG Advisory Bulletin,* When Uncle Sam Locks the Door and You Can't Get In - What to Do to Survive a Government Shutdown

2017, August, *DHG Advisory Bulletin,* SCA Contractors – DoL Updates Health & Welfare Fringe Benefits Rates

2017, April, *DHG Advisory Bulletin,* How will Defense Contracting Audit Reform Evolve?

## TRAINING/WEBINARS

2017 -Present, *DHG's Issues in Focus*

2017 – Present, *Government Contractor Update*, Virginia Society of CPAs

2018 – Present, *Master's Series in Government Contracting*, *Pricing Equitable Adjustments and Cost Accounting*, George Mason University

2021 – *CAS: The Series*,  Public Contracting Institute

2020 – Present – *Cost Accounting Deep Dive*, George Mason University

2020 - Present – *Pricing and Pricing Fundamentals*, George Mason University

2020 - Present – *DHG's CMMC Trailblazer Series*

2021 – *DFun with the DFARS*, Public Contracting Institute

**LISTING OF TRIAL TESTIMONY/DEPOSITIONS (Prior 5 Years)**

2016, Arbitration of DVK Inşaat Turizm Muhendislik Sanayi İç ve Dış Ticaret Anonim Şirketi vs. Arkel International, LLC, engaged by Mayer Brown at the American Arbitration Association, International Center for Dispute Resolution

2016, U.S.,ex rel. Thomas Warder, Gary Keyser, And Elizabeth Reeves Versus The Shaw Group, Inc., Fluor Enterprises, Inc., and CH2MHill, Inc.; engaged by Jones Walker, Civil Action: 09-4191-JCZ-DEK - US District Court for the Eastern District Of Louisiana, settled

2016, Fluor Federal Solutions, LLC. vs. PAE Applied Technologies LLC, engaged by Watt Tieder, Case No. 1:16-cv-215 AJT/JFA in the US District Court for the Eastern District of Virginia (Alexandria Division). Recognized as an expert by Judge Trenga on federal procurement contract cost accounting issues.

2016, Commercial Design Engineering, LTD v. Kirlin Builders, LLC, Civil Action No. 1:16-cv-02211, Engaged by Bradley Arant Boult & Cummings in The US District Court for the District of Colorado

2017, Kellogg Brown & Root Services vs. US, ASBCA 58161 57530, engaged by Vinson & Elkins.

2018, United States ex rel. Conyers v. Kellogg Brown & Root, Inc., No 12-4095 (C.D. Ill.), engaged by Arnold & Porter

2019, OMNISEC International Investigations, Inc et.al. v. Slavica Stone et.al., CL-2018-6368, engaged by GreenbergTraurig in Virginia, Fairfax County Circuit.

2019, Iron Bow Technologies v. Agile Defense, Inc. CL-2018-09119, engaged by Venable in Virginia, Fairfax County Circuit.

2019, Analytical Services, Inc. vs. Kord Technologies, et.al., Civil Action No. CV-2017-117-CMC, Engaged by Bradley

2019, BRC Uluslararasi Taahhut ve Ticaret AS vs. Montage, Inc., Case Number: 01-18-0004-1916 before the American Arbitration Association, Engaged by Bradley

2020, Transcore, LP v. Richmond Metropolitan Transportation Authority, engaged by Miles & Stockbridge in the US District Court for the Eastern District of Virginia, Richmond, Case No. 3:19-cv-820-REP2020,

2020, Moxie Holdings et.al. vs. PAE Holding Corporation et.al., Case No. CL-18-3721 in the Circuit Court of Arlington County, VA, Engaged by Holland & Knight, settled

2020, Old Dominion Electric Cooperative vs. White Oak Power Constructors, et al., Civil Action No. 3:17-cv-00355-JAG Before the United States District Court Eastern District of Virginia, Engaged by Miles & Stockbridge

2021, CoventBridge USA vs. NCI Information Systems, Inc. and AdvanceMed Corporation – American Arbitration Association Case Number 01-20-0014-9912, Engaged by David, Brody & Dondershine LLP

2021, USA ex rel. Robert Reddell and Robert Hendrix vs. Dyncorp International LLC and Damco USA, Inc, Civil Action No. 1:14-cv-0086-mac; US District Court for the Eastern District of Texas, Beaumont Division, Engaged by Blank Rome

2021, Satterfield & Pontikes Construction, Inc., ASBCA 59980, 62301, 62714, Engaged by Bradley

2021, CTA I, LLC v. Dept. of Veteran Affairs – ADR through CBCA 5826, 6861, 6897 and 7049, Engaged by Manfredonia Law Offices, LLC

2021, A. Harold & Associates vs. Solers Research Group, Inc. – Circuit Court of the Fourth Judicial Circuit, Duval County, Florida, Case No: 2020-VA-006375, Engaged by Taylor, Day, Grimm & Boyd

**LISTING OF BID PROTESTS (Access Granted to Protective Orders Unless Otherwise Noted)**

1995, Protest of McDonnell Douglas, B-259694 before the GAO, engaged by counsel for Intervenor Hughes, Morgan, Lewis & Bockius;

1996, Protest of Hughes, B-272418 before the GAO, engaged by counsel for protester Hughes, Holland & Knight;

Protest of World Wide Parking, DCCAB P-498 before the D.C Contract Appeals Board, settled, engaged by counsel for protester, Holland & Knight;

1998, Protest of Launch Support Company, L.L.C., Civil Action No. 1:98CV02145 RMU in the U.S. Court of Federal Claims, engaged by counsel for protester, Wiley Rein & Fielding;

1999, Protest of ITT Federal Services International Corp., B-283307, B-283307.2, engaged by counsel for Intervenor, Wiley Rein & Fielding;

Protest of ABC Company, B-283721 before the GAO, withdrawn, engaged by counsel for Intervenor, Wiley Rein & Fielding.

2002, Protest of WPI, B-288998.4 before the GAO, engaged by Wiley Rein & Fielding; for representation of Intervenor.

2011, Protest of ABC Corp., B-404591, engaged by counsel Wiley Rein LLP, for representation of Intervenor.

2011, Protest of Alliant Techsystems, Inc., B-405129 before the GAO, engaged by Meyer Brown, counsel for representation of Intervenor.

2016, Protest of Sotera Defense Solutions, Inc., B-414056.1 and .2 before the GAO engaged by Venable.

2018, Protest of Defense Base Services Inc., B-416874.1 before the GAO, engaged by Bradley.

2020, Protest of PAE Applied Technologies, B-419133.1 before the GAO engaged by Bradley for representation of Intervenor.

2020,  Protest of PAE Applied Technologies and Reliance Test & Technology, LLC, US Court of Federal Claims, engaged by Bradley, counsel for representation of Intervenor.

2022, Protest of Saber Systems, B-420090.3 before the GAO, engaged by Pillsbury for representation of the Intervenor.

Appendix C

**Details of Maximo Cross-Level Queries**

As mentioned in my report, with the aid of Mr. Ramirez, I designed four queries to extract the Maximo cross-leveling reports I used in my analysis.  All four queries are written in the SQL programming language.

**Assets Queries**

Queries A1 and A2 both pulled information primarily from the **ASSETTRANS** table within Maximo, as well as additional information from the **ASSET** table.  I understand the **ASSETTRANS** table contains information regarding asset transfers that took place after each asset had gone through KBR's procurement and receiving processes. The **ASSET** table contains detailed information about each specific asset, including crucial fields like *PURCHASEPRICE* and *PONUM* (purchase order number) that are not present in the **ASSETTRANS** table.

<u>Assets Before Cutover (Query A1)</u>

In Query A1, the statement, "*FROM GLBPRD.assettrans A*" instructs the script to pull information regarding transactions from the **ASSETTRANS** table (identified as table "A").

The statement, "*LEFT JOIN GLBPRD.ASSET B ON A.ASSETID = B.ASSETID AND A.SITEID = B.SITEID*" pulls information from certain fields present the **ASSET** table (identified as table "B") as long as both the *ASSETID* and *SITEID* fields for a particular asset within the **ASSETTRANS** table match their *ASSETID* and *SITEID* counterparts within the **ASSET** table. In other words, the "left join" instruction (i) takes information about specific asset transactions present in the **ASSETTRANS** table, then (ii) pulls further information about the specific assets involved in those transactions from the **ASSET** table via a matching mechanism, and finally (iii) consolidates everything into a single report.

The A1 query utilizes several filters to narrow the report to asset cross-level transactions between LOGCAP III sites. Specifically, the line "*WHERE A.ORGID = 'LC3'*" limits the report to transactions involving assets on the LOGCAP III property book. Next, the line "*and substr(a.toloc,1,9) <> substr(a.fromloc,1,9)*" limits the report to transactions where the first nine characters in the *TOLOC* field and the first nine characters in the *FROMLOC* field do not match. This part of the code filters out transactions where assets were not transferred outside their original locations.

In addition, the line "*and a.siteid = a.tositeid*" limits the data to transactions where the fields *SITEID* and *TOSITEID* within the **ASSETTRANS** table match. It is my understanding that when KBR imported pre-cutover asset transactions into the post-cutover, updated version of Maximo in Q4 2009, it copied the values in the *SITEID* field for those pre-cutover transactions and pasted them into the *TOSITEID* field. Thus, to isolate pre-cutover asset transfer transactions within the **ASSETTRANS** table, I had to design the A1 query to look for transactions where *SITEID* and *TOSITEID* were matching. Then, to isolate cross-level transactions, the query looked to the

*TOLOC* and *FROMLOC* fields, as described above, where it could discern that an asset was moving between two different physical locations.

The below screenshot demonstrates how this limitation on the combination of values in the *SITEID*, *TOSITEID*, *FROMLOC* and *TOLOC* fields is observable in the resulting dataset. Please note that the following screenshot is taken from the pre-cutover assets data *before* I performed any additional filtering of the fields to reach my final estimate of intra-theater cross-leveling.

| DESCRIPTION | TRANSDATE | SITEID | TOSITEID | FROMLOC | TOLOC |
|---|---|---|---|---|---|
| VEST BALLISTIC W/PLATES SIZE 5XL | 21-DEC-06 | USMI-CEN | USMI-CEN | ME-IRQ-D7 | ME-IRQ-F2 |
| HELMET BALLISTIC SIZE L | 07-JAN-07 | IRQ-A | IRQ-A | KBR | ME-IRQ-A |
| HELMET BALLISTIC SIZE M | 18-JAN-07 | IRQ-B1 | IRQ-B1 | KBR | ME-IRQ-A |
| HELMET BALLISTIC SIZE M | 26-FEB-07 | IRQ-T4 | IRQ-T4 | ME-IRQ-F2 | ME-IRQ-T1 |
| RADIO MOBILE | 04-MAR-07 | IRQ-CLSS | IRQ-CLSS | ME-IRQ-T1 | ME-IRQ-A |
| SWITCH ETHERNET 24 PORT | 05-MAY-07 | KWI-5A | KWI-5A | ME-KWI-EGL | ME-KWI-KGL |
| HELMET BALLISTIC | 07-MAY-07 | AFG-2B | AFG-2B | CA-AFG-2 | CA-AFG-2B |
| TRIMMER LINE | 10-MAY-07 | IRQ-F2 | IRQ-F2 | ME-UAE-DUB | ME-IRQ-F2X-... |
| TERMINAL ENHANCED DISPLAY WI... | 17-MAY-07 | IRQ-TTM | IRQ-TTM | ME-IRQ-T2 | ME-IRQ-A |
| HELMET BALLISTIC SIZE M | 25-MAY-07 | IRQ-F2 | IRQ-F2 | ME-IRQ-A | ME-IRQ-C1 |
| TELEPHONE CELLULAR | 18-JUN-07 | IRQ-F2 | IRQ-F2 | ME-IRQ-D12 | ME-IRQ-D2-TG |
| TRUCK MAINTENANCE UTILITY DIE... | 26-JUN-07 | IRQ-G3 | IRQ-G3 | ME-IRQ-G6 | ME-IRQ-G3 |
| CABINET DESSICATOR | 12-JUL-07 | IRQ-CLSS | IRQ-CLSS | ME-UAE-DUB | ME-IRQ-B1 |
| AIR CONDITIONER SPLIT UNIT | 04-AUG-07 | IRQ-C1 | IRQ-C1 | ME-IRQ-C | ME-IRQ-C1 |

Query A1 is also designed to filter out asset transactions with the value "INAC%" within either the *SITEID*, *TOSITEID*, *TOLOC*, or *FROMLOC* fields. This was done to remove all asset transactions that showed assets transferred to inactive sites. I understand based on my conversations with Mr. Ramirez that the 'inactive' site classification indicates that an asset was retired and could not be utilized further.

The statement *A.MATUSETRANSID = "NULL"* was included to ensure I did not double-count items between the materials and assets datasets.

Finally, the statement *A.TRANSDATE < '01-NOV-09* ensures that the resulting report contains only transactions prior to the cutover date.[1]

---

[1] Though I understand the cutover date was October 29, 2009, Query A1 captures transactions from October 30 and October 31, 2009. It is evident from the data that these transactions, though technically post-dating the cutover, were processed in the same manner as transactions that occurred prior to the cutover. As a result, my analysis treats assets transactions from those two days as pre-cutover transactions.

Assets After Cutover (Query A2)

The query for post-cutover Assets is similar to the query for pre-cutover Assets, discussed above.

Like the "A1" query, the "A2" query pulls information about transactions from the **ASSETTRANS** table and asset-specific background information from the **ASSET** table into a single report. The statement, "*LEFT JOIN GLBPRD.ASSET B ON A.ASSETID = B.ASSETID AND A.TOLOC = B.LOCATION*" pulls information from certain fields present the **ASSET** table (identified as table "B") as long as both the *ASSETID* and *TOLOC* fields for a particular asset within the **ASSETTRANS** table match their *ASSETID* and *LOCATION* counterparts within the **ASSET** tables. The "A2" query also uses the same '*LC3*' and '*INAC%*' filters, described above, to narrow the report to LOGCAP III assets and exclude transactions involving sites tagged as inactive.

To filter out transactions where assets were not transferred outside their original locations, the "A2" query requires that the *SITEID* and *TOSITEID* fields within the **ASSETTRANS** table are not matching (written as: *A.SITEID <> a.tositeid*). It is my understanding that in the post-cutover environment, the *SITEID* and *TOSITEID* fields in Maximo were both populated in accordance with their intended uses, meaning there is no need to account for those fields containing identical (and, in the case of *TOSITEID*, incorrect) values, as was the case with the pre-cutover "A1" query.

The below screenshot demonstrates how this limitation on the values in the *SITEID* and *TOSITEID* fields is observable in the resulting post-cutover Assets report. Again, please note that this image is taken from the post-cutover assets data *before* I performed any additional filtering of the fields to reach my final estimate of intra-theater cross-leveling.

| DESCRIPTION | TRANSDATE | SITEID | TOSITEID | FROMLOC | TOLOC ↓ |
|---|---|---|---|---|---|
| RADIO HANDHELD | 05-OCT-11 | IRQ-H7 | KWI-5A | ME-IRQ-H7 | ME-KWI-5A |
| RADIO HANDHELD | 10-OCT-11 | IRQ-H7 | KWI-5A | ME-IRQ-H7 | ME-KWI-5A |
| HELMET BALLISTIC SIZE S | 11-DEC-11 | IRQ-F23A | KWI-5A | ME-IRQ-F23A | ME-KWI-5A |
| VEST BALLISTIC W/PLATES SIZ... | 15-DEC-11 | IRQ-F23A | KWI-5A | ME-IRQ-F23A | ME-KWI-5A |
| VEST BALLISTIC W/PLATES SIZ... | 28-DEC-11 | IRQ-B1 | KWI-5A | ME-IRQ-B1 | ME-KWI-5A |
| HELMET BALLISTIC SIZE M | 02-FEB-12 | IRQ-F2 | KWI-5A | ME-IRQ-F2-B... | ME-KWI-5A |
| COMPUTER DESKTOP | 12-FEB-12 | IRQ-T1 | KWI-5A | ME-IRQ-T1 | ME-KWI-5A |
| AIR CONDITIONER WINDOW UN... | 24-MAY-10 | IRQ-D2 | USMI-CEN | ME-IRQ-D2-TG | ME-IRQ-USMI... |
| ACCOMMODATION UNIT DRY | 24-MAY-10 | IRQ-D2 | USMI-CEN | ME-IRQ-D2-TG | ME-IRQ-USMI... |
| HELMET BALLISTIC SIZE S | 05-AUG-11 | IRQ-F2 | USMI-CEN | ME-IRQ-F2-B... | ME-IRQ-USMI... |
| HELMET BALLISTIC SIZE LG | 08-MAR-10 | IRQ-A | IRQ-TTM | ME-IRQ-A | ME-IRQ-TTM-A |
| FREEZER CHEST | 24-JUL-10 | IRQ-T1 | IRQ-TTM | ME-IRQ-T1 | ME-IRQ-TTM-A |
| VEST BALLISTIC | 11-FEB-10 | IRQ-T1 | IRQ-T5 | ME-IRQ-T1 | ME-IRQ-T5 |
| HELMET BALLISTIC SIZE L | 15-JAN-10 | IRQ-T1 | IRQ-T2 | ME-IRQ-T1 | ME-IRQ-T2 |

Materials

The B1 and B2 queries I ran to generate the Materials cross-leveling data pulled information from the **MATUSETRANS** table within Maximo, as well as additional information from the **WORKORDER** table. I understand the **MATUSETRANS** table contains information regarding materials transfers that took place after material items had gone through KBR's procurement and receiving processes and had been entered into inventory at a LOGCAP III site. The **WORKORDER** table contains information about specific work orders that KBR executed on LOGCAP III, including the crucial field *WO_SITEID* (*i.e.*, the site where the Work Order requiring cross-leveled material items was performed), which is not present in the **MATUSETRANS** table.

Within Queries B1 and B2, the statement "*GLBPRD.matusetrans A*" instructs the script to pull information regarding transactions from the **MATUSETRANS** table (identified as table "A"). The statement, "*LEFT JOIN GLBPRD.WORKORDER B ON B.WONUM = A.REFWO*" instructs the script to pull information from certain fields present the **WORKORDER** table (identified as table "B") as long as the *WONUM* field in the **WORKORDER** table matches the *REFWO* (reference work order) field for a particular materials transaction in the **MATUSETRANS** table. In other words, the "left join" instruction (i) takes information about specific materials transactions present in the **MATUSETRANS** table, then (ii) pulls further information about the specific work orders involved in those transactions from the **WORKORDER** table via a matching mechanism, and finally (iii) consolidates everything into a single report.

The B1 and B2 Queries utilize several filters to narrow the report to Materials cross-level transactions between LOGCAP III sites. For instance, to filter out transactions where Materials were not transferred outside their original locations, the materials queries require that the *SITEID* field within the **MATUSETRANS** table and the *SITEID* field within the **WORKORDER** table are not matching (written in SQL as: *A.SITEID != B.SITEID*). Further, the statement "*AND A.PONUM IS NULL*" filters out transactions that the **MATUSETRANS** data indicates were linked to specific purchase orders, suggesting that the item had been ordered new rather than cross-leveled out of existing stock. Finally, as with the Assets queries, discussed above, the line "*AND A.ORGID = 'LC3'*" limits the Materials cross-leveling data to transactions involving items on LOGCAP III.

The final line in the B1 Query is the instruction that limits the data returned to transactions that occurred between 2006 and 2009. The B2 Query is identical to B1, just with the date limiters changed to 2010 and 2012.