E-FILED
Thursday, 29 September, 2022  05:21:00 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* GEOFFREY HOWARD AND ZELLA HEMPHILL, | ) ) ) | |
| | ) | Case No. 4:11-cv-04022-MMM-JEH |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Judge Michael M. Mihm |
| KBR, INC. AND KELLOGG BROWN & ROOT SERVICES, INC., | ) ) | Magistrate Judge Jonathan E. Hawley |
| | ) | |
| Defendants. | ) | |

**REBUTTAL EXPERT REPORT**

**OF**

**Gary M. Gaukler, Ph.D.**

June 27, 2022

## I.    INTRODUCTION

1.    My name is Gary Gaukler.  I am a tenured Associate Professor of Operations Management at the Drucker School of Management at Claremont Graduate University.  On March 1, 2022, I submitted an affirmative expert report on behalf of Relators (the "Affirmative Report").

2.    My qualifications are set forth in my Affirmative Report, including Appendix A to that Report.  I am currently being compensated for my work on this case at $350 per hour and my compensation does not depend on the outcome of this matter or the conclusions I reach. Apart from my deposition by counsel for KBR, I have not testified or been deposed as an expert witness in any action since submitting the Affirmative Report.

3.    Counsel for Relators have asked me to respond to certain opinions offered by William Walter, an accountant retained by counsel for KBR.  In particular, I have been asked to respond to the following opinions offered by Mr. Walter:

(a) KBR executed approximately 1.2 million cross-level transactions involving materials valued at approximately $1.2 billion during the relevant time period.[1]

(b) Of the approximately 1.2 million cross-level transactions, 607,929 transactions originated at the site a single site, IRQ-F2, and were sent to nearby sites within the same security perimeter as IRQ-F2, a region Mr. Walter calls "inside the wire."[2] Excluding these 607,929 "inside the wire" material transactions from the approximately 1.2 million materials cross-level transactions reduces the total value of materials cross-level transactions from approximately $1.2 billion to approximately $700,026,136.[3]

---

[1] Walter Report at 2; Walter Expert Dep. at 26:5-18 (correcting written report to identify 1.2 million, instead of 1.2 billion, as the correct approximate count of materials cross-level transactions).

[2] Walter Report at 2.

[3] Walter Report at 18.

(c) The $341 million in overorder costs identified in my Affirmative Report[4] comprise "15.5% of the in-scope purchase order lines for materials" and I "do not challenge 84.5% of KBR's materials purchases on LOGCAP III."[5]

(d) KBR executed approximately 870,000 cross-level transactions involving assets valued at approximately $3.7 billion during the relevant time period.[6]

(e) KBR's purchase orders and overorders decreased over time, while KBR's cross-leveling increased over time and exceeded its purchase orders starting in early 2010,[7] and that these trends "are consistent with continuous improvement of KBR's cross-leveling performance associated with a corresponding decrease in purchasing" and "consistent with KBR's consumption of existing inventory, including through cross-leveling, as KBR approached the end of its active performance."[8]

4.    I have also been asked to respond to the opinions of several of KBR's other experts regarding the challenges of cross-leveling in a war theater.

## II.    SUMMARY OF OPINIONS

5.    The opinions that Mr. Walter offers are irrelevant to my opinions on whether KBR cross-leveled materials in accordance with the LOGCAP III contract, KBR's Property Control Procedures ("PCPs"), or KBR's Desktop Operating Procedures ("DOPs"). Mr. Walter instead attempts to put my opinions into "context" by presenting the number of times that KBR cross-leveled materials, as well as the value of those materials. Mr. Walter's calculations, however, contain numerous errors and overstate the number and value of KBR's cross-level transactions. In particular, Mr. Walter:

(a) identifies "inside the wire" transactions as cross-levels despite acknowledging that the transactions appear to involve a single warehouse that issued materials to a group

---

[4] Affirmative Report at ¶ 10.

[5] Walter Report at 4.

[6] Walter Report at 2; Walter Expert Dep. at 26:5-18 (correcting written report to identify 870,000, instead of 871,000, as the correct approximate count of asset cross-level transactions).

[7] Walter Report at 22.

[8] Walter Report at 23.

of sites within a common security perimeter, as opposed to materials transactions between independent sites;

(b) includes transfers of property that did not fill a requisition and thereby avoid the need to order more goods—thus contradicting the very purpose of a cross-level. Specifically, Mr. Walter's totals include numerous transactions that simply disposed of excess property from the LOGCAP III contract;

(c) includes numerous other transactions that do not reflect Mr. Walter's own definition of a cross-level, including administrative transactions in Maximo relating to item research and counterfeits;

(d) includes pervasive double-counting of cross-level transactions for materials. Mr. Walter includes transactions in which KBR was returning materials to a storeroom from a worksite, such that he counts as a cross-level both the issue to fill a requisition and the return after the item was not used. Mr. Walter further double-counts transactions that KBR recorded in Maximo as both assets and materials, inflating the number and value of materials that KBR cross-leveled;[9]

(e) includes materials transactions that occurred within the same physical site, including materials that warehouses issued to "missions" located at their sites. Such transactions do not meet Mr. Walter's own definition of a cross-level;

(f) includes transactions involving items that KBR has asserted in this litigation are not subject to cross-leveling, including non-tangible items and TRECs;

(g) overstates the value of transactions by failing to correct errors in the materials' purchase price listed in Maximo.

---

[9] Mr. Walter similarly overstates the number of cross-levels involving assets. While I discuss Mr. Walter's errors involving asset transactions, I have not attempted to calculate the exact amount of overstatement as asset transactions are outside the scope of my Affirmative Report. As set forth below, however, the amount of the overstatement is substantial.

6.     Correcting the number and value of cross-leveled materials transactions that Mr. Walter improperly included reduces their value from approximately $1.2 billion to approximately $495 million.

7.     The corrected totals do not support Mr. Walter's assertion that KBR improved its cross-leveling performance over time.

8.     Mr. Walter's opinions also fail to properly contextualize my results because he includes billions of dollars' worth of transactions involving assets, whereas my model is limited to materials.  Mr. Walter compounds this problem by again overstating the number and value of the transactions.  Mr. Walter fails to exclude asset transactions where KBR booked multiple transactions almost simultaneously, resulting in counting multiple transactions as cross-levels even though the item could not have moved more than once.  He also failed to exclude transactions that occurred at the same physical site and failed to correct errors in the assets' purchase price listed in Maximo.

9.     Lastly, Mr. Walter's opinion that my model does not reflect the "reality" of KBR's inventory management is unsupported and ignores the model's high degree of accuracy in determining KBR's inventory levels.

## III.     SUMMARY OF MR. WALTER'S OPINIONS

10.     In Section I of his report, Mr. Walter attempts to identify the number of times that KBR cross-leveled assets and materials under the LOGCAP III contract between 2007 and 2011, as well as to calculate the value of the assets and materials KBR cross-leveled.[10]

11.     Mr. Walter broadly defines a "cross-level" to mean "a transaction where an existing asset or material item already in inventory is transferred or moved from one site to another site to fulfill a need at the receiving site."[11]  He further defines it as a transaction to and from the LOGCAP III contract.[12]  He then designed four queries of the Maximo database to

---

[10] Walter Report at 2-6.

[11] Walter Report at 5.

[12] Walter Expert Dep. at 94:11-24.

retrieve data on "assets and materials transactions."[13]  The first two queries, labeled A1 and A2, use two distinct methods to identify cross-levels of assets—tagged government property—across two versions of Maximo in effect during the relevant time period.  The second two queries, labeled B1 and B2, are identical except for the dates involved, and attempt to identify cross-levels of materials.[14]

12.    For materials transactions, Mr. Walter accounts for two transaction types (or ISSUETYPE): issues and returns.[15]  He then identifies the transactions in which the SITEID and WO_SITEID do not match, which he contends identifies transactions in which materials were moved outside their original locations.[16]  He then claims to filter transactions for issues and returns outside the LOGCAP III theater.[17]  He claims that the "resulting Issues transactions are all assumed to constitute intra-theater cross-levels," while "the Returns transactions required further filtering."[18]

13.    Mr. Walter contends that there were 1,239,953 materials issue transactions between 2007 and 2011 that represent intra-theater cross-levels, that the total quantity of materials in those transactions was 50,397,513 units, and that the total value of those units was $1,192,413,211.[19]

14.    For return transactions, Mr. Walter attempts to "isolate Returns likely to have been cross-levels" by filtering the data to include only transactions with a memo description "denoting that a cross-level had taken place."[20]  He contends that there were 25,695 return transactions between 2007 and 2011, which represent intra-theater cross-levels based on

---

[13] Walter Report at 5.

[14] Walter Report at 6.

[15] Walter Report at 10.

[16] Walter Report at 11.

[17] Walter Report at 11.

[18] Walter Report at 11.

[19] Walter Report at 11.

[20] Walter Report at 13.

language in the description field, that the total quantity of materials in those transactions was 2,337,047 units, and that the total value of those units was $43,654,776.[21]

15.     Combined, Mr. Walter opines that there were 1,265,648 cross-level transactions involving materials under the LOGCAP III contract, involving 52,734,560 units worth $1,236,067,987 in total.[22]

16.     Mr. Walter then filters transactions in which materials were sent from the IRQ-F2 site (which was located near the Baghdad airport) to a group of nearby sites, which Mr. Walter describes as "inside the wire" sites. He excludes such transactions by "assum[ing] the possibility" that KBR used the IRQ-F2 site "as a distribution hub to support the sites 'inside the wire.'"[23] Excluding such transactions reduces his materials totals to 657,719 alleged cross-levels, involving 28,520,331 units worth $705,026,136.[24]

17.     For asset transactions between 2007 and October 29, 2009, Mr. Walter identifies all transfers with different values in the FROMLOC and TOLOC fields, which he contends identifies transfers from "one site to another site."[25] For asset transactions after October 30, 2009, Mr. Walter identifies all transfers with different values in the SITEID and TOSITEID fields.[26] He then claims to have filtered the transactions "to isolate intra-theater cross-levels only."[27] The remainder, he contends, identifies KBR's cross-leveling. He asserts that "KBR cross-leveled 433,739 assets within Iraq and Afghanistan with a total

---

[21] Walter Report at 13.

[22] Walter Report at 15.

[23] Walter Report at 17.

[24] Walter Report at 19.

[25] Walter Report at 7. Mr. Walter does not provide code which leads to final output. Instead, he provides mid-process queries written in Oracle SQL ("Structured Query Language," which is a standard language for extracting data from databases), and then narratively describes additional steps which seem to have been done by hand after the queries were run. In the case of his two asset-related queries, A1 and A2, I have been able to match his results exactly, and have written SQL queries which include both the steps he performed in SQL and the steps he appears to have performed manually. These queries are provided in Appendix A.

[26] Walter Report at 8.

[27] Walter Report at 7.

value of $2,058,986,705 prior to [October 29, 2009]" and that "KBR cross-leveled 435,883 assets within Iraq and Afghanistan with a total value of $1,613,778,635 after the cutover."[28] In both cases, he contends the dollar values he calculated represent "the amount the government would have had to spend on new purchases had KBR not cross-leveled existing assets."[29]

18.     In Section II of his report, Mr. Walter compares the results of my overordering analysis to data in the POLINE table and calculates the percentage of overorder costs as a share of total purchase order costs as reflected in the POLINE table. To do so, Mr. Walter simply sums the costs in the RECEIVEDTOTALCOST field after applying date and site filters, then compares it to the $340,960,849.96 shown in my overordering analysis. He calculates that KBR's "total purchase order costs" as reflected in the RECEIVEDTOTALCOST field were $2.19 billion between May 28, 2007 and December 31, 2011 and that KBR's overorders were 15.5% of that total.[30] Based on these calculations, Mr. Walter opines that my model "does not question the vast majority of KBR's purchases over the entire relevant period."[31]

19.     Mr. Walter then analyzes the RECEIVEDTOTALCOST by date and compares it to the results of (1) my overordering analysis and (2) Mr. Walter's own cross-leveling analysis. He asserts that KBR's purchase orders and overorders decreased over time, while KBR's cross-leveling increased over time and exceeded its purchase orders starting in early 2010.[32] From this, he opines that the "trends are consistent with continuous improvement of KBR's cross-leveling performance associated with a corresponding decrease in purchasing" and "consistent with KBR's consumption of existing inventory, including through cross-leveling, as KBR approached the end of its active performance."[33]

---

[28] Walter Report at 7-8.

[29]  Walter Report at 8.

[30] Walter Report at 21.

[31] Walter Report at 22.

[32] Walter Report at 22.

[33] Walter Report at 23.

IV.    **REBUTTAL OF MR. WALTER'S OPINIONS**

A.    **Mr. Walter's Maximo Methodology Is Insufficient to Identify Cross-Level Transactions Accurately**

i.    **Materials Transactions (B1 and B2)**

20.    Mr. Walter's B1 materials analysis pertains to materials transactions that occurred between 2006 and 2009, and his B2 analysis pertains to materials transactions that occurred between 2010 and 2012.  The B1 and B2 queries are identical except for their date ranges and account for two transaction types (identified by their ISSUETYPE values): issues and returns.[34]  Mr. Walter filters both types of transactions to exclude those outside of Iraq or Afghanistan.[35]

21.    For issues, Mr. Walter identifies transactions where the issue is linked to a work order whose SITEID does not match the SITEID of the issue.  He additionally removes approximately 1% of the MATUSETRANS transactions that he concludes are linked to a purchase order.  Finally, he requires that each transaction has an ORGID value that equals LC3 (which is true for all lines in the MATUSETRANS table). This is the only filtering he performs on issues.  He claims that any issue meeting these criteria is a cross-level, with no further analysis.[36]

22.    For returns, which are transactions "where material items were intended to be used on a work order but were returned to the original location,"[37] Mr. Walter performs the same steps that he does when analyzing issues, and then additionally filters the data to include only transactions with a memo description "denoting that a cross-level had taken place."[38]  This is the only filtering Mr. Walter performs on returns.

23.    Mr. Walter's methodology is not sufficiently detailed to accurately represent KBR's materials cross-leveling.  As discussed in greater detail below, Mr. Walter's lack of

---

[34] Walter Report at 6, 10.

[35] Walter Report at 11.

[36] Walter Report at 11.

[37] Walter Report at 10.

[38] Walter Report at 13.

subsequent filtering sweeps in hundreds of thousands of transactions that, with additional and relatively simple inquiry, do not meet his own definition of a cross-level.

### ii. Asset Transactions (A1 and A2)

24.    Mr. Walter's analysis of asset cross-levels is irrelevant to the opinions in my Affirmative Report. I did not and was not asked to opine about KBR's asset cross-leveling. Thus, Mr. Walter's asset analysis does not even provide "context" for my conclusions. Nevertheless, I will discuss the issues I see resulting from Mr. Walter's asset cross-leveling calculations.

25.    Mr. Walter's A1 analysis pertains to asset transactions that occurred between January 1, 2007 and October 31, 2009, and his A2 analysis pertains to asset transactions that occurred after October 31, 2009. November 1, 2009 was the effective date of what Mr. Walter calls the "cutover," when "KBR changed some of its processes and used new fields for tracking locations and transfers between sites."[39] Before the cutover, Mr. Walter relies on two location fields (FROMLOC and TOLOC) to determine whether an asset transaction was moving from one site to another; after the cutover, Walter ignores these fields and looks only at site-level fields (SITEID and TOSITEID).[40] Other than this, the A1 and A2 queries are substantially similar. Table 1, set forth in Appendix A, shows a list of all steps performed in the A1 and A2 queries and subsequent processing.

26.    Mr. Walter's asset cross-leveling analysis consists only of the steps listed above. No other analysis is conducted and no other restrictions are applied. Any asset transaction meeting the criteria above contributes to Mr. Walter's cross-leveling count, and the PURCHASEPRICE value associated with that transaction contributes to Mr. Walter's cross-leveling total.

27.    Mr. Walter's methodology is not sufficiently detailed to accurately represent KBR's assets cross-leveling. As I explain below, the simplicity of the methodology and the lack of any additional checking and filtering means that Mr. Walter counts a very large number of asset transactions as cross-levels when a reasonably conservative and slightly more careful look

---

[39] Walter Report at 6.

[40] Walter Report at 6-8.

at those transactions would suggest that they almost certainly are not asset cross-levels according to Mr. Walter's own definition.

### B. Mr. Walter Inflates the Number and Value of KBR's Cross-Leveling Transactions

28.    KBR tasked Mr. Walter with identifying a "reasonable estimate of how much cross-leveling was done by KBR" in the relevant time period.[41]  Mr. Walter opined that KBR executed approximately 1.2 million cross-level transactions involving materials and 870,000 cross-level transactions involving assets in Iraq and Afghanistan during the relevant time period.[42]  Excluding the 607,929 "inside the wire" materials transactions, Mr. Walter opines that KBR executed approximately 660,000 materials cross-level transactions.[43]

29.    These are not "reasonable" estimates of the cross-levelling transactions KBR actually performed.  Based on analysis of the data upon which Mr. Walter relied and review of additional evidence adduced in this case, many of the transactions that Mr. Walter counts as "cross-levels" are not, in fact, cross-levels that avoided the need for KBR to submit one or more purchase orders under the LOGCAP III contract.  Mr. Walter's analysis thereby greatly inflates the amount of cross-levelling that KBR was actually performing.[44]  Mr. Walter has taken into account numerous transactions that have no bearing on the extent to which KBR overordered assets and materials.

---

[41] Walter Expert Dep. 22:11-13.

[42] Walter Report at 2; Walter Expert Dep. at 26:5-18 (correcting written report to identify 870,000 and 1.2 million, instead of 871,000 and 1.2 billion, as his approximations of asset and material cross-level transaction counts, respectively).

[43] Walter Report at 18-19.

[44] Mr. Walter testified that he understood "that the more cross-leveling that [he] could identify that KBR had performed, the weaker the relators' allegations would appear."  Walter Expert Dep. at 24:5-10.  Moreover, Mr. Walter purports to quantify both asset and materials cross-levels, even though Relators have not alleged that KBR failed to cross-level independently tracked assets and my report assesses only overorders based on KBR's material inventory.  Mr. Walter's report thus artificially diminishes KBR's materials overordering as a percentage of total cross-leveling.

### C.    Mr. Walter Inflates KBR's Cross-Levels of Materials

#### i.    Mr. Walter Incorrectly Counts "Inside the Wire" Materials Transactions

30.    Mr. Walter asserts that KBR cross-leveled over $1.2 billion in materials, of which approximately $500 million occurred within the security perimeter of the F2 site, an area he calls "inside the wire."  It is not clear from Mr. Walter's report and deposition testimony whether his opinion is that KBR cross-leveled $1,236,067,987 in materials (inside and outside the wire) or $705,026,136 (outside the wire).[45]  Notably, however, Mr. Walter uses the $705 million outside the wire figure when comparing the results of his analysis and mine.[46]  It may be inferred that Mr. Walter has serious reservations, as do I, about characterizing inside the wire transfers as "cross-levels."

31.    Based on my review of Mr. Walter's report and testimony, only the $705 million in outside-the-wire transactions meet Mr. Walter's definition as cross-levels.  Mr. Walter states that the site IRQ-F2 was located at the Baghdad airport and that KBR used the F2 site as a common warehouse for nearby locations in Baghdad.[47]  He observed what he calls "anomalies" in which a large percentage of the cross-levels he identified all came from a single site (F2).[48]  He has calculated that 90% of issue transactions from the F2 site went to other locations inside the wire.[49]  Mr. Walter's data show that cross-levels from F2 would be nearly equal to cross-levels from all other sites combined, a dramatic concentration that Mr. Walter does not attempt to explain.  My own calculations, discussed below, show that approximately 38% of KBR's "outside the wire" materials transactions reference cross-leveling in the "Memo" field of Maximo, while the same is true for only 2% of KBR's "inside the wire" materials transactions.[50]  This supports the conclusion that KBR employees did not believe transactions that occurred "inside the wire" were "cross-levels."

---

[45] *See* Walter Expert Dep. at 64:17-65:7.

[46] Walter Expert Dep. at 83:23-84:3.

[47] Walter Report at 17.

[48] Walter Expert Dep. at 62:14-19.

[49] Walter Report at 18; Walter Expert Dep at 77:1-12.

[50] I obtained these percentages by reviewing the MEMO field in the MATUSETRANS table. According to Mr. Walter, approximately $705 million in materials cross-levels were outside the

32.    In my experience, the patterns that Mr. Walter identified are not "anomalies" but rather are consistent with the F2 site serving as a common warehouse for receiving and storing supplies for distribution to nearby sites. If the F2 site had operated separately from the other sites in KBR's supply chain, I would have expected to see substantial bidirectional materials transfers between the F2 site and the surrounding sites, but a simple tally of Mr. Walter's data shows that the F2 site receives only $17 million of purported issue cross-levels, despite sending over $600 million of purported issue cross-levels. Moreover, the F2 site's location at a major airport is consistent with its serving as a logistics hub for the other sites. I see no basis in Mr. Walter's report or testimony for treating "inside-the-wire" transactions as site-to-site cross-levels. Therefore, inside-the-wire transactions should be excluded from the transactions that Mr. Walter counts as cross-levels, leaving $705,026,136 in materials transactions as a starting total. Even that total is significantly overstated, however, for the reasons I explain below.

### ii.    Mr. Walter Incorrectly Includes Disposition Transactions in His Materials Cross-Level Count

33.    Mr. Walter opines that KBR's materials cross-leveling improved over time, because it increased as a portion of overall purchasing over time and actually began to exceed purchases (but only in dollars, not lines) beginning in early 2010. Mr. Walter's opinion is based on a faulty premise—namely, the inclusion of disposition transactions in his cross-leveling totals.

34.    Mr. Walter's report defines cross-leveling as "a transaction where an existing asset or material item already in inventory is transferred or moved from one site to another site to fulfill a need at the receiving site."[51] Mr. Walter testified that his cross-levelling totals included items "transferred from one site to another KBR site within Iraq and

---

wire. Of that total, $266,823,808.98 referenced cross-leveling in the MEMO field. Mr. Walter found that approximately $531 million in materials cross-levels were inside the wire. Of that total, $10,889,470.60 mentioned cross-leveling in the MEMO field.

[51] Walter Report at 5.

Afghanistan"[52] and were confined to transactions under the LOGCAP III contract.[53]  Thus, to meet Mr. Walter's definition of a cross-level, a transaction on LOGCAP III must fulfill three criteria: (1) the item must already exist in inventory; (2) the item must move from one site to another site; and (3) the move must be done to fulfill a need at the receiving site for LOGCAP III work.

35.     Mr. Walter writes that the point of a cross-level is to avoid a new purchase.  He writes that his asset cross-leveling total "represents the amount the government would have had to spend on new purchases had KBR not cross-leveled existing assets" and, in his discussion of an allegedly cross-leveled water purifier, notes that "had KBR not cross-leveled this asset, I assume that KBR would have had to purchase a new ROWPU at the receiving site."[54]

36.     Mr.  Walter explained his methodology for determining whether a transaction qualified for treatment as a cross-level as follows:

> [T]he methodology I used was there's a site that has material. There's another site that requests that material. They've gone through MAXIMO. And it has been shipped to that other site for use on a work order that has been identified. My methodology keys on that work order, which tells me that there's a project that is in that other location that needs this material to be able to accomplish whatever the requirements of that work order are. And if that work order is being performed in a site different than the site that the material originated in, to me, that is a cross-level.[55]

37.     Mr. Walter's methodology is flawed.  Specifically, by "keying" on the mere existence of a work order and not performing sufficient checking or filtering, Mr. Walter incorrectly sweeps into his analysis transactions in which KBR was disposing of excess property that

---

[52] Walter Expert Dep. at 91:2-15.

[53] Walter Expert Dep. at 94:11-24.  In his report, Mr. Walter also writes that he requires that the ORGID field found in the ASSETTRANS and MATUSETRANS tables equal LC3 in order to "limit[] the report to transactions involving assets on the LOGCAP III property book" (for assets) and to "limit[] the Materials cross-leveling data to transactions involving items on LOGCAP III" (for materials).  *See* Walter Report Appendix C at 35 & 37.  He also makes this clear elsewhere in his report.  *See id*. at 10, 34, 36, 37.

[54] Walter Report at 7-8.

[55] Walter Expert Dep. at 7-19.

was simply no longer needed on LOGCAP III, not transactions that avoided the need for KBR to order more materials.

38.    For example, Mr. Walter incorrectly included in his cross-leveling totals over $60 million of materials apparently "cross-leveled" to incoming contractors on LOGCAP IV, such as Fluor.[56]  This includes transactions involving the "JAF AO STAY BEHIND TEAM," a group designated by KBR to assist with the transfer of materials from LOGCAP III to LOGCAP IV in Afghanistan.[57]  As Mr. Walter testified, if materials are "going off to another contract or to another program or outside of the Iraq/Afghanistan LOGCAP III theater, we should be excluding it [from the cross-levelling total]."[58]

39.    Mr. Walter also incorrectly included in his cross-level totals approximately $110 million of transactions that appear to represent excess materials that KBR returned to the government.  As Mr. Walter testified, if an item "goes to the government for disposal, it would not be a cross-level."[59]  Transactions involving the disposition of excess material to the government include:

    a.    Issues to the Defense Reutilization and Marketing Office (DRMO)[60]. Mr. Walter testified that he believed his report excluded issues to DRMO from the count of KBR's cross-level transactions because KBR was "not utilizing that [material] on another work order within the KBR work order environment."[61]  Mr. Walter incorrectly

---

[56] Many of these transactions contained the description "TO IPC," a reference to "incoming performance contractor."

[57] *See, e.g.*, KBR-HOW-8950152 (Mar. 7, 2010 memorandum).  "JAF AO" stands for Jalalabad Airfield Area of Operation.

[58] Walter Expert Dep. at 94:21-24.  Later in his deposition, Mr. Walter equivocated, stating "I don't know" whether an Issue from LOGCAP III to LOGCAP IV should count as a cross-level. *Id*. at 165:3-9.  Mr. Walter's first assessment appears to be the correct one, and it is the position represented in his report.

[59] Walter Expert Dep. at 166:12-14.

[60] Mr. Walter explained his understanding of the DRMO: "If there is excess material, they try to get rid of it."  Walter Expert Dep. at 95:12-13.

[61] Walter Expert Dep. at 96:10-11.

included approximately $11 million of transactions that expressly mention DRMO in his materials cross-leveling totals.

b.   Issues to the Plant Clearance Automated Reutilization Screening System (PCARSS). The PCARSS program was used to return excess material to the government.[62]  Mr. Walter incorrectly included approximately $10 million of transactions that expressly mention PCARSS in his materials cross-leveling totals (over half of which also mention DRMO).

c.   "3161" Transactions, "close out" Transactions, and "excess" Transactions.   I understand that DA Form 3161 was utilized by the Army to receive excess property from contractors.[63]  I further understand that the term "close out" and its variations are associated with the final disposition of materials on LOGCAP III.[64]  I also understand that the term "excess" was used by KBR to denote the final disposition of property no longer needed on LOGCAP III.[65]  Mr. Walter incorrectly counted over $85 million worth of materials issued in connection with transactions expressly involving "3161," "close out" or "closure," or the disposition of "excess."

d.   Larkin Memorandum Transactions.   I understand that the Larkin Memorandum provided guidelines to "assist KBR's performance of site closure and expedite property disposition/close-out" and directed KBR to dispose of certain excess materials by transferring them to the Government of Iraq, the U.S. Military, or coalition forces.[66]  Mr. Walter incorrectly counted over $1 million worth of materials issued in connection with the Larkin Memorandum in his materials cross-leveling totals.

---

[62] *See* Lust 30(b)(6) Dep. at 88:25-89:6.

[63] *See* Dep. Ex. 525 (DCMA-HOWARD-00235412 at '416) (March 13, 2010 LOTD).

[64] *See generally* KBR-HOW-0310069 (May 31, 2012 memorandum "KBR's responsibilities relating to LOGCAP III contract close out and transition effort"); KBR's Response to Relators' Interrogatory No. 11 (July 31, 2017).

[65] *See generally* KBR-HOW-0310069 (May 31, 2012 memorandum "KBR's responsibilities relating to LOGCAP III contract close out and transition effort").

[66] Dep. Ex. 524 (KBR-HOW-1889797 at '801-803) (June 23, 2008).

39.    To assess the scope of the disposition issue, I applied search terms that correspond to the various categories of disposition described above to the MEMO line and the work order description associated with the materials transactions that Mr. Walter claims are cross-levels. I applied additional terms intended to reduce the number of false positives for each category (for example, FLUOR was not considered a match if the text fields of the transaction included the word FLUORESCENT). The complete list of the search terms I applied is present in my materials analysis code, and the code outputs a unique identifier for each line in Walter's data that was flagged for any of these categories, along with a complete list of what those flags were.

40.    Applied together, my analysis of Mr. Walter's inclusion of materials disposition results in a reduction of almost $100 million of Mr. Walter's outside-the-wire cross-leveling total, and over $70 million of Mr. Walter's inside-the-wire cross-leveling total.

41.    In addition to examining the consequences of materials disposition on Mr. Walter's analysis, I have performed an analysis to assess whether KBR ultimately disposed of the excess materials that I concluded KBR over-ordered. Because KBR did not provide records showing ultimate disposition of materials, I was limited to relying on the above search terms to uncover as much disposition material as possible. I then limited the search to specific materials that KBR over-ordered. Taking, for each item number, the lesser of (a) the total amount that was ultimately disposed of, and (b) the total over-ordered amount, yields an amount greater than $170 million. This analysis is necessarily under-inclusive, and the "true" amount of material that was over-ordered and ultimately disposed of by KBR would be higher than my calculation.

### iii.    Mr. Walter Incorrectly Counts Other Types of Materials Transactions that Are Not Cross-Levels

42.    In addition to disposition transactions, Mr. Walter's analysis of KBR's cross-leveling includes numerous other materials transactions that do not meet his definition of a cross-level. I have identified three main categories: "research" transactions, counterfeit or "suspect" item transactions, and MRN replacement transactions.

43.    Research transactions. Mr. Walter's analysis  includes transactions involving "9999" storerooms, which contained items transferred from TRECs so that KBR could perform

"research" and "cleanup" on the data in Maximo.[67]  In a typical transaction, KBR virtually placed an item in Maximo into the LC-IRQ-DF-9999 storeroom (described as "TRANSFER RESEARCH STOREROOM" in the LOCATIONS table) and later issued it out of that storeroom, presumably when research on the item was complete.  As Mr. Walter testified, the 9999 transactions were associated with KBR data that "needed to be reconciled" and appeared to involve transactions "entered in the system to make some adjustments."[68]  Because these 9999 transactions do not appear to correspond to a physical movement of goods, much less a movement of goods to fill a requisition at another site, they do not meet Mr. Walter's definition of a cross-level and Mr. Walter should have excluded them.  Mr. Walter incorrectly included over $120 million of transactions involving 9999 storerooms in his materials cross-leveling totals.

44.    "Counterfeit" Transactions.    Mr. Walter likewise includes transactions involving "counterfeit" or "suspect" counterfeit items in his cross-level totals.  KBR implemented an administrative process for determining whether certain items in inventory were counterfeit.[69]  The process involved several steps within Maximo requiring KBR personnel to issue items they had reason to suspect were counterfeit to specific bins, and then to re-issue those same items to different bins once a final determination of authenticity had been made.[70]  The process also required KBR employees to annotate the relevant transaction MEMO using the terms "suspect" and "counterfeit."[71]  Although these issues appeared to show movement between sites, they were administrative in nature and were not cross-levels under Mr. Walter's definition.  Isolating transactions with the terms "counterfeit" or "suspect" shows that Mr. Walter incorrectly included over $12 million of materials

---

[67] Deposition of Lynellen Sullivan at 236-237.

[68] Walter Expert Dep. at 45:20-46:4.

[69] KBR-HOW-0554072 (Mar. 2011 Maximo Work Instruction).

[70] KBR-HOW-0554072 (Mar. 2011 Maximo Work Instruction).

[71] KBR-HOW-0554072 (Mar. 2011 Maximo Work Instruction).

transactions that appear to deal with counterfeit or suspect items in his cross-leveling totals.[72]

45.    <u>MRN Replacement Transactions</u>.   Mr. Walter similarly includes administrative MRN replacement transactions in his cross-level totals.   MRN stands for Material Reference Number.   Each type of item in KBR's inventory was assigned a unique MRN.   At various points in time, KBR assigned items new MRNs—i.e., "replaced" the MRNs—often in connection with standardization efforts.[73]   This required an administrative MRN replacement transaction in Maximo.   Isolating transactions with the term "replace by" and its variations shows that Mr. Walter incorrectly included over $5 million of transactions that appear to represent MRN replacements, including $3.7 that also mentions 9999 and "old data."[74]

### iv.  Mr. Walter Double-Counts Materials Cross-Levels

46.    Mr. Walter additionally double counts materials transactions as separate cross-levels when they reflect, at most, a single cross-level.   He does this by (1) treating an issue from a storeroom and its return to the storeroom as separate cross-levels; and (2) counting an asset cross-level and counting that same transaction as a "material" cross-level.

### 1.  Mr. Walter Improperly Treats Return Transactions as Cross-Levels

47.    As Mr. Walter explained in his report, an "issue" is a transaction "in which material items would be removed from inventory and put to use in connection with a work order being performed, either at the site where the item had been stored, or at a different site."[75]   A "return," in contrast, is a transaction "where material items were intended to be used on a

---

[72] As with disposition transactions, I applied search terms to the MEMO line and the work order description associated with the materials transactions that Mr. Walter claims are cross-levels to isolate "counterfeit" transactions.

[73] *See, e.g.*, KBR-HOW-3132963 (Apr. 23, 2008 KBR technical report).

[74] As with disposition transactions, I applied search terms to the MEMO line and the work order description associated with the materials transactions that Mr. Walter claims are cross-levels to isolate MRN replacement transactions.

[75] Walter Report at 10.

work order but were returned to the original location."[76]  Thus, by definition a "return" is merely a reversal of an unnecessary cross-level.

48.   Nevertheless, Mr. Walter counted certain return transactions as cross-levels.  Specifically, Mr. Walter counted as a cross-level any return transaction where at least one of the following terms appeared in the MEMO field of the MATUSETRANS table of Maximo: "x level", "cross-level", "x lvl", "xlvl", "crosslevel","x-lvl", "x-level", and "xl."[77]  He also included returns transactions containing the distinct term "cross-level", although that term is not listed in his report.   Mr. Walter counted 25,695 such transactions valued at $43,654,776.[78]

49.   As a preliminary matter, return transactions do not fall within the customary understanding of a cross-level because the transfer does not fill a requisition.   By including return transactions based on the description in the MEMO field, Mr. Walter is ignoring the fact that the transactions are returns and therefore do not meet his own definition of a cross-level.

50.   Mr. Walter also errs in identifying purported cross-level returns by using the descriptions in the MEMO field.   I have analyzed Maximo return data and concluded that the "cross-level" language that Mr. Walter identified in the MEMO field for return transactions often copies the MEMO field in the issue transactions that the return is intended to reverse.   This

---

[76] Walter Report at 10.

[77] Walter Report at 13.  Mr. Walter testified that KBR employee Mike Ramirez informed him that "some of the people in the field were actually using returns to process cross-levels."  Walter Expert Dep. at 106:20-24.  Mr. Walter used these specific search terms because Ramirez "identified that when he was working in the materials group working with MAXIMO, that that is how some of the people would identify cross-levels."  Walter Expert Dep. at 107:4-7.

[78] Walter Report at 13, Figure 14.  Mr. Walter testified at his deposition that, after producing his report, he performed additional post-report "filtering" of the 25,695 return transactions that he included as cross-levels.  Specifically, he looked for words such as "cancelled" or "returned from cross-level" that had been included in the MEMO field of the transaction, and admitted that these should have been excluded from his cross-level transaction count.  Walter Expert Dep. at 107:8-24.  He testified that such return transactions accounted for about $3.5 million ("half a percent" of the approximately $700 million total value of materials cross-levels).  Walter Expert Dep. at 107:25-108:8.

suggests that the field descriptions in returns, on which Mr. Walter relies, had been copied and pasted from the issue transaction, which would represent the only actual cross-level.

51.    Mr. Walter testified that he did not analyze whether the MEMO field of any given return transaction he counted as a cross-level was identical to the MEMO field of the corresponding issue transaction.[79]  When asked whether the thought it was possible that KBR employees simply copied the memo field from the issue transaction into the memo field of the corresponding return transaction, Mr. Walter responded that he did not know.[80] He also testified that he performed no analysis to assess how close in time an issue of a given item was to the return of that same item.[81]  It therefore appears that Mr. Walter double counts by adding issues and returns as separate cross-levels.

52.    Moreover, Mr. Walter's methodology of identifying purported cross-level returns by using the descriptions in the MEMO field calls into question his methodology for identifying *all issues* that are purportedly cross-levels.  According to Mr. Walter, he relied on the MEMO field for returns because KBR's Michael Ramirez told him "that within the relevant table in Maximo, MATUSETRANS, the MEMO field for *most* transactions includes a manually-entered note describing the purpose of the transaction."[82]  It follows that Mr. Walter also should have screened the MEMO fields of the *issues* he counted as cross-levels for the same cross-level terms he used to identify *returns* that were purportedly cross-levels.  At his deposition, Mr. Walter conceded that he could have performed the same screening for issues and returns and that he had no knowledge of KBR instructing employees to use the MEMO field differently for issues than for returns.[83]

53.    Issue transactions, like return transactions, come from the MATUSETRANS table and contain a MEMO field.  If Mr. Walter had handled issue transactions in a manner consistent with how he handled return transactions, he would have found that only $266,823,808.98

---

[79] Walter Expert Dep. at 113:23-114:4.

[80] Walter Expert Dep. at 114:6-8.

[81] Walter Expert Dep. at 112:18-20.

[82] Walter Report at 13 (emphasis added).

[83] Walter Expert Dep. at 116:5-7 & 120:16-24.

were outside-the-wire. *See* Note 50, *supra*. Thus, by value, of the materials transactions that Mr. Walter identifies as cross-levels, *less than forty percent list cross-leveling as the purpose of the transaction*. This single adjustment to Mr. Walter's methodology would effectively eviscerate his analysis, and would demonstrate that KBR cross-leveled far less material ($267 million) than it over-ordered (over $340 million).

## 2. Mr. Walter Counts Assets that Also Appear in Materials Transactions

54.   Mr. Walter also erroneously double-counted asset cross-level transactions that appeared as materials cross-level transactions. Because these assets had unique identifying numbers, it is clear that the duplicate entry should not have been part of Mr. Walter's materials cross-level totals.

55.   I discovered this double-counting when, during my examination of Mr. Walter's output, I noticed that general property numbers (commonly called GP numbers or GPNs), most often written with an L or WL followed by six or seven numbers or a D or R followed by six numbers, appeared both in his asset cross-leveling list and in the MEMO field of his materials cross-leveling list. Further investigation showed that this convention (rather than the MATUSETRANS value) was one way in which KBR linked related materials and assets transactions. In particular, GP numbers that appear in MEMO lines often indicate that a specific asset or group of assets is being issued, and sometimes those issues are also recorded as asset transactions.

56.   For example, Mr. Walter included in his asset totals two cross-levels that occurred on 4/16/2009.[84] The first cross-level was of a ROWPU from ME-IRQ-USMI to ME-IRQ-D2-TG valued at $89,790, with the unique GPNUM L039123.[85] The second cross-level was likewise of a ROWPU from ME-IRQ-USMI to ME-IRQ-D2-TG valued at $86,500, with the unique GPNUM L218466.[86] The sum of the two is $176,290.

---

[84] Walter Expert Dep. Ex. 850.

[85] Walter Expert Dep. Ex. 850.

[86] Walter Expert Dep. Ex. 850.

57.     These exact same assets, with the exact same aggregate value ($176,290) and GPNUMs, also appear in Mr. Walter's output as a materials cross-level from ME-IRQ-USMI to ME-IRQ-D2-TG on 3/28/2009.[87]  This line shows a transfer from USMI-CEN to a workorder at IRQ-D2 for two ROWPUs at a per-item cost of $89,790 and a LINECOST of $89,790 * 2 = $179,580.  Furthermore, the MEMO line of the material transaction reads, in its entirety: "CROSS LEVEL USMI TO D2 $176290  L039123, L218466."  The movement (USMI-CEN to IRQ-D2) matches the two 4/16/2009 asset transactions; the LINECOST nearly matches; the dollar amount recorded in the MEMO matches exactly; and the two GP numbers recorded in the MEMO also match.  Mr. Walter agreed that it appeared he had double-counted $176,000 worth of ROWPU units.[88]

58.     To quantify the extent of this error by Mr. Walter, I performed my own analysis.  The presence of a GP number in a materials MEMO line does not necessarily indicate that an asset is being tracked as a material; for example, it can serve as a note that materials are being transferred to repair a specific asset.  Moreover, there are cases when an asset seems to be moved as a material but there does not appear to be a corresponding, duplicative asset transaction.  However, examples like the one described above can be identified with reasonable certainty by comparing KBR_GPNUMs in Mr. Walter's asset transaction list to the KBR_GPNUMs in the MEMO line in Mr. Walter's materials transactions list, then reviewing whether the SITEID and TOSITEID match the SITEID and WO_SITEID (or whether the material SITEID and WOSITEID appear in the asset FROMLOC and TOLOC).

---

[87] Walter Expert Dep. Ex. 851.

[88] Walter Expert Dep. at 177:10-21.  Mr. Walter recognized the double-counting issue when he wrote his report, but did not even begin to address it.  Rather than examine general property numbers to ensure he did not double-count items between the materials and assets datasets, Mr. Walter examined the MATUSETRANSID value in the ASSETTRANS table, excluding any lines where the MATUSETRANSID value table is not NULL (meaning blank).  Walter Report Appendix C at 35.  However, the MATUSETRANSID value is essentially never used in the ASSETTRANS table—it is non-blank for only 79 rows out of 7,732,277.  The fact that the MATUSETRANSID value is almost always blank does not mean that property was almost never simultaneously tracked as assets and materials.  By relying on the MATUSETRANSID value, Mr. Walter has altogether failed to analyze the problem.

59.    To be conservative, I excluded from the comparison any materials transactions with a total value of $1,000 or less.  I also excluded transactions where the MEMO line contains the word "repair," as that may indicate that materials were being transferred to repair a particular asset. I concluded that if an ASSETTRANS line passed these two filters, contained a GP number also found in a materials transaction, had the same from and to locations as that materials transaction (as described above), and took place within 30 days of that materials transaction, it was reasonable to suspect that the asset transaction was a likely duplicate of the materials transaction.

60.    Removing only those materials transactions that had apparent asset transaction duplicates (as defined above) for all GP numbers found in the materials transaction MEMO field resulted in a total reduction of over $10 million.[89]

### v.  Mr. Walter Incorrectly Identifies Materials Transactions Occurring at the Same Physical Site as Cross-Levels

61.    Mr. Walter incorrectly includes materials transactions occurring within a single physical site in his materials cross-level totals.  He does this by treating distinct "missions" operating within a single physical site as though they are separate from that site.  Specifically, he inaccurately treats intra-site transfers involving Theater Transportation Mission (TTM), Corps Logistics Service Support (CLSS), and Joint Military Mail Terminal (JMMT) as cross-levels.

62.    I understand that TTM was a mission within the LOGCAP III contract that required KBR to provide and maintain a fleet of equipment for moving materials throughout theater.[90]   It is my understanding that most sites within theater had their own TTM yard.[91]   If KBR

---

[89] I have chosen this as a conservative option, but it is worth noting that removing materials transactions that had at least *some* such duplicates increases this number to over $22 million. The parameters of this analysis could also be expanded—for example, reducing the value threshold below $1,000 or increasing the allowable time difference past thirty days would likely find additional apparent duplicates.

[90] Walter Expert Dep. at 137:19-138:5.

[91] Deposition of Jeffrey Rock ("Rock Dep.") at 94:17-18 ("Each location or each base cluster had a TTM operations site.").  Mr. Rock served as project manager for TTM from February 2007 through May 2008.  Rock Dep. at 29:12-15.

issued materials from one part of a site to the TTM yard located at another part of that same site, and vice versa, Mr. Walter counted that issue as a cross-level.[92]

63.     Much like TTM, I understand that CLSS and JMMT were separate missions within LOGCAP III.  There were not distinct geographic sites apart from other sites for TTM, CLSS, or JMMT.  Rather, any given geographic site might have activities supporting TTM, CLSS, or JMMT.[93]  When these missions obtained materials from a warehouse at the same physical site, it appears that Mr. Walter counted each issue from that warehouse to that mission as a "cross-level."

64.     Mr. Walter testified that he believes such transactions are valid cross-levels.[94]  He offers no support for this position.  Indeed, it contradicts his own definition of a "cross-level": "a transaction where an existing asset or material item already in inventory is transferred or *moved from one site to another site t*o fulfill a need at the receiving site."[95]

65.     To calculate the impact of Mr. Walter's error, I determined the SITEID from the LOCATION field when the TTM/CLSS/JMMT missions are involved.[96]  This correction removes $57,386,287.33 from Mr. Walter's outside-the-wire materials issues total.

---

[92] Walter Expert Dep. at 138:11-139:9; *see also* Walter Expert Dep. Ex. 843 (excerpt of Mr. Walter's "Asset Cross-Level" output identifying two asset issues between location "ME-IRQ-A" and location "ME-IRQ-A-TTM," both of which are located at Anaconda).

[93] *See, e.g.*, KBR-HOW-0021209 at '228, '250, '286 (TO 147 Extension SOW requiring KBR to provide mail delivery services through JMMT); KBR-HOW-0039093 (Appendix to TO 159 showing sites with CLLS and TTM operations).

[94] *See, e.g.*, Walter Expert Dep. at 140:10-16 ("I counted it as a cross-level if it went from A, the basic Bilad site, which is where KBR's initial tasking was providing food service, providing maintenance on military vehicles, et cetera, to a different mission in that same site, which was theater transportation, because that is a different location.").

[95] Walter Report at 5 (emphasis added).

[96] I also changed "IRQ-A1," which is the ordinary terminology used for the A1 site in the LOCATION field, to "IRQ-A," which is the SIDEID convention for the A1 site.  *See, e.g.*,  KBR-HOW-0039093, KBR-HOW-6830095.

### vi.  Mr. Walter Identifies Materials Transactions for Items that KBR Has Asserted Cannot be Cross-Leveled

66.  Mr. Walter includes as cross-level transactions several items that KBR has asserted in this litigation cannot, in fact, be cross-leveled.  These include incinerators, certain non-tangible items, and low-value items.

### 1.  Incinerators, Generators, and ROWPUs

67.  During my deposition, counsel for KBR suggested that my overordering output unreasonably suggested that KBR should have cross-leveled assets such as incinerators, ROWPUs, and generators.  For incinerators, KBR's counsel suggested that they were simply too big to cross-level.[97]  For ROWPUs and generators, KBR's counsel suggested that my model did not account for whether cross-leveling the asset would cause the sending site to fall below the asset's "reserve level."[98]

68.  Mr. Walter includes several transactions involving large incinerators in his material cross-level totals, suggesting that according to him they can in fact be cross-leveled.  As to ROWPUs and generators, I note that Mr. Walter's analysis identifies many instances of those assets being cross-leveled.[99]  Analyzing Mr. Walter's data and applying a minimum cost of $10,000 for generators and $100,000 for ROWPUs and incinerators yields four transactions and a total of over $975,000 for incinerators; over $2.6 million for ROWPUs; and over $29 million for generators. Applying the same parameters to Mr. Walter's asset data suggests that generators alone constitute over $550 million of Mr. Walter's asset cross-

---

[97] Gaukler Dep. at 249:2-16 (("So your model simulated the cross-level of, it looks like, two incinerators for a total cost of $575,000; is that right? . . . THE WITNESS: Yes. . .  Q. Do you know if it's physically possible to cross-level an incinerator? . . .  Q. Do you know how big they are? . . .  Q. Do you know how they would be transported across either Iraq or Afghanistan?").

[98] Gaukler Dep. at 250:3-9 ("Sir, I'll represent to you that [a ROWPU] is the primary means for soldiers to obtain potable water in a war theater. With that representation, sir, do you know whether or not your model by simulating a cross-level, if it had been effectuated, would have caused the donating site to go below a reserve level of reverse osmosis water purification units?"); Gaukler Dep. at 252:14-18("[C]an you tell us . . . whether in reality the cross-level of any of these generators would have caused a site to lose its reserve of standby generators?").

[99] See Walter Expert Dep. Ex. 847 (purported cross-level of ROWPU with $574,000 purchase price); Walter Expert Dep. Ex. 844 (three purported cross-levels of generators with purchase prices ranging from $20,000 to $250,000).

leveling totals, with ROWPUs accounting for over $100 million and incinerators over $20 million.

69.     Whether incinerators, ROWPUs, and generators are subject to cross-leveling when classified as assets is not relevant to my analysis.  Because my Affirmative Report does not analyze cross-leveled assets, I only included incinerators, ROWPUs, and generators when KBR had tracked them in its materials inventory system.  Aggressively removing all items of any size matching the search string "GENERAT" would result in a reduction of approximately $7.96 million. Removing the two ROWPU cross-levels which my model identifies[100], along with one ROWPU membrane and two filters, would yield a reduction of approximately $940,000. Removing the single incinerator cross-level would yield an additional reduction of approximately $575,000. All told, the maximum impact of these three item types on my analysis is less than $9.5 million.

### 2.  Non-Tangible Items

70.     During my deposition, counsel for KBR also presented documentation suggesting that my overordering model improperly counted KBR's failure to cross-level stamp departure taxes, a non-tangible item that cannot be cross-leveled, among KBR's overorders.[101]

71.     Non-tangible items are not subject to cross-leveling.  Before providing my Affirmative Report, I manually reviewed a selection of my model's overordering output to assess whether non-tangible items had been inadvertently included.  At that time, I noted that approximately $2.3 million of overorders had been determined for freight charges, described as "FREIGHT, OTHER," which had been misclassified by KBR as materials, so I removed that amount from the overordering totals presented in my Affirmative Report.

72.     Following my deposition, I re-reviewed the model's overordering output and discovered that it inadvertently included a few additional lines of non-tangible items, also misclassified by KBR as materials, worth $163,007.91 (less than five hundredths of a percent of the

---

[100] My original model excluded all ROWPU storerooms from cross-leveling because KBR's 30(b)(6) deponent testified that they were off limits to cross-level.  Affirmative Report at ¶ 122. The ROWPUs included in my original overordering output were not located in ROWPU storerooms.

[101] *See* Gaukler Dep. Ex. 820B.

original total). I have removed these lines and their associated cost from my revised overordering output.

73.    Mr. Walter, however, included far more intangible items than I did. I have reviewed Mr. Walter's output and note that he erroneously counts 1,317 lines of freight and other non-tangible items worth $41,525,710.15 as cross-levels. This amount should be deducted from the total value of materials cross-level transactions that Mr. Walter opines KBR performed.

### 3. TRECs

74.    I note that the number and value of materials cross-level transactions provided in Mr. Walter's written report include issues from TRECs. As I set forth in my Affirmative Report, a "TREC" was a virtual "receiving" storeroom in Maximo that recorded supplies that had been requisitioned and were either in transit to their final destination or that had arrived at their final destination but had not yet been "received" into the storeroom.[102] Mr. Walter quantified the value of such transactions after submitting his report, estimating that issues from TRECs, combined with issues from "9999" storerooms, accounted for "just under" 5% of the approximately $700 million in materials cross-level transactions.[103]

75.    At my deposition, counsel for KBR suggested that it was inappropriate to ever cross-level from a TREC, because it was only a "virtual" storeroom.[104] Counsel likewise asked whether I could quantify how many times my model simulated a cross-level from a TREC.[105] At Mr. Walter's deposition, however, Mr. Walter refused to concede the point that KBR's counsel had suggested, that it was an "error" to include issues from TRECs when counting KBR's total cross-levels.[106] I take this as further support of my understanding that materials in TRECs were not exempt from cross-leveling.[107]

---

[102] Affirmative Report at ¶ 44.

[103] Walter Expert Dep. at 45:1-46:25.

[104] *See* Gaukler Dep. at 260-67.

[105] Gaukler Dep. at 266:25-267:2.

[106] Walter Expert Dep. at 45:20-21 ("I'm not going to necessarily say that they were errors . . ."). *Id*. at 50:3-5 ("[I]f an issue is from a TREC, I don't know that that would say it's not a valid cross-level.").

[107]  To account for the concerns that KBR's counsel raised, when inventory is newly inserted into a TREC, my model protects that inventory from cross-leveling for 60 days from insertion.

76.     Mr. Walter's approach as reflected in his Report, which included TRECs, is consistent with the record, which indicates that the TRECs contained property that KBR could cross-level. I understand that KBR was unable to determine what had happened to a substantial portion of the material that was contained in the TRECs.  Thus, KBR does not know whether such material was in fact consumed, or remained in storerooms but "invisible" to sites that required that material.[108]  Further, KBR documents reflect that KBR employees concealed material in TRECs to avoid having the material cross-leveled.[109]  Accordingly, in the absence of proof to the contrary, it was entirely appropriate for me to consider material in a TREC for longer than 60 days as available for cross-leveling.

77.     Nevertheless, I have assessed the magnitude of TRECs on my analysis as Mr. Walter claims to have done for his analysis by performing a sensitivity analysis with my model.  I have determined that if the material in TREC storerooms were excluded from cross-leveling, it would reduce the overordering amount by approximately $50 million.  I believe that it would be erroneous to exclude this amount from my model results.

### 4.  Low-Value Transactions

78.     During my deposition, KBR's counsel questioned two separate cross-leveling lines included in my overorder cost analysis.[110]  The first line was an over-order for thirty cents worth of wire involving ITEMNUM #1000417362.[111]  KBR's counsel asserted that such low-value transactions were not subject to cross-leveling.

79.     Mr. Walter's own list of purported material cross-levels includes the following lines for this exact item:

---

[108] *See, e.g.,* Dep. Ex. 417 (KBR-HOW-0943208 at '208); Dep. Ex. 604 (KBR-HOW-1859673 at '675).

[109] *See, e.g.,* KBR-HOW-5634497 (Oct. 3, 2009 email); Dep. Ex. 233 (KBR-HOW-1031980); KBR-HOW-4200868; KBR- HOW- 1329009 (Aug. 2009 email); Dep. Ex. 230 (KBR-HOW-1132972) (Nov. 4, 2009 email).

[110] *See generally* Gaukler Dep. at 224-28.

[111] Gaukler Dep Exhibit 824B.

| MATUSETRANSID | TRANSDATE | LINECOST | QUANTITY (inv) |
|---------------|-----------|----------|----------------|
| 2671075 | 09-AUG-08 | $0.36 | 2 |
| 2984092 | 15-SEP-08 | $1.44 | 8 |
| 4643613 | 26-MAR-09 | $0.32 | 1 |
| 4819496 | 13-APR-09 | $0.18 | 1 |
| 5823182 | 05-AUG-09 | $0.18 | 1 |
| 7834257 | 30-APR-10 | $1.40 | 7 |

80.    In other words, Mr. Walter claims that KBR actually conducted at least six cross-levels for this exact type of wire; these cross-levels had a total value of between $0.18 and $1.40 each, a total cost per foot of between $0.18 and $0.32, and a total number of feet between 1 and 8.  According to Mr. Walter, KBR could (and did) cross-level very small amounts of wire.

81.    Mr. Walter's conclusions contradict KBR's suggestion at my deposition that my model's inclusion of small cross-levels somehow undermines its reasonableness.

82.    Moreover, by counting transactions as cross-levels regardless of the value of the items involved, Mr. Walter's approach is much less conservative than my own, as I conservatively exclude over-orders below a $100 threshold.[112]

### 5.    Cross-Level Transactions Fulfilled from Multiple Sites

83.    During my deposition, KBR questioned whether my model would have fulfilled cross-levels with inventory located at multiple sites, using the 30-cent wire over-order as an

---

[112]  Since my deposition, I have made a minor adjustment to this particular feature of my model, which further distances my approach from Mr. Walter's.  In my model, even when an over-order exceeds the $100 threshold, the model controls for cost outliers by checking whether the unit cost is greater than four times the median.  If it is, the model assumes the unit cost may reflect a unit conversion error (or other error) and reduces the effective unit cost to half of the median. Following my deposition, I determined that when my model reduced the unit cost of an item and the transaction fell below $100, the model did not reapply the *de minimis* $100 threshold filter to the post-correction amount.  As a result, some post-correction transactions below $100, including an order involving ITEMNUM #1000417362, appeared in my model results.  Even though Mr. Walter would count such transactions without any correction at all, for the sake of consistency, I have filtered the overordering output data to remove over-orders with post-correction values below $100.  The change to the model's overordering results is relatively trivial: the correction removes 2,399 modeled over-orders from my original output file for a total reduction of $66,842.23 in ordering costs (less than two hundredths of a percent of the original total).

4:11-cv-04022-MMM-JEH    # 311-6    Filed: 09/29/22    Page 32 of 46

example, and suggested that such fulfillment would be inappropriate.[113]   Mr. Walter's report does not eliminate or otherwise assess when KBR fulfilled its purported cross-levels with inventory located at multiple sites.

84.    I am not aware of anything in KBR's documents, practices, or procedures that limited cross-level fulfillment to a single site.  In fact, my understanding is that the DMC routinely filled orders by cross-leveling from multiple sites.[114]  Because Mr. Walter's methodology would count cross-levels filled from multiple sites as separate cross-level transactions, it is appropriate for me to do so as well.

### vii.    Mr. Walter Overstates the Value of Materials Cross-Levels by Failing to Correct Materials Purchase Price Errors.

85.    Mr. Walter fails to control for inconsistent pricing of identical materials.  Indeed, he takes the information in Maximo at face value, without any attempt to account for and correct inconsistencies.

86.    Mr. Walter does not account for LINECOST inconsistencies in materials transactions.  ITEMNUM 1001917529, for example, a hydraulic pump, appears in Walter's materials cross-leveling issue data on 55 separate lines.  Forty-eight of these lines involve a quantity

---

[113] Gaukler Dep. 242:5-18 (Q. The output doesn't tell us, for example, this comes from one site or three sites; right? A. That's right. Q. So is it possible in your model, sir, that your model would have -- your model states that there should have been a cross-level of 1 foot of wire each from three different sites in Iraq? A. It's a possibility. Q. Okay. As you sit here today, you can't tell us whether, in fact, that's what your model did  here? A. I cannot. I mean, I would have to go back to the model and determine that. I could, but I can't do it right now.").

[114] *See, e.g.*, KBR-HOW-0573682; KBR-HOW-0355253; KBR-HOW-0415791.  In any case, the vast majority of the over-orders in my model results could have been cross-leveled from one site and even severe limitations on multi-site cross-leveling have a relatively small impact on the model's conclusions.  77.1% of the model's identified over-orders were fulfillable by cross-leveling from a single site; 14.9% were fulfillable by cross-leveling from two sites; 4.2% were fulfillable from three sites; and the remaining 3.8% were fulfillable from four or more sites .  In multi-site cases, the bulk of the over-order could have been fulfilled from the first or first and second sites, with the additional sites contributing relatively little.  Assuming that no more than two sites could fulfill an order would reduce KBR's over-orders by $5.8 million, or approximately 1.7% of the original total.  Even limiting the number of sites to one would reduce the over-orders by only $19.2 million, or approximately 4% of the original total. In performing this calculation, I have extracted physical sites from the TTM, CLSS and JMMT missions, in order to remain consistent with my analysis of Mr. Walter's report.

of one; the remaining 7 involve quantities between 2 and 15, for a total quantity of 91. For each of these lines, Walter adds the total LINECOST to his purported cross-leveling total, without performing even the most basic outlier analysis to check his conclusions. But in the case of this pump, the per-unit cost varies from line to line as follows:

| #1001917529 Lines at LINECOST/QUANTITY | Total QUANTITY | Exact LINECOST/QUANTITY On Line |
|---|---|---|
| 1 | 6 | $668.19 |
| 7 | 20 | $675.56 |
| 8 | 22 | $694.59 |
| 13 | 18 | $703.32 |
| 2 | 2 | $825.00 |
| 21 | 21 | $1,000.00 |
| 2 | 2 | $703,032.00 |

87.   From this investigation, which can be done by examining fields in Mr. Walter's final output, it appears that two of the lines overstate the per-item cost. In this case, it also appears that the cause of the error was the mistaken entry of a zero rather than a decimal place, since $703.32 is the second most commonly occurring unit price in the data. Putting this observation aside, and correcting the $703,032.00 down to the highest reasonable per-unit cost found in the data ($1,000), suggests that an excess $1,404,064.00 was added to Walter's purported materials cross-leveling value by this error alone.

88.   To assess the impact of LINECOST inconsistencies on Mr. Walter's conclusions, I conducted a simple search through Walter's issue data for ITEMNUMs that met the following criteria: (1) the maximum non-zero per-item price observed on a line was over $1,000; (2) the maximum non-zero per-item price was more than 100 times greater than the second-highest per-item price; (3) three or more distinct non-zero per-item prices were observed; and (4) the highest per-item price did not appear on more lines than the other non-zero prices.

89.   For ITEMNUMs meeting these criteria, I applied the conservative correction used in the hydraulic pump example above, replacing the maximum per-item price ($703,032.00 in that example) with the second-highest per-item price ($1,000.00 in that example) and noting the difference. I did this even when (as in the pump example) there is clear evidence suggesting that the highest-value price was supposed to have been entered at a price lower than the second-highest price (in this case, $703.32).

90.    I consider these to be conservative choices for an outlier analysis (meaning that they are more likely to allow implausible values than omit plausible values).  The first two criteria ensure that I focused on relatively high-value items with extreme discrepancies between the highest price and the second-highest price listed.  The third criterion omits cases where only two prices are given, which would suggest that further analysis might be needed to determine whether the high value or the low value was the outlier.  The fourth criterion omits cases where a majority of the evidence in the data set supports the highest price.

91.    Applying this analysis to Walter's data suggests that clear cost errors have lead his materials cross-leveling value to be overstated by at least $31 million.[115]

92.    In contrast, my model implements safeguards designed to control for the existence of unit conversion and pricing errors in KBR's Maximo data.[116]  As I explained in my Affirmative Report, I assess the unit cost of an item against the unit costs for other orders for the same ITEMNUM and ORDERUNIT.[117]  If the unit cost is greater than four times the median, I assume the unit cost may reflect a unit conversion error (or some other type of error) and reduce the effective unit cost to half of the median.[118]  This cost correction approach is intended to be aggressively conservative.  If I had ignored unit cost errors, as Mr. Walter did, my overordering estimate would have been approximately $36.7 million greater.

---

[115] These criteria omit cases which, upon examination, appear to represent incorrectly high prices.  For example, Mr. Walter's data contains four lines for a single unit of item number #1002668119, which is a "STATOR PLATE ASSY."  Three of these lines have a unit cost of $505,378; the fourth has a unit cost of $505.78. This example is excluded by criterion 3 (since only two distinct prices are specified) and criterion 4 (since the higher price occurs on three lines and the lower price occurs only on one).  However, it appears that the difference between the high and low price is the result of a decimal-place error (just as in the hydraulic pump example).  I have counted this error as a reduction because I identified it through manual examination, but there undoubtedly are other errors that my criteria exclude.  For comparison, reducing the minimum unit cost to $100, the minimum multiple to $10, and removing criteria 3 and 4 yields an adjusted reduction of over $81 million.

[116] *See* Affirmative Report at  ¶¶ 118, 141, 146.

[117] Affirmative Report at ¶ 146.

[118] Affirmative Report at ¶ 146.  I also exclude all orders processed in currencies other than USD.  Affirmative Report at ¶ 145.

93.   Mr. Walter could have been similarly precautionary. But he did not implement even a simple method that analyzed data only from transactions that Mr. Walter had already identified as being cross-leveled.

94.   My Affirmative Report also controls for unit errors that could artificially increase the order size, such as ordering feet of wire instead of spools of wire. I do this by assessing whether the order quantity associated with the order is greater than 100 times the median of all order quantities for the same ITEMNUM and ORDERUNIT.[119] If the order quantity is an outlier in the positive direction, the order is not processed for cross-leveling.[120]

95.   At my deposition, counsel for KBR presented documents indicating that my unit conversion and pricing safeguards had failed to catch certain outliers.[121] Following the deposition, I investigated the issue and discovered that I had erroneously used the stated UNITCOST from the purchase order line when applying this correction, rather than using the effective unit cost (meaning the RECEIVEDTOTALCOST divided by the RECEIVEDQTY). This meant that when the UNITCOST itself was misstated, the correction would fail.

96.   Fixing this error in my cost correction of the algorithm caused the removal of an additional $2,545,756.33 from my overordering output (approximately three fourths of one percent of the original total).

### viii. Summary of Materials Adjustments.

97.   When I apply the corrections listed above to Mr. Walter's determination that KBR cross-leveled approximately $705 million of materials, excluding inside the wire transactions, that amount is reduced to approximately $495 million. Those adjustments include the removal of apparent data cleanup and disposition lines, the application of cost correction for extreme values, the exclusion of returned materials, the removal of non-physical items, the use of site information present in location values, and the removal of some materials

---

[119] Affirmative Report at ¶ 141.

[120] Affirmative Report at ¶ 141.

[121] *See* Gaukler Dep. Exs. 821A, 821B, 822A, 822B, 823A, 823B.

lines which seem to have been double-counted on the asset side of Mr. Walter's analysis. All of these are described above.

98.    While the overall difference in the outside-the-wire totals is approximately 25%, the reduction in 2010 is closer to 40%, with an original total of approximately $240 million reduced to around $145 million.

99.    The overall reduction in Mr. Walter's inside-the-wire total is even more dramatic, with an original balance of approximately $530 million reduced to less than $300 million—a reduction of almost 45%.

100.    I have also calculated the adjustments to my own model to reflect the additional analysis discussed above.  Those adjustments, which include the use of effective unit cost rather than stated unit cost in performing cost correction, the application of a *de minimis* cutoff after cost correction, and the removal of some additional non-physical items identified after my first report, reduce my original overorder estimate from $340,962,581.20 to a total of $338,184,225.62.  This represents a reduction of $2,778,355.58, which is eight tenths of a percent of my original total.

101.    I have included the code I used to conduct these analyses.  It reads Mr. Walter's output files, and writes a set of lines indicating, for any MATUSETRANSID in Mr. Walter's data set implicated in the above analyses, what category and what specific observations are associated with the line. The rightmost value represents any adjustment to the LINECOST of the associated line. This file should allow the easy derivation of the totals described above. The code base also contains reference queries that I used to examine Mr. Walter's output in the MAXIMO context. Because of certain small irregularities in Mr. Walter's materials output, the materials queries do not match his output exactly, but the asset queries do.

102.    I have also included the adjusted over-ordering cost (OOC) code and its output.  (The underlying over-ordering (OO) model was not changed—the three changes described above are limited to the post-processing step).

### D.     Mr. Walter's Assets Analysis Suffers from Many of the Same Flaws as His Materials Analysis

103.  As discussed above, Mr. Walter's analysis of asset transactions is entirely irrelevant to my Affirmative Report.  My purpose in providing some analysis of Mr. Walter's asset cross-levels is to demonstrate some obvious flaws in his analysis.

####     i.     Mr. Walter Improperly Counts as Cross-Levels Asset Transactions that Occur Extremely Close in Time

104.  Mr. Walter inflated the number of asset cross-levels by double or even triple counting transactions involving identical assets that occurred improbably close in time to one another.

105.  As Mr. Walter notes, "[w]ithin Maximo, an asset is given a unique identifier indicated in the field ASSETID."   This field refers not to the type of asset, but to a specific, individual item.[122]

106.  Mr. Walter purports to identify 444,427 asset cross-levels before the cutover and 435,883 asset cross-levels after the cutover, for a total of 880,310 transactions.[123]  Twenty of these are for transactions where the ASSETID is NULL (meaning that it is missing or blank). The remaining 880,290 transactions are spread across only 332,321 distinct ASSETIDs.

107.  152,560 (45.9%) of the 332,321 distinct ASSETIDs appear only once in Mr. Walter's output, meaning that Mr. Walter believes they were cross-leveled once.  However, 179,761 (54.1%) of the ASSETIDs appear in the output more than once, meaning that Mr. Walter believes they were cross-leveled multiple times.  Some assets appear many times, with 14,154 occurring ten times or more, and 942 occurring 20 times or more.  The record is held by ASSETID #23695420—described as a "VEST BALLISTIC W/PLATES SIZE 2XL"—which appears 44 times in Mr. Walter's data.  Again, as I noted above, each of these appearances is counted as a separate cross-level, with no exceptions.

---

[122] Walter Report at 5, n2.

[123] Walter Report at 8-9.

108.    While it is not impossible for a given asset to be cross-leveled more than once, allowing KBR to avoid multiple new purchases at multiple sites, Mr. Walter's data suggests that many of these multiple occurrences almost certainly are not separate cross-levels.

109.    Maximo records the exact time[124] of each asset transaction.  In many transactions, Mr. Walter has identified two or more transactions that occur less than 24 hours apart, sometimes much less so.   8,805 of the 13,706 within-a-day transactions (covering $39,054,775.47) occur within 8 hours of the previous transaction; 4,246 of them (covering $26,409,040.44) occur within an hour; 1,817 (covering $16,343,696.78) occur within 5 minutes.  And 396 (covering $7,121,250.09) occur on the same second as the previous transaction, with another 77 (covering $1,797,957.14) occurring in the very next second.

110.    For example, Mr. Walter's asset cross-level output counts three transactions involving the transfer of "Truck Tractor HET" with the ASSETNUM 761179 and a purchase price of $337,610.[125]  Each transaction identifies ME-IRQ-A as the FROMLOC and ME-IRQ-TTM-A as the TOLOC.[126]  And each transaction occurred at exactly 15:07:11 on 9/29/2009.[127]  Plainly, only one transfer of ASSETNUM 761179 from ME-IRQ-A to ME-IRQ-TTM-A occurred at exactly 15:07:11 on 9/29/2009.  Instead of counting this transaction once and adding $337,610 to KBR's purported asset cross-level total, Mr. Walter counts this transaction three times and adds $1,012,830 to that total.[128]

111.    Similarly, Mr. Walter's asset cross-level output counts two transactions involving the transfer of a "Truck Fire Fighting Rescue" with the ASSETNUM 450778 and a purchase price of $643,492.90.[129]  The first transaction identifies ME-IRQ-B6 as the FROMLOC

---

[124] Mr. Walter's prepared output files ("Asset Cross-Levels Before Cutover.csv" and "Asset Cross-Levels After Cutover.csv") contain only date information for each asset transaction, but Maximo records both date and time information.  I have used the original Maximo data to perform this analysis.

[125] Walter Expert Dep. Ex. 845.

[126] Walter Expert Dep. Ex. 845.

[127] Walter Expert Dep. Ex. 845.

[128]  Walter Expert Dep. at 146:11-14 ("Q So you've counted this $337,000 truck tractor three times for a single cross-level, correct?  . . . THE WITNESS: I believe I would have.").

[129] Walter Expert Dep. Ex. 846.

and ME-IRQ-B1 as the TOLOC and occurred at 10:31:35 on 1/10/2010.[130]  The second transaction identifies ME-IRQ-B1 as the FROMLOC and ME-IRQ-B6 as the TOLOC and occurred at 10:35:47 on 1/10/2010—a mere four minutes after the original transaction.[131]

112.    Mr. Walter confirmed at his deposition that his methodology would capture both of these transactions, crediting KBR with having cross-leveled assets worth approximately $1.2 million.[132]   He testified that he did not know why "four minutes apart two different transactions are here, but the employees are the ones that put this information into the system on that date.  That's all I can tell from this."[133]

113.    It is my opinion that any reasonable analysis would exclude transactions occurring within 24 hours of a prior transaction without strong affirmative evidence that they represent genuine separate cross-levels rather than database entry errors or steps in an asset's journey from one site to another.

114.    In my experience, excluding transactions occurring within 24 hours would be the absolute minimum needed for a reasonable analysis, as transactions occurring in longer increments, especially those occurring within 48 hours, are similarly improbable.   While it is theoretically possible that KBR could have cross-leveled an asset from one site to another, fulfilling a need at the receiving site and avoiding a new purchase, and then moved the asset to another site within 24 hours, fulfilling a new need at the other site and avoiding another purchase, time and geography makes this improbable.[134]

115.    Using the transaction times saved in Maximo, I have determined that 13,706 of Mr. Walter's purported asset cross-levels occur within 24 hours of another purported cross-level for exactly the same asset.  The total PURCHASEPRICE value associated with these within-a-day lines is $50,872,160.46.

---

[130] Walter Expert Dep. Ex. 846.

[131] Walter Expert Dep. Ex. 846.

[132] Walter Expert Dep. at 147:12-19.

[133] Walter Expert Dep. at 148:3-7.

[134] *See, e.g.*, Dep. Ex. 509 (KBR-HOW-6091367 at '368) ("The average time for cross-leveling is in the range of 16-20 days, whereas for purchasing the average time is 90-120 days.").

### ii. Mr. Walter Incorrectly Counts as Cross-Levels Asset Transactions Occurring at the Same Physical Site

116. As he did with materials, Mr. Walter improperly counts transactions involving TTM, CLSS, and JTTM as cross-levels.

117. For example, for a pre-cutover asset transaction with a FROMLOC of ME-IRQ-A and a TOLOC of ME-IRQ-A-TTM, Mr. Walter's algorithm concludes that the asset is moving between two different sites. His algorithm similarly concludes than an asset transaction with a FROMLOC of ME-IRQ-H3-TTM and a TOLOC of ME-IRQ-TTM-H3 is a cross-level.

118. Mr. Walter makes a similar error in his post-cutover asset analysis. After the cutover, Mr. Walter's analysis compares SITEID and TOSITEID to each other. However, the FROMLOC and TOLOC fields are still filled out and available for analysis. In Maximo, TTM, CLSS and JMMT locations typically receive SITEID values of IRQ-TTM, IRQ-CLSS, and IRQ-JMMT, with the LOCATION values indicating the actual site. For example, a LOCATION value of ME-IRQ-H3 would correspond with a SITEID value of IRQ-H3, but a LOCATION value of ME-IRQ-H3-TTM would correspond with a SITEID value of IRQ-TTM. Mr. Walter therefore effectively counts any movement into the TTM, CLSS, and JMMT missions as a cross-level, whether or not it meets his definitional requirement that the transaction moved the asset between sites.

119. I have not analyzed these patterns systematically, but I have looked at the association between FROMLOC and TOLOC and SITEID and TOSITEID manually. Pre-cutover, the total PURCHASEPRICE associated with a FROMLOC of ME-IRQ-A and a TOLOC of ME-IRQ-A-TTM is over $415 million by itself. Based on an initial review, I estimate that correcting these issues would reduce Mr. Walter's pre-cutover asset cross-leveling total by over $500 million and his post-cutover asset cross-leveling total by at least $20 million.[135]

---

[135] Mr. Walter's decision to ignore LOCATION information post-cutover and rely entirely on SITEID values creates another inconsistency between the pre- and post-cutover analyses. Namely, it excludes transactions from his asset cross-level pre-cutover when, post-cutover, it would count the same transactions as cross-levels. The inconsistency is well-illustrated by the F2 site, which the Maximo data suggest contained various subsites, including IRQ-F23A, IRQ-F2-3B, IRQ-F2-3C, IRQ-F2-IZ, IRQ-F2-PK, and IRQ-F2-WW. Because pre-cutover transactions contain identical SITEID and TOSITEID fields in Maximo, Mr. Walter attempts to

### iii.  Mr. Walter Overstates the Value of Assets Cross-Levels by Failing to Correct Asset Purchase Price Errors

120.    Just as Mr. Walter failed to correct purchase price errors in his materials analysis, he failed to do so with his assets cross-leveling analysis.

121.    Mr. Walter does not analyze the PURCHASEPRICE data by ASSETID and therefore counts apparently erroneous PURCHASEPRICE values towards the asset cross-leveling total.  I have identified 59 individual assets (by ASSETID) which are cross-leveled multiple times but have inconsistent PURCHASEPRICE values in Mr. Walter's output.[136]  Some of these inconsistencies are individually quite significant.  For example, Mr. Walter included three transactions in his asset cross-level totals that each involved the transfer of a "Generator Set 60 KW" with the ASSETNUM 155648.[137]  The first cross-level transaction, dated 12/4/2009, identified the purchase price at approximately $250,000.[138]  The remaining two transactions, dated 12/18/2009 and 6/10/2009, identified the purchase price at $20,000.[139]  Mr. Walter did not adjust the $250,000 price downward, despite it being an obvious outlier.  Instead, he simply "used the purchase price as it was identified in MAXIMO," without performing any correction for likely "human error."[140]

---

identify site information from the FROMLOC and TOLOC fields.  Walter Report Appendix C at 34.  To do this, he extracts the first 9 characters from the FROMLOC and TOLOC fields and "limits the report to transactions where the first nine characters in the TOLOC field and the first nine characters in the FROMLOC field do not match. . . . [which] filters out transactions where assets were not transferred outside their original locations."  Walter Report Appendix C at 34.  This 9-character comparison causes Mr. Walter to exclude transactions occurring at the F2 subsites from his pre-cutover asset cross-level count.  For example, Mr. Walter excludes (pre-cutover) asset transactions with a FROMLOC of ME-IRQ-F2 and a TOLOC of ME-IRQ-F2-3B. However, the same transaction post-cutover would typically have a SITEID of IRQ-F2 and a TOSITEID of IRQ-F23B, and would therefore be included as a cross-level if it happened later in time.

[136] I have not counted missing or zero PURCHASEPRICE values as inconsistent, as I interpret those as the absence of information rather than the presence of conflicting information.

[137] Walter Expert Dep. Ex. 844.

[138] Walter Expert Dep. Ex. 844.

[139] Walter Expert Dep. Ex. 844.

[140] Walter Expert Dep. Ex. 143.

122.    The price correction I used in my model (as described above) would have adjusted for this human error automatically. In other words, my methodology would have determined that "Generator Set 60 KW" price at $250,000 was an outlier and conservatively reduced the price to $10,000, half of the $20,000 median price.

### E.  Mr. Walter Incorrectly Concludes that His Calculations are Necessary to Reflect the "Reality" of KBR's Inventory Management

123.    At his deposition, Mr. Walter criticized my model as "based on a utopia where everything is going to be perfect and the computer can make decisions" that did not reflect the "reality of the environment that KBR and its employees were working in."[141]  Indeed, in opining that my overordering output of $341 million amounted to "only" 15.5% of the in-scope purchase order line dollars for materials, Mr. Walter testified that he felt this "context" was necessary to provide in his written report in light of the "very utopian" nature of my model.[142]

124.    During my deposition, counsel for KBR likewise questioned whether my model's output was "reflective of the reality of the period" my model covers, and further suggested that I had not sufficiently "validated" my model.[143]

125.    The premise of these critiques of my model is misguided.  In preparing a model that analyzes KBR's inventory levels over time, I wrote computer code that accounts for the items that KBR received into and issued from its warehouses.  It is a feature of my methodology, not a "utopian" bug, that the code will process each and every transaction the same way under the rules reflective of KBR's policies and procedures.  This method sets a high standard for both accuracy and conservativism, which allows the model to return reasonable results despite the natural presence of a certain amount of human uncertainty.

126.    As I explained in my Affirmative Report and at my deposition, I performed an internal validation and reviewed contemporaneous documents that assured me that my model fairly implements KBR's contemporary inventory control procedures.  My internal validation

---

[141] Walter Expert Dep at 31:1-5.

[142] Walter Expert Dep. at 82:2-21.

[143] Gaukler Dep. at 118:4-6.

specifically checked for the consistency of KBR's inventory balances over time.[144]  The incidence of unidentified patterns in this data was quite low, accounting for only 1.5% of all the transactions I processed.[145]  I programmed the model to respond to unidentified patterns by setting its modeled balances to zero, so that any inconsistencies in the data or the rules I applied would understate KBR's accumulated inventory and therefore underestimate KBR's overordering due to failures to cross-level.[146]  I also performed an extensive manual inspection of many ILBs.[147] These actions sufficiently validate the model.

127.    Nonetheless, I have performed an additional analysis demonstrating that my model is closely tethered to the reality of KBR's own inventory counts during the relevant time period.  I have utilized KBR's contemporaneous Authorized Stock List reports (ASL reports) to validate the model's historical reconstruction of inventory balances.  The ASL reports are suitable for this purpose because, when they are generated, they record the current balance (meaning the system or logical balance) and the physical count (meaning the count recorded when the last physical inventory was performed) for the item numbers, storerooms, and bin numbers analyzed in the report on the date that each ASL report was run.

128.    I began this analysis by extracting item number, storeroom, bin number, current (system) balance, and physical count information from 250 distinct ASL report files provided to me in their original format.[148]  This data set contains 1,041,621 lines recorded on 38 distinct dates between December 17, 2008 and March 8, 2011. I then used the inventory reconstruction components of the model to calculate the model balance for each item number, storeroom, and bin number found in the ASL data set on the date that the relevant

---

[144] Affirmative Report at  ¶ 93-94.

[145] Affirmative Report at  ¶ 95.

[146] Affirmative Report at  ¶ 119.

[147] Affirmative Report at  ¶ 96.

[148] The set contains every line I was able to identify in the provided files, other than a small number of lines (n=62,122) from 7 separate files where the ASL reports showed multiple distinct balances for the same ITEMNUM, STORELOC, and BINNUM on a single date.

ASL report was run.  Finally, I compared my modeled balance to the system balance and physical count recorded in the ASL files for each item/storeroom/bin on each date to see whether the model's reconstruction typically matched the historical balance data provided by the ASL files.[149]

129.    Approximately 8.20% of the item/storeroom/bin combinations present in the ASL reports were not found in the Maximo data. This suggests, if anything, that inventory data may have been removed from the Maximo transaction tables after the relevant ASL reports were run, which would lead my model to conservatively underestimate the amount of inventory that was actually available for cross-leveling. Without further investigation, I cannot conclude that inventory information was scrubbed from the Maximo transaction tables, but these mis-matches suggest the possibility.  An additional 0.15% of item/storeroom/bin combinations consist of' LC-IRQ-G3-GTHR lines which can be found under two different SITEIDs (IRQ-G3 and IRQ-G6). I exclude these rare cases as well, since I cannot be sure which inventory balance the ASL report is referring to without further investigation..

130.    I next place these two categories aside in order to analyze the cases where a direct, unambiguous comparison between the ASL data and the modeled balances is possible.  My analysis shows that for 97.95% of the ASL lines, the reconstructed model balance is exactly equal to the system balance recorded in the ASL data.  This is the normal expectation in MAXIMO.  An additional 0.16% of the ASL lines have the model balance distinct from the system balance but equal to the physical count, which can occur when certain transaction types update the physical count but not the system count.  This leaves 1.89% of cases in which the model balance does not match the ASL data.  In 67% of these cases (1.26% of the overall lines) the model balance is either zero (1.11%) or lower (0.15%) than either the ASL current balance or the ASL physical count, suggesting that when there is a mismatch, the model typically underestimates the balance available, often showing no balance available.  In 0.52% of cases, the model balance is higher than the recorded ASL

---

[149] To perform this comparison, I have turned off additional conservative features of the model (settling time and protection time) since the ASL report numbers would not reflect these assumptions.  This means that even when the model conclusions match the ASL report exactly, the balance that the model considers potentially available based on its extremely cautious inventory reconstruction assumptions is often lower than what the ASL report recorded.

balances, and in 0.11% of cases, the model balance lies between the ASL current balance and the ASL physical count.[150]

131.  Consequently, the model I have developed accurately reflects the reality of KBR's warehouses as set forth in KBR's contemporaneous inventory records.  Out of approximately one million records, the model perfectly validates against over 935,000 lines of contemporaneous data, and when it does not exactly match it tends to understate the amount that was available. Notably, Mr. Walter concedes that he did not analyze my methodology.[151]  It is therefore not clear on what basis he questions the accuracy of my results.

## V.    REBUTTAL OF OTHER KBR EXPERT OPINIONS

132.  I understand that several of KBR's other experts have discussed some of the logistical challenges presented by attempting to cross-level in a war theater.  While I do not address the validity of such concerns, my analysis of KBR records suggest that such considerations did not often preclude KBR from cross-leveling materials.

133.  Beginning in July 2009, the Distribution Management Center began preparing comprehensive reports reflecting the number and total value of approved cross-levels per day, approved cross-level denials, and the specific store location which was denying availability.

134.  The earliest comprehensive report I received is dated July 22, 2009, and the latest is dated October 25, 2011. This represents a time period of 826 days.  I have analyzed approximately 650 separately-dated reports within this period,[152] meaning that my analytical sample covers approximately 80% of the time period in question.  A comparison of the values of the per-day lines that the DMC supported against the daily lines that were

---

[150] I have not investigated these mismatches comprehensively, but I suspect that some of them reflect the fact that I am reconstructing model balances at midnight on the day listed in the ASL file name.  If balance-changing transactions occurred between this point in time and the point in time when the ASL report was actually run, that would manifest as a mismatch.

[151] Walter Expert Dep. at 31:21-23.

[152] I screened out two reports, KBR-HOW-3470818 and KBR-HOW-0392550, which appear to contain mathematical errors.

denied by the sites shows that the per-day support was approximately $93.5 million, whereas the per-day denials were approximately $1 million, suggesting a denial rate, by value, of about 1%.[153]

135.    I intend to consider the impact, if any, that incorporating these denials could have on my model, and will be prepared to discuss that topic at my deposition.  I expect, however, that any change will have a minimal effect on my analysis.



By:    _____

Gary M. Gaukler

June 27, 2022

---

[153] These reports also contain information about cross-level requests that are still waiting for approval, as well as a separate total that appears to reflect the total of all cross-levels approved on a day, even when they originated on previous days.  Comparing the overall totals suggest that the cross-levels waiting for approval were denied at a rate that is, if anything, lower than the same-day denial rate.