E-FILED
Monday, 31 October, 2022  08:02:39 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* GEOFFREY HOWARD and ZELLA HEMPHILL,<br><br>    Plaintiffs,<br><br>    v.<br><br>KBR INC. and KELLOGG BROWN AND ROOT SERVICES INC.,<br><br>    Defendants. | Case No. 4:11-cv-04022-MMM-JEH<br><br>Judge Michael M. Mihm<br>Magistrate Judge Jonathan E. Hawley |

**PLAINTIFFS/RELATORS' OPPOSITION
TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF
PLAINTIFFS' REBUTTAL EXPERT DOV ZAKHEIM, Ph.D.**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................ 1

II.  BACKGROUND ......................................................................................................... 1

III.  LEGAL STANDARD ................................................................................................. 5

IV.  ARGUMENT .............................................................................................................. 6

    A.  Dr. Zakheim's Testimony Will Assist the Trier of Fact. ................................... 6

    B.  Dr. Zakheim's Testimony is Reliable Because His Methodology is
    Based on his Extensive Experience. ................................................................. 7

    C.  Dr. Zakheim Relies on Sufficient Facts and Data in Forming His
    Opinions and His Factual Assumptions are Supported by the Evidence. ....... 11

    D.  KBR's Arguments Go to the Weight, Not Admissibility ................................. 19

    E.  Dr. Zakheim Directly Rebuts KBR's Expert Goetz. ....................................... 20

V.  CONCLUSION ......................................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

## Cases

*Africano v. Atrium Med. Corp.*,
   561 F. Supp. 3d 772 (N.D. Ill. 2021) ................................................................. 20

*Brown v. Burlington N. Santa Fe. Ry. Co.*,
   765 F.3d 765 (7th Cir. 2014) ...................................................................... 10, 11

*Cohen v. Astrue*,
   258 Fed. App'x 20 (7th Cir. 2007) ...................................................................... 16

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) .......................................................................... 6, 7, 8, 19

*Dhillon v. Crown Controls Corp.*,
   269 F. 3d 865 (7th Cir. 2001) .............................................................................. 7

*Est. of Carlock v. Williamson*,
   No. 08-3075, 2013 WL 12244415 (C.D. Ill. June 21, 2013) ................................... 9, 11, 13

*Illinois Liberty PAC v. Madigan*,
   No. 12 C 5811, 2015 WL 5589630 (N.D. Ill. Sept. 21, 2015) ............................................ 8

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   581 F. Supp. 3d 1029 (N.D. Ill. 2022) .......................................................... 6, 14

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................................ 8

*Manpower, Inc. v. Ins. Co. of Pa.*,
   732 F.3d 796 (7th Cir. 2013) ....................................................................... 11, 20

*Metavante Corp. v. Emigrant Sav. Bank*,
   619 F.3d 748 (7th Cir. 2010) .............................................................. 7, 9, 11, 13

*Miller UK Ltd. v. Caterpillar, Inc.*,
   No. 10-CV-03770, 2015 WL 10818831 (N.D. Ill. Nov. 1, 2015) ................................... 8-9

*Orthofix Inc. v. Gordon*,
   No. 1:13-cv-1463, 2016 WL 1273160 (C.D. Ill. Mar. 31, 2016) ...................................... 15

*Prayitno v. Nextep Funding LLC*,
   No. 17 C 4310, 2019 WL 6497374 (N.D. Ill. Dec. 3, 2019) ...................... 9, 11, 13, 19-20

*Richman v. Sheahan*,
    415 F. Supp. 2d 929 (N.D. Ill. 2006) ................................................................................ 14

*Smith v. Ford Motor Co.*,
    215 F.3d 713 (7th Cir. 2000) ...................................................................................... 15, 20

*Stevenson v. Dowie*,
    3 Ill. Cir. Ct. Rep. 135 (1902) .......................................................................................... 16

*Stollings v. Ryobi Tech., Inc.*,
    725 F.3d 753 (7th Cir. 2013) ............................................................................ 5, 6, 19, 20

*Triad Cap. Mgmt., LLC v. Priv. Equity Cap. Corp.*,
    No. 07 C 3641, 2010 WL 10076450 (N.D. Ill. Nov. 22, 2010) ........................................ 9

*Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*,
    223 F.3d 585 (7th Cir. 2000) .................................................................................. 6, 8, 14

*United States v. Grintjes*,
    237 F.3d 876 (7th Cir. 2001) .......................................................................................... 20

*United States v. Jett*,
    908 F.3d 252 (7th Cir. 2018) ............................................................................................ 8

*United States v. Parkhurst*,
    865 F.3d 509 (7th Cir. 2017) ........................................................................... 8, 9, 11, 13

*United States v. Rogan*,
    517 F.3d 449 (7th Cir. 2008) ................................................................................ 7, 13, 19

*United States v. Romero*,
    189 F.3d 576 (7th Cir.1999) ............................................................................................. 8

*United States v. U.S. Gypsum Co.*,
    333 U.S. 364 (1947) ........................................................................................................ 16

*Walker v. Soo Line R. Co.*,
    208 F.3d 581 (7th Cir. 2000) ...................................................................................... 15, 19

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005) ...................................................................................... 10, 11

## I.     <u>INTRODUCTION</u>

Relators offer the expert testimony of Dr. Dov Zakheim to counter the opinions offered by KBR's expert, Dr. Douglas Goetz.  Dr. Zakheim opines that KBR should have disclosed to the Government that it was failing to adequately perform its obligations under the LOGCAP III contract, and if KRB had disclosed rather than concealed this information the Government could have, and likely would have: (i) questioned reimbursements to KBR; and (ii) recommended reduced compensation to KBR.  As demonstrated below, Dr. Zakheim's role as a high ranking Department of Defense ("DoD") official who supervised Government auditors and who served as a Commissioner on the Commission on Wartime Contracting, qualify him to render his opinion.

## II.     <u>BACKGROUND</u>

In December 2001, the U.S. Army awarded the LOGCAP III contract to KBR.  See KBR SOF 5, ECF No. 293.  Pursuant to LOGCAP III, KBR agreed to provide life support and other services to the Army.  *Id*.  The Army delegated aspects of administration of LOGCAP III, including property management oversight, to the U.S. Defense Contract Management Agency ("DCMA").  KBR SOF 17.  Pursuant to LOGCAP III, KBR was required to establish and maintain an adequate property management system approved by DCMA.  KBR SOF 18.  In addition, KBR's costs under LOGCAP III were subject to audit and evaluation by the U.S. Defense Contract Audit Agency ("DCAA") (KBR SOF 47), and DCAA had the authority to question particular costs claimed by KBR and issue a "Form 1," which suspends payment and recommends to DCMA that the Government disallow payment to the contractor.  *Id*.

This case is about KBR's willful violation of its fundamental obligation to check for excess material and use it before spending taxpayer dollars to buy more.  At the core of this case lies a basic tenet: an inventory manager, seeking billions of dollars in reimbursement from the Government, cannot deliberately bypass, for more than half the dollar value of the material it

purchases, available stockpiles of that material, and instead just purchase more. But this is exactly what KBR did. KBR and the Government used the term "cross-leveling" to describe KBR's fundamental obligation to look for excess material and use it before spending taxpayer dollars to buy more. But even when KBR looked for excess, it could not see much of what was available because KBR deliberately misclassified material to shield it from cross-leveling. KBR's failure to meet this obligation cost the Government over $340 million in unnecessary purchases.

KBR wants to frame this case as quibbling over whether KBR was "efficient" enough in cross-leveling, but even a cursory review of the evidence demonstrates a deliberate, systemic scheme to overcharge the Government by hundreds of millions of dollars. According to a member of KBR's "Senior Leadership Team" (one of five top executives on LOGCAP III), KBR simply bypassed cross-leveling requirements for 50% of its dollar purchases in 2009, with even worse performance in previous years.

In an attempt to prove compliance, KBR offers the "expert" testimony of Dr. Douglas Goetz. In his report, Goetz opines that since the DCMA performed various audits and evaluations of KBR's property management system, and never disapproved of that system, KBR must have therefore fulfilled its contractual obligations. Goetz does not consider whether the DCMA received complete information or understood the significant admissions of failure described in KBR's internal emails. Instead, Goetz is content to ignore evidence that KBR's senior management was aware of KBR's systematic failure to cross-level, yet concealed that information from the Government.

Goetz testified that none of the internal emails he reviewed gave him pause or caused him to question whether KBR had met the applicable standards for managing government property.[1] *See* Exhibit 1 (Goetz Dep.) at 145:2-146:2. For instance, Goetz testified that he did not even try to determine if the express statements about KBR's cross-leveling failures were true or not. *See id*. at 178:13-183:15. He also testified that he gave no weight to the deposition testimony of the DCMA's Maria McNamara expressing surprise and serious concern when she was shown, for the first time, KBR's senior management's admissions of its systemic failures. *See id*. at 45:9-25.

Indeed, Goetz made it clear that he ignored KBR's internal admissions, and instead assumed that if KBR was in fact failing, the Government employees who evaluated KBR's performance would have discerned that, with or without the benefit of KBR's admissions. Since the Government did not reach that conclusion, Goetz comfortably concluded that KBR was adequately performing the contract. *Id*. at 39:8-24, 43:8-48:4, 126:7-15. Notwithstanding Goetz' admission that he had no way of knowing if KBR withheld information that might have affected the Government's review of KBR's performance (*id*. at 33:2-15), he testified that it was his opinion that the Government had a set of information that was sufficiently complete and accurate to allow it to evaluate KBR's performance (*id*. at 32:6-25). Goetz even went so far as to testify that even if the Government subsequently changed its original conclusions regarding the accuracy of its assessments of KBR's performance, that would *not* affect his opinion, and he would still "count that [the Government's original assessments] as accurate, reliable, a valid assessment of their performance then at the time (*id*. at 15:18-16:7).

---

[1] Notably, Goetz has never been responsible for managing inventory and therefore lacks personal or expert knowledge of, and would have no basis to write a manual governing, the inventory management function that KBR was to perform on LOGCAP III. Exhibit 1 (Goetz Dep.) at 7:18-8:3.

Relators retained Dr. Zakheim to respond to and rebut Goetz' flawed opinions. Applying his knowledge and experience regarding how the Government agencies function and how they assess a contractor's performance, Dr. Zakheim considered the internal admissions that KBR withheld from the Government, admissions which Goetz ignored, and opines that:

> 1.  The internal KBR emails he reviewed, and that Goetz ignored, which prove that senior KBR management was aware of KBR's systemic and deliberate failure to "cross-level," contain information regarding KBR's assessment of its performance of LOGCAP III that the Government would have wanted, and that should have been disclosed to both the DCMA and the DCAA;

> 2.  Had DCAA been aware that KBR knew, at the highest levels of the company, that it was systematically and deliberately failing to cross-level, DCAA, at a minimum, could have, and likely would have, questioned reimbursements to KBR and would have recommended reduced compensation to KBR;[2] and

> 3.  Since KBR did not disclose to the Government that its senior management knew that KBR was systematically and deliberately failing to cross-level, DCMA's approval of KBR's property management system does not, contrary to Goetz' testimony, establish that KBR was in compliance with its contractual obligations to the Government, or entitled to reimbursement for all of the materials it had purchased.

Dr. Zakheim is exceedingly well qualified to render these opinions, which are based on his years of experience serving the Government, including, most significantly, his time in senior roles in the DoD. From 1985 to 1987, Dr. Zakheim served as the Deputy Undersecretary of Defense for Planning and Resources, where he worked on DoD's systems acquisition, strategic planning, programming and budgeting processes. From 2001 to April 2004 he served as DoD's Under

---

[2] Dr. Zakheim opines that had DCAA concluded that KBR had deliberately kept it in the dark, DCAA might also have recommended that KBR be suspended or even debarred from the LOGCAP III follow-on contract, entitled LOGCAP IV.

Secretary of Defense (Comptroller) and Chief Financial Officer, where he was the principal advisor to the Secretary of Defense on financial and budgetary matters, led over 50,000 staff, developed and managed the world's largest budgets, and negotiated five major defense agreements with U.S. allies and partners. While holding that position, Dr. Zakheim oversaw the activities of the DCAA, and he meet with the DCAA Director, who reported directly to him, at least every other week. Exhibit 2 (Zakheim Dep.) at 39:17-40:1. After service in the DoD, Dr. Zakheim was appointed, and served for two years, as a Commissioner on the U.S. Congress's Commission on Wartime Contracting in Iraq and Afghanistan. The Commission, which, among other matters, investigated issues relating to contractor waste, fraud, and abuse, and better oversight of contractors, conducted in excess of 30 hearings, and issued 8 reports. *Id*. at 98:13-101:17. Dr. Zakheim is the recipient of numerous awards for his government, professional and civic work, including in 1986, 1987, and 2004, the Distinguished Public Service Award, DoD's highest civilian award.

## III.　**LEGAL STANDARD**

"Expert testimony is admissible at trial under Federal Rule of Evidence 702 if the testimony is relevant to a fact in issue, is based on sufficient facts or data, and is the product of reliable scientific or other expert methods that are properly applied." *Stollings v. Ryobi Tech., Inc*., 725 F.3d 753, 765 (7th Cir. 2013). While a district court's role is to act as a gatekeeper to ensure expert testimony meets the requirements of Rule 702, it is not the "trier of all facts relating to expert testimony." *Id.* "The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony." *Id.*

IV.    **ARGUMENT**

A.    **Dr. Zakheim's Testimony Will Assist the Trier of Fact.**

Expert testimony must be relevant to be admissible.  *Stollings*, 725 F.3d at 765.  Expert testimony is relevant where it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993).  Testimony is also relevant where it has "any tendency to make a fact more or less probable." Fed. R. Evid. 401(a).  Here, Dr. Zakheim's testimony will help the jury understand the facts surrounding a central issue in the case—how the Government could have, and likely would have, responded had it been aware of KBR's systemic failures.

KBR argues that Dr. Zakheim's testimony should be excluded because he merely interprets KBR's internal emails, and his testimony adds nothing beyond what jurors can determine on their own.  KBR Br. at 13-14.  If a purpose of Dr. Zakheim's report was to determine if KBR's internal emails were true or false, KBR might have a point.  But Dr. Zakheim does not offer such an opinion.  Instead, he takes the emails at face value, and opines, based on his experience, what the Government could have, and likely would have, done had it been aware of KBR's admissions.  An expert can rely upon representations provided by the party that hired them, and "it is proper for counsel to furnish factual assumptions to experts as long as the factual assumptions are supported by the record." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1079 (N.D. Ill. 2022) (internal citation omitted); see also, *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (finding damages calculation based on financial information furnished by plaintiff, and assumptions given him by counsel, did not render expert testimony inadmissible).  Thus, it would have been proper, and indeed it is commonplace with experts, for Relators to instruct Dr. Zakheim to offer an opinion based entirely on hypothetical facts, without

showing him any documents at all.  As long as Relators have evidence to support those facts, and are not asking Dr. Zakheim to opine on their accuracy, his opinion is admissible. As discussed at pages 11-18, below, ample factual support exists for all of Dr. Zakheim's assumptions.

It is Dr. Zakheim's expert testimony, beyond the text of KRB's emails, that will substantially help the jury understand the evidence in this case, because he is testifying to something more than what is obvious to a layperson.  *See Daubert*, 509 U.S. at 580, *Dhillon v. Crown Controls Corp.*, 269 F. 3d 865, 871 (7th Cir. 2001).  Goetz says that KBR's internal emails do not matter because the Government approved KBR's property management system.  Dr. Zakheim says the internal emails do matter, and the fact that the admissions of wrongdoing they contain were concealed, undercuts the validity of the Government's approval.  The jury will determine which expert to believe.

In addition, Dr. Zakheim's expert testimony also confirms that KBR's systemic failures are material to the amount the Government paid KBR.  By charging the Government for new materials when those materials were already available in KBR's store rooms, KBR submitted false claims for reimbursement.  By using his direct experience to explain that the DCAA would likely have rejected KBR's reimbursement claims, Dr. Zakheim confirms that KBR's cross-leveling failures were "capable of influencing," or had a "natural tendency to influence," the Government's decision whether to reimburse KBR.  *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008).  Thus, his testimony is highly relevant and will assist the jury making the required materiality determination.

**B.    Dr. Zakheim's Testimony is Reliable Because His Methodology is Based on his Extensive Experience.**

"Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'"  *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting Fed. R. Evid. 702) (emphasis in original),  "Anyone with relevant expertise

enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing. v. Am. Suzuki Motor Corp*., 223 F.3d at 591 (7th Cir. 2000). "Training and experience are proper foundations for expert testimony." *United States v. Parkhurst*, 865 F.3d 509, 516–17 (7th Cir. 2017), holding modified by *United States v. Jett*, 908 F.3d 252 (7th Cir. 2018). *See also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony"); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

It is well established in the Seventh Circuit that the test for reliability for nonscientific experts is flexible. *United States v. Romero*, 189 F.3d 576, 584 (7th Cir.1999). "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. Even in *Daubert*, where scientific expert testimony was considered, the Court noted that " [t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one." 509 U.S. at 594. Consequently, the Seventh Circuit has repeatedly allowed expert's to testify based on their experience, without requiring "scientific methodologies" or "peer review." *Parkhurst*, 865 F.3d at 516-17. Thus, "[u]nlike scientific or technical experts, whose hypotheses can be tested or subjected to peer review and whose methods can be measured against specific industry standards, a [nonscientific expert's] testimony . . . cannot be so mechanically scrutinized." *Illinois Liberty PAC v. Madigan*, No. 12 C 5811, 2015 WL 5589630, at *4–5 (N.D. Ill. Sept. 21, 2015); s*ee also Miller UK Ltd. v. Caterpillar, Inc*., No. 10-CV-03770, 2015 WL 10818831, at *10 (N.D. Ill. Nov.

1, 2015) ("In sum, testability is not a necessary characteristic of an experienced expert's methodology.").

In *Metavante*, the Seventh Circuit allowed an expert to opine, based on his industry experience, to the reasonableness of services performed in the banking sector. 619 F.3d at 761. The court held that "[a]n expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'" *Id.* (emphasis in original). The expert "explained that in the financial sector, *as he has seen and experienced it*," the vendor acted in a commercially reasonable manner. *Id.* (emphasis added). "These explanations were based on [the expert's] experience in the industry, which included managing a fifty-person development team." *Id. See also Parkhurst*, 865 F.3d at 516-17 (allowing expert to interpret advertisement's language "based on his extensive training and experience," which "are proper foundations for expert testimony."); *Triad Cap. Mgmt., LLC v. Priv. Equity Cap. Corp.*, No. 07 C 3641, 2010 WL 10076450, at *6 (N.D. Ill. Nov. 22, 2010) ("Regarding methodology, like the expert in *Metavante Corp.*, George explained that he arrived at his first and sixth opinions based on usual business practices in the industry 'as he has seen and experienced it.' Given this, this court concludes—as … the Seventh Circuit concluded in *Metavante Corp.*—that George's testimony 'cannot be characterized as mere *ipse dixit*' and is reliable."); *Est. of Carlock v. Williamson*, No. 08-3075, 2013 WL 12244415, at *4 (C.D. Ill. June 21, 2013) ("Waller's methodology for his opinions, which is based on his education and training, is sufficiently reliable under the flexible discretion afforded to courts under *Daubert* and Rule 702."); *Prayitno v. Nextep Funding LLC*, No. 17 C 4310, 2019 WL 6497374, at *7 (N.D. Ill. Dec. 3, 2019) (rejecting *Daubert* challenge and finding expert

"qualified to opine on plaintiff's likelihood of obtaining better credit terms by his long experience in lending and underwriting.").

Here, Dr. Zakheim reviewed a series of internal KBR emails, the May 4, 2009 testimony from DCAA Director April Stephenson, DCMA Director Charlie Williams, and other senior officials who appeared before Dr. Zakheim and his colleagues on the Commission on Wartime Contracting; the Defendants' Motion to Dismiss, the Plaintiffs'/Relators' Opposition to that Motion, and testimonies of expert witnesses both in support of, and opposition to, Relators.  Exhibit 3 (Zakheim Report) at 1.  He then applied his extensive experience as first, the DoD's Under Secretary of Defense (Comptroller), and then the DoD's Chief Financial Officer, which included his oversight, supervision, and at least bi-weekly meetings with the Director, of DCAA.  He then made determinations based on that analysis:  "having been involved in budgets for 45 years, and having managed DCAA, having oversight to be more accurate over DCAA and then having sat on the commission that looked at contracting in Afghanistan and Iraq, I had a pretty good sense of what should or should not be done in the context of  what this is all about … With respect to providing full and open information to the government regarding the expenditures."  Exhibit 2 (Zakheim Dep) at 61:18-62:10.

KBR relies on inapposite cases that deal primarily with scientific experts.  For instance, *Brown v. Burlington N. Santa Fe. Ry. Co.*, involved a medical expert who purported to employ a "differential etiology" methodology to opine on the cause of plaintiff's injuries, but who failed to follow the accepted "differential etiology" methodology.  765 F.3d 765, 772, 774 (7th Cir. 2014). The court also noted that the expert's applicable experience was "suspect" as it involved a vague recollection of spending less than an hour at a different rail yard a decade prior.  *Id*. at 776. *See also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416 (7th Cir. 2005) (excluding expert

for failing to perform a multivariate regression analysis, the accepted mathematical methodology for the circumstances).

In contrast to the experts in *Brown* and *Zenith*, Dr. Zakheim is not performing a mathematical, technical or quantitative analysis that "substitute[s] a guess" for a widely available method like a differential etiology or a multivariate regression. In fact, Dr. Zakheim is not conducting an analysis where technical methodologies exist, nor is he improperly relying on a "suspect" accounting of his experience. Rather, Dr. Zakheim's approach is in line with the many cases permitting experts to testify on reliable opinions based on their experience. *See Metavante*, *Parkhurst, Est. of Carlock,* and *Prayitno*, *supra*.

Finally, KBR argues that Dr. Zakheim's experience is too generic and generalized. KBR Br. at 7-8. However, experts need not be the most qualified person to opine on the issue based on the narrowest, most specialized expertise; experts need only have "a body of specialized knowledge that can be helpful to the jury." *Prayitno*, 2019 WL 6497374, at *3. "Mr. Forster possesses certain specialized knowledge that may assist the trier of fact, and to the extent that plaintiff argues that it is not narrowly specialized enough in the relevant field to point to the correct conclusion, the way to test his expertise is not at the threshold in a *Daubert* motion, but at trial though opposing evidence or cross-examination." *Id.* at * 6.

### C.    Dr. Zakheim Relies on Sufficient Facts and Data in Forming His Opinions and His Factual Assumptions are Supported by the Evidence.

Rule 702 requires that expert testimony be supported by "sufficient facts or data." Fed. R. Evid. 702. This means that the expert "considered sufficient data to employ [his] methodology," and the data relied upon had a "quantitative or qualitative connection to the methodology employed." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808-09 (7th Cir. 2013). Here, Dr. Zakheim reviewed internal KBR emails admitting widespread and systemic failures to cross-level,

wasting hundreds of millions of taxpayer dollars. For instance, Dr. Zakheim relies on a March 20, 2010, internal KBR email from one Senior KBR official to another acknowledging the extent of KBR's cross-leveling failures:

> I have decide[d] to take over the management of materials since no one else here has a clue how that ought to be done ... **Last year, fully 35% of all requisitions (with an extended value of $401M[illion]) by-passed the cross-leveling check**. As we start to turn over more and more materials to [the Government of Iraq], **we are facing an increasing risk of being Formed 1 for buying items we just declared excess and gave away** ...
>
> **We've got $71M[illion] in reserved stock of which less than 50% is legitimate**. The rest is against cancelled ACLs, completed ACLs, or just plain **"hidden" from cross-leveling**.
>
> **TREC storerooms is going to be my biggest challenge ....we've currently got $331M[illion] in them as of yesterday**. I've told Guy [LaBoa, KBR Principal Program Manager] this is the **Mother of all Forms 1**.

Exhibit 4 (Mar. 20, 2010 email from KBR Deputy Program manager – Support, R. Kaye, to KBR Deputy Principal Program Manager, L. Lust) at '9112 (emphasis added).

In addition, Dr. Zakheim relies on a February 25, 2010, internal KBR email from a senior KBR official admitting KBR was "purchasing $5M[illion] per day when [it had] $1.2 B[illion] i[n] excess on hand," and cautioning, that "[a]t some point the DCAA is going to put KBR out of business if we keep doing this." Exhibit 5 (internal KBR email containing Feb. 25, 2010 email from KBR's Deputy Program Manager – Support, R. Kaye) at '0062.

Dr. Zakheim also relies upon a March 3, 2010 internal KBR email from a senior KBR official acknowledging that the Government would not pay KBR for purchasing new items if the items were already in stock:

> If C-Sites has an item(s) that can fill a [material requisition] .... and you are the only place it can come from .... and we

-12-

> don't cross-level it, we're going to create a [purchase order]
> (and expend $$) for items that have on hand. Sure as we're
> having this conversation, the DCAA is going to audit our
> excess disposition process. To have something on hand and
> to not use it in lieu of purchasing more is a recipe for the
> DCAA to find fault with us and collect back what we paid
> for the item via a Form 1.

Exhibit 6 (Mar. 3, 2010 internal KBR email from KBR's Deputy Program Manager, R. Kaye)
at '2915.

Dr. Zakheim assumed that KBR's admissions contained in those emails, namely that senior KBR management was aware of its systemic failure to cross-level, were true. And he assumed the truth of evidence that KBR never disclosed those admissions to the Government. Then, just like the experts in *Metavante, Parkhurst, Est. of Carlock,* and *Prayitno*, applying his decades of experience in Government financial and budgetary matters, including his extensive experience as first, DoD's Under Secretary of Defense (Comptroller), and then DoD's Chief Financial Officer, which included his oversight of DCAA, and as a Commissioner on the Commission on Wartime Contracting, and his knowledge and experience regarding how the DCAA and the DCMA, the agencies charged with auditing and evaluating KBR's performance, operate, he opines how the Government could have and likely would have responded had it been aware of KBR's systemic failures. Consequently, Dr. Zakheim relied upon facts and data that were qualitatively connected directly to his methodology. Moreover, his testimony establishes that KBR's cross-leveling failures were "capable of influencing," or had a "natural tendency to influence," the Government's decision whether to reimburse KBR. *See Rogan*, 517 F.3d at 452.

KBR argues that Dr. Zakheim's testimony should be excluded because: (i) he ignored "probative" evidence and instead limited his review to only 14 internal KBR email threads, picked by Relators' counsel (KBR Brief at 8-11); (ii) he failed to critically analyze those emails, or to

learn if the chains were complete, or to review the deposition testimony of KBR's witnesses who authored the emails, and instead simply concluded that the admissions contained in them (that senior KBR management was aware of KBR's systemic and deliberate failure to consistently cross-level) were true (*id*. at 4-5); (iii) he assumed the information contained in the emails was not communicated to the Government (*id*. at 11 ); and (iv) his testimony is simply provides a "bottom line" conclusion, connected to the existing data only by *ipse dixit* of the expert ..." (*id*. at 6-7). KBR is wrong for a number of reasons.

First, contrary to KBR's contention and as noted above at page 6, "it is proper for counsel to furnish factual assumptions to experts as long as the factual assumptions are supported by the record." *In re Dealer*, 581 F. Supp. 3d at 1079 (internal citation omitted); s*ee also*, *Tuf Racing*, 223 F.3d at 591 (damages calculation based on information and assumptions provided by counsel did not render expert testimony inadmissible). Moreover, the fact that Dr. Zakheim assumed that the admissions in KBR's internal emails were true does not render his opinion unreliable, as *In re Dealer*, 581 F. Supp. 3d at 1080 ("experts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence.") (citing *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006)).

In a breathtaking sleight of hand, KBR argues that Dr. Zakheim's "counterfactual predictions about what the agencies might have done are unreliable because they are rooted in ignorance of what the agencies actually did." KBR Br. at 11-12. Further, KBR contends, without citation, that "[n]one of this speculation about what *might* have happened *if* the facts were different than reality are proper expert testimony." *Id*. at 11 (emphasis in original). However, "counterfactuals," or, more commonly, "hypotheticals," simply create the predicate for an expert's opinion of what might have happened if the facts were different. Indeed, they form the routine

building blocks of expert opinion. Experts routinely assume the truth of contested facts and opine accordingly. The "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions … are factual matters to be determined by the trier of fact …." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *see also Walker v. Soo Line R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000) (inaccuracies in documents expert relied on not basis for exclusion, can be explored on cross-examination); *Orthofix Inc. v. Gordon*, No. 1:13-cv-1463, 2016 WL 1273160, at *2 (C.D. Ill. Mar. 31, 2016) ("[T]he reliability of the facts on which an expert bases his evaluation is not a matter the district court evaluates …."). When facts are disputed, "experts sometimes reach different conclusions based on competing versions of the facts"; however, Rule 702 "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702, advisory committee note to 2000 amendment.

Second, his assumption that the admissions contained in the emails were true is clearly supported by the record. KBR criticizes Dr. Zakheim for failing to consider "the vast amount of probative evidence" and to "ask Relators' counsel if the chains were even complete or if other pertinent emails even existed." (KBR Brief at 4-5). However, despite producing nearly 1.3 million emails in this litigation, KBR has never pointed to a single internal KBR document that refutes, or counters, these admissions. KBR also complains that Dr. Zakheim did not review the self-serving, deposition testimony of the KBR employees who authored the emails he reviewed, and who attempted, long after the fact, to defuse their devastating contemporaneously written admissions by calling them mere "hyperbole." KBR Br. at 9. Far from being a basis for excluding an expert, the choice to rely upon KBR's emails, and not long after the fact deposition testimony, is utterly justified. Written communications are "milestones upon the road to truth. They do not forget or

'disremember'; they have no memory; they cannot color their evidence; they speak the honest truth as of the date they are written, and are free from all influences that actuate the living witness." *Stevenson v. Dowie*, 3 Ill. Cir. Ct. Rep. 135 (1902), available at https://cite.case.law/ill-cir-ct-rep/3/135/.  *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1947) (recognizing that when oral "testimony is in conflict with contemporaneous documents we give it little weight"); *Cohen v. Astrue*, 258 Fed. App'x 20, 26 (7th Cir. 2007) (finding "contemporaneous reports to physicians and their independent observations" were a "legitimate basis for affording little weight to [the witness's contrary] testimony.").

Third, the assumptions that the information contained in the emails was not communicated to the Government, and that the Government was not aware of KBR's systemic failure to cross-level, is also clearly supported by the record.  KBR cannot reasonably dispute that it hid from the Government its systemic failures to cross-level, and that it was stockpiling hundreds of millions of dollars in useless inventory. *See* Exhibit 7 (containing June 6 and 23, 2008 emails from KBR's Business Segment Manager for Theater Maintenance, B. McGarry) at '3832-33 (admitting that one site "looked good on the surface but this was due to an extensive cover up versus fixing what was broken," and acknowledging KBR was "hiding two warehouses full of parts/tools and illegally procured items to keep in good standing with auditors instead of getting the items out to someone that can use them … There are more PCP and FAR violations in those two warehouses than I care to mention and it is no wonder we have a billion in stock lying around unused in theater[.]"); Exhibit 8 (May 5, 2009 internal KBR email containing May 4, 2009 email from J. Haught) (discussing whether to produce a report showing 60 percent of inventory was "underutilized" at five sites, stating "I don't think we should be showing underutilized on anything that can be seen by USG [United States Government."); Exhibit 9 (internal KBR email) (discussing KBR's refusal

to turn over internal audits reflecting KBR's systemic failures to cross-level, despite DCMA's request for such audits).

In their depositions, numerous KBR witnesses confirmed that despite a host of senior KBR employees being aware, both generally, and specifically, qualitatively and quantitatively, of KBR's systemic cross-leveling failures, no one disclosed these failures to the Government. For instance, KBR's Principal Program Manager—the person responsible for overseeing all of KBR's operations in theater—Guy LaBoa testified that he does not remember ever disclosing to the Government that 35% of all requisitions in 2009 bypassed MATCON and the cross-leveling step (as referenced in the March 5, 2010 email) (*see* Exhibit 10 (LaBoa Dep.) at 83:6-13), or that KBR had issues with TRECs (*id.* at 94:5-18), or that he reprimanded an employee who ordered millions of dollars of materials that KBR concluded were unneeded (*id.* at 89:15-90:7; *see also* Exhibit 11 (May 4, 2010 internal KBR email attaching Letter of Reprimand from G. LaBoa) at '2477). Other KBR witnesses confirmed that no one at KBR ever disclosed any systemic problems with KBR's inventory management, including problems with TRECs, systemic issues with over-ordering inventory, the systemic failure to cross-level, and the fact that KBR had purchased more inventory then was needed to perform the contract. *See* Relators' Statement of Additional Material Facts, ECF No. 304, ¶¶ 109-121.

Further, the Government's witnesses testified that they were not aware of KBR's systemic inventory failures. These witnesses included Mary Sheridan, who at times served as DCMA's Theater Administrative Contracting Officer during LOGCAP III and was the senior-most DCMA person in the field responsible for administering the LOGCAP III contract on behalf of DCMA, Maria McNamara, the DCMA's Prime Property Administrator assigned to KBR from 1997 to 2014, and Colonel Kirk Vollmecke, the DCMA Commander and senior contracting official for

contract administration in theater.  They testified that they were not aware that:  (i) in February 2010, KBR was purchasing $5 million of material daily even though it had $1.2 billion in excess; (ii) KBR was resisting placing material requisitions in MATCON status and sending the majority of requisitions directly through the procurement channels without going through the cross-level process; (iii) KBR's Head of the DMC, Conor O'Muirgheasa, had expressed concern regarding KBR's three false statements on the PCARSS form; (iv) KBR was using TRECs to conceal inventory from cross-leveling; (v) KBR was misclassifying "Non-stock" items as "Stock" making over $80 million of inventory unavailable for cross-leveling; (vi) KBR's rule against cross-leveling Stock items for priority 3 requests was causing KBR to not be able to cross-level over $50 million of inventory; (vii) KBR employees put items on reserve so that they could not be cross-leveled; and (viii) KBR had up to 70 years of cable in inventory.  *See id*. ¶¶ 122-136.  These Government witnesses also testified that had they been aware of KBR's systemic inventory failures, they would have taken action to see that KBR corrected these problems.  *Id*.  Indeed, Ms. Sheridan went so far as to say that, "this is something . . . I most likely would have had a conversation with CID [Criminal Investigation Division] about." Exhibit 12 (Sheridan Dep.) at 179:7-180:21, 165:24-166:5.

Fourth, far from mere *ipse dixit*, Dr. Zakheim assumed that KBR's internal admissions were true, and that they were never disclosed.  Then, applying his extensive experience, he opines how the Government could, and likely would, have responded had it been aware of KBR's admissions of systemic failures.  Consequently, Dr. Zakheim relied upon facts and data that were qualitatively connected directly to his methodology.

Finally, KBR argues that because Dr. Zakheim failed to review: (i) the information KBR actually provided to the Government regarding cross-leveling; or (ii) the Government's knowledge

of KBR's cross—leveling practices as memorialized in the DCAA and DCMA audit reports and evaluations (KBR Br. at 8-9), his opinions are not sufficiently grounded in facts and should be excluded.  Again, KBR is wrong.  Dr. Zakheim did consider that KBR did not disclose, indeed concealed from the Government, the fact that its senior leadership was fully aware of KBR's abysmal performance regarding cross-leveling.  And he considered the fact that the Government did not issue Forms 1 to KBR demanding that it disgorge reimbursements it had received for purchasing materials that it already had in stock.  Exhibit 3 (Zakheim Report) at 5.  Dr. Zakheim provides independent confirmation of the consequences of KBR's performance.  Specifically, by opining that had the Government been aware of KBR's admissions, the Government could have, and likely would have, at a minimum, disallowed reimbursement for KBR's purchases of duplicative material, he confirms that KBR's cross-leveling failures were "capable of influencing," or had a "natural tendency to influence," the Government's decision whether to reimburse KBR. *See Rogan*, 517 F.3d at 452.

> ### D.    KBR's Arguments Go to the Weight, Not Admissibility.

Although KBR has no legitimate basis for disputing the validity of the information on which Dr. Zakheim relied, even if KBR could offer persuasive, contrary evidence, KBR's protestations merely go to weight of Dr. Zakheim's testimony, not to its admissibility. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Walker*, 208 F.3d at 589 (reversing trial court's exclusion of expert, finding that to the extent the expert "might have relied on faulty information, the matter certainly could be explored on cross-examination."); *Stollings*, 725 F.3d at 767 ("The judge should have let the jury determine how the uncertainty about the effectiveness rate" of the alternative technology relied upon by plaintiff's expert "affected the weight of [the expert's] testimony."); *Prayitno*, 2019 WL

6497374, at *3 (citing *Smith*, 215 F.3d at 718) ("'The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment,' not on a motion to bar the expert from testifying on evidentiary grounds."); *Africano v. Atrium Med. Corp.*, 561 F. Supp. 3d 772, 777-78 (N.D. Ill. 2021) (citing *Stollings*, 725 F.3d at 768) ("Moreover, even if the experts made any inaccurate assumptions, the 'fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible.' To the extent Plaintiff believes that either expert makes unfounded or incorrect assumptions, he remains free to address those deficiencies through vigorous cross-examination."); *Manpower,* 732 F.3d at 808 ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis …" and "arguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury.").

### E.     Dr. Zakheim Directly Rebuts KBR's Expert Goetz.

It is true that in his deposition, Dr. Zakheim stated that he was not rebutting the testimony of Goetz. The question is not whether Dr. Zakheim understood precisely what he was rebutting, but rather whether his underlying opinions do "in fact" rebut the testimony of Goetz.  KBR's "gotcha" argument elevates form over substance and should be rejected.  The function of rebuttal evidence is "to contradict, impeach or defuse the impact of the evidence offered by an adverse party."  *United States v. Grintjes,* 237 F.3d 876, 879 (7th Cir. 2001).  Thus, the test for rebuttal evidence does not depend on whether a witness labels it so, but on the substance and content of the evidence itself.

Here, Dr. Zakheim opines that:

> (a)  the fact that the Government approved KBR's property management system is no indication that KBR was actually in compliance with its contractual obligations, or entitled to reimbursement for all the materials it had purchased, because the Government did not have full visibility into KBR's practices in the performance of its obligations, including the fact that senior KBR management was aware of KBR's systemic failure to cross-level; and

> (b)  had the Government been aware of the admissions in these in these emails, the Government at a minimum could have, and likely would have, questioned reimbursements to KBR and recommended reduced compensation to KBR.

Dr. Zakheim's opinions directly rebut, refute, counter and contradict the opinions offered by KBR's expert Goetz, who opined that:

> (a)  the Government's approval of KBR's property management system, and KBR's implementation of that system, was a clear indication that the Government was satisfied with KBR's performance of the LOGCAP III contract (Goetz Report at 7);

> (b)  the determinations made by the Government following its property management analysis and its audits provide clear evidence that KBR performed in accordance with its obligations (*id*. at 8); and

> (c)  the periodic meetings between KBR and the Government provide evidence that KBR and the Government were working together, knowledgeable in the areas that required corrective action (*id*.).

In arriving at his opinion, Goetz assumed that the Government's conclusion, that KBR's performance was satisfactory, was dispositive of the issue. Goetz reached this conclusion without even considering, let alone explaining or understanding, whether KBR's internal admissions that it was failing on a systemic basis to cross-level were true, or whether they were known to the Government. In direct response to Goetz, Dr. Zakheim takes KBR's admissions into consideration, assumes they are true, and opines that had they been disclosed, the Government could have, and

-21-

likely would have, concluded, at a minimum, that KBR's performance was *not* satisfactory. Irrespective of whether Dr. Zakheim labeled his opinions as rebuttal of Goetz, the fact remains that he was rebutting him, and thus his opinions were not untimely.

## V.     <u>CONCLUSION</u>

KBR's argument boils down to this:  because Dr. Zakheim limited his review to KBR internal emails, where KBR admitted that (i) it was not performing its obligations under LOGCAP III, and (ii) if the Government found out it would put KBR "out of business," but failed to review the after the fact attempts by KBR's witness to twist themselves into pretzels to try and explain away the devastating internal and concealed admissions in their emails, his opinion should be excluded.  However, by taking the emails at face value, and applying his extensive experience supervising the DCAA, Dr. Zakheim has opined what the Government could have done, and likely would have done, had it been aware of KBR's admissions.  Thus, Dr. Zakheim's expert testimony will substantially help the jury understand the evidence in this case, and will be of particular assistance to the jury because he is testifying to something beyond what is obvious to the typical layperson.  Accordingly, the Court should deny KBR's motion.

Dated:  October 31, 2022

Respectfully submitted,

*/s/* William C. Meyers

Daniel Vitelli
Amianna Stovall
Joel A. Chernov
**CONSTANTINE CANNON LLP**
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701
dvitelli@constantinecannon.com
astovall@constantinecannon.com
jchernov@constantinecannon.com

Eric R. Havian (Lead Attorney)
Leah L. Judge
**CONSTANTINE CANNON LLP**
150 California Street, 16th Floor
San Francisco, CA 94111
Telephone: (415) 766-3589
Facsimile: (415) 639-4002
ehavian@constantinecannon.com
ljudge@constantinecannon.com

David J. Chizewer
Frederic R. Klein
William C. Meyers
W. Kyle Walther
**GOLDBERG KOHN LTD.**
55 East Monroe Street, Suite 3300
Chicago, IL 60603-5792
Telephone: (312) 201-4000
Facsimile: (312) 332-2196
david.chizewer@goldbergkohn.com
frederic.klein@goldbergkohn.com
william.meyers@goldbergkohn.com
kyle.walther@goldbergkohn.com

Edward H. Arens
George Collins
Stephen S. Hasegawa
**PHILLIPS & COHEN LLP**
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Telephone: (415) 836-9000
Facsimile: (415) 836-9001
earens@pcsf.com
gcollins@pcsf.com
shasegawa@pcsf.com

*Attorneys for Relators Geoffrey Howard
and Zella Hemphill*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type volume limitations of C.D. Ill. Local Civ. R. 7.1(B)(4)(b) because it contains fewer than 7,000 words.  The word count of the brief (excluding the cover page, Table of Contents, Table of Authorities, signature block, Certificate of Compliance, and Certificate of Service) is 6,945 according to the word processing system used to prepare the brief.

Dated: October 31, 2022                    */s/* William C. Meyers

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of October, 2022, I caused the foregoing **PLAINTIFFS/RELATORS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' REBUTTAL EXPERT DOV ZAKHEIM, Ph.D** to be served through the Court's Electronic Case Filing system upon all attorneys of record.


<u>*/s/* William C. Meyers</u>