**EXHIBITS TO**
**PLAINTIFFS/RELATORS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE**
**TESTIMONY OF PLAINTIFFS' REBUTTAL EXPERT DOV ZAKHEIM, Ph.D.**

Excerpts from the 5/19/22 deposition of Dr. Douglas Goetz.............................................Exhibit 1

Excerpts from the 7/29/22 deposition of Dr. Dov Zakheim .............................................Exhibit 2

Expert Rebuttal Report of Dr. Dov Zakheim.................................................................Exhibit 3

3/20/10 Email from R. Kaye to L. Lust ........................................................................Exhibit 4

2/25/10 Internal KBR email, including email from R. Kaye ............................................Exhibit 5

3/4/10 Internal KBR email, including email from R. Kaye..............................................Exhibit 6

7/12/08 Internal KBR email, including emails from B. McGarry ....................................Exhibit 7

5/5/09 Internal KBR email, including email from J. Haught............................................Exhibit 8

6/18/08 Internal KBR email..........................................................................................Exhibit 9

Excerpts from the 2/19/20 deposition of Guy LaBoa ....................................................Exhibit 10

5/4/2010 Internal KBR email.........................................................................................Exhibit 11

Excerpts from the 1/13/21 deposition of Mary Sheridan.................................................Exhibit 12

# EXHIBIT 1

Page 1

1

2      IN THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
3      ROCK ISLAND DIVISION
       No. 4:11-cv-04022-MMM-JEH
4      ----------------------------------------x
       UNITED STATES OF AMERICA, ex rel.,
5      GEOFFREY HOWARD and ZELLA HEMPHILL,
6                          Plaintiffs,
7           - against -
8      KBR INC., and KELLOGG, BROWN and ROOT
       SERVICES, INC.,
9
                          Defendants.
10
       ----------------------------------------x
11
                       May 19, 2022
12                     9:36 a.m.
13
14
15         VIDEOTAPED DEPOSITION of DR. DOUGLAS
16     GOETZ, held at the offices of Constantine
17     Cannon LLP, located at 1001 Pennsylvania
18     Avenue, Suite 1300, Washington, D.C. 2004,
19     pursuant to the Federal Rules of Civil
20     Procedure for the United States District
21     Courts pertaining to the taking of
22     depositions, before Anthony Giarro, a
23     Registered Professional Reporter, a
24     Certified Realtime Reporter and a Notary
25     Public of the State of New York.

Page 7

```
  1                    DR. DOUGLAS GOETZ
  2    an objection.  And then after that's
  3    done, you can go ahead and answer the
  4    question; okay?
  5         A       Yes, sir.
  6         Q       Anytime you want to take a
  7    break, if you just let us know, we could
  8    take a break at any time.  If there's a
  9    question pending, I'd ask you to answer
 10    the question, and then we could take a
 11    break at your convenience; okay?
 12         A       Very good.  I do understand
 13    that.
 14         Q       Is there any reason today
 15    why you cannot give full and honest
 16    answers to my questions?
 17         A       No, sir.
 18         Q       Have you ever been
 19    responsible for directly managing
 20    inventory?
 21         A       No, sir.
 22         Q       You understand that one of
 23    KBR's functions under LOGCAP III, which
 24    is the subject of this lawsuit, is KBR's
 25    responsibility to manage inventory;
```

Page 8

1                    DR. DOUGLAS GOETZ

2    correct?

3         A        Yes, sir.

4         Q        Could you describe the

5    concept of cross-leveling?

6                    MS. LOLLAR:  Objection to

7       form.

8         A        From my knowledge and

9    readings and experience, it is the

10   process by which material that has been

11   acquired and has been deemed excess can

12   be consumed under other work that may

13   have a valid and supportable need.

14        Q        What role does

15   cross-leveling play in the effect of

16   management of government property?

17        A        Respectfully, when I look at

18   the issue of government property, which

19   is my area of expertise, the FAR, Federal

20   Acquisition Regulation, nor the DFAs, nor

21   the DOD property manual make no reference

22   of cross-leveling.  As such, I would be

23   remiss in trying to provide you the role

24   and responsibility in that regard to

25   government property.

Page 14

                              DR. DOUGLAS GOETZ

1

2          A         That is one of the avenues

3     of audits that I used, yes, sir.

4          Q         If you learned the DCMA had

5     changed its mind since issuing those

6     PMSAs, regarding its view of KBR's

7     performance, might that change your view

8     of whether KBR had satisfied its

9     cross-leveling obligations?

10         A         The question is in regard to

11    cross-leveling.  And as such, that's not

12    something that DCMA would had been

13    reviewing as part of their PMSAs.

14         Q         I'll ask the question

15    differently then.

16                   If you learned DCMA had

17    changed its mind regarding the

18    assessments it had made in its PMSAs of

19    KBR's performance, would that possibly

20    change your opinions in this case?

21         A         Respectfully, no, sir.

22         Q         Why not?

23         A         The PMSAs that were

24    performed are that snapshot in time of

25    the performance over a period of time,

Page 15

DR. DOUGLAS GOETZ

1                 DR. DOUGLAS GOETZ
2     predicated upon the application of the
3     DOD property manual, 4161.2-M, such that
4     cross-leveling is not addressed within
5     that.  I don't see how a PMSA would be
6     looking at that as their normal course of
7     action.
8          Q        So my question -- that last
9     question had nothing to do -- did not
10    mention cross-leveling.
11                  MR. CHIZEWER:  Mr. Court
12          Reporter, could you please read the
13          last question back?
14                  (The requested portion was
15          read back by the court reporter.)
16                  MS. LOLLAR:  David, maybe
17          you just want to ask it again.
18          Q        If you learned that DCMA had
19    changed its mind regarding the accuracy
20    of its PMSA assessments, would that
21    change any of your opinions in this case?
22          A        No, sir.
23          Q        And why not?
24          A        Again, DCMA is going to be
25    performing their audits in accordance

Page 16

                        DR. DOUGLAS GOETZ

1

2    with the DOD property manual, manual that

3    I wrote.  And as such, that is that

4    snapshot in time of their performance.

5    As such, I count that as accurate,

6    reliable, a valid assessment of their

7    performance then at that time.

8         Q        You authored a version of

9    the DOD property manual; correct?

10        A        I authored the version of

11   the DOD property manual for 161.2-M for

12   its original publication during -- issued

13   in December of 1991.  That was my manual,

14   sir.

15        Q        And that property manual

16   is -- its use is mandatory by all DOD

17   components; correct?

18        A        That was mandatory during

19   its life cycle.

20        Q        When was its life cycle?

21        A        December 1991.  It was

22   replaced in 2012.

23        Q        So from December '91 through

24   2012, the DOD manual that you authored

25   was mandatory by all DOD components; is

Page 32

DR. DOUGLAS GOETZ

1
2       the criteria set forth in the manual.  So
3       I have faith in their reports.
4           Q       My question wasn't whether
5       you had faith in the reports.
6                   My question was whether you
7       have expressed an opinion in this case as
8       to whether DCMA had a set of information
9       that was accurate and complete enough by
10      which to evaluate KBR.
11          A       So my answer to that
12      question would be yes in regard to my
13      review of their PMSAs which document the
14      evidence that they were provided.
15          Q       Did you go back and evaluate
16      the source materials that DCMA used to
17      prepare their PMSAs?
18          A       Sir, to the best of my
19      knowledge, those source materials no
20      longer existed because the government by
21      its records retention category for the
22      work papers, those are not kept over that
23      period of time.
24          Q       So you did not?
25          A       That is correct.

Page 33

DR. DOUGLAS GOETZ

1
2          Q          You did not review the
3     DCMA's work papers that they used to
4     prepare their PMSAs; correct?
5          A          That is correct.
6          Q          So you don't know what
7     information the DCMA had access to in
8     order to prepare their PMSAs; correct?
9          A          Not directly, sir.  But I do
10    know what the criteria are within the DOD
11    property manual, that they must analyze
12    and as such, what source data they would
13    be looking at, reviewing, auditing to
14    determine performance.  But I do not have
15    the source work papers.  Sorry, sir.
16         Q          And you don't know whether
17    KBR was withholding any critical
18    information from the DCMA that might have
19    affected the PMSAs that they created;
20    correct?
21         A          No, sir.  That would not be
22    an assumption I'd be looking at.  I know
23    the qualifications of the PAs and their
24    due diligence looking through their
25    performance of a PMSA.

Page 39

1                    DR. DOUGLAS GOETZ

2       property manual, knowing the education

3       and training that they've gone through

4       and knowing the people that they sent

5       over looking at the PMSAs, the property

6       administrators who were boots on the

7       ground, yes, sir, I do.

8            Q        Just to be clear, based on

9       the training that you know DCMA employees

10      get and the specific employees who are

11      involved here, you believe that based

12      merely on those two criteria, that the

13      DCMA reports are to be trusted; correct?

14           A        The DOD property manual

15      criteria, the training which I conducted

16      along with other professors as we did a

17      course design as to program manager in

18      concert with all of DOD and the armed

19      services, knowing their requirements to

20      become certified as a property

21      administrator with their education,

22      experience being evaluated, yes, sir, I

23      have confidence as my report says.  I

24      have a high degree of confidence.

25           Q        In placing your trust and

```
                                         Page 42
 1                     DR. DOUGLAS GOETZ
 2      professional colleagues who I've dealt
 3      with.  And I know that their reports,
 4      their analyses, their PMSAs would be done
 5      in a thorough and complete fashion.
 6           Q        As between you and a DCMA
 7      employee who is charged with monitoring
 8      KBR's performance on inventory
 9      management, who is in a better position
10      to determine whether the DCMA considered
11      a particular compliance issue to be
12      material?
13           A        You've got to do it again,
14      David.  I'm sorry, sir.  Can you hit me
15      again?  I'm confused.
16           Q        Sure.  As between you --
17           A        Yes.
18           Q        -- and a DCMA employee who
19      is charged with the specific
20      responsibility of managing the contract
21      that KBR was implementing with respect to
22      inventory management, who would be in a
23      better position to determine whether DCMA
24      considered a particular compliance issue
25      to be material?
```

Page 43

```
 1                    DR. DOUGLAS GOETZ
 2        A        The DCMA property
 3   administrator who has boots on the ground
 4   at that location, I'm sitting back here
 5   in the United States.  They're there on
 6   the front lines seeing all of the
 7   operations.
 8        Q        Did you consider Maria
 9   McNamara's testimony in this case
10   regarding whether DCMA might have taken a
11   different view of KBR's performance if it
12   had been given access to certain internal
13   KBR documents?
14        A        I reviewed Maria McNamara's
15   deposition there.  I do, I think,
16   remember seeing some comment about that.
17   Please keep in mind that the criteria
18   that are set forth in the DOD manual,
19   which the guys over there in Iraq had to
20   follow, they have full view, full vision
21   as to what's going on and how KBR is
22   handling their government property.  For
23   clarification, sir, I prefer to use the
24   term government property -- and I will --
25   versus inventory management.
```

Page 44

```
 1                    DR. DOUGLAS GOETZ
 2        Q        The management of government
 3   property includes inventory management;
 4   you understand that; right?
 5        A        Yes, sir.
 6        Q        How do you know that DCMA
 7   had what you call full view of KBR's
 8   performance in war theater?
 9        A        Okay.  The government
10   property administrator, DCMA government
11   property administrator has access as
12   allowed by the government property
13   clause, knowing their abilities in regard
14   to doing that analysis, i.e., an audit.
15   They are competent and capable of digging
16   through records, through the life cycle
17   processes called out in the DOD manual,
18   ranging from acquisition through
19   disposition.
20        Q        Did you personally compare
21   the materials that the DCMA looked at in
22   order to create their PMSAs with all of
23   the materials that KBR had internally?
24        A        I'm sorry, sir.  What do you
25   mean all of the KBR materials?  I don't
```

Page 45

DR. DOUGLAS GOETZ

1    know what you mean there.

3    Q    KBR keeps its own records of

4    its performance; correct?

5    A    They keep stewardship

6    records for the government.  Did I

7    compare those records?  No, sir, I did

8    not.

9    Q    Did Ms. McNamara's testimony

10    about what documents she did have access

11    to and what documents she did not have

12    access to influence you at all as to

13    whether or not you should have a high

14    degree of confidence in the DCMA's PMSAs?

15    A    No, sir.

16    Q    Why not?

17    A    I know the rigor of the DCMA

18    performance of a PMSA.  I know the

19    corrective actions that were requested if

20    there were deficiencies.  I know also

21    that Ms. McNamara, Maria, held KBR's

22    property management system in an approved

23    status throughout the entire life of this

24    contract performance during the time when

25    this was involved.

Page 46

1                    DR. DOUGLAS GOETZ

2        Q        You know the rigor -- strike

3    that.

4                 You are claiming to know the

5    rigor of the DCMA performance of a PMSA

6    and the corrective actions that were

7    requested by reviewing the documents in

8    this case; correct?

9        A        Reviewing the PMSAs, summary

10   documents that I have for this.  And I do

11   have those in the other room if you'd

12   like any references to that.

13       Q        And given your review of

14   those documents that were done as of the

15   date that they were done, you decided you

16   did not need to be influenced by

17   Ms. McNamara's later testimony about the

18   documents that she did have access to

19   versus the documents she did not have

20   access to; correct?

21       A        That is correct.

22       Q        Do you believe that the

23   coursework that you provide to DCMA

24   employees prevents them from ever being

25   deceived about the performance of a

```
                                          Page 47
 1                    DR. DOUGLAS GOETZ
 2      contractor?
 3           A        I believe that the
 4      coursework we presented through the
 5      numerous courses dealing with performance
 6      of a PMSA, the exercises that we did in
 7      other courses to enhance their abilities
 8      gave them the proper tools to use to
 9      perform that audit and disclose any
10      deficiencies.
11           Q        Do you believe that the
12      coursework that you provided to DCMA
13      employees who worked on the LOGCAP III
14      contract prevented them from ever being
15      deceived by a contractor?
16                    MS. LOLLAR:  Objection,
17          asked and answered.
18           A        Okay.  I have to answer?
19           Q        Yes.
20           A        Okay.  Same thing.  Yes,
21      sir.  This coursework had them dig into
22      all of those records.  And you can see
23      that looking at these summaries.  They
24      were not easy on KBR, if that's what
25      you're implying in any way, shape or
```

Page 48

                              DR. DOUGLAS GOETZ

1
2       form.  They had the criteria established
3       within the DOD property manual.  They'd
4       find stuff.
5            Q       Are you aware of any
6       challenges that the DCMA faced in trying
7       to assess KBR's performance and its
8       management of government property?
9            A       Looking at the broader
10      issue, they're in a war zone.  So that
11      would be impacted by restrictions to
12      travel, hostilities, other things like
13      that.  If you're asking about the actual
14      conduct of a PMSA, no, sir.
15           Q       So you're not aware of any
16      challenges that DCMA faced in performing
17      PMSAs on KBR's property management
18      system; is that correct?
19           A       I gave you the things that
20      could impact them.  And that would be
21      getting to the site to do a review,
22      summary reviews, audits, systems
23      analysis, might have been delayed because
24      they couldn't get transport because there
25      were hostilities going on.  They

Page 126

1                    DR. DOUGLAS GOETZ

2          is 1:51 p.m.  This begins Unit 4.

3          We're on the record.

4          Q        Dr. Goetz, you understand

5     you're still under oath; correct?

6          A        Yes, sir.

7          Q        Is it your opinion that DCMA

8     had a more accurate evaluation of KBR's

9     property management system than KBR's own

10    internal assessment?

11                    MS. LOLLAR:  Objection to

12         form.

13         A        Based upon the protocols

14    applied through the DOD property manual,

15    yes.

16         Q        If I could direct your

17    attention to page 8 of your report,

18    paragraph O --

19         A        Yes, sir.

20         Q        -- in paragraph O of your

21    report on page 8, you say, "In my

22    opinion, by not considering whether a

23    single deficiency was isolated versus

24    systemic, the SMART team could and often

25    did reach false conclusions."

1                    DR. DOUGLAS GOETZ
2       best of my recollection.
3            Q        Was there anything that you
4       read that caused you any question as to
5       whether KBR had met or exceeded the
6       applicable requirements for managing
7       government property?
8            A        The clearest evidence of
9       that, the approval letters signed by
10      Maria McNamara as the PA, saying their
11      property management system is approved
12      and adequate to meet these requirements.
13           Q        That doesn't answer my
14      question.
15                    My question was --
16           A        I'm trying.
17           Q        -- did you review anything
18      that caused you to question whether KBR
19      actually exceeded or met the applicable
20      requirements for managing government
21      property?
22           A        I reviewed the PMSAs.  And
23      they told me quite clearly what they were
24      doing and with the determinations that
25      they were adequate.

Page 145

DR. DOUGLAS GOETZ

1

2     Q       So it sounds like nothing

3     that you reviewed gave you any pause or

4     called into question at all, whether KBR

5     had met or exceeded the applicable

6     requirements for managing government

7     property; right?

8     A       Sorry.  I can't agree with

9     you saying right.  I'm sorry.  I looked

10    at these reports, PMSAs, showing what KBR

11    was performing, their performance levels.

12    I did not go over to Iraq to review their

13    applications.

14    Q       You list -- everything you

15    reviewed is in Appendix A; correct?

16    A       Yes, sir.

17    Q       Was there anything in

18    Appendix A that you looked at and said,

19    hey, this gives me some pause about

20    whether KBR was exceeding or meeting

21    their requirements, I better look at this

22    a little more closely because I'm not

23    sure I can reach that conclusion?

24    A       Yeah.  Gave me pause --

25    Q       Anything like that?

Page 146

1              DR. DOUGLAS GOETZ
2        A        No, sir.  I'll say that.
3        Q        In paragraph Z of your
4    report on pages 9 and 10, could you
5    review paragraph Z, and let me know when
6    you've had a chance to review it?
7        A        Yes, sir.
8        Q        Your opinion is that it's an
9    impressive accomplishment, that KBR
10   engaged in almost 870,000 cross-leveling
11   transactions; correct?
12       A        That is what is stated there
13   as a data point, yes, sir.
14       Q        It's stated there.
15                Do you stand by that
16   statement?
17       A        Yes, sir.
18       Q        What led you to being
19   impressed by the fact that KBR engaged in
20   at least 870,000 cross-leveling
21   transactions?
22       A        I read the analysis that was
23   provided by a -- I don't know how to
24   characterize this individual --
25   Mr. Walters, I believe his name is, in

```
 1                  DR. DOUGLAS GOETZ
 2      access to the raw data.  But I can look
 3      at this Excel spreadsheet and use the
 4      filters and use some -- auto some feature
 5      to come up with different numbers.
 6           Q      Did you review any evidence
 7      in your work in this case that suggested
 8      that some of the work order numbers in
 9      this spreadsheet that Mr. Howard prepared
10      were false?
11           A      No, sir.
12           Q      Did you review any evidence
13      in this case, suggesting that the
14      justifications for the reservations in
15      Mr. Howard's spreadsheet were false?
16           A      No, sir.
17           Q      Do you know who Rich Kaye
18      is?
19           A      I've seen his name on a
20      number of e-mails that I've reviewed.
21           Q      Did you speak with Rich Kaye
22      in connection with preparing your expert
23      report?
24           A      No, sir.
25           Q      Did you ask -- do you know
```

Page 178

                    DR. DOUGLAS GOETZ

1                   DR. DOUGLAS GOETZ

2       whether Mr. Kaye regarded Mr. Howard's

3       report as accurate?

4                   MS. LOLLAR:  Objection to

5           form, foundation.

6           Q       You can answer.

7           A       I'm thinking.

8           Q       I'm sorry.

9           A       Big report, lots of

10      different documents I looked at.  Sir,

11      respectfully, I'd have to say I just

12      don't remember at this time.

13          Q       Dr. Goetz, you've been

14      handed what's been previously marked as

15      Deposition Exhibit No. 592.  It's an

16      e-mail chain, ending with an e-mail from

17      Rich Kaye to Larry Lust, dated

18      March 20th, 2010, identified as

19      KBR-HOW-1329112.

20                  You reviewed this e-mail in

21      connection with your report; correct?

22          A       I believe I did, sir, yes.

23          Q       Did you provide an opinion

24      in your report as to whether the

25      statements by Mr. Kaye in this e-mail

Page 179

1                         DR. DOUGLAS GOETZ

2       were accurate?

3            A        I would have to review my

4       report to see if I made reference to it.

5       I would assume that I have seen it.  I

6       cannot tell you at this point whether or

7       not I actually did make reference to this

8       in my report.  Would you like me to look

9       for one minute or no?

10           Q        You can look for a minute.

11      And while you're looking, my question's

12      not whether you referred to the e-mail in

13      your report.

14                    My very specific question

15      is, can you point to an opinion in your

16      report that suggests that the statements

17      by Mr. Kaye in his March 20th, 2010

18      e-mail to Mr. Lust were inaccurate?

19                    MS. LOLLAR:  Objection to

20          form.  You're talking about all of

21          the statements in this e-mail?

22                    MR. CHIZEWER:  Any of them.

23           A        I have no knowledge about

24      patches that were used by divisional

25      patches.  I'd have to go further to the

Page 180

1                    DR. DOUGLAS GOETZ

2        second paragraph here.  I see Mr. Kaye's

3        discussion about the requisitions, must

4        go through MATCON.  I believe we

5        discussed that.  So the technical

6        direction that was issued there.

7                    I cannot interpret why

8        Mr. Kaye would refer to a Form 1.  I

9        cannot get into his head or figure out

10       where he was going.  Stock versus

11       non-stock, that is not a requirement of

12       the government property clause there.

13            Q      Let me direct you to the

14       fourth paragraph of Mr. Kaye's

15       March 20th, 2010 e-mail to Mr. Lust in

16       which Mr. Kaye says, "We've got

17       71 million in reserved stock of which

18       less than 50 percent is legitimate."

19                    Did you express an opinion

20       in your report as to whether that

21       statement by Mr. Kaye is accurate?

22            A      I did not, to my memory,

23       make a statement that that was inaccurate

24       based upon what Mr. Kaye was saying.

25            Q      And do you have any basis to

Page 181

                    DR. DOUGLAS GOETZ

1
2       say that Mr. Kaye was wrong when he said
3       that we've got 71 million in reserve
4       stock of which less than 50 percent is
5       legitimate?
6            A        Only if I'm using the Excel
7       spreadsheet that was provided by
8       Mr. Howard, if I do my analysis of that
9       spreadsheet, that is problematic.
10           Q        I noticed you said you
11      couldn't get into the head of Mr. Kaye
12      regarding what he was writing in this
13      March 20th, 2010 e-mail; is that correct?
14           A        Yes, sir.
15           Q        Can you get into the head of
16      any of the DCMA employees who were
17      writing PMSAs?
18           A        The PMSAs addressed those
19      requirements in the FAR government
20      property clause and the DOD property
21      manual as statements of fact regarding
22      their system analysis.  This is, shall I
23      say, a far more emotional laden e-mail.
24      I can't figure out why they were thinking
25      about these things in this fashion.

1                    DR. DOUGLAS GOETZ
2          Q          Would you want to get to the
3     bottom of the statements that Mr. Kaye is
4     making to Mr. Lust before making a
5     determination as to whether or not there
6     were significant findings that KBR should
7     have reported to the DCMA?
8                    MS. LOLLAR:  Objection to
9          form.
10         A          I've heard your question,
11    sir.  I'm thinking for a moment.  I have
12    addressed numerous issues within my
13    report that address things like the issue
14    of the ASLs, like the issues of stock,
15    non-stock items, stuff going through
16    MATCON.
17                    And, yes, we addressed the
18    technical directives, saying everything's
19    got to go through that.  I'm convinced
20    that KBR was taking action to make sure
21    that things were going properly.
22         Q          My question was, would you
23    want to get to the bottom and know
24    whether what Mr. Kaye was saying to
25    Mr. Lust was truthful and accurate before

Page 183

```
1                    DR. DOUGLAS GOETZ
2     determining whether or not KBR had an
3     obligation to report a significant
4     finding to the DCMA?
5                    MS. LOLLAR:  Objection to
6         form.
7         A        Wow.  Truthful and accurate,
8     sir, I'm really confused as to how I'm
9     going to do something like that.  I am
10    looking at hard, cold data from that
11    Excel spreadsheet.  I'm looking at the
12    corrective action that was taken in
13    regard to that issue of MATCON.  I don't
14    know how else I would have been able to
15    do that, sir.  I do not know.
16        Q        You note in your report that
17    there was no requirement for KBR to
18    engage in any form of self-assessment;
19    correct?
20        A        During a specific period of
21    time, yes.  Upon the modification of
22    their contract to the 2007 government
23    property clause, which was incorporated
24    in their contract in 2009, that
25    self-assessment became a requirement.
```

Page 280

C E R T I F I C A T I O N

I, ANTHONY GIARRO, a Shorthand
Reporter and a Notary Public, do hereby
certify that the foregoing witness, DR.
DOUGLAS GOETZ, was duly sworn on the date
indicated, and that the foregoing, to the
best of my ability, is a true and accurate
transcription of my stenographic notes.

I further certify that I am not
employed by nor related to any party to
this action.


ANTHONY GIARRO

# EXHIBIT 2

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF ILLINOIS

3                    ROCK ISLAND DIVISION

4        ------------------------------:

5        UNITED STATES OF AMERICA       :

6        ex rel. GEOFFREY HOWARD AND    :

7        ZELLA HEMPHILL,                :

8                    Plaintiffs,        :

9              vs.                      : Case No.:

10       KBR, INC., AND KELLOGG         : 4:11-CV-04022-

11       BROWN & ROOT SERVICES, INC.,   : MMM-JEH

12                    Defendants.       :

13       ------------------------------:

14

15          Videotaped Deposition of DOV S. ZAKHEIM

16                    Washington, D.C.

17                 Friday, July 29, 2022

18                       10:10 a.m.

19

20       Job No. PA-5328091

21       Pages 1 - 297

22       Reported by:  Robert M. Jakupciak, RPR

Page 39

| | | |
|---|---|---|
| 1 | A    Yes. | 10:45:30 |
| 2 | Q    How many? | 10:45:32 |
| 3 | A    Oh, God.  I can't remember now.  It wasn't | 10:45:33 |
| 4 | a very large group.  Maybe a dozen, something like | 10:45:36 |
| 5 | that. | 10:45:40 |
| 6 | Q    Is this in Baghdad? | 10:45:42 |
| 7 | A    Yes. | 10:45:45 |
| 8 | Q    Did you meet with any of the auditors that | 10:45:46 |
| 9 | were at bases outside of Baghdad? | 10:45:48 |
| 10 | A    No. | 10:45:51 |
| 11 | Q    And I apologize.  You said you went to | 10:45:52 |
| 12 | Iraq you think twice when you were in this position? | 10:45:55 |
| 13 | A    Correct. | 10:45:59 |
| 14 | Q    Did you meet with folks from DCAA on both | 10:46:00 |
| 15 | occasions? | 10:46:04 |
| 16 | A    I only recall one occasion. | 10:46:05 |
| 17 | Q    What was your day-to-day with Bill Reed | 10:46:11 |
| 18 | like? | 10:46:15 |
| 19 | A    I didn't meet with him every day.  I would | 10:46:16 |
| 20 | meet with him regularly probably weekly, maybe | 10:46:18 |
| 21 | biweekly.  If there were any issues that he had, he | 10:46:23 |
| 22 | would come and raise them with me.  But I can't give | 10:46:25 |

Page 40

1    you specifics.  This is quite a while ago.                10:46:28

2         Q    You can't give me specifics of any types        10:46:31

3    of issues that he raised with you?                        10:46:33

4         A    Can't recall.  There was nothing that was       10:46:36

5    explosive to my recollection.                             10:46:37

6         Q    Umm.                                            10:46:41

7         A    He was a very, very good manager.  He was       10:46:42

8    there quite a few years.  I believe he had been           10:46:44

9    there before I got there and certainly was there          10:46:47

10   after I got there for quite some time.  He was            10:46:49

11   highly respected.                                         10:46:54

12        Q    As best as you can recall, tell me what         10:47:01

13   types of information he would convey to you at these      10:47:04

14   weekly or biweekly meetings.                              10:47:07

15        A    It would be anything from the agency's          10:47:09

16   budget needs, it would be personnel needs.  I don't       10:47:12

17   recall any major substantive issue that he couldn't       10:47:16

18   handle himself.                                           10:47:19

19        Q    What do you mean when you say substantive       10:47:22

20   issue?                                                    10:47:25

21        A    In other words, if there was, you know,         10:47:25

22   for example, if there was a matter that DCAA felt         10:47:29

Page 61

1          Q    Is cross-leveling something you have ever    11:11:37

2     encountered prior to being contacted about this    11:11:40

3     litigation?    11:11:43

4          A    I didn't have to deal with that, no.    11:11:43

5          Q    And you have never heard about it before?    11:11:46

6          A    It wouldn't have reached my level.    11:11:49

7          Q    So the answer is no?    11:11:51

8          A    No.    11:11:52

9          Q    Do you have an understanding of what the    11:11:59

10    relevant time period is for this case?    11:12:00

11         A    Yes.  It was looking at -- the LOGCAP III    11:12:02

12    was signed in 2001 as I recall, and I think the    11:12:08

13    concerns ran as late as 2009 if I'm not mistaken.    11:12:16

14         Q    So you think it's, the relevant time    11:12:22

15    period is 2001 to 2009?    11:12:24

16              MR. CHIZEWER:  Objection to foundation.    11:12:27

17         A    I think so.  I may be off by a year.    11:12:29

18         Q    And what is your expertise, what's your    11:12:38

19    relevant expertise that allowed you to form the    11:12:45

20    opinions that are contained in your expert report?    11:12:48

21         A    Well, having been involved in budgets for    11:12:51

22    45 years, and having managed DCAA, having oversight    11:12:56

Page 62

| | | |
|---|---|---|
| 1 | to be more accurate over DCAA and then having sat on | 11:13:02 |
| 2 | the commission that looked at contracting in | 11:13:05 |
| 3 | Afghanistan and Iraq, I had a pretty good sense of | 11:13:08 |
| 4 | what should or should not be done in the context of | 11:13:11 |
| 5 | what this is all about. | 11:13:18 |
| 6 | Q    What should or should not be done with | 11:13:20 |
| 7 | respect to? | 11:13:22 |
| 8 | A    With respect to providing full and open | 11:13:24 |
| 9 | information to the government regarding the | 11:13:28 |
| 10 | expenditures. | 11:13:33 |
| 11 | Q    Did anyone apart from counsel for the | 11:13:45 |
| 12 | relaters assist you in your work here? | 11:13:49 |
| 13 | A    No. | 11:13:51 |
| 14 | Q    Dr. Zakheim, you are not an expert on the | 11:14:01 |
| 15 | law; correct? | 11:14:02 |
| 16 | A    I'm not a lawyer. | 11:14:03 |
| 17 | Q    You are not an expert in government | 11:14:05 |
| 18 | contracts; correct? | 11:14:07 |
| 19 | A    Correct. | 11:14:08 |
| 20 | Q    You are not an expert in the regulations | 11:14:11 |
| 21 | that apply to government contractors with respect to | 11:14:13 |
| 22 | management of government property? | 11:14:16 |

Page 98

```
 1          A    If you are asking me if I'm an email        12:12:35

 2     analyst, is that what you are asking me?             12:12:37

 3          Q    Yeah.                                       12:12:40

 4          A    I analyze content.  I don't analyze the     12:12:41

 5     form.  The form was an email, the content is the     12:12:45

 6     issue.                                                12:12:51

 7          Q    And in terms of your analysis skills, what  12:12:52

 8     you pointed me to is your experience with budgets?   12:12:55

 9          A    Budgets, programs, spending and based on    12:12:59

10     my time on the commission, contractor -- how do I    12:13:03

11     put it -- what's allowable and what's not allowable  12:13:10

12     for a contractor.                                     12:13:12

13          Q    Let's talk about the commission.  What was  12:13:16

14     the commission?                                       12:13:20

15          A    What it was?                                12:13:29

16          Q    Uh-huh.                                      12:13:30

17          A    It was established by the Congress to look  12:13:31

18     at primarily the degree of waste, fraud and abuse by 12:13:33

19     contractors in the wars in Afghanistan and Iraq.     12:13:39

20          Q    And the full name of it?                    12:13:44

21          A    Commission on Contracting -- the            12:13:46

22     Commission on War Time Contracting in Iraq and       12:13:48
```

```
                                                   Page 99
 1      Afghanistan.                               12:13:53

 2           Q    And how long did it -- well, what was the   12:13:54

 3      work of the commission?                    12:14:00

 4           A    The commission's job was to investigate   12:14:01

 5      the degree to which, particularly in the case of   12:14:05

 6      waste, whether there was taxpayer money that had   12:14:10

 7      been wasted on projects that were not necessary,   12:14:13

 8      projects that were overpriced, and that was our job.   12:14:17

 9      And then to make recommendations as to how the   12:14:24

10      government could improve its oversight.     12:14:27

11           Q    And you were a commissioner; correct?   12:14:29

12           A    Correct.                          12:14:31

13           Q    And what did that entail?         12:14:31

14           A    Well, it entailed holding hearings.  We   12:14:33

15      had hearings with various government officials.  It   12:14:39

16      entailed study visits.  It entailed contributing to   12:14:44

17      the writing of the report.  We had a staff that we   12:14:49

18      managed that did a lot of the research and then we   12:14:53

19      evaluated the research.                     12:14:56

20           Q    And where did the funding come from?   12:14:59

21           A    The funding as I recall was, came out of   12:15:04

22      the DoD budget if I'm not mistaken.         12:15:07
```

Page 100

```
 1          Q    Do you know how much the commission cost?    12:15:12

 2          A    I don't know.  Can't recall the number.      12:15:16

 3          Q    Ballpark?                                    12:15:19

 4          A    It would just be a wild guess.  It's         12:15:22

 5     pointless.                                             12:15:24

 6          Q    In the millions?                             12:15:25

 7          A    Oh, yeah.  In the millions.                  12:15:27

 8          Q    In the single digit millions?               12:15:28

 9          A    You are pushing me in a direction I can't    12:15:31

10     go.                                                    12:15:33

11          Q    Certainly at least several million?          12:15:36

12          A    Several millions I would say.                12:15:38

13          Q    Could have been tens of millions?            12:15:39

14          A    I don't know.  I don't think so.             12:15:41

15          Q    And the commission worked for about two      12:15:43

16     years?                                                 12:15:49

17          A    Roughly.                                     12:15:50

18          Q    2009 to 2011?                                12:15:51

19          A    Correct.                                     12:15:54

20          Q    And were you a commissioner for the entire   12:15:54

21     duration?                                              12:15:56

22          A    Yes.                                         12:15:56
```

Page 101

| | | |
|---|---|---|
| 1 | Q    If I said we counted 31 hearings and 8 | 12:15:58 |
| 2 | reports issued by the commission, do you have any | 12:16:02 |
| 3 | reason to dispute that? | 12:16:04 |
| 4 | A    No. | 12:16:05 |
| 5 | Q    Then you said the commissioners made | 12:16:09 |
| 6 | recommendations; right? | 12:16:10 |
| 7 | A    Correct. | 12:16:12 |
| 8 | Q    What was the actual result of the | 12:16:16 |
| 9 | commission? | 12:16:19 |
| 10 | A    Well, the commission reported on | 12:16:20 |
| 11 | everything from the need for better oversight of | 12:16:24 |
| 12 | subcontractors to adding more personnel for | 12:16:28 |
| 13 | oversight, to definitizing contracts earlier in the | 12:16:33 |
| 14 | process.  I would say, and it's not the only | 12:16:39 |
| 15 | commission I've been on, that it was relatively | 12:16:44 |
| 16 | unsuccessful.  These were recommendations made to | 12:16:47 |
| 17 | the Hill and few of them were actually acted upon. | 12:16:51 |
| 18 | Q    Can you think of any that were acted on? | 12:16:58 |
| 19 | A    Well, I think they plussed up the | 12:17:02 |
| 20 | personnel, but by and large, as I recall, it was | 12:17:05 |
| 21 | disappointing. | 12:17:12 |
| 22 | Q    When you say plussed up the personnel, you | 12:17:13 |

Page 297

1    UNITED STATES OF AMERICA    )

2                                    ss:

3    DISTRICT OF COLUMBIA         )

4              I, ROBERT M. JAKUPCIAK, an RPR and Notary

5    Public within and for the District of Columbia do

6    hereby certify:

7              That the witness whose deposition is

8    hereinbefore set forth, was duly sworn and that the

9    within transcript is a true record of the testimony

10    given by such witness.

11              I further certify that I am not related to

12    any of these parties to this action by blood or

13    marriage and that I am in no way interested in the

14    outcome of this matter.

15              IN WITNESS WHEREOF, I have hereunto set my

16    hand this 3rd day of August, 2022.

17

18                              _____

19

20

21    My Commission Expires:

22    February 29, 2024

# EXHIBIT 3

I am Dov S. Zakheim. I currently am a Senior Advisor at the Center for Strategic and International Studies and am Vice Chairman of the Foreign Policy Research Institute. I have served as a Principal Analyst at the Congressional Budget Office, held a series of Senior Executive positions at the Department of Defense from 1981-85, served as Deputy Under Secretary of Defense for Planning and Resources from 1985-87, and returned to DoD as Under Secretary of Defense (Comptroller) and Chief Financial Officer from 2001-2004. While holding that position I oversaw the activities of the Defense Contract Audit Agency, whose Director reported to me. Subsequent to my government service I was a Commissioner on the Commission on Wartime Contracting in Iraq and Afghanistan, which, among other matters, investigated issues relating to contractor waste, fraud and abuse. When not in government I have worked in the private sector, have consulted to DoD, served on the Defense Business Board, which I created with the approval of Secretary of Defense Donald Rumsfeld, and chaired the National Intelligence Council's International Business Practices Advisory Panel (2008-2011).

I have reviewed a series of internal Kellogg, Brown and Root (KBR) emails beginning in February 2009 and ending in April 2010. I have also reviewed the May 4, 2009 testimony from Defense Contract Audit Agency (DCAA) Director April Stephenson, Defense Contract Management Agency (DCMA) Director Charlie Williams, and other senior officials who appeared before me and my colleagues on the Commission on Wartime Contracting. Lastly, I have reviewed the Defendants' Motion to Dismiss, the Plaintiffs'/Relators' Opposition to that Motion, and testimonies of expert witnesses both in support of, and opposition to, the Plaintiffs.

It is my opinion that the fact that DCMA (Defense Contracts Management Agency) had approved KBR's property management system is no indication that KBR was actually in compliance with its contractual obligations to the United States Government or entitled to reimbursement for all the materials it had purchased. In addition to DCMA, the Defense Contracts Audit Agency (DCAA), also had oversight of the

financial aspects of the KBR contract, and as I shall outline below, did not have full visibility into KBR's practices.

In addition, it is my opinion that the contents of KBR emails that I have reviewed should have been disclosed to both DCMA and DCAA. Had these emails been disclosed, they certainly would have been assessed in DCAA audits. Moreover, in my opinion, had DCAA been made aware of the issues raised in these emails, DCAA at a minimum would have questioned those reimbursements. For reasons that I shall outline below, it is also my opinion that DCAA would also have recommended reduced compensation from either KBR, or Halliburton, which was backing up KBR costs. Moreover, had DCAA concluded that KBR had deliberately kept it in the dark regarding items stored in TRECs, it might also have recommended that KBR be suspended or even debarred from the LOGCAP III follow-on contract, entitled LOGCAP IV.

Finally, given both the large number of KBR charges that DCAA had previously questioned or invalidated, had DCAA been aware of KBR's non-action with respect to cross-leveling, and concluded that KBR deliberately concealed what it was doing, the Director of DCAA likely would have raised the matter with the Comptroller. I can only say that had this matter been brought to my attention, I would have supported DCAA, whether the agency sought reimbursement from KBR as well as voiding of its award fee, or gone further to recommend suspension or debarment from LOGCAP IV.

BACKGROUND: DIFFERING MISSIONS FOR DCMA AND DCAA

The DCMA provides contract administration services for the Department of Defense, other federal organizations and international partners, and is an essential part of the acquisition process from pre-award to sustainment. The Agency describes itself as "first and foremost, a product delivery

2

organization." It sees its mission as "enhancing warfighter lethality by ensuring timely delivery of quality products, and providing relevant acquisition insight supporting affordability and readiness."[1]

DCAA's role differs markedly from that of DCMA. As DCAA Director April Stephenson outlined to the Commission, "DCAA services include audits and professional advice to contracting officials on accounting and financial matters to assist them in the negotiation, award, administration and settlement of contracts."[2] But ultimate decisions relating to contracts do not lie with DCAA. "Decision-making authority on DCAA recommendations resides with contracting officers," she pointed out.[3]

DCAA, on the other hand, serves an entirely different purpose. Its "primary function is to conduct contract audits and related financial advisory services."[4] Contract audits are independent, professional reviews of *financial representations made by defense contractors,* and DCAA helps determine whether contract costs are allowable, allocable, and reasonable."[5] (Emphasis added). DCAA also "provides audit and financial advisory services to DoD and other federal entities responsible for acquisition and contract administration,"[6] including DCMA.

As a Small Business Administration guide notes: "After award, continuing through contract closeout, the DCMA closely monitors the contractor for compliance with all contract terms. By contrast, the Defense Contract Audit Agency, or DCAA, has the primary responsibility for monitoring and auditing the accounting systems of contractors in doing their work for the DoD."[7]

---

[1] https://www.dcma.mil/About-Us/
[2] Testimony of April Stephenson, Director, DCAA before the Commission on Wartime Contracting in Iraq and Afghanistan (May 4, 2009), p. 49.
[3] *Ibid.*
[4] https://www.dcaa.mil/
[5] *Ibid.*
[6] *Ibid.*
[7] https://www.sbir.gov/tutorials/accounting-finance/tutorial-5.

DCAA can disallow contractor claims for reimbursement; it can also penalize contractors. DCAA can issue what is called a Form 1, defined in the Federal Acquisition Regulations as a "Notice of Contract Costs Suspended and/or Disapproved."[8] DCAA can penalize contractors when disallowing costs. Penalties include: "the amount of the disallowed costs allocated to contracts . . . for which an indirect cost proposal has been submitted; plus interest on the paid portion, if any, of the disallowance."[9] Additional penalties include "other administrative, civil, and criminal penalties provided by law."[10]

KBR's management practices and charges prompted numerous actions on the part of DCAA. DCAA questioned $221 million in excess KBR fuel payments. As a result of DCAA's findings, DoD reduced "the cost basis for the award fee by half the cost figure questioned by DCAA."[11] Similarly, in April 2005 DCAA challenged the prices that KBR was paying for "living containers" to be used for housing, and disapproved $51.3 million on KBR's claimed costs.[12] In her testimony before the Commission of Wartime Contracting in Iraq and Afghanistan, Director Stephenson provided further clarification regarding the housing issue. She pointed out that KBR had acquired higher priced living units and falsely claimed that they offered additional amenities.[13] She also gave additional examples of KBR's record of overcharging the government including charging for "significantly more meals than were actually served," and charging higher prices to pay for more expensive subcontractors serving meals.[14]

More generally, as Director Stephenson pointed out, with respect to LOGCAP III, DCAA audited "about 80 Task Order proposals valued at $28.7 billion . . . questioned $3.2 billion and found [that KBR] could

---

[8] https://www.acquisition.gov/far/part-42#FAR_42_709
[9] *Ibid.*
[10] *Ibid.*
[11] Commission on Wartime Contracting in Iraq and Afghanistan, *Transforming Wartime Contracting: Controlling Costs, Reducing Risks*, (Washington, DC: GPO, 2011), p. 83.
[12] Commission on Wartime Contracting in Iraq and Afghanistan, *At What Cost?: Contingency Contracting in Iraq and Afghanistan: Interim Report* (Washington, DC: GPO, 2009), p 48. At the time the report appeared DCMA issued an interim decision allowing KBR to recover half the disallowance, but was coordinating with DCAA regarding whether the interim decision would stand.
[13] Stephenson Testimony, p. 54.
[14] *Ibid.,* pp. 52-53.

not support an additional $1.5 billion."[15] Moreover, DCAA issued 32 suspected irregularity referrals, what a member of the Commission on Wartime Contracting termed "fraud referrals," and estimated that of those referrals 95 percent were for KBR. DCAA Director Stephenson did not contradict the assertion regarding the percentage attributable to KBR. She instead pointed out that "I have to say that in the history of DCAA I do not think we are aware of a program, a contract or a contractor that has had this number of suspensions and referrals."[16]

KBR's own internal emails indicate that its practices likely would have generated a DCAA Form 1. It would appear, therefore, that DCAA did not issue a Form 1 in this regard only due to the fact that it was unaware of KBR's cross-leveling issues.

LOGCAP III and LOGCAP IV

In addition to disallowing the costs of duplicative materiel, had DCAA been aware of KBR's management practices, DCAA could have imposed additional penalties on KBR. Such penalties could have included suspension or disbarment from LOGCAP IV.

The Army Materiel Command awarded KBR the LOGCAP III contract, the largest and most extensive of its kind, in December 2001, two months after the launching of Operation Enduring Freedom. The contract called for both a base and award fee, and incorporated a series of option years, all of which the Army approved. By 2007, however, in the face of heavy criticism of KBR's performance, the Army officially terminated the contract and issued a Request for Proposal for LOGCAP IV, which, unlike its predecessor, would be a multiple award contract with three winners competing for each task order. In June 2007 the Army announced that of the five companies that bid on the contract, there were three winners: KBR, Flour and DynCorp. The losing companies promptly protested, placing the new contract in

---

[15] Stephenson Testimony, p 51
[16] *Ibid*., p 71.

abeyance; the Army took corrective action and awarded the same three companies the LOGCP IV

contract in April 2008.

Nevertheless, even subsequent to the 2008 award, during the course of transitioning to LOGCAP IV, the

Army continued to work with KBR under the terms of the LOGCAP III contract. As of 2009, the transition

to LOGCAP IV was not yet complete, however; it was under way in Kuwait and Afghanistan but had only

just begun in Iraq. LOGCAP IV had awarded only eight task orders, including one to KBR for project

management.[17] Moreover, LOGCAP IV provided for each of the contractors to compete for task orders.

Thus, had DCAA called for KBR's suspension or debarment, it would have been less complex than would

have been the case with respect to LOGCAP III, because the Army was still transitioning to LOGCAP IV.

The Army Materiel Command could simply have re-competed what had been KBR's contract between

the other two LOGCAP IV awardees, Flour and DynCorp. Thus, had DCAA been made aware of the nature

of KBR's management practices, it could have suspended KBR from LOGCAP IV task orders, or disbarred

KBR from LOGCAP IV altogether.

## DCMA UNDERSTAFFED; DCAA CONCERNS WITH KBR; KBR OFFICIALS FEARED DCAA PENALTIES

On May 4, 2009 the Commission held a hearing in which it received testimony from Charlie Williams,

Director DCMA; April Stephenson, Director DCAA; Jeff Parsons, Executive Director of the U.S. Army

Contracting Command, a major component of Army Materiel Command; and Lee Thompson, Executive

Director of the LOGCAP Program Office. The hearing made it clear that KBR had not justified many

charges and had been forced to reimburse the government hundreds of millions of dollars. The

Commission also found that DCMA and DCAA did not coordinate efficiently; and that DCAA findings and

recommendations were often ignored.

---

[17] Testimony of Lee Thompson, Executive Director, LOGCAP Program Office before the Commission on Wartime Contracting in Iraq and Afghanistan (May 4, 2009), p. 39.

Parsons testified that the Army was improving its system of granting award fees for LOGCAP IV. He stated that the new process would "verify that the award fee board was properly conducted in accordance with regulations and policy."[18] The implication was that the granting of award fees for LOGCAP III had left much to be desired. He also stated that "Army officials have placed additional emphasis on the role of the contracting officer's representative. The COR acts as the eyes and ears of the contracting officer, ensuring the government is getting the best value for the dollars spent."[19] Again, the implication was clear: under LOGCAP III CORs did not always have the "eyes and ears" to focus on practices that escaped his/her purview.

DCMA's Williams' testimony essentially explained why not all contractor practices were visible to the government. He pointed out that LOGCAP III covered "a multitude of countries" as well as a "variety of contract functions" previously described as service support.  He acknowledged that "with the DCMA mission traditionally framed in industrial plant operations, our LOGCAP learning curve has been steep."[20] Yet he was stating this in 2009, seven years after LOGCAP III had been awarded.

One reason for the challenge that DCMA faced was that the agency had unfilled personnel requirements. Williams noted that there were unfilled requirements for 335 CORs in Iraq and 362 CORs in Afghanistan,[21] yet these were Parson's "eyes and ears" for contract oversight.  Clearly, the DCMA could not cope with the demands of monitoring the massive contract. The agency could therefore easily overlook activities that for whatever reason that the contractor did not report. Thus the assertion that "the Government through DCMA's Property Management System Analysis (PMSAs) was satisfied with

---

[18] Testimony of Jeff Parsons, Executive Director of the U.S. Army Contracting Command, before the Commission on Wartime Contracting in Iraq and Afghanistan (May 4, 2009) (Parsons Testimony), p. 30.

[19] *Ibid.*, p. 32.

[20] Testimony of Charlie Williams, Director DCMA, before the Commission on Wartime Contracting in Iraq and Afghanistan (May 4, 2009) (Williams Testimony), p. 42.

[21] *Ibid.* p. 44.

KBR's performance managing government property,"[22] only holds true insofar as DCMA had the wherewithal to evaluate the system. As Charlie Williams indicated before the Commission, however, his agency was both understaffed and not fully capable of addressing the complexities that were inherent in LOGCAP III.

Williams also pointed out that "ACOs [Administrative Contracting Officers] were authorized to approve contractor material requisitions, validating requirements with the LOGCAP support officers and promoting prudent business judgment in the ordering of material and equipment by the contractors."[23] In order to do so effectively, however, the ACO needed visibility into what the contractor already possessed in its storeroom, and this was not necessarily the case. Indeed, a little over a month after Williams testified, on June 24th KBR's Deputy Theater PSM Manager wrote that the current process for determining that an item was excess to the contract did not account for theater-wide needs; that items had not been screened for cross-level requirements throughout the theater; and that KBR's current process could not determine that items would not be required in support of the current mission."[24] Indeed, an email sent earlier on same day indicated that items were being sent to the Plant Clearance Automated Clearance Reutilization Screening Process (PCARSS).[25] The process made it difficult, if not impossible, for ACOs to contradict or even evaluate the accuracy of that process.

Crucially, shortly before the Commission hearing, DCAA had issued "an audit report on KBR's purchasing system . . . used for acquiring pricing and monitoring subcontractors among other items."[26] DCAA found that system "inadequate."[27]  It recommended that DCMA suspend reimbursement of part of KBR's claimed costs. Moreover, Director Stephenson observed that as of mid-2009 "internal control

---

[22] Expert Report of Dr. Douglas N. Goetz, CPPM, CF (Goetz Report), p. 7.
[23] Williams Testimony, p. 46.
[24] Conor O'Muirgheasa to Elias Faris et. al., June 24, 2009, 1:03 PM, KBR-HOW-0815822.
[25] O'Muirgheasa to Faris et. al., June 24, 2009, 11:12 AM, KBR-HOW-0815821.
[26] Stephenson Testimony, *ibid.,* p. 53.
[27] *Ibid.*

deficiencies at KBR continue to exist."[28] Her statement would appear to contradict the assertion that

somehow the Government was "satisfied with KBR's performance managing government property."[29]

Director Stephenson later explained to the Commission that "unsupported costs leads to contractors

being unable to justify why a cost was incurred, and yet they have billed us. That is . . . to be taken

seriously. . . . In some instances it takes some withholdings and it takes some other incentives to get that

[justification] information to be provided to the government, so it can be properly evaluated and

determined what appropriate prices should be."[30] In the case of KBR's failure to cross-level, however,

the issue was not one of not providing justification; worse, it was a matter of failing to provide

information to DCAA.

As the aforementioned June 24, 2009 email from KBR's Deputy Theater PSM Manager pointed out, "we

could be sending items for PCARSS from one storeroom, while the same items were being consumed

every day at another storeroom....we started to see materials on PCARSS schedules that we KNEW [all

caps in original] was being consumed regularly in theater. We could not justify this."[31] The manager

continued, "we were in the situation of sending lines for purchase when we knew that they were sitting

in the PCARSS bins but were untouchable....We saw requests to reactive flagged MRNs [material

reference numbers] for purchase because, even though there was inventory of them in theater, they

were in PCARSS bins and thus could not be consumed."[32] Yet a third email from that manager on the

same day questioned whether items were screened for cross-level requirements throughout the theater

and noted that at the time of writing any KBR assertion that "there are no foreseeable requirements in

support of the current mission" simply was "not a true statement."[33] As an email from KBR's Deputy

---

[28] *Ibid.*
[29] Goetz Report, p. 7.
[30] Stephenson Testimony, pp. 69-70.
[31] O'Muirgheasa to Faris et al., June 24, 2009,11:12 AM, KBR-HOW-0815821.
[32] O'Muirgheasa to Faris et al., June 24, 2009 11:12 AM, KBR-HOW-0815821.
[33] O'Muirgheasa to Faris et. al. June 24, 2009, 1:03PM, KBR-HOW-0815822

Program Manager-Support sent the following year acknowledged, "in 2009, 35% of all requisitions (having an extended cost of $401 M) bypassed" the supposedly mandatory screening review "against in theater excess before being released to either the DOD wholesale system . . . or commercial purchase."[34]

Months after the June 24 emails noted above, KBR had done relatively little to change its processes regarding cross-leveling even though KBR recognized that should DCAA uncover what it was doing, the agency could impose severe penalties on the contractor. Indeed, KBR officials were aware that were DCAA to uncover its practice of avoiding cross levelling by storing materiel while ordering duplicates of the same materiel, the company risked suspension or debarment from the new LOGCAP IV contract. An internal email from the KBR Deputy Program Manager-Support, a member of KBR's Senior Leadership Team. dated February 25, 2010 explicitly stated that "we [i.e. KBR] are purchasing $5M per day when we've got $1.2 B is[sic] excess on hand," and the email continued, "*at some point the DCAA  is going to put KBR out of business if we keep doing this*."[35] (Emphasis added).

A week later, the author of the February 25th email again wrote that "if we don't cross-level . . . we're going to create a PO [purchase order] (and expend $$) for items that [we] have on hand. Sure as we're having this conversation, the DCAA is going to audit our excess disposition process. To have something on hand and not use it in lieu of purchasing more is a recipe for the DCAA to find fault with us and collect back what we paid for the item via a Form 1."[36]   The following month, the official warned that "we are facing the risk of being Formed *[sic]* 1 for buying items we just declared excess and gave away."[37] He added "We've currently got $331M in them [TREC storerooms] as of yesterday...this is the

---

[34] Kaye to Guy LaBooa March 5, 2010 11:53 AM, KBR-HOW-3374744.
[35] Kaye to John Downey, February 25, 2010, 3:53 PM, KBR-HOW-0580062.
[36] Kaye to Abraham, March 3, 2010, 10:37 PM, KBR-HOW-5162915.
[37] Kaye to Larry Lust, March 20, 2010, 7:28 AM, KBR-HOW-1329112.

Mother of all Forms 1."[38] Finally, about a month after that, on April 1, the same KBR official wrote, "the deeper I dig, the more uncomfortable I become that we really do know what's going on."[39] Clearly the author of the email recognized that KBR could be suspended or debarred from the new LOGCAP IV contract.

That KBR did little to correct the system's deficiencies should have come as no surprise. As another commissioner, Linda Gustitus put it, as early as 2004-2005 "DCAA kept telling KBR: Clean up your systems. Get us the accurate information….It did not happen….the history of KBR is delay, delay, delay, delay on fixing up these systems."[40] Gustitus acknowledged that the issue was not whether KBR was not furnishing what the warfighter needed. That was not the case at all; but it was also beside the point. As she put it, "everybody agrees that the warfighter seems to be satisfied with what they get from KBR. We are here to talk about the price and what it costs us to get that and if there are other ways to do it."[41]

Her comment elicited no dissent from the witnesses. Parsons, the Executive Director of the Army Contracting Command, bluntly stated, "Ma'am I do not disagree with you"[42] and later echoed her comment regarding the warfighter and explicitly pointed out that warfighters had little knowledge of, or real concern about, the business aspects of a contract. As he put it, "what tends to happen is the actual performance, the technical performance . . . for the most part the warfighters have been very happy with the performance they are receiving, *So they are not familiar with the business systems side of it. So I think what happens is that performance tends to overshadow some of the business issues associated with it."* (Emphasis added).[43]

---

[38] *Ibid.*
[39] Kaye to LaBoa, April 1, 2010, 5:22 PM, KBR-HOW-0337417.
[40] Commission on Wartime Contracting hearing, May 4, 2009, p. 83.
[41] *Ibid.*
[42] Parsons Testimony, pp. 84-85.
[43] Parsons Testimony, pp. 112-113.

That the warfighter was satisfied with KBR's performance did not necessarily mean that KBR should have received award fees. Nor for that matter did it mean that KBR should not have been even more severely penalized for withholding information regarding its failure to cross-level while continuing to purchase materiel and billing the government for those purchases. Perhaps DCMA went easy on KBR because as Commissioner Chris Shays put it, "the military doesn't seem to care about the cost as long as they get the service…but it seems like we have developed a system that the major contractors know we are going to be less focused on cost than on service….KBR gets the soft touch because of operational support from area commanders."[44] There is no indication, however, that DCAA adopted the same approach; indeed, the two agencies disagreed over whether, and by how much, KBR should be penalized for practices that DCAA deemed unallowable.

Because DCMA and DCAA have quite different functions, they have differing attitudes to perceived contractor infractions. Michael Thibault, co-chairman of the Wartime Contracting Commission who also served under me as Deputy Director of DCAA, provided one such example of the difference. DCAA had found that KBR's accounting system was inadequate.  On the other hand, the DCMA contracting officer found the KBR system to be adequate. "And," stated Thibault, "the reason was they [DCMA] do not care about the volume of transfers. They care about the quality of the accounting changes."[45] DCMA Director Williams acknowledged that DCMA did not always account sufficiently for DCAA concerns.[46]

 In particular, Director Stephenson noted that DCMA did not have to follow DCAA recommendations regarding award fees, and often did not do so. As she put it, "there were various instances where we [DCAA was] asked to provide input on the status of systems, deficiencies, how timely KBR was being in providing data to support our audits…There were instances where we described to the [award fee]

---

[44] Commission on Wartime Contracting hearing, May 4, 2009, p. 160.
[45] Commission on Wartime Contracting hearing, May 4, 2009, p. 90.
[46] Williams Testimony, *ibid*. p. 90.

board a number of delays we were having, the inadequacies we were having….and in some of these instances, had those items been taken into consideration in accordance with award fee criteria, KBR's award fee would have been much less and in some instances they may not have received any award fee for that particular board."[47]

Lee Thompson, the Executive Director of the LOGCAP Program Office pointed out that "with our partner, DCMA, where we get our property administrators from because all property…has to be accounted for…We rely heavily on the DCMA property administrators to get us that visibility."[48] Clearly, if DCMA did not have visibility, it could not support the Army. And if DCAA did not have visibility either, it could not recommend that DCMA take any degree of action against KBR. From KBR's internal emails it does appear to be the case that the relevant government agencies had no inkling regarding any cross-leveling issues.

KBR did have a record of withholding information from the government. As Commissioner Gustitus pointed out to Director Stephenson, "KBR refused to disclose their management reviews."[49] She added that "there were three KBR employees who were convicted of kickbacks with respect to the LOGCAP contract, and DCAA asked for KBR's review of these three incidents, but KBR said no…And then there was a report by a KBR tiger team that looked at the dining hall subcontracts in 2004, and DCA asked for the tiger team review, I guess KBR said they lost it."[50] Stephenson acknowledged that KBR had acted in that manner, responding, "I am not sure what their explanation was. We certainly did not get it. We have not yet….we still do not have it and we should, and we will be pursuing that."[51]

---

[47] Stephenson Testimony, p. 110.
[48] *Ibid*.
[49] Commission on Wartime Contracting hearing, May 4, 2009, p. 141.
[50] *Ibid*., pp. 141-42.
[51] Stephenson Testimony, p. 142.

And emails from the KBR Deputy Program Manager-Support would appear to indicate that the company was acting in the same manner with respect to implementing cross-leveling. On April 6 he wrote that there was "massive resistance from the 'that's not the way we do it on LOCGCAP III crowd. Mostly a futile effort…the rest are just intentionally slow rolling the process."[52]

From the testimony that senior government officials provided to the Commission on Wartime Contracting, it is clear that they had been unaware of KBR's approach to cross-leveling. It was therefore not even a matter of a lack of supporting evidence for charges to the government that DCAA could then deem unallowable or unsupportable.  LOGCAP Executive Director Thompson had specifically noted in his testimony that "KBR, in LOGCAP III…are required to close out their bases if they are providing services there, *are also, the equipment they have,* [required] *to move that equipment…We are holding them accountable for that*. (Emphasis Added).[53]

CONCLUSION

The assertion that DCMA, and the US Government generally, was "satisfied" with KBR's performance is simply not accurate. DCMA was seriously understaffed and its existing personnel, even after nearly a decade of work in Iraq and Afghanistan, still had not sufficiently climbed what its Director called "the learning curve" and therefore was in no position to assess information that KBR had not proffered to the government. For its part, DCAA was not satisfied with KBR's performance; the agency had challenged, with some success, numerous KBR claims for reimbursement. Finally, commanders in the field were concerned with KBR's effectiveness, not with its management and financial practices.

Had the various government agencies involved in monitoring the KBR contract been aware of KBR's actions that the company's own internal emails identified, at a minimum they would have considered

---

[52] Kaye to Lust,  April 6, 2010, 7:10 AM, KBR-HOW-2297358.
[53] Thompson testimony, *ad. loc.*, p. 153.

14

some action against the contractor. And knowing as I did the training, competence, and integrity of

DCAA's auditors and leadership I am convinced that DCAA, at least, would have recommended far more

than a slap on KBR's wrist, much as at least some of KBR's own personnel actually feared.

Dr. Dov S. Zakheim

June 24, 2022

## APPENDIX: LIST OF DATA CONSIDERED

| | |
|---|---|
| KBR-HOW-5162915 | KBR-HOW-0337421 |
| KBR-HOW-5162916 | KBR-HOW-2297357 |
| KBR-HOW-0815821 | KBR-HOW-2297358 |
| KBR-HOW-0815822 | KBR-HOW-2297359 |
| KBR-HOW-0815823 | KBR-HOW-2297360 |
| KBR-HOW-3534445 | KBR-HOW-2297361 |
| KBR-HOW-3534446 | Dep. Exhibit 105 |
| KBR-HOW-3534447 | Deposition Transcript of Maria McNamara (November 14, 2019) |
| KBR-HOW-3534448 | |
| KBR-HOW-3374744 | Deposition Transcript of Mary Sheridan (January 13, 2021) |
| KBR-HOW-5971778 | |
| KBR-HOW-3205170 | Deposition Transcript of Kirk Vollmecke (October 23, 2020) |
| KBR-HOW-3205171 | |
| KBR-HOW-3205172 | Memorandum in Support of Defendants' Motion to Dismiss Complaint (May 7, 2020) |
| KBR-HOW-3205173 | |
| KBR-HOW-3205174 | Relators' Opposition to Defendant's Motion to Dismiss Complaint (June 4, 2020) |
| KBR-HOW-3205175 | |
| KBR-HOW-3205176 | Defense Contract Management Agency, https://www.dcma.mil/About-Us/ |
| KBR-HOW-3205177 | |
| KBR-HOW-3205178 | Defense Contract Audit Agency, https://www.dcaa.mil/ |
| KBR-HOW-3205179 | |
| KBR-HOW-3205180 | Small Business Innovation Research Course Guide, https://www.sbir.gov/tutorials/accounting-finance/tutorial-5 |
| KBR-HOW-3205181 | |
| KBR-HOW-3205182 | |
| KBR-HOW-3205183 | Federal Acquisition Regulation (FAR), 42.709 Penalties for Unallowable Costs, https://www.acquisition.gov/far/part-42#FAR_42_709 |
| KBR-HOW-3205184 | |
| KBR-HOW-3205185 | |
| KBR-HOW-3205186 | |
| KBR-HOW-3205187 | Commission on Wartime Contracting in Iraq and Afghanistan, *Transforming Wartime Contracting: Controlling Costs, Reducing Risks*, (Washington, DC: GPO, 2011) |
| KBR-HOW-3374744 | |
| KBR-HOW-3374745 | |
| KBR-HOW-3374746 | |
| KBR-HOW-3374747 | Commission on Wartime Contracting in Iraq and Afghanistan, *At What Cost?: Contingency Contracting in Iraq and Afghanistan: Interim Report* (Washington, DC: GPO, 2009) |
| KBR-HOW-3374748 | |
| KBR-HOW-0580062 | |
| KBR-HOW-0580063 | |
| KBR-HOW-0580064 | Expert Report of Dr. Douglas N. Goetz, CPPM, CF (April 22, 2022) |
| KBR-HOW-0580065 | |
| KBR-HOW-4322795 | Expert Report of Elliott Branch (April 22, 2022) |
| KBR-HOW-4322796 | Expert Report of Ret. Lieutenant General John R. Vines |
| KBR-HOW-3590086 | |
| KBR-HOW-3590087 | Expert Report of Dr. Richard Brennan, Jr. (April 22, 2022) |
| KBR-HOW-3590088 | |
| KBR-HOW-3590089 | Expert Report of Ret. Colonel Michael Rudolph (February 25, 2022) |
| KBR-HOW-3590090 | |
| KBR-HOW-2325534 | Commission on Wartime Contracting Hearing Transcript, May 4, 2009* |
| KBR-HOW-2325535 | |
| KBR-HOW-1329112 | |
| KBR-HOW-1329113 | *Includes testimony of April Stephenson (DCAA Director), Lee Thompson (Executive Director of the LOGCAP Program Office), Jeff Parsons (Executive Director of the U.S. Army Contracting Command), and Charlie Williams (DCMA Director)* |
| KBR-HOW-0337417 | |
| KBR-HOW-0337418 | |
| KBR-HOW-0337419 | |
| KBR-HOW-0337420 | |

**APPENDIX: TESTIMONY FROM PAST FOUR YEARS**

None.

**APPENDIX: PUBLICATIONS FROM THE LAST 10 YEARS**

<u>2012</u>

*The United States Navy and the Israeli Navy: Background, Current Issues, Scenarios and Prospects (*Alexandria, VA: CNA, 2012). https://www.cna.org/archive/CNA_Files/pdf/d0026727.a1.pdf

"American strategy in the aftermath of its twenty-first century wars," *Proceedings of the Royal Swedish Academy of War Sciences* (No. 2/2012), pp. 5-16. https://kkrva.se/wp-content/uploads/Artiklar/122/kkrvaht_2_2012_3.pdf

"The Opportunity Cost of Security," *Prism* 3 (June 2012), pp. 119-24. https://ciaotest.cc.columbia.edu/journals/prism%20/v3i3/f_0025981_21272.pdf

<u>2013</u>

"Sequestered: The Strategic Implication of a Freefalling U.S. Defense Budget," *The American Interest* VIII (July/August 2013), pp. 43-51.

<u>2014</u>

*Interim Report of the Military Compensation and Retirement Modernization Commission* (Washington, DC: USGPO, June 2014). https://apps.dtic.mil/sti/citations/ADA625895

"The Holy Grail of Defense Reform," *The Ripon Forum* 48 (Spring 2014), pp. 4-7. https://riponsociety.org/article/the-holy-grail-of-defense-reform-2/

"Abandon Nation Building," *The National interest* 131 (May/June 2014), pp. 38-45. https://nationalinterest.org/feature/abandon-nation-building-10333

"America's Receding Strategic Footprint in the Middle East," *Defense Dossier* no. 11 (American Foreign Policy Council, June 2014), pp. 3-5. http://www.insidethecoldwar.net/files/defense_dossier_11_june_2014.pdf

"The Wages of a Strategy of Avoidance," *Proceedings of the Royal Swedish Academy of War Sciences* (No. 3/2014), pp. 57-65.

"Defense Acquisition Reform: Where Do We Go From Here?," *Staff Report for the Permanent Subcommittee on Investigations of the Senate Committee on Homeland Security* (Washington, DC: USGPO, October 2, 2014), pp. 227-34.

"Facing the Challenges of the 21st Century," *Orbis* 58 (Winter 2014), pp. 8-14. https://doi.org/10.1016/j.orbis.2013.11.001

<u>2015</u>

"King Abdullah's Passing Brings More Uncertainty to a Troubled Middle East," *Foreign Policy* (January 2015). https://foreignpolicy.com/2015/01/23/king-abdullahs-passing-brings-more-uncertainty-to-a-troubled-middle-east/

*Final Report of the Military Compensation and Retirement Modernization Commission* (Washington, DC: USGPO, January 2015). https://apps.dtic.mil/sti/pdfs/ADA625626.pdf

"Evaluating the Opportunity and Financial Costs of Missile Defense," in Catherine McArdle Kelleher and Peter Dombrowski, eds. *Regional Missile Defense from a Global Perspective* (Stanford, CA: Stanford University Press, 2015), pp. 264-82.

"Bibi the Bridge Burner," *Foreign Policy* (February 2015). https://foreignpolicy.com/2015/02/25/bibi-the-bridge-burner-congress-obama-iran/

"Why Pundits Got the Israeli Election So Wrong," *Foreign Policy* (March 2015). https://foreignpolicy.com/2015/03/18/israel-election-netanyahu/

"Restoring American Preeminence," *The National Interest* 136 (March/April 2015), pp.29-38. https://nationalinterest.org/feature/restoring-american-supremacy-12325

"Summit to Nowhere," *Foreign Policy* (May 2015). https://foreignpolicy.com/2015/05/15/summit-to-nowhere/

"The Middle East in Conflict: The Empires Strike Back," *Turkish Policy Quarterly* 14  (Spring 2015), pp. 47-62. turkishpolicy.com/Files/ArticlePDF/the-middle-east-in-conflict-the-empires-strike-back-spring-2015-en.pdf

"The National Security Answers Missing from the Democratic Debate," *Foreign Policy* (October 2015). https://foreignpolicy.com/2015/10/13/the-national-security-answers-missing-from-the-democratic-debate/

"Meeting Russia's New Nuclear Challenge," *The Washington Times* (October 2015). https://www.washingtontimes.com/news/2015/oct/29/crosstalk-meeting-russias-new-nuclear-challenge/

"ISIS Will Not Be Defeated: It Can Only Be Contained," in Nicholas Burns and Jonathon Price, eds., *Blind Spot: America's Response to Radicalism in the Middle East* (Washington, DC: The Aspen Institute, 2015), pp. 143-52. http://www.jstor.org/stable/j.ctt19gfk32.17

2016

"How America Contributed to the Saudi-Iran Flare-Up," *Foreign Policy* (January 2016). https://foreignpolicy.com/2016/01/06/how-america-contributed-to-the-saudi-iran-flare-up/

"Prospects for the Third Offset Strategy," in Nicholas Burns and Jonathon Price, eds. *America's National Security Architecture: Rebuilding the Foundation* (Washington, DC: Aspen Institute, 2016), pp. 165-76. http://www.jstor.org/stable/j.ctt1pwtd5r.16

"The Trump Phenomenon and American Isolationism-the Strange Nature of the 2016 Presidential Campaign," *Proceedings of the Royal Swedish Academy of War Sciences* (No. 2/2016), pp. 80-89. https://paperzz.com/doc/7718706/the-trump-phenomenon-and-american-isolationism

"Pentagon Reform: Hope Springs Eternal," *The American Interest* (April 2016). https://www.the-american-interest.com/2016/04/11/pentagon-reform-hope-springs-eternal/

"How the State Department's Human Rights Report Treats Friends — and Adversaries," *Foreign Policy* (May 2016). https://foreignpolicy.com/2016/05/20/how-the-state-departments-human-rights-report-treats-friends-and-adversaries/

"Trump's Position on Treaty Commitments Has Already Hurt America," *Foreign Policy* (July 2016). https://foreignpolicy.com/2016/07/22/trumps-position-on-treaty-commitments-has-already-hurt-america/

"Defense Reform: This Time For Real?," *The American Interest* XI (July/August 2016), pp. 41-50.

Review Essay: "The Quagmire Quandary," *The National Interest* 144 (July/August 2016), pp. 68-77. https://nationalinterest.org/feature/bacevichs-middle-east-misdiagnosis-everyone-terrible-16829

"The U.S.-Israel Aid Dilemma," *The National Interest* 145 (September/October 2016), pp. 11-17. https://nationalinterest.org/feature/fund-israels-military-not-its-settlements-17295

Review Essay: "Strategy, Operations and the Margin of Victory," *Naval War College Review* 69 (Autumn 2016), pp. 152-55. https://digital-commons.usnwc.edu/cgi/viewcontent.cgi?article=1148&context=nwc-review

2017

"Beware Trump's Kitchen Cabinet," *Foreign Policy* (February 2017). https://foreignpolicy.com/2017/02/07/beware-trumps-kitchen-cabinet-andrew-jackson-amateurs-bannon-miller-kushner/

"The Irony of Trump's Trip to Masada and the Hard Road to Peace," *Foreign Policy* (May 2017). https://foreignpolicy.com/2017/05/05/the-irony-of-trumps-trip-to-masada-and-the-hard-road-to-peace/

"Why Trump Should Stand Down in the Gulf Crisis," *Foreign Policy* (June 2017). https://foreignpolicy.com/2017/06/13/why-trump-should-stand-down-in-the-gulf-crisis-qatar-iran-saudi-arabia-kuwait/

"John McCain Is a National Treasure," *Foreign Policy* (June 2017). https://foreignpolicy.com/2017/07/20/john-mccain-is-a-national-treasure/

"NATO and Its Authoritarian Member States," in Nicholas Burns, Leah Bitounis, and Jonathon Price, eds. *The World Turned Upside Down: Maintaining American Leadership in a Dangerous Age* (Washington, DC: Aspen Institute, 2017), pp. 167-76. https://doi.org/10.2307/j.ctt20q22cv

"Trump and Allies in American National Security," *Proceedings of the Royal Swedish Academy of War Sciences* (No. 1/2017), pp. 38-43.

"Bannon Out, But Most Definitely Not Dead," *Foreign Policy* (August 2017). https://foreignpolicy.com/2017/08/18/bannon-out-but-most-definitely-not-dead/?utm_source=FPRI+E-Mails&utm_campaign=1f9c5c47f1-EMAIL_CAMPAIGN_2016_11_08&utm_medium=email&utm_term=0_e8d0f13be2-1f9c5c47f1-

"Iran, Turkey, and Russia Aren't Natural Friends. It's Up to the U.S. to Keep It That Way." *Foreign Policy* (September 2017). https://foreignpolicy.com/2017/09/04/iran-turkey-and-russia-arent-natural-friends-its-up-to-the-u-s-to-keep-it-that-way/

"Jared Kushner, Mohammed bin Salman, and Benjamin Netanyahu Are Up to Something," *Foreign Policy* (November 2017). https://foreignpolicy.com/2017/11/07/jared-kushner-mohammed-bin-salman-and-benjamin-netanyahu-are-up-to-something/

"Donald Trump Is Single-Handedly Wrecking the Special Relationship," *Foreign Policy* (November 2017). https://foreignpolicy.com/2017/11/30/donald-trump-is-singlehandedly-wrecking-the-special-relationship-with-britain/

"Two Cheers for Trump's National Security Strategy," *Foreign Policy* (December 2017). https://foreignpolicy.com/2017/12/19/two-cheers-for-trumps-national-security-strategy/

Review Essay: "The Case for Hard Power," *Naval War College Review* 70 (Autumn 2017), pp. 125-33. https://digital-commons.usnwc.edu/nwc-review/vol70/iss4/9/

2018

Review Essay: "Schemer and Dreamer," *The National Interest* 153 (January/February 2018), pp. 76-86. https://nationalinterest.org/feature/israels-last-founding-father-23724

Review Essay: "Whose Realism?," *The National Interest* 155 (May/June 2018), pp. 78-88. https://nationalinterest.org/feature/clash-the-strategists-25384

"Trump's Perilous Path," *The National Interest* 156 (July/August 2018), pp.13-21. https://nationalinterest.org/feature/trumps-perilous-path-26325

Review Essay: "Lehman's Maritime Triumph," *Naval War College Review* 71 (Autumn 2018), pp. 141-46. https://digital-commons.usnwc.edu/nwc-review/vol71/iss4/11?utm_source=digital-commons.usnwc.edu%2Fnwc-review%2Fvol71%2Fiss4%2F11&utm_medium=PDF&utm_campaign=PDFCoverPages

2019

Review Essay: "History's Horror," *The National Interest* 163 (September/October 2019), pp. 79-90. https://nationalinterest.org/feature/how-far-did-armenian-genocide-extend-new-book-examines-question-72231

"Europe Whole and Free: What Three Decades Have Wrought," in Slawomir Debski and Daniel S. Hamilton, eds., *Europe Whole and Free: Vision and Reality* (Warsaw and Washington, DC: Polish Institute of International Affairs, 2019), pp. 129-37. https://transatlanticrelations.org/wp-content/uploads/2019/11/Hamilton.pdf

2020

"A Trump Second Term and international Security," *Proceedings of the Royal Swedish Academy of War Sciences* (No. 1/2020), pp. 96-101.

Review Essay: "Trump Doctrine," The National Interest 166 (March/April 2020), pp. 84-96. https://nationalinterest.org/feature/trump-doctrine-explained-123341

"The Case Against Trump," *The National Interest* 169 (September/October 2020), pp. 15-20. https://nationalinterest.org/feature/case-against-trump-166810

Review Essay: "From Victory to Failure: The Army Study of the Iraq War, 2003-2006," *Naval War College Review* 72 (Autumn 2019), pp. 164-70. https://digital-commons.usnwc.edu/nwc-review/vol72/iss4/17?utm_source=digital-commons.usnwc.edu%2Fnwc-review%2Fvol72%2Fiss4%2F17&utm_medium=PDF&utm_campaign=PDFCoverPages

"Can Trump Take Advice?," *Horizons* No. 15 (Winter 2020), pp. 205-18. https://www.jstor.org/stable/48573648

Review Essay: "The Military We Need," *The National Interest* 170 (November/December 2020) pp. 78-90. https://nationalinterest.org/feature/book-reveals-why-america-could-lose-world-war-iii-170844

2021

Review Essay: "Call To Arms," *The National Interest* 172 (March/April 2021), pp. 81-96. https://nationalinterest.org/feature/what-does-civilization-owe-war-more-we%E2%80%99d-think-178868

Review Essay: "Observations of a Well-Rounded Diplomat," *Orbis* 65 (Winter 2021), pp. 187-99. https://doi.org/10.1016/j.orbis.2020.11.010

Review Essay: "Caliphate Lost," *The National Interest* 176 (November/December 2021), pp. 76-87. https://nationalinterest.org/feature/islam-roman-catholicism-and-borderless-believers-195101

"Window on Washington: The Ten Big Mistakes," *The Jerusalem Strategic Tribune* 2 (November/December 2021), pp. 82-87. https://jstribune.com/print-issue-2/

2022

"America's Political Troubles," *The Jerusalem Strategic Tribune* 3 (January/February 2022), pp. 126-31. https://jstribune.com/print-issue-3/

Review Essay: "Viva el Emperador," *The National Interest* 179 (May/June 2022), pp. 68-81. https://nationalinterest.org/feature/rise-and-fall-mexico%E2%80%99s-last-emperor-202066


IN ADDITION

-Weekly column for *The Hill* since 2019

- Occasional (every 6-8 weeks) columns for *The National Interest* since 2009.

- Two books on the Bible and Jewish history

- Articles on Jewish history and law

**APPENDIX: RATE**

I am charging $800 an hour for my work on this matter.

## Honorable Dov S. Zakheim

Dov S. Zakheim is Senior Advisor at the Center for Strategic and International Studies and Senior Fellow at the CNA Corporation, a federally funded think tank. Previously he was Senior Vice President of Booz Allen Hamilton where he led the Firm's support of U.S. Combatant Commanders worldwide.

From 2001 to April 2004 he was Under Secretary of Defense (Comptroller) and Chief Financial Officer for the Department of Defense, serving as principal advisor to the Secretary of Defense on financial and budgetary matters, leading over 50,000 staff, developing and managing the world's largest budgets, and negotiating five major defense agreements with US allies and partners. From 2002-2004 Dr. Zakheim was DOD's coordinator of civilian programs in Afghanistan. He also helped organize the 2003 New York (UN) and Madrid Donors conferences for Iraq reconstruction.

From 1987 to 2001 he was both corporate vice president of System Planning Corporation, a technology and analysis firm based in Arlington, Va. and chief executive officer of its subsidiary, SPC International Corp.

During the 2000 presidential campaign, Dr. Zakheim served as a senior foreign policy advisor to then-Governor Bush. In 2012 he was a policy advisor to former Governor Mitt Romney's presidential campaign. He served as co-leader for national security in former Governor Jeb Bush's presidential campaign.

From 1985 until 1987, Dr. Zakheim was Deputy Under Secretary of Defense for Planning and Resources, playing an active role in the Department's system acquisition, strategic planning, programming and budget processes. He held other senior DOD posts from 1981-1985.

Dr. Zakheim has served on numerous government, corporate, non-profit and charitable boards. He is Vice Chairman of the Foreign Policy Research Institute's Board of Trustees, and Vice Chairman of the Board of Directors of the Center for The National Interest.

Dr. Zakheim's membership of government boards and panels includes the National Intelligence Council's International Business Practices Advisory Panel, which he chaired (2008-2011); the United States Commission for the Preservation of America's Heritage Abroad (1991-93); the Task Force on Defense Reform (1997); the Board of Visitors of the Department of Defense Overseas Regional Schools (1998-2001); the Commission on Wartime Contracting in Iraq and Afghanistan (2008-11); the Military Compensation and Retirement Modernization Commission (2013-2015); the Chief of Naval Operations Executive Panel (2004-16) and the Defense Business Board (2004-2010, 2013-2017), which he helped establish. He currently serves on the Board

of Control of the United States Naval Academy Athletic Association and is an Executive Advisor to the Chief of Naval Operations.

Dr. Zakheim is a member of the Council on Foreign Relations; Chatham House/the Royal Institute of International Affairs (UK) and the International Institute for Strategic Studies. He was elected a Fellow of the Royal Swedish Academy of War Sciences in 2011.

A 1970 Phi Beta Kappa graduate of Columbia University with a B.A., *summa cum laude*, Dr. Zakheim also studied at the London School of Economics. He holds a doctorate in economics and politics at St. Antony's College, University of Oxford. He has been an adjunct Senior Fellow of the Council on Foreign Relations, an adjunct Scholar of the Heritage Foundation and an adjunct professor at the National War College and at four universities.

Dr. Zakheim is the author of numerous books, monographs, chapters in edited volumes, articles and book reviews. His writings have been translated into Arabic, French, Hebrew, Italian and Norwegian. He lectures widely and provides print, radio and television commentary on national security policy issues domestically and internationally. He blogs on *The National Interest* and *The Hill*.

Dr. Zakheim is the recipient of numerous awards for his government, professional and civic work, including the Defense Department's highest civilian award in 1986, 1987 and 2004.

# EXHIBIT 4

**From:** Rich Kaye
**Sent:** Saturday, March 20, 2010 7:28
**To:** Larry Lust
**Subject:** RE: US Army Log Force Structure

Right. And the next step will be to re-patch each BCT so that only the tactical headquarters (the formations formerly known as divisions) will wear the divisional patches.

Things here are still going along. I have decide to take over the management of materials since no one else here has a clue how that ought to be done ...we've got so many folks who simply, and slavishly, just going about things by rote. So far, I've enforced that all requisitions ....FSS included ....must go through MATCON. Last year, fully 35% of all requisitions (with an extended value of $401M) by-passed the cross-leveling check. As we start to turn over more and more materials to GOI, we are facing an increasing risk of being Formed 1 for buying items we just declared excess and gave away.

Tomorrow, I'm going in through the back door and enforcing the STK vs NS rules ....as of yesterday, we 43,801 lines across Iraq being carried as STK that have 2 or fewer demands in the past 360 days. Then, we are going to automatically calculate RO and ROP. We did a trial run on three sites and determined that 80% of their STK lines had RO and ROP set above what it should be based upon demand history.

Simultaneously, we are unreserving all reserved stock that does not have an active work order or ACL against it. We've got $71M in reserved stock of which less than 50% is legitimate. The rest is against cancelled ACLs, completed ACLs, or just plain "hidden" from cross-leveling.

TREC storerooms is going to be my biggest challenge ....we've currently got $331M in them as of yesterday. I've told Guy this is the Mother of all Forms 1. As you know, someone at a primary receiving site (Dubai, Kuwait or Houston) had to enter it into STEAM. The causative research will be brutal.

Bottom line: I'm trying to do what you'd do if you were here.

v/r,

Rich Kaye

Deputy Program Manager - Support
LOGCAP-III ME
KBR, Inc.
F-1 ID 43382
APO AE 09344
Office Telephone: 281-669-1949
Email: Richard.Kaye@KBR.com

---

**From:** Larry Lust
**Sent:** Saturday, March 20, 2010 6:47 AM
**To:** Rich Kaye
**Subject:** RE: US Army Log Force Structure

Hello Rich:

Thank you for the attachment. This is going to take some study to get the units and patches straight in my thinking. Knowing the players was a lot simpler when the force was division based. ☺ LJL

Larry J. Lust
Deputy Principal Program Manager
LOGCAP-III ME


EXHIBIT
592

KBR, Inc
F-1 ID # 43382
APO AE 09344
Telephone: 713-445-4516
larry.lust@kbr.com

**From:** Rich Kaye
**Sent:** Friday, March 19, 2010 23:24 PM
**To:** Larry Lust
**Subject:** US Army Log Force Structure

Thought you'd be interested in this.


v/r,

Rich Kaye

Deputy Program Manager - Support
LOGCAP-III ME
KBR, Inc.
F-1 ID 43382
APO AE 09344
Office Telephone:  281-669-1949
Email:  Richard.Kaye@KBR.com

KBR-HOW-1329113

# EXHIBIT 5

Page 1

From: John Downey
Sent: Thu Feb 25 13:11:21 2010
To: Rich Kaye
Subject: RE: DMC Directive "P3" G-3 Delta, A332356 (20100225)
Importance: Normal

Expected you to but a lot of time wasted today could have been avoided with a simple phone call.

Tried to call you. Need to discuss assumptions for the plans you ask us to start working on.

John Downey
Project Manager
KBR, Inc.
D & F
F-2 ID# 43375
APO AE 09344
Office: 281-669-5030
Cell: 0771 116 9653

From: Rich Kaye
Sent: Thursday, February 25, 2010 3:53 PM
To: John Downey
Subject: RE: DMC Directive "P3" G-3 Delta, A332356 (20100225)

John,

I disagree. We are purchasing $5 M per day when we've got $1.2 B is excess on hand. At some point, the DCAA is going to put KBR out of business if we keep doing this. What Jerry needs to do is ensure that his folks do their job ....as he notes the material is not reserved. I'll have the DMC reverse this transaction. But the Chief and I have 1.5 hours with Guy this weekend to discuss the entire issue of excess, and we will be laying out the what we believe needs to be done if we've got a prayer to get this under control by August 31st. I'm certain he'll ask the PMs for their input.

v/r,

Rich Kaye

Deputy Program Manager - Support
LOGCAP-III ME
KBR, Inc.
F-1 ID 43382
APO AE 09344
Office Telephone: 281-669-1949
Email: Richard.Kaye@KBR.com

From: John Downey
Sent: Thursday, February 25, 2010 2:51 PM
To: Rich Kaye
Subject: RE: DMC Directive "P3" G-3 Delta, A332356 (20100225)

From where I sit I see absolutely no thought going into a cross level action.

"There it is in Maximo so cross level it".

John Downey
Project Manager

EXHIBIT
112

KBR-HOW-0580062

KBR, Inc.
D & F
F-2 ID# 43375
APO AE 09344
Office: 281-669-5030
Cell: 0771 116 9653

**From:** Jerardo Reyes
**Sent:** Thursday, February 25, 2010 1:24 PM
**To:** Rich Kaye
**Cc:** John Downey; Conor O'Muirgheasa; Zella Hemphill; Jafar Shaikh
**Subject:** FW: DMC Directive "P3" G-3 Delta, A332356 (20100225)
**Importance:** High

Sir,
Request that this cross level request be denied.  This plywood was just cross leveled a few days ago from C1 for IHP EN2213 to repair the DFAC floor at D1 Shield.  The only issue is why the site did not reserve the material immediately upon receipt – we are investigating and taking the appropriate action.  In the mean time the plywood is being reserved in MAXIMO to prevent this from happening again.

v/r

Jerardo "Jerry" Reyes
Deputy Project Manager - B/O
KBR, Inc.
D&F Sites
F2 ID # 43375
APO AE 09344
office: 713-970-5301
cell:  0771-290-5739
Jerardo.Reyes@kbr.com

**From:** Timothy Cope
**Sent:** Thursday, February 25, 2010 12:28 PM
**To:** Jerardo Reyes
**Subject:** FW: DMC Directive "P3" G-3 Delta, A332356 (20100225)

Jerry,

We need a denial for this crosslevel. This plywood was cross leveled for the DFAC floor from C-1. I will investigate why it was not reserved immediately, but in the meantime, please deny support.

Thankyou & regards,

Tim.

Timothy C Cope
Material Control Manager
KBR, Inc.
D & F Sites
Regional - Camp Liberty
Baghdad, Iraq  APO AE 09344 - F2
☎ [713] 445 5916
✉ timothy.cope@kbr.com

**From:** Jafar Shaikh
**Sent:** Thursday, February 25, 2010 10:07 AM
**To:** Ezechukwu Iwundu; Jiwan Sharma; Leverette Lisenbee; Laresa Cooper
**Cc:** Jafar Shaikh; Nicole Ellis; Deborah Ford; Muhammad Chughtai; Amanulla Parkar; Trina Cormier; Ali Asghar; Kujtim

KBR-HOW-058006

Islami; Pratheesh Kumar
**Subject:** DMC Directive "P3" G-3 Delta, A332356 (20100225)

(Please Do Not Change the Subject Line and Please Forward this Email in order to Retain its Attachments)

Distribution Representative(s):

Please ship the item(s) listed in your storeroom to the site noted in the shipping details. As directed by Senior Leadership, you are required to support this cross level [DOP, Section 1.5.1.3 – 1.5.13.3].

Please reply within 4 hours, regardless of priority, stating whether you will fully support, partially support, or not support.

If your Site will not fully support, please send a statement / reason of denial to the DMC immediately. The DMC will then notify you, your Materials Manager, your PSM Supply and your DPM-S if the denial will be placed on the DMC X-Lvl Directives Not Executed list.

When the items have been turned over to Traffic / Logistics for transport, the Distribution Representative of the Supporting Site will forward the scanned shipping packet to the DMC and Distribution Representative of Requesting Site. On receipt of the material, the Requesting Site's Receiving POC will sign and scan the Issue Ticket back to the Supporting Site's Distribution Representative and DMC [DOP, Section 1.5.1.6 – 1.5.1.7].

Thanks in advance for your immediate response and confirmation of support.

| SHIPPING DETAILS | |
|---|---|
| Materials POC: | KUJTIM ISLAMI |
| Materials POC SAP: | 00313587 |
| Requesting POC: | ISLAMI KUJTIM |
| Requesting POC SAP: | 00313587 |
| Requesting POC Dept.: | G3- WHSE |
| Requesting Site / Site Name: | G-3 Camp Delta |
| Requesting Site DODAAC: | CDA016 |
| Requesting Site Storeroom: | LC-IRQ-G3-0023 |
| Requesting Site Telephone: | 713-970-6186 |
| Requesting Site DSN Phone: | 844-2029 |

| DIRECTIVE DETAILS | |
|---|---|
| Work Order Number: | A20181839 |
| MR Number: | A332356 |
| Priority Code: | 3 |

KBR-HOW-0580064

| | |
|---|---|
| Commercial Priority Equivalent: | 3 |
| MR Line Number: | 1 |
| Supporting Storeroom: | LC-IRQ-D1-0001 |
| Storeroom Description: | D-D1-Shield-Warehouse |
| MRN Number: | 1002435865 |
| Item Description: | PLYWOOD 1-1/8 IN X 4 FT X 8 FT |
| Stock Category: | NS |
| Current Balance: | 165 |
| Quantity Currently Reserved: | 0 |
| Quantity Available: | 165 |
| Safety Stock Level (SSL): | 0 |
| Reorder Point (ROP): | 0 |
| Quantity Available for Cross Level: | 165 |
| Directed Quantity: | 165 |
| Issue Unit | SHT |
| Issue Order Unit | SHT |
| MR Order Unit: | SHT |
| Unit Cost: | $54.00 |
| Line Cost: | $8,910.00 |

Thanks and best regard.

JAFAR SHAIKH
DMC Administrative Specialist
Distribution Management Center (DMC)
Blue Complex, Mahboula
BLG# 7, FLR# 6, RM# 23
**KBR**, Inc. LOG CAP III
**Ph:** 713-970-4031

KBR-HOW-058006

# EXHIBIT 6

| From: | Richard Abraham |
|---|---|
| Sent: | Thursday, March 4, 2010 6:27 AM |
| To: | Rich Kaye |
| Cc: | Tracy Townsend; Rochelle Knight; Becky Meador; Casey Varenas; Conor O'Muirgheasa; Zella Hemphill; Dan Stack; Clifford Whatley; Wayne Bennett |
| Subject: | RE: Non Stock Items |

Thanks Rich, I understand the issue and will follow your advice and will work with Tracy and Rochelle on a case-by-case situation. They have been helpful in the past and I know they will be now.

Abe

Richard Abraham
Deputy Project Manager - Support
KBR, Inc.
COB Speicher
Tikrit, Iraq
APO, AE 09393
Tel: 281-669-5506
Richard.Abraham@kbr.com

**From:** Rich Kaye
**Sent:** Wednesday, March 03, 2010 10:37 PM
**To:** Richard Abraham
**Cc:** Tracy Townsend; Rochelle Knight; Becky Meador; Casey Varenas; Conor O'Muirgheasa; Zella Hemphill
**Subject:** RE: Non Stock Items

Abe,

I can't do that, but what I can do for the next 12 days is ask the DMC to send the candidate cross-level directive to Tracy Townsend for approval.

Here's the dilemma and why this is so important: We are packaging up materials and declaring them as excess. Best case, it goes to another LOGCAP user. Worst case, we sign it over via 3161 to GoI. Either way, until the material is physically no longer ours it is on the books. If C-Sites has an item(s) that can fill a MR ....and you are the only place it can come from ....and we don't cross-level it, we're going to create a PO (and expend $$) for items that have on hand. Sure as we're having this conversation, the DCAA is going to audit our excess disposition process. To have something on hand and to not use it in lieu of purchasing more is a recipe for the DCAA to find fault with us and collect back what we paid for the item via a Form 1.

Also, I'm certain you have a digital camera at the C-Sites. If you've got a situation as described below, "Several times when a connex has been filled and even sealed but the documentation is not yet entered in maximo the contents inside are still open to being cross-leveled. When it happens the connex has to be unloaded to get to the item and then reloaded, a lot of time is wasted" take a picture and sent it to Tracy/Rochelle. They have the authority to give you dispensation from breaking open the container.

v/r,

Rich Kaye

Deputy Program Manager - Support
LOGCAP-III ME

1

KBR-HOW-5162915

EXHIBIT

504

KBR, Inc.
F-1 ID 43382
APO AE 09344
Office Telephone: 281-669-1949
Email: Richard.Kaye@KBR.com

---

**From:** Richard Abraham
**Sent:** Wednesday, March 03, 2010 7:42 PM
**To:** Rich Kaye
**Cc:** Tracy Townsend; Rochelle Knight; Becky Meador; Casey Varenas
**Subject:** Non Stock Items

Rich

I have an urgent request that I need your immediate help on.  According to the Planned Schedule given to us by HQ for managing our Non-Stock Items, C sites are way behind in packing and loading material for delivery to Afghanistan.  Casey has given specific instructions to catch up with the plan ASAP.  To accomplish this we must handle 12,488 line items in 12 days or about 1,000 per day starting now.

We have put a recovery plan in place we believe will work, but we need your help with one major obstetrical; cross leveling.  Several times when a connex has been filled and even sealed but the documentation is not yet entered in maximo the contents inside are still open to being cross-leveled.  When it happens the connex has to be unloaded to get to the item and then reloaded, a lot of time is wasted.

What we need from you is to grant us temporary relief from cross leveling until we meet the NS plan.  In other words, allow us to be exempt from the program, if not there is a high probability we will not meet the mission assigned to us.

Thanks for your consderation

Abe

Richard Abraham
Deputy Project Manager - Support
KBR, Inc.
COB Speicher
Tikrit, Iraq
APO, AE 09393
Tel: 281-669-5506
Richard.Abraham@kbr.com

2

KBR-HOW-5162916

# EXHIBIT 7

From: David Stallard
Sent: Sat Jul 12 17:24:18 2008
To: Craig Wheeler
Cc: Jeff Rock
Subject: FW: C-5 Theater Maintenance AAR
Importance: High


I'm just now reading this, we need to discuss in the AM. You will need to schedule a visit to Taji to conduct a proper assessment and provide a properly written summary of the findings. This could be tied to the MMR but needs to be done sooner rather then later.


David Stallard
Deputy Program Manager - Operations
LOGCAP III
F-1 ID# 43382
APO, AE 09344
Office Phone: 713-445-5882
david.stallard@kbr.com

........................................................................................................

**From:** Brandon McGarry
**Sent:** Monday, June 23, 2008 8:57 AM
**To:** David Stallard; Jeff Rock
**Cc:** Craig Wheeler
**Subject:** FW: C-5 Theater Maintenance AAR
**Importance:** High
**Sensitivity:** Confidential

FYI

        This is the Taji write up and it is intended for SLT only. Point and case is that Taji looked good on the surface but this was due to an extensive cover up versus fixing what was broken. Keep in mind the magnitude of hiding two warehouses full of parts/tools and illegally procured items to keep in good standing with auditors instead of getting the items out to someone that can use them... There are more PCP and FAR violations in those two warehouses than I care to mention and it is no wonder we have a billion in stock lying around unused in theater...
        The last Maintenance Manager (partially responsible for this mess) was recently promoted to Director of Maintenance at C-Sites and in my humble opinion based off of his performance and past performance C-Sites is in big trouble especially since Darlene (also partially responsible for the below mess) was running the Taji Maintenance program that yielded the results and condoned the activities below. I realize my opinion is not professionally optimal but when we talk about the Power Generation issue and CMIP I feel it is relevant to detail relevant historical facts concerning the players we are dealing with.


Very Respectfully,

Brandon McGarry
Theater Maintenance
Business Segment Manager
Middle East/Central Asia
KBR/F-1 ID#43382
APO AE 09344
713-445-5874
Iraqna 0790-644-9790



........................................................................................................

**From:** Brandon McGarry
**Sent:** Friday, June 06, 2008 9:11 PM
**To:** Eric Swanson; Kay Williams
**Cc:** Richard Diddams; David Stallard; Craig Wheeler
**Subject:** C-5 Theater Maintenance AAR
**Importance:** High
**Sensitivity:** Confidential

**Taji Site Visit**

Dates June 2nd through the 6th

**Purpose of the visit:**

To conduct a walk through assessment with corrective action recommendations and render assistance in the Vehicle Maintenance and Power Generation areas of operation as requested by DPM-O and PM.

**Background of Taji Maintenance prior to visit:**

Recently the PM, DPM-O, DPM-S, Senior Maintenance Manager, and a few other key individuals have changed in a close range of time. The new PM and DPM-O have conducted a series of internal reviews and looked deep into the operation here at Taji revealing many areas *that appeared to look* good on the surface but upon closer scrutiny by them it revealed areas that were in serious need of attention. Larry Mcholan left Taji going to Tallil as the Director of Maintenance leaving Verlin Collins as the Maintenance Manager, and he too is scheduled to leave Taji to the C-Sites as the Director of Maintenance. The problems in Maintenance we are finding are very disturbing and leave this company open to a high level of Risk.

**NOTE:**

KBR-HOW-2663832

The PM/DPM have many of these problems squarely in their sites and a plan is in place that is working to correct these issues. This write up is to identify the failures from a Maintenance point of view and the recommended corrective actions that work across Theater and to reduce any potential risk to KBR.

**Assistance rendered:**

- 5 STEAM accesses and training was arranged so Taji can now open STEAM SORs and close them out fixing the problem of having to go to the service desk to open the SOR or issuing parts to a SAP number.
- Parts getting stuck in Anaconda inbound to Taji were holding up the repair process. A conference call to CLSS managers was arranged and there were positive results from this meeting including a better understanding of the process and solid POCs for the JDC Yard and Management.
- Air Freight and the possibility to fly the items that are critical to Taji from vendor direct via FED EX or DHL was discussed with MEPSC and is possible pending a few more questions from MEPSC.
- Conducted on site SOP and SOW training with the Dispatch and PC personnel.
- Processes to accommodate CTR/ECOD w/separate ACL on client owned vehicle over the current ACL level of maintenance discussed with Management.

**Summary of Failures**

- **Accountability:** Maintenance Managers not held accountable for SOP/PCP violations, systemic failures, and high risks caused from neglect and improper management of the Maintenance Department.
- Multiple FAR, PCP, SOP and SOW violations *that can still cause KBR to be issued multiple CARs, or have adverse PEB/AFEB affects* (or both)
- Risks and core failures have been covered up at the maintenance department level
- **Property and Materials Accountability/Control:** See below for examples.
- **SOP/SOW:** Only foreman or supervisors had a current SOP and few had any knowledge of the SOP/SOW
- **Uncontrolled Substitutions:** Power Generation units found to have been seriously cannibalized and hidden.
- **TI not being performed:** Prior to assumption of equipment a proper TI is to be done and this has not happened at C-5
- **CTR Compliance:** CTRs are not being turned in consistently on Power Generation and Automotive units that need Level 3 Maintenance
- **CTR Compliance:** CTRs being under estimated and then illegal 2nd REQs being submitted for the balance of parts needed without amending the CTR
- **ACO/GPA approval Delays:** Unacceptable delays in times for approvals, however no request for assistance by Maintenance Management to HQ or PM.
- **No ASL in place for PG:** No ASL for Power Generation and excess/waste ASL in Automotive. Some CTR parts in stock were illegally procured and not maintained with ASL reviews as directed.
- **Internal Delays in PSM:** Prioritization Policy Compliance issues
- **P-2 Deadline REQs:** Deadline parts ordered P-2
- **Missing History Jackets PG:** All C-Sites deadlined generators were missing the history jackets.
- **Parts Accountability:** Power Generation Refurbishment parts are not accounted for
- **Air Freight Abuse:** Power Generation rebuild kits being air freighted in with parts missing and no reason to air freight in the first place and many deadline parts not being air freighted in on the automotive side. Air Freight not being used correctly as it is just to get the parts to the freight forwarder versus straight to site.
- **Parts Issuance and PCP/SOP compliance:** Parts were being issued to a person (SAP Number) not an asset or a STEAM work order. It was so bad that it was difficult for people to clear for R&R that had thousands of dollars in parts assigned to their SAP number.
- **PCP Violations:** Many warehousing and materials storage issues. Most are being addressed but RISK is still present.
- **Deferred Maintenance:** Deferred maintenance is not present and many parts ordered for a non-deadline issue on a GP asset are going to waste and not being tracked or installed.

**Recommendations:**

- **Accountability:** Hold the responsible Department Management accountable for failures to ensure the Maintenance Operation is run IAW core guidance. My professional opinion is the current Maintenance Manager has failed to lead this maintenance department and by magnitude alone he is not the right answer to fix the C-Sites as a Director of Maintenance based on the lack of knowledge, concern, integrity and most of all the current failures in area of operation. He should be held accountable for his part in these failures.
- **STEAM:** STEAM must be used in the Maintenance Department to Open and Close all Maintenance SORs. This is essential in creating efficiencies and staying with current and future standards and directives. This is also a must to correct the above STEAM parts issuance problem. When Verlin was asked what he had done to correct the situation with his people having thousands of dollars in Materials assigned to their SAP number he stated that he had tried to gain STEAM accesses and failed. I inquired who had denied the STEAM access he explained Taji Materials personnel denied them and no other attempt was made. Within 2 hours I had 5 additional STEAM accesses and STEAM training provided to include assistance from another site to assist and teach. This is another example of the failures found that bottleneck at the past and present Maintenance Manager's foxhole.
- **Gain Materials and Property Accountability and Control:** See below what to avoid and correct.
- **Training:** SOW, SOP, FAR, and PCP training and keep SOPs in all working areas *including cross training between supporting departments*
- **Tool Room:** Open and maintain an SOP compliant Tool Room.
- **Centralize inspect able areas:** Have the Production control and Dispatch areas in the Dispatch Lanes to keep all history jackets, SRO/SOR creation and completion areas, ECOD and CTR processing areas all in one area so the Client, Customer, or Auditor only goes to one place to do an inspection on the administrative areas.
- **EPA Compliance:** Ensure all techs that use any FREON or FREON recovery/recharge machines are EPA certified.
- **Basic SOP compliance:** All areas of concern both past and present are all basic SOP violations and the Maintenance Manager and Supervisor need to ensure 100% compliance and bolster this with QAQC, Property, Materials, DOL and PM/DPM walkthroughs and leadership visits/cross training.
- **ASL Review:** Conduct regular ASL reviews and get all the excess up for redstro, and keep Maintenance Personnel involved with the ASL reviews and let them have a voice in what needs to stay and go.
- **Integrity:** Integrity was not present at the vehicle maintenance facility as there was no less than 3 different answers for any question posed to the Maintenance Manager and his crew. In every case the answers were only correct from the subordinates.
- **Deferred Maintenance:** Ensure any part that is ordered for a GP asset deadline or non-deadline gets installed when received.
- **Help C-5 with staffing issues: HQ needs to help in this area as some areas are critical such as Power Generation.**
- **Follow through with air freight issues for C-5:** MEPSC and HQ PSM is working the issue

## Specific Areas of Concern

**Property Accountability Violation**

KBR-HOW-2663833

- 2 post Bend Pak 15000 lbs lift
- Acquisition cost $3000.00 USD
- See figure 1 below

The example below is one of many. The lift in question was located in the Maintenance AO and when gathering information regarding this Government Property the current the Maintenance Manager could not give a straight or truthful answer when asked for information regarding the situation below. When inquiring about the situation (below) Verlin Collins placed the blame squarely on Materials, then on Property and even when the PCP was quoted (below) "**responsibility starts at the Department Manager level**", he then blamed it on Larry Mcholan the former maintenance manager.

I explained that he needed to use the lift or offer it up as excess **but most important he needed to get it out of the mud and get in PCP compliance** he stated **he would not get rid of it and that it was a Materials issue** I am extremely concerned that when you look at the current condition of the maintenance department and the failures associated with it you have to wonder why Mr. Collins was not engaged or elevating concerns of this magnitude to higher-ups and at least asking for help. If you look in the area you see that the area is trashed and even though it is under construction/remodeling there is no excuse for this staggering lack of pride or ability in his maintenance area of operation.

## **References**

**Per Maintenance SOP 7-O**

    1.1    **Tools and Special Diagnostic Equipment**

        1.1.1   KBR maintenance will provide a secured, lockable area with controlled access to tools and diagnostic equipment owned by the U.S. Government.

        1.1.2   Tools will be inventoried when assigned to a mechanic by the tool room custodian. The hand receipt holder is accountable for lost, damaged, destroyed, or stolen tools and any administrative action that is deemed appropriate for the infraction. Individuals who sign for tools on the tool room register or sub hand receipt are responsible for any administrative action that is deemed appropriate in the event of lost, damaged, destroyed or stolen tools.

    1.2    **Equipment Maintenance Management Plan**

        1.2.1   Goals:

            1.2.1.1  Keep equipment reliable, safe, and in satisfactory operating condition  at minimal cost.

**Per PCP Tab E Storage of Government Property and Materials**

**1.0 PURPOSE**

Establish procedure for handling and storing operational supplies and materials entering into project inventory.

**2.0 SCOPE**

Applies to all departments and personnel maintaining or having storage areas or facilities, and storing or warehousing property.

**3.0 RESPONSIBILITY**

    3.1 The Materials Manager is responsible for operation of all storage and warehouses areas used for LOGCAP Government Property.

    3.2 Warehouse Managers/Supervisors assure storage/warehouse areas under their control are operated and maintained in a safe, efficient and professional manner; and all property stored therein is properly cared for, protected, and accounted for.

    3.3 Department managers and supervisors ensure storage areas or facilities under their control are maintained in accordance with this procedure, and the property stored therein properly cared for, protected, and used for its intended purpose.

    3.4 The project Security Department is responsible for physical security of storage and warehousing facilities.

**Per Tab K of the PCP Moving Government Property**

**1.0 PURPOSE**

Establish uniform procedures for moving Government property.

**2.0 SCOPE**

Applies to personnel involved in moving Government property.

**3.0 RESPONSIBILITY**

    3.1 The Materials Manager is responsible for safe, effective and efficient movement of all LOGCAP Government Property.

    3.2 Warehouse Managers/Supervisors assure Government property under their control is properly stored, accounted for, prepared for shipment and moved in an efficient manner.

    3.3 Material control is responsible for preparation of shipping documents. IE Issue tickets, Shipping Record

KBR-HOW-2663834

**4.0 PROCEDURES**

4.1 All shipments or moving of Government Property must have proper authorization and documentation. The Responsible Property Holder will notify the Site/Project Property Administrator before equipment is moved off-site. The Site/Project Property Administrator is responsible for ensuring that all Government Property moves are authorized.

4.2 All Government Property shall be moved in a safe manner that ensures adequate protection from the elements, theft, and other hazards. The material to be moved shall be protected to include packing, covering, skidding, and utilization of proper handling equipment.

4.3 Government property shall be preserved, packaged, marked, shipped and documented in accordance with the applicable requirement of the contract. Blocking, bracing and crating practices should be strong enough to withstand the abuse it will receive from the means of transportation utilized. Consideration must be given to the cargo being transported, distance of travel and the method of transport. This will assist in determining the extent of blocking, bracing and crating required.

**Per Tab F of the PCP Consumption, Utilization, and Maintenance of Government Property**

**1.0 PURPOSE**

Ensure proper consumption, maximum utilization, and required maintenance of Government property in accordance with contractual requirements.

**2.0 SCOPE**

Applies to all project personnel using or having custody of Government property.

**3.0 RESPONSIBILITY**

3.1 Each KBR Project/Program Manager responsible for Government Property shall ensure that all Government property is properly utilized only in the performance of the contract for which it was acquired. Any deviations must have the prior approval of the Contracting Officer.

3.2 The Site Property Manager and the Materials Manager establishes and maintains an effective program to ensure proper use, maintenance, and accountability of LOGCAP Government Property in storage.

3.3 Warehouse Managers/Supervisors ensure all property stored therein is properly cared for, protected, and accounted for.

3.4 Department managers and supervisors ensure Government property under their control is used only for its intended purpose, and properly maintained.

They ensure:

3.4.1 Care for, protect, and control property issued to, utilized by, or located in the department.

3.4.2 Perform preventive maintenance per maintenance schedule.

3.4.3 Promptly report any occurrence of loss, damage or destruction of Government property.

Figure 1

KBR-HOW-2663835







KBR-HOW-2663836

KBR-HOW-2663837



<u>**Other Compliance issues**</u>

- • **Warehouse has new and used parts in the same location**
- • **Many CTR items ordered with no CTR**
- • **New transmission ordered for stock w/no CTR**
- • **Used unknown transmission**
- • **New GM transmission full of dirt and dust**
- • **New Engine that is exposed to the elements**
- • **New unknown Perkins Engine Used**
- • **Broken Perkins Used Engine no idea what it goes to or if it is good**
- • **Another new unknown transmission not properly stored or sealed**

 

KBR-HOW-2663838

KBR-HOW-2663839



**Flamables not stored properly and being wasted instead of consumed or offered up**

KBR-HOW-2663840

KBR-HOW-2663841





**Parts Ordered for a GP asset and not installed**
-
-

KBR-HOW-2663842

KBR-HOW-2663843






**Power Generation**

**Generator Discrepancies**

- **L693301 FG Wilson 508KW D/L 16-Feb-08 (Engine Excessive Wear Capital Rehabilitation)**

1.  No Technical Inspection performed before acceptance of equipment; DOP
2.  No History Jacket on this Generator from C1; SOP 7R
3.  The parts ordered will not repair this generators this generator has been cannibalized/uncontrolled substitution performed ;PCP, FAR, SOP
4.  $37,561 (39) Line items received on requisition closed 23 APR 08 and the generator is still on deadline.

- **L525379 FG Wilson 508KW D/L 27-Feb-08 (Engine Excessive Wear Capital Rehabilitation)**
1.  No History Jacket on this Generator from C1; SOP 7R
2.  The parts ordered will not repair this generators this generator has been cannibalized/uncontrolled substitution performed ;PCP, FAR, SOP
3.  $37,059 (40) Line items received on requisition closed 11 APR 08 and the generator is still on deadline.

KBR-HOW-2663844

- **L525371 FG Wilson 508KW D/L 10-Mar-08 (Engine Excessive Wear Capital Rehabilitation)**
1. No History Jacket on this Generator from C1; SOP 7R
2. The parts ordered will not repair this generators this generator has been cannibalized/uncontrolled substitution performed ;PCP, FAR, SOP
3. $38,879 (41) Line items received on requisition closed 24 APR 08 and the generator is still on deadline.

- **L771359 FG Wilson 1000KW D/L 26-Oct-07 FG Wilson 1000KW (Excessive Wear Capital Rehab)**
1. No History Jacket on this Generator from C1; SOP 7R
2. The parts ordered will not repair this generators this generator has been cannibalized/uncontrolled substitution performed ;PCP, FAR, SOP
3. $83,042 (35) Line items received on requisition closed 21 JAN 08 and the generator is still on deadline due to wrong parts ordered. PCP, FAR

- **L770779 Marapco 1000KW D/L 18-Jan-08 (Engine Excessive Wear Capital Rehabilitation)**
1. No History Jacket on this Generator from C1; SOP 7R
2. The parts ordered are not needed to repair generator uncontrolled substitution performed ;PCP, FAR, SOP
3. $106,639.22 (41) Line items received on requisition closed 10 MAR 08
4. $ 5000 Air Freight
5. Combined with MP119703 $2,175 (3) line items on requisition closed 10 MAR 08 this REQ is for another deadline generator. PCP, FAR

## Power Generation Parts Accountability SOP, FAR & PCP Violations

- **MP 117366** $5500 (4) line items  in excess warehouse ordered Feb 08

- **MP 119073** $2175 (3) line items were apart of combined shipment for L770779 Marapco 1000KW parts in excess warehouse ordered Feb 08

- **MP 75107** $36,770.12 (26) line items ordered for high hour service, theses parts needed a CTR submitted to order them they are not a part of normal maintenance these are level III parts they are in the excess warehouse. The parts where ordered Sept 07

- **MP 113751** $12,571 (30) line items ordered for deadline generator GP# L417196 in Jan 08 the generator is no longer on deadline and the parts are in the excess warehouse

- **MP 72685** $1,016.02 (2) line items ordered for deadline generator GP# L352472 in Sep 07 generator is no longer on deadline and the parts are in excess warehouse

- **MP 107393** $1203 (7) line items ordered to repair C1 generator GP# L197847 generator is no longer on deadline parts ordered Jan 08 and are in excess warehouse

- **MP 1077634** $7,059.46 (30) line items ordered against GP# L693350 C1 generator and not against a work order parts are in excess warehouse

- **MP 118776** $106,639.22 (41) line items ordered for CTR on GP# L770779 this generator is still on deadline and the parts have air freight attached to the requisition the parts are in the excess warehouse ordered in Feb 08

- **MP109556** $26,415 (31) line items ordered against C1 generator GP# L693347 no CTR submitted for the parts and the parts are in excess warehouse generator is no longer on deadline ordered Jan 08

- **MP 49139** $57,324 (7) line items ordered against GP# L574632 no CTR submitted for the Level III repair parts ordered in Jun 07 generator no longer on deadline and the parts are in excess warehouse

- **MP 58330** $121,422 (30) line items ordered against ACL-07-139-C5-513 the parts where ordered as a push packages, these are not push package parts they are level III parts and are in the excess warehouse Jul 07

- **MP 88513** $ 31,070 (15) line items ordered for a 8000 hr service Nov 07 parts are in excess warehouse

## MP 117366 Excess Radiator and Camshaft ordered for L492042 and never used for its intended use

KBR-HOW-2663845



**Misc Excess Perkins 1000 Series Radiators**



**Engine Rebuild parts ordered with no CTR**

KBR-HOW-2663846





**Parts ordered MP88513 for a CTR rebuild and this order was mixed with a stock order. CTR orders are very specific to the price in the packet to the GPA and ACO and somehow stock parts were added to the CTR order?**

KBR-HOW-2663847



Very Respectfully,

Brandon McGarry
Theater Maintenance Manager
Middle East/Central Asia
Business Segment Manager
KBR/F-1 ID#43382
APO AE 09344
US #1-713-445-5874
US to Mobile 00971-790-644-9790
Iraqna 0790-644-9790
Brandon.McGarry@kbr.com

KBR-HOW-2663848

# EXHIBIT 8

Page 1 of 5 **FILED**
Thursday, 24 March, 2011 12:52:33 PM
Clerk, U.S. District Court, ILCD

**From:** Lynellen Sullivan

**Sent:** Tuesday, May 05, 2009 6:55 AM

**To:** Geoffrey Howard

**Subject:** RE: First Draft-AFG Planning

Geoffrey,
We don't own the data...We want to Materials and PSM whatever they want...so I'm good with it if it is
what they want and need....

---

**From:** Geoffrey Howard
**Sent:** Tuesday, May 05, 2009 4:04 PM
**To:** Lynellen Sullivan
**Subject:** RE: First Draft-AFG Planning

Hello Lyn,

Your Ok on this?

Geoffrey Howard
Business Systems Analyst
Maximo - Kuwait Support Office-Al-Egaila
KBR, Inc.
Lot 2 Street 101 / Building 5, 1st Floor, Room A
APO AE 09366-1002
Office: 713-970-2931

IT Security and proper usage of computer resources is everyone's responsibility.
For assistance, please contact either your Local IT department, the Global Service Desk, or use the GetIT system.

KBR IT Global Service Desk Number
Houston / Middle East / Overseas dial: 713-753-4357

**MAXIMO**
Production:
Training: http://kbrmaximotrain/maximo

Don't ask what we can do for the system; ask what the system can do for us.

---

**From:** Tracy Townsend
**Sent:** Tuesday, May 05, 2009 13:00
**To:** Geoffrey Howard
**Cc:** John Vujic
**Subject:** FW: First Draft-AFG Planning

Geoffrey,

Could you provide a report like the one listed in the attachment named "Inventory Adjustment Report"?  I
see the number of STK, NS, and SP lines and their dollar amounts, but we are not sure if they are
accurate or current.

Can you help?  This would be for all of AFGH.

Tracy Townsend



EXHIBIT
168

EX 25

Deputy Theatre PSM Manager - Supply
KBR, Inc.
F-1 ID# 43382
APO AE 09344
(281) 669-5629

---

**From:** Jim Haught
**Sent:** Monday, 04 May, 2009 7:20 PM
**To:** Darlene Roberson; Tracy Townsend; John Vujic
**Subject:** FW: First Draft-AFG Planning

Darlene: I need you to verify the numbers and dollars from AFG-line items with our April EOM.

Tracy/John: Need you to validate the material numbers with our records. I don't think we should be showing underutilized on anything that can be seen by USG.

Jim

---

**From:** Floyd Shelton
**Sent:** Monday, May 04, 2009 4:59 PM
**To:** David Stallard
**Cc:** Jim Haught; Ted Herman; Kari Gibb; David Sarles; DL_KBR LOGCAP HQ Transition Team
**Subject:** FW: First Draft-AFG Planning

Sir,

Here is the information you requested on Afghanistan:

- The ppt. (Annex A) is a map of Afghanistan with the dividing line showing north and south. North is to the right of the line and south is to the left
- The pdf. (Inventory adjustment) is the materials inventory by hub with dollar amounts and number lines
- The first xls. is the personnel numbers broken out by hub/north-south
- The second xls is the property items by hub with dollar amounts and number lines

Should you need any other information please let me know.

Floyd

Floyd Shelton
Manager - Business Planning
KBR, Inc.
F1 ID# 43382
APO, AE 09344
Office: 713-445-5384

---

**From:** Thomas Sellars
**Sent:** Monday, May 04, 2009 9:00 AM
**To:** Floyd Shelton; DL_KBR LOGCAP HQ Transition Team
**Cc:** William Green; Jim Luchsinger
**Subject:** RE: First Draft-AFG Planning

Floyd,

Please see attached, let me know if there is any other info required.

Regards,

Thom Sellars
DPM- Operations
Afghanistan/ Republic of Georgia
KBR, Inc.
Bagram Air Field
APO AE 09354
281-669-2547

**From:** Floyd Shelton
**Sent:** Sunday, May 03, 2009 7:19 PM
**To:** Thomas Sellars; Jim Luchsinger
**Cc:** Franco Livigni; William Green; Frank Garza
**Subject:** RE: First Draft-AFG Planning

Thanks Thom.

Floyd

Floyd Shelton
Manager - Business Planning
KBR, Inc.
F1 ID# 43382
APO, AE 09344
Office: 713-445-5384

**From:** Thomas Sellars
**Sent:** Sunday, May 03, 2009 5:13 PM
**To:** Floyd Shelton; Jim Luchsinger
**Cc:** Franco Livigni; William Green; Frank Garza
**Subject:** RE: First Draft-AFG Planning

Floyd,

Working it now, have it to you tonight or in the morning..

Regards,

Thom Sellars
DPM- Operations
Afghanistan/ Republic of Georgia
KBR, Inc.
Bagram Air Field
APO AE 09354
281-669-2547

**From:** Floyd Shelton
**Sent:** Sunday, May 03, 2009 5:43 PM
**To:** Jim Luchsinger
**Cc:** Franco Livigni; William Green; Frank Garza; Thomas Sellars
**Subject:** RE: First Draft-AFG Planning

Jim,

I haven't received anything from the staff to this point.

Thanks,

Floyd

Floyd Shelton
Manager - Business Planning
KBR, Inc.
F1 ID# 43382
APO, AE 09344
Office: 713-445-5384

---

**From:** Jim Luchsinger
**Sent:** Friday, May 01, 2009 4:57 PM
**To:** Floyd Shelton
**Cc:** Franco Livigni; William Green; Frank Garza; Thomas Sellars
**Subject:** RE: First Draft-AFG Planning

Thanks Floyd the staff members will answer David's question

Jim Luchsinger
Deputy Principal Program Manager
Central Asia
KBR, Inc
APO AE 09354
Office Phone:  281-669-2558
DSN:  431-3055
Cell: +971-502-402 583
Jim.Luchsinger@KBR.com

---

**From:** Floyd Shelton
**Sent:** Friday, May 01, 2009 3:57 PM
**To:** Jim Luchsinger
**Cc:** Mark Tenley; DL_KBR LOGCAP HQ Transition Team
**Subject:** FW: First Draft-AFG Planning

Hi Jim,

After my briefing to David Stallard today he had some questions that I need you and your staff to provide. Please send answers directly to me at the DL mail box on the Cc line:

Break down sites (to include Base Camps, Outlying Logistics Bases, and FOBs) by the projected LCIV North and South AORs and current Task Order.

- Number of employees on each site
- Number of property items and estimated cost on each site
- Number of material lines and estimated cost on each site

I also gave him a copy of the attached out briefing. The items in red are items I told him that I did not mention in the out brief with you.

Thank you in advance for the information and if you have any questions please don't hesitate to contact me and my staff.

Thank you and your team again for your hospitality; I look forward to visiting again soon,

Floyd

Floyd Shelton
Manager - Business Planning
KBR, Inc.
F1 ID# 43382
APO, AE 09344
Office: 713-445-5384

4:11-cv-04022-MMM-JEH    # 326-1    Filed: 10/31/22    Page 103 of 144
4:11-cv-04022-MMM-JEH    # 1-28    Page 6 of 10
Page 1 of 5

| From: | Lynellen Sullivan |
|---|---|
| Sent: | Wednesday, May 06, 2009 4:11 AM |
| To: | Charles Weaver |
| Cc: | Geoffrey Howard |
| Subject: | Report required |

**Attachments:** Inventory adjustment report May-1-09.pdf

Chuck and Geoffrey,
I sent this earlier...You never responded.  Can we use yesterday's data or even day before yesterday's data to create this report?

---

**From:** Jim Haught
**Sent:** Wednesday, May 06, 2009 2:07 PM
**To:** Lynellen Sullivan
**Subject:** FW: First Draft-AFG Planning

I don't need a report just like the attachment.  The report should show total numbers and dollars, not usage or underutilization.  It will be for Transition Information in AFG.

Jim

---

**From:** Tracy Townsend
**Sent:** Wednesday, May 06, 2009 8:44 AM
**To:** Lynellen Sullivan
**Cc:** Jim Haught
**Subject:** FW: First Draft-AFG Planning

Lyn,

Could you provide a report like the one listed in the attachment named "Inventory Adjustment Report"? We need the number of STK, NS, and SP lines and their dollar amounts, but we are not sure if they are accurate or current.  This would be for all of AFGH.

We need the following:

Total lines of inventory for:  STK, NS, and SP
Total dollar amount of inventory for STK, NS, and SP

This is needed by end of business today.

Tracy Townsend
Deputy Theatre PSM Manager – Supply
KBR, Inc.
F-1 ID# 43382
APO AE 09344
(281) 669-5629

---

**From:** Jim Haught

**Sent:** Monday, 04 May, 2009 7:20 PM
**To:** Darlene Roberson; Tracy Townsend; John Vujic
**Subject:** FW: First Draft-AFG Planning

Darlene: I need you to verify the numbers and dollars from AFG-line items with our April EOM.

Tracy/John: Need you to validate the material numbers with our records. I don't think we should be showing underutilized on anything that can be seen by USG.

Jim

---

**From:** Floyd Shelton
**Sent:** Monday, May 04, 2009 4:59 PM
**To:** David Stallard
**Cc:** Jim Haught; Ted Herman; Kari Gibb; David Sarles; DL_KBR LOGCAP HQ Transition Team
**Subject:** FW: First Draft-AFG Planning

Sir,

Here is the information you requested on Afghanistan:

- The ppt. (Annex A) is a map of Afghanistan with the dividing line showing north and south. North is to the right of the line and south is to the left
- The pdf. (Inventory adjustment) is the materials inventory by hub with dollar amounts and number lines
- The first xls. is the personnel numbers broken out by hub/north-south
- The second xls is the property items by hub with dollar amounts and number lines

Should you need any other information please let me know.

Floyd

Floyd Shelton
Manager - Business Planning
KBR, Inc.
F1 ID# 43382
APO, AE 09344
Office: 713-445-5384

---

**From:** Thomas Sellars
**Sent:** Monday, May 04, 2009 9:00 AM
**To:** Floyd Shelton; DL_KBR LOGCAP HQ Transition Team
**Cc:** William Green; Jim Luchsinger
**Subject:** RE: First Draft-AFG Planning

Floyd,

Please see attached, let me know if there is any other info required.

Regards,

Thom Sellars
DPM- Operations
Afghanistan/ Republic of Georgia
KBR, Inc.
Bagram Air Field

APO AE 09354
281-669-2547

**From:** Floyd Shelton
**Sent:** Sunday, May 03, 2009 7:19 PM
**To:** Thomas Sellars; Jim Luchsinger
**Cc:** Franco Livigni; William Green; Frank Garza
**Subject:** RE: First Draft-AFG Planning

Thanks Thom,

Floyd

Floyd Shelton
Manager - Business Planning
KBR, Inc.
F1 ID# 43382
APO, AE 09344
Office: 713-445-5384

---

**From:** Thomas Sellars
**Sent:** Sunday, May 03, 2009 5:13 PM
**To:** Floyd Shelton; Jim Luchsinger
**Cc:** Franco Livigni; William Green; Frank Garza
**Subject:** RE: First Draft-AFG Planning

Floyd,

Working it now, have it to you tonight or in the morning..

Regards,

Thom Sellars
DPM- Operations
Afghanistan/ Republic of Georgia
KBR, Inc.
Bagram Air Field
APO AE 09354
281-669-2547

---

**From:** Floyd Shelton
**Sent:** Sunday, May 03, 2009 5:43 PM
**To:** Jim Luchsinger
**Cc:** Franco Livigni; William Green; Frank Garza; Thomas Sellars
**Subject:** RE: First Draft-AFG Planning

Jim,

I haven't received anything from the staff to this point.

Thanks,

Floyd

Floyd Shelton
Manager - Business Planning

KBR, Inc.
F1 ID# 43382
APO, AE 09344
Office: 713-445-5384

---

**From:** Jim Luchsinger
**Sent:** Friday, May 01, 2009 4:57 PM
**To:** Floyd Shelton
**Cc:** Franco Livigni; William Green; Frank Garza; Thomas Sellars
**Subject:** RE: First Draft-AFG Planning

Thanks Floyd the staff members will answer David's question

Jim Luchsinger
Deputy Principal Program Manager
Central Asia
KBR, Inc
APO AE 09354
Office Phone:  281-669-2558
DSN:  431-3055
Cell: +971-502-402 583
Jim.Luchsinger@KBR.com

---

**From:** Floyd Shelton
**Sent:** Friday, May 01, 2009 3:57 PM
**To:** Jim Luchsinger
**Cc:** Mark Tenley; DL_KBR LOGCAP HQ Transition Team
**Subject:** FW: First Draft-AFG Planning

Hi Jim,

After my briefing to David Stallard today he had some questions that I need you and your staff to provide. Please send answers directly to me at the DL mail box on the Cc line:

Break down sites (to include Base Camps, Outlying Logistics Bases, and FOBs) by the projected LCIV North and South AORs and current Task Order.

-   Number of employees on each site
-   Number of property items and estimated cost on each site
-   Number of material lines and estimated cost on each site

I also gave him a copy of the attached out briefing. The items in red are items I told him that I did not mention in the out brief with you.

Thank you in advance for the information and if you have any questions please don't hesitate to contact me and my staff.

Thank you and your team again for your hospitality; I look forward to visiting again soon,

Floyd

Floyd Shelton

Manager - Business Planning
KBR, Inc.
F1 ID# 43382
APO, AE 09344
Office: 713-445-5384

| | Totals and Averages | Bagram | Kabul | CJOA | Jalabad | Kandahar | Salerno | Sharana |
|---|---|---|---|---|---|---|---|---|
| Total$$ of warehouse inventory | $ 116,665,660 | $ 37,337,898 | $ 25,840,638 | $ 5,326,855 | $ 15,709,288 | $ 8,485,590 | $ 9,680,992 | $ 14,484,401 |
| STK | $ 85,445,661 | $ 30,143,581 | $ 20,536,573 | $ 3,391,441 | $ 9,560,744 | $ 4,104,371 | $ 6,782,908 | $ 10,926,242 |
| NS | $ 24,574,087 | $ 6,304,698 | $ 4,644,763 | $ 1,729,384 | $ 6,146,583 | $ 2,484,060 | $ 2,104,336 | $ 1,160,263 |
| SP | $ 6,645,713 | $ 889,619 | $ 459,300 | $ 206,030 | $ 1,961 | $ 1,897,159 | $ 793,748 | $ 2,397,896 |
| | | | | | | | | |
| Percentage of Non Stock Value | 21% | 17% | 18% | 32% | 39% | 29% | 22% | 8% |
| | | | | | | | | |
| Total Lines of inventory | 99380 | 30384 | 20406 | 7986 | 8492 | 10897 | 11100 | 10115 |
| STK | 70633 | 23157 | 17196 | 5342 | 4161 | 5365 | 7956 | 7456 |
| NS | 22935 | 6665 | 2995 | 2392 | 4329 | 3010 | 2548 | 996 |
| SP | 5812 | 562 | 215 | 252 | 2 | 2522 | 596 | 1663 |
| % of STK | 71% | 76% | 84% | 67% | 49% | 49% | 72% | 74% |
| | | | | | | | | |
| Number of lines issued | 37757 | 9881 | 8403 | 3550 | 3684 | 4014 | 4425 | 3800 |
| STK | 30077 | 9045 | 6874 | 2572 | 2576 | 2590 | 3501 | 2919 |
| NS | 6268 | 635 | 1359 | 913 | 1108 | 1221 | 775 | 257 |
| SP | 1412 | 201 | 170 | 65 | 0 | 203 | 149 | 624 |
| Non stock utilization | 17% | 6% | 16% | 26% | 30% | 30% | 18% | 7% |
| | | | | | | | | |
| Lines with No Consumption | 59339 | 20496 | 11959 | 4436 | 4641 | 6702 | 6675 | 4430 |
| STK | 38791 | 14110 | 10298 | 2770 | 1517 | 2737 | 4455 | 2904 |
| NS | 16237 | 6025 | 1636 | 1479 | 3123 | 1663 | 1773 | 538 |
| SP | 4311 | 361 | 25 | 187 | 1 | 2302 | 447 | 988 |
| under utilization % | 60% | 67% | 59% | 56% | 55% | 62% | 60% | 44% |

EX 24

# EXHIBIT 9

From: Bill Walter
Sent: Wed Jun 18 10:39:45 2008
To: Ty Hippert; Todd Bishop
Cc: Mike Mayo; Sharon Steele
Subject: RE: PCSA by GPA
Importance: Normal

I think that you, Todd, Sharon and I should talk first to discuss exactly what we would say to Jerry and Maria – As I said in my e-mail, I think there is a bridge that we can build to help Maria, Jerry and KBR – we just need to make sure that we are all on the same page.

Bill Walter
Senior Vice President
KBR | Government & Infrastructure
2451 Crystal Drive
Arlington, Virginia 22202

bill.walter@kbr.com

Phone: (703) 526-7763
Cell: (703) 627-1007

---

**From:** Ty Hippert
**Sent:** Wednesday, June 18, 2008 6:34 AM
**To:** Bill Walter; Todd Bishop
**Cc:** Mike Mayo; Sharon Steele
**Subject:** RE: PCSA by GPA

Bill,

I'm not providing the Internal audit and I explained that to DCMA, all they want is the corrective action plans for the sites that we visited. If we provide them it's possible that DCMA will not have to go review the sites themselves. It also shows that we are being proactive and chances are can justify a passing review, otherwise I think we will get an unsat property system. With over $4 Billion in property on LOGCAP a disapproved property system will have a serious financial impact on KBR. Maria wants the actual Audit's that we perform, I told her we can not provide them. My guess is that the USG will mod the contract to add the new property clause 52.245-1 in the near future. As you know under that new clause we have no choice but to release internal property system audits. Since acquisition is part of the Property review I think that they will also want procurement files, but that won't be until after a modification to the contract. My recommendation is for Todd, Sharon, you and I speak with Jerry and Maria and see where this is going.

Thanks,

Ty

Ty Hippert
Director, Supply Management
KBR Government and Infrastructure
4100 Clinton Drive, 03/598
Houston, TX 77020
Office: 713-753-3213

KBR-HOW-6616463

EXHIBIT

279

Cell:  281-630-8515
Fax:    713-753-3045
Ty.Hippert@KBR.COM

---

**From:** Bill Walter
**Sent:** Wednesday, June 18, 2008 4:59 AM
**To:** Ty Hippert; Todd Bishop
**Cc:** Mike Mayo
**Subject:** RE: PCSA by GPA

Ty –

Can you and Todd get together and he can show you the draft of a policy that we have drafted.  I expect that the DCAA will insist on changes to the draft but, I believe that we can provide Executive Summaries of the information contained in the reports.

The challenge will be that if we provide these reports or CAPs for each one, then the Procurement Compliance reports and internal audit reports are not far behind.  I am sure that we can find the appropriate bridge - - -

Ty and Todd, if you want, please schedule a call to discuss.


Bill Walter
Senior Vice President
KBR | Government & Infrastructure
2451 Crystal Drive
Arlington, Virginia 22202

*bill.walter@kbr.com*

Phone: (703) 526-7763
Cell: (703) 627-1007

---

**From:** Mike Mayo
**Sent:** Wednesday, June 18, 2008 5:09 AM
**To:** Ty Hippert
**Subject:** FW: PCSA by GPA

Ty,
Jim H. sent this to me.  We don't have a problem releasing these, but before they go to the USG I would suggest you check with Government Compliance.  If you already have then I apologize for interfering.

We approach the SMART reports the same as the Procurement Compliance reports and corrective action plans.  Those are not released from the Project tot eh USG.

Mike
281-669-5600

---

**From:** Ty Hippert
**Sent:** Tuesday, June 17, 2008 6:45 PM

**To:** Jim Haught
**Cc:** Michael Leonard; Karl Murray; Jim King
**Subject:** RE: PCSA by GPA

Jim,

The meeting after the GPIC with Teresa and Maria was very positive, she indicated that she recognizes KBR efforts to fix the property control issues and wants us to pass the audits. Evidently she is getting heat from her boss to give an unsat across the board, but she is not willing to do that at this point. She stated that this will the third review in some cases and it is really imperative that we pass them. Our approval status will rest with these reviews. She also indicated that if she had the corrective action results and a mile stone for the corrective actions that she would give us credit for self reviews. I explained that we can not release any internal reviews at this point, but I see no harm in releasing corrective action reports.

Thanks,

Ty

Ty Hippert
Director, Supply Management
KBR Government and Infrastructure
4100 Clinton Drive, 03/598
Houston, TX 77020
Office: 713-753-3213
Cell: 281-630-8515
Fax:   713-753-3045
Ty.Hippert@KBR.COM

---

**From:** Jim King
**Sent:** Tuesday, June 17, 2008 10:33 AM
**To:** Jim Haught; Ty Hippert
**Cc:** Reginald Delasbour; Rickey MacKey; Leroy Hill; Michael Leonard; Karl Murray; Rickie McNeal; Randall Ross
**Subject:** PCSA by GPA
**Importance:** High

Jim,
Just got out of a meeting with Maria, Ty, and Teresa, I need copies of all the site(s) corrective actions/milestones of all the reviews that have been conducted by the SMART team. The Government is asking for these and we agree to provide them but we will not provide a copy of the actual Review/checklist. Also Teresa (GPA) told us that they will conduct a PCSA starting July 26, 2008, at the following sites;

Afghanistan

 Salerno & Bagram

Iraq

B6,C5,C7, F2,

B6 & C7 will be the key sites where they will review the following functional areas; Acquisition, receiving, consumption, storage, records, physical inventory

Jim, as you know it is extremely urgent that we get to these sites ASAP before this audit and ensure that they are ready for this PCSA, if we get an unsatisfactory rating they will disapprove our Property system..... I have one team heading to B6 already, I need to point my other teams to the other sites also, let me know what more you need from our office in Houston and we will do all that we can to get these sites ready. Also let me know ASAP if you will plan to send out any of your folks to these sites so we don't run over each other.

Regards,

Jim...

Jim King
Sr. Manager, Supply Management Assistance & Review Team (SMART)
KBR Government & Infrastructure
4100 Clinton Dr.
Houston Tx. 77020
Office: 713-753-3763
Cell: (832) 729-8153
FAX: (713) 753-3045



# EXHIBIT 10

Page 1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
2                     ROCK ISLAND DIVISION
3    UNITED STATES OF AMERICA, )
     ex rel. GEOFFREY HOWARD    )
4    and ZELLA HEMPHILL         )
                                )
5    vs.                        ) NO. 4:11-cv-04022-MMM-JEH
                                )
6    KBR, INC. and KELLOGG      )
     BROWN AND ROOT SERVICES,   )
7    INC.                       )
8
9                 ORAL VIDEOTAPED DEPOSITION
10                        GUY LABOA
11                    February 19, 2020
12
13        ORAL VIDEOTAPED DEPOSITION OF GUY LABOA,
14    produced as a witness at the instance of the
15    Plaintiff and duly sworn, was taken in the
16    above-styled and numbered cause on the 19th day of
17    February, 2020, from 10:30 a.m. to 3:14 p.m., before
18    Shauna Foreman, Certified Shorthand Reporter in and
19    for the State of Texas, reported by computerized
20    stenotype machine at the offices of Arnold & Porter,
21    700 Louisiana, Suite 4000, Houston, Texas, pursuant
22    to the Federal Rules of Civil Procedure and the
23    provisions stated on the record or attached hereto.
24
25

```
                                              Page 83
 1   remember a discussion.  And there may have been a
 2   discussion, but I don't remember it.
 3        Q.    Did you ask him for the data to support --
 4        A.    Sir, I don't remember that.  I don't
 5   remember that.
 6        Q.    Did you share Mr. Kaye's March 5th, 2010,
 7   e-mail with anybody from the military?
 8              MS. LOLLAR:  Objection to form.
 9        A.    I don't remember.
10        Q.    (BY MR. CHIZEWER)  Do you remember
11   discussing the content of Mr. Kaye's March 5th, 2010,
12   e-mail with anybody from the military?
13        A.    I do not remember.
14              MR. CHIZEWER:  Let's go off the record
15   just for two minutes.  I have to find something.
16              VIDEOGRAPHER:  Now going off the
17   record.  The time is approximately 2:14.
18         (Recess from 2:14 p.m. to 2:15 p.m.)
19              VIDEOGRAPHER:  Back on the record.
20   The time is approximately 2:15.
21        Q.    (BY MR. CHIZEWER)  Mr. LaBoa, you've been
22   handed what's been previously marked as Deposition
23   Exhibit 172.
24        A.    Yeah.
25        Q.    It's an e-mail chain ending with an e-mail
```

```
                                              Page 89
 1    I'm not interested in any legal advice that you
 2    received.
 3                 I just wanted to know to the best of
 4    your recollection who informed you of the
 5    circumstances --
 6        A.   I don't know that.  I mean, at the time, I
 7    did.  I don't know that.
 8        Q.   Okay.  You -- you signed a letter of
 9    reprimand against Ms. Smith because she had ordered
10    new material for purchase that was not needed,
11    correct?
12        A.   I don't remember the details of this.
13    However, our procedures provides enough information
14    to me to know that this is an appropriate action.
15        Q.   So I wasn't trying to ask you to opine
16    whether your action was appropriate or not.  I just
17    wanted to understand the basis for the reprimand.
18                 And so, my question was:  This
19    reprimand that you signed for Ms. Smith in April of
20    2010 was because she had ordered material to be
21    purchased that was, in fact, not needed, correct?
22        A.   That is my understanding.
23        Q.   And the value of those unneeded materials
24    were in the range of a million dollars or more,
25    right?
```

Page 90

1        A.    That was what was reported.

2        Q.    Did you then report this circumstance to

3   anyone in the United States government?

4        A.    To my knowledge, I did not.  Normally these

5   kind of situations, certainly a COBC violation, are

6   not discussed with the government.  That's internal

7   stuff to KBR.

8        Q.    You understood that ordering of excess

9   material was a major breach of the process, correct?

10             MS. LOLLAR:  Objection to form.

11       A.    The procedures which are outlined in the

12  document you showed me earlier says that, okay?  And

13  so, the appropriate investigation by the appropriate

14  individuals and COBC investigations were very

15  thorough, out of my hands, and then I had the

16  obligation of taking the appropriate action.  So I'm

17  confident in what was reported to me of officials

18  that do that for the company.

19       Q.    (BY MR. CHIZEWER)  How many letters of

20  reprimand like this one did you issue for ordering of

21  unnecessary material?

22       A.    I have no idea.

23       Q.    Was it a fairly common occurrence?

24       A.    I don't remember it being so.

25       Q.    Have you ever seen a computation of the

Page 94

1         A.    I'm sure I was at some point in time, but

2     the experts were there to explain it and how -- if

3     there was a problem, how we were going to solve it.

4     Once again, this is an area of expertise of Mr. Lust.

5         Q.    Did you personally discuss any issues with

6     TRECs with anyone from the United States government?

7         A.    I don't know, and I don't remember.

8         Q.    You don't remember --

9         A.    I don't remember, yeah.  I don't remember.

10        Q.    You don't remember discussing any issues

11    with TRECs with anyone from the United States

12    government, correct?

13        A.    I do not remember, yes.

14        Q.    You didn't direct anyone else within your

15    organization to discuss TREC issues with anyone from

16    the United States government, correct?

17              MS. LOLLAR:  Objection to form.

18        A.    Not to my knowledge.

19        Q.  (BY MR. CHIZEWER)  When did you first learn

20    about this case that you're here to testify about?

21        A.    Three weeks ago about.

22        Q.    Prior to three weeks ago you didn't even

23    know this case existed; is that correct?

24        A.    That's correct.

25        Q.    And how did you learn of its existence?

Page 110

```
 1   COUNTY OF HARRIS   )
 2   STATE OF TEXAS     )
 3         I hereby certify that the witness was notified
 4   on _____ that the witness has 30 days (or
 5   _____ days, per agreement of counsel) after being
 6   notified by the officer that the transcript is available
 7   for review by the witness and if there are changes in
 8   the form or substance to be made, then the witness shall
 9   sign a statement reciting such changes and the reasons
10   given by the witness for making them;
11         That the witness' signature was/was not
12   returned as of _____, 2020.
13         Subscribed and sworn to on this the 20th
14   day of February, 2020.
15
16
17
                           Shauna Foreman
18                         Shauna Foreman, CSR
                           Texas CSR 3786
19                         Expiration:  10/31/2021
                           Veritext Legal Solutions
20                         300 Throckmorton Street
                           Suite 1600
21                         Fort Worth, Texas  76102
                           Tel. (817)336-3042
22                         Firm No. 571
23
24
25
```

# EXHIBIT 11

| | |
|---|---|
| **From:** | Frances Smith |
| **Sent:** | Tuesday, May 4, 2010 7:42 AM |
| **To:** | Jeff Rock |
| **Cc:** | Bradley Bryant; Elias Faris; Victoria Smith; Benjamin Moulding |
| **Subject:** | Letter of Reprimand from Guy Laboa |
| **Attachments:** | Reprimand.pdf |

Dear Mr. Rock,

Attached you will find a copy of my letter of reprimand along with a copy of my rebuttal to the reprimand. I have also included some proof as to what was given to the investigators as well as some insight as to what we were experiencing. I am hoping for full resolution in this matter so that I can move forward in my career with KBR and continue to provide the service I was contracted to do. I thank you kindly for your attention and oversight in this matter.

Respectfully,

Frances Smith
Warehouse Manager
KBR Inc.
C5 Taji Unit 6012
APO AE 09378
713-970-3639 (rings in Iraq)
Email: frances.smith@kbr.com

1



EXHIBIT
196



OFFICE OF THE PRINCIPAL PROGRAM MANAGER
GOVERNMENT AND INFRASTRUCTURE • LOGCAPIII IRAQ/GOA/HTTRS/HQCCI
CAMP VICTORY / IRAQ • APO AE 09342

27 April 2010

Frances Smith, 451810
Warehouse Manager
KBR / C5, Camp Cooke, Taji
APO AE 09378

SUBJECT: Letter of Reprimand

As a result of a recent Code of Business Conduct investigation, it was disclosed that you were writing requisitions for materials that were not needed and you failed to report the excess ordering of materials to the Ethics Hotline, Project Manager, or Senior Leadership.

All employees, and especially managers, are expected to adhere to the Code of Business Conduct and I expect each employee to be aware of their duties and that when an excess of materials are being ordered which are not necessary to be on hand or are already sufficiently stocked, that you immediately notify the appropriate authorities to assure that fraud, waste and abuse is not being committed. In this particular case, an excess of one million dollars had been ordered in excess supplies and materials. As manager, you should have been aware and questioned the ordering of these supplies.

You are hereby reprimanded for your actions which were displayed and are expected to adhere to a higher standard in the future. You shall receive five days suspension without pay to run consecutively within the same week of the same month. If this violation were to occur again, more stringent action will be taken.

GUY LABOA
Principal Program Manger
LOGCAP III HQ (ME/CA)

KELLOGG BROWN & ROOT INFORMATION - FOR OFFICIAL USE ONLY (FOUO)

NOTE: This document contains information which may be withheld from the public release or disclosure which cause a foreseeable harm to an interest protected by one or more provisions of the Freedom of Information Act 5 USC Section 552. Furthermore, it is recommended that any Government entity reviewing this information join in consultation with DoD 5400.7-R, before providing this information or as being for official use only (FOUO), and more information.

02 May 2010

Frances Smith 451810
Warehouse Manager
KBR/C5, Camp Cooke, Taji
APO AE 09378

SUBJECT: Response to Letter of Reprimand

Mr. Jeff Rock

I am writing this email in response to a reprimand being administered to me erroneously with the facts stated in the reprimand letter and signed off by Guy Laboa. I am contacting you in an attempt to follow my chain of command.

According to the letter I received I am to be given 5 days off with out pay for not reporting a COBC violation and for writing requisitions that was not needed.
The letter of reprimand also states that this is the results of a recent code of business conduct investigation. Well this incident happened almost a year ago.

First I would like to state some facts in the incidents that occurred and then I have some question for SLT and KBR as a company.

At the time in question I was not a manager nor was I in a Leadership position to make any decisions that would affect the requisition process. I was an MCS at the time.

I was also TDY to assist another site JMMT at HQ's request because of my work ethics and knowledge of Materials process and procedures.

Prior to my leaving I was made aware of what is now considered "the million dollar mistake." I was also aware that the chain of command was followed however that chain of command was compromised because most of that chain was directly involved in the mistake and attempted cover up.
The person that discovered the mistake was trained directly by me and was always taught to walk the warehouse before any requisitions are processed to ensure the material is not on the shelves or captured under the wrong MRN's. He was also taught to research the system by description as well as MRN, again for the same reason.

From my understanding and again I want to reiterate I was told of the events and later provided the proof. This individual (Mr. Willie Boyd) was instructed by the Materials Manager at the time (Ronald Seckman) to order everything on the ASL and do not waste time checking the warehouse for stock.

As this person continued with the directive, he questioned the data given to him to order the material and brought it to the attention of his immediate supervisor Material Control Supervisor (Trina Hays) who brought it to (Rhonda Gauger) the other Material Control

KBR-HOW-8122478

Supervisor. They both brought it to the attention of the DPMS ( Julia Hearn) who was the person directly responsible for Ronald Seckman the Materials Manager and Randy Maduano the Warehouse Manager.

Attached you will find a copy of one of many requisitions and please pay close attention, because on this particular requisition there were motorcycle parts order which by the way are still at the warehouse because they are specialty parts and can not be returned.

Again from my understanding when the findings were presented to Ms. Hearn her reaction was oh my goodness I signed off on those req's. (Please see same attached req's)

When the two supervisors realized that nothing was going to be done to stop the mistake (again this is what I was told) they made a phone call to the HQ's theater PSM and reported the incident. It was told to them they would give Ms. Hearn a few days to correct the mistake and reprimand the individual responsible. (the Materials Manager).

Please be reminded during this time I was an MCS currently TDY at JMMT and I started getting phone calls and emails from the Material Control Supervisor that reported the misconduct (Trina Hays) saying she is fearful of retaliation behind the reporting because nothing was done and their attitude had changed towards her because she felt Rhonda informed Julia and Ronald about the reported incident.

All of this information was given to the investigator to include the documentation to support the facts. Yet at this time the people that has done the right thing by reporting the incident through their chain of command and supplying the documentation to the investigator is being penalized.

I am attaching a few of the many emails I received to give you an idea of the atmosphere at the time and the attempted cover up.

My first question is how is it assumed that any one of us did not report the violation to the Ethics Hotline?. Especially when the hot line allows you to remain anonymous.

If the incident was not reported then how did the investigation get started?

Also if we are to encourage our personnel to report misconduct, fraud, waste and abuse what would you consider a reasonable amount of time for the investigation and action to be taken?. Also how many people does it take to report the incident with out it looking like a witch hunt by disgruntled employees?

I agree with the statement in the letter of reprimand saying ALL employees, and especially Mangers are expected to adhere to the Code of Business Conduct.

KBR-HOW-8122479

However I do not believe any of the managers involved contacted anyone in regards to the incident, and again I want to make it clear at the time I was a material control specialist and did everything that was expected of me as a KBR employee fully aware of what is considered a COBC violation.

I am respectfully requesting the investigation be revisited and my reprimand be withdrawn.

Respectfully,

*Frances Smith*

Frances Smith
Warehouse Manager
LOGCAP III C5 Taji

KBR-HOW-8122480

...

## Damien Doolittle

**From:** Frances Smith
**Sent:** Tuesday, September 15, 2009 2:55 PM
**To:** Damien Doolittle
**Subject:** FW:

---

**From:** Trina Hays
**Sent:** Thursday, June 18, 2009 9:46 AM
**To:** Frances Smith
**Subject:** RE:

Don't do anything with it till I am gone –

It will only get worse in the next couple of weeks

Thanks,

Trina Hays
SMCS
K.B.R Government & Infrastructure
C-5 Taji Unit # 6012
APO AE 09378
713-445-4840
trina.hays@kbr.com

---

**From:** Frances Smith
**Sent:** Thursday, June 18, 2009 9:41 AM
**To:** Trina Hays
**Subject:** RE:

Don't worry I promise you it will get to the right people. This is ridiculous.

---

**From:** Trina Hays
**Sent:** Thursday, June 18, 2009 9:26 AM
**To:** Frances Smith
**Subject:**

I am sending you an e-mail with attachments and documentation as to info I am e-mailing to you in next e-mail.

I am doing this as I know once I leave they will trash my name at HQ saying I didn't know what I was doing. The proof is in the pudding – I want you to have the info that I am sending so when the garbage starts flying you will have the proof.

I am tired of seeing the abuse and waste going on here – I can no longer be a part of this – I am planning on my last day being the end of the month but I am not saying anything till the week before. Julia will tell HQ that I didn't know anything but you will have some proof. She keeps me out of the loop as much as possible so I can't bring up what is happening. Anyone that knows anything gets sent away. I did mention to her about the ordering but she was not concerned in the least as she has total confidence in Rhonda.

Thanks,

5/2/2010

KBR-HOW-8122482

**1000041962**                                                    Thu, June 18, 2009 10:00:49 AM

From: Trina Hays <Trina.Hays@kbr.co .     View Contact
To: Frances Smith <Frances.Smith@kbr.com>; Damien Doolittle <Damien.Doolittle@kbr.com>
Cc: francessmith116@yahoo.com; trinalhays@yahoo.com
Document.pdf (883KB)

I haven't given a notice yet- no where as of today. The ordering at TMP is a mess –I have gone through a
couple of orders Willie has placed – Rhonda gave him a spreadsheet to place orders from, I called Ernie and
ask him what was up with the orders that were being placed. He said they are placing everything on reserve
so DMC won't ask for it CL – these MRN should be fixed in the system not just a bandage via reserve. Looking
at ROP,SS and issues for the year it doesn't make any sense the orders that are being placed. They should fix
them at time of order if in fact they are truly necessary. There are enough people at TMP these orders should
be checked and double checked but orders are being dropped blindly – no thought process… Some MRN,
there are no issues in the last year and they are ordering material and we have stock available. Numerous
items are way above reorder points and they are ordering more "i.e." 1000041962 current balance 217 ROP
96 SS 48 issues in the last year 48. MP278849 for 96 more – this was a commercial purchase!!!!
1000041962 is available via FSS 4330-01-437-8930, this part is also available under various MRNs. One
being, 1000043955 this is also a STK item at TMP with a balance of 48 ROP 128 SS 64 no issues in the last
year – so an order for this item will be placed also as it is below ROP. Rhonda has re-done the ASL Julia told
me last night. We should build another warehouse to stock all the unnecessary material.
This isn't Willie's fault he is just doing what he is told. These spreadsheets should be double checked for
accuracy before being hand to subordinates to order.

The above example is just one of many I have found. I have learned to not say anything as you will get
demoted, sent away or sent home.

Thanks,

Trina Hays
SMCS
K.B.R Government & Infrastructure
C-5 Taji Unit # 6012
APO AE 09378
713-445-4840
trina.hays@kbr.com

**From:** Frances Smith
**Sent:** Thursday, June 18, 2009 6:56 AM
**To:** Trina Hays
**Subject:** RE: send me your personal e-mail please

francessmith116@yahoo.com
where are you going?

**From:** Trina Hays
**Sent:** Wednesday, June 17, 2009 6:52 PM
**To:** Frances Smith
**Subject:** send me your personal e-mail please

Thanks,

Trina Hays

http://de.mg4.mail.yahoo.com/dc/launch?.gx=1&.rand=4c59bcpb1ateb&.intl=us                    5/2/2010

KBR-HOW-8122483

4:11-cv-04022-MMM-JEH    # 326-1    Filed: 10/31/22    Page 130 of 144

## Damien Doolittle

**From:** Frances Smith
**Sent:** Tuesday, September 15, 2009 2:57 PM
**To:** Damien Doolittle
**Subject:** FW:

**From:** Trina Hays
**Sent:** Thursday, June 18, 2009 9:26 AM
**To:** Frances Smith
**Subject:**

I am sending you an e-mail with attachments and documentation as to info I am e-mailing to you in next e-mail.

I am doing this as I know once I leave they will trash my name at HQ saying I didn't know what I was doing. The proof is in the pudding -- I want you to have the info that I am sending so when the garbage starts flying you will have the proof.

I am tired of seeing the abuse and waste going on here -- I can no longer be a part of this -- I am planning on my last day being the end of the month but I am not saying anything till the week before. Julia will tell HQ that I didn't know anything but you will have some proof. She keeps me out of the loop as much as possible so I can't bring up what is happening. Anyone that knows anything gets sent away. I did mention to her about the ordering but she was not concerned in the least as she has total confidence in Rhonda.

Thanks,

Trina Hays
SMCS
K.B.R Government & Infrastructure
C-5 Taji Unit # 6012
APO AE 09378
713-445-4840
trina.hays@kbr.com

5/2/2010

KBR-HOW-8122484

FW:

Thu. June 18, 2009 12:26:35 PM

From: Trina Hays <Trina.Hays@kbr.co>,     View Contact
To: Frances Smith <Frances.Smith@kbr.com>; francessmith115@yahoo.com
Cc: Damien Doolittle <Damien.Doolittle@kbr.com>; trinelhays@yahoo.com

2 Files  Download All
roshan2 tmp.xls (714KB); Copy of ASL_C5-0012_!-MAR-08_TT (2).xls (1620KB)

Francis,

Willie sent me attachment # one labeled roshan2 tmp. This is the spreadsheet Rhonda is having him order from, as you can see this is dated Feb 19.

2nd attachment is what we ordered parts from after the million dollar mistake was made. Order qty was column N with short in column O. These 2 attachments are the same thing – all of these parts are on order and are probably now just coming in..

Rhonda has given Willie the very same spreadsheet and told him to use it to order. You can see I have highlighted the first couple of exact matches – color coded on roshan2 tmp and match on ASL March 1. There has been no adjustment to current inventory balances – she is ordering from balances that were current Feb 19.

When Ron sent attachment # 2 for us to order from – I told him at that time, "we shouldn't be ordering from inventory that isn't got live and current at that point in time and he said just order from this list and don't get wrapped up in the fuel.

I don't understand why she wouldn't have use live inventory numbers to place orders – these counts are from FEB!!!!!!!! You should always reevaluate your stock mins and maxes to see if you are ordering correctly.

I can not BELIEVE what is going on !!!!!!!

Thanks,

Trina Hays
SMCS
K.B.R Government & Infrastructure
C-5 Taji Unit # 6012
APO AE 09378
713-445-4840
trina.hays@kbr.com

From: Willie Boyd Jr
Sent: Thursday, June 18, 2009 11:34 AM
To: Trina Hays
Subject:

Hey Trina,

This is the ASL list you wanted to see. Everything in orange. I was not able to find in SAP. Bugeye # showed no record.

Willie Boyd Jr.
Material Control Specialist

http://de.mg4.mail.yahoo.com/dc/launch?.gx=1&.rand=4c59bcpb1atcb&.intl=us                5/2/2010

KBR-HOW-8122485

KBR-HOW-8122486

## MATERIAL REQUISITION

| | | | | | PROJECT | REQUISITION NUMBER | | PAGE |
|---|---|---|---|---|---|---|---|---|
| | | | | | LOG CAP3 | 24423 | | Page 1 of 4 |
| PREPARED DATE | CHANGED DATE | APPROVED DATE | REQUIRED DATE | VENDOR'S CODE | LOCATION CODE | STATUS | PRIORITY | |
| 07-May-09 | 06-May-09 | | 06-Jun-09 | DRO | LC-IRQ-C6 | WAPPR | 2 | |
| PREPARED AT IT | CHANGED BY ID | PRINT DATE | WORK FLOW ID | STATUS DATE | | TOTAL COST (USD) | | |
| MAT | ROMUALD | 08-May-09 | SPU | 07-May-09 | | $ 22,800.00 | | |
| PREPARED BY NAME | CHANGED BY NAME | | FOB | SHIP VIA | INVENTORY LAB | | FOB EMAIL | |
| | | | | | N | | | |

| MIR ACCOUNT NO/COC CODE | INTENDED USE OF MATERIAL | ADDITIONAL SHIP TO INFORMATION |
|---|---|---|
| | C6 WAREHOUSE 100 VOLT/WAREHOUSE1 ELECTRICAL | Attention : 0000884  RANDY MACUENO |
| | WAREHOUSE STOCK S&L ELECTRICAL | Name : C6X  MIL-IRQ-C6 C6-Taji |
| | FOR1288443 | Address : C6-Taji |
| | | Taji Taji APO AE 09378 |

| ITEM NO. | QUANTITY | UNIT | ITEM/SERVICE DESCRIPTION/PART NUMBER | MANUFACTURER & PART NUM | PURCH/STOCK/COM | UNIT PRICE/UOM | AMOUNT/UOM | REMARK |
|---|---|---|---|---|---|---|---|---|
| 1 | 100 | RL | TAPE, ELECTRICAL | | 1000091427 | $ 10.00 | $ 1000.00 | |
| | | | | | LC-IRQ-C6-0001 | | | |
| | | | ELECTRICAL TAPE PREMIUM GRADE BLACK | | | | | |
| 2 | 100 | EA | ROD, GROUNDING | | 1000145881 | $ 88.00 | $ 8800.00 | |
| | | | | | LC-IRQ-C6-0001 | | | |
| | | | 3/4 INCH DIAMETER X 10 FOOT LENGTH GROUNDING ROD | | | | | |
| 3 | 200 | EA | FLUORESCENT FIXTURES, OUTDOOR | | 1002444567 | $ 65.00 | $ 13000.0 | |
| | | | | | LC-IRQ-C6-0001 | | | |
| | | | FLUORESCENT FIXTURES, OUTDOOR MANUFACTURER NAME: DECO MANUFACTURER PART NUM: DWH-25-CNV-EB | | | | | |

| PURCHASING GROUND | IS PROPERTY ITEM(S)  Y / N | PROCUREMENT USE | PROJECT CONTROLLER |
|---|---|---|---|
| | MAY 0 9 2009 | | PM  REQ  Y / N  BOE  Y / N |
| | | | ACO  REQ  Y / N  BOE $ |

MATERIAL CONTROL

KELLOGG BROWN & ROOT PROPRIETARY DATA

NOTE: In addition to protection under Federal Acquisition Regulation 3.104, this document contains information which may be withheld from the public because disclosure would cause a foreseeable harm to an interest protected by one or more Exemptions of the Freedom of Information Act, 5 USC Section 552. Furthermore, it is requested that any Government entity receiving this information act in accordance with DoD 5400.7-R, and consider this information as being for official use only (FOUO), and mark, handle and store this information so as to prevent unauthorized access

08-May-09 06:15

KBR-HOW-8122487

# MATERIAL REQUISITION

| | | | STEAM SITE | REQUISITION NUMBER | PAGE |
|---|---|---|---|---|---|
| | | | LOGCAP-3 | 26179 | Page 2 of 4 |

| ITEM NO. | QUANTITY | UNIT | ITEM/SERVICE DESCRIPTION / MANUFACTURER AND DESCRIPTION | MRUS/STOCK NO. | UNIT PRICE (ESTIMATED) | AMOUNT (ESTIMATED) | REMARK |
|---|---|---|---|---|---|---|---|
| 4 | 4000 | EA | FLUORESCENT LAMP, T8, 32 W, 48 IN | 1000340000 LC-IRQ-CS-0001 | $ 110.00 | $ 440000. | |
| | | | LAMP T8 HE735 FLUORESCENT 32W 36 PKG QTY 48 IN L TRIAL 3/8. 826 MANUFACTURER NAME: GENERAL ELECTRIC LIGHTING MANUFACTURER PART NBR: 26637 | | | | |
| 5 | 2000 | EA | SPRING NUT, STEEL, 3/8 IN | 1000752283 LC-IRQ-CS-0001 | $ 1.00 | $ 2000.00 | |
| | | | METAL FRAMING SPRING NUTS TYPE REGULAR SPRING NUT FOR USE WITH THOMAS AND BETTS - CHANNEL TYPE A ONLY MATERIAL: STEEL MANUFACTURER NAME: THOMAS AND BETTS MANUFACTURER PART NUM A-196-3/8 | | | | |
| 6 | 2000 | EA | 3/8-16 X 1-1/2, A193 B7 HEX BOLT | 1000550370 LC-IRQ-CS-0001 | $ 15.00 | $ 30000.0 | |
| | | | BOLTS TYPE HEX HEAD BOLTS THREAD SIZE 5/8-16 LENGTH UNDER HEAD: N/A L/M, 1-1/2 MATERIAL: ALLOY STEEL - B7 - B7 FINISH/COATING: PLAIN MANUFACTURER NAME: MADE IN USA MANUFACTURER PART NUM: 00860-2620-400 | | | | |
| 7 | 100 | EA | BREAKER, CIRCUIT, 3PH, 16A, 220V | 1000143542 LC-IRQ-CS-0001 | $ 25.00 | $ 2500.00 | |
| | | | BREAKER, CIRCUIT, 3PH, 16A, 220V MANUFACTURER NAME: MERLIN GERIN | | | | |
| 8 | 400 | EA | BREAKER, 16A, 220/380V, 1P, C TYPE | 1000143548 LC-IRQ-CS-0001 | $ 25.00 | $ 10000.0 | |
| | | | 16A, 220/380V, 1P, C TYPE BREAKER, MANUFACTURER NAME: MERLIN GERIN | | | | |
| 9 | 200 | EA | BREAKER, CIRCUIT 3/P, 20A. | 1000144022 LC-IRQ-CS-0001 | $ 25.00 | $ 5000.00 | |
| | | | 3/P, 20A CIRCUIT BREAKER, MANUFACTURER NAME: MERLIN GERIN | | | | |
| 10 | 300 | EA | BREAKER, 20A, 240V, 1P, TYPE C | 1000143472 LC-IRQ-CS-0001 | $ 25.00 | $ 7500.00 | |
| | | | BREAKER, 20A, 240V, 1P, TYPE C MANUFACTURER NAME: MERLIN GERIN | | | | |
| 11 | 50 | EA | CIRCUIT BREAKER, 50 A, 25 KA @ 485 V AC | 1000573934 LC-IRQ-CS-0001 | $ 520.00 | $ 28000.0 | |
| | | | MOLDED CASE SERIES C CIRCUIT BREAKERS DEPTH: 3-3/8 AMPERAGE INTERRUPT RATING: 25KA@480VAC WIDTH: 4-1/8 HEIGHT: 4 AMPERAGE RATING: 50 NUMBER OF POLES/WIRES: 3 WIRE MANUFACTURER NAME: CUTLER-HAMMER MANUFACTURER PART NUM: FD3050L | | | | |

08-May-09 06:15

KBR-HOW-8122488

## MATERIAL REQUISITION

| ITEM NO. | QUANTITY REQUIRED | UNIT | ITEM/SERVICE DESCRIPTION/PART NUMBER/REQUISITIONER DESCRIPTION | MATERIAL STOCK CODE | UNIT PRICE/NUM | AMOUNT/WORTH | REMARK |
|---|---|---|---|---|---|---|---|
| 12 | 1000 | M | BORE-2.50 X STROKE-24 AGRADEBLE WELDED C | 1000582207 LC-IRQ-C5-0001 | $ 200.00 | $ 200000. | Motorcycle, Rod |
| | | | HYDRAULIC CYLINDERS VELOCITY SEAL MOUNTINGS BORE SIZE: 2.5 IN, STROKE LENGTH: 24 MOUNTINGS STYLE, CROSS TUBE TYPE: WELDED VELOMVERSAL MOUNTINGS ROD DIAMETER: 1.375 IN, MANUFACTURER NAME: PRINCE MANUFACTURER PART NUM: PMC-5424 | | | | |
| 13 | 1000 | M | ELECTRICAL CABLE, 1, GREEN, 70 SQ MM | 1001895574 LC-IRQ-C5-0001 | $ 10.00 | $ 10000.9 | |
| | | | 1C X 70MM2 CABLE, GREEN, MANUFACTURER NAME: HES KABLO, MANUFACTURER | | | | |
| 14 | 1000 | MT | ELECTRICAL CABLE, 3, 600 V, 2.5 MM | 1000050375 LC-IRQ-C5-0001 | $ 2.00 | $ 2000.00 | |
| | | | CABLE, 3C 2.5MM, JACKETED, STRANDED, 600V | | | | |
| 15 | 1000 | MT | ELECTRICAL CABLE, 3, 4 MM | 1000059400 LC-IRQ-C5-0001 | $ 2.00 | $ 2000.00 | |
| | | | CABLE, 3C, 4MM, STRANDED | | | | |
| 16 | 1000 | EA | MOUNTING STRAP, STEEL, ZINC PLATED | 1000016922 LC-IRQ-C5-0001 | $ 1.00 | $ 1000.00 | |
| | | | ONE HOLE STRAPS TYPE: PIPE OR CONDUIT SNAP STRAP PIPE SIZE: 3/4 CONDUIT TYPE: EMT NUMBER OF MOUNTING HOLES: 1 MATERIAL: STEEL FINISH/COATING: ZINC PLATED | | | | |
| 17 | 1000 | EA | CABLE LUG, 10 MM | 1001838319 LC-IRQ-C5-0001 | $ 2.00 | $ 2000.00 | |
| | | | COMPRESSION CABLE LUGS 10MM — MANUFACTURER NAME: HEX ENGLAND, MANUFACTURER PART NUM: HT10-10 | | | | |
| 18 | 200 | EA | GROUND FAULT CIRCUIT BREAKER, 4, 40 A | 1001904000 LC-IRQ-C5-0001 | $ 65.00 | $ 13000.0 | |
| | | | GFI BREAKER, 4 POLE 250/690 V, 40 AMP, MANUFACTURER NAME: ABB, MANUFACTURER PART NUM: F374 - 400/03 | | | | |
| 19 | 200 | EA | CABLE LUG, 14 MM, 240 MM | 1001872448 LC-IRQ-C5-0001 | $ 10.00 | $ 2000.00 | |
| | | | 240MM COMPRESSION CABLE LUGS, MANUFACTURER NAME: HEX ENGLAND, MANUFACTURER PART NUM: HT 240-14 | | | | |

Information or data contained on this page is subject to the restrictions contained on the cover page (or first page – depends on how the document is arranged)

06-May-09 06:15

KBR-HOW-8122489

| | MATERIAL REQUISITION | | | | S TRANSMIT | REQUISITION NUMBER | | PAGE |
|---|---|---|---|---|---|---|---|---|
| | | | | | 1000311 | XXXX | | Page # of 4 |
| ITEM NO. | QUANTITY REQUIRED | UNIT | ITEM SERVICE DESCRIPTION/PART NUMBER/GENERAL DESCRIPTION | | MANUFACTURER/PART | UNIT PRICE/BONUS | ADDED/ VALUE | REMARK |
| 20 | 50 | EA | CIRCUIT BREAKER, 230 V, 15 A, 1 | | 1001883127 LC-IRQ-CS-0001 | $ 35.00 | $ 1750.00 | |
| | | | 230 VOLT, 15 AMP, 1 POLE, BREAKER, MANUFACTURER NAME CUTLER HAMMER, MANUFACTURER PART NUMBER, 1215K | | | | | |
| 21 | 1000 | EA | CLAMP GROUND | | 1000381092 LC-IRQ-CS-0001 | $ 10.00 | $ 10000.0 | |
| | | | GROUNDING ROD CLAMP SINGLE NUT, FOR 3/8 WIRE GAUGE MAX, 3/4 04 ROD DIAMETER | | | | | |
| 22 | 500 | EA | BALLAST | | 1002444565 LC-IRQ-CS-0001 | $ 15.00 | $ 7500.00 | |
| | | | BALLAST. | | | | | |
| 23 | 200 | EA | ELECTRICAL RECEPTACLE, 220 V, DUPLEX | | 1000416704 LC-IRQ-CS-0001 | $ 35.00 | $ 7000.00 | EE |
| | | | RECEPTACLE, DUPLEX 220V, 13A. | | | | | |
| 24 | 1000 | EA | WIRE CONNECTOR RED | | 1000953283 LC-IRQ-CS-0001 | $ 20.00 | $ 20000.0 | |
| | | | CONNECTOR, CABLE, QUICK, DISCONNECT, AP, 22-16 20 PER BOX | | | | | |

**************** NOTHING FOLLOWS ****************

Information or data contained on this page is subject to the restrictions contained on the cover page for first page – depends on how the document is arranged)

09-May-09 06.15

MATERIAL REQUISITION

| | Item | Part No. | | |
|---|---|---|---|---|
| 1 | TAPE, BLACK | | $10.00 | $4,000.00 |
| 2 | GROUND ROD | | $15.00 | $6,000.00 |
| 3 | FIXTURE, OUTDOOR FLUORESCENT | | $90.00 | $13,500.00 |
| 4 | HARP, 3/4" LIFT | | $110.00 | $440,000.00 |
| 5 | Spring Nuts, 5/8 | | $25.00 | $3,000.00 |
| 6 | 15A, 3P BREAKER | | $110.00 | $70,000.00 |
| 7 | 15A, 1P BREAKER | | $15.00 | $3,000.00 |
| 8 | 20A, 1P BREAKER | | $25.00 | $16,000.00 |
| 9 | 20A, Mechanical Bushing | | $20.00 | $4,000.00 |

KBR-HOW-8122491

### MATERIAL REQUISITION CONTINUATION SHEET

| | | | DESCRIPTION | | PART NUMBER | U/PRICE | AMOUNT | | |
|---|---|---|---|---|---|---|---|---|---|
| 15 | | EA | 3/4 | | 1009983490 | $7.00 | $2,000.00 | | |
| 16 | | EA | 1" Lamp Screw - 1008310622 | | 1008310622 | $1.00 | $1,000.00 | | |
| 17 | | EA | 16mm Legs | | 1081025911 | $2.00 | $2,000.00 | | |
| 18 | | EA | 22A, RCD breakers - 1001025458 | | 1001025458 | $85.00 | $13,025.00 | | |
| 19 | | EA | 290mm Legs | | 1021672648 | $10.00 | $3,000.00 | | |
| 20 | | EA | BA, Circus Breaker - 1001025127 | | 1001025127 | $85.00 | $1,762.00 | | |
| 21 | | EA | | | 1009781005 | $10.00 | $15,000.00 | | |
| 22 | | EA | Hose Reuse | | 1007240005 | $15.00 | $7,600.00 | | |
| 23 | | EA | | | 1009140711 | $25.00 | $2,000.00 | | |
| 24 | 1000 | SO | WIRE CONNECTOR, 22-18 RED | | 1008672363 | $20.00 | $25,000.00 | | |
| 25 | | | | | | | $0.00 | | |
| | | | | | | | $0.00 | | |
| | | | | | | | $0.00 | | |

# EXHIBIT 12

Page 1

1

2    UNITED STATES DISTRICT COURT
     FOR THE CENTRAL DISTRICT OF ILLINOIS
3    Civil Action No. 4:11-cv-04022-MMM-JEH
     - - - - - - - - - - - - - - - - - - - - - x
4
     United States ex rel. Howard and Hemphill,
5
                         Plaintiff,
6
                  v.
7
     KBR Inc., et al.,
8
                         Defendant.
9    - - - - - - - - - - - - - - - - - - - - - x
10
                         January 13, 2021
11                       10:34 a.m.
12                       106 Rocketts Way
                         Henrico, Virgina
13
14        REMOTE VIDEOTAPED DEPOSITION of MARY
15   SHERIDAN, taken before Brittany Saline, a
16   Professional Shorthand Reporter and Notary Public
17   of the State of New York, pursuant to the Federal
18   Rules of Civil Procedure, Subpoena, and written
19   notice as to time and place thereof.
20
21
22
23
24
25

```
                                    Page 165

 1                     Mary Sheridan
 2    via reserve."
 3             Are you aware that people at KBR
 4    were reserving items improperly so they
 5    wouldn't be available for cross leveling?
 6         A    No.
 7         Q    Continuing on, Ms. Hays says, "Some
 8    MRN there are no issues in the last year and
 9    they are ordering material and we have stock
10    available.  Numerous items are way above
11    reorder points and they are ordering more."
12    And she goes down a little bit further and
13    she says, "We should build another warehouse
14    to stock all the unnecessary material."
15             Were you aware of these internal
16    discussions by KBR?
17         A    No.
18         Q    Had you been aware of them, is
19    there a standard procedure you would have
20    followed to address them?
21         A    Yes.  As previously stated, I would
22    have brought in, made aware PCO, PMO, the
23    customers on the ground.
24         Q    All right.
25         A    The corporate office, DCAA and
```

Page 166

1                        Mary Sheridan
2    possibly, in this case, I might even thrown
3    this over to CID.
4         Q    Criminal Investigation Division?
5         A    Yep.
6         Q    And why?
7         A    Just because I'm -- I'm curious by
8    what I read here if it -- if it shows fraud
9    or it shows improper action, so let somebody
10   else make that decision.
11        Q    Okay.  Now, let's go to
12   Exhibit 112.  It's an email string.  I am
13   going to ask you about an email on the first
14   page, page 062?
15             (Exhibit 112 previously marked for
16        identification.)
17        A    Okay.
18        Q    It's from Rich Kaye, who is the
19   Deputy Program Manager for support.  Mr. Kaye
20   in his email through John Downey, I will read
21   a portion of it.
22             "We are purchasing $5 million per
23   day when we've got $1.2 billion in excess on
24   hand.  At some point, the DCAA is going to
25   put KBR out of business if we keep doing

```
                                  Page 179
 1                    Mary Sheridan
 2              And then take a look down at the
 3    bottom of the total, do you see that number,
 4    $342,000,000.  Slightly above that.
 5              Do you see that?
 6        A    Yes.
 7        Q    So assuming that this chart and
 8    that there's been testimony that this chart
 9    indicates that there's over $340,000,000 of
10    material that has been sitting in TRECs for
11    more than 60 days.  And then going back to
12    Exhibit 116, where it says, "Personnel
13    utilizing the TRECs to conceal inventory
14    quantities from DMC for cross level."
15              My question is:  Were you aware of
16    this?
17              MS. HILL:  Objection.  Form.  Calls
18         for speculation.
19              MR. MARGOLIS:  I echo the
20         government's objections to your
21         question, Mr. Havian.
22              MR. HAVIAN:  Thank you,
23         Mr. Margolis, I'm sure the government
24         appreciates the help.
25              MS. HILL:  Ms. Sheridan, you can
```

Page 180

                        Mary Sheridan

1      answer.

2      A    No, I was not aware.

3      Q    If you had been aware that there

4  was over $340,000,000 of materials that were

5  in TRECs, they were not visible to the DMC

6  for cross leveling, is there a standard

7  process you would have followed to address

8  that situation?

9              MS. HILL:  Objection.  Form.

10        Foundation.  Again, calls for

11        speculation.

12              MR. MARGOLIS:  Again, I join in the

13        government's objections to your

14        question, Mr. Havian.

15     Q    You can answer.

16     A    Yes.  I would have had a

17  conversation with the PCO, the PMO, theater

18  personnel, DCAA, property, corporate office,

19  and this is something I -- I most likely

20  would have had a conversation with CID about.

21     Q    Okay.  Now, set this aside for the

22  moment.

23              You had earlier testified about

24  being aware of KBR's failures to cross level

Page 321

1

2                    C E R T I F I C A T I O N

3

4    STATE OF NEW YORK    )

                                : ss.:

5    COUNTY OF NEW YORK   )

6

7          I, BRITTANY SALINE, a Notary Public for and

8    within the State of New York, do hereby certify:

9          That the witness whose testimony as herein

10   set forth was duly sworn by me.

11         I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage, and that I am in no way interested in

14   the outcome of this matter.

15         IN WITNESS WHEREOF, I have hereunto set my

16   hand this 18th day of January, 2021.

17

18

19                              *Brittany Saline*

20                         BRITTANY SALINE

21

22

23

24

25